EXECUTION COPY

TRICOLOR AUTO SECURITIZATION TRUST 2025-2,
as Issuer,

TRICOLOR AUTO GRANTOR TRUST 2025-2,
as Underlying Trust,

TRICOLOR AUTO RECEIVABLES 2 LLC,
as Depositor,

TRICOLOR AUTO ACCEPTANCE, LLC,
as Seller and as Servicer,

WILMINGTON TRUST, NATIONAL ASSOCIATION,
as Indenture Trustee and Custodian,

and

VERVENT INC.,
as Backup Servicer

---

SALE AND SERVICING AGREEMENT

Dated as of June 1, 2025

---

(2025-2)
4924-3107-4870v.5

TABLE OF CONTENTS

Page

ARTICLE ONE DEFINITIONS                                                                          1

Section 1.01. Capitalized Terms; Rules of Usage.......................................................................1
Section 1.02. Calculations of Interest ......................................................................................1

ARTICLE TWO CONVEYANCE OF TRUST PROPERTY                                      2

Section 2.01. Conveyance of Trust Property ...............................................................................2
Section 2.02. Representations and Warranties of the Seller as to the Receivables ......................3
Section 2.03. Representations and Warranties of the Depositor as to the Receivables.................4
Section 2.04. Representations and Warranties as to Security Interests .........................................4
Section 2.05. Repurchase of Receivables Upon Breach ..............................................................6
Section 2.06. Custody of Receivable Files ..................................................................................6
Section 2.07. Duties of the Custodian.........................................................................................7
Section 2.08. Liability of the Custodian .....................................................................................8
Section 2.09. Limitation on Liability of the Custodian ...............................................................9
Section 2.10. Effective Period and Termination..........................................................................9
Section 2.11. Access to Certain Documentation and Information Regarding Receivables..........10

ARTICLE THREE ADMINISTRATION AND SERVICING OF THE TRUST PROPERTY   10

Section 3.01. Duties of Servicer ...............................................................................................10
Section 3.02. Delegation of Duties; Subservicers......................................................................11
Section 3.03. Collection of Receivable Payments; Modification of Receivables........................12
Section 3.04. Realization Upon Receivables .............................................................................13
Section 3.05. Maintenance of Physical Damage Insurance Policies ...........................................13
Section 3.06. Maintenance of Security Interests in Financed Vehicles.......................................13
Section 3.07. Covenants of Servicer ..........................................................................................14
Section 3.08. Purchase of Receivables Upon Breach .................................................................14
Section 3.09. Servicing Compensation; Payment of Certain Expenses by Servicer ...................14
Section 3.10. Investor Reports...................................................................................................15
Section 3.11. Annual Statement as to Compliance; Notice of Servicer Termination Events........15
Section 3.12. Annual Accountants' Report.................................................................................15
Section 3.13. Access to Certain Documentation and Information Regarding Receivables...........16
Section 3.14. Reports to the Rating Agencies............................................................................16
Section 3.15. Rights Prior to Assumption of Duties by the Backup Servicer or
                     Designation of Successor Servicer.................................................................16

ARTICLE FOUR DISTRIBUTIONS; RESERVE FUND; STATEMENTS TO
SECURITYHOLDERS                                                                            18

Section 4.01. Establishment of Accounts ..................................................................................18
Section 4.02. Reserve Fund ......................................................................................................19

i

Section 4.03. [Reserved]. ....................................................................................................21
Section 4.04. Collections ...................................................................................................21
Section 4.05. Application of Collections ............................................................................21
Section 4.06. Additional Deposits .....................................................................................21
Section 4.07. Determination Date Calculations; Application of Available Funds .......................21
Section 4.08. Statements to Securityholders.....................................................................22

ARTICLE FIVE THE DEPOSITOR                                                                   23

Section 5.01. Representations and Warranties of Depositor...............................................23
Section 5.02. Liability of Depositor; Indemnities..............................................................25
Section 5.03. Merger, Consolidation or Assumption of the Obligations of Depositor.................26
Section 5.04. Limitation on Liability of Depositor and Others ..........................................27
Section 5.05. Depositor Not to Resign...............................................................................27
Section 5.06. Depositor May Own Securities .....................................................................27
Section 5.07. Covenants of Depositor.................................................................................27

ARTICLE SIX THE SERVICER, THE CUSTODIAN AND THE BACKUP SERVICER        28

Section 6.01. Representations and Warranties of Servicer..................................................28
Section 6.02. Representations and Warranties of Custodian ..............................................29
Section 6.03. Representations and Warranties of Backup Servicer.....................................31
Section 6.04. Liability of Servicer and Backup Servicer; Indemnities................................32
Section 6.05. Merger or Consolidation of, or Assumption of the Obligations of Servicer,
    Custodian and Backup Servicer .................................................................34
Section 6.06. Limitation on Liability of Servicer and Backup Servicer.......................................35
Section 6.07. Servicer, Custodian and Backup Servicer Not to Resign; Termination of the
    Backup Servicer and Custodian .................................................................35
Section 6.08. Servicer, Custodian and Backup Servicer May Own Securities............................36

ARTICLE SEVEN SERVICER TERMINATION EVENTS                                    36

Section 7.01. Servicer Termination Events.........................................................................36
Section 7.02. Appointment of Successor Servicer..............................................................38
Section 7.03. Effect of Servicing Transfer.........................................................................40
Section 7.04. Notification to Noteholders and each Rating Agency ...................................40
Section 7.05. Waiver of Past Servicer Termination Events.................................................40

ARTICLE EIGHT TERMINATION                                                                    40

Section 8.01. Optional Purchase of All Receivables ..........................................................40
Section 8.02. Termination...................................................................................................41

ARTICLE NINE MISCELLANEOUS                                                                   41

Section 9.01. Amendment...................................................................................................41

(2025-2)
4924-3107-4870v.5

Page

Section 9.02. Protection of Title to Issuer ........................................................................43
Section 9.03. Notices ........................................................................................................44
Section 9.04. Assignment ..................................................................................................45
Section 9.05. Severability ..................................................................................................45
Section 9.06. Further Assurances.......................................................................................45
Section 9.07. No Waiver; Cumulative Remedies ..............................................................46
Section 9.08. Successors and Assigns; Third-Party Beneficiaries.....................................46
Section 9.09. Actions by Securityholders .........................................................................46
Section 9.10. Counterparts .................................................................................................46
Section 9.11. Table of Contents and Headings ..................................................................47
Section 9.12. **GOVERNING LAW; JURISDICTION; WAIVER OF JURY TRIAL** ...........47
Section 9.13. No Petition ...................................................................................................47
Section 9.14. No Recourse..................................................................................................47
Section 9.15. Servicer Payment Obligation .......................................................................48
Section 9.16. Patriot Act ....................................................................................................48
Section 9.17. Multiple Roles..............................................................................................48

(2025-2)
4924-3107-4870v.5

Page

## SCHEDULES

Schedule A – Location of Receivable Files ............................................................................. SA-1

## EXHIBITS

Exhibit A – Representations and Warranties as to the Receivables ........................................... A-1
Exhibit B – Form of Request for Release ................................................................................. B-1
Exhibit C – Form of Custodian Certificate .............................................................................. C-1
Exhibit D – Form of Investor Report ....................................................................................... D-1
Exhibit E – Form of Monthly Backup Servicer Certificate ...................................................... E-1

## APPENDIX

Appendix A – Definitions ...................................................................................................... AA-1

(2025-2)
4924-3107-4870v.5

This SALE AND SERVICING AGREEMENT, dated as of June 1, 2025 (as amended, restated, supplemented or otherwise modified from time to time, this "Agreement"), is among TRICOLOR AUTO RECEIVABLES 2 LLC, a Delaware limited liability company (the "Depositor"), TRICOLOR AUTO ACCEPTANCE, LLC, a Delaware limited liability company, as seller (in such capacity, the "Seller") and as servicer (in such capacity, the "Servicer"), TRICOLOR AUTO SECURITIZATION TRUST 2025-2, a Delaware statutory trust, as issuer (the "Issuer"), TRICOLOR AUTO GRANTOR TRUST 2025-2, a Delaware statutory trust, as underlying trust (the "Underlying Trust"), and WILMINGTON TRUST, NATIONAL ASSOCIATION, as indenture trustee (in such capacity, the "Indenture Trustee") and as custodian (in such capacity, the "Custodian"), and VERVENT INC., as backup servicer (the "Backup Servicer").

WHEREAS, the Issuer desires to purchase from the Depositor from time to time pools of receivables arising in connection with motor vehicle retail installment sale contracts and installment loans purchased by the Seller in the ordinary course of its business and sold to the Depositor;

WHEREAS, the Depositor desires to sell the receivables to the Issuer, the Servicer desires to service such motor vehicle retail installment sale contracts and installment loans and the Backup Servicer desires to act as Backup Servicer, in each case pursuant to the terms hereof; and

WHEREAS pursuant to the Underlying Trust Agreement and an assignment and assumption agreement, the Issuer shall assign such receivables to the Underlying Trust and shall hold a trust certificate evidencing its beneficial interest in such Underlying Trust.

NOW, THEREFORE, in consideration of the premises and mutual covenants herein contained, and of other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

ARTICLE ONE

DEFINITIONS

Section 1.01.  Capitalized Terms; Rules of Usage.  Capitalized terms used herein that are not otherwise defined shall have the meanings ascribed thereto in Appendix A.  Appendix A also contains rules as to usage applicable to this Agreement.

Section 1.02.  Calculations of Interest.  Collections of interest on the Receivables will be calculated in accordance with the Simple Interest Method.

ARTICLE TWO

CONVEYANCE OF TRUST PROPERTY

Section 2.01.  <u>Conveyance of Trust Property</u>.

(a)      <u>Conveyance</u>. In consideration of the Issuer's delivery to or upon the order of the Depositor on the Closing Date of authenticated Notes, in authorized denominations in an aggregate principal amount equal to the Initial Note Balance, and authenticated Certificates, the Depositor hereby irrevocably sells, transfers, assigns, grants and otherwise conveys to the Issuer, without recourse (subject to the obligations of the Depositor set forth herein), all right, title and interest of the Depositor, whether now owned or existing or hereafter acquired or arising, and wheresoever located, in, to and under the following:

(i)      The Receivables and all amounts due and collected on or in respect of the Receivables (including proceeds of the repurchase of Receivables by the Seller pursuant to Section 2.05 of this Agreement or Section 3.03(c) of the Receivables Purchase Agreement or the purchase of Receivables by the Servicer pursuant to Sections 3.03, 3.08 or 8.01 of this Agreement) after the Cutoff Date;

(ii)      the security interests in the Financed Vehicles granted by the Obligors pursuant to the Receivables and any other interest of the Depositor in such Financed Vehicles, including the certificates of title with respect to the Financed Vehicles;

(iii)      all proceeds from claims on any physical damage or theft insurance policies and extended warranties covering such Financed Vehicles and any proceeds of any credit life or credit disability insurance policies relating to the Receivables, the related Financed Vehicles or the related Obligors;

(iv)      the Receivable Files that relate to the Receivables;

(v)      the Collection Account, the Note Payment Account, the Reserve Fund and all amounts, securities, Financial Assets, investments and other property deposited in or credited to any of the foregoing and all proceeds thereof;

(vi)      all rights of the Depositor, but none of the obligations, under the Receivables Purchase Agreement and First-Tier Assignment, including the right to require the Seller to repurchase Receivables from the Issuer;

(vii)      the right to realize upon any property (including the right to receive future Net Liquidation Proceeds and Recoveries) that shall have secured an Receivable and have been repossessed by or on behalf of the Issuer; and

(viii)      all present and future claims, demands, causes of action and choses in action in respect of any or all of the foregoing, and all payments on or under and all proceeds of every kind and nature whatsoever in respect of any or all of the foregoing, including all proceeds of the conversion thereof, voluntary or involuntary, into cash or other liquid property, all accounts, accounts receivable, general intangibles, chattel paper,

2

documents, money, investment property, deposit accounts, letters of credit, letter of credit rights, insurance proceeds, condemnation awards, notes, drafts, acceptances, rights to payment of any and every kind and other forms of obligations and receivables, instruments and other property which at any time constitute all or part of, or are included in, the proceeds of any of the foregoing.

(b)      Intent of Conveyances.  The Depositor and the Issuer intend that each transfer of Trust Property contemplated by Section 2.01(a) constitutes a sale of such Trust Property from the Depositor to the Issuer, conveying good title to such Trust Property free and clear of any Liens and, in the event of the filing of a bankruptcy petition by or against the Depositor under any Insolvency Law, that such Trust Property shall not be part of the Depositor's estate.  In the event, however, that any such transfer is deemed to be a pledge, the Depositor hereby grants to the Issuer a first priority security interest in all of its right, title and interest in, to and under the Receivables, the other Trust Property and all proceeds thereof, in each case whether now owned or existing or hereafter acquired or arising, to secure the payment of the Notes and accrued interest thereon and all other amounts owing under the Basic Documents and in such event, this Agreement shall constitute a security agreement under Applicable Law.

(c)      No Assumption of Obligations.  The sale, transfer, assignment and conveyance of Trust Property made under this Section shall not constitute, and is not intended to result in, an assumption by the Issuer of any obligation of the Depositor or the Seller to the Obligors or any other Person in connection with the Receivables and the other Trust Property or any obligation of the Depositor or the Seller under any agreement, document or instrument related thereto.

(d)      Assignment to Underlying Trust.  Immediately upon the vesting of each transfer of Trust Property pursuant to Section 2.01(a), the Issuer shall assign such property to the Underlying Trust pursuant to the Assignment and Assumption Agreement.  Pursuant to (i) the Underlying Trust Agreement, the Issuer will hold the Underlying Certificate representing the entire beneficial ownership in the Underlying Trust and (ii) the Indenture, each of the Issuer and the Underlying Trust shall grant a security interest in the Collateral held by it to the Indenture Trustee to secure the repayment of the Notes.  The Certificates shall represent the beneficial ownership interest in the Issuer, and the Certificateholders shall be entitled to receive distributions with respect to the Trust Property as set forth herein, in the Indenture and in the Trust Agreement.

Section 2.02.  Representations and Warranties of the Seller as to the Receivables.  The Seller has made, under the Receivables Purchase Agreement, each of the representations and warranties as to the Receivables set forth in Exhibit A.  The Issuer shall be deemed to have relied on such representations and warranties in accepting the related Receivables.  Except to the extent otherwise provided therein, the representations and warranties set forth in Exhibit A speak as of, with respect to the Receivables, the Closing Date, but shall survive the sale, transfer, assignment and conveyance of the Receivable to the Issuer pursuant to this Agreement and the pledge of such Receivables to the Indenture Trustee pursuant to the Indenture.  Pursuant to Section 2.01(a), the Depositor has sold, transferred, assigned and otherwise conveyed to the Issuer, as part of the Trust Property, its rights under the Receivables Purchase Agreement, including its right to require the Seller to repurchase certain Receivables in accordance with the Receivables Purchase Agreement upon a breach of the representations and warranties set forth in Exhibit A.

3

The Seller hereby agrees that the Issuer shall have the right to enforce any and all rights of the Depositor under the Receivables Purchase Agreement assigned to the Issuer under this Agreement, including the right to require the Seller to repurchase Receivables in accordance with the Receivables Purchase Agreement upon a breach of the representations and warranties set forth in Exhibit A, directly against the Seller as though the Issuer were a party to the Receivables Purchase Agreement and that the Issuer shall not be obligated to enforce any such right indirectly through the Depositor.

Section 2.03.  Representations and Warranties of the Depositor as to the Receivables. The Depositor makes the following representations and warranties as to the Receivables on which the Issuer shall be deemed to have relied in accepting them.  Except to the extent otherwise provided therein, the representations and warranties speak as of, with respect to the Receivables, the Closing Date, but shall survive the sale, transfer, assignment and conveyance of the related Receivables to the Issuer pursuant to this Agreement, the transfer and assignment thereof to the Underlying Trust pursuant to the Assignment and Assumption Agreement and the pledge of such Receivables to the Indenture Trustee pursuant to the Indenture:

(a)    Title.  It has purchased the Receivables from the Seller.  It intends that the transfer of the Receivables contemplated by Section 2.01 constitute a sale of the Receivables from the Depositor to the Issuer and that the beneficial interest in, and title to, the Receivables not be part of the Depositor's estate in the event of the filing of a bankruptcy petition by or against it under any Insolvency Law.

(b)    Security Interest Matters.  It has caused or will cause prior to the Closing Date the filing of all appropriate financing statements in the proper filing offices in the appropriate jurisdictions under Applicable Law necessary to perfect the security interest in the Receivables granted to the Issuer under this Agreement and the assignment of the Receivables to the Underlying Trust under the Assignment and Assumption Agreement. The security interest of the Seller in each Financed Vehicle has been validly assigned by the Depositor to the Issuer and by the Issuer to the Underlying Trust.

(c)    Financing Statements.  All financing statements filed or to be filed against it in favor of the Indenture Trustee (as assignee of the Issuer) contain a statement substantially to the following effect: "A purchase of or security interest in any collateral described in this financing statement will violate the rights of the Indenture Trustee".

(d)    No Transfer Restrictions.  It has not created, incurred or suffered to exist any restriction on transferability of the Receivables except for the restrictions on transferability imposed by this Agreement.  The transfer of the Receivables and the Receivable Files by it to the Issuer pursuant to this Agreement is not subject to the bulk transfer laws or any similar statutory provisions in effect in any applicable jurisdiction.

Section 2.04.  Representations and Warranties as to Security Interests.  The Depositor makes the following representations and warranties as to the Receivables on which the Issuer shall be deemed to have relied in accepting the Receivables.  The representations and warranties speak as of the date of execution and delivery of this Agreement and as of the Closing Date, except to the extent otherwise provided, but shall survive the sale, transfer, assignment and

4

conveyance of the Receivables to the Issuer pursuant to this Agreement, the transfer and assignment thereof to the Underlying Trust pursuant to the Assignment and Assumption Agreement and the pledge of the Receivables to the Indenture Trustee pursuant to the Indenture:

(a)     This Agreement creates a valid and continuing "security interest" (as defined in the applicable UCC) in the Receivables in favor of the Issuer, which security interest is prior to all other Liens, and is enforceable as such against creditors of and purchasers from it.

(b)     It has taken all steps necessary to perfect its security interest against the Obligor in the Financed Vehicles.

(c)     The Receivables constitute "tangible chattel paper" within the meaning of the applicable UCC.

(d)     It owns and has good and marketable title to the Receivables free and clear of any Lien, claim or encumbrance of any Person.

(e)     All original executed copies of each loan agreement and retail installment sales contract that constitute or evidence the Receivables have been delivered to the Custodian.

(f)     It has received a written acknowledgment from the Custodian that the Custodian is holding the loan agreements and retail installment sales contracts that constitute or evidence the Receivables solely on behalf and for the benefit of the Issuer and the Underlying Trust.

(g)     Other than the security interest granted to the Issuer pursuant to this Agreement and the Indenture and the transfer and assignment pursuant to the Assignment and Assumption Agreement, the Depositor has not pledged, assigned, sold, granted a security interest in, or otherwise conveyed any of the Receivables.  The Depositor has not authorized the filing of and is not aware of any financing statements against the Issuer that include a description of collateral covering the Receivables other than any financing statement relating to the security interest granted to the Issuer hereunder, and the transfer and assignment pursuant to the Assignment and Assumption Agreement or that has been terminated.  The Depositor is not aware of any judgment or tax lien filings against it.

(h)     None of the loan agreements or retail installment sales contracts that constitute or evidence the Receivables has any marks or notations indicating that it has been pledged, assigned, or otherwise conveyed to any Person other than the Issuer and the Underlying Trust.  All financing statements filed or to be filed against the Depositor in favor of the Issuer in connection herewith describing the Transferred Assets contain a statement to the following effect:  "A purchase of or security interest in any collateral described in this financing statement will violate the rights of the secured party."

Notwithstanding the foregoing, the representations and warranties set forth in this Section may not be waived.  The representations and warranties set forth in this Section will survive the termination of this Agreement until the Indenture has been discharged.

(2025-2)
4924-3107-4870v.5

Section 2.05.  Repurchase of Receivables Upon Breach.  Each of the Depositor, the Seller, the Servicer, the Underlying Trust and the Issuer shall inform the other parties to this Agreement and a Responsible Officer of the Indenture Trustee promptly, in writing, upon its discovery of any breach or failure to be true of the representations and warranties set forth in Exhibit A.  If such breach or failure shall not have been cured by the close of business on the last day of the Collection Period which includes the 45th day after the date on which the Seller becomes aware of, or receives written notice from the Depositor, the Servicer or the Owner Trustee of, such breach or failure, and such breach or failure materially and adversely affects the interest of the Issuer or the Underlying Trust in a Receivable, the Seller shall repurchase such Receivable from the Underlying Trust as of the close of business on the last day of such Collection Period.  In consideration of any such repurchase of a Receivable, the Seller shall remit the Purchase Amount of such Receivable on the Deposit Date immediately following such Collection Period in the manner specified in Section 4.06.  The sole remedy of the Issuer, the Underlying Trust, the Trustees and the Securityholders with respect to a breach or failure to be true of the representations and warranties set forth in Exhibit A shall be to require the Seller to repurchase Receivables pursuant to this Section and Section 3.03(c) of the Receivables Purchase Agreement.  Except as expressly set forth in the Basic Documents, no Trustee nor the Backup Servicer shall have (i) any enforcement obligation with respect to breaches of representations or warranties pursuant to this Section or (ii) any duty to conduct an affirmative investigation as to the occurrence of any condition requiring the repurchase of any Receivable pursuant to this Section or the eligibility of any Receivable for purposes of this Agreement.  Following each such repurchase, the Custodian shall deliver the related Receivable File to the Seller upon receipt of a Request for Release.

Section 2.06.  Custody of Receivable Files.

(a)    To assure uniform quality in servicing the Receivables and to reduce administrative costs, the Issuer hereby revocably appoints WTNA as its agent, and WTNA hereby accepts such appointment, to act as Custodian, on behalf of the Issuer and the Underlying Trust, of the following documents or instruments, for the benefit of the Indenture Trustee as pledgee of the Trust Property pursuant to the Indenture with respect to each Receivable (collectively, a "Receivable File"):

(i)    the fully executed original of the Receivable reflecting manual or electronic signatures; and

(ii)    the original certificate of title, or evidence of an electronic filing, for the related Financed Vehicle (or evidence that such certificate of title has been applied for) or such other documents that the Seller shall keep on file, in accordance with its customary practices and procedures, evidencing the security interest of the Seller in such Financed Vehicle.

(b)    On or prior to the Closing Date, the Seller will cause the related Receivable Files to be delivered to the Custodian.

(c)    Conditioned upon the Seller's timely delivery of the Receivables Files pursuant to Section 2.06(b) in a form and format readily accessible to the Custodian, on or prior to the 30th

6

Business Day after the Closing Date, the Custodian shall review the Receivable Files delivered to it (or, in the case of electronic certificates of title, the evidence of electronic filing made available to it) by the Seller pursuant to Section 2.06(b) to verify the presence of (i) an executed original of each related Receivable and (ii) an original certificate of title, or evidence of an electronic filing, for the related Financed Vehicles (or evidence that any such certificate of title has been applied for).  Within 30 Business Days of the Closing Date, the Custodian shall deliver a Custodian Certificate substantially in the form attached hereto as Exhibit C to the Issuer confirming that it has received, on behalf of the Issuer and the Indenture Trustee as pledgee of the Receivables, the executed originals of the applicable Receivables and the original certificates of title, or evidence of an electronic filing, for the related Financed Vehicle (or evidence that any such certificate of title has been applied for), or stating as exceptions those Receivables for which such documents or evidence have not been received, and the Issuer, the Underlying Trust and the Indenture Trustee are hereby authorized to rely on each such Custodian Certificate.

If the Custodian shall not have delivered a Custodian Certificate with respect to the Receivables to the Issuer within 30 Business Days after the Closing Date, by such 30th Business Day after the Closing Date, the Custodian shall provide to the Issuer, the Underlying Trust and the Seller (with a copy emailed to each Rating Agency at its address in Section 9.03) a list of those Receivables for which either (i) evidence in the related Receivables Files that a certificate of title has been applied for (if there is no original certificate of title) or (ii) neither evidence of an application, nor an original certificate of title is included in the related Receivables Files.

Section 2.07.  Duties of the Custodian.

(a)    Safekeeping.  The Custodian shall hold the Receivable Files for the benefit of the Issuer, the Underlying Trust and the Indenture Trustee as pledgee of the Receivables and maintain such accurate and complete accounts, records and computer systems pertaining to each Receivable File as shall enable the Servicer, the Backup Servicer, the Underlying Trust, the Indenture Trustee and the Issuer to comply with this Agreement and the Indenture Trustee to comply with the Indenture.  In performing its duties as custodian, the Custodian shall not be liable for any actions it takes or omits to take in good faith which it believes to be authorized or within its rights or powers; provided, that its conduct does not constitute willful misconduct, negligence or bad faith.  The Custodian shall maintain the Receivable Files held by it under this Agreement, and of the related accounts, records and computer systems, in a secure, fire resistant vault, clearly identifying the Receivables on its system as being separate from all other records maintained by it at the same location, and in such a manner as shall enable the Issuer or the Servicer to verify the accuracy of its record keeping.  The Custodian shall promptly report to the Issuer and the Servicer any failure on its part to hold the Receivable Files and to maintain its accounts, records and computer systems as herein provided and promptly take appropriate action to remedy any such failure.  Nothing herein shall be deemed to require an initial or any periodic review of the Receivable Files by the Issuer, the Underlying Trust or any Trustee, and none of the Issuer, the Underlying Trust, the Servicer or any Trustee shall be liable or responsible for any action or failure to act by the Custodian in its capacity as custodian hereunder.

(b)    Maintenance of and Access to Records.  The Custodian shall maintain each Receivable File at one of the locations specified in Schedule A or at such other location as shall be specified to the Issuer and the Servicer by 30 days' prior written notice.  The Custodian shall

maintain a record on its system indicating whether any certificate of title reviewed by it hereunder is an original certificate of title or consists of evidence of an electronic filing, and, upon the written request of any party hereto, shall deliver to such requesting party a report setting forth such information.  The Custodian shall make available to the Issuer and the Servicer or their respective duly authorized representatives, attorneys or auditors a list of locations of the Receivable Files and the related accounts, records and computer systems maintained by it, upon not less than three Business Days' notice, at such times during normal business hours as the Issuer and the Servicer shall reasonably request.  The Custodian shall cooperate with the Servicer in connection with the Servicer performing its servicing duties pursuant to this Agreement.

(c)     Release of Documents.  As soon as practicable after receiving written instructions from the Servicer, substantially in the form attached hereto as Exhibit B, the Custodian shall release any document being held by it in the Receivable Files to the Servicer or its agent or designee, at such place or places as the Servicer may reasonably designate.  The Custodian shall not be responsible for any loss occasioned by the failure of the Servicer or its agent or designee to return any document or any delay in so doing.

(d)     Title to Receivables.  The Custodian shall not at any time have, or in any way attempt to assert, any interest in any Receivable held by it as custodian hereunder or in the related Receivable File.  The entire equitable interest in such Receivable and the related Receivable File shall at all times be vested in the Underlying Trust pursuant to the Assignment and Assumption Agreement, subject to the interest of the Indenture Trustee as pledgee of such Receivable pursuant to the Indenture.

Section 2.08.  Liability of the Custodian.

(a)     The Custodian shall be liable in accordance herewith only to the extent of the obligations specifically undertaken by it in such capacity herein.  No implied duties (including fiduciary duties) covenants or obligations shall be read into this Agreement against the Custodian and, in the absence of bad faith on its part, it may conclusively rely on the truth of the statements and the correctness of the opinions expressed in any certificates or opinions furnished to it and conforming to the requirements of this Agreement.

(b)     The Custodian shall not be liable for:

(i)      an error of judgment made in good faith by one of its officers; or

(ii)     any action taken, suffered or omitted to be taken in good faith in accordance with or believed by it to be authorized or within the discretion or rights or powers conferred, by this Agreement relating to the exercise of any power conferred upon it under this Agreement;

in each case unless it shall be proved that the Custodian shall have been negligent in ascertaining the pertinent facts.

(c)     Without limiting the generality of this Section, the Custodian shall have no duty (i) to see to any recording, filing or depositing of this Agreement or any agreement referred to herein or any financing statement or continuation statement evidencing a security interest in the

(2025-2)
4924-3107-4870v.5

Receivables or the Financed Vehicles, or to see to the maintenance of any such recording or filing or depositing or to any recording, refiling or redepositing of any thereof, (ii) to see to any insurance of the Financed Vehicles or Obligors or to effect or maintain any such insurance, (iii) to see to the payment or discharge of any tax, assessment or other governmental charge or any Lien or encumbrance of any kind owing with respect to, assessed or levied against, any Receivables, (iv) to confirm or verify the contents of any reports or certificates of the Servicer delivered to it pursuant to this Agreement and believed by it to be genuine and to have been signed or presented by the proper party or parties or (v) to inspect the Financed Vehicles at any time or ascertain or inquire as to the performance or observance of any of the Servicer's (A) representations, warranties or covenants or (B) duties and obligations and as the maintainer of books, records, files and computer records relating to the Receivables under this Agreement.

Section 2.09.  <u>Limitation on Liability of the Custodian</u>.

(a)    The Custodian undertakes to perform only such duties and obligations as are specifically set forth in this Agreement.  Neither the Custodian nor any of its officers, directors, employees or agents shall be (i) liable, directly or indirectly, for any damages or expenses arising out of the services performed under this Agreement other than damages which result from the negligence or willful misconduct of it or them or (ii) liable for any consequential, indirect or special damages.

(b)    For so long as the Custodian also acts as Indenture Trustee, the Custodian, in its capacity as custodian hereunder, shall be entitled to any protection, privilege or indemnity afforded to the Indenture Trustee under the terms of this Agreement and the Indenture.

Section 2.10.  <u>Effective Period and Termination</u>.  The Custodian's appointment as custodian shall become effective as of the Cutoff Date and shall continue in full force and effect until terminated pursuant to this Section or terminated by Securityholders pursuant to Section 6.07.  If the Indenture Trustee shall resign or be terminated as Indenture Trustee pursuant to Section 6.08 of the Indenture, the appointment of the Custodian as custodian hereunder shall automatically be terminated.  In addition, the appointment of the Custodian as custodian hereunder may be terminated by the Majority Noteholders or, if the Notes have been paid in full, by Certificateholders evidencing not less than 51% of the aggregate Certificate Percentage Interests, by notice given in writing no less than 30 days prior to such termination to the Depositor, the Custodian and the Servicer (with a copy to the Trustees and each Rating Agency if given by Securityholders).  Any successor Indenture Trustee appointed pursuant to Section 6.08 or 6.09 of the Indenture shall automatically include its appointment as successor Custodian. Pursuant to Section 6.08(d) of the Indenture, if a successor Indenture Trustee does not take office within 60 days after the retiring Custodian resigns or is removed, the retiring Custodian, the Issuer or the Majority Noteholders may petition any court of competent jurisdiction for the appointment of a successor Custodian, with the cost of such petition to be borne by the Issuer. As soon as practicable after any termination of such appointment, the Custodian shall deliver, or cause to be delivered, the Receivable Files and the related accounts and records maintained by it to the successor Custodian (or, at the direction of such successor Custodian, its agent) at such place as the successor Custodian may reasonably designate or, if the Notes have been paid in full, at such place as the Issuer may reasonably designate.

9

Section 2.11.  <u>Access to Certain Documentation and Information Regarding Receivables</u>.
Subject to Section 2.07(b), the Custodian shall provide the Depositor, the Servicer and the
Trustees with access to the Receivables Files in the cases where the related Trustee or the
Securityholders are required by Applicable Law to have access to such documentation.  Such
access shall be afforded only upon at least five Business Days' notice and during normal
business hours which does not unreasonably interfere with the normal operations or customer or
employee relations of the Custodian, at the offices of the Custodian.  Nothing in this Section
shall affect the obligation of the Custodian to observe any Applicable Law prohibiting disclosure
of information regarding the Obligors, and the failure of the Custodian to provide access to
information as a result of such obligation shall not constitute a breach of this Section.

ARTICLE THREE

ADMINISTRATION AND SERVICING OF THE TRUST PROPERTY

Section 3.01.  <u>Duties of Servicer</u>.  The Servicer, acting alone or through one or more
subservicers to the extent permitted hereunder, for the benefit of the Issuer, as holder of the
Underlying Certificate evidencing beneficial ownership of the Underlying Trust, shall manage,
service, administer and make collections on the Receivables with reasonable care but in no event
less than the care that the Servicer exercises with respect to all comparable motor vehicle retail
installment sales contracts and installment loans that it services for itself or others.  The
Servicer's duties shall include collection and posting of all payments, responding to inquiries of
Obligors or by Governmental Authorities with respect to the Receivables, investigating
delinquencies, sending payment coupons to Obligors, reporting tax information to Obligors in
accordance with its customary practices, policing the collateral, accounting for collections and
furnishing monthly and annual statements to the Trustees with respect to distributions, providing
collection and repossession services in the event of an Obligor default, remitting Texas Deferred
Sales Tax Payments to the State of Texas, generating U.S. federal income tax information and
performing the other duties specified herein.  The Servicer shall have full power and authority to
do any and all things in connection with such managing, servicing, administration and collection
that it may deem necessary or desirable, it being understood, however, that it shall at all times
remain responsible to the Issuer and the Indenture Trustee for the performance of its duties and
obligations hereunder.  Subject to the foregoing and to Section 3.02, the Servicer shall follow its
customary standards, policies, practices and procedures in performing its duties hereunder as
Servicer.  Without limiting the generality of the foregoing, the Servicer shall be authorized and
empowered to execute and deliver, on behalf of itself, the Depositor, the Issuer, the Underlying
Trust, the Trustees, the Securityholders or any of them, any and all instruments of satisfaction or
cancellation, or of partial or full release or discharge and all other comparable instruments, with
respect to the Receivables and the Financed Vehicles.  The Servicer shall punctually perform all
of its obligations and agreements under this Agreement, shall comply with all applicable federal
and State laws and regulations, and shall maintain all material State and federal licenses and
franchises necessary for it to perform its servicing responsibilities hereunder, in each case, unless
such failure shall not impair the security interest of the Indenture Trustee in respect of any
portion of the Collateral or the obligations of the Servicer hereunder.

The Servicer is hereby authorized to commence, in its own name or in the name of the
Issuer or the Underlying Trust, a Proceeding to enforce a Receivable pursuant to Section 3.04 or

10

to commence or participate in a Proceeding (including a bankruptcy Proceeding) relating to or involving a Receivable, including a Defaulted Receivable.  If the Servicer commences or participates in such a Proceeding in its own name, the Issuer or the Underlying Trust, as applicable, shall thereupon be deemed to have automatically assigned, solely for the purpose of collection on behalf of the party retaining an interest in such Receivable, such Receivable and the other property conveyed to the Issuer pursuant to Section 2.01 with respect to such Receivable to the Servicer for purposes of commencing or participating in any such Proceeding as a party or claimant, and the Servicer is authorized and empowered by the Issuer or the Underlying Trust, as applicable, to execute and deliver in the Servicer's name any notices, demands, claims, complaints, responses, affidavits or other documents or instruments in connection with any such Proceeding.  If in any enforcement suit or Proceeding it shall be held that the Servicer may not enforce a Receivable on the grounds that it shall not be a real party in interest or a holder entitled to enforce such Receivable, the Issuer and the Underlying Trust shall, at the Servicer's expense and written direction and with acceptable indemnification, take steps to enforce such Receivable, including bringing suit in the Servicer's or the Issuer's name of the Issuer, the Underlying Trust, the Servicer, any Trustee, the Noteholders, the Certificateholders or any of them.

The Issuer and the Underlying Trust shall furnish the Servicer with any powers of attorney and other documents and take any other steps which the Servicer may deem necessary or appropriate to enable it to carry out its servicing and administrative duties hereunder.  The Servicer, at its expense, shall obtain on behalf of the Issuer or the Underlying Trust all licenses, if any, required by the laws of any jurisdiction to be held by the Issuer or the Underlying Trust in connection with ownership of the Receivables and shall make all filings and pay all fees as may be required in connection therewith during the term of this Agreement.

Section 3.02.  Delegation of Duties; Subservicers.

(a)     So long as Tricolor is the Servicer, the Servicer may without notice or consent delegate (i) any or all of its duties under this Agreement to any Affiliate of Tricolor or (ii) specific duties to subservicers or sub-contractors who are in the business of performing such duties.  The Backup Servicer may subservice or sub-contract any and all of its duties and responsibilities hereunder, including its duties as Successor Servicer hereunder, should the Backup Servicer become the Successor Servicer pursuant to Section 7.02.

(b)     The Servicer and the Backup Servicer may enter into subservicing or sub-contracting agreements in accordance with Section 3.02(a) with one or more subservicers for the servicing and administration of any or all of the Receivables.  References in this Agreement or any subservicing or sub-contracting agreement to actions taken, or to be taken, permitted to be taken or restrictions on actions permitted to be taken, by the Servicer or the Backup Servicer, as the case may be, in servicing the Receivables shall include actions taken, or to be taken, permitted to be taken or restrictions on actions permitted to be taken, by a subservicer on behalf of the Servicer or the Backup Servicer.  Each subservicing or sub-contracting agreement will be upon such terms and conditions as are not inconsistent with this Agreement and the standard of care set forth herein and as the Servicer or the Backup Servicer, as the case may be, and the related subservicer have agreed.  All compensation payable to a subservicer under a subservicing or sub-contracting agreement shall be payable by the Servicer or the Backup Servicer from its servicing compensation or otherwise from its own funds.

11

(c)     Notwithstanding any subservicing or sub-contracting agreement or any of the provisions of this Agreement relating to agreements or any arrangements between the Servicer or the Backup Servicer, on the one hand, and a subservicer, on the other hand, or any reference to actions taken through such entities or otherwise, the Servicer and the Backup Servicer shall remain obligated and liable for the servicing and administering of the Receivables in accordance with this Agreement without diminution of such obligation or liability by virtue of such subservicing or sub-contracting agreements.

(d)     Any subservicing or sub-contracting agreement that may be entered into and any other transactions or servicing arrangements relating to or involving a subservicer shall be deemed to be between the subservicer on the one hand and the Servicer or Backup Servicer, as the case may be, on the other hand, and the other parties hereto and the Administrator shall not be deemed parties thereto and shall have no obligations, duties or liabilities with respect to any such subservicer.

Section 3.03.   Collection of Receivable Payments; Modification of Receivables.  The Servicer shall make reasonable efforts to collect all payments called for under the terms and provisions of the Receivables as and when the same shall become due and otherwise act with respect to the Receivables and the other Trust Property in such manner as will, in the reasonable judgment of the Servicer, maximize the amount to be received by the Issuer, as holder of the Underlying Certificate evidencing beneficial ownership of the Underlying Trust, with respect thereto and in accordance with the standard of care required by Section 3.01.  The Servicer shall allocate collections on or in respect of the Receivables between principal and interest in accordance with the Simple Interest Method and the customary servicing practices and procedures it follows with respect to all comparable motor vehicle retail installment sales contracts and installment loans that it services for itself or others.  The Servicer shall not increase or decrease the number or amount of any Monthly Payment, Semi-Monthly Payment, Bi-Weekly Payment or Weekly Payment, as applicable, except in response to a prepayment by the related Obligor, the Amount Financed under any Receivable or, except as may be required by Applicable Law, the APR of any Receivable, or extend, rewrite or otherwise modify the payment terms of any Receivable; provided, however, that the Servicer may extend the due date for one or more payments due on any Receivable for credit-related reasons that would be acceptable to it with respect to comparable motor vehicle retail installment sales contracts and installment loans that it services for itself or others and in accordance with its customary standards, policies, practices and procedures if the cumulative extensions with respect to any Receivable shall not cause the term of such Receivable to extend beyond the last day of the Collection Period immediately preceding the Class F Final Scheduled Distribution Date.  If the Servicer fails to comply with the provisions of the preceding sentence, it shall be required to purchase each Receivable affected thereby for the related Purchase Amount as of the close of business on the last day of the Collection Period that includes the 45th day after the Servicer becomes aware of such failure, by making such deposit in the manner specified in Section 3.08 on the Deposit Date immediately following such Collection Period.  The Servicer may, in its discretion (but only in accordance with its customary standards, policies, practices and procedures), waive any late payment charge or any other fee that may be collected in the ordinary course of servicing a Receivable.  In addition, in the event that any such extension of a Receivable modifies the terms of such Receivable in such a manner as to constitute a cancellation of such Receivable and the creation of a new motor vehicle receivable that results in a deemed exchange thereof within the

12

meaning of Section 1001 of the Code, the Servicer shall purchase such Receivable pursuant to Section 3.08, and the receivable created shall not be included in the Underlying Trust Property.

Section 3.04.  <u>Realization Upon Receivables</u>.  The Servicer shall use commercially reasonable efforts on behalf of the Issuer, as holder of the Underlying Certificate evidencing beneficial ownership of the Underlying Trust, in accordance with the standard of care required under Section 3.01, to repossess or otherwise convert the ownership of each Financed Vehicle securing a Defaulted Receivable.  In taking such action, the Servicer shall follow such customary and usual practices and procedures as it shall deem necessary or advisable in its servicing of comparable motor vehicle retail installment sales contracts and installment loans, and as are otherwise consistent with the standard of care required under Section 3.01.  The Servicer shall be entitled to recover all reasonable expenses incurred by it with respect to realizing on a Defaulted Receivable, including such expenses incurred in the course of repossessing and liquidating a Financed Vehicle into cash proceeds.  The foregoing is subject to the proviso that, in any case in which the Financed Vehicle shall have suffered damage, the Servicer shall not expend funds in connection with any repair or towards the repossession of such Financed Vehicle unless it shall determine in its discretion that such repair or repossession shall increase the Net Liquidation Proceeds or Recoveries of the related Receivable.

Section 3.05.  <u>Maintenance of Physical Damage Insurance Policies</u>.  The Servicer shall follow its customary standards, policies, practices and procedures to determine whether or not each Obligor shall have maintained physical damage insurance covering the related Financed Vehicle.  The Servicer shall not obtain force-placed insurance in respect of the Receivables.

Section 3.06.  <u>Maintenance of Security Interests in Financed Vehicles</u>.  The Servicer shall take such steps, in accordance with the standard of care required under Section 3.01, as are necessary to maintain perfection of the security interest created by each Receivable in the related Financed Vehicle.  The Issuer hereby authorizes the Servicer, and the Servicer hereby agrees, to take such steps as are necessary to re-perfect or continue the perfection of such security interest on behalf of the Issuer, the Underlying Trust and the Indenture Trustee in the event the Servicer receives notice of, or otherwise has actual knowledge of, the fact that such security interest is not perfected as a result of the relocation of a Financed Vehicle or for any other reason.  In the event that the assignment of a Receivable to the Issuer or the Underlying Trust is insufficient, without a notation on the related Financed Vehicle's certificate of title, or without fulfilling any additional administrative requirements under the laws of the State in which the Financed Vehicle is located (including by way of recordation of the Indenture Trustee's lien in the electronic titling system of the related Registrar of Titles), to perfect a security interest in the related Financed Vehicle to grant to the Issuer or the Underlying Trust, as applicable, a first priority perfected security interest in the related Financed Vehicle.  Notwithstanding the foregoing, the Issuer and the Underlying Trust appointed the Seller, and the Servicer hereby agrees to serve as the agent of the Issuer and the Underlying Trust for the purpose of perfecting its security interest in each Financed Vehicle and agrees that the Servicer's listing as the secured party on the certificate of title is solely in its capacity as agent of the Issuer or the Underlying Trust, as applicable.  The Servicer shall not release, in whole or in part, any security interest in a Financed Vehicle created by the related Receivable except as permitted herein or in accordance with its customary standards, policies, practices and procedures.

13

Section 3.07.  Covenants of Servicer.  The Servicer makes the following covenants:

(a)      Liens in Force.  Except upon the payment in full of a Receivable or as otherwise contemplated by this Agreement or Applicable Law, it shall not release in whole or in part any Financed Vehicle from the security interest securing the related Receivable.

(b)      No Impairment.  It shall not impair in any material respect the rights of the Depositor, the Issuer, the Underlying Trust, the Trustees or the Securityholders in the Receivables or, except as permitted under Section 3.03, otherwise amend or alter the terms of the Receivables and as a result of such amendment or modification or alteration, the interests of the Depositor, the Issuer, the Underlying Trust, the Trustees or the Securityholders would be materially adversely affected.

(c)      Schedule of Receivables to Indenture Trustee.  It shall on or before the Closing Date deliver to the Custodian a copy of the related Receivables, which may be delivered in electronic format.

Section 3.08.  Purchase of Receivables Upon Breach.  Each of the Depositor, the Seller, the Servicer, the Issuer and the Underlying Trust shall inform the other parties to this Agreement and a Responsible Officer of the Indenture Trustee promptly, in writing, upon the discovery by it of any breach of Section 3.03, 3.06 or 3.07.  If such breach shall not have been cured by the close of business on the last day of the Collection Period which includes the 45th day after the date on which the Servicer becomes aware of, or receives written notice from the Depositor, the Seller, the Issuer or the Underlying Trust of, such breach, and such breach materially and adversely affects the interest of the Issuer in a Receivable, the Servicer shall purchase such Receivable from the Underlying Trust, as of the close of business on the last day of the related Collection Period, by depositing the Purchase Amount of such Receivable into the Collection Account in the manner specified in Section 4.06 on the related Deposit Date.  The sole remedy of the Issuer, the Underlying Trust, the Trustees and the Securityholders with respect to a breach of Section 3.03, 3.06 or 3.07 shall be to require the Servicer to purchase Receivables pursuant to this Section.  No Trustee shall have any duty to conduct an affirmative investigation as to the occurrence of any condition requiring the purchase of any Receivable pursuant to this Section. Except as expressly set forth in the Basic Documents, neither the Indenture Trustee nor the Backup Servicer shall have any enforcement obligation relating to breaches of representations or warranties pursuant to this Section.

Section 3.09.  Servicing Compensation; Payment of Certain Expenses by Servicer.  The Servicer shall receive the Monthly Servicing Fee for servicing the Receivables.  As additional servicing compensation, the Servicer shall be entitled to receive or retain the Supplemental Servicing Fee.  The Servicer shall pay all expenses incurred by it in connection with the activities under this Agreement (including the Independent Accountants and any subservicer, taxes imposed on the Servicer, expenses incurred in connection with distributions and reports to Securityholders and all other fees and expenses not expressly stated under this Agreement to be for the account of the Securityholders), except to the extent paid in accordance with Section 2.08 of the Indenture and except expenses incurred in realizing upon Receivables under Section 3.04.

14

Section 3.10.  <u>Investor Reports</u>.  On or before each Determination Date, the Servicer shall deliver to the Depositor, the Seller, the Backup Servicer and the Trustees, an Investor Report containing all information necessary to make the transfers and distributions required by Sections 4.01, 4.02, 4.06 and 4.07 in respect of the related Collection Period and the related Distribution Date and all information necessary for the Trustees, as applicable, to send (or provide access to via the internet) statements to Securityholders pursuant to Section 6.06 of the Indenture and Section 5.01(b) of the Trust Agreement and setting forth for the related Collection Period and the Cumulative Net Loss Ratio.  The Servicer shall also specify to the Trustees, no later than the Determination Date following the last day of a Collection Period as of which the Seller shall separately identify (by account number), in a written notice to the Depositor and the Trustees, the Receivables to be repurchased by the Seller or purchased by the Servicer, as the case may be, on the related Deposit Date.  The Servicer will include the disclosure required by Rule 4(c)(1)(ii) of Regulation RR in the first Investor Report or otherwise within a reasonable time after the Closing Date in accordance with Regulation RR.  It shall not be a duty of the Indenture Trustee or the Backup Servicer under this Agreement or any other Basic Document to which it is a party to determine whether any Investor Report contains any "nonpublic personal information" within the meaning of Title V of the Gramm-Leach-Bliley Financial Services Modernization Act of 1999 or any similar applicable State law.

Section 3.11.  <u>Annual Statement as to Compliance; Notice of Servicer Termination Events</u>.

(a)     The Servicer shall deliver to the Depositor, the Backup Servicer, the Trustees and the Rating Agencies, within 90 days of the end of each calendar year, beginning March 31, 2026, an Officer's Certificate of the Servicer, stating that (i) a review of its activities during the preceding 12-month period ended December 31 (or, if applicable, such shorter period as shall have elapsed since the Closing Date in the case of the first such Officer's Certificate) and of its performance under this Agreement has been made under such officer's supervision and (ii) to the best of such officer's knowledge, based on such review, the Servicer has fulfilled all its obligations under this Agreement in all material respects throughout such period, or, if there has been a failure to fulfill any such obligation in any material respect, specifying each such default known to such officer and the nature and status thereof.

(b)     The Servicer shall deliver to the Depositor, the Backup Servicer and the Trustees, promptly after having obtained knowledge thereof, but in no event later than five Business Days' thereafter, an Officer's Certificate specifying any event which constitutes or, with the giving of notice or lapse of time, or both, would become, a Servicer Termination Event.

Section 3.12.  <u>Annual Accountants' Report</u>.  The Servicer shall cause Accountants, who may also render other services to the Servicer or its Affiliates, to deliver to the Trustees and the Depositor on or before June 30 of each year, beginning on June 30, 2026, with respect to the preceding 12-month period ended December 31 (or, if applicable, such shorter period as shall have elapsed since the Closing Date in the case of the first such Officer's Certificate), a report addressed to the board of directors of the Servicer and to the Trustees (the "Accountant's Report") to the effect that such Accountants have, at the request of the Servicer, performed agreed upon procedures with respect to the Receivables and issued a report thereon that is performed in accordance with standards established by the American Institute of Certified

Public Accountants.  In the event such Accountants require the Indenture Trustee to agree to the procedures to be performed by such firm in any of the reports required to be prepared pursuant to this Section, the Servicer shall direct the Indenture Trustee in writing to do so agree; it being understood and agreed that the Indenture Trustee will deliver such letter of agreement in conclusive reliance upon the direction of the Servicer, and has not made any independent inquiry or investigation as to, and shall have no obligation or liability in respect of, the sufficiency, validity or correctness of such procedures.  The Indenture Trustee shall not be liable for any claims, liabilities or expenses relating to such Accountant's engagement or any report issued in connection with such engagement and dissemination of any such report is subject to the consent of the Accountants.

Section 3.13.  <u>Access to Certain Documentation and Information Regarding Receivables</u>. The Servicer shall provide the Depositor, the Backup Servicer and the Trustees with access to any documentation in its possession regarding the Receivables.  Such access shall be afforded without charge but only upon reasonable request and during normal business hours which does not unreasonably interfere with the normal operations or customer or employee relations of the Servicer, at the offices of the Servicer.  Nothing in this Section shall affect the obligation of the Servicer to observe any Applicable Law prohibiting disclosure of information regarding the Obligors, and the failure of the Servicer to provide access to information as a result of such obligation shall not constitute a breach of this Section.

Section 3.14.  <u>Reports to the Rating Agencies</u>.  The Servicer shall deliver to each Rating Agency a copy of all reports or notices furnished or delivered by it pursuant to this Article and a copy of any amendments, supplements or modifications to this Agreement and any other information reasonably requested by such Rating Agency that can be provided without undue effort or expense.

Section 3.15.  <u>Rights Prior to Assumption of Duties by the Backup Servicer or Designation of Successor Servicer</u>.

(a)     On or before each Determination Date, the Servicer shall deliver to the Backup Servicer an electronic file containing all information necessary to allow the Backup Servicer to perform the actions set forth in this subsection.  The Backup Servicer shall use such tape or diskette (or other electronic transmission acceptable to the Indenture Trustee and the Backup Servicer) to (i) confirm that such tape, diskette or other electronic transmission is in readable form and (ii) calculate and confirm against the Investor Report (A) the Pool Balance as of the close of business on the last day of the related Collection Period, (B) the number and aggregate Principal Balance of Receivables that were 31-60 days, 61-90 days and more than 90 days Delinquent as of the close of business on the last day of the related Collection Period, (C) the Cumulative Net Loss Ratio with respect to the related Collection Period and (D) statistical data related to the average Principal Balance, weighted average APR, weighted average original term, weighted average remaining term and number of Receivables for the related Collection Period and the immediately preceding Collection Period (for the avoidance of doubt the weighted average calculations per this subclause should be weighted based on the Principal Balance of each Receivable as of the end of the related Collection Period).  The Backup Servicer shall use the Investor Report to confirm the mathematical accuracy of (i) the Available Collections, (ii) all fees, including the Senior Servicing Fee, the Subordinated Servicing Fee, the Total Trustee Fees

16

for the Trustees, the Custodian Fee and the Backup Servicing Fee, (iii) the Monthly Interest Distributable Amount for each Class of Notes, (iv) the First Priority Principal Distributable Amount, the Second Priority Principal Distributable Amount, the Third Priority Principal Distributable Amount, the Fourth Priority Principal Distributable Amount, the Fifth Priority Principal Distributable Amount and the Sixth Priority Principal Distributable Amount, (v) the Regular Principal Distributable Amount (adjusted to account for the actual amount available to be paid pursuant to 2.08(a) of the Indenture), (vi) the Note Balance of each Class of Notes after giving effect to all distributions made pursuant to clauses (iv) and (v) above, (vii) the Note Factor for each Class of Notes after giving effect to all distributions made pursuant to clauses (iv) and (v) above, (viii) the Interest Carryover Shortfall Amount, (ix) the Reserve Fund Deficiency, (x) the Reserve Fund Required Amount and (xi) the Reserve Fund Draw Amount.  In the event of any discrepancy between the information set forth in the two foregoing sentences, as calculated by the Servicer, from that determined or calculated by the Backup Servicer, the Backup Servicer shall promptly notify the Servicer and, if within five days of such notice being provided to the Servicer, the Backup Servicer and the Servicer are unable to resolve such discrepancy, the Backup Servicer shall promptly notify the Trustees.  The Backup Servicer shall provide a Monthly Backup Servicer Certificate to the Trustees and the Servicer on or before the close of business on the fifth Business Day following the related Determination Date or within three Business Days of receipt of the related electronic file, whichever is later.  The Backup Servicer, in its capacity as such, shall not be responsible for delays attributable to the Servicer's failure to deliver information, defects in the information supplied by the Servicer or other circumstances beyond the control of the Backup Servicer.

(b)      Other than as specifically set forth elsewhere in this Agreement, the Backup Servicer shall have no obligation to supervise, verify, monitor or administer the performance of the Servicer and shall have no liability for any action taken or omitted by the Servicer.

(c)      The Backup Servicer shall consult with the Servicer as may be necessary from time to time to perform or carry out the Backup Servicer's obligations hereunder, including the obligation to succeed to the duties and obligations of the Servicer pursuant to Section 7.02.

(d)      Notwithstanding any other provision of this Agreement, the Backup Servicer shall be authorized to accept and rely on all accounting, records and work of the Servicer without any audit or other examination thereof, and the Backup Servicer shall have no duty, responsibility, obligation or liability for the acts and omissions of the Servicer.  If any Errors exist in any information received from the Servicer, and such Errors should cause or materially contribute to the Backup Servicer making Continuing Errors, the Backup Servicer shall have no liability for such Continuing Errors; provided, however, that it agrees to use its best efforts to prevent further Continuing Errors.  In the event the Backup Servicer becomes aware of Errors or Continuing Errors, it shall promptly notify the Trustees and use its best efforts to reconstruct and reconcile such data as is commercially reasonable to correct such Errors and Continuing Errors and prevent future Continuing Errors.  The Backup Servicer shall be entitled to recover its costs thereby expended in accordance with Section 2.08 of the Indenture.

ARTICLE FOUR

DISTRIBUTIONS; RESERVE FUND; STATEMENTS TO SECURITYHOLDERS

Section 4.01.  <u>Establishment of Accounts</u>.

(a)      The Servicer shall establish with the Indenture Trustee the following Accounts, on or before the Closing Date, and maintain each as an Eligible Account for the benefit of:

(i)      the Securityholders, in the name of the Issuer, designated as the "Tricolor Auto Securitization Trust 2025-2 Collection Account, Wilmington Trust, National Association, Indenture Trustee" (the "Collection Account");

(ii)      the Noteholders, in the name of the Issuer, designated as the "Tricolor Auto Securitization Trust 2025-2 Note Payment Account, Wilmington Trust, National Association, Indenture Trustee" (the "Note Payment Account"); and

(iii)      the Issuer, in the name of the Issuer, designated as the "Tricolor Auto Securitization Trust 2025-2 Reserve Fund, Wilmington Trust, National Association, Indenture Trustee" (the "Reserve Fund");

in each case bearing a designation clearly indicating that the funds deposited therein are held in trust for the benefit of the related Persons.  The Accounts shall be under the control of the Indenture Trustee; provided, however, that the Servicer may direct the Indenture Trustee in writing to make (or cause to be made) deposits to and withdrawals from the Accounts in accordance with this Agreement and the other Basic Documents.  All monies deposited from time to time in the Accounts shall be held by, or in the name of, the Indenture Trustee as part of the Trust Estate, and all deposits to and withdrawals therefrom shall be made only upon the terms and conditions of the Basic Documents.  Amounts on deposit in each Account may, to the extent permitted by Applicable Law, be invested, as directed in writing by the Servicer, by the depository institution then maintaining such Account in Eligible Investments and all investment earnings, net of investment losses, shall constitute Available Collections.  If direction to invest funds in the Accounts is not received by the Indenture Trustee, the funds shall remain uninvested.  In the event that any Account is no longer an Eligible Account, the Servicer shall, with the Indenture Trustee's assistance if necessary, transfer amounts on deposit in such Account within five Business Days to an account that is an Eligible Account.

(b)      The parties hereto agree that (i) each of the Accounts is a "securities account" (within the meaning of Section 8-501(a) of the UCC), in respect of which the Indenture Trustee is the "securities intermediary" (within the meaning of Section 8-102(a)(14) of the UCC) and the Indenture Trustee is the "entitlement holder" (within the meaning of Section 8-102(a)(7) of the UCC); (ii) each item of property (including cash) of the Issuer credited to an Account shall be treated as a "financial asset" (within the meaning of Section 8-102(a)(9) of the UCC); (iii) the "securities intermediary's jurisdiction" (within the meaning of Section 8-110(e) of the UCC) with respect to each of the Accounts shall be New York; and (iv) the law in force in the State of New York is applicable to all issues specified in Article 2(1) of "The Convention on the Law Applicable to Certain Rights in Respect of Securities Held with an Intermediary", ratified

18

Sept. 28, 2016, S. Treaty Doc. No. 112-6 (2012)" (the "Hague Securities Convention").  The Indenture Trustee represents and warrants that as of the Closing Date, it had a physical office in the United States that satisfied the criteria set forth in Article 4(1)(a) or (b) of the Hague Securities Convention.  The Indenture Trustee agrees that, at all times while this Agreement is in effect, it shall maintain a physical office in the United States that satisfies the criteria set forth in Article 4(1)(a) or (b) of the Hague Securities Convention.  Notwithstanding the intent of the parties hereto, to the extent that any Account shall be determined to constitute a "deposit account" (within the meaning of Section 9-102(a)(29) of the UCC), the parties hereto agree that the Eligible Institution that holds the Accounts (A) shall treat the Indenture Trustee as the Eligible Institution's sole "customer" (within the meaning of Section 9-104 of the UCC) with respect to such deposit account and (B) shall comply with instructions from the Indenture Trustee, without any consent by the Issuer or any other Person.  The parties hereto acknowledge and agree that each of the Accounts is subject to the sole dominion and control of Indenture Trustee, subject to the terms hereof.  The Indenture Trustee shall have the sole right of withdrawal with respect to each Account in accordance with the terms of the Indenture and this Agreement.  The Issuer shall not have a right of withdrawal with respect to any Account. The Indenture Trustee, subject to the terms of this Agreement, shall comply with all "entitlement orders" (as defined in Section 8-102(a)(8) of the UCC) with respect to all "securities entitlements" (as defined in Section 8-102(a)(17) of the UCC) related to the Accounts, including any entitlement orders and instructions directing disposition of funds financial assets, or other assets in each of the Accounts originated by the Indenture Trustee without further consent by the Issuer or any other party.  The Indenture Trustee acknowledges and agrees that it has not entered into, and until the termination of this Agreement shall not enter into, any agreement with any Person other than the Issuer relating to any Account, and in each case any funds held therein, pursuant to which it has agreed, or will agree, to comply with orders or instructions of any other such Person.  The parties hereto agree that this subsection shall constitute an account agreement for the purposes of the UCC, including Section 8-501 thereof.

(c)      If, as of any Distribution Date, the sum of the amounts on deposit in the Collection Account and the Reserve Fund Amount equals or exceeds the Note Balance, all accrued and unpaid interest thereon and all amounts due to the Servicer, the Backup Servicer and the Trustees, all such amounts on deposit will be applied up to the amounts necessary to retire the Notes and pay such amounts due.

Section 4.02.   <u>Reserve Fund</u>.

(a)      On the Closing Date, the Depositor shall deposit the Reserve Fund Deposit into the Reserve Fund from the net proceeds of the sale of the Notes pursuant to the Note Purchase Agreement.  The Reserve Fund Property has been conveyed by the Depositor to the Issuer pursuant to Section 2.01(a).  Pursuant to the Indenture, the Issuer will pledge all of its right, title and interest in, to and under the Reserve Fund and the Reserve Fund Property to the Indenture Trustee on behalf of the Noteholders to secure its obligations under the Notes and the Indenture.

(b)      If the Reserve Fund is no longer to be maintained at the Indenture Trustee, the Servicer shall, with Tricolor's and the Indenture Trustee's prior approval (not to be unreasonably withheld) and assistance as necessary, promptly (and in any case within ten Business Days) cause the Reserve Fund to be replaced by another Eligible Account.  The Servicer shall promptly

19

notify the Rating Agencies and the Trustees in writing of any change in the account number or location of the Reserve Fund.

(c)      On each Distribution Date, the Indenture Trustee will deposit, or cause to be deposited, into (i) the Collection Account all investment earnings, net of investment losses and expenses, on Eligible Investments in the Reserve Fund and (ii) the Reserve Fund, from amounts collected on or in respect of the Receivables during the related Collection Period and not used on that Distribution Date to pay the Required Payment Amount, the amount, if any, by which the Reserve Fund Required Amount for that Distribution Date exceeds the amount on deposit in the Reserve Fund on that Distribution Date, after giving effect to all deposits to and required withdrawals therefrom on that Distribution Date.

(d)      On each Determination Date, the Servicer will determine the Reserve Fund Draw Amount, if any, for the related Distribution Date.  If the Reserve Fund Draw Amount for any Distribution Date is greater than zero, the Indenture Trustee will withdraw, or cause to be withdrawn, from the Reserve Fund, an amount equal to the Reserve Fund Draw Amount, and transfer the amount withdrawn to the Collection Account on the Deposit Date.

(e)      If the Reserve Fund Amount for any Distribution Date (after giving effect to the withdrawal of the Reserve Fund Draw Amount for such Distribution Date and the distribution described in the last sentence of Section 4.02(d)) exceeds the Reserve Fund Required Amount for such Distribution Date, the Servicer shall instruct the Indenture Trustee in writing to distribute or cause to be distributed on the related Deposit Date, the amount of such excess to the Collection Account for payment to the Certificateholders on such Distribution Date.  Any amount paid to the Certificateholders will no longer constitute a portion of the Trust Estate and the Indenture Trustee and the Issuer hereby release, on each Distribution Date, their security interest in, to and under the Reserve Fund Property distributed to the Certificateholders.  Notwithstanding the foregoing, investment income for each Collection Period (net of losses and expenses) on amounts on deposit in the Reserve Fund shall constitute Available Collections.

(f)      If the Note Balance and all other amounts owing or to be distributed hereunder or under the Indenture to the Noteholders, the Trustees and the Servicer have been paid in full and the Issuer has been terminated, any remaining Reserve Fund Property shall be distributed to the Certificateholders.

(g)      Notwithstanding any other provision of this Agreement, no portion of the Reserve Fund Draw Amount may be paid to Tricolor or an Affiliate thereof, other than in its capacity as a Securityholder.  The Indenture Trustee, as such and in any of its other capacities under the Basic Documents, shall have no responsibility for monitoring or enforcing the satisfaction of any risk retention requirements applicable to the Issuer, Tricolor or any Affiliate or any Securities (including any calculation of the Reserve Fund Draw Amount or monitoring compliance of any Servicer instruction to the Indenture Trustee (including those given in accordance with Section 4.07(c)) with risk retention requirements, upon which instructions the Indenture Trustee shall be entitled to conclusively rely).  No Trustee, the Custodian or the Backup Servicer will be charged with knowledge of such rules, nor will any of them be liable to any Securityholder, the Depositor, the Sponsor, the Servicer or any other Person for violation of such rules now or hereinafter in effect.

Section 4.03.  [Reserved].

Section 4.04.  <u>Collections</u>.  Subject to Sections 4.05 and 4.06(a), the Servicer shall remit to the Collection Account all amounts received by the Servicer on or in respect of the Receivables (including Net Liquidation Proceeds and all amounts received by the Servicer in connection with the repossession and sale of a Financed Vehicle (whether or not the related Receivable has been classified as a Defaulted Receivable) but excluding payments with respect to Purchased Receivables and excluding any Texas Deferred Sales Tax Payments and Collateral Protection Insurance Payments made on or in respect of the Receivables) as soon as practicable and in no event after the close of business on the second Business Day after such amounts have been received and identified.

Section 4.05.  <u>Application of Collections</u>.  For purposes of this Agreement, all amounts received on or in respect of a Receivable during any Collection Period (including Net Liquidation Proceeds and all amounts received by the Servicer in connection with the repossession and sale of a Financed Vehicle (whether or not the related Receivable has been classified as a Defaulted Receivable) but excluding payments with respect to Purchased Receivables) shall be applied by the Servicer to interest and principal on such Receivable in accordance with the Simple Interest Method, in the case of a Simple Interest Receivable.

Section 4.06.  <u>Additional Deposits</u>.

(a)     The following additional deposits shall be made to the Collection Account: (i) the Seller shall remit to the Collection Account the aggregate Purchase Amount with respect to Purchased Receivables pursuant to Section 2.05 hereof or pursuant to Section 3.03(c) of the Receivables Purchase Agreement, (ii) the Servicer shall remit or cause to be remitted to the Collection Account (A) the aggregate Purchase Amounts with respect to Purchased Receivables pursuant to Section 3.03 or 3.08 and (B) the amount required upon the optional purchase of all Receivables by the Servicer pursuant to Section 8.01 and (iii) the Indenture Trustee shall remit or shall cause to be remitted, pursuant to Section 4.02, (A) all investment earnings, net of investment losses and expenses, on Eligible Investments in the Reserve Fund and (B) the Reserve Fund Draw Amount to the Collection Account.

(b)     All deposits required to be made in respect of a Collection Period pursuant to this Section by the Servicer may be made in the form of a single deposit and shall be made in immediately available funds, no later than 5:00 p.m., New York City time, on the related Deposit Date.

Section 4.07.  <u>Determination Date Calculations; Application of Available Funds</u>.

(a)     On each Determination Date, the Servicer shall calculate the following amounts with respect to the related Distribution Date and Collection Period:

     (i)       the Available Collections;

     (ii)      the Senior Servicing Fee;

     (iii)     the Subordinated Servicing Fee;

21

(iv)        the Total Trustee Fee and any fees, expenses and indemnities owed to the Trustees;

(v)        the Custodian Fee and any fees, expenses and indemnities owed to the Custodian;

(vi)        the Backup Servicing Fee and any fees, expenses and indemnities owed to the Backup Servicer;

(vii)        the Interest Distributable Amount for each Class of Notes;

(viii)        the First Priority Principal Distributable Amount, the Second Priority Principal Distributable Amount, the Third Priority Principal Distributable Amount, the Fourth Priority Principal Distributable Amount, the Fifth Priority Principal Distributable Amount and the Sixth Priority Principal Distributable Amount;

(ix)        the Regular Principal Distributable Amount;

(x)        the Reserve Fund Deficiency, if any; and

(xi)        the sum of the amounts described in clauses (ii) through (vii) above (the "Required Payment Amount"); provided, however, that so long as the Notes have not been accelerated in accordance with the Indenture following an Event of Default, the aggregate amount of expenses and indemnities to be included in the Required Payment Amount pursuant to clauses (iii) through (v) above in any given calendar year payable to (A) the Owner Trustee and the Underlying Trustee, collectively, shall not exceed $150,000, (B) the Indenture Trustee and the Custodian, collectively, shall not exceed $150,000, and (C) the Backup Servicer, shall not exceed $40,000.

(b)        On each Determination Date, the Servicer shall calculate the Reserve Fund Amount, the Reserve Fund Required Amount, the Reserve Fund Draw Amount and the amount, if any, by which the Reserve Fund Required Amount exceeds the Reserve Fund Amount (after giving effect to any deposits to the Reserve Fund and the withdrawal of the Reserve Fund Draw Amount for such Distribution Date).

(c)        On each Determination Date, the Servicer shall instruct the Indenture Trustee to apply (or cause to be applied) on the related Distribution Date, the Available Funds for such Distribution Date to make the related payments and deposits set forth in Section 2.08 of the Indenture.

Section 4.08.  Statements to Securityholders.  Within the prescribed period of time for tax reporting purposes after the end of each calendar year during the term of the Issuer, but not later than the latest date permitted by Applicable Law, the Servicer shall cause each Trustee to make available to each Person who at any time during such calendar year shall have been a Securityholder, a statement, prepared by the Servicer, containing certain information for such calendar year or, in the event such Person shall have been a Securityholder during a portion of such calendar year, for the applicable portion of such year, for the purposes of such Securityholder's preparation of U.S. federal income tax returns.  In addition, the Servicer shall

22

furnish to the Trustees for distribution to such Person at such time any other information necessary under Applicable Law for the preparation of such income tax returns.

ARTICLE FIVE

THE DEPOSITOR

Section 5.01.  <u>Representations and Warranties of Depositor</u>.  The Depositor makes the following representations and warranties on which the Issuer is deemed to have relied in acquiring the Trust Property.  The representations and warranties speak as of the date of execution and delivery of this Agreement, as of the Closing Date, and shall survive the sale, transfer, assignment and conveyance of the Trust Property to the Issuer, the transfer and assignment thereof to the Underlying Trust pursuant to the Assignment and Assumption Agreement and the pledge thereof to the Indenture Trustee pursuant to the Indenture.

(a)    <u>Organization and Good Standing</u>.  It has been duly organized and is validly existing as a limited liability company in good standing under the laws of the State of Delaware, with power and authority to own its properties and to conduct its business as such properties are currently owned and such business is presently conducted, and had at all relevant times, and has, power, authority and legal right to acquire, own and sell the Receivables.

(b)    <u>Due Qualification</u>.  It is duly qualified to do business as a foreign limited liability company in good standing and has obtained all necessary licenses and approvals in each jurisdiction in which the failure to so qualify or to obtain such licenses and approvals would, in its reasonable judgment, materially and adversely affect the performance by it of its obligations under, or the validity or enforceability of, the Depositor Basic Documents, the Receivables or the Securities.

(c)    <u>Power and Authority</u>.  It has the power and authority to execute, deliver and perform its obligations under the Depositor Basic Documents.  It has the power and authority to sell, assign, transfer and convey the property to be transferred to and deposited with the Issuer and has duly authorized such sale, assignment, transfer and conveyance by all necessary limited liability company action; and the execution, delivery and performance of the Depositor Basic Documents has been duly authorized by it by all necessary limited liability company action.

(d)    <u>Valid Sale; Binding Obligation</u>.  This Agreement effects a valid sale, transfer, assignment and conveyance to the Issuer of the Receivables and the other Trust Property, enforceable against all creditors of and purchasers from the Depositor.  Each Depositor Basic Document constitutes a legal, valid and binding obligation of the Depositor enforceable against it in accordance with its terms, except as enforceability may be subject to or limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, fraudulent transfer or other similar laws affecting the enforcement of creditors' rights in general, and by general principles of equity, regardless of whether considered in a Proceeding in equity or at law.

23

(e)     No Violation.  The execution, delivery and performance by the Depositor of the Depositor Basic Documents and the consummation of the transactions contemplated hereby and thereby and the fulfillment of the terms hereof and thereof does not conflict with, result in any breach of any of the terms and provisions of, nor constitute (with or without notice or lapse of time, or both) a default under, the certificate of formation or limited liability company agreement of the Depositor, or conflict with or violate any of the material terms or provisions of, or constitute (with or without notice or lapse of time, or both) a default under, any indenture, agreement or other instrument to which it is a party or by which it shall be bound or to which any of its properties is subject; nor result in the creation or imposition of any Lien upon any of its properties pursuant to the terms of any such indenture, agreement or other instrument (other than this Agreement); nor violate any law or, to the Depositor's knowledge, any order, rule or regulation applicable to it or of Governmental Authority having jurisdiction over it or its properties, which conflict, breach, default, Lien or violation would have a material adverse effect on the performance by the Depositor of its obligations under or the validity or enforceability of, the Depositor Basic Documents, the Receivables or the Securities.

(f)     No Proceedings.  There are no Proceedings or investigations pending, or to its knowledge, threatened against it, before any Governmental Authority having jurisdiction over it or its properties: (i) asserting the invalidity of any Basic Document or the Securities, (ii) seeking to prevent the issuance of the Securities or the consummation of any of the transactions contemplated by the Basic Documents, (iii) seeking any determination or ruling that, in its reasonable judgment, would materially and adversely affect the performance by it of its obligations under, or the validity or enforceability of, the Depositor Basic Documents, the Receivables or the Securities or (iv) relating to it and which might have a material adverse effect on the treatment of the Issuer, the Underlying Trust or the Securities for U.S. federal income tax purposes.

(g)     Investment Company Act.  None of the Depositor, the Issuer or the Underlying Trust is an "investment company" under the Investment Company Act in reliance on the exclusion or exemption contained in Section 3(c)(5) of the Investment Company Act (although there may be additional exclusions or exemptions available). The Issuer is being structured so as not to constitute a "covered fund" for purposes of the Volcker Rule under the Dodd-Frank Act.

(h)     No Consents.  No consent, approval, authorization or order of or declaration or filing with any governmental authority is required for the issuance or sale of the Securities or the consummation of the other transactions contemplated by this Agreement, except such as have been duly made or obtained.

(i)     Financial Condition.  The Seller is able to and does pay its liabilities as they mature.  The Seller is not in default under any obligation to pay money to any Person except for matters being disputed in good faith that do not involve an obligation of the Seller on a promissory note.  The Seller will not use the proceeds from the transactions contemplated by the Basic Documents to give any preference to any creditor or class of creditors, and such transaction will not leave the Seller with remaining assets which are unreasonably small compared to its ongoing operations.

(2025-2)
4924-3107-4870v.5

(j)     Fraudulent Conveyance.  The Seller is not selling the Receivables to the Trust with any intent to hinder, delay or defraud any of its creditors; the Seller will not be rendered insolvent as a result of the sale of the Receivables to the Trust.

(k)     Tax Returns.  The Seller has filed on a timely basis all tax returns which are required to be filed by it and paid all taxes, including any assessments received by it, to the extent that such taxes have become due (other than taxes, the amount or validity of which are currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been on its books).

(l)     Certificates, Statements and Reports.  Neither this Agreement nor any officer's certificates, statements, reports or other documents prepared by the Seller and furnished by it to the Indenture Trustee pursuant to this Agreement or any other Basic Document to which it is a party, and in connection with the transactions contemplated hereby or thereby (including information regarding loan loss and delinquency experience), when taken as a whole, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein or therein, in the light of the circumstances under which they were made, not misleading.

(m)     Sale Treatment.  The Seller agrees to treat the conveyances hereunder as secured financings for tax and accounting purposes and as a sale for all other purposes (including legal and bankruptcy purposes), on all relevant books, records, tax returns, financial statements and other applicable documents.

Section 5.02.  Liability of Depositor; Indemnities.

(a)     The Depositor shall be liable in accordance herewith only to the extent of the obligations specifically undertaken by it under this Agreement.

(b)     The Depositor shall indemnify, defend and hold harmless the Issuer, the Underlying Trust and the Trustees from and against any taxes that may at any time be asserted against them with respect to the transactions contemplated by the Basic Documents, including any sales, gross receipts, gross margin, general corporation, tangible personal property, privilege or license taxes (but not including any taxes asserted with respect to as of the date of each sale of Receivables to the Issuer or the Underlying Trustee or the issuance and original sale of the Securities, or U.S. federal or State income taxes arising out of distributions on the Securities), and all costs and expenses in defending against such taxes.

(c)     The Depositor shall indemnify, defend and hold harmless the Issuer, the Underlying Trust, the Trustees and the Securityholders from and against any loss, liability, claim, damage or expense incurred by reason of the Depositor's willful misfeasance, bad faith or negligence (other than errors in judgment) in the performance of its duties under the Depositor Basic Documents, or by reason of reckless disregard of its obligations and duties under the Depositor Basic Documents.

(d)     The Depositor shall indemnify, defend and hold harmless the Trustees from and against all Expenses arising out of or incurred in connection with the acceptance or performance of the trusts and duties contained herein, in the Trust Agreement (in the case of the Owner

25

Trustee), the Underlying Trust Agreement (in the case of the Underlying Trustee) and in the Indenture (in the case of the Indenture Trustee), (including those incurred in connection with any enforcement of any indemnification or other obligation hereunder), except to the extent that such loss, liability, claim, cost, damage or expense (i) shall be due to the willful misfeasance, bad faith or gross negligence of the related Trustee, as determined by a court of competent jurisdiction, and the indemnification provided for in this Section shall be paid until such time as such court enters a judgment as to the extent and effect of the alleged gross negligence, willful misconduct or bad faith, at which time such Trustee shall, to the extent required pursuant to such court's determination, promptly return to the Depositor any such indemnification amounts so received but not owed as determined by such court, (ii) in the case of (A) the Owner Trustee, shall arise from the breach by it of any of its representations or warranties set forth in the Trust Agreement, (B) the Underlying Trustee, shall arise from the breach by it of any of its representations or warranties set forth in the Underlying Trust Agreement or (C) the Indenture Trustee, shall arise from the breach by it of any of its representations and warranties set forth in the Indenture or shall arise out of or be incurred in connection with the performance by the Indenture Trustee of the duties of a Successor Servicer hereunder, (iii) shall be one as to which the Servicer is required to indemnify any Trustee or (iv) relates to any tax other than the taxes with respect to which the Servicer shall be required to indemnify any Trustee.  The Depositor shall pay any and all taxes levied or assessed upon all or any part of the Trust Estate.

(e)     Indemnification under this Section shall survive the resignation or removal of any Trustee and the termination or assignment of this Agreement and shall include reasonable fees and expenses of counsel and expenses of litigation.  To the extent that the Depositor fails to promptly pay to a Trustee any indemnification amounts under this Section, such Trustee shall be entitled to recover such amounts in accordance with Section 2.08 of the Indenture.  If the Depositor shall have made any indemnity payments pursuant to this Section and the Person to or on behalf of whom such payments are made thereafter shall collect any of such amounts from others, such Person shall promptly repay such amounts to the Depositor, without interest.  Notwithstanding anything to the contrary contained herein, the Depositor shall only be required to pay (i) any fees, expenses, indemnities or other liabilities that it may incur under the Basic Documents from funds available pursuant to, and in accordance with, the payment priorities set forth in this Agreement and the other Basic Documents and (ii) to the extent it has additional funds available (other than funds described in clause (i) above) that would be in excess of amounts that would be necessary to pay its debt and other obligations in accordance with its certificate of formation, operating agreement and all financing documents to which it is a party.  The agreement set forth in the preceding sentence shall constitute a subordination agreement for purposes of Section 510(a) of the Bankruptcy Code.  In addition, no amount owing by the Depositor hereunder in excess of liabilities that it is required to pay in accordance with the preceding sentence shall constitute a "claim" (as defined in Section 101(5) of the Bankruptcy Code) against it.

Section 5.03.  <u>Merger, Consolidation or Assumption of the Obligations of Depositor</u>.  Any Person (i) into which the Depositor shall be merged or consolidated, (ii) resulting from any merger, conversion or consolidation to which the Depositor shall be a party or (iii) that shall succeed by purchase and assumption to all or substantially all of the business of the Depositor, which Person in any of the foregoing cases executes an agreement of assumption to perform every obligation of the Depositor under this Agreement, shall be the successor to the Depositor

26

under this Agreement without the execution or filing of any other document or any further act on the part of any of the parties to this Agreement; provided, however, that (A) the Depositor shall have delivered to the Trustees an Officer's Certificate and an Opinion of Counsel each stating that such merger, conversion, consolidation or succession and such agreement of assumption comply with this Section, (B) the Depositor shall have delivered to the Trustees an Opinion of Counsel stating that, in the opinion of such counsel, either (1) all financing statements and continuation statements and amendments thereto have been authorized and filed that are necessary to fully preserve and protect the interest of the Issuer, the Underlying Trust and the Indenture Trustee, respectively, in the Receivables, and reciting the details of such filings or referring to prior Opinions of Counsel in which such details are given, or (2) no such action shall be necessary to fully preserve and protect such interest and (C) the Rating Agency Condition shall have been satisfied.  Notwithstanding anything to the contrary contained herein, the execution of the foregoing agreement of assumption and compliance with clauses (A), (B) and (C) above shall be conditions to the consummation of the transactions referred to in clauses (i), (ii) and (iii) above.

Section 5.04.  <u>Limitation on Liability of Depositor and Others</u>.  The Depositor and any director, officer, employee or agent of the Depositor may rely in good faith on any document of any kind, prima facie properly executed and submitted by any Person respecting any matters arising hereunder.  The Depositor shall not be under any obligation to appear in, prosecute or defend any legal action that shall not be incidental to its obligations under this Agreement, and that in its opinion may involve it in any expense or liability.

Section 5.05.  <u>Depositor Not to Resign</u>.  Subject to the provisions of Section 5.03, the Depositor shall not resign from the obligations and duties hereby imposed on it as Depositor hereunder.

Section 5.06.  <u>Depositor May Own Securities</u>.  The Depositor and any of its Affiliates may, in its individual or any other capacity, become the owner or pledgee of Securities with the same rights as it would have if it were not the Depositor or an Affiliate of the Depositor, except as otherwise expressly provided herein or in any other Basic Document (including in the definition of the terms "Note Balance" and "Outstanding").  Except as otherwise expressly provided herein or in the other Basic Documents (including in the definition of the terms "Note Balance" and "Outstanding"), Securities so owned by or pledged to the Depositor or such Affiliate shall have an equal and proportionate benefit under the provisions of this Agreement and the other Basic Documents, without preference, priority or distinction as among the Notes or the Certificates as the case may be.

Section 5.07.  <u>Covenants of Depositor</u>.  The Depositor makes the following covenants as of the date of this Agreement:

(a)    It makes the covenants in Section 2.08, 4.03(c)(iv) and 4.03(c)(v) of the Depositor Limited Liability Company Agreement, which covenants are hereby incorporated into and made a part of this Agreement.

(b)    It shall not conduct or promote any activities except as set forth in Section 2.04 of the Depositor Limited Liability Company Agreement.

(2025-2)
4924-3107-4870v.5

ARTICLE SIX

THE SERVICER, THE CUSTODIAN AND THE BACKUP SERVICER

Section 6.01.   Representations and Warranties of Servicer.  Tricolor, as initial Servicer, makes the following representations and warranties on which the Issuer is deemed to have relied in acquiring the Trust Property.  The representations and warranties speak as of the date of execution and delivery of this Agreement, as of the Closing Date, and shall survive the sale, transfer, assignment and conveyance of the Trust Property to the Issuer, the transfer and assignment thereof to the Underlying Trust pursuant to the Assignment and Assumption Agreement and the pledge thereof to the Indenture Trustee pursuant to the Indenture:

     (a)   Organization and Good Standing.  It is a limited liability company duly organized and validly existing under the laws of the State of Delaware and continues to hold a valid certificate to do business as such.  It is duly authorized to own its properties and transact its business and is in good standing in each jurisdiction in which the character of the business transacted by it or any properties owned or leased by it requires such authorization and in which the failure to be so authorized would have a material adverse effect on its business, properties, assets or condition (financial or other) and those of its subsidiaries, considered as one enterprise.  It has, and at all relevant times had, the power, authority and legal right to service the Receivables.

     (b)   Due Qualification.  It is duly qualified to do business in good standing and has obtained all necessary licenses and approvals in each jurisdiction in which the failure to so qualify or to obtain such licenses and approvals would, in its reasonable judgment, materially and adversely affect the performance by it of its obligations under, or the validity or enforceability of, the Servicer Basic Documents, the Receivables or the Securities.

     (c)   Power and Authority.  It has the power and authority to execute, deliver and perform its obligations under the Servicer Basic Documents, the execution, delivery and performance of the Servicer Basic Documents have been duly authorized by it by all necessary action and each Servicer Basic Document has been duly executed and delivered by it.

     (d)   Binding Obligation.  Each Servicer Basic Document constitutes the legal, valid and binding obligation of it, enforceable against it in accordance with its terms, except as enforceability may be subject to or limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, fraudulent transfer or other similar laws affecting the enforcement of creditors' rights in general, and by general principles of equity, regardless of whether considered in a Proceeding in equity or at law.

     (e)   No Violation.  The execution, delivery and performance by it of the Servicer Basic Documents, the consummation of the transactions contemplated hereby and thereby and the fulfillment of their respective terms shall not conflict with, result in any breach of any of the terms and provisions of, or constitute (with or without notice or lapse of time or both) a default under, its certificate of formation or limited liability

28

company agreement, or any material indenture, agreement, mortgage, deed of trust or other instrument to which it is a party, by which it is bound or to which any of its properties are subject; or result in the creation or imposition of any Lien upon any of its properties pursuant to the terms of any such indenture, agreement, mortgage, deed of trust or other instrument, other than the Servicer Basic Documents, or violate any law, order, rule or regulation applicable to it or its properties of any Governmental Authority having jurisdiction over it or any of its properties.

(f)     No Proceedings.  There are no Proceedings or investigations pending or, to its knowledge, threatened, against it before any Governmental Authority having jurisdiction over it or its properties: (i) asserting the invalidity of any Basic Document, (ii) seeking to prevent the issuance of the Securities or the consummation of any of the transactions contemplated by the Basic Documents, (iii) seeking any determination or ruling that, in its reasonable judgment, would materially and adversely affect the performance by it of its obligations under, or the validity or enforceability of, this Agreement or the Receivables or (iv) seeking to have a material adverse effect on the treatment of the Issuer, the Underlying Trust or the Securities for U.S. federal income tax purposes.

(g)     No Consents.  It is not required to obtain the consent of any Person or any consent, license, approval or authorization, or registration or declaration with, any Governmental Authority in connection with the execution, delivery, performance, validity or enforceability of this Agreement and the other Servicer Basic Documents which has not already been obtained.

(h)     Insurance.  So long as any Notes are Outstanding, it will: (i) (A) require each Obligor to maintain full coverage insurance through a third party on the related Financed Vehicle or (B) maintain a single interest policy which covers the lowest of (1) the value of such Financed Vehicle, (2) the unpaid Principal Balance of the related Receivable or (3) the cost to repair such Financed Vehicle, which may include a blanket coverage policy, and (ii) carry errors and omissions insurance in an amount customary of similar businesses and issued by an insurer rated A- or higher by an NRSRO.

(i)     Additional Representation.  It uses IDMS (Integrated Database Management System) as its servicing system of record.

Section 6.02.  Representations and Warranties of Custodian.  The Custodian makes the following representations and warranties on which the Issuer is deemed to have relied in acquiring the Trust Property.  The representations and warranties speak as of the date of execution and delivery of this Agreement, as of the Closing, and shall survive the sale, transfer, assignment and conveyance of the Trust Property to the Issuer, the transfer and assignment thereof to the Underlying Trust pursuant to the Assignment and Assumption Agreement and the pledge thereof to the Indenture Trustee pursuant to the Indenture:

(a)     Organization and Good Standing.  It is a national banking association organized and validly existing under the laws of the United States, with power, authority and legal right to own its properties and to conduct its business as such properties are

29

currently owned and such business is currently conducted, and had at all relevant times, and now has, the power, authority and legal right to enter into and perform its obligations under the Custodian Basic Documents.

(b)     Due Qualification.  It is duly qualified to do business as a foreign corporation in good standing and has obtained all necessary licenses and approvals in each jurisdiction in which the failure to so qualify or to obtain such licenses and approvals would, in its reasonable judgment, materially and adversely affect its performance of its obligations under, or the validity or enforceability of, the Custodian Basic Documents.

(c)     Power and Authority.  It has the power and authority to execute, deliver and perform its obligations under the Custodian Basic Documents, the execution, delivery and performance of such Basic Documents have been duly authorized by it by all necessary action and it has duly executed each Custodian Basic Document.

(d)     Binding Obligation.  Each Custodian Basic Document constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, except as enforceability may be subject to or limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, fraudulent transfer or other similar laws affecting the enforcement of creditors' rights in general, and by general principles of equity, regardless of whether considered in a Proceeding in equity or at law.

(e)     No Violation.  The execution, delivery and performance by it of the Custodian Basic Documents, the consummation of the transactions contemplated hereby and thereby and the fulfillment of their respective terms shall not conflict with, result in any breach of any of the terms and provisions of, or constitute (with or without notice or lapse of time or both) a default under, its articles of association or any material indenture, agreement, mortgage, deed of trust or other instrument to which it is a party, by which it is bound or to which any of its properties are subject; or result in the creation or imposition of any Lien upon any of its properties pursuant to the terms of any such indenture, agreement, mortgage, deed of trust or other instrument, other than such Basic Documents, or violate any law, order, rule or regulation of the State of Delaware, the State of New York or the United States governing its banking and trust powers applicable to it or its properties of any Governmental Authority having jurisdiction over it or any of its properties.

(f)     No Proceedings.  There are no Proceedings or investigations pending or, to its knowledge, threatened, against it before any Governmental Authority having jurisdiction over it or its properties: (i) asserting the invalidity of any Custodian Basic Document, (ii) seeking to prevent the issuance of the Securities or the consummation of any of the transactions contemplated by such Basic Documents or (iii) seeking any determination or ruling that, in its reasonable judgment, would materially and adversely affect the performance by it of its obligations under, or the validity or enforceability of, this Agreement or the Receivables.

(2025-2)
4924-3107-4870v.5

(g)      No Consents.  It is not required to obtain the consent of any Person or any consent, license, approval or authorization, or registration or declaration with, any Governmental Authority of the State of Delaware, the State of New York or the United States governing its banking and trust powers in connection with the execution, delivery, performance, validity or enforceability of the Custodian Basic Documents to which it is a party which has not already been obtained.

Section 6.03.  Representations and Warranties of Backup Servicer.  The Backup Servicer makes the following representations and warranties on which the Issuer is deemed to have relied in acquiring the Trust Property.  The representations and warranties speak as of the date of execution and delivery of this Agreement, as of the Closing Date, and shall survive the sale, transfer, assignment and conveyance of the Trust Property to the Issuer, the transfer and assignment thereof to the Underlying Trust pursuant to the Assignment and Assumption Agreement and the pledge thereof to the Indenture Trustee pursuant to the Indenture:

(a)      Organization and Good Standing.  It is a corporation organized and validly existing under the laws of the State of Delaware, with power, authority and legal right to own its properties and to conduct its business as such properties are currently owned and such business is currently conducted, and had at all relevant times, and now has, the power, authority and legal right to enter into and perform its obligations under the Backup Servicer Basic Documents.

(b)      Due Qualification.  It is duly qualified to do business as a foreign corporation in good standing and has obtained all necessary licenses and approvals in each jurisdiction in which the failure to so qualify or to obtain such licenses and approvals would, in its reasonable judgment, materially and adversely affect its performance of its obligations under (including the servicing of the Receivables), or the validity or enforceability of, the Backup Servicer Basic Documents.

(c)      Power and Authority.  It has the power and authority to execute, deliver and perform its obligations under the Backup Servicer Basic Documents, the execution, delivery and performance of such Basic Documents have been duly authorized by it by all necessary action and the Backup Servicer Basic Documents have been duly executed and delivered by it.

(d)      Binding Obligation.  Each Backup Servicer Basic Document constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, except as enforceability may be subject to or limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, fraudulent transfer or other similar laws affecting the enforcement of creditors' rights in general, and by general principles of equity, regardless of whether considered in a Proceeding in equity or at law.

(e)      No Violation.  The execution, delivery and performance by it of the Backup Servicer Basic Documents, the consummation of the transactions contemplated hereby and thereby and the fulfillment of their respective terms shall not conflict with, result in any breach of any of the terms and provisions of, or constitute (with or without notice or lapse of time or both) a default under, its articles of association or any material

31

indenture, agreement, mortgage, deed of trust or other instrument to which it is a party, by which it is bound or to which any of its properties are subject; or result in the creation or imposition of any Lien upon any of its properties pursuant to the terms of any such indenture, agreement, mortgage, deed of trust or other instrument, other than such Basic Documents, or violate any law, order, rule or regulation of the State of Delaware, the State of New York or the United States governing its banking and trust powers applicable to it or its properties of any Governmental Authority having jurisdiction over it or any of its properties.

(f)     No Proceedings.  There are no Proceedings or investigations pending or, to its knowledge, threatened, against it before any Governmental Authority having jurisdiction over it or its properties: (i) asserting the invalidity of any Backup Servicer Basic Document, (ii) seeking to prevent the issuance of the Securities or the consummation of any of the transactions contemplated by such Basic Documents or (iii) seeking any determination or ruling that, in its reasonable judgment, would materially and adversely affect the performance by it of its obligations under, or the validity or enforceability of, this Agreement or the Receivables.

(g)     No Consents.  It is not required to obtain the consent of any Person or any consent, license, approval or authorization, or registration or declaration with, any Governmental Authority of the State of Delaware, the State of New York or the United States governing its corporate powers in connection with the execution, delivery, performance, validity or enforceability of the Backup Servicer Basic Documents which has not already been obtained.

Section 6.04.   Liability of Servicer and Backup Servicer; Indemnities.

(a)     The Servicer shall be liable in accordance herewith only to the extent of the obligations specifically undertaken by it under this Agreement.  Such obligations shall include the following:

(i)     The Servicer shall indemnify, defend and hold harmless the Issuer, the Underlying Trust, the Trustees, the Custodian, the Backup Servicer, the Securityholders and the Depositor from and against all losses, liabilities, actions, suits, claims, damages and expenses arising out of or incurred in connection with the use, ownership or operation by the Servicer or any Affiliate of the Servicer or agent or subcontractor thereof of a Financed Vehicle.

(ii)     The Servicer shall indemnify, defend and hold harmless the Issuer, the Underlying Trust, the Depositor, the Custodian, the Backup Servicer and the Trustees from and against any taxes that may at any time be asserted against any such Person as a result of or relating to the transactions contemplated herein and in the other Basic Documents, including any sales, gross receipts, gross margin, general corporation, tangible personal property, privilege or license taxes (but not including any taxes asserted with respect to, and as of the date of, the sale of the Receivables to the Issuer, the transfer and assignment thereof to the Underlying Trust pursuant to the Assignment and Assumption Agreement or the issuance and original sale of the Securities, or U.S. federal

32

or State income taxes arising out of distributions on the Securities) and costs and expenses in defending against such taxes.

(iii)     The Servicer shall indemnify, defend and hold harmless the Issuer, the Underlying Trust, the Trustees, the Custodian, the Backup Servicer, the Securityholders and the Depositor from and against any loss, liability, claim, action, suit, damage or expense incurred by reason of its willful misfeasance, bad faith or negligence in the performance of its duties under the Servicer Basic Documents or by reason of a reckless disregard of its obligations or duties under, or as a result of a breach of any representation or warranty made by it under the Servicer Basic Documents.

(iv)     The Servicer shall indemnify, defend and hold harmless the Trustees, the Custodian, the Backup Servicer and their respective officers, directors, employees and agents from and against all losses, liabilities, claims, costs, damages and expenses (including reasonable legal fees and expenses and court costs) arising out of or incurred in connection with the acceptance or performance of the trusts and duties herein and contained in the Trust Agreement (in the case of the Owner Trustee), contained in the Underlying Trust Agreement (in the case of the Underlying Trustee)  and contained in the Indenture (in the case of the Indenture Trustee) (including those incurred in connection with any enforcement of any indemnification or other obligation hereunder), except to the extent that such loss, liability, claim, cost, damage or expense: (A) shall be due to the willful misfeasance, bad faith or gross negligence (except for errors in judgment) of the related Trustee as determined by a court of competent jurisdiction, and the indemnification provided for in this Section shall be paid until such time as such court enters a judgment as to the extent and effect of the alleged gross negligence, willful misconduct or bad faith, at which time the related Trustee, shall, to the extent required pursuant to such court's determination, promptly return to the Servicer any such indemnification amounts so received but not owed as determined by such court, (B) in the case of the Owner Trustee, shall arise from the breach by it of any of its representations or warranties set forth in Section 7.03 of the Trust Agreement, (C) in the case of the Underlying Trustee, shall arise from the breach by it of any of its representations or warranties set forth in Section 7.03 of the Underlying Trust Agreement or (D) relates to any tax other than to the taxes with respect to which either the Depositor or the Servicer shall be required to indemnify a Trustee.

(v)     The Servicer shall pay (A) the Owner Trustee compensation, reimbursement or other payments owed to it pursuant to Sections 8.01 and 8.02 of the Trust Agreement and (B) the Underlying Trustee compensation, reimbursement or other payments owed to it pursuant to Sections 8.01 and 8.02 of the Underlying Trust Agreement.

(b)     The Backup Servicer shall be liable in accordance herewith only to the extent of the obligations specifically undertaken by it under the Backup Servicer Basic Documents.  Such obligations shall include indemnifying, defending and holding harmless the Issuer, the Underlying Trust, the Trustees, the Servicer, the Securityholders and the Depositor from and against all losses, liabilities, claims, damages, costs and expenses incurred by reason of its willful misconduct, bad faith or gross negligence in the performance of its duties under the Backup

Servicer Basic Documents or by reason of a reckless disregard of its obligations and duties
thereunder.

(c)      In addition to the foregoing indemnities, if any Trustee is entitled to
indemnification by the Depositor pursuant to Section 5.02 and the Depositor is unable for any
reason to provide such indemnification to such Trustee, then the Servicer shall be liable for any
indemnification that such Trustee is entitled to under Section 5.02.  If the Servicer, for any
reason, does not provide such indemnification to a Trustee, then such Trustee shall be entitled to
recover such amounts in accordance with Section 2.08 of the Indenture.  For purposes of this
Section, in the event of a termination of the rights and obligations of the Servicer (or any
Successor Servicer) pursuant to Section 7.01 or a resignation by the Servicer pursuant to
Section 6.07, such Servicer shall be deemed to be the Servicer pending appointment of a
Successor Servicer pursuant to Section 7.02.  Indemnification under this Section by the Servicer
(or any Successor Servicer), with respect to the period such Person was (or was deemed to be)
the Servicer, shall survive the termination of each Person as Servicer or a resignation by such
Person as Servicer, as well as the resignation or removal of the Owner Trustee or the Indenture
Trustee, as the case may be, the termination of this Agreement or assignment by the Depositor or
the Servicer of this Agreement and shall include reasonable fees and expenses of counsel and
expenses of litigation including any costs and expenses (including reasonable fees and expenses
of counsel and court costs and losses) incurred in connection with any action, claim or suit
brought to enforce the indemnified party's right to indemnification.  If the Servicer shall have
made any indemnity payments pursuant to this Section and the Person to or on behalf of whom
such payments are made thereafter collects any of such amounts from others, such Person shall
promptly repay such amounts to the Servicer, as the case may be, without interest.

Section 6.05.  <u>Merger or Consolidation of, or Assumption of the Obligations of Servicer,
Custodian and Backup Servicer</u>.

(a)      Any Person (i) into which the Servicer, the Custodian or the Backup Servicer
shall be merged or consolidated, (ii) which may result from any merger, conversion or
consolidation to which it shall be a party or (iii) which may succeed to all or substantially all of
its business, which Person in any of the foregoing cases is an Eligible Servicer and executes an
agreement of assumption to perform every of its obligations under this Agreement and the other
Basic Documents to which it is a party, shall be the successor to the Servicer, the Custodian or
the Backup Servicer, as the case may be, under this Agreement without the execution or filing of
any other document or any further act on the part of any of the parties hereto; provided, however,
the Servicer, the Custodian or the Backup Servicer shall have delivered to the Depositor and the
Trustees (A) an Officer's Certificate and an Opinion of Counsel each stating that such merger,
conversion or consolidation and such agreement of assumption comply with this Section and
(B) an Opinion of Counsel stating that, in the opinion of such counsel, either (1) all financing
statements and continuation statements and amendments thereto have been authorized and filed
that are necessary to preserve and protect the interest of the Issuer, the Underlying Trust and the
Indenture Trustee, respectively, in the assets of the Issuer and the Underlying Trust and reciting
the details of such filings or referring to prior Opinions of Counsel in which such details are
given or (2) no such action shall be necessary to preserve and protect such interest.
Notwithstanding anything to the contrary contained herein, the execution of the foregoing
agreement of assumption and compliance with clauses (A) and (B) above shall be conditions to

(2025-2)
4924-3107-4870v.5

the consummation of the transactions referred to in the immediately preceding sentence.  Each of the Servicer, the Custodian and the Backup Servicer shall provide prior written notice of any merger, conversion, consolidation or succession pursuant to this Section to the Trustees, the Depositor and the Rating Agencies.  The Servicer shall provide such information in writing as reasonably requested by the Depositor to allow the Depositor to comply with its Exchange Act reporting obligations with respect to a Successor Servicer.

(b)    Notwithstanding anything in Section 6.05(a), whether in its capacity as Custodian, Backup Servicer or as Successor Servicer, any Person (i) into which the Custodian or the Backup Servicer shall be merged or consolidated, (ii) which may result from any merger, conversion or consolidation to which it shall be a party or (iii) which may succeed to all or substantially all of its business, which Person in any of the foregoing cases is an Eligible Servicer and executes an agreement of assumption to perform every obligation of the Custodian or the Backup Servicer under this Agreement, as applicable, shall be the successor to the Custodian or the Backup Servicer under this Agreement, as applicable, without the execution or filing of any other document or any further act on the part of any of the parties hereto.

Section 6.06.  <u>Limitation on Liability of Servicer and Backup Servicer</u>.

(a)    Neither the Servicer, the Backup Servicer nor their respective directors, officers, employees or agents shall be under any liability to the Issuer, the Underlying Trust or any Securityholders for any action taken or for refraining from the taking of any action pursuant hereto, or for errors in judgment; provided, however, that this provision shall not protect the Servicer, the Backup Servicer or any such Person against any liability that would otherwise be imposed by reason of willful misconduct, bad faith or negligence (excluding errors in judgment) in the performance of duties, a breach of its obligations resulting from its willful misconduct, bad faith or negligence or by reason of reckless disregard of obligations and duties hereunder or, in the case of the Servicer, a breach of its obligations.  The Servicer, the Backup Servicer and their respective directors, officers, employees or agents may rely in good faith on any document of any kind prima facie properly executed and submitted by any Person in respect of any matters arising under this Agreement.

(b)    Except as provided herein, neither the Servicer nor the Backup Servicer shall be under any obligation to appear in, prosecute or defend any legal action that shall not be incidental to its duties to administer and service the Receivables in accordance with this Agreement, and that in its opinion may involve it in any expense or liability; provided, however, that the Servicer may undertake any reasonable action that it may deem necessary or desirable in respect of this Agreement and the rights and duties of the parties to this Agreement and the interests of the Securityholders under this Agreement.  In such event, the legal expenses and costs of such action and any liability resulting therefrom shall be expenses, costs and liabilities of the Servicer.

Section 6.07.  <u>Servicer, Custodian and Backup Servicer Not to Resign; Termination of the Backup Servicer and Custodian</u>.

(a)    Tricolor will not resign as Servicer under this Agreement except upon determination that the performance of its duties under this Agreement is no longer permissible

35

under Applicable Law.  Any such resignation of the Servicer will become effective in accordance with Section 7.02.  Prior to the effectiveness of such resignation, the Servicer will deliver to the Depositor and the Trustees (i) notice of any such determination permitting the resignation of Tricolor as Servicer (with a copy being provided to the Backup Servicer) and (ii) an Opinion of Counsel to such effect.  The Custodian and, prior to the time it becomes Successor Servicer pursuant to Section 7.02 the Backup Servicer, may resign upon 30 days' prior written notice to the other parties hereto; provided, however, that no such resignation of will be effective until (A) the resigning entity has delivered to the Depositor and the Trustees notice of such determination, (B) the Rating Agency Condition has been satisfied and (C) a successor entity has assumed its responsibilities and obligations under this Agreement and the other Basic Documents to which it is a party.  If a successor Custodian or Backup Servicer has not replaced the outgoing Custodian or Backup Servicer as provided in clause (C) above within 30 days of the date of notice of resignation, the resigning Custodian or Backup Servicer may, at the expense of the Issuer, petition a court of competent jurisdiction for the appointment of a successor to it that is an Eligible Servicer.

(b)      The Indenture Trustee shall, at the direction of the Majority Noteholders (or Holders of Certificates representing not less than 51% of the aggregate Certificate Percentage Interests if the Notes are no longer Outstanding), terminate the Custodian or the Backup Servicer, without cause, upon not less than 30 days' prior written notice by notice given in writing no less than 30 days prior to such termination to the Depositor, the Custodian and the Servicer (with a copy to the Trustees and the Rating Agencies if given by the Securityholders), and appoint a successor to replace it.  If the applicable Securityholders shall fail to approve a successor Custodian or Backup Servicer, as the case may be, in accordance with the immediately preceding sentence within 30 days of the date of notice of removal, the Custodian or the Backup Servicer, as applicable, may, at the expense of the Issuer, petition a court of competent jurisdiction for the appointment of a successor that is an Eligible Servicer.

Section 6.08.  <u>Servicer, Custodian and Backup Servicer May Own Securities</u>.  The Servicer, the Custodian, the Backup Servicer and their respective Affiliates may, in its individual or other capacity, become the owner or pledgee of Securities with the same rights as it would have if it were not the Servicer, the Custodian, the Backup Servicer or any of their respective Affiliates, except as otherwise expressly provided herein or in any other Basic Document (including in the definition of the terms "Note Balance" and "Outstanding").  Except as otherwise expressly provided herein or in the other Basic Documents (including in the definition of the terms "Note Balance" and "Outstanding"), Securities so owned by or pledged to the Servicer, the Custodian, the Backup Servicer or any of their respective Affiliates shall have an equal and proportionate benefit under the provisions of this Agreement and the other Basic Documents, without preference, priority or distinction as among any other Securities.

ARTICLE SEVEN

SERVICER TERMINATION EVENTS

Section 7.01.  <u>Servicer Termination Events</u>.  The occurrence of any one of the following events shall constitute an event of servicing termination hereunder (each, a "Servicer Termination Event"):

36

(a)    any failure by the Servicer to deliver to the Indenture Trustee the Investor Report for any Collection Period, which failure shall continue unremedied beyond the earlier of two Business Days following the date such Investor Report was required to be delivered and the related Distribution Date, or any failure by the Servicer to make any required payment or deposit under this Agreement, which failure shall continue unremedied beyond the earlier of three Business Days following the date such payment or deposit was due and, in the case of a payment or deposit to be made no later than a Distribution Date or the related Deposit Date, such Distribution Date or Deposit Date, as applicable, in each case after an Executive Officer of the Servicer has knowledge thereof or after written notice of such failure, requiring the same to be remedied, shall have been given to the Servicer by the Indenture Trustee or by the Holders of Notes evidencing not less than 25% of the Note Balance of the Controlling Class of Notes (or, after the Notes have been paid in full, the holders of Certificates evidencing not less than 25% of the aggregate Certificate Percentage Interests);

(b)    any failure by the Servicer to duly observe or to perform in any respect any other covenant or agreement of the Servicer set forth in this Agreement, which failure shall materially and adversely affect the rights of the Noteholders and shall continue unremedied for a period of 45 days after an Executive Officer of the Servicer has knowledge thereof or 45 days after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Servicer by the Indenture Trustee or by the Holders of Notes evidencing not less than 25% of the Note Balance of the Controlling Class of Notes (or, after the Notes have been paid in full, the holders of Certificates evidencing not less than 25% of the aggregate Certificate Percentage Interests);

(c)    any representation or warranty of the Servicer made in this Agreement, or in any certificate or report delivered pursuant hereto, other than any representation or warranty relating to a Receivable that has been purchased by the Servicer, proving to have been incorrect in any material respect as of the time when the same shall have been made, and the circumstance or condition in respect of which such representation or warranty was incorrect shall not have been eliminated or otherwise cured for a period of 45 days after an Executive Officer of the Servicer has knowledge thereof or 45 days after the date on which written notice of such circumstance or condition, requiring the same to be eliminated or cured, shall have been given to the Servicer by the Indenture Trustee or by the Holders of Notes evidencing not less than 25% of the Note Balance of the Controlling Class of Notes; or

(d)    an Insolvency Event occurs with respect to the Servicer.

If a Servicer Termination Event shall have occurred and not have been remedied, the Indenture Trustee, acting at the written direction of the Majority Noteholders (or Holders of Certificates representing not less than 51% of the aggregate Certificate Percentage Interests if the Notes are no longer Outstanding), by providing a Servicer Termination Notice to the Depositor, the Servicer and the Backup Servicer (and to the Indenture Trustee if given by the Noteholders), shall terminate all the rights and obligations of the Servicer under this Agreement; provided,

(2025-2)
4924-3107-4870v.5

however, that the indemnification obligations of the Servicer under Section 6.04 shall survive such termination.

On or after the receipt by the Servicer of a Servicer Termination Notice, all authority and power of the Servicer under this Agreement, whether with respect to the Notes, the Certificates, the Trust Estate or otherwise, shall, without further action, pass to and be vested in the Backup Servicer or such other Successor Servicer as may be appointed under Section 7.02; and, without limitation, the Trustees are hereby authorized and empowered to execute and deliver, on behalf of the outgoing Servicer, as attorney-in-fact or otherwise, any and all documents and other instruments, and to do or accomplish all other acts or things necessary or appropriate to effect the purposes of such notice of termination, whether to complete the transfer and endorsement of the Receivable Files or the certificates of title to the Financed Vehicles, or otherwise.  The outgoing Servicer shall cooperate with the Trustees and the Successor Servicer in effecting the termination of its responsibilities and rights under this Agreement, including the transfer to the Indenture Trustee or such Successor Servicer for administration by it of all cash amounts that shall at the time be held by the outgoing Servicer for deposit, or have been deposited by it in the Accounts or thereafter received with respect to the Receivables, all servicing files and all information or documents that such Successor Servicer may require.  In addition, the Servicer shall transfer its electronic records relating to the Receivables to the Successor Servicer in such electronic form as the Successor Servicer may reasonably request.  All Transition Costs shall be paid by the Issuer upon presentation of reasonable documentation of such costs and expenses.

The Trustees shall have no obligation to notify the Securityholders or any other Person of the occurrence of any event specified in this Section prior to the continuance of such event through the end of any cure period specified in this Section.

Section 7.02.  Appointment of Successor Servicer.

(a)        Upon the resignation of the Servicer pursuant to Section 6.07 or the termination of the Servicer pursuant to Section 7.01, the Backup Servicer (unless the Majority Noteholders shall have exercised their option pursuant to Section 7.02(b) to appoint an alternate Successor Servicer, with the Backup Servicer or such other entity being the "Successor Servicer") shall be the successor in all respects to the Servicer in its capacity as Servicer under this Agreement and shall be subject to all the obligations and duties placed on the Servicer by the terms and provisions of this Agreement, except as otherwise expressly set forth herein; provided, however, that the Successor Servicer shall have no obligations pursuant to Section 3.09 with respect to the fees and expenses of the Trustees, the fees and expenses of the attorneys for the Trustees, the fees and expenses of any custodian appointed by the Trustees, the fees and expenses of Independent accountants or expenses incurred in connection with distributions and reports to the Securityholders.  If the Backup Servicer is legally unable to act as Successor Servicer, then another Successor Servicer may be appointed pursuant to Section 7.02(b).  As compensation therefor, the Successor Servicer shall be entitled to such compensation (whether payable out of the Collection Account or otherwise) as the Servicer would have been entitled to under this Agreement if no such resignation or termination had occurred unless otherwise consented to by the Holders of Notes evidencing not less than 51% of the Note Balance of the Controlling Class of Notes (or Holders of Certificates representing not less than 51% of the aggregate Certificate Percentage Interests if the Notes are no longer Outstanding).  The Servicer shall not be relieved

38

of its duties as Servicer under this Section until a Successor Servicer shall have assumed the obligations and duties of the outgoing Servicer under this Agreement.

(b)        Upon the resignation of the Servicer pursuant to Section 6.07 or the termination of the Servicer pursuant to Section 7.01, the Indenture Trustee (acting at the written direction of the Majority Noteholders) may appoint an Eligible Servicer other than the Backup Servicer to be the Successor Servicer, and shall have no liability to the Backup Servicer, the outgoing Servicer or any other Person if it does so.  Notwithstanding the foregoing and the provisions of Section 7.02(a), if the Backup Servicer is legally unable to act as Successor Servicer and the Majority Noteholders shall fail to approve a Successor Servicer in accordance with the immediately preceding sentence within 30 days of the date of notice of resignation, the Indenture Trustee may, at the expense of the Issuer, petition a court of competent jurisdiction for the appointment of an Eligible Servicer as the successor to the terminated Servicer under this Agreement.  In connection with any such appointment, arrangements may be made for the compensation of such Successor Servicer out of collections on or in respect of the Receivables as it and such successor shall agree; provided, however, that such compensation shall not be greater than that payable to Tricolor as initial Servicer hereunder without the prior consent of the Majority Noteholders.

(c)        Notwithstanding any other provision of this Agreement, the Successor Servicer shall be authorized to accept and rely on all Predecessor Servicer Work Product without any audit or other examination thereof, and the Successor Servicer shall have no duty, responsibility, obligation or liability for the acts and omissions of the prior Servicer.  If any Errors exist in any Predecessor Servicer Work Product and such Errors make it materially more difficult to service or should cause or materially contribute to the Continuing Errors of the Successor Servicer, the Successor Servicer shall have no duty, responsibility, obligation or liability for such Continuing Errors; provided, however, that the Successor Servicer agrees to use its best efforts to prevent further Continuing Errors.  In the event the Successor Servicer becomes aware of Errors or Continuing Errors, it shall promptly notify the Trustees and use its best efforts to reconstruct and reconcile such data as is commercially reasonably to correct such Errors and Continuing Errors and to prevent future Continuing Errors.  The Successor Servicer shall be entitled to recover its costs thereby expended in accordance with Section 2.08 of the Indenture.

(d)        The Successor Servicer shall have (i) no liability with respect to any obligation which was required to be performed by the predecessor Servicer prior to the date that such entity became the Successor Servicer or any claim based on any alleged action or inaction of the predecessor Servicer, (ii) no obligation to perform any repurchase or advancing obligations, if any, of the Servicer, (iii) no obligation to pay any taxes required to be paid by the Servicer, (iv) no obligation to pay any of the fees and expenses of any other party involved in the transactions contemplated by the Basic Documents and (v) no liability or obligation with respect to any Servicer indemnification obligations of any prior Servicer.  The indemnification obligations of the Successor Servicer, upon becoming the Successor Servicer, are expressly limited to those instances of negligence or willful misconduct of the Successor Servicer.

(e)        When a Trustee or a Successor Servicer incurs expenses after the occurrence of a Servicer Termination Event described in Section 7.01(d) with respect to the Servicer, the expenses are intended to constitute expenses of administration under the Bankruptcy Code or any other applicable federal or State Insolvency Laws.

39

Section 7.03.  Effect of Servicing Transfer.

(a)     After a transfer of servicing hereunder, the Successor Servicer shall notify the Obligors to make directly to the Successor Servicer payments that are due under the Receivables after the effective date of such transfer.

(b)     Except as provided in Section 7.02, after a transfer of servicing hereunder, the outgoing Servicer shall have no further obligations with respect to the administration, servicing, custody or collection of the Receivables, and the Successor Servicer shall have all of such obligations (except as otherwise set forth herein), except that the outgoing Servicer will transmit or cause to be transmitted directly to the Successor Servicer for its own account, promptly on receipt and in the same form in which received, any amounts or items held by the outgoing Servicer (properly endorsed where required for the Successor Servicer to collect any such items) received as payments upon or otherwise in connection with the Receivables.

(c)     Any Successor Servicer shall provide the Depositor with access to its records (whether written or automated) with respect to the Receivables.  Such access shall be afforded without charge, but only upon reasonable request and during normal business hours at the offices of the Successor Servicer.  Nothing in this Section shall affect the obligation of a Successor Servicer to observe any Applicable Law prohibiting disclosure of information regarding the Obligors, and its failure to provide access to information as a result of such obligation shall not constitute a breach of this Section.

(d)     Any transfer of servicing hereunder shall not constitute an assumption by the related Successor Servicer of any liability of the outgoing Servicer arising out of any breach by such outgoing Servicer of its duties hereunder prior to such transfer of servicing.

Section 7.04.  Notification to Noteholders and each Rating Agency.  Upon the receipt of written notice or actual knowledge by a Responsible Officer of the Indenture Trustee of a Servicer Termination Event or upon any termination of, or any appointment of a successor to, the Servicer pursuant to this Article, the Indenture Trustee shall give prompt written notice thereof to the Noteholders and the Rating Agencies.

Section 7.05.  Waiver of Past Servicer Termination Events.  The Majority Noteholders may, on behalf of all Securityholders, waive any Servicer Termination Event, other than a Servicer Termination Event consisting of a failure to make any required payment or deposit under this Agreement.  Upon any such waiver of a Servicer Termination Event, such event shall cease to exist, and shall be deemed to have been remedied for every purpose of this Agreement. No such waiver shall extend to any subsequent or other event or impair any right arising therefrom, except to the extent expressly so waived.

ARTICLE EIGHT

TERMINATION

Section 8.01.  Optional Purchase of All Receivables.

40

(a)      If, as of the last day of any Collection Period, the Note Balance shall be less than or equal to 10.0% of the initial Note Balance of the Notes as of the Closing Date, the Servicer shall have the option to purchase on the following Distribution Date the Trust Estate, other than the Accounts.  To exercise such option, the Servicer shall notify the Depositor, the Trustees, the Backup Servicer and each Rating Agency, not fewer than ten nor more than 30 days prior to the Distribution Date on which such repurchase is to be effected and shall deposit into the Collection Account on the related Deposit Date an amount equal to the aggregate Purchase Amount for the Receivables (including Receivables that became Defaulted Receivables during the related Collection Period), less the Reserve Fund Amount, which funds shall be transferred from the Reserve Fund into the Collection Account.  Notwithstanding the foregoing, the Servicer shall not be permitted to exercise such option unless the amount to be deposited in the Collection Account (together with amounts on deposit in the Reserve Fund and the Collection Account) pursuant to this Section is at least equal to the sum of all amounts due to the Servicer, the Trustees, the Custodian and the Backup Servicer under the Basic Documents plus the Note Balance plus all accrued but unpaid interest (including any overdue interest) on the Notes plus all accrued but unpaid Issuer Expenses, without regard to any annual caps or similar limitations on payment.  Upon such payment, the Seller shall succeed to and own all interests in and to the Issuer.  The aggregate amount so deposited in respect of such Distribution Date, plus, to the extent necessary, all amounts in the Reserve Fund, if any, shall be used to make payments in full to the Noteholders in the manner set forth in Article Four.

(b)      Following the satisfaction and discharge of the Indenture and the payment in full of the principal of and interest on the Notes, the Certificateholders shall succeed to the rights of the Noteholders hereunder and the Indenture Trustee shall continue to carry out its obligations hereunder with respect to the Certificateholders, including making distributions from the Collection Account in accordance with Section 4.07(c) and making withdrawals from the Reserve Fund in accordance with Sections 4.02 and 4.06.  Notwithstanding the satisfaction and discharge of the Indenture, the Indenture Trustee shall be entitled to the rights and protections of the Indenture Trustee contained therein in connection with the performance of its duties hereunder (including Article Six of the Indenture).

Section 8.02.  <u>Termination</u>.  Notwithstanding anything in this Agreement to the contrary, this Agreement shall terminate upon the earliest to occur of (i) the maturity or liquidation of the latest maturing Receivable and the disposition of any amounts received thereon in accordance with Section 2.08 of the Indenture, (ii) the payment to the Securityholders of all amounts required to be paid to them under the Basic Documents and (iii) the exercise by the Servicer of its rights under Section 8.01, the deposit into the Collection Account by the Servicer of the amount required to be deposited therein in accordance with Section 8.01 and the application of such amounts in accordance with Section 2.08 of the Indenture.

ARTICLE NINE

MISCELLANEOUS

Section 9.01.  <u>Amendment</u>.

41

(a)     This Agreement may be amended from time to time by the parties hereto without the consent of any Securityholders to cure any ambiguity or to correct or supplement any provision herein which may be inconsistent with any other provision herein or with the Offering Memorandum; provided, however, that except for an amendment intended to make this Agreement consistent with the Offering Memorandum, no such amendment may materially adversely affect the interests of any Noteholder.

(b)     This Agreement may also be amended from time to time by the parties hereto, with the consent of the Majority Noteholders (or if the Notes are no longer Outstanding, Holders of Certificates evidencing not less than 51% of the aggregate Certificate Percentage Interests), for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Agreement, or of modifying in any manner the rights of the Noteholders; provided, however, that no such amendment (i) will be permitted unless (A) the Rating Agency Condition shall have been satisfied and (B) an Opinion of Counsel is delivered to the Depositor and the Trustees to the effect that such amendment will not cause the Issuer or the Underlying Trust to be characterized for U.S. federal income tax purposes as an association or publicly traded partnership taxable as a corporation or otherwise have any material adverse effect on the U.S. federal income taxation of any Notes Outstanding or any Noteholder and (ii) may (A) increase or reduce in any manner the amount of, or accelerate or delay the timing of, or change the allocation or priority of, collections of payments on or in respect of the Receivables or distributions that are required to be made for the benefit of the Noteholders or change any Interest Rate or the Reserve Fund Required Amount without the consent of 100% of the Noteholders affected thereby or (B) reduce the percentage of the Note Balance of the Controlling Class of Notes, the consent of the Noteholders of which is required for any amendment to this Agreement without the consent of 100% of the Noteholders of Notes affected thereby.

(c)     An amendment to this Agreement shall be deemed not to materially adversely affect the interests of any Noteholder if (i) the Person requesting such amendment obtains and delivers to the Trustees an Opinion of Counsel (which counsel shall not be in-house counsel to the Servicer or the Depositor) or an Officer's Certificate to that effect or (ii) the Rating Agency Condition has been satisfied with respect to such amendment.

(d)     Prior to the execution of any amendment pursuant to this Section, the Servicer shall provide written notification of the substance of such amendment to each Rating Agency.

(e)     Promptly after the execution of any amendment or consent pursuant to Section 9.01(b), the Issuer shall furnish (i) written notification of the substance of such amendment or consent to each Noteholder.  It shall not be necessary for the consent of the Noteholders pursuant to Section 9.01(b) to approve the particular form of any proposed amendment or consent, but it shall be sufficient if such consent shall approve the substance thereof.  The manner of obtaining such consents (and any other consents of the Noteholders provided for in this Agreement) and of evidencing the authorization of the execution thereof by the Noteholders shall be subject to such reasonable requirements as the Trustees may prescribe.

(f)     Prior to the execution of any amendment pursuant to this Section, the Depositor and the Trustees shall be entitled to receive and rely upon (i) an Opinion of Counsel stating that the execution of such amendment is authorized or permitted by this Agreement and (ii) an

42

Officer's Certificate of the Servicer that all conditions precedent provided for in this Agreement to the execution of such amendment have been complied with.  Each Trustee may, but shall not be obligated to, enter into any such amendment which adversely affects its own rights, duties or immunities under this Agreement.  Any amendment which adversely affects the rights, duties, immunities or liabilities of the Owner Trustee shall require its written consent.  All expenses reasonably incurred by the Indenture Trustee and the Backup Servicer in connection with any amendment shall be the obligation of the Issuer and paid in accordance with Section 2.08 of the Indenture.

Section 9.02.  Protection of Title to Issuer.

(a)    The Depositor or the Servicer, or both, shall authorize and file such financing statements and cause to be authorized and filed such continuation statements, all in such manner and in such places as may be required by law fully to preserve, maintain and protect the interest of the Issuer, the Underlying Trust and of the Indenture Trustee for the benefit of the Noteholders in the Receivables and in the proceeds thereof.  The Depositor or the Servicer, or both, shall deliver (or cause to be delivered) to the Trustees file-stamped copies of, or filing receipts for, any document filed as provided above, as soon as available following such filing.

(b)    Neither the Depositor nor the Servicer shall change its name, identity or organizational structure in any manner that would make any financing statement or continuation statement filed in accordance with Section 9.02(a) seriously misleading within the meaning of Section 9-506 of the UCC, unless it shall have given the Trustees at least 30 days' prior written notice thereof and shall have promptly filed such amendments to previously filed financing statements or continuation statements or such new financing statements as may be necessary to continue the perfection of the interest of the Issuer, the Underlying Trust and the Indenture Trustee for the benefit of the Noteholders in the Receivables, the Underlying Trust Certificate, as applicable, and the proceeds thereof.

(c)    Each of the Seller, the Depositor and the Servicer shall give the Trustees at least 30 days' prior written notice of any change in its name, identity, organizational structure or jurisdiction of organization or any relocation of its principal place of business or chief executive office if, as a result of such change or relocation, the applicable provisions of the UCC would require the filing of any amendment to any previously filed financing statement or continuation statement or of any new financing statement and shall promptly file any such amendment, continuation statement or new financing statement.  The Depositor shall at all times maintain its jurisdiction of organization, its principal place of business and its chief executive office within the United States.  The Servicer shall at all times maintain each office from which it shall service Receivables, and each office at which the Receivable Files are located, within the United States.

(d)    The Servicer shall maintain accounts and records as to each Receivable accurately and in sufficient detail to permit (i) the reader thereof to know at any time the status thereof, including payments and recoveries made and payments owing (and the nature of each) and (ii) reconciliation between payments or recoveries on (or with respect to) each Receivable and the amounts from time to time deposited in the Collection Account in respect thereof.

43

(e)    The Servicer shall maintain its computer systems so that, from and after the time of the transfer of Receivables to the Issuer pursuant to this Agreement and the transfer and assignment thereof to the Underlying Trust pursuant to the Assignment and Assumption Agreement, its master computer records (including any back-up archives) that refer to any Receivable shall indicate clearly and unambiguously the interest of the Issuer, the Underlying Trust and the Indenture Trustee in such Receivable and that such Receivable is owned by the Underlying Trust and has been pledged to the Indenture Trustee pursuant to the Indenture. Indication of the interest of the Issuer, the Underlying Trust and the Indenture Trustee in a Receivable shall be deleted from or modified on the Servicer's computer systems when, and only when, it shall have been paid in full or repurchased by the Seller or purchased by the Servicer.

(f)    If at any time the Depositor or the Servicer shall propose to sell, grant a security interest in, or otherwise transfer any interest in any motor vehicle retail installment sales or installment loans contract to any prospective purchaser, lender or other transferee, the Servicer shall give to such prospective purchaser, lender or other transferee computer tapes, CDs, records or printouts (including any restored from back-up archives) that, if they shall refer in any manner whatsoever to any Receivable, shall indicate clearly and unambiguously that it has been sold and is owned by the Underlying Trust and has been pledged to the Indenture Trustee (unless such Receivable has been paid in full or repurchased by the Seller or purchased by the Servicer).

(g)    The Servicer shall permit the Trustees and their respective agents at any time during normal business hours, upon reasonable prior notice, to inspect, audit and make copies of and abstracts from the Servicer's records regarding any Receivable.

(h)    If the Seller or the Servicer has repurchased one or more Receivables from the Underlying Trust pursuant to Section 2.05 or 3.08, respectively, the Servicer shall, upon request, furnish to the Owner Trustee or to the Indenture Trustee, within ten Business Days, a list of all Receivables (by contract number) then held as part of the Underlying Trust, together with a reconciliation of such list to the Schedule of Receivables (as amended or supplemented to date) and to each of the Investor Reports furnished before such request indicating removal of Receivables from the Underlying Trust.

(i)    The Servicer shall deliver to the Depositor and the Trustees, promptly after the authorization and delivery of each amendment to any financing statement delivered pursuant to this Agreement, an Opinion of Counsel stating that, in the opinion of such counsel, either (A) all financing statements and continuation statements have been authorized and filed that are necessary fully to preserve and protect the interest of the Depositor (in the case of an opinion delivered by the Servicer) or the Issuer, the Underlying Trust and the Indenture Trustee (in the case of an opinion delivered by the Depositor) in the Receivables, and reciting the details of such filings or referring to prior Opinions of Counsel in which such details are given, or (B) no such action shall be necessary to preserve and protect such interest.

Section 9.03.  Notices.  Unless otherwise specified in this Agreement, all notices, requests, demands, consents, waivers or other communications to or from the parties to this Agreement will be in writing.  Notices, requests, demands, consents and other communications will be deemed to have been given and made, (i) upon delivery or, in the case of a letter mailed via registered first class mail, postage prepaid, three days after deposit in the mail and (ii) in the

case of (a) a facsimile, when receipt is confirmed by telephone or by reply e-mail or reply facsimile from the recipient, (b) an e-mail, when receipt is confirmed by telephone or by reply e-mail from the recipient and (c) an electronic posting to a password-protected website, upon printed confirmation of the recipient's access to such password-protected website, or when notification of such electronic posting is confirmed in accordance with clauses (ii)(b) and (ii)(c) above. Unless otherwise specified in this Agreement, any such notice, request, demand, consent or other communication will be delivered or addressed, in the case of (i) the Depositor, the Seller and the Servicer, at Tricolor Auto Acceptance, LLC, 6021 Connection Drive, 4th Floor, Irving, Texas 75039, Attention: Daniel Chu (dchu@tricolor.com), facsimile: (424) 290-2700; (ii) the Issuer or the Owner Trustee, at the Corporate Trust Office of the Owner Trustee, Attention: Patrick Kanar (PKanar@wilmingtontrust.com), facsimile:  (302) 636-4140; (iii) the Underlying Trust or the Underlying Trustee, at the Corporate Trust Office of the Underlying Trustee, Attention: Patrick Kanar (PKanar@wilmingtontrust.com), facsimile:  (302) 636-4140; (iv) the Indenture Trustee or Custodian, at its Corporate Trust Office, Attention: Clarice Wright (cwright1@wilmingtontrust.com), facsimile: (302) 636-4140; (v) the Backup Servicer, Vervent Inc., 10182 Telesis Court, Suite 300, San Diego, California 92121, Attention: General Counsel (dgamble@vervent.com); (vi) KBRA, Kroll Bond Rating Agency, LLC, 805 Third Avenue, 29th Floor, New York, New York 10022, Attention: ABS Surveillance (abssurveillance@kbra.com); (vii) S&P Global Ratings, acting through Standard & Poor's Financial Services LLC, 55 Water Street, New York, New York  10041, Attention: Asset Backed Surveillance Department (servicer_reports@spglobal.com), facsimile: (212) 438-2649; and (viii) as to each of the foregoing, at such other address as shall be designated by written notice to the other parties.

Section 9.04.  Assignment.

(a)      Notwithstanding anything to the contrary contained herein, except as provided in the remainder of this Section or as provided in Sections 6.07 and 7.02, this Agreement may not be assigned by the Depositor or the Servicer without the prior written consent of the Trustees and the Majority Noteholders.

(b)      The Depositor hereby acknowledges and consents to the mortgage, pledge, assignment and grant of a security interest to the Indenture Trustee pursuant to the Indenture for the benefit of the Noteholders (i) by the Underlying Trust of all of its right, title and interest in, to and under the Underlying Trust Property and other assets included in the Underlying Trust Collateral and (ii) by the Issuer of all or its right, title and interest in, to and under the Underlying Certificate, the Accounts and other assets included in the Issuer Collateral.

Section 9.05.  Severability.  If any one or more of the covenants, agreements, provisions or terms of this Agreement is held invalid, illegal or unenforceable, then such covenants, agreements, provisions or terms will be deemed severable from the remaining covenants, agreements, provisions and terms of this Agreement and will in no way affect the validity, legality or enforceability of the other covenants, agreements, provisions and terms of this Agreement.

Section 9.06.  Further Assurances.  The Servicer agrees to do and perform any and all acts and to execute any and all further instruments required or reasonably requested by the other parties hereto to more fully effect the purposes of this Agreement, including the execution of any

financing statements or continuation statements relating to the Trust Estate for filing under the provisions of the UCC of any applicable jurisdiction.

Section 9.07.  No Waiver; Cumulative Remedies.  No failure to exercise and no delay in exercising, on the part of the Depositor, any Trustee or any Securityholders, any right, remedy, power or privilege hereunder, shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges provided in this Agreement are cumulative and not exhaustive of any rights, remedies, powers and privileges provided by law.

Section 9.08.  Successors and Assigns; Third-Party Beneficiaries.  This Agreement will inure to the benefit of and be binding upon the parties to this Agreement, and their respective successors and assigns and inure to the benefit of the Owner Trustee, the Underlying Trustee and their respective successors and assigns.  Except as otherwise provided in this Agreement, no other Person will have any right or obligation under this Agreement.

Section 9.09.  Actions by Securityholders.

(a)      Wherever in this Agreement a provision provides that an action may be taken, or a notice, demand or instruction given, by Securityholders, such action, notice or instruction may be taken or given by any related Securityholder, unless such provision requires a specific percentage of the related Securityholders.

(b)      Any request, demand, authorization, direction, notice, consent, waiver or other act by a Securityholder shall bind such Securityholder and every subsequent Holder of the related Note or Certificate issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof in respect of anything done or omitted to be done by any Trustee or the Servicer in reliance thereon, whether or not notation of such action is made upon such Note or Certificate.

Section 9.10.  Counterparts.  This Agreement may be executed in any number of counterparts, each of which will be an original, and all of which will together constitute one and the same instrument.  The words "execution", "signed", "signature" and words of like import in this Agreement or in any other certificate, agreement or document related to this Agreement shall include images of manually executed signatures transmitted by facsimile or other electronic format and other electronic signatures.  The use of electronic signatures and electronic records (including any contract or other record created, generated, sent, communicated, received or stored by electronic means) shall be of the same legal effect, validity and enforceability as a manually executed signature or use of a paper-based record-keeping system to the fullest extent permitted by Applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, any State law based on the Uniform Electronic Transactions Act and the UCC.  Each party hereto shall be entitled to conclusively rely upon, and shall have no liability with respect to, any faxed, scanned or photocopied manual signature, or other electronic signature, of any other party and shall have no duty to investigate, confirm or otherwise verify the validity or authenticity thereof.

Section 9.11.  <u>Table of Contents and Headings</u>.  The Table of Contents and the various headings in this Agreement are included for convenience only and will not affect the meaning or interpretation of any provision of this Agreement.

Section 9.12.  **<u>GOVERNING LAW; JURISDICTION; WAIVER OF JURY TRIAL</u>. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY OTHERWISE APPLICABLE PRINCIPLES OF CONFLICT OF LAWS (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW), AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.  EACH OF THE PARTIES HERETO HEREBY AGREES TO THE NON-EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK, LOCATED IN THE BOROUGH OF MANHATTAN, AND THE FEDERAL COURTS LOCATED WITHIN THE STATE OF NEW YORK IN THE BOROUGH OF MANHATTAN.  EACH OF THE PARTIES HERETO HEREBY WAIVES ANY OBJECTION BASED ON FORUM NON CONVENIENS, AND ANY OBJECTION TO VENUE OF ANY ACTION INSTITUTED HEREUNDER IN ANY OF THE AFOREMENTIONED COURTS AND CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH COURT.  TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH OF THE PARTIES HERETO WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE BETWEEN THE PARTIES HERETO ARISING OUT OF, CONNECTED WITH, RELATED TO OR INCIDENTAL TO THE RELATIONSHIP BETWEEN ANY OF THEM IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.  INSTEAD, ANY SUCH DISPUTE RESOLVED IN COURT WILL BE RESOLVED IN A BENCH TRIAL WITHOUT A JURY.**

Section 9.13.  <u>No Petition</u>.  Each of the Seller, the Servicer and the Trustees covenants and agrees that it will not at any time institute against, or join any Person in instituting against, the Issuer, the Underlying Trust or the Depositor any bankruptcy, reorganization, arrangement, insolvency or liquidation Proceedings, or other Proceedings under any Insolvency Law in connection with any obligations relating to any of the Basic Documents and agrees that it will not cooperate with or encourage others to file a bankruptcy petition against the Issuer, the Underlying Trust or the Depositor during the same period; provided, however, that nothing herein shall prevent any related Trustee from filing a proof of claim in any such Proceeding.

Section 9.14.  <u>No Recourse</u>.  It is expressly understood and agreed by the parties hereto that (i) this Agreement is executed and delivered by Wilmington Trust Company, not individually or personally but solely as Owner Trustee of the Issuer and Underlying Trustee of the Underlying Trust, as applicable, in the exercise of the powers and authority conferred and vested in the Trust Agreement and Underlying Trust Agreement, (ii) each of the representations, undertakings and agreements herein made on the part of the Issuer or the Underlying Trust is made and intended not as personal representations, undertakings and agreements by the Owner Trustee or the Underlying Trustee but is made and intended for the purpose of binding only the Issuer or the Underlying Trust, as applicable, (iii) nothing herein contained shall be construed as

47

creating any liability on Wilmington Trust Company, individually or personally, to perform any covenant either expressed or implied contained herein, all such liability, if any, being expressly waived by the parties hereto and by any Person claiming by, through or under the parties hereto, (iv) Wilmington Trust Company has made no investigation as to the accuracy or completeness of any representations and warranties made by the Issuer or the Underlying Trust, as applicable, in this Agreement and (v) under no circumstances shall Wilmington Trust Company be personally liable for the payment of any indebtedness or expenses of the Issuer or the Underlying Trust, as applicable, or be liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by the Issuer or the Underlying Trust under this Agreement or any other related documents.

Section 9.15. <u>Servicer Payment Obligation</u>.  The initial Servicer shall be responsible for the payment of all fees and expenses of the Issuer, the Underlying Trustee and the Trustees, except to the extent paid in accordance with Section 2.08 of the Indenture, paid by any of them in connection with any of their obligations under the Basic Documents to obtain or maintain or cause to be obtained or maintained any license required by Applicable Law.

Section 9.16. <u>Patriot Act</u>.  The parties hereto acknowledge that in accordance with the Patriot Act and its implementing regulations, each of the Indenture Trustee and the Custodian, in order to help fight the funding of terrorism and money laundering, is required to obtain, verify and record information that identifies each Person that establishes a relationship or opens an account with it.  Each party hereby agrees that it shall provide each of the Indenture Trustee and the Custodian with such information as each of them may request that will help such entity to identify and verify such party's identity, including such party's name, physical address, tax identification number, organizational documents, certificate of good standing, license to do business or other pertinent identifying information.

Section 9.17. <u>Multiple Roles</u>.  The Trustees and the Custodian are Affiliates.  Each such entity may, in such capacities, discharge its respective separate functions fully, without hindrance or regard to conflict of interest principles, duty of loyalty principles or other equitable principles to the extent that any such conflict or breach arises from the performance by it of its respective express duties set forth in any of the Basic Documents, all of which defenses, claims or assertions shall be deemed waived by the parties to the Basic Documents and the Securityholders.

(2025-2)
4924-3107-4870v.5

IN WITNESS WHEREOF, the parties hereto have caused this Sale and Servicing Agreement to be duly executed by their respective officers, thereunto duly authorized, as of the day and year first above written.

TRICOLOR AUTO SECURITIZATION TRUST
2025-2

By: WILMINGTON TRUST COMPANY, not in its individual capacity but solely as Owner Trustee on behalf of the Issuer

By: _____
Name:
Title:   Clarice Wright
Vice President

TRICOLOR AUTO GRANTOR TRUST 2025-2

By: WILMINGTON TRUST COMPANY, not in its individual capacity but solely as Underlying Trustee on behalf of the Underlying Trust

By: _____
Name:
Title:   Clarice Wright
Vice President

TRICOLOR AUTO RECEIVABLES 2 LLC,
as Depositor

By: _____
Name: Daniel Chu
Title:  President

TRICOLOR AUTO ACCEPTANCE, LLC, as
Seller and Servicer

By: _____
Name: Daniel Chu
Title:  CEO and President

*Sale and Servicing Agreement*

IN WITNESS WHEREOF, the parties hereto have caused this Sale and Servicing Agreement to be duly executed by their respective officers, thereunto duly authorized, as of the day and year first above written.

TRICOLOR AUTO SECURITIZATION TRUST 2025-2

By: WILMINGTON TRUST COMPANY, not in its individual capacity but solely as Owner Trustee on behalf of the Issuer

By: _____

    Name:

    Title:

TRICOLOR AUTO GRANTOR TRUST 2025-2

By: WILMINGTON TRUST COMPANY, not in its individual capacity but solely as Underlying Trustee on behalf of the Underlying Trust

By: _____

    Name:

    Title:

TRICOLOR AUTO RECEIVABLES 2 LLC, as Depositor

By: _____

    Name: Daniel Chu

    Title:  President

TRICOLOR AUTO ACCEPTANCE, LLC, as Seller and Servicer

By: _____

    Name: Daniel Chu

    Title:  CEO and President

*Sale and Servicing Agreement*

WILMINGTON TRUST, NATIONAL
   ASSOCIATION, not in its individual capacity,
   but solely as Indenture Trustee

By: _____
    Name:    Clarice Wright
    Title:     Vice President

WILMINGTON TRUST, NATIONAL
   ASSOCIATION, as Custodian

By: _____
    Name:
    Title:

VERVENT INC., as Backup Servicer

By: _____
    Name:
    Title:

WILMINGTON TRUST, NATIONAL
    ASSOCIATION, not in its individual capacity,
    but solely as Indenture Trustee


By: _____
    Name:
    Title:


WILMINGTON TRUST, NATIONAL
    ASSOCIATION, as Custodian


By: _____
    Name: Lisa M. Lewis
    Title: Senior Vice President


VERVENT INC., as Backup Servicer


By: _____
    Name:
    Title:

WILMINGTON TRUST, NATIONAL
    ASSOCIATION, not in its individual capacity,
but solely as Indenture Trustee


By: _____
    Name:
    Title:


WILMINGTON TRUST, NATIONAL
    ASSOCIATION, as Custodian


By: _____
    Name:
    Title:


VERVENT INC., as Backup Servicer

By: *Louis W. Geibel* _____
    Name: Louis W. Geibel
    Title: Executive Vice President

SCHEDULE A

## LOCATION OF RECEIVABLE FILES

Wilmington Trust, National Association
693 Seneca Street, 4th Floor
Buffalo, New York  14210
Attention: Document Custody, TAST 2025-2
Telephone:  716-279-4366

SA-1

EXHIBIT A

REPRESENTATIONS AND WARRANTIES AS TO THE RECEIVABLES

The following representations and warranties shall be made with respect to the Receivables as of the Cutoff Date.

(i)    <u>Characteristics of Receivables</u>.  Each Receivable (a) was originated in the United States by the Originators (and such Originator had all necessary licenses and permits to originate such Receivable in the State where such Receivable was originated) for the retail sale of a Financed Vehicle in the ordinary course of business of the Originators in accordance with the Seller's credit policies as of the date of origination or acquisition of the related Receivable, is payable in United States dollars, has been fully and properly executed by the parties thereto, has been purchased by the Seller from such Originators and has been validly assigned by such Originators to the Seller, (b) has created a valid, subsisting and enforceable first priority security interest in favor of the Seller or an Originator in the Financed Vehicle, which security interest shall be perfected and prior to any other interest in such Financed Vehicle (and which security interest, if in favor of an Originator, has been assigned to the Seller), which security interest is assignable by the Seller and reassignable by the assignee, (c) contains customary and enforceable provisions such that the rights and remedies of the holder thereof are adequate for realization against the collateral of the benefits of the security, including a right of repossession following default, (d) shall provide for level Monthly Payments, Semi-Monthly Payments, Bi-Weekly Payments or Weekly Payments, as applicable (provided that the payment in the first or last month in the life of the Receivable may be minimally different from the level payments), that fully amortize the Amount Financed over its original term and shall provide for a finance charge or shall yield interest at its APR, (e) has had at least its first scheduled payment due date prior to the applicable Cutoff Date, (f) shall provide for the right of the Obligor to prepay such Receivable without any penalty and, in the event that such Receivable is prepaid, for a prepayment that fully pays the Principal Balance and includes accrued but unpaid interest at least through the date of prepayment in an amount calculated by using an interest rate at least equal to its APR, (g) provides for the allocation of payments thereon pursuant to the Simple Interest Method, (h) is due from an Obligor who is a natural person with a mailing address within the United States or its territories who is not an Affiliate of any party to any of the Basic Documents, (i) arose under an retail installment sale contract with respect to which the Seller has performed all obligations required to be performed by it thereunder, and the related Financed Vehicle has been delivered to the related Obligor, (j) except in the case of the Receivables specified on Annex 1 to this Exhibit A, arose under a contract with respect to which the Obligor has paid all deferred down payment amounts, (k) arose under a contract that is written in English, except where required by Applicable Law to be written in Spanish, (l) has only one original executed copy and (m) to the best of the Seller's knowledge, is not assumable by another Person in a manner which would release the Obligor thereof from such Obligor's obligations to the Seller with respect to such Receivable.

A-1

(ii)     Schedule of Receivables.  The information set forth in the Schedule of Receivables shall be true and correct in all material respects as of the close of business on the Cutoff Date, and the Receivables were selected (a) from those motor vehicle receivables of the Seller which met the selection criteria set forth in this Agreement and (b) using selection procedures, believed by the Seller, not to be adverse to the Noteholders.

(iii)     Compliance with Law.  Each Receivable, the sale of the Financed Vehicle and the sale of any physical damage, theft insurance and any extended warranties or service contracts (A) complied at the time the related Receivable was originated or made, and at the Closing Date, complies, in all material respects with all requirements of applicable federal, State and local laws, and regulations thereunder including, usury laws, the Federal Truth-in-Lending Act, the Equal Credit Opportunity Act, the Fair Credit Reporting Act, the Fair Debt Collection Practices Act, the Federal Trade Commission Act, the Magnuson-Moss Warranty Act, the Federal Reserve Board's Regulations B and Z, the Servicemembers Civil Relief Act, the Military Reservist Relief Act, the Texas Consumer Credit Code, the California Automobile Sales Finance Act and State adaptations of the National Consumer Act and of the Uniform Consumer Credit Code, and all other applicable consumer credit laws and equal credit opportunity and disclosure laws, and (B) without limiting the generality of the foregoing, is not subject to liabilities or is not rendered unenforceable based on general theories of contract limitation or relief including, theories based on unconscionable, deceptive, unfair, or predatory sales or financing practices.

(iv)     Binding Obligation.  Each Receivable includes rights and remedies allowing its holder to enforce the obligations of the related Obligor and realize on the related Financed Vehicle and represents the genuine, legal, valid and binding payment obligation in writing of the related Obligor, enforceable by the holder thereof in accordance with its terms, except as (a) enforceability thereof may be limited by bankruptcy, insolvency, reorganization or similar laws affecting the enforcement of creditors' rights generally and by equitable limitations on the availability of specific remedies, regardless of whether such enforceability is considered in a Proceeding in equity or at law and (b) such Receivable may be modified by the application after the applicable Cutoff Date of the Servicemembers Civil Relief Act or by any similar applicable State law.

(v)     No Government Obligor.  No Receivable is due from the United States or any State or any agency, department, subdivision or instrumentality thereof.

(vi)     Obligor Bankruptcy.  To the best of the Seller's knowledge, at the applicable Cutoff Date, no Obligor is the subject of a bankruptcy Proceeding.

(vii)     Security Interest in Financed Vehicles.  Immediately prior to the transfer of the Receivables by the Seller to the Depositor, each Receivable was secured by a valid, binding and enforceable first priority perfected security interest in favor of the Seller or an Originator in the related Financed Vehicle, which security interest has been validly assigned either (a) by the Seller to the Depositor or (b) by the related Originator to the

A-2

Seller and then by the Seller to the Depositor.  The Servicer has received, or will receive within 180 days after the Closing Date, as the case may be, the original certificate of title for each Financed Vehicle or notice from the applicable State entity issuing such certificate of title, that such certificate of title is being processed (other than any Financed Vehicle that is subject to a certificate of title statute or motor vehicle registration law that does not require that the original certificate of title for such Financed Vehicle be delivered to the Seller).

(viii)   <u>Receivables in Force</u>.  No Receivable shall have been satisfied, subordinated or rescinded, nor shall any Financed Vehicle have been released in whole or in part from the Lien granted by the related Receivable; each Receivable arose under a contract with respect to which Tricolor has performed all obligations required to be performed by it thereunder, and delivery of the related Financed Vehicle to the related Obligor has occurred.

(ix)   <u>No Waivers</u>.  No provision of a Receivable shall have been waived in such a manner that such Receivable fails to meet all of the other representations and warranties made by the Seller with respect thereto.

(x)   <u>No Amendments</u>.  No Receivable shall have been amended in any material respect, except for amendments and modifications that are included in the Receivable Files.  No Receivable shall have been amended or modified in such a manner that the total number of Monthly Payments, Semi-Monthly Payments, Bi-Weekly Payments or Weekly Payments, as applicable, has been increased or decreased or that the related Amount Financed has been increased or decreased or that such Receivable fails to meet all of the other representations and warranties made by the Seller herein with respect thereto.

(xi)   <u>Risk of Loss</u>.  Each Receivable contains provisions requiring the related Obligor to assume all risk of loss or malfunction on the related Financed Vehicle, requiring such Obligor to pay all sales, use, property, excise and other similar taxes imposed on or with respect to the Financed Vehicle and making the Obligor liable for all payments required to be made thereunder, without any setoff, counterclaim or defense for any reason whatsoever, subject only to the Obligor's right of quiet enjoyment.

(xii)   <u>No Liens</u>.  No Liens or claims shall have been filed, including Liens for work, labor or materials or for unpaid local, State or federal taxes relating to any Financed Vehicle that shall be prior to, or equal or coordinate with, the security interest in such Financed Vehicle granted by the related Receivable.

(xiii)   <u>No Defaults; Repossessions</u>.  Except for payment defaults that, as of the applicable Cutoff Date, have been continuing for a period of not more than 30 days, no default, breach or violation under the terms of any Receivable, permitting acceleration, shall have occurred as of such Cutoff Date and no continuing condition that with notice or the lapse of time or both would constitute a default, breach or violation under the terms of any Receivable, permitting acceleration, shall have arisen; and the Seller shall not have waived any of the foregoing except as otherwise permitted hereunder.  On or prior to

A-3

such Cutoff Date, no Financed Vehicle has been repossessed or assigned for repossession.

(xiv)   <u>Insurance</u>.  Each Receivable requires the related Obligor to obtain physical damage insurance covering the related Financed Vehicle and to maintain such insurance. No Financed Vehicle is subject to force-placed insurance as of the applicable Cutoff Date.

(xv)   <u>Good Title</u>.  Immediately prior to the conveyance of Receivables to the Purchaser pursuant to the Receivables Purchase Agreement, the Seller had good and marketable title to such Receivables free and clear of all Liens and rights of others, except for Liens that shall be released on or before the Closing Date; immediately upon the transfer and assignment thereof to the Purchaser, the Purchaser shall have good and marketable title to each Receivable, free and clear of all Liens and rights of others; and the transfer and assignment herein contemplated has been perfected under the UCC.

(xvi)   <u>Lawful Assignment</u>.  No Receivable has been originated in, or is subject to the laws of, any jurisdiction under which the sale, transfer, assignment and conveyance of such Receivable under (a) the Receivables Purchase Agreement, or (b) the Sale and Servicing Agreement, or the pledge of such Receivables hereunder, thereunder or under the Indenture is unlawful, void or voidable or under which such Receivable would be rendered void or voidable as a result of any such sale, transfer, assignment, conveyance or pledge.  The terms of each Receivable do not limit the right of the owner of such Receivable to assign it.  The Seller has not entered into any agreement with any account debtor that prohibits, restricts or conditions the assignment of the Receivables.

(xvii)   <u>All Filings Made</u>.  All filings (including UCC filings) necessary in any jurisdiction to give the Purchaser, the Issuer, the Underlying Trust and the Indenture Trustee a first priority security interest in the Receivables shall have been made or will be made on the Closing Date, as applicable.

(xviii)   <u>Location of Receivable Files; One Original</u>.  Each Receivable File shall be kept at the location listed in Schedule A.  There is only one original executed copy of each Receivable.

(xix)   <u>Principal Balance</u>.  As of the related Cutoff Date, each Receivable had a remaining Principal Balance of not more than $51,000 and not less than $2,000.

(xx)   <u>Original Term to Maturity</u>.  Each Receivable had an original term to maturity of not more than 73 months and, based on the number of remaining Monthly Payments, Semi-Monthly Payments, Bi-Weekly Payments or Weekly Payments, as applicable, a remaining term to maturity as of their respective Cutoff Date, of at least 3 months and not more than 73 months.

(xxi)   <u>Weighted Average Remaining Term to Maturity</u>.  As of the Cutoff Date, based on the number of remaining Monthly Payments, Semi-Monthly Payments, Bi-Weekly Payments or Weekly Payments, as applicable, the weighted average remaining

A-4

term to maturity (based upon the Principal Balance of each Receivable as of the Cutoff Date) of the Receivables was no greater than 58 months.

(xxii)   <u>Annual Percentage Rate</u>.  Each Receivable has an interest rate APR of at least 5.00% and not more than 27.00%.  The weighted average interest rate of the Receivables as of the Cutoff Date was 16.90%.

(xxiii)   <u>Marking Records</u>.  As of the Closing Date, the Seller will have caused its computer and accounting records relating to each Receivable to be marked to show that the Receivables have been sold to the Purchaser by the Seller and transferred and assigned by the Purchaser to the Issuer in accordance with the terms of the Sale and Servicing Agreement, and pledged by the Issuer to the Indenture Trustee in accordance with the terms of the Indenture.

(xxiv)   <u>Chattel Paper</u>.  Each Receivable constitutes "tangible chattel paper" within the meaning of the UCC as in effect in the State of origination.

(xxv)   <u>Final Scheduled Distribution Date</u>.  No Receivable has a final scheduled payment date later than six months prior to the Class F Final Scheduled Distribution Date.

(xxvi)   <u>No Fleet Sales</u>.  None of the Receivables have been included in a "fleet" sale (i.e., a sale to any single Obligor of more than seven Financed Vehicles).

(xxvii)   <u>No Fraud or Misrepresentation</u>.  Each Receivable that was originated by an Originator and was sold by the Originator to the Seller, to the best of the Seller's knowledge, was so originated and sold without fraud or misrepresentation on the part of such Originator in either case.

(xxviii)<u>No Impairment</u>.  The Seller has not done anything to convey any right to any Person that would result in such Person having a right to payments due under a Receivable or otherwise to impair the rights of the Purchaser in any Receivable or the proceeds thereof.

(xxix)   <u>No Consent</u>.  To the best of the Seller's knowledge, no notice to or consent from any Obligor is necessary to effect the acquisition of the Receivables by the Purchaser or the Issuer or the pledge of the Receivables by the Issuer to the Indenture Trustee.

(xxx)   <u>FICO® Score</u>.  The non-zero weighted average FICO® score of the Receivables as of the Cutoff Date (based on the FICO® score recorded at the respective dates of origination of such Receivables) was approximately 600.  The FICO® score with respect to any Receivable with co-obligors is the primary obligor's FICO® score at the time of application.

(xxxi)   <u>No Delinquent or Defaulted Receivables</u>.  As of the Cutoff Date, each Receivable is neither Delinquent nor is it a Defaulted Receivable.

(xxxii) <u>Full Amount Advanced</u>.  The full amount of each Receivable has been advanced to each Obligor, and there are no requirements for future advances thereunder. The Obligor with respect to each Receivable does not have any option under the terms of the related contract to borrow from any person additional funds secured by the Financed Vehicle.

(xxxiii) <u>California Receivables</u>.  Each Receivable originated in the State of California has been, and at all times during the term of the Sale and Servicing Agreement will be, serviced by the Servicer in compliance with Cal. Civil Code § 2981, <u>et</u> <u>seq</u>.

(xxxiv) <u>Licenses and Approvals</u>.  Each Originator has obtained all necessary licenses and approvals in all jurisdictions in which the origination and purchase of installment promissory notes and security agreements and the sale thereof requires or shall require such licenses or approvals, except where the failure to obtain such licenses or approvals would not result in a material adverse effect on the value or marketability of any Receivable (including the enforceability or collectability of any Receivable).

A-6

ANNEX 1 to EXHIBIT A

Account Number

A-7

EXHIBIT B

FORM OF REQUEST FOR RELEASE

_____, 202_

Wilmington Trust, National Association
693 Seneca Street, 4th Floor
Buffalo, New York  14210
Attention:  Document Custody, TAST 2025-2

     Re:    Tricolor Auto Securitization Trust 2025-2

Ladies and Gentlemen:

    Reference is made to the Sale and Servicing Agreement, dated as of June 1, 2025 (as amended, restated, supplemented or otherwise modified from time to time, the "Sale and Servicing Agreement"), among Tricolor Auto Securitization Trust 2025-2, Tricolor Auto Grantor Trust 2025-2, Tricolor Auto Receivables 2 LLC, Tricolor Auto Acceptance, LLC and Wilmington Trust, National Association.  Capitalized terms used herein that are not otherwise defined shall have the meanings ascribed thereto in the Sale and Servicing Agreement.

    The undersigned, as Servicer of the Receivables, requests the release of the Receivable and/or original title being held by the Custodian described below for the reason indicated.

    REASON FOR REQUESTING DOCUMENTS: (ALL DOCUMENTS TO BE RETURNED UNLESS SPECIFIED)

    ___RECEIVABLE PAID IN FULL

    ___REPOSSESSION

    ___LIQUIDATION

    ___REPURCHASE UPON BREACH

    ___OTHER-EXPLAIN_____

    You are hereby directed to deliver the Receivables Files relating to the foregoing Receivables to our attention at the following address: _____.

    Shipping Carrier Information: _____.

B-1

Very truly yours,

TRICOLOR AUTO ACCEPTANCE, LLC,
as Servicer

By: _____
    Name:
    Title:

B-2

EXHIBIT C

FORM OF CUSTODIAN CERTIFICATE

_____, 202_

Tricolor Auto Securitization Trust 2025-2
1100 North Market Street
Wilmington, Delaware  19801
Attention:  Clarice Wright, Corporate Trust Administration

Tricolor Auto Grantor Trust 2025-2
1100 North Market Street
Wilmington, Delaware  19890
Attention:  Corporate Trust Administration

Wilmington Trust, National Association,
as Indenture Trustee
1100 North Market Street
Wilmington, Delaware  19890
Attention:  Corporate Trust Administration

     Re:    Tricolor Auto Securitization Trust 2025-2

Ladies and Gentlemen:

Reference is made to the Sale and Servicing Agreement, dated as of June 1, 2025 (as amended, restated, supplemented or otherwise modified from time to time, the "Sale and Servicing Agreement"), among Tricolor Auto Securitization Trust 2025-2, Tricolor Auto Grantor Trust 2025-2, Tricolor Auto Receivables 2 LLC, Tricolor Auto Acceptance, LLC, Wilmington Trust, National Association ("WTNA") and Vervent Inc.  Capitalized terms used herein that are not otherwise defined shall have the meanings ascribed thereto in the Sale and Servicing Agreement.

WTNA, as Custodian, is acting as custodian of the Receivables Files and, pursuant to Section 2.04(f) of the Sale and Servicing Agreement, acknowledges that we are holding the Receivables solely on behalf and for the benefit of the Issuer and the Underlying Trust.  We hereby confirm, pursuant to Section 2.06(c) of the Sale and Servicing Agreement, that we have received on behalf of the Issuer and the Underlying Trust and the Indenture Trustee, as pledgee of the Receivables (except as set forth on the exception report attached hereto) the executed originals of the Receivables reflecting manual or electronic signatures and the original certificates of title, or evidence of an electronic filing, for the related Financed Vehicle (or evidence that any such certificate of title has been applied for).  We have not verified the name of the lienholder on any such certificate of title.

C-1

Very truly yours,

WILMINGTON TRUST, NATIONAL
ASSOCIATION, as Custodian


By: _____
    Name:
    Title:

C-2

EXHIBIT D

## FORM OF INVESTOR REPORT

**Tricolor Auto Securitization Trust 2025-2**

**Investor Report**

**Collection Period ended**

|  | Amounts in USD |
|---|---|

| **Dates** | |
|---|---|
| Collection Period No. | |
| Collection Period (from...to) | |
| Determination Date | |
| Record Date | |
| Distribution Date | |
| Interest Period of Notes | |
| (from _____ to _____) | 30/360 Days |

| **Summary** | |

|  | Initial Balance | Beginning Balance | Ending Balance | Principal Payment | Principal per $1,000 Face Amount | Note Factor |
|---|---|---|---|---|---|---|
| Class A Notes | $ | $ | $ | $ | $ | |
| Class B Notes | $ | $ | $ | $ | $ | |
| Class C Notes | $ | $ | $ | $ | $ | |
| Class D Notes | $ | $ | $ | $ | $ | |
| Class E Notes | $ | $ | $ | $ | $ | |
| Class F Notes | $ | $ | $ | $ | $ | |
| **Total Note Balance** | **$** | **$** | **$** | **$** | | |

|  | | | |
|---|---|---|---|
| Overcollateralization | $ | $ | $ |
| Total Note Balance | $ | $ | $ |
| **Pool Balance** | **$** | **$** | **$** |

|  | Amount | Percentage |
|---|---|---|
| Initial Overcollateralization Amount | $ | % |
| Target Overcollateralization Amount | $ | % |
| Current Overcollateralization Amount | $ | % |

|  | Interest Rate | Interest Payment | Interest per $1,000 Face Amount | Interest & Principal Payment | Interest & Principal Payment per $1000 Face Amount |
|---|---|---|---|---|---|
| Class A Notes | % | $ | $ | $ | $ |
| Class B Notes | % | $ | $ | $ | $ |
| Class C Notes | % | $ | $ | $ | $ |
| Class D Notes | % | $ | $ | $ | $ |
| Class E Notes | % | $ | $ | $ | $ |
| Class F Notes | % | $ | $ | $ | $ |
| **Total** | | **$** | | **$** | |

D-1

| **Available Funds** | |
| --- | --- |
| Principal Collections | $ |
| Interest Collections | $ |
| Net Liquidation Proceeds | $ |
| Recoveries | $ |
| Purchase Amounts | $ |
| Investment Earnings | $ |
| **Available Collections** | $ |
| Reserve Fund Draw Amount | $ |
| **Available Funds** | $ |

| **Distribution** | |
| --- | --- |
| (1) Senior Servicing Fee, Successor Servicer Transition Costs | $ |
| (2) pro rata (A) Total Trustee Fees and fees and other amounts owed to the Trustees, (B) Backup Servicing Fee and other amounts owed to the Backup Servicer, and (C) Custodian Fee and fees and other amounts owed to the Custodian, in each case subject to annual caps | $ |
| (3) Interest Distributable Amount to Class A Notes | $ |
| (4) First Priority Principal Distributable Amount | $ |
| (5) Interest Distributable Amount to Class B Notes | $ |
| (6) Second Priority Principal Distributable Amount | $ |
| (7) Interest Distributable Amount to Class C Notes | $ |
| (8) Third Priority Principal Distributable Amount | $ |
| (9) Interest Distributable Amount to Class D Notes | $ |
| (10) Fourth Priority Principal Distributable Amount | $ |
| (11) Interest Distributable Amount to Class E Notes | $ |
| (12) Fifth Priority Principal Distributable Amount | $ |
| (13) Interest Distributable Amount to Class F Notes | $ |
| (14) Sixth Priority Principal Distributable Amount | $ |
| (15) To Reserve Fund to reach the Reserve Fund Deficiency | $ |
| (16) Regular Principal Distributable Amount | $ |
| (17) Subordinated Servicing Fee | |
| (18) Fees and other amounts owed to Servicer, Trustees, Custodian, Successor Servicer and Backup Servicer not previously paid under (1) and (2) | |
| (19) Excess Collections to Certificateholders | $ |
| **Total Distribution** | |

| **Distribution Detail** | | | |
| --- | --- | --- | --- |
| | **Due** | **Paid** | **Shortfall** |
| Senior Servicing Fee | $ | $ | $ |
| Subordinated Servicing Fee | $ | $ | $ |
| Total Other Expenses | $ | $ | $ |

D-2

(2025-2)
4924-3107-4870v.5

| | | | |
|---|---|---|---|
| Monthly Interest Distributable Amount | $ | $ | $ |
|    Class A Notes | $ | $ | $ |
|    Class B Notes | $ | $ | $ |
|    Class C Notes | $ | $ | $ |
|    Class D Notes | $ | $ | $ |
|    Class E Notes | $ | $ | $ |
|    Class F Notes | $ | $ | $ |
| Interest Carryover Shortfall Amount | $ | $ | $ |
|    Class A Notes | $ | $ | $ |
|    Class B Notes | $ | $ | $ |
|    Class C Notes | $ | $ | $ |
|    Class D Notes | $ | $ | $ |
|    Class E Notes | $ | $ | $ |
|    Class F Notes | $ | $ | $ |
| Interest Distributable Amount | $ | $ | $ |
| | | | |
| First Priority Principal Distributable Amount | $ | $ | $ |
| Second Priority Principal Distributable Amount | $ | $ | $ |
| Third Priority Principal Distributable Amount | $ | $ | $ |
| Fourth Priority Principal Distributable Amount | $ | $ | $ |
| Fifth Priority Principal Distributable Amount | $ | $ | $ |
| Sixth Priority Principal Distributable Amount | $ | $ | $ |
| Regular Principal Distributable Amount | $ | $ | $ |
| Aggregate Principal Distributable Amount | $ | $ | $ |

**Reserve Fund and Investment Earnings**

**Reserve Fund**

| | |
|---|---|
| Reserve Fund Required Amount | $ |
| | |
| Reserve Fund Amount - Beginning Balance | $ |
|   plus top up Reserve Fund up to the Required Amount | $ |
|   plus Net Investment Earnings for the Collection Period | $ |
|   minus Net Investment Earnings | $ |
|   minus Reserve Fund Draw Amount | $ |
| Reserve Fund Amount - Ending Balance | $ |
| | |
| Reserve Fund Deficiency | $ |

**Investment Earnings**

| | |
|---|---|
| Net Investment Earnings on the Reserve Fund | $ |
| Net Investment Earnings on the Collection Account | $ |
| Investment Earnings for the Collection Period | $ |

**Notices to Investors**

D-3

**Pool Statistics**

**Pool Data**

| | Amount | Number of Receivables |
|---|---|---|
| Cutoff Date Pool Balance | $263,252,406.75 | 12,570 |
| Pool Balance beginning of Collection Period | $ | |
| Principal Collections | $ | |
| Principal Collections attributable to Full Pay-offs | $ | |
| Principal Purchase Amounts | $ | |
| Principal Gross Losses | $ | |
| Pool Balance end of Collection Period | $ | |
| Pool Factor – Class A Notes | | |
| Pool Factor – Class B Notes | | |
| Pool Factor – Class C Notes | | |
| Pool Factor – Class D Notes | | |
| Pool Factor – Class E Notes | | |
| Pool Factor – Class F Notes | | |

| | As of Cutoff Date | Current |
|---|---|---|
| Weighted Average APR | % | % |
| Weighted Average Number of Remaining Payments | | |
| Weighted Average Seasoning (months) | | |

**Delinquency Profile \***

| | Amount | Number of Receivables | Percentage |
|---|---|---|---|
| Current | $ | | % |
| 31-60 Days Delinquent | $ | | % |
| 61-90 Days Delinquent | $ | | % |
| 91-120 Days Delinquent | $ | | % |
| Total | $ | | 100% |

\* A receivable is not considered delinquent if the amount past due is less than 10% of the payment due under such receivable

**Losses**

| | Tricolor Indirect | Auto Finance | Total |
|---|---|---|---|
| Principal Gross Losses | $ | $ | $ |
| Principal Net Liquidation Proceeds | $ | $ | $ |
| Principal Recoveries | $ | $ | $ |
| Principal Net Losses | $ | $ | $ |
| Cumulative Principal Net Losses | $ | $ | $ |
| Cumulative Principal Net Loss as % of Pool Balance | % | % | % |

D-4

**[For the first Investor Report delivered after the Closing Date]**

**Risk Retention Summary**

| Class | Interest Rate | Fair Value ($) | Fair Value (as %) |
|---|---|---|---|
| Class A Notes | | | |
| Class B Notes | | | |
| Class C Notes | | | |
| Class D Notes | | | |
| Class E Notes | | | |
| Class F Notes | | | |
| Certificates | | | |
|    Risk Retained | | | |
|    Non Risk Retained | | | |

| | Aggregate Principal Balance | Assumed Cutoff Date | Weighted Average APR | Weighted Average Original Term | Weighted Average Remaining Term |
|---|---|---|---|---|---|
| Repline | | | | | |
| 1 | | | | | |
| 2 | | | | | |
| 3 | | | | | |
| 4 | | | | | |
| 5 | | | | | |
| 6 | | | | | |
| 7 | | | | | |

D-5

(2025-2)
4924-3107-4870v.5

EXHIBIT E

FORM OF MONTHLY BACKUP SERVICER CERTIFICATE

_____, 202_

Wilmington Trust, National Association,
as Indenture Trustee
1100 North Market Street
Wilmington, Delaware  19890
Attention:  Clarice Wright

Wilmington Trust Company,
as Owner Trustee
1100 North Market Street
Wilmington, Delaware  19801
Attention:  Patrick A. Kanar

Tricolor Auto Acceptance, LLC,
as Servicer
6021 Connection Drive, 4th Floor
Irving, Texas  75039
Attention:  Daniel Chu

> Re:  Tricolor Auto Securitization Trust 2025-2
>       Monthly Backup Servicer Certificate

Ladies and Gentlemen:

This certificate is furnished pursuant to Section 3.16(a) of the Sale and Servicing Agreement, dated as of June 1, 2025 (the "Sale and Servicing Agreement"), among Tricolor Auto Securitization Trust 2025-2, Tricolor Auto Grantor Trust 2025-2, Tricolor Auto Receivables 2 LLC, Tricolor Auto Acceptance, LLC, Wilmington Trust, National Association and Vervent Inc., as backup servicer (the "Backup Servicer").  Capitalized terms used herein that are not otherwise defined shall have the meanings ascribed thereto in the Sale and Servicing Agreement.

The undersigned officer of the Backup Servicer hereby certifies that it has reviewed the Investor Report and determined the following:

(i)      that such Investor Report is complete on its face;

(ii)     that the Collection Account and Reserve Fund balances as of the date of such Investor Report and that the amounts withdrawn from the Collection Account and Reserve Fund as set forth in the records of the Servicer are the same as the amount set forth in the Investor Report; and

E-1

(iii)   the Reserve Fund Amount.

The Backup Servicer has confirmed that the electronic file received from the Servicer is in readable form and verified the following, in each case as set forth in the Investor Report:

(i)   the Available Collections;

(ii)   the Total Servicing Fee;

(iii)   the Total Trustee Fees and any fees, expenses and indemnities owed to the Trustees;

(iv)   the Custodian Fee and any fees, expenses and indemnities owed to the Custodian;

(v)   the Backup Servicing Fee and any fees, expenses and indemnities owed to the Backup Servicer;

(vi)   the Interest Distributable Amount for each of the Class of Notes;

(vii)   the First Priority Principal Distributable Amount, the Second Priority Principal Distributable Amount, the Third Priority Principal Distributable Amount, the Fourth Priority Principal Distributable Amount, the Fifth Priority Principal Distributable Amount and the Sixth Priority Principal Distributable Amount;

(viii)   the Regular Principal Distributable Amount;

(ix)   the Reserve Fund Deficiency;

(x)   the Reserve Fund Required Amount;

(xi)   the Reserve Fund Draw Amount; and

(xiii)   the Cumulative Net Loss Ratio.

The results of such confirmations are on the attached report.  The Backup Servicer has made no independent examination of the Investor Report beyond the review specifically required in the Sale and Servicing Agreement.

Very truly yours,

VERVENT INC.,
as Backup Servicer


By: _____
     Name:
     Title:

E-2

APPENDIX A

AA-1