EXECUTION COPY

TRICOLOR FUNDING SPV 4 LLC,
as the Borrower,

TRICOLOR AUTO ACCEPTANCE, LLC,
as the Servicer,

the LENDERS
from time to time party hereto,

the AGENTS
from time to time party hereto,

JPMORGAN CHASE BANK, N.A.,
as the Administrative Agent,

VERVENT INC.,
as the Backup Servicer,

and

WILMINGTON TRUST, NATIONAL ASSOCIATION,
as the Collateral Custodian and the Account Bank

_____

CREDIT AGREEMENT

Dated as of November 13, 2020
_____

Trustee's Exhibit 018

# TABLE OF CONTENTS

Page

## ARTICLE ONE

## DEFINITIONS; CONSTRUCTION

Section 1.01.  Definitions ................................................................................ 2
Section 1.02.  Accounting Terms and Determinations .......................................... 45
Section 1.03.  Computation of Time Periods ...................................................... 45
Section 1.04.  Interpretation ........................................................................... 45
Section 1.05.  Interest Rates; LIBOR Notification ............................................... 46

## ARTICLE TWO

## LOANS

Section 2.01.  Loans ...................................................................................... 47
Section 2.02.  Funding Mechanics .................................................................... 48
Section 2.03.  Reductions of Aggregate Commitment ......................................... 49
Section 2.04.  Repayment of Loans; Evidence of Debt; Extensions of Commitments ........... 50
Section 2.05.  Optional Principal Repayments .................................................... 51
Section 2.06.  Payments ................................................................................. 51
Section 2.07.  Settlement Procedures ............................................................... 53
Section 2.08.  Payments, Computations, Etc ..................................................... 54
Section 2.09.  Collections and Allocations; Investment of Funds .......................... 55
Section 2.10.  Fees ........................................................................................ 56
Section 2.11.  Alternate Rate of Interest ........................................................... 56
Section 2.12.  Increased Costs; Capital Adequacy; Illegality; Rating Requests ........... 58
Section 2.13.  Taxes ...................................................................................... 60
Section 2.14.  Sharing of Payments, Etc ........................................................... 64
Section 2.15.  Securitizations .......................................................................... 64
Section 2.16.  The Account Bank ..................................................................... 66
Section 2.17.  Collection Account .................................................................... 72

## ARTICLE THREE

## SECURITY

Section 3.01.  Collateral ................................................................................. 75
Section 3.02.  Release of Collateral; No Legal Title ............................................ 77
Section 3.03.  Protection of Security Interest; Administrative Agent, as Attorney-in-
Fact ............................................................................................................ 77
Section 3.04.  Assignment of the Purchase Agreement ....................................... 78
Section 3.05.  Waiver of Certain Laws .............................................................. 78
Section 3.06.  Matters Relating to Electronic Chattel Paper ................................. 79
Section 3.07.  Master Collection Account .......................................................... 79

<u>Page</u>

ARTICLE FOUR

CONDITIONS OF CLOSING AND LOANS

Section 4.01.    Conditions to Closing.........................................................................80
Section 4.02.    Conditions Precedent to All Loans ..................................................81

ARTICLE FIVE

REPRESENTATIONS AND WARRANTIES

Section 5.01.    Representations and Warranties of the Borrower ...........................83
Section 5.02.    Representations and Warranties of the Borrower as to the Receivables..........87
Section 5.03.    Representations and Warranties of the Initial Servicer....................88
Section 5.04.    Representations and Warranties of the Backup Servicer ..................90
Section 5.05.    Representations and Warranties of the Collateral Custodian and
                 Account Bank.................................................................................91
Section 5.06.    Breach of Representations and Warranties ......................................92

ARTICLE SIX

COVENANTS

Section 6.01.    Affirmative Covenants of the Borrower .........................................94
Section 6.02.    Negative Covenants of the Borrower...............................................97
Section 6.03.    Covenant of the Borrower Relating to the Hedging Agreement....................102
Section 6.04.    Affirmative Covenants of the Servicer ..........................................103
Section 6.05.    Negative Covenants of the Servicer...............................................106

ARTICLE SEVEN

ADMINISTRATION AND SERVICING OF RECEIVABLES

Section 7.01.    Designation of Servicing................................................................109
Section 7.02.    Servicing Compensation ................................................................109
Section 7.03.    Duties of the Servicer....................................................................109
Section 7.04.    Collection of Payments .................................................................113
Section 7.05.    Payment of Certain Expenses by Servicer ....................................114
Section 7.06.    Reports and Due Diligence ...........................................................114
Section 7.07.    Annual Statement as to Compliance .............................................115
Section 7.08.    Annual Independent Public Accountant's Reports .......................115
Section 7.09.    Rights of the Backup Servicer Prior to Assumption of Duties by a
                 Successor Servicer .......................................................................116
Section 7.10.    Rights After Assumption of Duties by Successor Servicer; Liability ...........118
Section 7.11.    Limitation on Liability of the Servicer and Others .......................119
Section 7.12.    The Servicer Not to Resign ...........................................................119

261320820v.10 94601/30060

Section 7.13.   Servicer Termination Events.................................................................. 119
Section 7.14.   Appointment of Successor Servicer.............................................................. 121
Section 7.15.   Merger or Consolidation, Assumption of Obligations or Resignation, of
the Servicer ....................................................................................... 123
Section 7.16.   Responsibilities of the Borrower.................................................................. 124

## ARTICLE EIGHT

## BACKUP SERVICER

Section 8.01.   Designation of the Backup Servicer.............................................................. 125
Section 8.02.   Duties of the Backup Servicer..................................................................... 125
Section 8.03.   Backup Servicing Compensation ................................................................. 125
Section 8.04.   Backup Servicer Removal.......................................................................... 125
Section 8.05.   Backup Servicer Not to Resign ................................................................... 126
Section 8.06.   Monthly Backup Servicer Certificate ........................................................... 126
Section 8.07.   Covenants of the Backup Servicer ............................................................... 126
Section 8.08.   Merger of the Backup Servicer ................................................................... 126
Section 8.09.   Rights of the Backup Servicer after Assumption of Duties by Successor
Servicer; Liability ............................................................................... 127

## ARTICLE NINE

## THE COLLATERAL CUSTODIAN

Section 9.01.   Appointment; Duties of the Collateral Custodian........................................... 129
Section 9.02.   Compensation and Indemnification of the Collateral Custodian ................... 129
Section 9.03.   Liability of the Collateral Custodian............................................................ 129
Section 9.04.   Limitation on Liability of the Collateral Custodian and Others ................... 131
Section 9.05.   Certain Matters Affecting the Collateral Custodian....................................... 131
Section 9.06.   Documents Held by the Collateral Custodian; Inspection and Release of
Contract Files .................................................................................... 134

## ARTICLE TEN

## TERMINATION EVENTS

Section 10.01.   Termination Events .................................................................................. 136
Section 10.02.   Actions Upon Declaration of the Occurrence of the Amortization Date....... 139
Section 10.03.   Exercise of Remedies .............................................................................. 140
Section 10.04.   Waiver of Certain Laws ........................................................................... 140
Section 10.05.   Power of Attorney ................................................................................... 141

261320820v.10 94601/30060

Page

## ARTICLE ELEVEN

## INDEMNIFICATION

Section 11.01.   Indemnities by the Borrower ........................................................... 142
Section 11.02.   Indemnities by the Servicer ........................................................... 144
Section 11.03.   Additional Indemnification Provisions ........................................ 145

## ARTICLE TWELVE

## THE ADMINISTRATIVE AGENT AND THE AGENTS

Section 12.01.   Authorization and Action .............................................................. 146
Section 12.02.   Delegation of Duties ..................................................................... 146
Section 12.03.   Exculpatory Provisions ................................................................. 146
Section 12.04.   Reliance ........................................................................................ 147
Section 12.05.   Non-Reliance on Agents and Other Lenders ................................ 148
Section 12.06.   Indemnification ............................................................................ 148
Section 12.07.   Agents in Their Individual Capacities ......................................... 149
Section 12.08.   Successor Agents .......................................................................... 149

## ARTICLE THIRTEEN

## ASSIGNMENTS; PARTICIPATIONS

Section 13.01.   Assignments and Participations .................................................... 151

## ARTICLE FOURTEEN

## MUTUAL COVENANTS REGARDING CONFIDENTIALITY

Section 14.01.   Covenants of the Borrower, the Servicer, the Backup Servicer, the
                 Collateral Custodian and the Account Bank ................................. 155
Section 14.02.   Covenants of the Secured Parties and the Agents......................... 155

## ARTICLE FIFTEEN

## MISCELLANEOUS

Section 15.01.   Amendments and Waivers ............................................................ 158
Section 15.02.   Notices, Etc .................................................................................. 159
Section 15.03.   No Waiver, Rights and Remedies ................................................. 159
Section 15.04.   Binding Effect; Third Party Beneficiary ...................................... 159
Section 15.05.   Term of this Agreement ................................................................ 159
Section 15.06.   GOVERNING LAW; CONSENT TO JURISDICTION; WAIVER OF
                 OBJECTION TO VENUE ............................................................ 160

iv

Page

Section 15.07.    WAIVER OF JURY TRIAL ........................................................................ 160
Section 15.08.    Costs, Expenses and Taxes ..................................................................... 160
Section 15.09.    No Insolvency Proceedings ..................................................................... 161
Section 15.10.    Recourse Against Certain Parties ............................................................ 161
Section 15.11.    Patriot Act Compliance .......................................................................... 162
Section 15.12.    Execution in Counterparts; Severability; Integration ................................. 162
Section 15.13.    Multiple Capacities ................................................................................ 163
Section 15.14.    JPMorgan CP Rate ................................................................................ 163

## SCHEDULES

Schedule A    –    Conduit Lender Supplement ........................................................ SA-1
Schedule B    –    Eligible Receivable Criteria ........................................................ SB-1
Schedule C    –    Schedule of Receivables ............................................................ SC-1
Schedule D    –    Location of Receivable Files ....................................................... SD-1
Schedule E    –    Notice Information ..................................................................... SE-1
Schedule F    –    Perfection Representations and Warranties .................................... SF-1

## EXHIBITS

Exhibit A    –    Form of Funding Request .................................................... A-1
Exhibit B    –    Form of Assignment and Acceptance ................................... B-1
Exhibit C    –    Credit and Collection Policy .............................................. C-1
Exhibit D    –    Form of Power of Attorney ................................................ D-1
Exhibit E    –    Form of Monthly Report .................................................... E-1
Exhibit F    –    Form of Securitization Release ........................................... F-1
Exhibit G    –    Form of Monthly Backup Servicer Certificate ...................... G-1
Exhibit H    –    Form of Receivable Receipt ................................................ H-1
Exhibit I    –    Form of Request for Contract File Release ............................ I-1
Exhibit J    –    Form of Notice of Exclusive Control .................................... J-1
Exhibit K-1    –    Form of U.S. Tax Compliance Certificate ............................ K-1-1
Exhibit K-2    –    Form of U.S. Tax Compliance Certificate ............................ K-2-1
Exhibit K-3    –    Form of U.S. Tax Compliance Certificate ............................ K-3-1
Exhibit K-4    –    Form of U.S. Tax Compliance Certificate ............................ K-4-1

## CREDIT AGREEMENT

This Credit Agreement, dated as of November 13, 2020 (as amended, restated, supplemented or otherwise modified from time to time, this "Agreement"), is among Tricolor Funding SPV 4 LLC, a Delaware limited liability company, as borrower (the "Borrower"), Tricolor Auto Acceptance, LLC, a Delaware limited liability company ("Tricolor"), as servicer (the "Servicer"), the lenders from time to time party hereto (the "Lenders"), the agents for the Lender Groups (as defined herein) from time to time party hereto (the "Agents"), JPMorgan Chase Bank, N.A., as administrative agent for the Lenders (the "Administrative Agent"), Vervent Inc., as backup servicer (the "Backup Servicer"), and Wilmington Trust, National Association, as collateral custodian (in such capacity, the "Collateral Custodian") and as account bank (in such capacity, the "Account Bank").

### W I T N E S S E T H :

WHEREAS, the Borrower was formed for the purpose of purchasing and holding various assets, including motor vehicle retail installment sale contracts, amounts received on or in respect of such retail installment sale contracts and proceeds of the foregoing;

WHEREAS, the Borrower has requested that the Lenders make certain loans to the Borrower from time to time, the proceeds of which will be used to finance the purchase price of such retail installment sale contracts as described herein; and

WHEREAS, the Lenders have agreed to make such loans to the Borrower upon the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

261320820v.10 94601/30060

ARTICLE ONE

DEFINITIONS; CONSTRUCTION

Section 1.01.  <u>Definitions</u>.  Whenever used herein, unless the context otherwise requires, the following words and phrases shall have the following meanings:

"<u>3-Month Rolling Average Delinquency Ratio</u>" means, with respect to any Collection Period, the average of the Delinquency Ratios for such Collection Period and the two immediately preceding Collection Periods (or, if fewer than three Collection Periods have elapsed since the Closing Date, the average of the Delinquency Ratios for the number of Collection Periods that have elapsed since the Closing Date).

"<u>3-Month Rolling Average Extension Ratio</u>" means, with respect to any Collection Period, the average of the Extension Ratios for such Collection Period and the two immediately preceding Collection Periods (or, if fewer than three Collection Periods have elapsed since the Closing Date, the average of the Extension Ratios for the number of Collection Periods that have elapsed since the Closing Date).

"<u>3-Month Rolling Average Net Loss-to-Liquidation Ratio</u>" means, with respect to any Collection Period, the average of the Net Loss-to-Liquidation Ratios for such Collection Period and the two immediately preceding Collection Periods (or, if fewer than three Collection Periods have elapsed since the Closing Date, the average of the Net Loss-to-Liquidation Ratios for the number of Collection Periods that have elapsed since the Closing Date).

"<u>3-Month Rolling Average Serviced Portfolio Delinquency Ratio</u>" means, with respect to any calendar month, the average of the Serviced Portfolio Delinquency Ratios for such calendar month and the two immediately preceding calendar months.

"<u>3-Month Rolling Average Serviced Portfolio Extension Ratio</u>" means, with respect to any calendar month, the average of the Serviced Portfolio Extension Ratios for such calendar month and the two immediately preceding calendar months.

"<u>3-Month Rolling Average Serviced Portfolio Net Loss-to-Liquidation Ratio</u>" means, with respect to any calendar month, the average of the Serviced Portfolio Net Loss-to-Liquidation Ratios for such calendar month and the two immediately preceding calendar months.

"<u>Account Bank</u>" has the meaning given to such term in the Preamble.

"<u>Account Bank Fee</u>" means $1,000 per month.

"<u>Account Collateral</u>" means, the Accounts, together with all cash, securities, financial assets (as defined in Section 8-102(a)(9) of the UCC) and investments and other property from time to time deposited or credited to such Account, all security entitlements (as defined in Section 8-102(a)(17) of the UCC) arising therefrom or related thereto and all proceeds thereof.

"<u>Accounts</u>" means the Master Collection Account and the Collection Account.

2

"Adjusted LIBO Rate" means, with respect to any Loan for any Interest Period, an interest rate per annum (rounded upwards, if necessary, to the next 1/16 of 1%) equal to the quotient, expressed as a percentage, obtained by dividing (i) the LIBO Rate by (ii) 100% minus the Statutory Reserve Rate.

"Administrative Agent" has the meaning given to such term in the Preamble.

"Administrative Agent Account" means account number 645475500, maintained at JPMorgan Chase Bank, N.A. (ABA No. 021000021), account name: Chariot Funding LLC, or such other account as the Administrative Agent may from time to time specify by written notice to the Borrower, the Servicer and each Lender.

"Advisors" means accountants, attorneys, consultants, advisors, credit enhancers, liquidity providers, Persons similar to the foregoing and their respective directors, officers, employees and managers.

"Affected Party" means a Lender, a Credit Provider or any of their respective Affiliates.

"Affiliate" means, with respect to a Person, any other Person controlling, controlled by or under common control with such Person.  For purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" or "controlled" have meanings correlative to the foregoing.

"Agent" means the agent for a particular Lender Group and "Agents" means all agents for all Lender Groups.

"Aggregate Commitment" means, as of any day, the sum of the Commitments of each Lender Group.

"Aggregate Unpaids" means, as of any day, an amount equal to the sum of, without duplication, (i) the Loans Outstanding, (ii) all accrued but unpaid Interest and (iii) all Usage Fees, Unused Fees and all other Obligations owed (whether due or accrued) by the Borrower or the Servicer to the Secured Parties, the Backup Servicer and the Account Bank under this Agreement and the other Basic Documents.

"Agreement" has the meaning given to such term in the Preamble.

"Alternate Base Rate" means, for any day, a rate per annum equal to the greatest of (i) the Prime Rate in effect on such day, (ii) the NYFRB Rate in effect on such day plus 0.50% and (iii) the Adjusted LIBO Rate for such day (or if such day is not a Business Day, the immediately preceding Business Day) plus 1.00%; provided, that the Adjusted LIBO Rate for any day shall be based on the LIBO Rate, as applicable, at approximately 11:00 a.m., London time, on such day. Any change in the Alternate Base Rate due to a change in the Prime Rate, the NYFRB Rate or the Adjusted LIBO Rate shall be effective from and including the effective date of such change

in the Prime Rate, the NYFRB Rate or the Adjusted LIBO Rate, respectively.  If the Alternate Base Rate is being used as an alternate rate of interest pursuant to Section 2.11 (for the avoidance of doubt, only until the Benchmark Replacement has been determined pursuant to Section 2.11(b)), then the Alternate Base Rate shall be the greater of the rate determined pursuant to clauses (i) and (ii) above and shall be determined without reference to clause (iii) above.

"Amortization Date" means the earliest to occur of (i) the Commitment Termination Date, (ii) the occurrence of an Amortization Event and (iii) the date of the declaration or automatic occurrence of the Amortization Date pursuant to Section 10.01(b) following the occurrence of a Termination Event.

"Amortization Event" means the occurrence of any of the following events:

(i)     a Borrowing Base Deficiency shall exist for three consecutive Business Days; provided, that if such Borrowing Base Deficiency is caused solely by a Step-Up Credit Enhancement Trigger Event, then no Amortization Event will occur under this clause (i) and the Amortization Period will not commence unless such Borrowing Base Deficiency continues to exist on the Payment Date in the sixth Collection Period after the Collection Period in which such Borrowing Base Deficiency occurred;

(ii)     a Material Adverse Effect occurs with respect to the Borrower, any Originator, the Seller, the Servicer or the Performance Guarantor, as determined by the Administrative Agent (acting with the consent of the Required Lenders);

(iii)     the occurrence of a Servicer Termination Event; or

(iv)     the occurrence of a Termination Event.

"Amortization Period" means the period commencing on the Amortization Date and ending on the day on which the Loans Outstanding are reduced to zero and all other Aggregate Unpaids have been paid in full.

"Amount Financed" means, with respect to a Receivable, the aggregate amount advanced under such Receivable toward the purchase price of the related Financed Vehicle and any related costs, including amounts advanced in respect of accessories, insurance premiums, service and warranty contracts, other items customarily financed as part of a Contract and related costs.

"Annual Percentage Rate" or "APR" means, with respect to a Receivable, the rate per annum of finance charges stated in such Receivable as the "annual percentage rate" (within the meaning of the Federal Truth-in-Lending Act).  If, after the applicable Funding Date, the rate per annum of finance charges with respect to a Receivable is reduced (i) as a result of an Insolvency Proceeding involving the related Obligor or (ii) pursuant to the Servicemembers Civil Relief Act or similar State law, "Annual Percentage Rate" or "APR" shall refer to such reduced rate.

"Anti-Corruption Laws" means all laws, rules and regulations of any jurisdiction applicable to each of the Borrower, the Servicer and their respective Subsidiaries from time to time concerning or relating to bribery or corruption.

4

"Anti-Terrorism Laws" means (i) Executive Order 13224 of September 23, 2001, (ii) the Patriot Act, (iii) the Money Laundering Control Act of 1986, 18 U.S.C. Sect. 1956, (iv) the Proceeds of Crime (Money Laundering) and Terrorist Financing Act (Canada), (v) the Bank Secrecy Act, and the rules and regulations promulgated thereunder, and (vi) any other Requirements of Law of the United States, Canada or any member state of the European Union now or hereafter enacted to monitor, deter or otherwise prevent (a) terrorism, (b) the funding or support of terrorism or (c) money laundering.

"Applicable Law" means, with respect to any Person, all existing and future applicable laws, rules, regulations (including proposed, temporary and final income tax regulations), statutes, treaties, codes, ordinances, permits, certificates, orders and licenses of and interpretations by any Governmental Authority (including usury laws, the Federal Truth in Lending Act, Regulation Z and Regulation B of the CFPB, the Securities Act, including Regulation AB, and the Exchange Act), and applicable judgments, decrees, injunctions, writs, orders or line actions of any court, arbitrator or other administrative, judicial or quasi-judicial tribunal or agency of competent jurisdiction.

"Assignment and Acceptance" means an assignment and acceptance agreement between a Lender and an Eligible Assignee, in substantially the form of Exhibit B.

"Authoritative Copy" means, with respect to any Electronic Chattel Paper, a copy of such Electronic Chattel Paper that is unique, identifiable and, except as otherwise provided in Section 9-105 of the UCC, unalterable, any perceivable rendering of which is marked "View of Authoritative Copy" and has no watermark or other marking that would indicate that it is a "copy" or "duplicate" or not an original or not an "authoritative copy".

"Available Amount" means, as of any day during the Revolving Period, the positive amount, if any, by which the Aggregate Commitment exceeds the Loans Outstanding on such day.

"Available Funds" means, with respect to any Payment Date and the related Collection Period, (i) Collections on deposit in the Collection Account, to the extent received during or in respect of such Collection Period, (ii) all payments received by the Borrower pursuant to any Hedging Agreement or Hedge Transaction, (iii) all investment earnings in the Collection Account and (iv) the amount deposited in the Collection Account on any Securitization Date during such Collection Period.

"Available Tenor" means, as of any date of determination and with respect to the then-current Benchmark, any tenor for such Benchmark or payment period for interest calculated with reference to such Benchmark, that is or may be used for determining the length of an Interest Period pursuant to this Agreement as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is removed from the definition of the term "Interest Period" pursuant to Section 2.11(f).

"Backup Servicer" has the meaning given to such term in the Preamble.

"Backup Servicer Termination Notice" has the meaning given to such term in Section 8.04.

"Backup Servicing Fee" means, an amount of $5,000 on the Closing Date, and with respect to any Collection Period and the related Payment Date, if the Pool Balance on the first day of such Collection Period is (i) not more than $100,000,000, $3,500, (ii) greater than $100,000,000 but not greater than $200,000,000, $4,000, or (iii) greater than $200,000,000, $5,000.

"Backup Servicing Fee Rate" means, with respect to any Collection Period, an amount equal to the product of (i) the percentage equivalent of a fraction, (a) the numerator of which is the Backup Servicing Fee for such Collection Period and (b) the denominator of which is the greater of (1) $50,000,000 and (2) the average daily Pool Balance during such Collection Period, times (ii) 12.

"Bankruptcy Code" means the United States Bankruptcy Code (Title 11 of the United States Code).

"Basel II" means the second Basel Accord issued by the Basel Committee on Banking Supervision.

"Basel III" means the third Basel Accord issued by the Basel Committee on Banking Supervision.

"Basic Documents" means this Agreement, the Purchase Agreement, each Transfer Agreement, all Hedging Agreements, the Master Collection Account Agreement, the Fee Letter, the KLDL Letter Agreement and any other document, certificate, opinion, agreement or writing the execution of which is necessary or incidental to carrying out the transactions contemplated by this Agreement or any of the other foregoing documents.

"Benchmark" means, initially, the LIBO Rate; provided, that if a Benchmark Transition Event, a Term SOFR Transition Event or an Early Opt-in Election, as applicable, and its related Benchmark Replacement Date have occurred with respect to the LIBO Rate or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 2.11(b) or (c).

"Benchmark Replacement" means, for any Available Tenor, the first alternative set forth in the order below that can be determined by the Administrative Agent for the applicable Benchmark Replacement Date:

    (i)    the sum of (a) Term SOFR and (b) the related Benchmark Replacement Adjustment;

    (ii)    the sum of (a) Daily Simple SOFR and (b) the related Benchmark Replacement Adjustment;

    (iii)    the sum of (a) the alternate benchmark rate that has been selected by the Administrative Agent and the Borrower as the replacement for the then-current Benchmark for the applicable Corresponding Tenor giving due consideration to (1) any selection or recommendation of a replacement benchmark rate or the mechanism for

6

determining such a rate by the Relevant Governmental Body or (2) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement to the then-current Benchmark for Dollar-denominated syndicated credit facilities at such time and (b) the related Benchmark Replacement Adjustment;

provided, that in the case of clause (i) above, such Unadjusted Benchmark Replacement is displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion; provided, further, that notwithstanding anything to the contrary in this Agreement or in any other Basic Document, upon the occurrence of a Term SOFR Transition Event, and the delivery of a Term SOFR Notice, on the applicable Benchmark Replacement Date the "Benchmark Replacement" shall revert to and be deemed to be the sum of (A) Term SOFR and (B) the related Benchmark Replacement Adjustment, as set forth in clause (i) above (subject to the first proviso above).

If the Benchmark Replacement as so determined pursuant to clauses (i), (ii) or (iii) above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Basic Documents.

"Benchmark Replacement Adjustment" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement for any applicable Interest Period and Available Tenor for any setting of such Unadjusted Benchmark Replacement:

(i)    for purposes of clauses (i) and (ii) of the definition of the term "Benchmark Replacement", the first alternative set forth in the order below that can be determined by the Administrative Agent:

(a)    the spread adjustment, or method for calculating or determining such spread adjustment (which may be a positive or negative value or zero) as of the Reference Time such Benchmark Replacement is first set for such Interest Period that has been selected or recommended by the Relevant Governmental Body for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for the applicable Corresponding Tenor; and

(b)    the spread adjustment (which may be a positive or negative value or zero) as of the Reference Time such Benchmark Replacement is first set for such Interest Period that would apply to the fallback rate for a derivative transaction referencing the ISDA Definitions to be effective upon an index cessation event with respect to such Benchmark for the applicable Corresponding Tenor; and

(ii)    for purposes of clause (iii) of the definition of the term "Benchmark Replacement", the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent and the Borrower for the applicable Corresponding Tenor giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement

7

by the Relevant Governmental Body on the applicable Benchmark Replacement Date or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar-denominated syndicated credit facilities;

provided, that in the case of clause (i) above, such adjustment is displayed on a screen or other information service that publishes such Benchmark Replacement Adjustment from time to time as selected by the Administrative Agent in its reasonable discretion.

"Benchmark Replacement Conforming Changes" means, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definitions of "Alternate Base Rate", "Business Day" and "Interest Period", the timing and frequency of determining rates and making payments of interest, the timing of borrowing requests or prepayment, conversion or continuation notices, length of lookback periods, the applicability of breakage provisions, and other technical, administrative or operational matters) that the Administrative Agent decides may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the it decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of such Benchmark Replacement exists, in such other manner of administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Basic Documents).

"Benchmark Replacement Date" means the earlier to occur of the following events with respect to the then-current Benchmark:

(i)    in the case of clause (i) or (ii) of the definition of the term "Benchmark Transition Event", the later of the date (a) of the public statement or publication of information referenced therein and (b) on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof);

(ii)    in the case of clause (iii) of the definition of the term "Benchmark Transition Event", the date of the public statement or publication of information referenced therein;

(iii)    in the case of a Term SOFR Transition Event, the date that is 30 days after the date a Term SOFR Notice is provided to the Lenders and the Borrower pursuant to Section 2.11(c); or

(iv)    in the case of an Early Opt-in Election, the sixth Business Day after the date notice of such Early Opt-in Election is provided to the Lenders, so long as the Administrative Agent has not received, by 5:00 p.m. (New York, New York time) on the fifth Business Day after the date notice of such Early Opt-in Election is provided to the

8

Lenders, written notice of objection to such Early Opt-in Election from Lenders comprising the Required Lenders.

For the avoidance of doubt, (i) if the event giving rise to the Benchmark Replacement Date occurs on the same day as, but earlier than, the Reference Time in respect of any determination, the Benchmark Replacement Date will be deemed to have occurred prior to the Reference Time for such determination and (ii) the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (i) or (ii) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Transition Event" means the occurrence of one or more of the following events with respect to the then-current Benchmark:

(i)    a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely; provided, that at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(ii)    a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Federal Reserve Board, the NYFRB, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely; provided, that at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(iii)    a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are no longer representative.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Unavailability Period" means the period (if any) (i) beginning at the time that a Benchmark Replacement Date pursuant to clause (i) or (ii) of the definition thereof has

9

occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Basic Document in accordance with Section 2.11 and (ii) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Basic Document in accordance with Section 2.11.

"<u>Beneficial Ownership Certification</u>" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"<u>Beneficial Ownership Regulation</u>" means 31 C.F.R. § 1010.230.

"<u>Benefit Plan</u>" means (i) employee benefit plans (as defined in Section 3(3) of ERISA) that are subject to Title I of ERISA, (ii) plans described in Section 4975(e)(1) of the Code, including individual retirement accounts or Keogh Plans that are not exempt under Section 4975(g) of the Code and (iii) any entities whose underlying assets include plan assets by reason of a plan's investment in such entities.

"<u>BlackRock Loan Agreement</u>" means the Loan and Security Agreement, dated as of August 6, 2020, among Tricolor and Tricolor Holdings, as borrowers, the guarantors party thereto, Wilmington Savings Fund Society, FSB, as agent, and the lenders party thereto.

"<u>BlackRock Subscription Agreement</u>" means (i) the subscription agreement, dated as of January 27, 2020, between Tricolor Holdings and the subscribers party thereto and (ii) the BlackRock Loan Agreement.

"<u>Borrower</u>" has the meaning given to such term in the Preamble.

"<u>Borrower Basic Documents</u>" means all Basic Documents to which the Borrower is a party or by which it is bound.

"<u>Borrowing Base</u>" means, as of any date of determination, the Net Eligible Pool Balance on such date minus the Required Credit Enhancement Amount on such date.

"<u>Borrowing Base Deficiency</u>" means, as of any date of determination, the positive amount, if any, by which (i) the Required Credit Enhancement Amount exceeds (ii) the Net Eligible Pool Balance minus the Loans Outstanding.

"<u>Breakage Costs</u>" means such amount or amounts as shall compensate any Lender for any actual loss, cost or expense (excluding lost profits) incurred by such Lender (as reasonably determined by the Lender) as a result of any prepayment of a Loan (and interest thereon).

"<u>Business Day</u>" means (i) any day other than a Saturday or a Sunday on which commercial banking institutions are not required or authorized to be closed in New York, New York, Wilmington, Delaware, Chicago, Illinois and San Diego, California and (ii) if the term "Business Day" is used in connection with the Adjusted LIBO Rate, such day must also be a LIBOR Business Day.

"<u>Cash Equivalents</u>" means (i) securities with maturities of 90 days or less from the date of acquisition issued or fully guaranteed or insured by the United States Government or any

agency thereof, (ii) certificates of deposit and eurodollar time deposits with maturities of 90 days or less from the date of acquisition and overnight bank deposits of any commercial bank having capital and surplus in excess of $500,000,000, (iii) repurchase obligations of any commercial bank satisfying the requirements of clause (ii) above, having a term of not more than seven days with respect to securities issued or fully guaranteed or insured by the United States Government, (iv) commercial paper of a domestic issuer rated at least "A-1" or the equivalent thereof by Standard & Poor's or "P-1" or the equivalent thereof by Moody's and in either case maturing within 90 days after the day of acquisition, (v) securities with maturities of 90 days or less from the date of acquisition issued or fully guaranteed by any State, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such State, commonwealth or territory or by any foreign government, the securities of which State, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) are rated at least "A" by Standard & Poor's or "A2" by Moody's, (vi) securities with maturities of 90 days or less from the date of acquisition backed by standby letters of credit issued by any commercial bank satisfying the requirements of clause (ii) above, (vii) shares of money market mutual or similar funds which invest exclusively in assets satisfying the requirements of clauses (i) through (vi) above or (viii) investments in money market or common trust funds having a rating from each of Moody's and Standard & Poor's in the highest investment category for short-term unsecured debt obligations or certificates of deposit granted thereby.

"Certificate of Formation" means, with respect to any Tricolor Entity, its certificate of formation filed with the Secretary of State of the State of Delaware.

"Certificate of Title" means, with respect to a Financed Vehicle, (i) the original certificate of title relating thereto, or copies of correspondence to the applicable Registrar of Titles, and all enclosures thereto, for issuance of the original certificate of title or (ii) if the applicable Registrar of Titles issues a letter or other form of evidence of lien in lieu of a certificate of title (including electronic titling), the original lien entry letter or form or copies of correspondence to such Registrar of Titles, and all enclosures thereto, for issuance of the original lien entry letter or form, which, in either case, shall name the related Obligor as the owner of such Financed Vehicle and the related Originator, the Borrower or the Administrative Agent as secured party.  For Financed Vehicles registered in States that issue confirmation of the lienholder's interest electronically, the "Certificate of Title" may consist of notification of an electronic recordation, by either a third party service provider or the relevant Registrar of Titles, which indicates that the lien of the secured party on the Financed Vehicle is recorded on the original certificate of title on the electronic lien and title system of the applicable State.

"CFPB" means the Consumer Financial Protection Bureau.

"Change in Control" means, at any time, (i) (a) any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act, but excluding any employee benefit plan of such person or its Subsidiaries, and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan) becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Exchange Act, except that a person or group shall be deemed to have "beneficial ownership" of all securities that such person or group has the right to acquire, whether such right is exercisable immediately or only after the passage of time (such right, an "option right")), directly or indirectly, of 51% or more of the Equity Interests of

Tricolor Holdings entitled to vote for members of the board of directors or equivalent governing body of Tricolor Holdings on a fully-diluted basis (and taking into account all such securities that such person or group has the right to acquire pursuant to any option right), (ii) Tricolor Holdings fails to own, directly or indirectly, and control 51% or more of the outstanding Equity Interests of Tricolor, (iii) Tricolor fails to own, directly or indirectly, and control all of the outstanding Equity Interests of the Borrower, or (iv) a "change of control" or similar event shall occur with respect to any Tricolor Entity under and as defined in (a) any agreement governing Indebtedness of such Tricolor Entity including any repurchase agreement, any loan and security agreement, any credit agreement, any indenture, any warehouse agreement or the BlackRock Subscription Agreement or (b) any agreement relating to or governing any management or equity arrangement with respect to a Tricolor Entity.

"Closing Date" means November 13, 2020.

"Code" means the Internal Revenue Code of 1986.

"Collateral" has the meaning given to such term in Section 3.01(a).

"Collateral Custodian" has the meaning given to such term in the Preamble.

"Collateral Custodian Basic Documents" means the Basic Documents to which the Collateral Custodian is a party.

"Collateral Custodian Fee" means the fees of the Collateral Custodian as described in the Collateral Custodian Fee Letter.

"Collateral Custodian Fee Letter" means the Collateral Custodian Fee Letter, dated as of the Closing Date, among Tricolor, the Borrower and the Collateral Custodian.

"Collateral Custodian Fee Rate" means, with respect to any Collection Period, an amount equal to the product of (i) the percentage equivalent of a fraction, (a) the numerator of which is the Collateral Custodian Fee for such Collection Period and (b) the denominator of which is the greater of (1) $50,000,000 and (2) the average daily Pool Balance during such Collection Period, times (ii) 12.

"Collection Account" means a segregated account established by the Servicer with the Account Bank, in the name of the Administrative Agent, for the benefit of the Secured Parties, into which Collections shall be deposited.

"Collection Period" means with respect to any Payment Date, the immediately preceding calendar month, except for the first Payment Date, in which case such term means the period from but excluding the initial Cutoff Date to and including the last day of the calendar month in which the Closing Date occurs.

"Collections" means (i) all cash collections or other cash proceeds of any Receivable received by the Servicer (including from Tricolor or the Borrower) from or on behalf of any Obligor in payment of any amounts owed in respect of such Receivable, including all Release Price amounts deposited in the Collection Account pursuant to Section 5.06, Insurance Proceeds,

12

Liquidation Proceeds and (ii) any other funds received by the Servicer (including from Tricolor or the Borrower) with respect to any Receivable, including ancillary fees, the related Financed Vehicle or any other related Collateral.  Notwithstanding the foregoing, no "phone pay fees" in respect of ACH transactions shall constitute Collections.

"Commercial Paper" means any promissory notes issued by or on behalf of a Conduit Lender.

"Commercial Paper Notes" means any Commercial Paper issued by or on behalf of a Conduit Lender with respect to financing any Loan hereunder.

"Commitment" means, with respect to any Committed Lender or Lender Group, the commitment of such Committed Lender or Lender Group to fund Loans in an aggregate amount not to exceed, in the case of (i) the Committed Lenders, the amounts set forth underneath their respective names on the signature pages hereof, (ii) any other Committed Lender, the amount set forth in the Assignment and Acceptance or a Conduit Lender Supplement pursuant to which it became a party to this Agreement and (iii) a Lender Group, the aggregate amount of the Commitments of its Committed Lenders, in each case as such amount may be modified in accordance with the terms hereof.

"Commitment Termination Date" means November 13, 2021 or, with respect to any Lender, such later date to which the Commitment Termination Date may be extended for such Lender in accordance with Section 2.04(d).

"Committed Lender" means any Lender that is designated as a Committed Lender on the signature pages hereof, in a Conduit Lender Supplement or in the Assignment and Acceptance pursuant to which it became a party to this Agreement, and any assignee of such Lender to the extent of the portion of the related Commitment assumed by such assignee pursuant to its respective Assignment and Acceptance.

"Conduit Funding Limit" means the maximum amount of Loans that may be funded hereunder by a Conduit Lender that is not a Committed Lender in an aggregate amount not to exceed, in the case of (i) each initial Conduit Lender that is not a Committed Lender, the amount set forth underneath its name on the signature pages hereof and (ii) any other Conduit Lender that is not a Committed Lender, the amount set forth in the Conduit Lender Supplement or the Assignment and Acceptance pursuant to which it became a party to this Agreement.

"Conduit Lender" means any Lender that is designated as a Conduit Lender in the Conduit Lender Supplement or in the Assignment and Acceptance pursuant to which it became a party to this Agreement, and any assignee of such Lender to the extent of the portion of its Commitment or Conduit Funding Limit assumed by such assignee pursuant to its respective Assignment and Acceptance.

"Conduit Lender Supplement" means the information substantially in the form set forth in Schedule A for each Conduit Lender, relating to payment and notice information, its CP Rate, its Conduit Funding Limit and, as applicable, the Commitment and related Committed Lender. Such information may be amended or otherwise modified from time to time by the Lenders

named therein, with, in the case of changes to the Commitment, Conduit Funding Limit and the definition of the CP Rate, the consent of the Borrower.

"Confidential Information" means any information with respect to any Tricolor Entity, their respective businesses, financial information or condition, the Obligors, the Receivables and the Serviced Portfolio and includes (i) information transmitted in written, oral, magnetic or any other medium, (ii) all copies and reproductions, in whole or in part, of such information and (iii) all summaries, analyses, compilations, studies, notes or other records which contain, reflect or are generated from such information; provided, that Confidential Information does not include, with respect to a Person, information that (a) was already known to such Person and such knowledge was not obtained from any other entity who was known by such Person to be subject to an obligation of confidentiality or otherwise prohibited from transmitting such information to such Person, (b) is or has become part of the public domain through no act or omission of such Person, (c) is or was lawfully disclosed to such Person without restriction on disclosure by a third party, (d) is or was developed independently by such Person or (e) is or was lawfully and independently provided to such Person prior to disclosure hereunder, from a third party who is not known by such Person to be subject to an obligation of confidentiality or otherwise prohibited from transmitting such information.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Continued Errors" has the meaning given to such term in Section 7.09(e).

"Contract" means any retail installment sale contract or conditional sale contract executed by an Obligor for a Financed Vehicle under which an extension of credit by the applicable Originator has been made in the ordinary course of business to such Obligor, which is secured by the related Financed Vehicle in which the related Originator shall have been granted a security interest and, if the related Receivable is being financed pursuant to this Agreement, the Borrower acquires all right, title or interest from Tricolor pursuant to the Purchase Agreement.

"Contract File" means, with respect to each Contract, the original executed Contract, the original Certificate of Title or evidence that such Certificate of Title has been applied for, and the original endorsements or assignments showing the chain of ownership of such Contract.

"Contractual Obligation" means, with respect to any Person, any provision of any securities issued by such Person or any indenture, mortgage, deed of trust, contract, undertaking, agreement, instrument or other document to which such Person is a party or by which it or any of its property is bound or is subject.

"Corresponding Tenor" with respect to any Available Tenor means, as applicable, either a tenor (including overnight) or an interest payment period having approximately the same length (disregarding business day adjustment) as such Available Tenor.

"CP Rate" means, with respect to a Conduit Lender, the rate identified as its "CP Rate" in the related Conduit Lender Supplement.

"Credit and Collection Policy" means, with respect to (i) the initial Servicer, the credit and collection policies of the Servicer, as revised from time to time in accordance with this Agreement and as attached hereto as Exhibit C, or (ii) any Successor Servicer, the customary credit and collection policies of such Successor Servicer.

"Credit Facility" means any committed loan facility, line of credit, letter of credit and other form of credit enhancement available to a Conduit Lender that is not a Liquidity Facility.

"Credit Provider" means any bank or other financial institution providing a Credit Facility or Liquidity Facility, and any holding company in respect of any such bank or financial institution.

"Credit Tier" means an underwriting tier ranging from A+ to E established as part of Tricolor's proprietary underwriting system.

"Cured" means, with respect to a Step-Up Credit Enhancement Trigger Event, that as of the last day of three consecutive Collection Periods after the occurrence of such Step-Up Credit Enhancement Trigger Event, the event giving rise to such Step-Up Credit Enhancement Trigger Event has not occurred and no other Step-Up Credit Enhancement Trigger Event has occurred and is continuing.

"Cutoff Date" means, with respect to Receivables transferred to the Borrower on a Funding Date, the date as shall be identified as the Cutoff Date in the related Funding Request; provided, that such date shall be no earlier than ten days prior to the proposed Funding Date.

"Daily Simple SOFR" means, for any day, SOFR, with the conventions for this rate (which will include a lookback) being established by the Administrative Agent in accordance with the conventions for this rate selected or recommended by the Relevant Governmental Body for determining "Daily Simple SOFR" for business loans; provided, that if the Administrative Agent decides that any such convention is not administratively feasible for the it, then the Administrative Agent may establish another convention in its reasonable discretion.

"Debt Service Coverage Ratio" means, with respect to any period, the percentage equivalent of a fraction (i) the numerator of which equals interest payments and amortizing payments on Indebtedness and any dividends or distributions on the preferred stock of Tricolor Holdings and its Subsidiaries, including PIK or "payment in kind" interest, made during such period, but excluding any payments on inventory financing facilities or structured warehouse and securitization facilities of Tricolor Holdings and its Subsidiaries, made during such period and (ii) the denominator of which equals the total Operating Income for Tricolor Holdings for such period.

"Default Rate" means a per annum rate equal to the Alternate Base Rate plus 4.25%.

"Defaulted Receivable" means any Receivable or Serviced Portfolio Receivable (i) with respect to which 10% or more of any Scheduled Payment remains unpaid for 120 days or more from its original due date as of the last day of the most recent Collection Period, (ii) with respect to which the related Financed Vehicle has been repossessed and the Servicer has either liquidated such Financed Vehicle or held such Financed Vehicle in its inventory for more than 90 days as

15

of the last day of the most recent Collection Period, (iii) which has been or should otherwise be charged-off or is deemed uncollectible by the Servicer in accordance with the Credit and Collection Policy or (iv) the Obligor is the subject of an Insolvency Proceeding.

"Delinquency Ratio" means, with respect to any Collection Period, the percentage equivalent of a fraction, (i) the numerator of which is equal to the aggregate Principal Balance of all Delinquent Receivables as of the last day of such Collection Period and (ii) the denominator of which is equal to the aggregate Principal Balance of the Receivables as of the last day of such Collection Period.

"Delinquent Receivable" means any Receivable or Serviced Portfolio Receivable, other than a Defaulted Receivable, with respect to which the greater of (i) 10% of any Scheduled Payment or (ii) $50.00 is more than 60 days past due.

"Derivative" means any (i) exchange-traded or over-the-counter forward, future, option, swap, cap, collar, floor or foreign exchange contract or any combination of the foregoing, whether for physical delivery or cash settlement, relating to any interest rate, interest rate index, currency, currency exchange rate, currency exchange rate index, debt instrument, debt price, debt index, depository instrument, depository price, depository index, equity instrument, equity price, equity index, commodity, commodity price or commodity index, (ii) similar transaction, contract, instrument, undertaking or security or (iii) transaction, contract, instrument, undertaking or security containing any of the foregoing.

"Dissenting Lender" means a Non-Extending Lender from the date of its refusal notice or the Commitment Termination Date.

"Dodd-Frank Act" means The Dodd-Frank Wall Street Reform and Consumer Protection Act (Pub.L. 111-203, H.R. 4173), including all requests, rules, guideline, regulations and directives thereunder.

"Dollars" or "$" means the lawful currency of the United States.

"Drawn Liquidity Rate" shall have the meaning set forth in the Fee Letter.

"DTI" means, with respect to any Obligor and the related Contract, the ratio (expressed as a percentage) of (i) the sum of (a) all pre-existing monthly payment of all outstanding debt obligations of such Obligor as reported by a credit bureau and (b) the related Scheduled Payment to (ii) such Obligor's reported gross monthly income, in each case as of the date of origination of such Contract.

"Early Adoption Increased Costs" means charges or compensation related to any measures instituted by an Affected Party in anticipation of a Regulatory Requirement (including the imposition of internal charges on such Affected Party's interests or obligations under this Agreement), in advance of the effective date of such Regulatory Requirement.

"Early Opt-in Election" means, if the then-current Benchmark is the LIBO Rate, the occurrence of:

(i)       a notification by the Administrative Agent to (or the request by the Borrower to the Administrative Agent to notify) each of the other parties hereto that at least five currently outstanding Dollar-denominated syndicated credit facilities at such time contain (as a result of amendment or as originally executed) a SOFR-based rate (including SOFR, a term SOFR or any other rate based upon SOFR) as a benchmark rate (and such syndicated credit facilities are identified in such notice and are publicly available for review); and

(ii)      the joint election by the Administrative Agent and the Borrower to trigger a fallback from LIBO Rate and the provision by the Administrative Agent of written notice of such election to the Lenders.

"ECP Control Date" means the first date on which the aggregate Principal Balance of Eligible Receivables constituting Electronic Chattel Paper exceeds an amount equal to the product of 10.0% and the Eligible Pool Balance.

"Election Period" means the 30-day period following the date of a request for an extension pursuant to Section 2.04(d).

"Electronic Chattel Paper" means "electronic chattel paper" under and as defined in Article 9 of the relevant UCC.

"Eligible Assignee" means a Person who is (i) a multi-seller commercial paper conduit or an Affiliate of a Lender, an Agent or the Administrative Agent, or (ii)(a) acceptable to the Agent relating to the portion of the Commitment and/or Loans Outstanding being assigned, and (b) prior to the automatic occurrence or declaration of the occurrence of the Amortization Date pursuant to Section 10.01(b), consented to by the Borrower (which consent shall not be unreasonably withheld, delayed or conditioned).

"Eligible FICO® Score Receivables" means Eligible Receivables for which the related Obligors had a non-zero FICO® Score at the time of origination of the related Contract.

"Eligible Pool Balance" means, on any date of determination, the sum of the Principal Balances of all of the Receivables (or if indicated by the context, a specified portion of the Receivables) that are Eligible Receivables as of the last day of the most recently ended Collection Period or the related Cutoff Dates, as indicated by the context, in each case as reduced in accordance with Section 5.06.

"Eligible Receivable" means, as of any date of determination, any Receivable (i) for which the related Contract File is in the possession of the Collateral Custodian after delivery thereof to the Collateral Custodian in accordance with Section 9.06, or with respect to any portion of such Contract File that constitutes Electronic Chattel Paper, is under the "control" (within the meaning of Section 9-105 of the UCC) of Tricolor (on behalf of the Secured Parties), (ii) which is identified on the Schedule of Receivables delivered by the Borrower to the Administrative Agent as part of a Funding Request and (iii) which satisfies the eligibility requirements set forth on Schedule B.

"Entitlement Order" means, an "entitlement order" as defined in Section 8-102(a)(8) of the UCC.

"Equity Interests" means, as to any Person, all of the (i) shares of capital stock of (or other ownership or profit interests in) such Person, (ii) warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, (iii) securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and (iv) other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"ERISA" means the Employee Retirement Income Security Act of 1974, and the regulations promulgated and rulings issued thereunder.

"ERISA Affiliate" means (i) any corporation which is a member of the same controlled group of corporations (within the meaning of Section 414(b) of the Code) as the Borrower, (ii) a trade or business (whether or not incorporated) under common control (within the meaning of Section 414(c) of the Code) with the Borrower or (iii) a member of the same affiliated service group (within the meaning of Section 414(m) of the Code) as the Borrower, any corporation described in clause (i) above or any trade or business described in clause (ii) above.

"Errors" has the meaning given to such term in Section 7.09(e).

"Eurodollars" means deposits in Dollars held in financial institutions outside of the United States.

"Excess Concentration Amounts" means, as of any date of determination, the sum, without duplication, of the following amounts:

(i)        the excess of (a) the aggregate Principal Balance of all Eligible Receivables as to which the related Obligors were residents of the State of Texas on the dates of origination of the related Receivables over (b) an amount equal to the product of 80.0% and the Eligible Pool Balance;

(ii)        the excess of (a) the aggregate Principal Balance of all Eligible Receivables as to which the related Obligors were residents of the State of California on the dates of origination of the related Receivables over (ii) an amount equal to the product of 40.0% and the Eligible Pool Balance;

(iii)        the excess of (a) the aggregate Principal Balance of all Eligible Receivables originated at any single Originator dealership over (b) an amount equal to the product of 10.0% and the Eligible Pool Balance;

(iv)        the excess of (a) the aggregate Principal Balance of all Eligible Receivables as to which the related Obligors were residents of any single State other than

18

the States of Texas and California on the dates of origination of the related Receivables over (b) an amount equal to the product of 10.0% and the Eligible Pool Balance;

(v)        the excess of (a) the aggregate Principal Balance of all Eligible Receivables as to which the LTV Ratio as of the dates of origination of the related Receivables was greater than 140% over (b) an amount equal to the product of 32.5% and the Eligible Pool Balance;

(vi)        the excess of (a) the aggregate Principal Balance of all Eligible Receivables as to which the related Obligors had no FICO® Score, a missing FICO® Score or a FICO® Score of zero as of the dates of origination of the related Receivables over (b) an amount equal to the product of 60.0% and the Eligible Pool Balance;

(vii)        the excess of (a) the aggregate Principal Balance of all Eligible Receivables as to which the related Obligors had a FICO® Score of less than 500 as of the dates of origination of the related Receivables (excluding Obligors that had no FICO® Score, a missing FICO® Score or a FICO® Score of zero as of the dates of origination) over (b) an amount equal to the product of 10.0% and the Eligible Pool Balance;

(viii)        the excess of (a) the aggregate Principal Balance of all Eligible Receivables as to which the related Obligors were assigned a Credit Tier of "E" as of the dates of origination of the related Receivables over (b) an amount equal to the product of 2.5% and the Eligible Pool Balance;

(ix)        the excess of (a) the aggregate Principal Balance of all Eligible Receivables as to which the related Obligors were assigned a Credit Tier of "D" or "E" as of the dates of origination of the related Receivables over (b) an amount equal to the product of 5.0% and the Eligible Pool Balance;

(x)        the excess of (a) the aggregate Principal Balance of all Eligible Receivables as to which the related Obligors were assigned a Credit Tier lower than "B" as of the dates of origination of the related Receivables over (b) an amount equal to the product of 35.0% and the Eligible Pool Balance;

(xi)        the excess of (a) the aggregate Principal Balance of all Eligible Receivables as to which, as of the dates of origination of the related Receivables, the related Obligors were resident at the mailing address specified in the related application for credit for less than 12 months over (b) an amount equal to the product of 12.5% and the Eligible Pool Balance;

(xii)        the excess of (a) the aggregate Principal Balance of all Eligible Receivables originated under the Ganas Ya! brand as of the dates of origination of the related Receivables over (b) an amount equal to the product of 10.0% and the Eligible Pool Balance;

(xiii)        the excess of (a) the aggregate Principal Balance of all Eligible Receivables originated under the Ride Now brand as of the dates of origination of the

19

related Receivables over (b) an amount equal to the product of 1.0% and the Eligible Pool Balance;

(xiv)        the excess of (a) the aggregate Principal Balance of all Eligible Receivables as to which the gross monthly income of the related Obligors was less than $2,000 as of the dates of origination of the related Receivables over (b) an amount equal to the product of 5.0% and the Eligible Pool Balance;

(xv)        the excess of (a) the aggregate Principal Balance of all Eligible Receivables as to which the original term to maturity of such Receivables was greater than 60 months as of the dates of origination of the related Receivables over (b) an amount equal to the product of 1.0% and the Eligible Pool Balance;

(xvi)        the aggregate Principal Balance of the Eligible Receivables having LTV Ratios as of the dates of origination of such Receivables of higher than 135.0% that would need to be excluded from the Receivables that are Eligible Receivables on such date in order to cause the weighted average LTV Ratios (based on the current Principal Balance of such Eligible Receivables) of all remaining Eligible Receivables to be less than or equal to 135.0%;

(xvii)        the aggregate Principal Balance of the Eligible Receivables having FICO® Scores at origination of less than 560 (excluding Obligors that had no FICO® Score, a missing FICO® Score or a FICO® Score of zero as of the dates of origination) that would need to be excluded from the Receivables that are Eligible Receivables on such date in order to cause the weighted average FICO® Score (based on the current Principal Balance of such Eligible Receivables) of all remaining Eligible Receivables (excluding Obligors that had no FICO® Score, a missing FICO® Score or a FICO® Score of zero as of the dates of origination) to be 560 or higher;

(xviii)        the aggregate Principal Balance of the Eligible Receivables as to which the gross monthly incomes of the related Obligors were less than $3,750 as of the dates of origination of the related Receivables that would need to be excluded from the Receivables that are Eligible Receivables on such date in order to cause the weighted average gross monthly income of the related Obligors of all remaining Eligible Receivables (based on the current Principal Balance of such Eligible Receivables) to be greater than $3,750;

(xix)        the aggregate Principal Balance of the Eligible Receivables as to which the PTI as of the dates of origination of the related Receivables was higher than 17.0% that would need to be excluded from the Receivables that are Eligible Receivables on such date in order to cause the weighted average PTI (based on the current Principal Balance of such Eligible Receivables) for all remaining Eligible Receivables to be less than or equal to 17.0%;

(xx)        the aggregate Principal Balance of the Eligible Receivables as to which the DTI of the related Obligor and Contract as of the dates of origination of the related Receivables was higher than 32.5% that would need to be excluded from the Receivables

that are Eligible Receivables on such date in order to cause the weighted average DTI (based on the current Principal Balance of such Eligible Receivables) of the related Obligor and Contract for all remaining Eligible Receivables to be less than or equal to 32.5%; and

(xxi)        prior to the ECP Control Date, the excess of (a) the aggregate Principal Balance of all Eligible Receivables as to which the related Contracts constitute Electronic Chattel Paper over (b) an amount equal to the product of 10.0% and the Eligible Pool Balance.

"Excess Spread Percentage" means, as of any date of determination, a percentage (which may be a negative percentage) equal to (i) the Weighted Average APR of all Receivables as of such date, minus (ii) the sum of (a) the Servicing Fee Rate, (b) the Usage Fee Rate, (c) the Backup Servicing Fee Rate, (d) the Collateral Custodian Fee Rate and (e) the weighted average (weighted based on notional amount) of the interest rate cap rates with respect to all Hedge Transactions as of such date.

"Exchange Act" means the Securities Exchange Act of 1934.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (i) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (a) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (b) that are Other Connection Taxes, (ii) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (a) such Lender acquires such interest in the Loan or Commitment or (b) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.13, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (iii) Taxes attributable to such Recipient's failure to comply with Section 2.13(g) and (iv) any withholding Taxes imposed under FATCA.

"Extended Receivable" means any Receivable or Serviced Portfolio Receivable for which an extension or payment deferment was made in accordance with the Servicer's extension policy contained in the Credit and Collection Policy.

"Extension Ratio" means, with respect to any Collection Period, the percentage equivalent of a fraction, (i) the numerator of which is the aggregate number of Receivables that became Extended Receivables during such Collection Period and (ii) the denominator of which is the aggregate number of Receivables on the last day of such Collection Period.

"Facility Termination Date" means the date following the Amortization Date on which the Aggregate Unpaids have been indefeasibly paid in full.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"FCA" means Flexi Compras Autos, LLC.

"FCA Transfer Agreement" means the Transfer Agreement, dated as of the Closing Date, between FCA and Tricolor.

"Federal Funds Effective Rate" means, for any day, the rate calculated by the NYFRB based on such day's federal funds transactions by depositary institutions, as determined in such manner as shall be set forth on the NYFRB's Website from time to time, and published on the next succeeding Business Day by the NYFRB as the effective federal funds rate; provided, that if the Federal Funds Effective Rate as so determined would be less than 0%, such rate shall be deemed to be 0% for the purposes of this Agreement.

"Federal Reserve Bank of New York's Website" means the website of the NYFRB at http://www.newyorkfed.org, or any successor source.

"Federal Reserve Board" means the Board of Governors of the Federal Reserve System.

"Fee Letter" means the fee letter, dated as of November 13, 2020, among the Borrower, the Servicer, the Administrative Agent and the Agents, setting forth, among other things, the Upfront Fees, the Unused Fee Rate, the Drawn Liquidity Rate and the Usage Fee Rate.

"FICO® Score" means a credit score for each Obligor as provided by Fair Isaac Corporation, measured as of the date of origination of the related Receivable.

"Financed Vehicle" means, with respect to a Receivable or Serviced Portfolio Receivable, any new or used automobile, light-duty truck, minivan, sport utility vehicle, motorcycle or other passenger vehicle, together with all accessions thereto, securing the related Obligor's Indebtedness thereunder.

"Floor" means the benchmark rate floor, if any, provided in this Agreement initially (as of the execution of this Agreement, the modification, amendment or renewal of this Agreement or otherwise) with respect to the LIBO Rate.

"Force Majeure Event" means an act of God or the public enemy, acts of declared or undeclared war (including acts of terrorism), public disorder, rebellion or sabotage, epidemics, landslides, lightening, fire, hurricanes, earthquakes, floods or similar causes.

"Foreign Lender" means a Lender that is not a U.S. Person.

22

"Formation Documents" means, with respect to any Tricolor Entity, its Certificate of Formation and the Operating Agreement.

"Funding Date" means each Business Day during the Revolving Period on which a Loan is made and Receivables are added to the Collateral in connection with such Loan.

"Funding Request" means a written notice from the Borrower requesting a Loan and including the items required by Section 2.01(a)(i), substantially in the form of Exhibit A.

"GAAP" means generally accepted accounting principles as in effect from time to time in the United States; provided, that with respect to generally accepted accounting principles related to the determination of the carrying value of finance receivables (and corresponding balance sheet and income statement entries, including members' equity or net worth affected directly thereby) such principles as in effect as of either (i) the Closing Date or (ii) the applicable date of determination.

"Governmental Authority" means, with respect to any Person, any nation or government, any State or other political subdivision thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, any central bank or comparable agency and any court or arbitrator having jurisdiction over such Person.

"Hedge Collateral" means all of the rights of the Borrower, whether now existing or hereafter acquired, in and to all Hedging Agreements, Hedge Transactions and all present and future amounts payable by all Hedge Counterparties to the Borrower under or in connection with such Hedging Agreements and Hedge Transactions with such Hedge Counterparties.

"Hedge Counterparty" means any entity that on the date of entering into any Hedge Transaction is either (i) JPMorgan or (ii) an interest rate swap dealer whose debt ratings satisfy the Long-Term Rating Requirement and the Short-Term Rating Requirement. Each Hedge Counterparty must consent to the assignment of the Borrower's rights under the Hedging Agreement to the Administrative Agent pursuant to Section 6.03(b).

"Hedge Counterparty Collateral Account" means a segregated trust account established by the Collateral Custodian or Administrative Agent for the benefit of the Lenders and the other Secured Parties, in which cash or other types of collateral permitted to be posted by the Hedge Counterparty to the Borrower under a Hedging Agreement shall be deposited.

"Hedge Transaction" means each interest rate cap transaction between the Borrower and a Hedge Counterparty entered into pursuant to Section 6.03(a) that is governed by a Hedging Agreement.

"Hedging Agreement" means each ISDA Master Agreement between the Borrower and a Hedge Counterparty which governs one or more Hedge Transactions entered into pursuant to Section 6.03(a), together with a "Schedule" thereto and each "Confirmation" thereunder confirming the specific terms of each such Hedge Transaction, which agreement shall be in form and substance satisfactory to the Required Lenders.

23

"Indebtedness" means, with respect to any Person and any day, without duplication, (i) all indebtedness of such Person for borrowed money, including subordinated indebtedness, (ii) all obligations of such Person representing the deferred purchase price of property other than accounts payable arising in the ordinary course of such Person's business on terms customary in the trade, (iii) all obligations of such Person, whether or not assumed, secured by liens or payable out of the proceeds or products of property now or hereafter owned or acquired by such Person, (iv) all obligations of such Person which are evidenced by Loans, acceptances (including bankers acceptances), or other instruments, (v) all reimbursement obligations of such Person with respect to any letters of credit and (vi) all amounts of such Person owing or to become owing in connection with clauses (i) through (v) above.  For the avoidance of doubt, Preferred Equity will be classified as Indebtedness.

"Indemnified Amounts" has the meaning given to such term in Section 11.01.

"Indemnified Parties" has the meaning given to such term in Section 11.01.

"Indemnified Taxes" means (i) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any Basic Document and (ii) to the extent not otherwise described in clause (i) above, Other Taxes.

"Independent Director" shall mean a member of the Board of Directors of the Borrower who (i) (a) shall not have been at the time of such Person's appointment or at any time during the preceding five years, and shall not be as long as such Person is a director of the Borrower, (1) a director, officer, employee, partner, shareholder, member, manager or Affiliate of any of the following Persons (collectively, the "Independent Parties"): Tricolor Holdings or any of its Subsidiaries or Affiliates (other than the Seller) (provided that such Person may also have acted as an independent director for such Subsidiary or Affiliate), (2) a supplier to any of the Independent Parties, (3) a Person controlling or under common control with any partner, shareholder, member, manager, Affiliate or supplier of any of the Independent Parties or (4) a member of the immediate family of any director, officer, employee, partner, shareholder, member, manager, Affiliate or supplier of any of the Independent Parties, (b) has prior experience as an independent director or manager for a corporation or limited liability company whose charter documents required the unanimous consent of all independent directors or managers thereof before such corporation or limited liability company could consent to the institution of bankruptcy or insolvency proceedings against it or could file a petition seeking relief under any applicable federal or State law relating to bankruptcy and (c) has at least three years of employment experience with one or more entities that provide, in the ordinary course of their respective businesses, advisory, management or placement services to issuers of securitization or structured finance instruments, agreements or securities or (ii) has been approved in writing by the Administrative Agent and the Agents.

"Ineligible Receivable" means a Receivable that is not an Eligible Receivable.

"Initial Loan" means the first Loan made on or after the Closing Date.

"Initial Receivables" means Receivables that are included as part of the Collateral in connection with the Initial Loan.

"Insolvency Event" means, with respect to any Person:

(i)     such Person shall fail generally to pay its debts as they come due, or shall make a general assignment for the benefit of creditors, or any case or other proceeding shall be instituted by such Person seeking to adjudicate it as bankrupt or insolvent, or seeking liquidation, reorganization, debt arrangement, dissolution, winding up, or composition or readjustment of debts of it or its debts under any Insolvency Laws, or seeking the entry of an order for relief or the appointment of a trustee, receiver, custodian, liquidator, assignee, sequestrator or the like for such Person or all or substantially all of its assets under any such Insolvency Law or such Person shall take any corporate or limited liability company action to authorize any of such actions; or

(ii)     a case or other proceeding shall be commenced, without the application or consent of such Person in any court seeking the liquidation, reorganization, debt arrangement, dissolution, winding up or composition or readjustment of debts of such Person, the appointment of a trustee, receiver, custodian, liquidator, assignee, sequestrator or the like for such Person or all or substantially all of its assets, or any similar action with respect to such Person under any Insolvency Law, and (a) such case or proceeding shall continue undismissed, or unstayed and in effect, for a period of 60 consecutive days or (b) an order for relief in respect of such Person shall be entered in such case or proceeding or a decree or order granting such other requested relief shall be entered.

"Insolvency Laws" means the Bankruptcy Code and all other applicable liquidation, conservatorship, bankruptcy, moratorium, arrangement, rearrangement, receivership, insolvency, reorganization, suspension of payments, marshaling of assets and liabilities or similar debtor relief laws from time to time in effect affecting the rights of creditors generally.

"Insolvency Proceeding" means, with respect to any Person, any bankruptcy, insolvency, arrangement, rearrangement, conservatorship, moratorium, suspension of payments, readjustment of debt, reorganization, receivership, liquidation, marshaling of assets and liabilities or similar proceeding of or relating to such Person under any Insolvency Laws.

"Instrument" means any "instrument" (as defined in Article 9 of the UCC), other than an instrument that constitutes part of chattel paper.

"Insurance Policy" means, with respect to any Receivable or Serviced Portfolio Receivable, (i) an insurance policy covering physical damage to or loss of the related Financed Vehicle or (ii) any lender's single interest, credit life, disability, hospitalization and similar insurance policies with respect to the related Obligor.

"Insurance Proceeds" means any amounts payable or any payments made under any Insurance Policy.

"Interest" means, for any Interest Period and each Loan outstanding during such Interest Period, the sum for each day during such Interest Period of the following:

$$IR \times PA/CB$$

where:

| | | |
|---|---|---|
| IR | = | the Interest Rate applicable to such Loan on such day; |
| PA | = | the Principal Amount of such Loan on such day; and |
| CB | = | in the case of (i) a Loan as to which the applicable Interest Rate is the Prime Rate, 365 and (ii) any other Loan, 360; |

provided, that (i) no provision of this Agreement shall require or permit the collection of Interest in excess of the Maximum Lawful Rate and (ii) Interest shall not be considered paid by any distribution if at any time such distribution is rescinded or must otherwise be returned for any reason.

"Interest Period" means a Collection Period, except for the first Interest Period, which will begin on the Closing Date and end on the last day of the month preceding the first Payment Date; provided, however, that any Interest Period that commences before the Facility Amortization Date that would otherwise end after the Facility Termination Date shall end on the Facility Termination Date.

"Interest Rate" means, with respect to any Loan (or portion thereof) on any day:

     (i)     if such Loan (or portion thereof) is funded or maintained by a Conduit Lender by issuing Commercial Paper Notes, the CP Rate for such Conduit Lender on such day; or

     (ii)     otherwise, the sum of (a) the Adjusted LIBO Rate on such day, plus (b) the Drawn Liquidity Rate;

provided, that (A) during the continuation of any event described in Section 2.11(a), the "Interest Rate" applicable under clause (b)(i) shall be the rate determined pursuant to Section 2.11(a) and (B) on each day following the occurrence of a Termination Event, the Interest Rate for each Loan (or portion thereof) shall be a rate per annum equal to the Default Rate.

"Invested Percentage" means, with respect to a Lender on any day, the percentage equivalent of (i) an amount equal to (a) the sum of (1) the portion of the Loans Outstanding funded by such Lender on or prior to such day, plus, without duplication, (2) any portion of the Loans Outstanding acquired by such Lender on or prior to such day as an assignee from another Lender pursuant to an Assignment and Acceptance, minus (b) any portion of the Loans Outstanding assigned by such Lender to an assignee on or prior to such day pursuant to an Assignment and Acceptance, divided by (ii) the Loans Outstanding on such day. Notwithstanding the foregoing, so long as any Lender has failed to fund any portion of a Lender Advance with respect to any Funding Date, such unfunded amount shall not be included in the calculation of the Invested Percentage for such Lender unless and until such amount has been funded by such Lender.

"Investment" means, with respect to any Person, any direct or indirect loan, advance or investment by such Person in any other Person, whether by means of share purchase, capital contribution, loan or otherwise, and excluding commission, travel and similar advances to officers, employees and directors made in the ordinary course of business.

"Investment Company Act" means the Investment Company Act of 1940.

"IRS" means the U.S. Internal Revenue Service.

"ISDA Definitions" means the 2006 ISDA Definitions published by the International Swaps and Derivatives Association, Inc., as amended or supplemented from time to time, or any successor thereto, or any successor definitional booklet for interest rate derivatives published from time to time by the International Swaps and Derivatives Association, Inc., or any successor thereto.

"JPMorgan" means JPMorgan Chase Bank, N.A.

"Key Man Event" means Daniel Chu (i) shall cease to be employed by Tricolor as its chief executive officer for any reason, including termination, resignation, retirement or death, (ii) is not directly involved in the day-to-day operations of Tricolor or (iii) shall suffer a permanent disability that renders him unable to carry out his duties as an employee of Tricolor as such duties existed prior to suffering such permanent disability and a replacement reasonably satisfactory to Administrative Agent is not employed or appointed within 45 days of such occurrence.

"KLDL Letter Agreement" means that certain letter agreement, dated as of the Closing Date, among KLDL, LLC, Tricolor, the Borrower and the Administrative Agent.

"Lender" means a Conduit Lender or a Committed Lender, as indicated by the context, and "Lenders" means, collectively, all of the foregoing Persons.

"Lender Advance" means, with respect to a Lender, its Lender Percentage of the Principal Amount of a particular Loan to be made to the Borrower on a Funding Date.

"Lender Group" means each group of Lenders consisting of (i) a Committed Lender, (ii) an Agent and (iii) one or more Conduit Lenders, if any. As of the Closing Date, the only Lender Group is the Lender Group consisting of (i) JPMorgan, in its capacity as Agent, (ii) JPMorgan, as Committed Lender and (iii) Chariot Funding LLC, as Conduit Lender.

"Lender Percentage" means, as of any date of determination (i) prior to the Amortization Date, with respect to a (a) a Lender, its Commitment or Conduit Funding Limit on such date as a percentage of the Aggregate Commitment on such date or (b) a Lender Group, the aggregate Commitment of the Committed Lenders in such Lender Group on such date as a percentage of the Aggregate Commitment on such date or (ii) on or after the Amortization Date, with respect to (a) a Lender, the portion of the Loans Outstanding funded or maintained by such Lender on such date as a percentage of the Loans Outstanding on such date or (b) a Lender Group, the portion of the Loans Outstanding funded or maintained by the Lenders in such Lender Group on such date as a percentage of the Loans Outstanding on such date.

"Lender Register" has the meaning given to such term in Section 13.01(d).

"Lender's Account" means the account or accounts identified by each Lender to the Borrower as its Lender's Account hereunder.

"LIBO Rate" means, for any day, a rate per annum equal to the 90-day London-Interbank Offered Rate appearing on the Bloomberg ICE (Intercontinental Exchange) Benchmark Administration Page (or on any successor or substitute page of such service, providing rate quotations comparable to those currently provided on such page of such service, as determined by the related Agent in its reasonable discretion at approximately 11:00 a.m. (London time) on such day or, if such day is not a LIBOR Business Day, the immediately preceding LIBOR Business Day; provided, that if such rate shall be less than 0.00%, the LIBO Rate shall be deemed to be 0.00% for the purposes of this Agreement.

"LIBOR Business Day" means any day of the year other than a Saturday, Sunday or any day on which banking institutions in New York, New York or London, England generally are required or authorized to be closed.

"Lien" means any mortgage, lien, pledge, charge, claim, security interest or encumbrance of any kind.

"Liquidation Proceeds" means, with respect to any Collection Period and any Defaulted Receivable, the amount (which shall not be less than zero) received by the Servicer and deposited into the Collection Account after a Receivable becomes a Defaulted Receivable, in connection with the attempted realization of the full amounts due or to become due under such Receivable, whether from the sale or other disposition of the related Financed Vehicle, the proceeds of repossession or any collection effort, the proceeds of recourse or similar payments payable under the related Receivable, receipt of Insurance Proceeds or otherwise, net of any reasonable out-of-pocket expenses (exclusive of overhead) incurred by the Servicer with respect to the collection and enforcement of such Receivable, in each case to the extent not previously reimbursed to the Servicer.

"Liquidity Facility" means any committed loan or purchase facility, line of credit, backup purchase or other financial accommodation available to a Conduit Lender to support the liquidity of its Commercial Paper Notes.

"Loan" has the meaning given to such term in Section 2.01(a).

"Loans Outstanding" means, on any day, the aggregate Principal Amount of all Loans made on or prior to such day, reduced from time to time by payments and distributions to the Lenders in respect of principal of such Loans in accordance with the terms hereof; provided, however, that any such principal shall not be considered paid by any distribution if at any time such distribution is rescinded or must otherwise be returned for any reason.

"Long-Term Rating Requirement" means, with respect to any Person, that such Person has a long-term unsecured debt rating of not less than "A-" by Standard & Poor's and not less than "A3" by Moody's.

"LTV Ratio" means, with respect to any Receivable, the ratio (expressed as a percentage) of (i) the Amount Financed of such Receivable to (ii) the sales price of the related Financed Vehicle at the date of origination, as determined in accordance with the Credit and Collection Policy.

"Master Collection Account" means the deposit account into which Collections are deposited in accordance with the Master Collection Account Agreement.

"Master Collection Account Agreement" means that certain Deposit Account Control Agreement (Access Restricted after Notice), dated as of the Closing Date among the Master Collection Account Bank, Tricolor and the Administrative Agent.

"Master Collection Account Bank" means Wells Fargo Bank, National Association.

"Material Adverse Effect" means, with respect to any Person and to any event or circumstance, a material adverse effect on (i) the business, condition (financial or otherwise), operations, performance, properties or prospects of such Person, taken as a whole, (ii) the validity, enforceability or collectability of this Agreement or any other Basic Document or the validity, enforceability or collectability of a material portion of (a) the Contracts (taken as a whole), (b) the collectability of the Receivables (taken as a whole) or (c) any other Collateral (taken as a whole), (iii) the rights and remedies of the Secured Parties under the Basic Documents, (iv) the ability of such Person to perform its obligations under this Agreement or any other Basic Document to which it is a party or (v) the status, existence, perfection, priority or enforceability of the interest of the Administrative Agent or the Lenders in the Collateral.

"Maturity Date" means the earlier of (i) the Payment Date that occurs in the 78th month after the beginning of the Amortization Period and (ii) the Payment Date that occurs in the 78th month after the Commitment Termination Date.

"Maximum Lawful Rate" means the highest rate of interest permissible under Applicable Law.

"Minimum Excess Spread Percentage" means 9.0%

"Monthly Backup Servicer Certificate" means a monthly report of the Backup Servicer, in substantially the form of Exhibit G.

"Monthly Interest and Fees" means, with respect to any Payment Date, the sum of (i) Interest for such Payment Date and (ii) all accrued and unpaid Usage Fees and Unused Fees for such Payment Date, together with any accrued and unpaid Interest, Usage Fees and Unused Fees from prior Payment Dates.

"Monthly Principal Payment Amount" means, with respect to any Payment Date:

    (i)      prior to the Amortization Date, the lesser of (a) the amount, if any, necessary to reduce the Loans Outstanding to an amount such that no Borrowing Base Deficiency shall exist on the related Payment Date after giving effect to such principal

29

reduction and (b) the amount of Available Funds remaining after the payment on such Payment Date of the amounts specified in clauses (i) through (iii) of Section 2.07; or

(ii)    on or after the Amortization Date, the lesser of (a) the amount necessary to reduce the Loans Outstanding to zero and (b) the amount of Available Funds remaining after the payment on such Payment Date of the amounts specified in clauses (i) through (iii) of Section 2.07.

"Monthly Report" means a monthly statement of the Servicer delivered pursuant to Section 7.06(a) on each Reporting Date with respect to the related Collection Period, substantially in the form of Exhibit E.

"Moody's" means Moody's Investors Service, Inc.

"Multiemployer Plan" means a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA which is or was at any time during the current year or the immediately preceding five years contributed to by the Borrower, Tricolor or any of their respective ERISA Affiliates on behalf of their employees.

"Net Eligible Pool Balance" means, as of any date of determination, (i) the sum of (a) the Eligible Pool Balance of the Receivables as of the last day of the most recent Collection Period (or as of such date of determination if such date is the last day of a Collection Period) and (b) the aggregate Principal Balance of all Eligible Receivables added to the Collateral during the period commencing on the last day of such Collection Period and ending on such date of determination, as of their related Cutoff Dates, minus (ii) without duplication, the sum of (a) the Excess Concentration Amount as of such date of determination and (b) the aggregate Principal Balance of Delinquent Receivables as of such date of determination.

"Net Income" means, with respect to Tricolor Holdings and its consolidated Subsidiaries in accordance with GAAP and any period, revenue less cost of goods sold, selling, general and administrative expenses, operating expenses, depreciation and amortization, interest, taxes and other and non-recurring expenses.

"Net Loss-to-Liquidation Ratio" means, with respect to any Collection Period, the ratio, expressed as a percentage, of (i) (a) the aggregate Principal Balance of all Receivables that became Defaulted Receivables during such Collection Period, minus (b) the aggregate Liquidation Proceeds received in respect of all Defaulted Receivables during such Collection Period divided by (ii) the sum of (a) the aggregate Principal Balance of all Receivables that became Defaulted Receivables during such Collection Period and (b) the aggregate amount of all Collections in respect of principal on the Receivables during such Collection Period.

"Non-Extending Lender" means, after its respective Commitment Termination Date, each Committed Lender that has declined to extend its Commitment Termination Date in accordance with Section 2.04, to the extent not replaced pursuant to Section 2.04(e).

"Non-U.S. Lender" means a Lender that is not a United States person as defined in Code Section 7701(a)(30).

"Notice of Exclusive Control" means a written notice substantially in the form of Exhibit J.

"NYFRB" means the Federal Reserve Bank of New York.

"NYFRB Rate" means, for any day, the greatest of (i) the Federal Funds Effective Rate in effect on such day and (ii) the Overnight Bank Funding Rate in effect on such day (or if such day that is not a Business Day, for the immediately preceding Business Day); provided, that if neither of the rates in clauses (i) and (ii) above are published for any day that is a Business Day, such clauses (i) and (ii) shall be replaced with the rate for a federal funds transaction quoted at 11:00 a.m. (New York, New York time) on such day received by the Administrative Agent from a federal funds broker of recognized standing selected by it; provided, further, that if any of the aforesaid rates as so determined be less than 0%, such rate shall be deemed to be 0% for purposes of this Agreement.

"Obligations" means all loans, advances, debts, liabilities, indemnities and obligations for monetary amounts owing by the Borrower to the Secured Parties, the Backup Servicer, the Account Bank or any of their respective assigns, as the case may be, whether due or to become due, matured or unmatured, liquidated or unliquidated, contingent or non-contingent and all covenants and duties regarding such amounts, of any kind or nature, present or future, arising under or in respect of any of the Loans, whether or not evidenced by any separate note, agreement or other instrument, including all principal, interest (including interest that accrues after the commencement against the Borrower of any action under the Bankruptcy Code), amounts payable pursuant to Section 2.12, 2.13, Breakage Costs, fees, including any and all arrangement fees, loan fees, Usage Fees, Unused Fees and any and all other fees, expenses, costs or other sums (including attorney fees and disbursements) chargeable to the Borrower under the Basic Documents.

"Obligor" means each Person obligated to make payments pursuant to a Receivable or Serviced Portfolio Receivable, including any guarantor thereof.

"OFAC" means the U.S. Department of the Treasury's Office of Foreign Assets Control.

"Officer's Certificate" means with respect to any Person, a certificate signed by any officer or trustee of such Person, and delivered to the Administrative Agent or such other party hereto as indicated by the context.

"Operating Agreement" means, with respect to any Tricolor Entity, its limited liability company agreement.

"Operating Income" means, with respect to Tricolor Holdings and its consolidated Subsidiaries in accordance with GAAP and any period, the sum of (i) Net Income, (ii) consolidated interest expense, (iii) consolidated depreciation and amortization expense, (iv) consolidated income taxes and income tax expenses and (v) other non-cash and/or non-recurring charges.

"Opinion of Counsel" means, with respect to any Person, a written opinion of counsel, who is reasonably acceptable to the Administrative Agent (with the consent of the Required

31

Lenders) or, if such opinion of counsel is not addressed to the Administrative Agent, the addressee thereof.

"Originator" means TAG, TCAG, FCA, Tricolor or any other originator approved by the Administrative Agent.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Basic Document, or sold or assigned an interest in any Loan or Basic Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Basic Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"Overnight Bank Funding Rate" means, for any day, the rate comprised of both overnight federal funds and overnight Eurodollar borrowings by U.S.-managed banking offices of depository institutions, as such composite rate shall be determined by the NYFRB as set forth on the Federal Reserve Bank of New York's Website from time to time, and published on the next succeeding Business Day by the NYFRB as an overnight bank funding rate.

"Partial Expiration Event" means the occurrence of the election of one or more Non-Extending Lenders after the Commitment Termination Date to not extend its Commitment, unless such Non-Extending Lender is replaced pursuant to Section 2.04(d) or unless the Amortization Date shall have occurred.

"Partial Expiration Event Amount" means the portion of Loans Outstanding payable in connection with a Partial Expiration Event.

"Participant Register" has the meaning given to such term in Section 13.01(f).

"Patriot Act" means the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)).

"Payment Date" means the 15th day of each calendar month or, if any such day is not a Business Day, the next succeeding Business Day, commencing December 15, 2020.

"Pension Plan" means an "employee pension benefit plan," as such term is defined in Section 3 of ERISA, maintained by any Person or in which employees of such Person are entitled to participate, as from time to time in effect.

"Performance Guarantor" means Tricolor Holdings.

"Performance Guaranty" means the Performance Guaranty, dated as of the Closing Date, from Tricolor Holdings in favor of the Administrative Agent and the Agents.

"Permitted Investments" means any of the following types of investments:

(i)      marketable obligations of the United States, the full and timely payment of which are backed by the full faith and credit of the United States and which have a maturity of not more than 270 days from the date of acquisition;

(ii)      bankers' acceptances and certificates of deposit and other interest-bearing obligations (in each case having a maturity of not more than 270 days from the date of acquisition) denominated in Dollars and issued by any bank with capital, surplus and undivided profits aggregating at least $100,000,000, the short-term obligations of which meet or exceed the Short-Term Rating Requirement;

(iii)      repurchase obligations with a term of not more than ten days for underlying securities of the types described in clauses (i) and (ii) above entered into with any bank of the type described in clause (ii) above;

(iv)      commercial paper rated at least "A-1" by Standard & Poor's and "Prime-1" by Moody's;

(v)      money market funds registered under the Investment Company Act having a rating, at the time of such investment, in the highest rating category by Moody's and by Standard & Poor's (including funds for which the Account Bank or any of its Affiliates is investment manager or advisor);

(vi)      demand deposits, time deposits or certificates of deposit (having original maturities of no more than 365 days) of depository institutions or trust companies incorporated under the laws of the United States or any State (or domestic branches of any foreign bank) and subject to supervision and examination by federal or State banking or depository institution authorities; provided, however, that at the time such investment, or the commitment to make such investment, is entered into, the short-term debt rating of such depository institution or trust company shall meet or exceed the Short-Term Rating Requirement; and

(vii)      any other investments approved in writing by the Administrative Agent with the consent of the Required Lenders and the consent of each Rating Agency then rating the Loans, if any.

"Permitted Liens" means (i) Liens in favor of the Borrower created pursuant to the Purchase Agreement, (ii) Liens in favor of the Administrative Agent, as agent for the Secured Parties created pursuant to this Agreement or any other Basic Document, (iii) Liens for taxes and assessments not yet due or for taxes which the Borrower is contesting in good faith and by appropriate legal proceedings the validity, applicability or amount thereof and such contest does not materially endanger any right or interest of the Secured Parties under the Basic Documents and (iv) Liens created pursuant to the Master Collection Account Agreement.

"Person" means an individual, partnership, corporation, limited liability company, joint stock company, trust (including a business or statutory trust), unincorporated association, sole proprietorship, joint venture, government (or any agency or political subdivision thereof) or other entity.

"Plan Event" means, with respect to any Person, the occurrence of any of the following: (i) a notice of intent to terminate such Person's Pension Plan has been filed, (ii) any of such Person's Pension Plans have been terminated under Section 4041(f) of ERISA, (iii) the Pension Benefit Guaranty Corporation institutes proceedings to terminate, or appoint a trustee to administer any of such Person's Pension Plans or (iv) the occurrence of an event or existence of any condition that might constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any of such Person's Pension Plans.

"Pool Balance" means, as of any date of determination, the aggregate Principal Balance of all Receivables as of such date. Notwithstanding the foregoing, (i) the Principal Balance of a Defaulted Receivable will be zero as of the last day of the Collection Period during which it became a Defaulted Receivable and (ii) the Pool Balance of the Receivables will be reduced by the Principal Balance (as of the end of the most recent Collection Period) of each Ineligible Receivable, regardless of whether or not such Ineligible Receivable is required to be repurchased by the Borrower pursuant to Section 5.06.

"Power of Attorney" means a Power of Attorney of the Borrower appointing the Administrative Agent as its lawful attorney in accordance with Section 10.05, in substantially the form of Exhibit D.

"Preferred Equity" means (i) the Class B membership interests in Tricolor Holdings conveyed to various subscribers pursuant to the BlackRock Subscription Agreement and (ii) the outstanding loans made to the borrowers pursuant to the BlackRock Loan Agreement.

"Prime Rate" means, the rate of interest last quoted by The Wall Street Journal as the "Prime Rate" in the U.S. or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Administrative Agent) or any similar release by the Federal Reserve Board (as determined by the Administrative Agent). Each change in the Prime Rate shall be effective from and including the date such change is publicly announced or quoted as being effective.

"Principal Amount" means, with respect to any Loan, the aggregate amount advanced by the Lenders on the related Funding Date in respect of such Loan.

"Principal Balance" means, for any Receivable as of any date of determination, the Amount Financed minus the sum of the following amounts, without duplication: (i) that portion of all Scheduled Payments actually received on or prior to such day allocable to principal using the Simple Interest Method, (ii) any payment of the Release Price with respect to such Receivable allocable to principal, (iii) any other non-cash credit or write-down of principal in respect of such Receivable and (iv) any prepayment in full or any partial prepayment applied in

34

reduction of principal of such Receivable.  Notwithstanding the foregoing, (a) the Principal Balance of a Defaulted Receivable will be zero as of the last day of the Collection Period during which it became a Defaulted Receivable and (b) the Pool Balance of the Receivables will be reduced by the Principal Balance (as of the end of the most recent Collection Period) of each Ineligible Receivable, regardless of whether such Ineligible Receivable is required to be repurchased by the Borrower pursuant to Section 5.06.

"PTI" means, with respect to any Receivable, the ratio (expressed as a percentage) of (i) the aggregate amount of Scheduled Payments owed by the related Obligor pursuant to the related Contract during a calendar month to (ii) such Obligor's monthly income, in each case as of the date of origination of the related Contract.

"Purchase Agreement" means the Purchase Agreement, dated as of November 13, 2020, between Tricolor, as seller, and the Borrower, as purchaser, and each Transfer Agreement.

"Qualified Institution" means any depository institution or trust company organized under the laws of the United States or any State (or any domestic branch of a foreign bank), (i) (a) that meets either the Long-Term Rating Requirement or the Short-Term Rating Requirement and (b) is otherwise acceptable to the Administrative Agent and (ii) whose deposits are insured by the Federal Deposit Insurance Corporation.

"Quarterly Data" means a data tape, which shall include as to each Receivable such information as shall be agreed upon by the Administrative Agent, the Agents and the Servicer, including such information as the Administrative Agent or an Agent may reasonably request from time to time to satisfy or fulfill regulatory requirements applicable to the Secured Parties or the Lenders in the related Lender Group, as the case may be, including capital treatment under Basel II or Basel III.

"Rating Agency" means any nationally recognized statistical ratings organization acceptable to the Required Lenders.

"Rating Request" means a written request by an Agent to the Borrower and the Servicer, stating that such Agent intends to request that a Rating Agency publicly issue a rating of at least the Required Rating to the transactions contemplated by this Agreement.

"Receivable" means Indebtedness owed to an Originator or the Seller by an Obligor under a Contract and the obligation of an Obligor and associated right of payment evidenced thereby secured by a first priority security interest in a Financed Vehicle that was originated by an Originator and subsequently sold or otherwise transferred (or purported to be sold or transferred) by such Originator to the Seller pursuant to the terms of the related Transfer Agreement and, in any case, sold or otherwise transferred (or purported to be sold or transferred) by the Seller to the Borrower pursuant to the terms of the Purchase Agreement.

"Receivable File" means, with respect to each Receivable and the related Contract, a file containing, among other things, (i) a copy (but not the original) of the Contract and all amendments thereof; provided, however, that the Servicer shall deliver any original amendments to the Contract to the Collateral Custodian immediately following execution thereof, (ii) the application of the Obligor for credit, (iii) all original instruments modifying the terms and

conditions of such Receivable or the related Contract, (iv) a copy of the Certificate of Title with a Lien notation or an application therefor (to the extent applicable State law permits or requires the Servicer to hold the Certificate of Title), (v) proof of insurance or application therefor if available, or agreement to provide insurance to the extent not incorporated in the Contract, with respect to the related Financed Vehicle, (vi) the Obligor's order for such Financed Vehicle and an indication of the down payment, if applicable, and (vii) such other documents as the Servicer may reasonably determine are necessary in order to accomplish its duties under this Agreement.

"Receivable Receipt" means a receivable receipt, substantially in the form attached hereto as Exhibit H, executed by the Collateral Custodian.

"Records" means, with respect to any Contract, all documents, books, records and other information (including computer programs, tapes, disks, punch cards, data processing software and related property and rights) maintained with respect to any related item of Collateral and the related Obligor.

"Recipient" means (i) the Administrative Agent or (ii) any Lender.

"Reference Time" with respect to any setting of the then-current Benchmark means, if such Benchmark (i) is the LIBO Rate, 11:00 a.m. (London time) on the day that is two London banking days preceding the date of such setting, and (ii) is not the LIBO Rate, the time determined by the Administrative Agent in its reasonable discretion.

"Registrar of Titles" means with respect to any State, the Governmental Authority responsible for the registration of, and the issuance of certificates of title relating to, motor vehicles and liens thereon.

"Regulation AB" means Regulation AB under the Securities Act.

"Regulation D" means Regulation D of the Federal Reserve Board, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"Regulatory Requirement" means (i) the adoption after the Closing Date of any Applicable Law (including any Applicable Law regarding capital adequacy or liquidity coverage) and (ii) any change after the Closing Date in any Applicable Law or the interpretation or administration thereof by any Governmental Authority charged with the interpretation or administration thereof, or compliance with any request or directive (whether or not having the force of law) of any such Governmental Authority; provided, that for purposes of this definition, (a) the Risk-Based Capital Requirements, (b) the Dodd-Frank Act and all requests, rules, guidelines or directives thereunder, issued in connection therewith or in implementation thereof, and (c) all requests, rules, guidelines and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, shall in each case be deemed to be a "Regulatory Requirement", regardless of the date enacted, adopted, issued or implemented.

"Release Price" means an amount equal to the Principal Balance of each Receivable retransferred pursuant to Section 5.06, plus accrued interest on such Receivable (at the related APR) through the date of repurchase and all Breakage Costs.

36

"Relevant Governmental Body" means the Federal Reserve Board and/or the NYFRB, or a committee officially endorsed or convened by the Federal Reserve Board and/or the NYFRB.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA for which the 30-day notice provision has not been waived.

"Reporting Date" means, with respect to any Payment Date and the related Collection Period, the second Business Day prior to such Payment Date.

"Request for Contract File Release" means a request to the Collateral Custodian for the release of Contract Files substantially in the form attached hereto as Exhibit I.

"Required Credit Enhancement Amount" means, as of any day, an amount equal to the product of (i) the Required Credit Enhancement Percentage on such date and (ii) the Net Eligible Pool Balance on such date.

"Required Credit Enhancement Percentage" means, as of any day, (i) so long as no Termination Event has occurred and no Step-Up Credit Enhancement Trigger Event has occurred that has not been Cured, 40.00%, (ii) if no Termination Event has occurred, but a Step-Up Credit Enhancement Trigger Event has occurred that has not been Cured, 50.00% or (iii) if a Termination Event has occurred, 100.00%.

"Required Lenders" means, as of any date of determination (i) if there are two or fewer Lender Groups on such date, all Agents or (ii) if there are more than two Lender Groups (a) with respect to any date of determination prior to the Amortization Date, Agents for Lender Groups with Commitments greater than 66.667% of the Aggregate Commitment (it being understood and agreed that, solely for purposes of this definition, the Commitment of a Non-Extending Lender shall be the portion of the Loans Outstanding funded by such Lender) and (b) with respect to any date of determination on or after the Amortization Date, Agents for Lender Groups having Loans in an aggregate Principal Amount representing greater than 66.667% of the Loans Outstanding.

"Required Rating" means, with respect to any Rating Agency, a long-term unsecured debt rating of at least "BBB" or its equivalent issued by such Rating Agency.

"Requirements of Law" means, with respect to any Person, any law, treaty, rule or regulation, or order or determination of an arbitrator or Governmental Authority, in each case applicable to or binding upon such Person or to which such Person is subject, whether federal, State or local (including usury laws, the Federal Truth in Lending Act, the Equal Credit Opportunity Act, the Fair Credit Billing Act, the Fair Credit Reporting Act, the Fair Debt Collection Practices Act, the Federal Trade Commission Act, the Magnuson-Moss Warranty Act, the Servicemembers Civil Relief Act, Regulations U and T of the Federal Reserve Board and Regulations X and Z of the CFPB, State adaptations of the Uniform Consumer Credit Code and all other consumer protection and usury laws).

"Responsible Officer" means, when used with respect to any Person, any officer of the such Person (and, in the case of the Account Bank and the Collateral Custodian, in the corporate trust office of such Account Bank and Collateral Custodian), including any president, vice

president, assistant vice president, chief financial officer, treasurer, secretary, assistant secretary, corporate trust officer or any other officer thereof customarily performing functions similar to those performed by the individuals who at the time shall be such officers, respectively, or to whom any matter is referred because of such officer's knowledge of or familiarity with the particular subject, and, in each case, having direct responsibility for the administration of this Agreement.

"Revolving Period" means the period commencing on the Closing Date and ending on the Amortization Date.

"Risk-Based Capital Requirements" means the United States bank regulatory rule titled, Risk-Based Capital Guidelines; Capital Adequacy Guidelines; Capital Maintenance: Regulatory Capital; Impact of Modification to Generally Accepted Accounting Principles; Consolidation of Asset-Backed Commercial Paper Programs; and Other Related Issues, adopted on December 15, 2009.

"Sanctioned Country" means, at any time, a country or territory which is the subject or target of any Sanctions (at the time of this Agreement, Crimea, Cuba, Iran, North Korea and Syria).

"Sanctioned Person" means, at any time, (i) any Person currently the subject or the target of any Sanctions, including any Person listed in any Sanctions-related list of designated Persons maintained by OFAC (or any successor thereto) or the U.S. Department of State, or as otherwise published from time to time, (ii) any Person that is 50% or more owned, directly or indirectly, in the aggregate by one or more Persons described in clause (i) above, (iii) any Person that is operating, organized or resident in a Sanctioned Country, (iv) any Person with whom engaging in trade, business or other activities is otherwise prohibited or restricted by Sanctions or (v) (a) an agency of the government of a Sanctioned Country, (b) an organization controlled by a Sanctioned Country, or (c) a Person resident in a Sanctioned Country, to the extent subject to a sanctions program administered by OFAC.

"Sanctions" means all economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (i) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (ii) the United Nations Security Council, the European Union, any European Union member state, Her Majesty's Treasury of the United Kingdom or other relevant sanctions authority.

"Schedule of Receivables" means the schedule of Receivables attached hereto as Schedule C, as updated from time to time in connection with each Loan.

"Scheduled Payments" means regularly scheduled payments to be made by an Obligor pursuant to the terms of the related Contract.

"Secured Party" means (i) the Administrative Agent, (ii) each Lender and (iii) each Hedge Counterparty.

"Securities Act" means the Securities Act of 1933.

38

"Securitization" means any issuance of term asset-backed securities having an initial aggregate principal balance of $50,000,000 or greater sponsored by Tricolor and undertaken by a Special Purpose Affiliate that will be secured, directly or indirectly, by all or a portion of the Collateral.

"Securitization Date" means the date upon which a Securitization is consummated.

"Securitization Date Certificate" means an Officer's Certificate of the Servicer delivered on a Securitization Date indicating that the requirements set forth in this Agreement for a Securitization has been satisfied, substantially in the form of Annex 1 to Exhibit F.

"Securitization Release" means a release executed pursuant to Section 2.15, substantially in the form of Exhibit F.

"Seller" means Tricolor, in its capacity as seller under the Purchase Agreement.

"Senior Monthly Interest and Fees" means, for any Payment Date, the sum of (i) the amount of any accrued and unpaid Interest for such Payment Date (calculated, in this case, without giving effect to clause (ii)(b) or clause (B) of the definition of the term "Interest Rate"), (ii) the Usage Fee for such Payment Date and (iii) the Unused Fee for such Payment Date.

"Serviced Portfolio" means the Servicer's entire portfolio of motor vehicle retail installment sale contracts and conditional sale contracts that are (i) originated by an Originator or Tricolor or (ii) owned by Tricolor or an Affiliate or a Subsidiary of Tricolor, including Receivables that have been securitized in a transaction for which Tricolor or any of its Affiliates is the Sponsor, in each case, which are serviced by the Servicer.

"Serviced Portfolio Defaulted Receivable" means any Serviced Portfolio Receivable (i) with respect to which 10% or more of any Scheduled Payment remains unpaid for 120 days or more from the original due date for such payment, (ii) with respect to which the related Financed Vehicle has been repossessed and the Servicer has either liquidated such Financed Vehicle or held such Financed Vehicle in its inventory for more than 90 days, (iii) which have been or should otherwise be charged-off in accordance with the Credit and Collection Policy or (iv) the Obligor is the subject of an Insolvency Proceeding.

"Serviced Portfolio Delinquency Ratio" means, with respect to any month, as of the last day of such month, the percentage equivalent of a fraction, (i) the numerator of which is equal to the aggregate principal balance of all Serviced Portfolio Delinquent Receivables as of the last day of such month and (ii) the denominator of which is equal to the aggregate principal balance of all Serviced Portfolio Receivables as of the last day of such month.

"Serviced Portfolio Delinquent Receivable" means any Serviced Portfolio Receivable, other than a Serviced Portfolio Defaulted Receivable, with respect to which the greater of (i) 10% of any Scheduled Payment or (ii) $50.00 is more than 60 days past due.

"Serviced Portfolio Extended Receivable" means any Serviced Portfolio Receivable for which an extension or payment deferment was made in accordance with the Servicer's extension policy contained in the Credit and Collection Policy.

39

"Serviced Portfolio Extension Ratio" means, with respect to any month, the percentage equivalent of a fraction, (i) the numerator of which is the aggregate number of Serviced Portfolio Receivables that became Serviced Portfolio Extended Receivables during such month and (ii) the denominator of which is the aggregate number of Serviced Portfolio Receivables as of the last day of such month.

"Serviced Portfolio Liquidation Proceeds" means, with respect to any month and any Serviced Portfolio Defaulted Receivable, the amount (which shall not be less than zero) received by the Servicer during such month after a Serviced Portfolio Receivable becomes a Serviced Portfolio Defaulted Receivable in connection with the attempted realization of the full amounts due or to become due under such Serviced Portfolio Receivable, whether from the sale or other disposition of the related Financed Vehicle, the proceeds of repossession or any collection effort, the proceeds of recourse or similar payments payable under the related Serviced Portfolio Receivable, receipt of Insurance Proceeds or otherwise, net of any reasonable out-of-pocket expenses (exclusive of overhead) incurred by the Servicer with respect to the collection and enforcement of such Serviced Portfolio Receivable, in each case to the extent not previously reimbursed to the Servicer.

"Serviced Portfolio Net Loss-to-Liquidation Ratio" means, with respect to any month, the ratio, expressed as a percentage, of (i) (a) the aggregate principal balance of all Serviced Portfolio Receivables that became Serviced Portfolio Defaulted Receivables during such month, minus (b) the aggregate Serviced Portfolio Liquidation Proceeds received in respect of all Serviced Portfolio Defaulted Receivables during such month divided by (ii) the sum of (a) the aggregate principal balance of all Serviced Portfolio Receivables that became Serviced Portfolio Defaulted Receivables during such month plus (b) the aggregate amount of all collections in respect of principal on the Serviced Portfolio Receivables received during such month.

"Serviced Portfolio Receivable" means any motor vehicle receivable included in the Serviced Portfolio.

"Servicer" has the meaning given to such term in the Preamble.

"Servicer Basic Documents" means all Basic Documents to which the Servicer is a party or by which it is bound.

"Servicer Termination Event" has the meaning given to such term in Section 7.13.

"Servicer Termination Notice" has the meaning given to such term in Section 7.13.

"Servicing Fee" means the fee payable to the Servicer on each Payment Date in accordance with Section 2.10(b) in an amount equal to the sum of the product of (i) one-twelfth, (ii) the Servicing Fee Rate and (iii) the aggregate Principal Balance of all Receivables as of the first day of the related Collection Period.

"Servicing Fee Rate" means 3.50% per annum.

40

"Short-Term Rating Requirement" means, with respect to any Person, that such Person has a short-term unsecured debt rating of not less than "A-1" by Standard & Poor's and not less than "Prime-1" by Moody's.

"Simple Interest Method" means the method of allocating a fixed level payment to principal and interest, pursuant to which the portion of such payment that is allocated to interest is equal to the product of the fixed rate of interest multiplied by the unpaid principal balance multiplied by the period of time elapsed since the preceding payment of interest was made.

"SOFR" means, with respect to any Business Day, a rate per annum equal to the secured overnight financing rate for such Business Day published by the SOFR Administrator on the SOFR Administrator's Website at approximately 8:00 a.m. (New York, New York time) on the immediately succeeding Business Day.

"SOFR Administrator" means the NYFRB (or a successor administrator of the secured overnight financing rate).

"SOFR Administrator's Website" means the NYFRB's website, currently at http://www.newyorkfed.org, or any successor source for the secured overnight financing rate identified as such by the SOFR Administrator from time to time.

"Solvent" means, as to any Person at any time, having a state of affairs such that (i) the fair value of the property owned by such Person is greater than the amount of such Person's liabilities (including disputed, contingent and unliquidated liabilities) as such value is established and liabilities evaluated for purposes of Section 101(32) of the Bankruptcy Code; (ii) the present fair salable value of the property owned by such Person in an orderly liquidation of such Person is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured; (iii) such Person is able to realize upon its property and pay its debts and other liabilities (including disputed, contingent and unliquidated liabilities) as they mature in the normal course of business; (iv) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay as such debts and liabilities mature; and (v) such Person is not engaged in business or a transaction, and is not about to engage in a business or a transaction, for which such Person's property would constitute unreasonably small capital.

"Special Purpose Affiliate" means any special purpose entity that is an Affiliate of the Borrower and was created for the purpose of one or more Securitizations.

"Standard & Poor's" means S&P Global Ratings, acting through Standard & Poor's Financial Services LLC.

"State" means any state of the United States or the District of Columbia.

"Statutory Reserve Rate" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentage (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Federal Reserve Board to which the Administrative Agent is subject with respect to the Adjusted LIBO Rate, for eurocurrency

41

funding (currently referred to as "Eurocurrency liabilities" in Regulation D). Such reserve percentage shall include those imposed pursuant to Regulation D. Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under Regulation D or any comparable regulation. The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Step-Up Credit Enhancement Trigger Event" means, that as of the last day of any Collection Period any of the following events has occurred:

      (i)    the 3-Month Rolling Average Net Loss-to-Liquidation Ratio exceeds 30.00%;

      (ii)    the 3-Month Rolling Average Extension Ratio exceeds 5.75%;

      (iii)    the 3-Month Rolling Average Delinquency Ratio exceeds 9.00%;

      (iv)    the 3-Month Rolling Average Serviced Portfolio Net Loss-to-Liquidation Ratio exceeds 30.00%;

      (v)    the 3-Month Rolling Average Serviced Portfolio Extension Ratio exceeds 5.75%; or

      (vi)    the 3-Month Rolling Average Serviced Portfolio Delinquency Ratio exceeds 9.00%;

provided, that, solely during the period commencing on the Securitization Date with respect to a Securitization that results in the sale by the Borrower of Eligible Receivables having an aggregate Principal Balance of 50.0% or more of the Net Eligible Pool Balance and ending on the earlier to occur of (a) the 90th day after the first full Collection Period following such Securitization Date or (b) the first date following such Securitization Date on which the Net Eligible Pool Balance exceeds $12,500,000, none of the events specified in clauses (i) through (iii) above will constitute a Step-Up Credit Enhancement Trigger Event. A Step-Up Credit Enhancement Trigger Event shall be deemed to be continuing under this Agreement until Cured.

"Subordinated Monthly Interest and Fees" means, with respect to any Payment Date, (i) Monthly Interest and Fees for such Payment Date, minus (ii) the Senior Monthly Interest and Fees for such Payment Date.

"Subsequent Loan" means each Loan made following the Initial Loan.

"Subsequent Receivable" means each Receivable that becomes a part of the Collateral on a Funding Date other than the Funding Date relating to the Initial Loan.

"Subservicer" means a subservicer appointed by the Servicer and acceptable to the Administrative Agent and the Required Lenders for the servicing and administration of the Receivables.

"Subsidiary" means, with respect to a Person, any entity with respect to which more than 50.0% of the outstanding voting securities shall at any time be owned or controlled, directly or indirectly, by such Person and/or one or more of its Subsidiaries, or any similar business organization which is so owned or controlled.

"Successor Servicer" has the meaning given to such term in Section 7.14(a).

"TAG" means Tricolor Auto Group, LLC.

"TAG Transfer Agreement" means the Transfer Agreement, dated as of the Closing Date, between TAG and Tricolor.

"Tangible Net Worth" means, with respect to the Tricolor Holdings and its consolidated Subsidiaries for any period, the aggregate net worth of such Persons, calculated in and its consolidated Subsidiaries for any period, the aggregate net worth of such Persons, calculated in accordance with GAAP after subtracting therefrom the aggregate amount of the deferred tax assets and Intangible Assets of such Persons, including goodwill, franchises, licenses, patents, trademarks, tradenames, copyrights and service marks, calculated in accordance with GAAP. For avoidance of doubt, Preferred Equity will be classified as Indebtedness.

"Tax" or "Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest additions to tax or penalties applicable thereto.

"TCAG" means Tricolor California Auto Group, LLC.

"TCAG Transfer Agreement" means the Transfer Agreement, dated as of the Closing Date, between TCAG and Tricolor.

"Term SOFR" means, for the applicable Corresponding Tenor as of the applicable Reference Time, the forward-looking term rate based on SOFR that has been selected or recommended by the Relevant Governmental Body.

"Term SOFR Notice" means a notification by the Administrative Agent to the Lenders and the Borrower of the occurrence of a Term SOFR Transition Event.

"Term SOFR Transition Event" means the determination by the Administrative Agent that (i) Term SOFR has been recommended for use by the Relevant Governmental Body, (ii) the administration of Term SOFR is administratively feasible for the Administrative Agent and (iii) a Benchmark Transition Event or an Early Opt-in Election, as applicable, has previously occurred resulting in a Benchmark Replacement in accordance with Section 2.11 that is not Term SOFR.  For the avoidance of doubt, the Administrative Agent shall not be required to deliver a Term SOFR Notice after a Term SOFR Transition Event and may do so in its sole discretion.

"Termination Event" has the meaning given to such term in Section 10.01(a).

43

"<u>Test Data File</u>" means a test data file, which shall include the loan master file, the transaction history file and all other files necessary to carry out the servicing obligations hereunder.

"<u>Total Indebtedness</u>" means, with respect to Tricolor Holdings and its consolidated Subsidiaries in accordance with GAAP and any period, Indebtedness less Preferred Equity.

"<u>Total Indebtedness to Tangible Net Worth Ratio</u>" means, with respect to Tricolor Holdings, as of any day, the percentage equivalent of a fraction (i) the numerator of which equals Total Indebtedness calculated in accordance with GAAP as of such day, and (ii) the denominator of which equals the Tangible Net Worth calculated in accordance with GAAP as of such day.

"<u>Transfer Agreement</u>" means the FCA Transfer Agreement, the TAG Transfer Agreement, the TCAG Transfer Agreement or such other transfer agreement in substantially the form attached to the Purchase Agreement as Exhibit A, executed by Tricolor and the Borrower in connection with a transfer of Receivables and the related Collateral on any Funding Date.

"<u>Transition Expenses</u>" has the meaning given to such term in Section 7.14(e).

"<u>Tricolor</u>" has the meaning given to such term in the Preamble.

"<u>Tricolor Entity</u>" means the Borrower, Tricolor, Tricolor Holdings, TAG, TCAG and FCA.

"<u>Tricolor Holdings</u>" means Tricolor Holdings, LLC, a Delaware limited liability company.

"<u>UCC</u>" means the Uniform Commercial Code, as from time to time in effect in the applicable jurisdiction.

"<u>Unadjusted Benchmark Replacement</u>" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"<u>United States</u>" or "<u>U.S.</u>" means the United States of America.

"<u>Unmatured Servicer Termination Event</u>" means any event that, with the giving of notice or the lapse of time, or both, would become a Servicer Termination Event.

"<u>Unmatured Termination Event</u>" means any event that, with the giving of notice or the lapse of time, or both, would become a Termination Event.

"<u>Unused Fee</u>" means, with respect to any Payment Date and the related Interest Period during the Revolving Period, a fee payable by the Borrower on such Payment Date in an amount equal to the sum of the product of (calculated for each day during such Interest Period) (i) the Unused Fee Rate, (ii) the Available Amount on such day and (iii) a fraction the numerator of which is equal to the actual number of days comprising such Interest Period and the denominator of which is equal to 360.

"Unused Fee Rate" shall have the meaning set forth in the Fee Letter.

"Upfront Fee" means the "Upfront Fee" set forth in the Fee Letter.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate" has the meaning given to such term in Section 2.13(g).

"Usage Fee" means, with respect to any Payment Date and the related Interest Period, a fee payable by the Borrower in an amount equal to the sum of the product of (calculated for each day during such Interest Period) (i) the Usage Fee Rate, (ii) the Loans Outstanding on such day funded or maintained through the issuance of Commercial Paper Notes and (iii) a fraction the numerator of which is equal to the actual number of days in such Interest Period and the denominator of which is equal to 360.

"Usage Fee Rate" shall have the meaning set forth in the Fee Letter.

"Vervent" means Vervent Inc.

"Volcker Rule" means the regulations adopted to implement Section 619 of the Dodd-Frank Act.

"Weighted Average APR" means, with respect to all or any group of Eligible Receivables as of any day, the average of the APRs of such Receivables as of such day, weighted based on the aggregate Principal Balance of such Receivables as of such day.

"Withholding Agent" means the Borrower and the Administrative Agent.

"WTNA" means Wilmington Trust, National Association.

Section 1.02.  Accounting Terms and Determinations.  Unless otherwise defined or specified herein, all accounting terms shall be construed herein, all accounting determinations hereunder shall be made, all financial statements required to be delivered hereunder shall be prepared and all financial records shall be maintained in accordance with GAAP.

Section 1.03.  Computation of Time Periods.  Unless otherwise stated in this Agreement, in the computation of a period of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding".

Section 1.04.  Interpretation.  When used in this Agreement, unless a contrary intention appears:  (i) a term has the meaning assigned to it; (ii) "or" is not exclusive; (iii) "including" means including without limitation; (iv) words in the singular include the plural and words in the plural include the singular; (v) any agreement, instrument or statute defined or referred to herein or in any instrument or certificate delivered in connection herewith means such agreement, instrument or statute as from time to time amended, restated, modified or supplemented and

45

includes (in the case of agreements or instruments) references to all attachments thereto and instruments incorporated therein; (vi) references to a Person are also to its successors and permitted assigns; (vii) the words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision hereof; (viii) references contained herein to Article, Section, subsection, Schedule and Exhibit, as applicable, are references to Articles, Sections, subsections, Schedules and Exhibits in this Agreement unless otherwise specified; (ix) references to "writing" include printing, typing and other means of reproducing words in a visible form, including electronic mail and facsimile; and (x) the term "proceeds" has the meaning set forth in the applicable UCC.

Section 1.05.  Interest Rates; LIBOR Notification.  The interest rate on the Loans shall be determined by reference to the LIBO Rate, which is derived from the London interbank offered rate.  The London interbank offered rate is intended to represent the rate at which contributing banks may obtain short-term borrowings from each other in the London interbank market.  In July 2017, the U.K. Financial Conduct Authority announced that, after the end of 2021, it would no longer persuade or compel contributing banks to make rate submissions to the ICE Benchmark Administration (together with any successor to the ICE Benchmark Administration, the "IBA") for purposes of the IBA setting the London interbank offered rate.  As a result, it is possible that commencing in 2022, the London interbank offered rate may no longer be available or may no longer be deemed an appropriate reference rate upon which to determine the interest rate on Loans.  In light of this eventuality, public and private sector industry initiatives are currently underway to identify new or alternative reference rates to be used in place of the London interbank offered rate.  Upon the occurrence of a Benchmark Transition Event, a Term SOFR Transition Event or an Early Opt-In Election, Section 2.11(b) and (c) provide the mechanism for determining an alternative rate of interest.  The Administrative Agent will promptly notify the Borrower, pursuant to Section 2.11(e), of any change to the reference rate upon which the interest rate on Loans is based.  The Administrative Agent shall not, however, warrant or accept any responsibility for, and shall not have any liability with respect to, the administration, submission or any other matter related to the London interbank offered rate or other rates in the definition of the term "LIBO Rate" or with respect to any alternative or successor rate thereto, or replacement rate thereof (including, without limitation, (i) any such alternative, successor or replacement rate implemented pursuant to Section 2.11(b) or (c), whether upon the occurrence of a Benchmark Transition Event a Term SOFR Transition Event or an Early Opt-in Election, and (ii) the implementation of any Benchmark Replacement Conforming Changes pursuant to Section 2.11(d), including, without limitation, whether the composition or characteristics of any such alternative, successor or replacement reference rate will be similar to, or produce the same value or economic equivalence of, the LIBO Rate or have the same volume or liquidity as did the London interbank offered rate prior to its discontinuance or unavailability).

46

ARTICLE TWO

LOANS

Section 2.01.  Loans.

(a)     On the terms and conditions set forth herein, including this Section and Article Four, the Borrower may from time to time on any Business Day during the Revolving Period, request that each Conduit Lender (or, the related Committed Lender if such Conduit Lender is not a Committed Lender and elects to not make a Lender Advance) and Committed Lender make an advance (each, a "Loan"), in the amount of such Conduit Lender's or Committed Lender's Lender Advance to it on a Funding Date.

No later than 1:00 p.m. (New York, New York time) on the Business Day that is two Business Days prior to a proposed Funding Date, the Borrower shall notify the Administrative Agent, the Agents and the Lenders of such proposed Funding Date and Loan by delivering to each such entity (with a copy to the Account Bank and the Collateral Custodian), in form and substance satisfactory to the Administrative Agent:

(i)     a Funding Request, which will include, among other things, the proposed Funding Date, a calculation of the Borrowing Base (calculated as of the last day of the most recently ended Collection Period or, with respect to the Receivables added to the Collateral following such last day but prior to or on such date of determination, the related Cutoff Date), the Principal Amount of the Loan requested, which shall be in an amount at least equal to $1,000,000 and integral multiples of $100,000 in excess thereof; and

(ii)     an updated Schedule of Receivables that includes each Receivable that is the subject of the proposed Loan and such other information as the Administrative Agent may reasonably request with respect to the related Loan.

(b)     Following receipt by the Administrative Agent, the Agents and the Lenders of a Funding Request, and prior to the end of the Revolving Period, (i) each Conduit Lender that is not a Committed Lender may, in its sole discretion, make its Lender Advance of any Loan requested by the Borrower pursuant to Section 2.01(a), and (ii) each Committed Lender, if (A) the related Lender Group consists only of one or more Committed Lenders and an Agent or (B) the related Conduit Lender in its Lender Group is not a Committed Lender and such Conduit Lender elects not to make a Lender Advance, severally agrees to make its Lender Advance of any Loan requested by the Borrower, in each case subject to the conditions contained herein, in an aggregate amount equal to the Loan so requested.

(c)     In no event shall:

(i)     a Lender be required to fund a Principal Amount that would cause its Lender Percentage of the Loans Outstanding, determined after giving effect to such funding to exceed its Commitment or Conduit Funding Limit;

47

(ii)     any Lender be obligated to fund any Loan, to the extent that after giving effect to such Loan either the Loans Outstanding would exceed the Borrowing Base or a Borrowing Base Deficiency would exist (and to the extent that the Loan is to be made on a date in any month prior to the Payment Date in such month, after giving effect to the reduction, if any, to the Loans Outstanding to be made on such Payment Date; provided, that the funds to make such reduction are on hand in the Collection Account) (calculated as of the last day of the most recently ended Collection Period, or, with respect to any Receivables added to the Collateral following such last day but prior to or on such date of determination, the related Cutoff Date);

(iii)     a Lender Group be required to fund the principal amount of any Loan in excess of its Lender Percentage of the Principal Amount of such Loan;

(iv)     a Lender be required on any date to fund a Loan (A) after the Revolving Period or (B) if an Amortization Event, Unmatured Termination Event, Termination Events, Unmatured Servicer Termination Event or Servicer Termination Event exists;

(v)     the Principal Amount of any proposed Loan exceeds the Available Amount or the Borrowing Base on such date; and

(vi)     more than one Loan be funded on any Business Day.

Section 2.02.  <u>Funding Mechanics</u>.

(a)     If any Funding Request is delivered to the Administrative Agent, the Agents and the Lenders after 1:00 p.m. (New York, New York time) two Business Days prior to the proposed Funding Date, such Funding Request shall be deemed to be received prior to 1:00 p.m. (New York, New York time) on the next succeeding Business Day and the proposed Funding Date of such proposed Loan shall be deemed to be two Business Days following such deemed receipt.  Each Funding Request shall include a representation by the Borrower that (i) the requested Loan will not, on the Funding Date, exceed the Available Amount and (ii) a representation that all conditions precedent to the making of such Loan set forth in Section 2.01 and Section 4.02 have been satisfied or will be satisfied as of the proposed Funding Date.  Any Funding Request shall be irrevocable.

(b)     Each Conduit Lender that is not a Committed Lender shall notify the Agent for its Lender Group and the Administrative Agent by 10:00 a.m. (New York, New York time) on the applicable Funding Date whether it has elected to make a Lender Advance pursuant to Section 2.01.  In the event that a Conduit Lender that is not a Committed Lender shall not have timely provided such notice, such Conduit Lender shall be deemed to have elected not to make its Lender Advance of such Loan.  If a Conduit Lender that is not a Committed Lender shall have elected or be deemed to have elected not to make its Lender Advance of such Loan, the Committed Lender in the related Lender Group shall make available on the applicable Funding Date an amount equal to the portion of the Loan that such Conduit Lender has not elected to fund, in an amount equal to its share of the Principal Amount to be funded.

(c)     Each Lender's Lender Advance of a Loan shall be made available to the Administrative Agent, subject to the fulfillment of the applicable conditions set forth in

48

Article Four, at or prior to 12:00 p.m. (New York, New York time) on the applicable Funding Date, by deposit of immediately available funds, by wire transfer thereof, to the Administrative Agent Account, and the Administrative Agent shall deposit such Lender Advance to the account specified by the Borrower in the related Funding Request at or prior to 4:00 p.m. (New York, New York time) on the applicable Funding Date, by deposit of immediately available funds, by wire transfer thereof. Each Lender shall promptly notify the Borrower, the related Agent and the Administrative Agent in the event that it either fails to make such funds available before such time or notifies the Borrower, the related Agent and the Administrative Agent that it will not make such funds available before such time. If the Administrative Agent makes available to the Borrower funds for any Loan to be made by the Lenders as provided in this Article, and such funds are not made available to the Borrower because the conditions to the applicable Loan set forth in Article Four are not satisfied or waived in accordance with the terms hereof, the Borrower shall return such funds (in like funds as received from the Administrative Agent) to the Administrative Agent (who shall promptly return such funds to the related Lenders), without interest.

(d)      In the event that, notwithstanding the fulfillment of the applicable conditions set forth in Article Four with respect to a Loan, a Conduit Lender that is not a Committed Lender elected to make an advance on a Funding Date but failed to make its Lender Advance available to the Administrative Agent when required by Section 2.02(c), such Conduit Lender shall be deemed to have rescinded its election to make such advance, and neither the Borrower nor any other party shall have any claim against such Conduit Lender by reason of its failure to timely make such advance. In any such case, the Agent for the related Lender Group shall give notice of such failure not later than 12:00 p.m. (New York, New York time) on the Funding Date to the Administrative Agent, each Committed Lender for such Lender Group and to the Borrower, which notice shall specify (i) the identity of such Conduit Lender and (ii) the amount of the Lender Advance which it had elected but failed to make. Subject to receiving such notice, the related Committed Lender shall advance a portion of the Principal Amount in an amount equal to the amount described in clause (ii) above by wire transfer thereof to the Administrative Agent Account, at or before 2:00 p.m. (New York, New York time) on such Funding Date and otherwise in accordance with Section 2.01(d).

(e)      The failure of any Lender to make any Loan required to be made by it shall not relieve any other Lender of its obligations hereunder; provided, that the Commitments of the Lenders are several and no Lender shall be responsible for any other Lender's failure to make Loans as required.

Section 2.03.  Reductions of Aggregate Commitment.

(a)      At any time during the Revolving Period, the Borrower may, upon at least ten Business Days' prior written notice to the Administrative Agent, each Agent, each Lender and the Account Bank, reduce the Aggregate Commitment in an amount not to exceed the Available Amount as of the date such reduction shall become effective, which reduction shall be applied, unless otherwise consented to by the Administrative Agent and the Lenders, pro rata to the Commitments (and with respect to the Aggregate Commitment, further allocated from each such Commitment to the related Conduit Funding Limits, pro rata). Each partial reduction shall be in a minimum aggregate amount of $5,000,000 or integral multiples of $1,000,000 in excess

49

thereof.  Any request for a reduction in the Aggregate Commitment shall be irrevocable and the Borrower shall deliver no more than two such requests during the Revolving Period.

(b)      On the Amortization Date (except as otherwise provided in the proviso set forth in the definition thereof), the Commitments and the Conduit Funding Limits of all Lenders shall be automatically and permanently reduced to zero.

Section 2.04.  Repayment of Loans; Evidence of Debt; Extensions of Commitments.

(a)      The Borrower hereby unconditionally promises to pay to each Lender the Principal Amount of each Loan made by each Lender on the Maturity Date, in an aggregate principal amount equal to the Loans Outstanding.

(b)      Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.  Any such recordation by a Lender or its related Agent shall constitute prima facie evidence of the accuracy of the information so recorded absent manifest error.  The failure of a Lender or its related Agent to make any such notation shall not limit or otherwise affect the obligation of the Borrower to repay the Loans in accordance with their respective terms as set forth herein.

(c)      Any Lender may request that Loans made by it be evidenced by a promissory note.  In such event, the Borrower shall prepare, execute and deliver to such Lender a promissory note payable to such Lender (or, if requested by such Lender, to such Lender and its registered assigns).  Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 13.01) be represented by one or more promissory notes in such form payable to the order of the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

(d)      So long as no Amortization Event has occurred, the Borrower may request in writing to the Administrative Agent and the Agents, no more than 120 nor fewer than 60 days prior to the applicable Commitment Termination Date, that each Committed Lender extend its Commitment Termination Date for an additional 364-day period as herein provided, which request will be granted or denied by each Committed Lender in its sole discretion.  Upon receipt of any such request, the Administrative Agent shall promptly notify each Agent thereof, which shall notify each Committed Lender in its Lender Group.  On or before the last day of the Election Period, each Committed Lender shall notify the Agent for its Lender Group of its willingness or refusal to so extend its Commitment Termination Date, provided that the failure of any Committed Lender to timely respond shall be deemed to be its refusal to so extend the Commitment Termination Date.  The Agent for such Lender Group shall notify the Borrower of such willingness or refusal by each Committed Lender not later than the Business Day following the last day of the Election Period.  If (i) one or more Committed Lenders has agreed to extend the Commitment Termination Date and (ii) at the end of the applicable Election Period, no Termination Event shall have occurred and be continuing, the Commitment Termination Date then in effect for each such Committed Lender that has agreed to extend the Commitment Termination Date shall be extended to the date which is 364 days following the last day of the

50

Election Period or, if such day is not a Business Day, the next preceding Business Day (or to any other date as agreed upon by the Borrower and each Committed Lender); provided, that if not all Committed Lenders have agreed to such extension, the Borrower may elect, by notice to the Administrative Agent delivered not later than five Business Days after the end of the Election Period, not to have such extension become effective.

(e)    Within two Business Days following the end of an Election Period, the Agent for each Lender Group shall notify each other Lender in such Lender Group, the Administrative Agent and the Borrower of the identity of any Dissenting Lender and the amounts of its Commitment. The Administrative Agent and the Borrower may (but shall not be required to) request one or more other Lenders to acquire all or a portion of the Commitment of the Dissenting Lender and all amounts payable to it hereunder in accordance with Article Thirteen and any such Lender may, in its sole discretion, assume all or a portion of such Commitment of the Dissenting Lender. Each Dissenting Lender hereby agrees to assign all or a portion of its Commitment and the amounts payable to it hereunder to a replacement Lender identified in accordance with the preceding sentence, subject to ratable payment of such Dissenting Lender's Invested Percentage of the Loans Outstanding, together with all accrued and unpaid interest thereon, and a ratable portion of all fees and other amounts due to it hereunder.

(f)    Prior to the occurrence of an Amortization Event, if a Partial Expiration Event has occurred, the Administrative Agent shall give notice to the Borrower and the Servicer to apply any Collections in accordance with Section 2.07(v), except as otherwise provided in Section 2.08, pro rata to the repayment of such amounts owing to any Non-Extending Lender as of the date of the related Partial Expiration Event, commencing no later than the first Payment Date which is at least two Business Days following the Commitment Termination Date for the Non-Extending Lender, specifying the amounts thereof.

Section 2.05.  Optional Principal Repayments.  The Borrower may, on any Payment Date prior to the occurrence of a Termination Event, prepay all of the Loans Outstanding and all other Aggregate Unpaids; provided, that (i) the Borrower shall have given at least two Business Days' prior written notice to the Administrative Agent, each Lender, the Account Bank and the Collateral Custodian, (ii) on such Payment Date, the Borrower pays to the appropriate parties all amounts due and owing pursuant to clauses (i), (ii) and (vii) of Section 2.07, (iii) the Borrower pays to the Administrative Agent, for the account of the Secured Parties, on the date of any such prepayment, (a) all accrued and unpaid Interest and (b) all other Aggregate Unpaids (including all Breakage Costs) payable to any Indemnified Party under this Agreement through the date of such prepayment, including any fees or other amounts payable pursuant to Section 11.01 and (iv) the Borrower certifies that following such prepayment, the Borrower will be in compliance with the provisions of this Agreement.  Any notice of a prepayment shall be irrevocable.

Section 2.06.  Payments.

(a)    The Borrower shall pay Interest on the unpaid Principal Amount of each Loan for the period from the related Funding Date until the date that such Loan shall be paid in full. Interest shall accrue during each Interest Period and be payable on the Loans Outstanding on each Payment Date in accordance with Section 2.07, unless earlier paid pursuant to Sections 2.05 or 2.15.

51

(b)        The Loans Outstanding shall be payable in installments equal to the Monthly Principal Payment Amount on each Payment Date in accordance with Section 2.07. Notwithstanding the foregoing, the Loans Outstanding, together with all Aggregate Unpaids, shall be due and payable in full in immediately available funds on the earlier of (i) the date on which the "Amortization Date" is declared or automatically occurs pursuant to Section 10.01(b) and (ii) the Maturity Date.

(c)        Unless otherwise specified in an applicable Conduit Lender Supplement, Interest calculated by reference to the CP Rate or the Adjusted LIBO Rate shall be calculated on the basis of a 360-day year for the actual days elapsed.  Interest calculated by reference to the Prime Rate and the Federal Funds Rate shall be calculated on the basis of a 365 or 366-day year, as applicable, for the actual days elapsed.  Periodic fees or other periodic amounts payable hereunder shall be calculated on the basis of a 360-day year and for the actual days elapsed.

(d)        The principal of and Interest on the Loans shall be paid as provided herein.  In the case of Loans held by an Agent on behalf of any Conduit Lender, the related Agent shall allocate to such Conduit Lender each payment in respect of the Loan received by the Agent as provided herein.  Payments in respect of principal and Interest shall be allocated and applied to the Lenders based on their respective Invested Percentages, or in any such case in such other proportions as each affected Lender may agree upon in writing from time to time with the Administrative Agent and the Borrower; provided, that from and after the Commitment Termination Date for each Dissenting Lender until the earlier to occur of (i) the Amortization Date and (ii) the date on which the aggregate amount of payments in reduction of Loans Outstanding made after the date of the occurrence of the related Partial Expiration Event equals the Partial Expiration Event Amount, except as otherwise provided in Section 2.08, payments pursuant to Section 2.07(v) in reduction of the Partial Expiration Event Amount shall be allocated and applied to Non-Extending Lenders pro rata based on their respective Lender Percentages (and if applicable, further allocated from each such Non-Extending Lender to each of its related Conduit Lenders that are not Committed Lenders, pro rata) as of the date of the related Partial Expiration Event.

(e)        At or before 1:00 p.m. (New York, New York time) on the day that is one Business Day prior to each Reporting Date, (i) the Agent for each Lender Group that includes a Conduit Lender shall notify the Administrative Agent (who shall notify the Borrower and the Servicer by 4:00 p.m. on such day) of the CP Rate for each such Conduit Lender in effect for the related Interest Period and (ii) each Committed Lender shall notify the Administrative Agent (who shall notify the Borrower and the Servicer) of the Adjusted LIBO Rate in effect for the related Interest Period.  Each Lender shall notify the Administrative Agent (who shall notify the Borrower and the Servicer) of all such rates, including the Alternate Base Rate for the related Interest Period and, if applicable, the dates on which the Alternate Base Rate was applicable to all or any portion of the Loans Outstanding.  Each determination by a Lender of its CP Rate, the Adjusted LIBO Rate or the Alternate Base Rate pursuant to any provision of this Agreement shall be conclusive and binding on the Borrower in the absence of manifest error.

(f)        Notwithstanding any other provision of this Agreement or the other Basic Documents, if at any time the rate of interest payable by any Person under the Basic Documents exceeds the Maximum Lawful Rate, then, so long as the Maximum Lawful Rate would be

exceeded, such rate of interest shall be equal to the Maximum Lawful Rate.  If at any time thereafter the rate of interest so payable is less than the Maximum Lawful Rate, such Person shall continue to pay Interest at the Maximum Lawful Rate until such time as the total interest received from such Person is equal to the total Interest that would have been received had Applicable Law not limited the interest rate so payable.  In no event shall the total Interest received by a Lender under this Agreement and the other Basic Documents exceed the amount which such Lender could lawfully have received, had the Interest due been calculated from the Closing Date at the Maximum Lawful Rate.

Section 2.07.  <u>Settlement Procedures</u>.  On or before each Reporting Date, the Servicer shall instruct (by delivery of the Monthly Report) the Account Bank (or the Qualified Institution holding the Collection Account), to pay to the following Persons, from the Collection Account, to the extent of Available Funds, the following amounts in the following order of priority, as set forth in such Monthly Report:

(i)    First, to the Servicer, the accrued and unpaid Servicing Fee;

(ii)    Second, pro rata, (a) to the extent not paid for by Tricolor, to the Backup Servicer, the accrued and unpaid Backup Servicing Fee and any out-of-pocket expenses and indemnities owed to the Backup Servicer, subject to an aggregate limit (1) during any calendar year prior to a Termination Event, $50,000 or (2) during any calendar year after a Termination Event, $250,000, (b) to the Successor Servicer, any unpaid Transition Expenses payable pursuant to Section 7.14(e), (c) to the Collateral Custodian, the Collateral Custodian Fee and any out-of-pocket expenses and indemnities due to the Collateral Custodian, subject to an aggregate limit for such out-of-pocket expense and indemnities (1) during any calendar year prior to a Termination Event, $75,000 or (2) during any calendar year after a Termination Event, $250,000, and (d) to the Account Bank, the Account Bank Fee and any out-of-pocket expenses and indemnities due to the Account Bank, subject to an aggregate annual limit for such out-of-pocket expenses and indemnities (1) during any calendar year prior to a Termination Event, $75,000 or (2) during any calendar year after a Termination Event, $250,000;

(iii)    Third, to the Administrative Agent for distribution to the Lenders, pro rata, in accordance with their Invested Percentage, the Senior Monthly Interest and Fees;

(iv)    Fourth, to the Administrative Agent for distribution to the Lenders, pro rata, in accordance with their Invested Percentage, the Monthly Principal Payment Amount;

(v)    Fifth, if a Partial Expiration Event has occurred, to reduce pro rata the portion of the Loans Outstanding constituting the Lender Advances of any Non-Extending Lender to zero;

(vi)    Sixth, to the Administrative Agent for distribution to the Lenders, pro rata, in accordance with their Invested Percentage, the Subordinated Monthly Interest and Fees;

(vii)     Seventh, pro rata, to the extent not previously paid in clause (ii) above and without regard to any annual caps on payment, to (a) the Backup Servicer, any Backup Servicing Fee, expenses and indemnities owed to the Backup Servicer, (b) the Collateral Custodian, the fees, expenses and indemnities owed to the Collateral Custodian and (c) the Account Bank, the Account Bank Fee, expenses and indemnities due to the Account Bank;

(viii)     Eighth, pro rata, to the Affected Parties or the Indemnified Parties, all other Aggregate Unpaids (other than the principal amount of the Loans Outstanding) then due under this Agreement to them; and

(ix)     Ninth, any remaining amount to the Borrower.

Section 2.08.   <u>Payments, Computations, Etc.</u>

(a)     Unless otherwise expressly provided herein, all amounts to be paid or deposited by the Borrower hereunder shall be paid or deposited in accordance with the terms hereof no later than 1:00 p.m. (New York, New York time) on the day when due in Dollars in immediately available funds to the Administrative Agent (who shall distribute such amounts on such day to the applicable Lender's Account for each Lender no later than 4:00 p.m. (New York, New York time)).  Except as otherwise provided in Section 2.06, the Borrower shall, to the extent permitted by Applicable Law, pay to the Lenders interest on all amounts not paid or deposited when due hereunder at the related Default Rate, payable on demand; provided, however, that such interest rate shall not at any time exceed the Maximum Lawful Rate.

(b)     Whenever any payment hereunder (i) shall be stated to be due on a day other than a Business Day, such payment shall be made, without penalty, on the next succeeding Business Day, except in the case where the next succeeding Business Day would occur in the succeeding calendar month, in which case such payment shall be due on the preceding Business Day or (ii) is received after 1:00 p.m. (New York, New York time) such payment shall be deemed to have been received on the next succeeding Business Day, and any such extension of time shall in such case be included in the computation of payment of Interest, other interest or any fee payable hereunder, as the case may be.

(c)     If any Loan requested by the Borrower and approved by a Lender and the Administrative Agent pursuant to Section 2.01 is not, for any reason other than due to the fault of a Lender, an Agent or the Administrative Agent, made or effectuated, as the case may be, on the date specified therefor, the Borrower shall indemnify such Lender, such Agent or the Administrative Agent against any reasonable loss, cost or expense incurred by such Lender, including any loss (including loss of anticipated profits, net of anticipated profits in the reemployment of such funds in the manner determined by such Lender), cost or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by such Lender or such Agent to fund or maintain such Loan.

(d)     All payments hereunder shall be made without set-off or counterclaim and in such amounts as may be necessary in order that all such payments shall not be less than the amounts otherwise specified to be paid under this Agreement.

54

(e)     To the extent that (i) any Person makes a payment to any party hereto or (ii) any party hereto receives or is deemed to have received any payment or proceeds for application to an obligation, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any Insolvency Law, State or federal law, common law or for equitable cause, then, to the extent such payment or proceeds are set aside, the obligation or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received or deemed received by the recipient thereof.

Section 2.09.   <u>Collections and Allocations; Investment of Funds</u>.

(a)     On or before the Closing Date (with respect to the Initial Receivables) or the applicable Funding Date (with respect to Subsequent Receivables), the Servicer shall direct and instruct all related Obligors to make all payments in respect of the related Receivables to the Master Collection Account.  Each of the Servicer and the Borrower shall promptly (but in no event later than two Business Days after the receipt and identification thereof) deposit all Collections received by it in the Collection Account.  The Borrower and the Servicer shall make such deposits or payments by electronic funds transfer, in immediately available funds.

(b)     On the Closing Date and on each Funding Date, the Servicer will deposit (in immediately available funds) into the Collection Account all Collections received after the applicable Cutoff Date and through and including the second Business Day prior to the Closing Date or such Funding Date, as the case may be, in respect of Receivables pledged on such date.

(c)     The Servicer shall be entitled to retain and to reimbursement of all amounts remitted by or on behalf of the Obligors to the Servicer under the terms of, or with respect to, the related Receivables, that represent ancillary fees (other than extension fees), including late fees, administrative fees or similar charges allowed by Applicable Law.

(d)     To the extent there are uninvested amounts on deposit in the Collection Account, such amounts shall be invested in Permitted Investments that mature no later than the Business Day before the next Payment Date, which Permitted Investments shall be selected (i) prior to the occurrence of an Amortization Event, by the Borrower, or (ii) from and after the occurrence of an Amortization Event, by the Administrative Agent.  Absent the written instruction of the Borrower or the Administrative Agent, amounts on deposit in the Collection Account shall remain uninvested.  Permitted Investments may be purchased from the Account Bank, the Administrative Agent, any Agent, any Lender or any of their respective Affiliates, but no Permitted Investment may be purchased at a premium.  Any earnings (and losses) on the foregoing investments shall be for the account of the Borrower.  Each of the Borrower, the Administrative Agent and each Agent acknowledges that upon its written request and at no additional cost, it has the right to receive notification after the completion of each purchase and sale of Permitted Investments or the Account Bank's receipt of a broker's confirmation; provided, however, the Account Bank may make available to the Administrative Agent, the Agents and the Borrower periodic account statements that reflect such investment activity in lieu of notifications; provided, further that no periodic account statements are required to be available for the Collection Account or the Hedge Counterparty Collateral Account if no activity has occurred therein during such period.

55

(e)     Any collateral posted by the Hedge Counterparty shall be retained in the Hedge Counterparty Collateral Account until required to be returned or otherwise permitted to be applied in accordance with the related Hedging Agreement.  The Account Bank shall hold funds in the Hedge Counterparty Collateral Account uninvested.  Any interest or other earnings on the Hedge Collateral may be paid to the Hedge Counterparty by the Account Bank upon written direction from the Borrower, to satisfy some or all of any obligations owed to the Hedge Counterparty in accordance with the related Hedging Agreement.  At any time any obligations are fully paid to the Hedge Counterparty, upon written request of the Borrower, any remaining Hedge Collateral may be applied to the Collection Account for inclusion in the amounts to be distributed pursuant to Section 2.07, and the priority of payments set forth therein.

Section 2.10.  Fees.

(a)     Each Lender shall be entitled to receive, monthly in arrears, the respective portion of the Usage Fees and Unused Fees payable to such Lender from the Collection Account in accordance with Section 2.07.

(b)     The Servicer, the Backup Servicer, Collateral Custodian and the Account Bank shall be entitled to receive their respective accrued and unpaid Servicing Fee, Backup Servicing Fee, Collateral Custodian Fee and Account Bank Fee, each in accordance with Section 2.07.

(c)     The Borrower paid to the Administrative Agent on the Closing Date, in immediately available funds, the Upfront Fee and other amounts due and payable pursuant to the Fee Letter on the Closing Date, including reimbursement to the Administrative Agent for fees and expenses of any Rating Agencies incurred in connection with affirming their ratings of the Commercial Paper Notes of the Conduit Lenders.

(d)     The Borrower shall pay to each of Morgan Lewis & Bockius LLP and Richards, Layton & Finger, P.A. on the Closing Date, its estimated reasonable fees and out-of-pocket expenses in immediately available funds (in each case not to exceed the amount previously agreed upon by the Borrower and the Administrative Agent) and shall pay all additional reasonable fees and out-of-pocket expenses of such counsel within 30 days after receiving an invoice for such amounts.

Section 2.11.  Alternate Rate of Interest.

(a)     Subject to Sections 2.11(b), (c), (d), (e) and (f), if prior to the commencement of any Interest Period for a Loan:

(i)     the Administrative Agent determines (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate or the applicable LIBO Rate, as applicable (including because the applicable LIBO Rate is not available or published on a current basis), for such Interest Period; provided, that no Benchmark Transition Event shall have occurred at such time; or

(ii)     the Administrative Agent is advised by the Required Lenders that the Adjusted LIBO Rate or the applicable LIBO Rate, as applicable, for such Interest Period

56

will not adequately and fairly reflect the cost to such Lenders (or Lender) of making or maintaining their Loans (or its Loan) included in such borrowing of Loan (or Loans) for such Interest Period;

then the Administrative Agent shall give notice thereof to the Borrower and the Lenders by telephone, telecopy or electronic mail as promptly as practicable thereafter and, until the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, the interest rate applicable to the Loans shall be the Alternate Base Rate.

(b)     Notwithstanding anything to the contrary herein or in any other Basic Document, if a Benchmark Transition Event or an Early Opt-in Election, as applicable, and its related Benchmark Replacement Date have occurred prior to the Reference Time in respect of any setting of the then-current Benchmark, then if a Benchmark Replacement is determined in accordance with (i) clause (i) or (ii) of the definition of the term "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Basic Document in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Agreement or any other Basic Document and (ii) clause (iii) of the definition of the term "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Basic Document in respect of any Benchmark setting at or after 5:00 p.m. (New York, New York time) on the fifth Business Day after the date notice of such Benchmark Replacement is provided to the Lenders without any amendment to, or further action or consent of any other party to, this Agreement or any other Basic Document, so long as the Administrative Agent has not received, by such time, written notice of objection to such Benchmark Replacement from the Required Lenders.

(c)     Notwithstanding anything to the contrary herein or in any other Basic Document and subject to the proviso below in this paragraph, if a Term SOFR Transition Event and its related Benchmark Replacement Date have occurred prior to the Reference Time in respect of any setting of the then-current Benchmark, then the applicable Benchmark Replacement will replace the then-current Benchmark for all purposes hereunder or under any Basic Document in respect of such Benchmark setting and subsequent Benchmark settings, without any amendment to, or further action or consent of any other party to, this Agreement or any other Basic Document; provided, that this subsection shall not be effective unless the Administrative Agent has delivered to the Lenders and the Borrower a Term SOFR Notice.

(d)     In connection with the implementation of a Benchmark Replacement, the Administrative Agent will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Basic Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Basic Document.

(e)     The Administrative Agent will promptly notify the Borrower and the Lenders of (i) any occurrence of a Benchmark Transition Event, a Term SOFR Transition Event or an Early

Opt-in Election, as applicable, and its related Benchmark Replacement Date, (ii) the implementation of any Benchmark Replacement, (iii) the effectiveness of any Benchmark Replacement Conforming Changes, (iv) the removal or reinstatement of any tenor of a Benchmark pursuant to Section 2.11(f) and (v) the commencement or conclusion of any Benchmark Unavailability Period.  Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Basic Document, except, in each case, as expressly required pursuant to this Section.

(f)     Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any request for a Loan, conversion to or continuation of any Loan as to which the applicable Interest Rate is the Adjusted LIBO Rate to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for a Loan or conversion to Loans that bear interest at the Alternate Base Rate.  During any Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of Alternate Base Rate based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of Alternate Base Rate.

Section 2.12.  <u>Increased Costs; Capital Adequacy; Illegality; Rating Requests</u>.

(a)     If any Regulatory Requirement (i) subjects any Affected Party to any charge or withholding on or with respect to this Agreement or its obligations under this Agreement, or on or with respect to the Loans and/or the Receivables, or changes the basis of taxation of payments to it of any amounts payable under this Agreement (except for (A) Indemnified Taxes, (B) Excluded Taxes, (C) Connection Income Taxes and (D) changes in the rate of tax on its overall net income (including franchise taxes imposed on net income)), (ii) imposes, modifies or deems applicable any reserve, assessment, fee, tax (other than Taxes), insurance charge, special deposit or similar requirement against assets of, deposits with or for the account of, or liabilities of an Affected Party, or credit extended by it pursuant to this Agreement, or (iii) imposes any other condition, the result of which is to increase the cost to an Affected Party of performing its obligations under this Agreement, or to reduce the rate of return on its capital or assets as a consequence of its obligations under this Agreement, to reduce the amount of any sum received or receivable by it under this Agreement, or to require any payment calculated by reference to the amount of interests or loans held or interest received by it, then, upon demand by the Administrative Agent on behalf of such Affected Party, the Borrower shall pay to the Administrative Agent, for the benefit of such Affected Party, such amounts charged to such Affected Party or such amounts to otherwise compensate it for such increased cost or such reduction within 30 days after demand by such Affected Party.  The Borrower acknowledges that any Affected Party may institute measures in anticipation of a Regulatory Requirement (including the imposition of internal charges on its interests or obligations under this Agreement), and may commence allocating charges to or seeking compensation from the

58

Borrower under this Section in connection with such Early Adoption Increased Costs in advance of the effective date of such Regulatory Requirement, and the Borrower agrees to pay such Early Adoption Increased Costs to the Administrative Agent, for the benefit of such Affected Party, following demand therefor without regard to whether such effective date has occurred; provided, however, that such amounts shall be payable to an Affected Party only if it represents and warrants in writing to the Borrower that it is (i) recognizing internal charges in respect of its interests or obligations under this Agreement in anticipation of a Regulatory Requirement and (ii) applying consistent return metrics in making determinations to charge Early Adoption Increased Costs or similar amounts to its similarly-situated subprime auto finance company customers; further provided, however, that no amount of Early Adoption Increased Costs shall begin to accrue or be payable by the Borrower in respect of an anticipated Regulatory Requirement until 60 days after it receives written notice that such Affected Party intends to make a claim for Early Adoption Increased Costs under this Section in respect of such change. For the avoidance of doubt, the Borrower shall not be required to pay any Early Adoption Increased Costs incurred by any Affected Party prior to the expiration of the 60-day notice period specified in the preceding sentence. The Borrower further acknowledges that any charge or compensation demanded hereunder may take the form of a monthly charge to be assessed by such Affected Party.

(b)     If (i) the introduction of or any change in or in the interpretation of any law, guideline, rule, regulation, directive, order or request (including the Dodd-Frank Act, Basel II, Basel III or the Risk-Based Capital Requirements) or (ii) compliance by any Affected Party with any law, guideline, rule, regulation, order, directive or request from any Governmental Authority (whether or not having the force of law), including compliance by an Affected Party with any law, guideline, rule, regulation, order, directive or request regarding capital adequacy (including the Dodd-Frank Act, Basel II, Basel III or the Risk-Based Capital Requirements) has the result of reducing the rate of return on an Affected Party's capital or assets as a consequence of its obligations under this Agreement, then from time to time, within 30 days after demand by such Affected Party (which demand shall be accompanied by a statement setting forth the basis for such demand), the Borrower shall pay directly to such Affected Party such additional amount or amounts as will compensate it for such reduction. The Borrower acknowledges that any Affected Party may institute measures in anticipation of any event described in this subsection in advance of the effective date of such event, and may commence allocating charges to or seeking compensation from such Borrower under this subsection and the Borrower agrees to pay such charges or compensation to such Affected Party following demand therefor without regard to whether such effective date has occurred.

(c)     In determining any amount provided for in this Section, the Affected Party may use any reasonable averaging and attribution methods. Any Affected Party making a claim under this Section shall submit to the Borrower a certificate as to such additional or increased cost or reduction, which certificate shall be conclusive absent manifest error.

(d)     If in its sole discretion a Lender so desires, the related Agent shall provide a Rating Request to the Borrower and the Servicer. The Borrower and the Servicer shall cooperate with the efforts of such Agent and the related Lender to obtain the Required Rating from the Rating Agency specified in the Rating Request, and shall provide such Rating Agency any information it may reasonably require for purposes of providing and monitoring the Required

59

Rating.  The related Lender shall pay the initial fees payable to the Rating Agency in connection with a Rating Request and the Servicer shall pay any subsequent or ongoing fees for the continued monitoring of the rating.  Nothing in this subsection shall preclude any such Lender from demanding compensation from the Borrower pursuant to Section 2.12(b) at any time and without regard to whether the Required Rating shall have been obtained, or shall require the obtaining of a rating on the facility prior to demanding any such compensation from the Borrower.

Section 2.13.  <u>Taxes</u>.

(a)    <u>Defined Terms</u>.  For purposes of this Section, the term "Applicable Law" includes FATCA.

(b)    <u>Payments Free of Taxes</u>.  Any and all payments by or on account of any obligation of the Borrower under any Basic Document shall be made without deduction or withholding for any Taxes, except as required by Applicable Law.  If any Applicable Law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with Applicable Law and, if such Tax is an Indemnified Tax, then the sum payable by the Borrower shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(c)    <u>Payment of Other Taxes by Borrower</u>.  The Borrower shall timely pay to the relevant Governmental Authority in accordance with Applicable Law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(d)    <u>Indemnification by Borrower</u>.  The Borrower shall indemnify each Recipient, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(e)    <u>Indemnification by the Lenders</u>.  Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that the Borrower has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Borrower to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 13.01(f) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the

60

Administrative Agent in connection with any Basic Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Basic Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this subsection.

(f)     Evidence of Payments.  As soon as practicable after any payment of Taxes by the Borrower to a Governmental Authority pursuant to this Section, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(g)     Status of Lenders.

(i)     Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Basic Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by Applicable Law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in subsections (g)(ii)(A), (ii)(B) and (ii)(D)) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)     Without limiting the generality of the foregoing, in the event that the Borrower is a U.S. Person:

(A)     any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or about the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of

61

copies as shall be requested by the recipient) on or about the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)     in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party with respect to (x) payments of interest under any Basic Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) any other applicable payments under any Basic Document, IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)     executed copies of IRS Form W-8ECI;

(3)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit K-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, or a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E; or

(4)     to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, IRS Form W-8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of Exhibit K-2 or Exhibit K-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided, that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit K-4 on behalf of each such direct and indirect partner;

(C)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or about the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of any other form prescribed by Applicable Law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax,

duly completed, together with such supplementary documentation as may be prescribed by Applicable Law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)    if a payment made to a Lender under any Basic Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by Applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment.  Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(h)    <u>Treatment of Certain Refunds</u>.  If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section (including by the payment of additional amounts pursuant to this Section), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this subsection (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this subsection, in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this subsection the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

63

(i)    Survival.  Each party's obligations under this Section shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Basic Document.

(j)    Tax Refunds.  Within 30 days of the written request of the Borrower therefor, the Administrative Agent and each Lender, as appropriate, shall execute and deliver to the Borrower such certificates, forms or other documents which can be furnished consistent with the facts and which are reasonably necessary to assist the Borrower in applying for refunds of Taxes remitted hereunder; provided, however, that (i) neither the Administrative Agent nor any Lender shall be required to deliver any such certificate, form or other document if in its sole discretion it is determined that the deliverance of such certificate, form or other document would have a material adverse effect on it and (ii) the Borrower shall reimburse the Administrative Agent and each Lender for all expenses incurred in the delivery of any such certificate, form or other document.

Section 2.14.  Sharing of Payments, Etc.  If, other than as expressly provided elsewhere herein, any Lender shall obtain on account of the Loans owed to it any payment in excess of its Invested Percentage in such payment, such Lender shall immediately (i) notify the Administrative Agent of such fact and (ii) purchase from the other Lenders such participations made by them as shall be necessary to cause such purchasing Lender to share the excess payment pro rata (based on the Lender Percentage of each Lender and, if applicable, further allocated from each such Lender to each of its related Conduit Lenders that are not Committed Lenders, pro rata) with each of them; provided, however, that if all or any portion of such excess payment is thereafter recovered from the purchasing Lender, such purchase shall to that extent be rescinded and each other Lender shall repay to the purchasing Lender the purchase price paid therefor, together with an amount equal to such paying Lender's ratable share (according to the proportion of (a) the amount of such paying Lender's required repayment to (b) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered.  The Borrower agrees that any Lender so purchasing a participation from another Lender may, to the fullest extent permitted by Applicable Law, exercise all its rights of payment (including the right of set-off) with respect to such participation as fully as if such Lender was the direct creditor of the Borrower in the amount of such participation.  The Administrative Agent will keep records (which shall be conclusive and binding in the absence of manifest error) of participations purchased under this Section and will in each case notify each Agent following any such purchases or repayments.

Section 2.15.  Securitizations.

(a)    On any Business Day, the Borrower shall have the right to prepay all or a portion of the Loans Outstanding and require the Administrative Agent to release its security interest and Lien on the related Receivables in connection with a Securitization, subject to the following terms and conditions:

(i)    the Borrower shall have given the Administrative Agent, the Account Bank, the Collateral Custodian, the Servicer and the Backup Servicer at least ten Business Days' prior written notice of its intent to effect a Securitization;

(ii)    unless a Securitization is to be effected on a Payment Date (in which case the relevant calculations with respect to such Securitization shall be reflected on the applicable Monthly Report), the Servicer shall deliver to the Administrative Agent and the Collateral Custodian (A) a Securitization Date Certificate (which shall include a calculation of the Borrowing Base after giving effect to such Securitization), together with evidence to the reasonable satisfaction of the Administrative Agent that the Borrower shall have sufficient funds on the related Securitization Date to effect such Securitization in accordance with this Agreement, which funds may come from the proceeds of sales of the Receivables in connection with such Securitization and (B) a computer tape of the Receivables, both before and after giving effect to such Securitization;

(iii)    on the related Securitization Date, the following shall be true and correct and the Borrower shall be deemed to have certified that after giving effect to the Securitization and the release to the Borrower of the related Receivables on the related Securitization Date, (A) no adverse selection procedures shall have been used by the Borrower with respect to the Receivables that will remain subject to this Agreement after giving effect to the Securitization, (B) no Borrowing Base Deficiency exists, (C) no Unmatured Termination Event, Termination Event, Unmatured Servicer Termination Event, Servicer Termination Event or Amortization Event has occurred or results from such Securitization, (D) the Excess Spread Percentage exceeds the Minimum Excess Spread Percentage and (E) the proportion (rounded to the nearest one hundredth of one percent) of the Pool Balance comprised of Receivables as to which the greater of (1) 10% of any Scheduled Payment or (2) $50.00, is unpaid for 31 or more but less than 61 days past its scheduled due date is not more than 1% greater than such proportion immediately prior to such Securitization; and

(iv)    on the related Securitization Date, the Administrative Agent shall have received, for the benefit of the Lenders in immediately available funds, and shall then distribute to the applicable entities, an amount equal to the sum of (A) the portion of the Loans Outstanding to be prepaid (which shall not be an amount less than the amount necessary to cause the Loans Outstanding to be less than or equal to the Borrowing Base after giving effect to the prepayment of the Loans Outstanding on such Securitization Date), (B) an amount equal to all unpaid Interest (including Interest not yet accrued) to the extent reasonably determined by the Administrative Agent to be attributable to that portion of the Loans Outstanding to be paid in connection with the Securitization, (C) an aggregate amount equal to the sum of all other amounts due and owing to the Administrative Agent, the Lenders, the Account Bank and the Backup Servicer, as applicable, under this Agreement and the other Basic Documents, to the extent accrued to such date and to accrue thereafter (including Breakage Costs) and (D) all other Aggregate Unpaids with respect thereto.

(b)    The Borrower hereby agrees to pay the reasonable legal fees and expenses of the Administrative Agent, the Agents, the Lenders, the Backup Servicer, the Collateral Custodian and the Account Bank in connection with any Securitization (including expenses incurred in connection with the release of the Lien of the Administrative Agent, the Lenders and any other party having an interest in the Receivables in connection with such Securitization).

(c)    In connection with any Securitization, on the related Securitization Date, subject to satisfaction of the conditions referred to in this Section, the Administrative Agent shall, at the expense of the Borrower, (i) execute such instruments of release with respect to the portion of the Receivables (and the other related Collateral) to be released to the Borrower, including a Securitization Release, in favor of the Borrower as the Borrower may reasonably request, (ii) deliver any portion of the Receivables (and the other related Collateral) to be released to the Borrower in its possession or control to the Borrower and (iii) otherwise take such actions as are necessary and appropriate to release the Lien of the Administrative Agent on the portion of the Receivables (and the other related Collateral) to be released to the Borrower and deliver to the Borrower such Receivables and related Collateral.

Section 2.16.  The Account Bank.

(a)    The Borrower hereby appoints WTNA as the initial Account Bank and WTNA accepts such appointment.  All payments of amounts due and payable in respect of the Obligations that are to be made from amounts withdrawn from the Collection Account shall be made on behalf of the Borrower by the Account Bank.

(b)    The Account Bank shall be compensated for its activities hereunder by receiving the Account Bank Fee and expenses.  The Borrower shall indemnify the Account Bank and its officers, directors, employees and agents for, and hold them harmless against, any loss, liability or expense incurred (including attorneys' fees and expenses and court costs), other than in connection with the willful misconduct, gross negligence or bad faith on the part of the Account Bank, arising out of or in connection with the performance of its obligations under and in accordance with this Agreement, including in connection with any action, claim or suit brought to enforce the Account Bank's right to indemnification.  All such amounts shall be payable in accordance with Section 2.07.

THE FOREGOING INDEMNIFICATION SHALL APPLY WHETHER OR NOT SUCH LIABILITIES AND COSTS ARE IN ANY WAY OR TO ANY EXTENT OWED, IN WHOLE OR IN PART, UNDER ANY CLAIM OR THEORY OF STRICT LIABILITY, OR ARE CAUSED, IN WHOLE OR IN PART, BY ANY NEGLIGENT ACT OR OMISSION OR ANY KIND BY THE ACCOUNT BANK.

(c)    The Account Bank shall be liable in accordance herewith only to the extent of the obligations specifically undertaken by the Account Bank in such capacity herein.  No implied covenants or obligations shall be read into this Agreement against the Account Bank and, in the absence of bad faith or gross negligence on the part of the Account Bank, the Account Bank may conclusively rely on the truth of the statements and the correctness of the opinions expressed in any certificates or opinions furnished to the Account Bank pursuant to and conforming to the requirements of this Agreement.

(d)    The Account Bank shall not be liable for:

(i)    an error of judgment made in good faith by one of its officers; or

(ii)    any action taken, suffered or omitted to be taken in good faith in accordance with or believed by it to be authorized or within the discretion or rights or

66

powers conferred, by this Agreement or at the direction of a Secured Party relating to the exercise of any power conferred upon the Account Bank under this Agreement or at the direction of the Servicer or Borrower in accordance with this Agreement, in each case unless it shall be proved that the Account Bank shall have been negligent in ascertaining the pertinent facts.

(e)     The Account Bank shall not be charged with actual or constructive knowledge of any event, default, event of default (including an Amortization Event, Termination Event, Unmatured Termination Event, Servicer Termination Event or Unmatured Servicer Termination Event) or information, or be required to act upon any event, default or event of default (including an Amortization Event, Termination Event, Unmatured Termination Event, Servicer Termination Event or Unmatured Servicer Termination Event) or information (including the sending of any notice) unless a Responsible Officer of the Account Bank obtains actual knowledge of such event or information, or a Responsible Officer of the Account Bank receives written notice of such event or information from the Borrower, the Servicer or any Secured Party.  For the avoidance of doubt, in the absence of such actual knowledge or written notice, the Account Bank may conclusively assume that there is no such event, default or event of default (including an Amortization Event, Termination Event, Unmatured Termination Event, Servicer Termination Event or Unmatured Servicer Termination Event) or information and, consequently, is not required to perform a duty (including the sending of a notice) to act upon such event, default, event of default (including an Amortization Event, Termination Event, Unmatured Termination Event, Servicer Termination Event or Unmatured Servicer Termination Event) or information or to determine whether any such event, default or event of default (including an Amortization Event, Termination Event, Unmatured Termination Event, Servicer Termination Event or Unmatured Servicer Termination Event) has occurred.

(f)     Without limiting the generality of this Section, the Account Bank shall have no duty (i) to see to any recording, filing or depositing of this Agreement or any agreement referred to herein or any financing statement or continuation statement evidencing a security interest in the Collateral, or to see to the maintenance of any such recording or filing or depositing or to any recording, refiling or redepositing of any thereof, (ii) to see to any insurance of the Financed Vehicles or Obligors or to effect or maintain any such insurance, (iii) to see to the payment or discharge of any Tax, assessment or other governmental charge or any Lien or encumbrance of any kind owing with respect to, assessed or levied against, any part of the Contracts, (iv) to confirm or verify the contents of any reports or certificates of the Servicer or the Borrower delivered to the Account Bank pursuant to this Agreement believed by the Account Bank to be genuine and to have been signed or presented by the proper party or parties or (v) to inspect the Financed Vehicles at any time or ascertain or inquire as to the performance or observance of any of the representations, warranties or covenants of the Borrower or the Servicer or the Servicer's duties and obligations as Servicer and as custodian of the books, records, files and computer records relating to the Contracts under this Agreement.

(g)     The Account Bank shall not be required to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if there shall be reasonable ground for believing that the repayment of such funds or adequate indemnity against such risk or liability shall not be reasonably assured to it, and none of the provisions contained in this Agreement shall in any

67

event require the Account Bank to perform, or be responsible for the manner of performance of, any of the obligations of the Servicer or any other party under this Agreement.

(h)    The Account Bank may rely and shall be protected in acting or refraining from acting upon any resolution, Officer's Certificate, Monthly Report, certificate of auditors or any other certificate, statement, instrument, opinion, report, notice, request, consent, order, appraisal, bond, approval, direction or other paper or document reasonably believed by it to be genuine and to have been signed or presented by the proper party or parties (including any of the foregoing deliverables in electronic format).

(i)    The Account Bank may consult with counsel of its choice with regard to legal questions arising out of or in connection with this Agreement and the advice or opinion of such counsel shall be full and complete authorization and protection in respect of any action taken, omitted or suffered by the Account Bank in good faith in accordance therewith.

(j)    The Account Bank shall be under no obligation to exercise any of the rights, powers or remedies vested in it by this Agreement (except to comply with its obligations under this Agreement and any other Basic Document to which it is a party) or to institute, conduct or defend any litigation under this Agreement or in relation to this Agreement, at the request, order or direction of the Administrative Agent (acting with the consent or at the direction of the Required Lenders) pursuant to the provisions of this Agreement, unless the Borrower, the Servicer or the Administrative Agent, on behalf of the Secured Parties, shall have offered to the Account Bank reasonable security or indemnity against the costs, expenses and liabilities that may be incurred therein or thereby.

(k)    The Account Bank shall not be bound to make any investigation into the facts of matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond, direction or other paper or document (including any of the foregoing delivered in electronic format), unless requested in writing so to do by the Borrower, the Servicer, any Secured Party or the Administrative Agent; provided, that if the payment within a reasonable time to the Account Bank of the costs, expenses or liabilities likely to be incurred by it in the making of such investigation shall be, in the opinion of the Account Bank, not reasonably assured by the Borrower, the Servicer or any Secured Party, the Account Bank may require indemnity reasonably satisfactory to it against such cost, expense or liability as a condition to so proceeding.  The reasonable expense of every such examination shall be paid by the Borrower or the Servicer or, if paid by the Account Bank, shall be reimbursed by the Borrower or the Servicer upon demand.  The Account Bank shall neither be responsible for, nor chargeable with, knowledge of the terms and conditions of any other agreement, instrument, or document other than this Agreement, whether or not an original or a copy of such agreement has been provided to the Account Bank. The Account Bank shall have no obligation to supervise, verify, monitor or administer the performance of the Servicer, the Borrower, the Administrative Agent or any other Person.

(l)    The Account Bank may execute any of the trusts or powers hereunder or perform any duties under this Agreement either directly or by or through agents or attorneys or a custodian.  The Account Bank shall not be responsible for any misconduct or negligence of any such agent or custodian appointed with due care by it hereunder.

68

(m)     The Account Bank shall have no duties or responsibilities except those that are specifically set forth herein, and no implied covenants or obligations shall be read into this Agreement against the Account Bank.  If the Account Bank shall request instructions from the Administrative Agent or the Servicer with respect to any act, action or failure to act in connection with and as set forth in this Agreement, the Account Bank shall be entitled to refrain from taking such action and continue to refrain from acting unless and until it shall have received written instructions from the Administrative Agent or the Servicer, as applicable, without incurring any liability therefor to the Administrative Agent, the Borrower, the Servicer or any other Person.

(n)     The Account Bank may act in reliance upon any written communication of the Administrative Agent or the Servicer concerning the delivery of Collateral pursuant to this Agreement.  The Account Bank does not assume and shall have no responsibility for, and makes no representation as to, monitoring the value of the Contracts and other Collateral.  The Account Bank shall not be liable for any action or omission to act hereunder, except for its own gross negligence, bad faith or willful misconduct.

THE FOREGOING PROVISIONS SHALL APPLY WHETHER OR NOT SUCH LIABILITIES ARE IN ANY WAY OR TO ANY EXTENT OWED, IN WHOLE OR IN PART, UNDER ANY CLAIM OR THEORY OF STRICT LIABILITY, OR ARE CAUSED, IN WHOLE OR IN PART, BY ANY NEGLIGENT ACT OR OMISSION OF ANY KIND BY THE ACCOUNT BANK.

(o)     If the Account Bank shall at any time receive conflicting instructions from the Administrative Agent and the Servicer or any other party to this Agreement and the conflict between such instructions cannot be resolved by reference to the terms of this Agreement, the Account Bank shall be entitled to rely on the instructions of the Administrative Agent.  In the absence of bad faith, gross negligence or willful misconduct on the part of the Account Bank, the Account Bank may rely and shall be protected in acting or refraining from acting upon any resolution, officer's certificate, Monthly Report, certificate of auditors or any other certificate, statement, instrument, opinion, report, notice request, consent, order, appraisal, bond, approval, direction or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties (including any of the foregoing delivered in electronic format).  The Account Bank may rely upon the validity of documents delivered to it, without investigation as to their authenticity or legal effectiveness, and the Servicer and the other parties to this Agreement will hold the Account Bank harmless from any claims that may arise or be asserted against the Account Bank because of the invalidity of any such documents or their failure to fulfill their intended purpose.  The Account Bank shall not be bound to ascertain or inquire as to the performance or observance of any of the terms of this Agreement or any other agreement on the part of any party, except as may otherwise be specifically set forth herein.  In no event will the Account Bank or any of its officers, directors, employees or agents be liable for any consequential, indirect, punitive or special damages (including lost profits).

(p)     The Account Bank is authorized, in its sole discretion, to disregard any and all notices or instructions given by any other party hereto or by any other individual, firm or corporation, except only such notices or instructions as are herein provided for and orders or process of any court entered or issued with or without jurisdiction.  If any property subject hereto

69

is at any time attached, garnished or levied upon under any court order or in case the payment, assignment, transfer, conveyance or delivery of any such property shall be stayed or enjoined by any court order, or in case any order, judgment or decree shall be made or entered by any court affecting such property or any part hereof, then and in any of such events the Account Bank is authorized, in its sole discretion, to rely upon and comply with any such order, writ, judgment or decree with which it is advised by legal counsel of its own choosing is binding upon it, and if it complies with any such order, writ, judgment or decree it shall not be liable to any other party hereto or to any other individual, firm or corporation by reason of such compliance even though such order, writ, judgment or decree maybe subsequently reversed, modified, annulled, set aside or vacated.

(q)    Any Person into which the Account Bank may be merged or converted or with which it may be consolidated, or any Person resulting from any merger, conversion or consolidation to which the Account Bank shall be a party, or any Person succeeding to the business of the Account Bank, provided that such Person otherwise meets the requirements in the definition of the term "Account Bank", shall be the successor of the Account Bank under this Agreement, without the execution or filing of any paper or any further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding.

(r)    The Account Bank may at any time resign and terminate its obligations under this Agreement; provided, however, that except as provided herein, no such resignation or termination shall be effective until a successor Account Bank is appointed (and accepts such appointment) pursuant to the terms of this Section.  The Borrower may remove the Account Bank with at least 30 days' prior written notice to the Account Bank and the prior written consent of the Administrative Agent.  Promptly after receipt of notice of the Account Bank's intended resignation, or after the Borrower's removal of the Account Bank, the Borrower shall appoint, by written instrument, a successor Account Bank. If the Borrower fails to appoint a successor Account Bank pursuant to the terms hereof within 30 days after receipt of the Account Bank's notice of resignation or after the Borrower's removal of the Account Bank, the Administrative Agent shall have the right to appoint a successor Account Bank that is acceptable to the Required Lenders by written instrument.  If neither the Borrower nor the Administrative Agent has appointed a successor Account Bank within 60 days after receipt of the Account Bank's notice of resignation or after the Borrower's removal of the Account Bank, the Account Bank may petition a court of competent jurisdiction to appoint a successor Account Bank, with the cost of such petition to be borne by the Borrower.

(s)    The Account Bank may conclusively rely on the face value of any document or direction believed by it to be genuine and to have been signed or presented by the proper Person. The Account Bank need not investigate any fact or matter stated in the document or direction including recalculate, evaluate, verify or independently determine the accuracy of any numerical information, report, certificate, information, statement, representation or warranty or any fact or matter stated in any such document or direction and may conclusively rely as to the truth of the statements and the accuracy of the information therein.

(t)    Without limiting the generality of any other provision hereof, the Account Bank shall have no duty to conduct any investigation as to a breach of any representation and warranty, the occurrence of any condition requiring the repurchase of any Receivable by any

70

Person pursuant to this Agreement or the eligibility of any Receivable for purposes of this Agreement.

(u)      Before the Account Bank acts or refrains from taking any action under this Agreement, it may require (i) written direction from the Administrative Agent (acting with the consent or at the direction of the Required Lenders) that the Account Bank act or refrain from acting and (ii) an Officer's Certificate and/or an Opinion of Counsel from the party requesting that the Account Bank act or refrain from acting, in form and substance acceptable to the Account Bank, the costs of which (including the Account Bank's reasonable attorney fees and expenses) shall be paid by the party requesting that the Account Bank act or refrain from acting. The Account Bank shall not be liable for any action it takes or omits to take in good faith in reliance on such Officer's Certificates and/or an Opinion of Counsel.

(v)      The Account Bank shall incur no liability if, by reason of any provision of any future law or regulation thereunder, or by any Force Majeure Event, the Account Bank shall be prevented or forbidden from doing or performing any act or thing which the terms of this Agreement provide shall or may be done or performed.

(w)      Notwithstanding anything to the contrary in this Agreement, the Account Bank shall not be required to take any action that is not in accordance with Applicable Law.

(x)      The right of the Account Bank to perform any permissive or discretionary act enumerated in this Agreement or any related document shall not be construed as a duty.

(y)      The Account Bank will not be responsible or liable for the existence, genuineness, value or protection of any collateral securing the Receivables, for the legality, enforceability, effectiveness or sufficiency of the Basic Documents for the creation, perfection, continuation, priority, sufficiency or protection of any of the Liens, or for any defect or deficiency as to any such matters or for monitoring the status of any Lien or performance of the Collateral.

(z)      The Account Bank shall not be liable for any action or inaction of the Borrower, the Servicer or any other party (or agent thereof) to this Agreement or any related document and may assume compliance by such parties with their obligations under this Agreement or any related agreements, unless a Responsible Officer of the Account Bank has actual knowledge or shall have received written notice to the contrary pursuant to Section 15.02.

(aa)      The Account Bank shall not be imputed with any knowledge of, or information possessed or obtained by, the Collateral Custodian or any Affiliate, line of business or other division of WTNA and vice versa (in each case other than instances where such roles are performed by the same group or division within WTNA or otherwise include common Responsible Officers).

(bb)      The Account Bank shall not be responsible for, and makes no representation or warranty as to, the validity, legality, enforceability, sufficiency or adequacy of this Agreement or any related document, or as to the correctness of any statement contained in any thereof.  The recitals contained herein shall be construed as the statements of the Borrower.  The Account Bank shall not be accountable for money paid to the Borrower pursuant to the provisions hereof,

71

and it shall not be responsible for any statement of the Borrower in this Agreement or in any document issued in connection with this Agreement.

(cc)      Delivery of any reports, information and documents to the Account Bank provided for herein is for informational purposes only and the Account Bank's receipt of such reports and any publicly available information shall not constitute actual or constructive knowledge or notice of any information contained therein or determinable from information contained therein, including the Servicer's or the Borrower's compliance with any of its representations, warranties or covenants hereunder (as to which the Account Bank is entitled to rely exclusively on Officer's Certificates of the Servicer or the Borrower with respect to such compliance thereof), unless a Responsible Officer of the Account Bank actually receives such report, other information or document and such party is expressly required under the terms of this Agreement or another Basic Document to review such information, document or the contents of any such report.  In connection with the delivery of any information to the Account Bank (including the Monthly Report) by the Servicer or any other party to the Basic Documents where the Account Bank is required to use such information in connection with the preparation or distribution of reports or in connection with the payment of funds, the Account Bank is entitled to conclusively rely on the accuracy of all such information and shall not be required to investigate or reconfirm its accuracy and shall not be liable in any manner whatsoever for any errors, inaccuracies or incorrect information resulting from the use of this information.

(dd)      In no event shall the Account Bank, its directors, officers, agents or employees be liable, directly or indirectly, for any special, indirect, punitive or consequential damages (including lost profits).

(ee)      In no event will the Account Bank have any duty, obligation or responsibility to determine or confirm whether the selection of an Benchmark Replacement is necessary or advisable, or to select or to confirm a Benchmark Replacement or Benchmark Replacement Conforming Changes.  The Account Bank shall have no liability for the Administrative Agent, the Borrower or any other Person's selection of an Benchmark Replacement or Benchmark Replacement Conforming Changes.  The Account Bank shall have no obligation to provide notice of any selection of an Benchmark Replacement to any Agent, Lender, any transaction party or any other Person.

Section 2.17.  <u>Collection Account</u>.

(a)      In accordance with this Agreement, the Borrower shall, on or prior to the Closing Date, establish at the Account Bank an account in the name of the Borrower, which shall be designated as the "Collection Account", which shall be maintained with the Account Bank in accordance herewith which shall be subject to the Lien of the Administrative Agent.

(b)      This Agreement shall constitute an "authenticated record" for purposes of, and Borrower hereby grants to and confers upon the Administrative Agent "control" of the Collection Account as contemplated in, Section 8-106 (and similar related provisions) of the UCC.

(c)     Each of Account Bank, Borrower and Administrative Agent hereby agrees that (a) Account Bank is a "securities intermediary" under and within the meaning of Section 8-102(a)(14) of the UCC in relation to the Collection Account; (b) the Collection Account constitutes a "securities account" under and within the meaning of Section 8-501(a) of the UCC and has been established by Account Bank on Account Bank's books; (c) Account Bank is maintaining the Collection Account for the benefit of the Borrower as entitlement holder, subject to the security interest of the Administrative Agent; (d) the Account Bank is acting in the capacity of a securities intermediary with respect to securities, financial assets and other property credited to the Collection Account and the "security entitlements" within the meaning of Section 8-102(a)(17) of the UCC arising therefrom, in each case, as to which the Borrower is the entitlement holder; and (e) each item of property credited to the Collection Account, including each item of "investment property" within the meaning of Section 9-102(a)(49) of the UCC, each "instrument" within the meaning of Section 9-102(a)(47) of the UCC and any cash, and each security entitlement in any of the foregoing, will be treated by the Account Bank and will constitute "financial assets" within the meaning of Section 8-102(a)(9) of the UCC.

(d)     The Account Bank hereby confirms and agrees that:

(i)     the Account Bank shall not change the name or account number of the Collection Account without the prior written consent of the Administrative Agent;

(ii)     all securities or other property underlying any financial assets credited to the Collection Account shall be registered in the name of the Account Bank, indorsed to the Account Bank or indorsed in blank or credited to another securities account maintained in the name of the Account Bank, and in no case will any financial asset credited to the Collection Account be registered in the name of the Borrower or any other Person, payable to the order of the Borrower or specially indorsed to the Borrower or any other Person, except to the extent the foregoing have been specially indorsed to the Administrative Agent, for the benefit of the Secured Parties, or in blank;

(iii)     all property transferred or delivered to the Account Bank pursuant to this Agreement will be promptly credited to the Collection Account;

(iv)     the Collection Account is an account to which financial assets are or may be credited, and the Account Bank shall, subject to the terms of this Agreement, treat each of the Borrower and the Servicer as entitled to exercise the rights that comprise any financial asset credited to such account;

(v)     the Account Bank shall promptly make available copies of all statements, confirmations and other material correspondence concerning the Collection Account and/or any financial assets credited thereto simultaneously to each of the Servicer (on behalf of the Borrower) and the Administrative Agent at the address for each set forth on Schedule E; and

(vi)     notwithstanding the intent of the parties hereto, to the extent that the Collection Account shall be determined to constitute a "deposit account" within the meaning of Section 9-102(a)(29) of the UCC, the Collection Account shall be subject to

73

the exclusive control of the Administrative Agent, for the benefit of the Secured Parties, and the Account Bank will comply with instructions originated by the Administrative Agent directing disposition of the funds in Collection Account without further consent by the Borrower or the Servicer.

(e)     Except as otherwise set forth in Sections 2.17(f) and (g), the Account Bank will comply with Entitlement Orders originated by the Borrower or by the Servicer.  The Borrower shall not directly make any withdrawals from Collection Account.

(f)     If at any time the Account Bank shall receive any Entitlement Order from the Administrative Agent (i.e., an order directing a transfer or redemption of any financial asset in the Collection Account), or any "instruction" (within the meaning of Section 9-104 of the UCC), originated by the Administrative Agent, after receipt by the Account Bank of a Notice of Exclusive Control, the Account Bank shall comply with such Entitlement Order or instruction without further consent by the Borrower, the Servicer or any other Person.

(g)     Upon receipt by the Account Bank of a Notice of Exclusive Control, the Account Bank will take all Entitlement Orders, instructions or other directions it receives from the Administrative Agent, on behalf of the Secured Parties, with respect to the Collection Account and the disposition of funds in the Collection Account, without further consent by the Borrower, the Servicer or any other Person, and shall cease complying with Entitlement Orders, instructions or other directions concerning the Collection Account originated by the Borrower, the Servicer or any other Person.

(h)     In the event that the Account Bank has or subsequently obtains by agreement, by operation of law or otherwise a security interest in the Collection Account or any financial assets, funds, cash or other property credited thereto or any security entitlement with respect thereto, the Account Bank hereby agrees that such security interest shall be subordinate to the security interest of the Administrative Agent, for the benefit of the Secured Parties.  Notwithstanding the preceding sentence, the financial assets, funds, cash or other property credited to the Collection Account will not be subject to deduction, set-off, banker's lien, or any other right in favor of any Person other than the Administrative Agent, for the benefit of the Secured Parties (except that the Account Bank may set-off all amounts due to the Account Bank in respect of customary fees and expenses for the routine maintenance and operation of the Collection Account).

(i)     Regardless of any provision in any other agreement, for purposes of the UCC, New York shall be deemed to be the "bank's jurisdiction" (within the meaning of Section 9-304 of the UCC) and the "security intermediary's jurisdiction" (within the meaning of Section 8-110 of the UCC).

(j)     The "account agreement" (within the meaning of the Hague Securities Convention) establishing the Collection Account is governed solely by the law of the State of New York and that the law of the State of New York shall govern all issues specified in Article 2(1) of the Hague Securities Convention.

ARTICLE THREE

SECURITY

Section 3.01.  Collateral.

(a)      The parties hereto intend that this Agreement constitute a security agreement and the transactions effected hereby constitute secured loans by the Lenders to the Borrower under Applicable Law.  As collateral security for the prompt, complete and indefeasible payment and performance in full when due, whether by lapse of time, acceleration or otherwise, of the Obligations, the Borrower hereby grants to the Administrative Agent, as agent for the Secured Parties, a Lien on and security interest in all of the Borrower's right, title and interest in, to and under the following, whether now existing or owned or hereafter arising or acquired by the Borrower (collectively, the "Collateral"):

(i)      the Receivables, all security interests or Liens purporting to secure payment of the foregoing and the related Contracts, and any accounts or obligations evidenced thereby, any guarantee thereof, all Collections and all monies due (including any payments made under any guarantee or similar credit enhancement with respect to any such Receivables) or to become due or received by any Person in payment of any of the foregoing on or after the related Cutoff Date;

(ii)      the Financed Vehicles (including Financed Vehicles that have been repossessed) or in any document or writing evidencing any security interest in any Financed Vehicle and each security interest in each Financed Vehicle, whether now existing or hereafter acquired, securing each such Receivable, including all proceeds from any sale or other disposition of such Financed Vehicles;

(iii)      the Account Collateral;

(iv)      subject to the Master Collection Account Agreement, the Borrower's rights to the Master Collection Account;

(v)      all Hedge Collateral;

(vi)      the Contract Files, the Receivables File, the Schedule of Receivables and all documents, agreements and instruments included in the Contract Files and the Receivables Files, including rights of recourse of the Borrower against Tricolor and/or any Originator;

(vii)      all Records, documents and writings evidencing or related to the Receivables or the Contracts;

(viii)      all rights to payment under all Insurance Policies with respect to a Financed Vehicle, including any monies collected from whatever source in connection with any default of an Obligor with respect to a Financed Vehicle and any proceeds from claims or refunds of premiums on any Insurance Policy, whether now existing or hereafter acquired, and all proceeds thereof;

75

(ix)    all guaranties, indemnities, warranties, insurance (and proceeds and premium refunds thereof) and other agreements or arrangements of whatever character from time to time supporting or securing payment of the Receivables, whether pursuant to the related Contracts or otherwise;

(x)    all rights to payment under all service contracts and other contracts and agreements associated with the Receivables and all of the Borrower's interest in all recourse rights against the related Originators;

(xi)    all security interests, Liens, guaranties and other encumbrances in favor of or assigned or transferred to the Borrower in and to the Receivables, whether now existing or hereafter acquired, the related Contracts, whether now existing or hereafter acquired and the Financed Vehicles, whether now existing or hereafter acquired;

(xii)    all deposit accounts, monies, deposits, funds, accounts and instruments relating to the foregoing (subject to the Master Collection Account Agreement);

(xiii)    the Purchase Agreement (including each Transfer Agreement) and all other Borrower Basic Documents and remedies thereunder and the assignment to the Administrative Agent of all UCC financing statements filed by the Borrower against Tricolor under or in connection with the Purchase Agreement; and

(xiv)    all accounts, general intangibles, chattel paper, instruments, documents, money, deposit accounts, certificates of deposit, goods (together with all embedded software, accessions, additions, attachments, improvements, substitutions and replacements thereto and therefor), investment property, letters of credit, letter-of-credit rights, commercial tort claims, uncertificated securities, securities accounts, security entitlements and supporting obligations; and

(xv)    all income and proceeds of the foregoing.

(b)    The grant under this Section does not constitute and is not intended to result in a creation or an assumption by any Secured Party or Agent of any obligation of the Borrower or any other Person in connection with any or all of the Collateral or under any agreement or instrument relating thereto.  Anything herein to the contrary notwithstanding, (i) the Borrower shall remain liable under the Contracts to the extent set forth therein to perform all of its duties and obligations thereunder to the same extent as if this Agreement had not been executed, (ii) the exercise by the Administrative Agent of any of its rights in the Collateral shall not release the Borrower from any of its duties or obligations under the Collateral and (iii) no Secured Party or Agent shall have any obligations or liability under the Collateral by reason of this Agreement, nor shall any Secured Party or Agent be obligated to perform any of the obligations or duties of the Borrower thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

(c)    Each of the Borrower and the Servicer represents and warrants as to itself that each remittance of Collections by it to the Administrative Agent (on behalf of the Secured Parties) under this Agreement will have been (i) in payment of a debt incurred by the Borrower in the ordinary course of business or financial affairs of the Borrower and the Administrative

76

Agent (on behalf of the Secured Parties) and (ii) made in the ordinary course of business or financial affairs of the Borrower and the Administrative Agent (on behalf of the Secured Parties).

(d)     Notwithstanding the foregoing grant of security interest, no account, instrument, chattel paper or other obligation or property of any kind due from, owned by or belonging to a Sanctioned Person shall be Collateral.

Section 3.02.  Release of Collateral; No Legal Title.

(a)     At the same time as any Contract (i) expires by its terms and all amounts in respect thereof have been paid by the related Obligor(s) and deposited in the Collection Account or (ii) has been prepaid in full and all amounts in respect thereof have been paid by the related Obligor(s) and deposited in the Collection Account, the Administrative Agent will promptly release its interest in the related Receivable and all related Collateral.  In connection with any sale of a Financed Vehicle, after the deposit by the Servicer of the proceeds of such sale into the Collection Account, the Administrative Agent will, automatically and without further action, be deemed to have released its interest and lien on such Financed Vehicle; provided, that the Administrative Agent will make no representation or warranty, express or implied, with respect to any such Receivable and all related Collateral (including any Financed Vehicle) in connection with such sale or transfer and assignment.  Nothing in this Section shall diminish the Servicer's obligations pursuant to Section 7.03(c) with respect to the proceeds of any such sale.

(b)     Upon (i) repurchase of Receivables and related Collateral in connection with a Securitization or optional prepayment of the Loans Outstanding or (ii) the Facility Termination Date, the Administrative Agent, at the Borrower's expense, upon payment in full of the related Aggregate Unpaids, shall execute and file such partial or full releases or partial or full assignments of financing statements and other documents and instruments, and cause or permit the Servicer to take such actions, as may be reasonably requested by the Borrower to effectuate the release of the relevant portion of the Collateral.

(c)     The Administrative Agent will not, except as may result from the exercise of its remedies hereunder, have legal title to any part of the Collateral on the Facility Termination Date and will have no further interest in or rights with respect to the Collateral.

Section 3.03.  Protection of Security Interest; Administrative Agent, as Attorney-in-Fact.

(a)     The Borrower agrees that from time to time, at its expense, it will promptly execute and deliver all instruments and documents, and take all actions, that may reasonably be necessary or desirable, or that the Administrative Agent may reasonably deem necessary, to perfect, protect or more fully evidence the security interest granted to the Administrative Agent, (on behalf of the Secured Parties) in the Receivables and the other Collateral, or to enable the Secured Parties to exercise and enforce their rights and remedies hereunder and thereunder.

(b)     If the Borrower fails to perform any of its obligations under this Section after five Business Days' notice from any Secured Party or Agent, such Secured Party or Agent may (but shall not be required to) perform, or cause performance of, such obligation; and the reasonable costs and expenses of such party incurred in connection therewith shall be payable by the Borrower as provided in Article Eleven.  The Borrower irrevocably authorizes the

77

Administrative Agent and appoints the Administrative Agent, as its attorney-in-fact to act on its behalf, (i) to execute or cause to be executed on its behalf as debtor and to file financing statements necessary or desirable in the Administrative Agent's sole discretion to perfect and to maintain the perfection and priority of the interest of the Secured Parties in the Receivables and the other Collateral, including financing statements that describe the collateral covered thereby as "all assets of the Borrower whether now owned or existing or hereafter acquired or arising and wheresoever located", and (ii) to file a carbon, photographic or other reproduction of this Agreement or any financing statement with respect to the Receivables and the other Collateral, as a financing statement in such offices as the Administrative Agent in its sole discretion deems necessary or desirable to perfect and to maintain the perfection and priority of the interests of the Secured Parties in the Receivables and the other Collateral.  This appointment is coupled with an interest and is irrevocable.

(c)     The Borrower shall indicate clearly on its applicable books and records that each Receivable constitutes collateral security for the payment of the Obligations to the Secured Parties hereunder.  If at any time the Borrower shall propose to sell, grant a security interest in, or otherwise transfer any interest in any motor vehicle receivables or amounts received on or in respect of such receivables to, any prospective purchaser, lender or other transferee, the Borrower shall give to such prospective purchaser, lender or other transferee computer tapes, records or printouts that, if they shall refer in any manner whatsoever to any of the Collateral, shall indicate clearly that such Collateral has been sold and is owned by the Borrower.

Section 3.04.  <u>Assignment of the Purchase Agreement</u>.  The Borrower hereby represents, warrants and confirms to the Administrative Agent that the Borrower has assigned to the Administrative Agent, for the ratable benefit of the Secured Parties hereunder, all of the Borrower's right and title to and interest in the Purchase Agreement.  The Borrower confirms that the Administrative Agent shall have the sole right to enforce the Borrower's rights and remedies under the Purchase Agreement for the benefit of the Secured Parties, but without any obligation on the part of the Secured Parties or any of their respective Affiliates to perform any of the obligations of the Borrower under the Purchase Agreement.  The Borrower further confirms and agrees that such assignment to the Administrative Agent (on behalf of the Secured Parties) shall terminate upon the Facility Termination Date; provided, however, that the rights of the Secured Parties pursuant to such assignment with respect to rights and remedies in connection with any indemnities and any breach of any representation, warranty or covenants made by Tricolor, pursuant to the Purchase Agreement, which rights and remedies survive the termination of the Purchase Agreement, shall be continuing and shall survive any termination of such assignment.

Section 3.05.  <u>Waiver of Certain Laws</u>.  Each of the Borrower, the Servicer and the Backup Servicer, if any, agrees, to the full extent that it may lawfully so agree, that neither it nor anyone claiming through or under it will set up, claim or seek to take advantage of any appraisement, valuation, stay, extension or redemption law now or hereafter in force in any locality where any part of the Collateral may be situated in order to prevent, hinder or delay the enforcement or foreclosure of this Agreement, or the absolute sale of any of the Collateral or any part thereof, or the final and absolute putting into possession thereof, immediately after such sale, of the purchasers thereof, and each such party for itself and all who may at any time claim through or under it, hereby waives, to the full extent that it may be lawful so to do, the benefit of

78

all such laws, and any and all right to have any of the properties or assets constituting the Collateral marshaled upon any such sale, and agrees that the Administrative Agent or any court having jurisdiction to foreclosure the security interests granted in this Agreement may sell the Collateral as an entirety or in such parcels as the Administrative Agent or such court may determine.

Section 3.06.  Matters Relating to Electronic Chattel Paper.

(a)      The Servicer hereby agrees that without the consent of the Administrative Agent (acting with the consent of the Lenders), it shall not, except in connection with a transfer of a Receivable permitted under the terms of this Agreement (i) "communicate" (as such term is used in Section 9-105 of the UCC) the Authoritative Copy of any Receivable constituting Electronic Chattel Paper to any other Person other than, if at all, the Borrower or (ii) allow the Authoritative Copy of any Receivable constituting Electronic Chattel Paper to contain any marks or notations indicating that it has been pledged, assigned or otherwise conveyed to any Person other than, if at all, the Borrower or the Administrative Agent (on behalf of the Secured Parties).

(b)      On the ECP Control Date, the Borrower shall deliver to the Administrative Agent and the Lenders an Opinion of Counsel in form and substance satisfactory to the Administrative Agent and the Required Lenders that Tricolor obtains "control" (within the meaning of Section 9-105 of the UCC) of the Contracts included in the Collateral that constitute Electronic Chattel Paper.

Section 3.07.  Master Collection Account.  As collateral security for the prompt, complete and indefeasible payment and performance in full when due, whether by lapse of time, acceleration or otherwise, of the Obligations, Tricolor hereby grants to the Administrative Agent, as agent for the Secured Parties, a Lien on and security interest in all of its right, title and interest in, to the Master Collection Account.

261320820v.10 94601/30060

ARTICLE FOUR

CONDITIONS OF CLOSING AND LOANS

Section 4.01.  Conditions to Closing.  The Closing Date shall not occur, nor shall any Lender, the Administrative Agent, the Account Bank or the Backup Servicer be obligated to take, fulfill or perform any other action hereunder, until, all of the following conditions have been satisfied, in the sole discretion of the Administrative Agent:

(a)       Each Basic Document shall have been duly executed by, and delivered to, the parties hereto and thereto and the Administrative Agent shall have received such other documents, instruments, agreements and legal opinions as the Administrative Agent shall request in connection with the transactions contemplated by this Agreement, each in form and substance satisfactory to the Administrative Agent.

(b)       The Administrative Agent shall have received (i) satisfactory evidence that each of the Borrower, Tricolor, Tricolor Holdings and the Backup Servicer have obtained all required consents and approvals of all Persons, including all requisite Governmental Authorities, to the execution, delivery and performance of this Agreement and the other Basic Documents to which each is a party and the consummation of the transactions contemplated hereby or thereby or (ii) an Officer's Certificate from each of the Borrower, the Servicer, Tricolor and the Backup Servicer in form and substance satisfactory to the Administrative Agent affirming that no such consents or approvals are required.

(c)       The Borrower, Tricolor, Tricolor Holdings and the Backup Servicer shall each be in compliance in all material respects with all Applicable Laws and shall have delivered an Officer's Certificate to the Administrative Agent as to this and other closing matters.

(d)       The Borrower shall have paid all fees, costs and expenses required to be paid by it hereunder on the Closing Date, including all fees required to be paid to the Lenders under the Fee Letter.

(e)       No Amortization Event, Termination Event or Unmatured Termination Event shall have occurred and be continuing.

(f)       No Servicer Termination Event or Unmatured Servicer Termination Event shall have occurred and be continuing.

(g)       The Administrative Agent shall have received, to the extent the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, at least five days prior to the Closing Date, a Beneficial Ownership Certification in relation to the Borrower.

(h)       The Administrative Agent shall have received an audit report in form and substance satisfactory to the Administrative Agent.

Section 4.02.  <u>Conditions Precedent to All Loans</u>.  Each request for a Loan by the Borrower to a Lender shall be subject to the conditions set forth in Section 4.01 and the further conditions precedent that:

(a)     With respect to any Loan (including the Initial Loan), the Servicer shall have delivered to the Administrative Agent, in each case in form and substance satisfactory to the Administrative Agent, (i) on or prior to the Business Day prior to the proposed Funding Date (or, if the Initial Loan, is on the Closing Date, on or prior to the Closing Date), a Funding Request and a Receivable Receipt for the related Receivables and (ii) on such Funding Date, a Transfer Agreement, which will contain such additional information as may be reasonably requested by the Administrative Agent.

(b)     On the related Funding Date, the following shall be true and correct and the Borrower shall be deemed to have certified that, after giving effect to the proposed Loan and pledge of the related Receivables:

(i)     all requirements, conditions and limitations imposed in Section 2.01 in connection with the Borrower's request for, and the Lenders' funding of, a Loan shall have been satisfied and complied with as of such day;

(ii)     the representations and warranties contained in Sections 5.01 and 5.02 are true and correct on and as of such day as though made on and as of such day and shall be deemed to have been made on such day;

(iii)     no event has occurred and is continuing, or would result from such transaction that constitutes (A) a Termination Event or Unmatured Termination Event, (B) a Servicer Termination Event or Unmatured Servicer Termination Event or (C) an Amortization Event;

(iv)     no Borrowing Base Deficiency exists;

(v)     the Borrower and the Servicer each has performed all of the agreements contained in this Agreement and the other Basic Documents to be performed by it at or prior to the related Funding Date; and

(vi)     no law or regulation shall prohibit, and no order, judgment or decree of any federal, State or local Governmental Authority shall prohibit or enjoin, the making of such Loan by the Lenders in accordance with the provisions hereof; and

(vii)     after giving effect to the Loan being made on the related Funding Date, the Excess Spread Percentage is equal to or greater than the Minimum Excess Spread Percentage.

(c)     The Borrower shall have delivered to the Servicer the Receivable Files for the related Receivables.

(d)       No adverse selection procedures were used by the Borrower or Tricolor with respect to the Receivables being funded by the related Loan.

(e)       On the related Funding Date, the Borrower shall be in compliance with Section 6.03 and with all requirements of any Hedging Agreement required thereby.

(f)       On the related Funding Date, the Administrative Agent and the Agents shall have received such other approvals, opinions, information or documents as they may reasonably require.

ARTICLE FIVE

REPRESENTATIONS AND WARRANTIES

Section 5.01.  Representations and Warranties of the Borrower.  The Borrower represents and warrants, as of the Closing Date and each Funding Date, as follows:

(a)     Organization and Good Standing.  The Borrower has been duly organized, and is validly existing as a Delaware limited liability company, in good standing under the laws of the State of Delaware, with all requisite power and authority to own or lease its properties and conduct its business as such business is presently conducted, and the Borrower had at all relevant times, and now has all necessary power, authority and legal right to acquire, own, sell and pledge the Receivables and other Collateral.

(b)     Due Qualification.  The Borrower is duly qualified to do business and is in good standing as a Delaware limited liability company, and has obtained all necessary licenses and approvals in all jurisdictions in which the ownership or lease of property or the conduct of its business (including, as applicable, the purchase, sale and pledge of the Receivables) requires such qualifications, licenses or approvals, except those jurisdictions in which failure to be so qualified would not have a Material Adverse Effect.

(c)     Power and Authority; Due Authorization.  The Borrower (i) has all necessary power, authority and legal right to (A) execute and deliver the Borrower Basic Documents, (B) carry out the terms of the Borrower Basic Documents and (C) grant the security interest in the Collateral on the terms and conditions herein provided and (ii) has duly authorized by all necessary trust action the execution, delivery and performance of the Borrower Basic Documents and the grant of the security interest in the Collateral on the terms and conditions herein and therein provided.

(d)     Binding Obligation.  Each Borrower Basic Document constitutes a legal, valid and binding obligation of the Borrower, enforceable against the Borrower in accordance with its respective terms, except as such enforceability may be limited by Insolvency Laws and except as such enforceability may be limited by general principles of equity (whether considered in suit at law or in equity).

(e)     No Violation.  The execution and delivery of the Borrower Basic Documents, the consummation of the transactions contemplated by the Borrower Basic Documents and the fulfillment of the terms hereof and thereof will not (i) conflict with, result in any breach of any of the terms and provisions of, or constitute (with or without notice or lapse of time or both) a default under, the Formation Documents or a default in any material respect under any Contractual Obligation of the Borrower, (ii) result in the creation or imposition of any Lien upon any of the Borrower's properties pursuant to the terms of any such Contractual Obligation (other than this Agreement) or (iii) violate any Applicable Law, the violation of which could reasonably be expected to have a Material Adverse Effect.

83

(f)     No Proceedings.  There is no litigation, proceeding or investigation pending or, to the best knowledge of the Borrower, threatened against the Borrower, before any Governmental Authority (i) asserting the invalidity of any Borrower Basic Document, (ii) seeking to prevent the consummation of any of the transactions contemplated by any Borrower Basic Document or (iii) seeking any determination or ruling that could reasonably be expected to have a Material Adverse Effect.

(g)     All Consents Required.  All approvals, authorizations, consents, orders, licenses or other actions of any Person or of any Governmental Authority required for the due execution, delivery and performance by the Borrower of the Borrower Basic Documents have been obtained.

(h)     Bulk Sales.  The execution, delivery and performance of this Agreement do not require compliance with any "bulk sales" act or similar law by the Borrower.

(i)     Solvency.  The transactions contemplated by the Borrower Basic Documents do not and will not render the Borrower not Solvent.

(j)     Selection Procedures.  No procedures believed by the Borrower to be materially adverse to the interests of the Lenders were utilized by the Borrower or Tricolor in identifying and/or selecting Receivables to be funded by the related Loans.  In addition, each Receivable was underwritten in accordance with and satisfied the requirements of the Credit and Collection Policy in effect at the time of the origination of such Receivable.

(k)     Taxes.  The Borrower has filed or caused to be filed all tax returns that are required to be filed by it.  The Borrower has paid or made adequate provisions for the payment of all Taxes and all assessments made against it or any of its property (other than any amount of Tax the validity of which is currently being contested in good faith by appropriate proceedings and with respect to which reserves in accordance with GAAP have been provided on the books of the Borrower), and no Tax lien has been filed and, to the Borrower's knowledge, no claim is being asserted, with respect to any such Tax, fee or other charge.

(l)     Exchange Act Compliance; Regulations T, U and X.  None of the transactions contemplated herein (including the use of the proceeds from the Loans and the pledge of the Collateral) will violate or result in a violation of Section 7 of the Exchange Act, or any regulations issued pursuant thereto, including Regulations U and T of the Federal Reserve Board and Regulation X of the CFPB.  The Borrower does not own or intend to carry or purchase, and no proceeds from the Loans will be used to carry or purchase, any "Margin Stock" within the meaning of Regulation U or to extend "Purchase Credit" within the meaning of Regulation U.

(m)     Quality of Title.  Each Receivable, together with the Contract related thereto, shall, at all times, be owned by the Borrower free and clear of any Lien except for Permitted Liens, and upon the Initial Loan or the related Subsequent Loan, as the case may be, the Administrative Agent, as agent for the Secured Parties, shall acquire a valid

and perfected first priority security interest in each Receivable and the related Collateral then existing or thereafter arising, free and clear of any Lien, other than Permitted Liens. No effective financing statement or other instrument similar in effect covering any portion of the Collateral shall at any time be on file in any recording office except such as may be filed in favor of (i) the Borrower in accordance with the Purchase Agreement or (ii) the Administrative Agent in accordance with this Agreement.

(n)     Security Interest.  This Agreement constitutes a grant of a security interest in all Collateral to the Administrative Agent which upon the filing of financing statements in the applicable jurisdictions and, in the case of Subsequent Receivables in connection with the applicable Subsequent Loan, upon acquisition thereof, shall be a first priority perfected security interest in each such Receivable and in the Borrower's rights in the other Collateral, subject only to Permitted Liens.  Upon the filing of UCC-1 financing statements naming the Administrative Agent, as secured party and the Borrower as debtor, the Administrative Agent, as agent for the Secured Parties, shall have a first priority (except for any Permitted Liens) perfected security interest in the Receivables and in the Borrower's rights in the other Collateral.  All filings (including such UCC filings) as are necessary in any jurisdiction to perfect the interest of the Administrative Agent, as agent for the Secured Parties, in the Receivables and in the Borrower's rights in the other Collateral have been (or prior to the applicable Loan will be) made.  The representations and warranties contained in Schedule F are true and correct in all material respects.

(o)     Reports Accurate.  All Monthly Reports (if prepared by the Borrower, or to the extent that information contained therein is supplied by the Borrower, such portion supplied by the Borrower), information, exhibits, financial statements, documents, books, records or reports furnished to or to be furnished by the Borrower to any Secured Party, any Agent, the Backup Servicer, the Collateral Custodian and the Account Bank in connection with this Agreement are true, complete and correct in all material respects.

(p)     Location of Offices.  The principal place of business and chief executive office of the Borrower and the office where the Borrower keeps the Records are located at the address of the Borrower referred to on the signature pages hereof (or at such other locations as to which the notice and other requirements specified in Section 6.02(f) shall have been satisfied).

(q)     Master Collection Account; Collection Account.  The Master Collection Account is the only address to which Obligors under the Receivables have been directed to make payment by check in respect of such Receivables.  The Master Collection Account is the only account to which Obligors under the Receivables remit Collections by wire transfer or electronic funds transfer in respect of such Receivables.  All Collections in the Master Collection Account are remitted to the Collection Account within two Business Days of receipt and identification.  The Master Collection Account and the Collection Account or any interest therein has not been pledged or assigned to any party other than as provided herein or in the Master Collection Account Agreement or the Intercreditor Agreement.

85

(r)     Trade Names and Place of Business.  The Borrower has no trade names, fictitious names, assumed names or "doing business as" names or other names under which it has done or is doing business and its principal place of business and chief executive office are located at its address set forth on the signature pages hereto and has been so for the last four months.

(s)     Purchase Agreement.  The Purchase Agreement is the only agreement pursuant to which the Borrower purchases Receivables.

(t)     Value Given.  The Borrower shall have given reasonably equivalent value to Tricolor in consideration for the transfer to the Borrower of the Receivables and the related Collateral under the Purchase Agreement, no such transfer shall have been made for or on account of an antecedent debt owed by Tricolor to the Borrower and no such transfer is or may be voidable or subject to avoidance under any section of the Bankruptcy Code.

(u)     Accounting.  The Borrower accounts for the transfers to it from Tricolor of Receivables and related Collateral under the Purchase Agreement as sales of such Receivables and related Collateral in its books, records and financial statements, in each case consistent with GAAP and with the requirements set forth herein, other than for U.S. federal income tax and consolidated accounting purposes.

(v)     Special Purpose Entity.  The Borrower is in compliance with Section 6.02(n).

(w)     ERISA.  Such Borrower is not a party to any Benefit Plan or Multiemployer Plan.  Each ERISA Affiliate of such Borrower is in compliance with ERISA in all material respects.  No Plan Event has occurred or is expected to occur that might result, directly or indirectly, in any lien being imposed on the property of such Borrower.

(x)     Investment Company Act; Volcker Rule.  The Borrower is not required to register as an "investment company" under the Investment Company Act.  The Borrower will rely on an exclusion or exemption from the definition of "investment company" under the Investment Company Act contained in Section 3(c)(5) of the Investment Company Act, although there may be additional exclusions or exemptions available to the Borrower.  The Borrower is not a "covered fund" for purposes of the Volcker Rule.

(y)     Equity Interests.  Tricolor owns directly all of the issued and outstanding Equity Interests of the Borrower.

(z)     Material Adverse Effect.  Since the date of the most recent audited financial statements of Tricolor Holdings, no Material Adverse Effect has occurred.

(aa)     Accuracy of Representations and Warranties.  Each representation or warranty by the Borrower contained herein, in any other Basic Document or in any certificate or other document furnished by the Borrower pursuant hereto or thereto or in connection herewith or therewith is true and correct in all material respects.

86

(bb)     Representations and Warranties in the Purchase Agreement.  The representations and warranties made by Tricolor to the Borrower in Section 3.02 of the Purchase Agreement are hereby remade by the Borrower on each date to which they speak in the Purchase Agreement, as if such representations and warranties were set forth herein.  For purposes of this Section, such representations and warranties are incorporated herein by reference as if made by the Borrower to the Administrative Agent and to each of the Secured Parties under the terms hereof mutatis mutandis.

(cc)     Anti-Corruption Laws, Anti-Terrorism Laws and Sanctions.  The Borrower has implemented and maintains in effect policies and procedures designed to ensure compliance by the Borrower, its directors, officers, employees and agents with Anti-Corruption Laws, Anti-Terrorism Laws and applicable Sanctions, and the Borrower, its directors, officers and employees and to the knowledge of the Borrower, its agents, are in compliance with Anti-Corruption Laws, Anti-Terrorism Laws and applicable Sanctions in all material respects.  The Borrower or any of its directors, officers or employees, or, to the knowledge of the Borrower, any agent of the Borrower that will act in any capacity in connection with or benefit from this Agreement or the Loans, is a Sanctioned Person.  No Loans, use of proceeds or other transaction contemplated by this Agreement will violate Anti-Corruption Laws, Anti-Terrorism Laws or applicable Sanctions.

(dd)     Tax Status.  The Borrower has not elected and will not elect to be treated as a corporation, or has not otherwise become and will not otherwise become treated as a corporation, for U.S. federal income tax purposes.

(ee)     Beneficial Ownership Certification.  As of the Closing Date, the information included in the Beneficial Ownership Certification is true and correct in all material respects.

Section 5.02.  Representations and Warranties of the Borrower as to the Receivables. The Borrower hereby represents and warrants, as of the Closing Date and each Funding Date, as follows:

(a)     As of the Closing Date, (i) Schedule C and the information contained in the Funding Request delivered pursuant to Section 2.01 is an accurate and complete listing in all material respects of the Receivables constituting a portion of the Collateral as of such date and the information contained therein with respect to the identity of such Receivables and the amounts owing thereunder is true and correct in all material respects as of the related Cutoff Date, (ii) each such Receivable is an Eligible Receivable, (iii) each such Receivable and the related Financed Vehicle is free and clear of any Lien of any Person (other than Permitted Liens) and in compliance with all Applicable Laws and (iv) with respect to each such Receivable, all consents, licenses, approvals or authorizations of or registrations or declarations with any Governmental Authority required to be obtained, effected or given by the Borrower in connection with the origination, purchase and pledge of such Receivable and the related Collateral to the Administrative Agent have been duly obtained, effected or given and are in full force and effect.

87

(b)      On each Funding Date, other than the Funding Date on which the Initial Loan is made, (i) Schedule C and the information contained in the Funding Request delivered pursuant to Section 2.01 is an accurate and complete listing in all material respects of the Receivables (including the Subsequent Receivables being transferred on such Funding Date) constituting a portion of the Collateral as of the date of the Subsequent Loan and the information contained therein with respect to the identity of such Receivables and the amounts owing thereunder is true and correct in all material respects as of the related Cutoff Date, (ii) each such Subsequent Receivable referenced on the related Funding Request is an Eligible Receivable, (iii) each such Subsequent Receivable and the related Financed Vehicle is free and clear of Liens (other than Permitted Liens) and in compliance in all material respects with all Applicable Laws and (iv) with respect to each such Subsequent Receivable, all material consents, licenses, approvals, authorizations, registrations or declarations with any Governmental Authority required to be obtained, effected or given by the Borrower in connection with the origination, purchase and pledge of such Subsequent Receivable and the related Collateral have been duly obtained, effected or given and are in full force and effect.

Section 5.03.  <u>Representations and Warranties of the Initial Servicer</u>.  The initial Servicer represents and warrants, as of the Closing Date and each Funding Date, as follows:

(a)      <u>Organization and Good Standing</u>.  The Servicer has been duly organized and is validly existing as a limited liability company in good standing under the laws of the State of Delaware, with all requisite power and authority to own or lease its properties and to conduct its business as such business is presently conducted and to enter into and perform its obligations pursuant to this Agreement.

(b)      <u>Due Qualification</u>.  The Servicer is duly qualified to do business and is in good standing as a limited liability company, and has obtained all necessary licenses and approvals in all jurisdictions in which the ownership or lease of its property and or the conduct of its business, including the origination and servicing of the Receivables requires such qualification, licenses or approvals.

(c)      <u>Power and Authority; Due Authorization</u>.  The Servicer (i) has all necessary limited liability company power, authority and legal right to (A) execute and deliver the Servicer Basic Documents and (B) carry out the terms of the Servicer Basic Documents and (ii) has duly authorized by all necessary limited liability company action the execution, delivery and performance of the Servicer Basic Documents.

(d)      <u>Binding Obligation</u>.  Each Servicer Basic Document constitutes a legal, valid and binding obligation of the Servicer enforceable against the Servicer in accordance with its respective terms, except as enforceability may be limited by Insolvency Laws and except as such enforceability may be limited by general principles of equity (whether considered in suit at law or in equity).

(e)      <u>No Violation</u>.  The execution and delivery of the Servicer Basic Documents, the consummation of the transactions contemplated by the Servicer Basic Documents and the fulfillment of the terms hereof and thereof will not (i) conflict with,

88

result in any breach of any of the terms and provisions of, or constitute (with or without notice or lapse of time or both) a default under, the Servicer's limited liability company agreement or certificate of formation or, in any material respect, any Contractual Obligation of the Servicer, (ii) result in the creation or imposition of any Lien upon any of the Servicer's properties pursuant to the terms of any such Formation Documents or Contractual Obligation, which, other than Liens relating to the Collateral and Liens created pursuant to the Purchase Agreement or this Agreement, could reasonably be expected to have a Material Adverse Effect or (iii) violate any Applicable Law, the violation of which could reasonably be expected to have a Material Adverse Effect.

(f)     No Proceedings.  There is no litigation, proceeding or investigation pending or, to the best knowledge of the Servicer, threatened against the Servicer, before any Governmental Authority (i) asserting the invalidity of any Servicer Basic Document, (ii) seeking to prevent the consummation of any of the transactions contemplated by any Servicer Basic Document, (iii) challenging the enforceability of a material portion of the Receivables or (iv) seeking any determination or ruling that could reasonably be expected to have a Material Adverse Effect.

(g)     All Consents Required.  All approvals, authorizations, consents, orders or other actions of any Person or of any Governmental Authority (if any) required for the due execution, delivery and performance by the Servicer of the Servicer Basic Documents have been obtained.

(h)     Reports Accurate.  All Monthly Reports, information, exhibits, financial statements, documents, books, records or reports furnished or to be furnished by the Servicer to any Secured Party, any Agent, the Backup Servicer, the Collateral Custodian and the Account Bank in connection with this Agreement are accurate, true and correct in all material respects.

(i)     Master Collection Account; Collection Account.  The Servicer has neither pledged nor assigned, nor entered into any agreement under which it grants "control" (as defined in the relevant UCC) to any Person with respect to, the Master Collection Account, except for the Master Collection Account Agreement and the Intercreditor Agreement.

(j)     Servicer's Performance.  The Servicer has the knowledge, the experience and the systems, financial and operational capacity available to timely perform each of its obligations hereunder.

(k)     Trade Names and Place of Business.  (i) Except as otherwise indicated in this Agreement, the Servicer has no trade names, fictitious names, assumed names or "doing business as" names or other names under which it has done or is doing business and (ii) the principal place of business and chief executive office of the Servicer are located at the address of the Servicer set forth on the signature pages hereto and has been so for the last four months.

(l)     <u>Compliance with Credit and Collection Policy</u>.  The Servicer has, with respect to the Receivables, complied in all material respects with the Credit and Collection Policy.

(m)     <u>ERISA Matters</u>.  The Servicer and each ERISA Affiliate are in compliance with ERISA in all material respects.  No Plan Event has occurred or is expected to occur that might result, directly or indirectly, in any lien being imposed on the property of the Servicer.

(n)     <u>Investment Company Act</u>.  The Servicer is not an "investment company" within the meaning of the Investment Company Act.

(o)     <u>Anti-Corruption Laws, Anti-Terrorism Laws and Sanctions</u>.  The Servicer has implemented and maintains in effect policies and procedures designed to ensure compliance by the Servicer and its Subsidiaries, directors, officers and employees with Anti-Corruption Laws, Anti-Terrorism Laws and applicable Sanctions, and to the knowledge of the Servicer, its agents, are in compliance with Anti-Corruption Laws, Anti-Terrorism Laws and applicable Sanctions in all material respects.  None of the Servicer or any of its Subsidiaries, directors, officers or employees, or to the knowledge of the Servicer, any agent of the Servicer that will act in any capacity in connection with or benefit from this Agreement or the Loans, is a Sanctioned Person.  No Loans, use of proceeds or other transaction contemplated by this Agreement will violate Anti-Corruption Laws, Anti-Terrorism Laws or applicable Sanctions.

(p)     <u>Solvency</u>.  The transactions contemplated by the Basic Documents do not and will not render the Servicer not Solvent.

(q)     <u>Taxes</u>.  The Servicer has filed, caused to be filed or received an extension of time for filing that has not yet expired for all material tax returns that are required to be filed by it.  The Servicer has paid or made adequate provisions for the payment of all material Taxes made against it or any of its property (other than any amount of Tax the validity of which is currently being contested in good faith by appropriate proceedings and with respect to which adequate reserves in accordance with GAAP have been provided on the books of the Servicer), and no tax lien has been filed and, to the Servicer's knowledge, no claim is being asserted, with respect to any such Tax.

(r)     <u>BlackRock Loan Agreement</u>. The Borrower is a "Special Purpose Affiliate" and an "Excluded Subsidiary" under and as defined in the BlackRock Loan Agreement.

Section 5.04.  <u>Representations and Warranties of the Backup Servicer</u>.  The Backup Servicer represents and warrants as follows:

(a)     <u>Organization and Good Standing</u>.  It has been duly organized, and is validly existing as a corporation and in good standing under the laws of the State of Delaware, with all requisite power and authority to own or lease its properties and to conduct its business as such business is presently conducted and to enter into and perform its obligations pursuant to this Agreement.

90

(b)     <u>Power and Authority; Due Authorization</u>.  It (i) has all necessary power, authority and legal right to (A) execute and deliver this Agreement and (B) carry out the terms of this Agreement and (ii) has duly authorized by all necessary action on its part the execution, delivery and performance of this Agreement.

(c)     <u>Binding Obligation</u>.  This Agreement constitutes a legal, valid and binding obligation of it enforceable against it in accordance with its terms, except as enforceability may be limited by Insolvency Laws and except as such enforceability may be limited by general principles of equity (whether considered in suit at law or in equity).

(d)     <u>No Violation</u>.  The consummation of the transactions contemplated by this Agreement and the fulfillment of the terms hereof will not (i) conflict with, result in any breach of any of the terms and provisions of, or constitute (with or without notice or lapse of time or both) a default under, its organizational documents or any Contractual Obligation of it, (ii) result in the creation or imposition of any Lien upon any of the its properties pursuant to the terms of any such organizational documents or Contractual Obligation, other than this Agreement, or (iii) violate any Applicable Law.

(e)     <u>No Proceedings</u>.  There is no litigation, proceeding or investigation pending or, to its best knowledge, threatened against it, before any Governmental Authority (i) asserting the invalidity of this Agreement, (ii) seeking to prevent the consummation of any of the transactions contemplated by this Agreement, (iii) challenging the enforceability of a material portion of the Receivables or (iv) seeking any determination or ruling that could reasonably be expected to have Material Adverse Effect.

(f)     <u>All Consents Required</u>.  All approvals, authorizations, consents, orders or other actions of any Person or of any Governmental Authority (if any) required for the due execution, delivery and performance by the Backup Servicer of this Agreement have been obtained.

Section 5.05.  <u>Representations and Warranties of the Collateral Custodian and Account Bank</u>.  Each of the Collateral Custodian and Account Bank represents and warrants as follows:

(a)     <u>Organization and Good Standing</u>.  It has been duly organized, and is validly existing as a national banking association and in good standing under the laws of the United States, with all requisite power and authority to own or lease its properties and to conduct its business as such business is presently conducted and to enter into and perform its obligations pursuant to each Basic Document to which it is a party.

(b)     <u>Power and Authority; Due Authorization</u>.  It (i) has all necessary power, authority and legal right to (A) execute and deliver each Basic Document to which it is a party and (B) carry out the terms of each Basic Document to which it is a party and (ii) has duly authorized by all necessary action on its part the execution, delivery and performance of each Basic Document to which it is a party.

(c)     <u>Binding Obligation</u>.  Each Basic Document to which it is a party constitutes a legal, valid and binding obligation of it enforceable against it in accordance

with its terms, except as enforceability may be limited by Insolvency Laws and except as such enforceability may be limited by general principles of equity (whether considered in suit at law or in equity).

(d)　No Violation.  The consummation of the transactions contemplated by this Agreement and the fulfillment of the terms hereof will not (i) conflict with, result in any breach of any of the terms and provisions of, or constitute (with or without notice or lapse of time or both) a default under, its organizational documents or any Contractual Obligation of it, (ii) result in the creation or imposition of any Lien upon any of its properties pursuant to the terms of any such organizational documents or Contractual Obligation, other than this Agreement, or (iii) violate any Applicable Law of the State of Delaware or the United States governing its banking and trust powers.

(e)　No Proceedings.  There is no litigation, proceeding or investigation pending or, to its Responsible Officer's best knowledge, threatened against it, before any Governmental Authority (i) asserting the invalidity of any Basic Document to which it is a party or (ii) seeking to prevent the consummation of any of the transactions contemplated by any Basic Document to which it is a party.

(f)　All Consents Required.  All approvals, authorizations, consents, orders or other actions of any Person or of any Governmental Authority (if any) of the State of Delaware or the United States governing its banking and trust powers required for the due execution, delivery and performance by it of the Basic Documents to which it is a party have been obtained.

Section 5.06.  Breach of Representations and Warranties.

(a)　Retransfer of Ineligible Receivables.  If it is discovered that a Receivable is an Ineligible Receivable as of the Funding Date as of which it became part of the Collateral, no later than the earlier of (i) knowledge by the Borrower of such Receivable having been an Ineligible Receivable and (ii) receipt by the Borrower from the Administrative Agent, an Agent or the Servicer of written notice thereof (which notice the Servicer shall be required to give promptly upon knowledge thereof), such Borrower shall (A) disclose the identity of such Ineligible Receivable on the related Monthly Report and (B) on or before the Payment Date relating to the Collection Period that includes the 30th day following the Collection Period in respect of which the event in clause (i) or (ii) occurred, to the extent such breach has not been cured or waived, make a deposit of the Release Price for each such Ineligible Receivable to the Collection Account in immediately available funds and the Borrower shall accept the release of each such Ineligible Receivable.  The Administrative Agent shall be deemed, upon deposit of the Release Price into the Collection Account, to convey to the Borrower, without recourse, representation or warranty, all of its right, title and interest in such Ineligible Receivable and the Borrower shall accept the release of each such Ineligible Receivable from the Administrative Agent and the Pool Balance shall be reduced by the Principal Balance (as of the end of the most recent Collection Period) of each such Ineligible Receivable.  On and after the date of release, the Ineligible Receivable so released shall not be included in the Collateral.  Upon each release to the Borrower of such Ineligible Receivable, the Administrative Agent shall automatically and without further action be deemed to transfer, assign and set-over to the Borrower, without

recourse, representation or warranty, all the right, title and interest of the Administrative Agent in, to and under such Ineligible Receivable and all future monies due or to become due with respect thereto, all proceeds of such Ineligible Receivable and, in the case of Defaulted Receivables, all Liquidation Proceeds and Insurance Proceeds relating thereto, all rights to security for any such Ineligible Receivable and all proceeds and products of the foregoing.  The Administrative Agent shall, at the sole expense of the Servicer, execute such documents and instruments of release as may be prepared by the Servicer on behalf of the Borrower and take other such actions as shall reasonably be requested by the Borrower to effect the release of such Ineligible Receivable pursuant to this subsection.

(b)      Retransfer of Receivables for Breach of Servicing Covenant.  In the event that the Servicer breaches a servicing covenant in Section 6.05(h)(i) or 7.03(c)(i) with respect to a Receivable no later than the earlier of (i) knowledge by the Servicer of such event or (ii) receipt by the Servicer from the Administrative Agent or the Borrower of written notice thereof, the Servicer shall (A) disclose the identity of such Receivable on the related Monthly Report and (B) on or before the Payment Date relating to the Collection Period following the Collection Period in respect of which such Monthly Report is delivered, if such breach has not been cured or waived, make a deposit of the Release Price for each such Receivable into the Collection Account in immediately available funds, and the Borrower shall accept the release of such Receivable(s), in each case as described in Section 5.06(a) and the Receivable so released shall not be included in the Collateral.

(c)      Notice of Release.  The Borrower or the Servicer, as applicable, shall provide written notice to the Administrative Agent on the related Monthly Report of any release of Receivables pursuant to Sections 5.05(a) or (b).

261320820v.10 94601/30060

ARTICLE SIX

COVENANTS

Section 6.01.  Affirmative Covenants of the Borrower.  From the Closing Date until the Facility Termination Date:

(a)    Compliance with Laws.  The Borrower will comply in all material respects with all Applicable Laws, including those with respect to the Receivables and the related Financed Vehicles.

(b)    Preservation of Existence.  The Borrower will preserve and maintain its existence, rights, franchises and privileges in the State of Delaware, and qualify and remain qualified in good standing as a foreign statutory trust in each jurisdiction where the failure to preserve and maintain such existence, rights, franchises, privileges and qualification has had, or could reasonably be expected to have, a Material Adverse Effect.

(c)    Performance and Compliance with Contracts.  The Borrower will, at its expense, timely and fully perform and comply (or will cause Tricolor to perform and comply pursuant to the Purchase Agreement and all Transfer Agreements), in all material respects, with all provisions, covenants and other promises required to be observed by it under the Basic Documents and the Contracts.

(d)    Keeping of Records and Books of Account.  To the extent not maintained and implemented by the Servicer, the Borrower will maintain and implement administrative and operating procedures (including an ability to recreate records evidencing Receivables in the event of the destruction of the originals thereof), and keep and maintain all documents, books, records and other information reasonably necessary or advisable for the collection of all Receivables.

(e)    Borrower Assets.  With respect to each Receivable, the Borrower will (i) acquire such Receivable pursuant to and in accordance with the terms of the Purchase Agreement, (ii) take all action necessary to perfect, protect and more fully evidence its ownership of such Receivable, including (A) filing and maintaining, effective financing statements (Form UCC-1) listing Tricolor as debtor in all necessary or appropriate filing offices, and filing continuation statements, amendments or assignments with respect thereto in such filing offices and (B) executing or causing to be executed such other instruments or notices as may be necessary or appropriate and (iii) take all additional action that the Administrative Agent may reasonably request, including the filing of financing statements listing the Administrative Agent as secured party to perfect, protect and more fully evidence the respective interests of the parties to this Agreement in the Collateral.

(f)    Separate Corporate Existence.  The Borrower shall be in compliance with the special purpose entity requirements set forth in Section 6.02(n).

(g)    Credit and Collection Policy.  The Borrower will, or will cause Tricolor or the Servicer to, as the case may be, (i) with respect to each Receivable, comply with the

94

Credit and Collection Policy, (ii) furnish to the Administrative Agent and each Lender, prior to its effective date, prompt notice of any material change to the Credit and Collection Policy and (iii) furnish to the Administrative Agent, each Lender and the Backup Servicer, revised versions of the Credit and Collection Policy containing the material changes that have been approved pursuant to clause (ii) above.

(h)      Termination Events, Amortization Events and Servicer Termination Events.  The Borrower will provide the Administrative Agent, the Backup Servicer, the Collateral Custodian and the Account Bank with written notice immediately following the Borrower's actual knowledge of the occurrence of each Termination Event, Unmatured Termination Event, Amortization Event, Servicer Termination Event or Unmatured Servicer Termination Event no later than three Business Days following the occurrence thereof.  The Borrower will provide to the Administrative Agent, the Backup Servicer, the Collateral Custodian and the Account Bank an Officer's Certificate setting forth the details of each such event and the action that the Borrower proposes to take with respect thereto.

(i)      Taxes.  The Borrower will file and pay any and all Taxes, including those required to meet the obligations of the Basic Documents.

(j)      Use of Proceeds.  The Borrower will use the Principal Amounts only to acquire Receivables.

(k)      Preservation of Security Interest.  The Borrower will (or will cause the Servicer to) execute and file such financing and continuation statements and any other documents that may be required by any Applicable Law to preserve and protect fully the security interest of the Administrative Agent in, to and under the Collateral.

(l)      Liens.  The Borrower will not create, or participate in the creation of, or permit to exist, any Liens (other than Permitted Liens) with respect to the Master Collection Account or the Collection Account, except as set forth herein or in the Master Collection Account Agreement or in the Intercreditor Agreement.

(m)      Reporting.  The Borrower will maintain for itself a system of accounting established and administered in accordance with GAAP and furnish (or cause the Servicer to furnish) to the Administrative Agent and each Rating Agency then rating the Loans:

(i)      Monthly Reports.  Not later than each Reporting Date, a Monthly Report and a monthly operations reporting package, including information as to the Receivables such as collections, delinquencies, losses, recoveries, cash flows and such other information as reasonably requested by the Administrative Agent or an Agent.

(ii)      Financial Statements. Within 120 days after each year, annual unaudited financial statements prepared in accordance with GAAP.

95

(iii)  Income Tax Liability.  Within ten Business Days after the receipt of revenue agent reports or other written proposals, determinations or assessments of the IRS or any other taxing authority which propose, determine or otherwise set forth positive adjustments to the Tax liability of any Affiliated Group (within the meaning of Section 1504(a)(l) of the Code) which equal or exceed $1,000,000 in the aggregate, telephonic or telecopied notice (confirmed in writing within five Business Days) specifying the nature of the items giving rise to such adjustments and the amounts thereof.

(iv)  Tax Returns.  Upon demand by the Administrative Agent, copies of all federal, State and local Tax returns and reports filed by the Borrower, or in which the Borrower was included on a consolidated or combined basis (excluding sales, use and like taxes).

(v)  Representations.  Promptly upon receiving knowledge of same, the Borrower shall notify the Administrative Agent if any representation or warranty set forth in Section 5.01 or 5.02 was incorrect in any material respect at the time it was given or deemed to have been given and at the same time deliver to the Administrative Agent a written notice setting forth in reasonable detail the nature of such facts and circumstances.  In particular, but without limiting the foregoing, the Borrower shall notify the Administrative Agent in the manner set forth in the preceding sentence before any Funding Date of any facts or circumstances within the knowledge of the Borrower which would render any of such representations and warranties untrue in any material respect at the date when they were made or deemed to have been made.

(vi)  Proceedings.  As soon as possible and in any event within three Business Days after any executive officer of the Borrower receives notice or obtains knowledge thereof, any settlement of, material judgment (including a material judgment with respect to the liability phase of a bifurcated trial) in or commencement of any labor controversy (of a material nature), litigation, action, suit or proceeding before any court or Governmental Authority, domestic or foreign, affecting the Borrower or any of its Affiliates.

(vii)  Notice of Material Events.  Promptly upon any Responsible Officer of such Borrower becoming aware thereof, notice of any other event or circumstance that, in the reasonable judgment of the Borrower, could be reasonably expected to have a Material Adverse Effect.

(viii)  Appointment of Independent Director.  The decision to appoint a new director of the Borrower as the "Independent Director" for purposes of this Agreement, such notice to be issued not less than ten (10) days prior to the effective date of such appointment and to certify that the designated Person satisfies the criteria set forth in the definition herein of "Independent Director."

(n)  Collections.  The Borrower will (or will cause the Servicer to on its behalf) (i) direct all Obligors under Receivables to remit all Collections in respect of such

96

Receivables directly to the Master Collection Account and (ii) cause all Collections from the Master Collection Account to be deposited into the Collection Account as described herein.  In the event any payments relating to Receivables are remitted directly to the Borrower or any of its Affiliates, the Borrower will remit (or will cause all such payments to be remitted) directly to the Collection Account within two Business Days following receipt and identification thereof, and, at all times prior to such remittance, the Borrower will itself hold such payments or, if applicable, will cause such payments to be held, in trust for the exclusive benefit of the Secured Parties.

(o)     Anti-Corruption Laws, Anti-Terrorism Laws and Sanctions.  The Borrower will maintain in effect and enforce policies and procedures designed to ensure compliance by the Borrower and its directors, officers, employees and agents with Anti-Corruption Laws, Anti-Terrorism Laws and applicable Sanctions.

(p)     Other.  The Borrower will furnish to the Administrative Agent promptly, from time to time, such other information, documents, records or reports respecting the Collateral or the condition or operations, financial or otherwise, of the Borrower as the Administrative Agent may from time to time reasonably request in order to protect the interests of the Secured Parties under or as contemplated by this Agreement.

(q)     Beneficial Ownership Certification.  The Borrower will notify the Administrative Agent and the Agents of any change in the information provided in the Beneficial Ownership Certification that would result in a change to the list of beneficial owners identified in parts (c) or (d) of such certification.

(r)     Certificate of Title Opinion.  Upon the request of the Administrative Agent, the Borrower will within 30 days of such request furnish to the Administrative Agent and the Lenders favorable Opinions of Counsel for the Borrower (which counsel, and the form and substance of such Opinions of Counsel, shall be reasonably satisfactory to the Administrative Agent) in each State in which the aggregate Receivables Balance having Obligors with mailing addresses in such State equals or exceeds 10% of the Pool Balance, as to the requirements in each such State for the assignment of a security interest in the applicable Financed Vehicles.  Such Opinion of Counsel shall, subject to reasonable and customary assumptions and qualifications, conclude that the security interest of the Administrative Agent in the applicable Financed Vehicles in such State will be perfected and may be enforced by the Administrative Agent notwithstanding the absence of a notation of the assignment of the security interest of the applicable Originator to the Administrative Agent on the related Certificate of Title.

Section 6.02.  Negative Covenants of the Borrower.  From the date hereof until the Facility Termination Date:

(a)     Other Business.  The Borrower will not (i) engage in any business other than the transactions contemplated by the Basic Documents, (ii) incur any Indebtedness, obligation, liability or contingent obligation of any kind other than pursuant to this Agreement or under any Hedging Agreement required by Section 6.03 or (iii) form any Subsidiary or make any Investment in any other Person.

97

(b)     Receivables Not to be Evidenced by Instruments.  The Borrower will take no action to cause any Receivable that is not, as of the Closing Date or the related Funding Date, as the case may be, evidenced by an Instrument, to be so evidenced except in connection with the enforcement or collection of such Receivable.

(c)     Security Interests.  The Borrower will not sell, pledge, assign or transfer to any other Person, or grant, create, incur, assume or suffer to exist any Lien on any portion of the Collateral, whether now existing or hereafter transferred hereunder, or any interest therein, and the Borrower will not sell, pledge, assign or suffer to exist any Lien on its interest, if any, hereunder.  The Borrower will promptly notify the Administrative Agent of the existence of any Lien on any portion of the Collateral, and the Borrower shall defend the right, title and interest of the Secured Parties in, to and under such Collateral, against all claims of third parties; provided, however, that nothing in this subsection shall prevent or be deemed to prohibit the Borrower from suffering to exist Permitted Liens upon any portion of the Collateral.

(d)     Mergers, Acquisitions, Sales, Etc.  The Borrower will not be a party to any merger or consolidation, or purchase or otherwise acquire all or substantially all of the assets or any stock or membership interests of any class of, or any partnership or joint venture interest in, any other Person, or, sell, transfer, convey or lease all or any substantial part of its assets, or sell or assign with or without recourse any portion of the Collateral or any interest therein (other than pursuant hereto).

(e)     Distributions.  The Borrower shall not declare or pay, directly or indirectly, any dividend or make any other distribution (whether in cash or other property) with respect to the profits, assets or capital of the Borrower or any Person's interest therein, or purchase, redeem or otherwise acquire for value any of its capital stock now or hereafter outstanding, except that so long as no Termination Event or Unmatured Termination Event has occurred and is continuing or would result therefrom, the Borrower may make distributions with the funds distributed to the Borrower pursuant to Section 2.07(ix), subject to Applicable Law.

(f)     Change of Name or Location of Receivable Files.  The Borrower shall not (i) change its name or State of organization, move the location of its principal place of business and chief executive office, and the offices where it keeps the Records from the location referred to on the signature pages hereof or (ii) except in accordance with Section 9.06, move, or consent to the Collateral Custodian moving, the Receivable Files from the locations specified on Schedule D, unless the Borrower has given at least 30 days' prior written notice to the Administrative Agent and has taken all actions required under the UCC of each relevant jurisdiction in order to continue the first priority perfected security interest of the Administrative Agent in the Collateral.

(g)     True Sale.  Except for purposes of GAAP, the Borrower will not account for or treat the transactions contemplated by the Purchase Agreement in any manner other than as the sale, or absolute assignment, of the Receivables and other Collateral by Tricolor to the Borrower.

(h)    ERISA Matters.  Neither Borrower will establish or be a party to any Benefit Plan or Multiemployer Plan.

(i)    Formation Documents; Purchase Agreement.  Without the prior consent of the Administrative Agent (acting with the consent of the Required Lenders), the Borrower will not amend, modify, waive or terminate any provision of the Formation Documents or the Purchase Agreement.

(j)    Changes in Payment Instructions to Obligors.  The Borrower will not add or make any change, or permit the Servicer to make any change, in its instructions to Obligors regarding payments to be made to the Borrower or the Servicer or payments to be deposited into the Master Collection Account, unless the Administrative Agent (acting with the consent of the Required Lenders) shall have consented to such change and has received duly executed copies of all documentation related thereto, which documentation shall be satisfactory in form and substance to the Administrative Agent (acting with the consent of the Required Lenders).

(k)    Extensions, Amendments and Modifications.  The Borrower will not, except as otherwise permitted hereunder, extend, amend or otherwise modify, or permit the Servicer to extend, amend or otherwise modify, the terms of any Contract.

(l)    Credit and Collection Policy.  The Borrower will not consent to, or permit the Servicer to effectuate, and amendment, modification, restatement, waiver or replacement, in whole or in part, the Credit and Collection Policy, which amendment, modification, restatement, waiver or replacement would materially impair the collectability of any Receivable or otherwise materially adversely affect the interests or the remedies of the Secured Parties under the Basic Documents, without the prior written consent of the Administrative Agent and each Lender.

(m)    No Assignments.  The Borrower will not assign or delegate, grant any interest in or permit any Lien to exist upon any of its rights, obligations or duties under this Agreement without the prior written consent of the Administrative Agent (acting with the consent of the Required Lenders).

(n)    Special Purpose Entity.  The Borrower shall not (nor has it taken any such action in the past):

(i)    engage in any business or activity other than the purchase and receipt of Receivables and related assets from Tricolor under the Purchase Agreement, the pledge of Receivables and other related Collateral under the Basic Documents and such other activities as are incidental thereto;

(ii)    acquire or own any material assets other than (A) the Receivables and other related Collateral from Tricolor under the Purchase Agreement and (B) incidental property as may be necessary for its operations;

(iii)    merge into or consolidate with any Person or dissolve, terminate or liquidate in whole or in part, transfer or otherwise dispose of all or substantially

99

all of its assets or change its legal structure, without in each case first obtaining the Administrative Agent's consent (acting with the consent of the Required Lenders);

(iv)    elect to be treated, or otherwise become taxable, as a corporation for U.S. federal income tax purposes;

(v)    fail to preserve its existence as an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization or formation, or without the prior written consent of the Administrative Agent (acting with the consent of the Required Lenders), amend, modify, terminate, fail to comply with the provisions of its Formation Documents or bylaws or other governing documents, as applicable, or fail to observe Delaware limited liability company formalities;

(vi)    own any Subsidiary or without the consent of the Administrative Agent (acting with the consent of the Required Lenders), make any Investment in any Person;

(vii)    commingle its assets with the assets of any of its Affiliates, or of any other Person;

(viii)    incur any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than Indebtedness to the Secured Parties hereunder or in conjunction with a repayment of the Aggregate Unpaids except for trade payables in the ordinary course of its business, provided that such debt is not evidenced by a note and paid when due;

(ix)    become insolvent or fail to pay its debts and liabilities from its assets as the same shall become due;

(x)    fail to maintain its records, books of account and bank accounts separate and apart from those of any other Person;

(xi)    enter into any contract or agreement with any of its Affiliates or any other Person, except upon terms and conditions that are commercially reasonable and intrinsically fair and substantially similar to those that would be available on an arm's-length basis with third parties other than its Affiliates;

(xii)    seek its dissolution or winding up in whole or in part;

(xiii)    fail to correct any known misunderstandings regarding the separate identity of the Borrower with any of its Affiliates or any other Person;

(xiv)    guarantee, become obligated for, or hold itself out to be responsible for the Indebtedness of another Person;

100

(xv)    make any loan or advances to any third party, including any Affiliate, or hold evidence of Indebtedness issued by any other Person (other than Permitted Investments);

(xvi)    fail either to hold itself out to the public as a legal entity separate and distinct from any other Person or to conduct its business solely in its own name in order not (A) to mislead others as to the identity with which such other party is transacting business, or (B) to suggest that it is responsible for the debts of any third party (including any of its Affiliates);

(xvii)    fail to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

(xviii)    file or consent to the filing or any petition, either voluntary or involuntary, to take advantage of any applicable Insolvency Laws, or make an assignment for the benefit of creditors;

(xix)    share any common logo with or hold itself out as or be considered as a department or division of any of its Affiliates or any other Person;

(xx)    permit any transfer (whether in any one or more transactions) of any direct or indirect ownership interest in the Borrower, unless the Borrower delivers to the Administrative Agent and the Lenders an acceptable non-consolidation opinion;

(xxi)    fail to maintain separate financial statements, showing its assets and liabilities separate and apart from those of any other Person, or have its assets listed on the financial statement of any other Person; provided, that such Borrower may have financial statements consolidated with Tricolor's financial statements in accordance with GAAP;

(xxii)    fail to pay its own liabilities and expenses only out of its own funds;

(xxiii)    fail to pay the salaries of its own employees in light of its contemplated business operations;

(xxiv)    acquire the obligations or securities of its Affiliates or stockholders;

(xxv)    fail to allocate fairly and reasonably any overhead expenses that are shared with an Affiliate, including paying for office space and services performed by any employee of an Affiliate;

(xxvi)    fail to use separate invoices and checks bearing its own name;

(xxvii)    pledge its assets for the benefit of any other Person, other than with respect to payment of the Indebtedness to the Lenders hereunder;

(xxviii)    fail at any time to have at least one Independent Director;

(xxix)    fail to provide that the unanimous consent of the Administrative Agent and the Lenders is required for the Borrower to (A) dissolve or liquidate, in whole or part, or institute proceedings to be adjudicated bankrupt or insolvent, (B) institute or consent to the institution of Insolvency Proceedings against it, (C) file a petition seeking or consent to reorganization or relief under any applicable Insolvency Law, (D) seek or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator, custodian or any similar official for the Borrower, (E) make any assignment for the benefit of its creditors, (F) admit in writing its inability to pay its debts generally as they become due or (G) take any action in furtherance of any of the foregoing;

(xxx)    amend, restate, supplement or otherwise modify its Formation Documents in any respect that would impair its ability to comply with the Basic Documents; and

(xxxi)    take or refrain from taking, as applicable, each of the activities specified in the non-consolidation opinion of Sidley Austin LLP, dated the Closing Date.

(o)    Liens.  The Borrower will not create, or participate in the creation of, or permit to exist, any Liens (other than Permitted Liens) with respect to the Master Collection Account or the Collection Account.

(p)    Anti-Corruption Laws, Anti-Terrorism Laws and Sanctions.  The Borrower will not request any Loan, and the Borrower shall not use, nor cause its respective directors, officers, employees and agents use, the proceeds of any Loan (i) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws or Anti-Terrorism Laws, (ii) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, or (iii) in any manner that would result in the violation of any Sanctions applicable to any party hereto.

Section 6.03.  Covenant of the Borrower Relating to the Hedging Agreement.

(a)    At any time that the Loans Outstanding are greater than $0.00, the Borrower shall be party to one or more effective Hedge Transactions that satisfy the following conditions:

(i)    the aggregate notional amount of such Hedge Transactions is equal to or greater than the Loans Outstanding at the end of the Revolving Period and on each Funding Date and Securitization Date, which aggregate notional principal amount may be stepped down on a schedule resulting from the usage of an assumed rate of prepayments on the Receivables for each Collection Period based upon the "Absolute Prepayment

Model" applied in accordance with current market standards for asset-backed securities transactions of not greater than 0.00%; and

(ii)     the related Hedging Agreements are in form and substance reasonably acceptable to the Required Lenders (including the notional amount, term and amortization rate of such Hedging Agreement) and a copy of which has been delivered to the Administrative Agent.

provided, that the forgoing requirement shall not apply following the occurrence of a Termination Event under Section 10.01 hereof if the Hedge Counterparty has terminated such Hedge Transactions as a result of such a Termination Event.

(b)     As additional security hereunder, the Borrower has assigned to the Administrative Agent (as agent for the Secured Parties) all right, title and interest of Borrower in the Hedge Collateral.  The Borrower acknowledges that, as a result of that assignment, the Borrower may not, without the prior written consent of the Administrative Agent (acting with the consent of the Required Lenders), exercise any rights under any Hedging Agreement or Hedge Transaction, except for: (i) the Borrower's right under any Hedging Agreement to enter into Hedge Transactions in order to meet the Borrower's obligations hereunder, (ii) the enforcement of any rights under the Hedging Agreement related to an "Event of Default" or "Termination Event" thereunder with respect to which the Hedge Counterparty is the "Defaulting Party" or the sole "Affected Party" and (iii) amendments to any Hedging Agreement which are accomplished via adherence to an industry standard protocol published by ISDA.  Nothing herein shall have the effect of releasing the Borrower from any of its obligations under any Hedging Agreement or any Hedge Transaction, nor be construed as requiring the consent of any Secured Party for the performance by the Borrower of any such obligations.

Section 6.04.  <u>Affirmative Covenants of the Servicer</u>.  From the date hereof until the Facility Termination Date:

(a)     <u>Compliance with Law</u>.  The Servicer will comply in all material respects with all Applicable Laws, including those with respect to the Contracts, the Receivables, the related Financed Vehicles and the Receivable Files or any part thereof.

(b)     <u>Preservation of Corporate Existence</u>.  The Servicer will preserve and maintain its existence, rights, franchises and privileges in the State of Delaware, and qualify and remain qualified in good standing as a foreign limited liability company in each jurisdiction where the failure to preserve and maintain such existence, rights, franchises, privileges and qualification has had, or could reasonably be expected to have, a Material Adverse Effect.

(c)     <u>Obligations and Compliance with Receivables</u>.  The Servicer will fulfill and comply with all obligations on the part of the Borrower to be fulfilled or complied with under or in connection with each Receivable and will do nothing to impair the rights of the Administrative Agent (as agent for the Secured Parties) in, to and under the Collateral.

261320820v.10 94601/30060

(d) <u>Performance and Compliance with Servicer Basic Documents</u>. The Servicer will timely and fully perform and comply with all provisions, covenants and other promises required to be observed by it under the Servicer Basic Documents.

(e) <u>Keeping of Records and Books of Account</u>. The Servicer will maintain and implement administrative and operating procedures (including an ability to recreate records evidencing Receivables, including the Receivable Files, in the event of the destruction of the originals thereof), and keep and maintain all documents, books, records and other information reasonably necessary or advisable for the collection of all Receivables, including the Receivable Files.

(f) <u>Preservation of Security Interest</u>. The Servicer will execute and file such financing and continuation statements and any other documents that may be required by Applicable Law of any Governmental Authority to preserve and protect fully the security interest of the Administrative Agent in, to and under the Collateral.

(g) <u>Credit and Collection Policy</u>. The Servicer will (i) comply in all material respects with the Credit and Collection Policy in regard to each Receivable, (ii) cause the Credit and Collection Policy to be amended solely as contemplated by and in accordance with Section 6.05(c), (iii) furnish to the Administrative Agent and each Lender, prior to its effective date, prompt notice of any material change to be put into effect without the prior written consent of the Administrative Agent and each Lender and (iv) furnish to the Administrative Agent and each Lender revised versions of the Credit and Collection Policy containing the material changes that have been approved pursuant to clause (iii) above and the changes described in clause (ii) above.

(h) <u>Termination Events, Amortization Events and Servicer Termination Events</u>. The Servicer will furnish to the Administrative Agent, each Agent, each Lender and each Hedge Counterparty, the Backup Servicer, the Collateral Custodian and the Account Bank, as soon as possible and in any event within three Business Days after the occurrence of each Amortization Event, Termination Event, Unmatured Termination Event, Servicer Termination Event or Unmatured Servicer Termination Event, a written statement of its chief financial officer or chief accounting officer setting forth the details of such event and the action that the Servicer purposes to take with respect thereto.

(i) <u>Other</u>. The Servicer will furnish to the Administrative Agent, each Agent and each Lender, promptly, from time to time, such other information, documents, records or reports respecting the Collateral or the condition or operations, financial or otherwise, of the Borrower or the Servicer as the Administrative Agent, any Agent or any Lender may from time to time reasonably request in order to protect the interests of the Administrative Agent or Lenders under or as contemplated by this Agreement.

(j) <u>Notice Regarding Collateral</u>. The Servicer shall advise the Administrative Agent, each Agent and the Collateral Custodian in writing in reasonable detail promptly following its actual knowledge of (i) any Lien asserted or claim made against any portion of the Collateral, (ii) the occurrence of any breach in any material respect by the Servicer of any of its representations, warranties and covenants contained herein and (iii) the

104

occurrence of any other event which would have a material adverse effect on the security interest of the Administrative Agent on behalf of the Secured Parties in the Collateral or the collectability of all or a material portion of the Receivables, or which would have a Material Adverse Effect.

(k)    Realization on Receivables.  In the event that the Servicer realizes upon any Receivable, the methods utilized by the Servicer to realize upon such Receivable or otherwise enforce any provision of such Receivable will not subject the Servicer, the Borrower, any Secured Party, any Agent or the Collateral Custodian to liability under any federal, State or local law, and any such realization or enforcement by the Servicer will be conducted in accordance with the provisions of this Agreement, the Credit and Collection Policy and Applicable Law.

(l)    Financial Statements.  The Servicer shall provide to the Administrative Agent and each Lender, within (i) 60 days after the end of each calendar quarter, unaudited quarterly financial statements (including an analysis of delinquencies and losses for each fiscal quarter) for the Performance Guarantor and for itself on a standalone basis and (ii) 120 days after the end of each year, audited annual financial statements for the Performance Guarantor and itself on a standalone basis.

(m)    Accounting Policy.  The Servicer will promptly notify the Administrative Agent and each Lender of any material change in the Servicer's accounting policies.

(n)    Additional Information.  The Servicer shall, within two Business Days of its receipt thereof, respond to reasonable written directions or written requests for information that the Borrower, the Administrative Agent, any Agent, any Lender, the Collateral Custodian or the Backup Servicer might have with respect to the administration of the Receivables, including the delivery of quarterly data tapes with respect to the Receivables.

(o)    Anti-Corruption Laws, Anti-Terrorism Laws and Sanctions.  The Servicer will maintain in effect and enforce policies and procedures designed to ensure compliance by the Servicer and each of its Subsidiaries and its or their respective directors, officers, employees and agents with Anti-Corruption Laws, Anti-Terrorism Laws and applicable Sanctions.

(p)    Notice Regarding Fines.  The initial Servicer shall notify the Administrative Agent, each Agent and each Lender of (i) any litigation, arbitration, or administrative, regulatory, judicial or quasi-judicial proceeding, action, suit, order, investigation, judgment, decree, injunction, consent order or stipulation of or with any Governmental Authority based on any alleged non-compliance by the initial Servicer with any Applicable Laws in connection with the Receivables; (ii) any formal inquiry, demand, civil investigative demand or subpoena or other request for information by any Governmental Authority concerning any possible non-compliance by the initial Servicer with any Applicable Laws in connection with the Receivables and (iii) any final fines, penalties or sanctions imposed by any Governmental Authority (including the CFPB) against Tricolor or its Affiliates, within five Business Days of such occurrence.

105

(q)      Taxes.  The initial Servicer will file and pay any and all Taxes, including those required to meet the obligations of the Basic Documents that are due and payable; provided, however, that the Servicer shall not be required to pay any such Tax if and so long as the amount, applicability or validity thereof is being contested in good faith by appropriate proceedings and with respect to which adequate reserves in accordance with GAAP have been provided on the books of the Servicer.

Section 6.05.  Negative Covenants of the Servicer.  From the date hereof until the Facility Termination Date:

(a)      Master Collection Account; Collection Account.  The Servicer shall not create or participate in the creation of, or permit to exist, any Liens with respect to the Master Collection Account or the Collection Account, other than Permitted Liens.  The Servicer shall not enter into any agreement under which it grants "control" (as defined in the relevant UCC) with respect to the Master Collection Account or the Collection Account to any Person other than as provided in the Basic Documents.

(b)      Change of Name or Location of Receivable Files.  The Servicer shall not (i) change its name or its State of organization, move the location of its principal place of business and chief executive office and the offices where it keeps records concerning the Receivables (other than the Receivable Files) from the location referred to on the signature pages hereof or (ii) move, or consent to the Collateral Custodian moving, the related Contract Files from the location Specified on Schedule D, unless the Servicer has given at least 30 days' prior written notice to the Administrative Agent and has taken all actions required under the UCC of each relevant jurisdiction in order to continue the first priority perfected security interest of the Administrative Agent, as agent for the Secured Parties, in the Collateral.

(c)      Credit and Collection Policy.  The Servicer will not amend, modify, restate, waive or replace, in whole or in part, the Credit and Collection Policy, which change would materially impair the collectability of any Receivable or otherwise materially adversely affect the interests or the remedies of the Secured Parties under the Basic Documents, without the prior written consent of the Administrative Agent and each Lender.

(d)      Change in Payment Instructions to Obligors.  The Servicer will not make any change in its instructions to Obligors regarding payments to be made to the Borrower or the Servicer or payments to be deposited into the Master Collection Account or the Collection Account, unless the Administrative Agent (acting with the consent of the Required Lenders) has consented to such change and has received duly executed documentation relating thereto.

(e)      Extension or Amendment of Contracts.  The Servicer will not, except as otherwise permitted in Section 7.03(c)(i), extend, amend or otherwise modify the terms of any Contract.

106

(f)    <u>No Instruments</u>.  The Servicer shall take no action to cause any Receivable to be evidenced by any Instrument.

(g)    <u>No Liens</u>.  The Servicer shall not sell, pledge, assign or transfer to any other Person, or grant, create, incur, assume or suffer to exist any Lien (other than Permitted Liens) on the Collateral or any interest therein, the Servicer will promptly notify the Administrative Agent and the Collateral Custodian of the existence of any Lien (other than Permitted Liens) on any portion of the Collateral immediately upon discovery thereof, and the Servicer shall defend the right, title and interest of the Administrative Agent on behalf of the Secured Parties in, to and under the Collateral against all claims of third parties claiming through or under the Servicer.

(h)    <u>Release; Additional Covenants</u>.  The Servicer shall (i) not release any Financed Vehicle securing any Receivable from the security interest granted therein by such Receivable in whole or in part except (A) in the event of payment in full by the Obligor thereunder or settlement thereof in accordance with the Credit and Collection Policy, (B) upon transfer of such Financed Vehicle to a purchaser following repossession by the Servicer or (C) after it deposits into the Collection Account an amount equal to the related Release Price or the entire amount of Insurance Proceeds resulting from a claim for the total insured value of such Financed Vehicle, (ii) not impair the rights of the Borrower, the Secured Parties or the Collateral Custodian in the Collateral, (iii) not increase the number of Scheduled Payments due under a Receivable or Contract except as permitted herein, (iv) prior to the payment in full, repurchase by the Servicer or the Borrower or release by the Administrative Agent of any Receivable, not sell, pledge, assign, or transfer to any other Person, or grant, create, incur, assume or suffer to exist any Lien on such Receivable, the related Collateral or any interest therein (other than Permitted Liens), (v) promptly notify the Borrower, the Backup Servicer and the Administrative Agent of the existence of any Lien on any portion of the Collateral (other than Permitted Liens) if the Servicer has actual knowledge thereof, (vi) defend the right, title and interest of the Borrower, the Secured Parties and the Collateral Custodian in, to and under the Collateral against all claims of third parties claiming through or under the Servicer, (vii) transfer to the Master Collection Account Bank or the Qualified Institution then holding the Collection Account for deposit into the Collection Account, all payments received by the Servicer with respect to the Receivables in accordance with this Agreement, (viii) comply with the terms and conditions of this Agreement relating to the obligation of the Borrower to remove Receivables from the Collateral pursuant to this Agreement and the obligation of Tricolor to reacquire Receivables from the Borrower pursuant to the Purchase Agreement, (ix) promptly notify the Borrower, the Backup Servicer, the Account Bank and the Administrative Agent of the occurrence of any (A) Servicer Termination Event and any material breach by the Servicer of any of its covenants or representations and warranties contained herein or (B) any event which, to the knowledge of the Servicer, would require that the Borrower make or cause to be made any filings, reports, notices or applications or seek any consents or authorizations from any and all Governmental Authorities in accordance with the relevant UCC and any State vehicle license or registration authority as may be necessary or advisable to create, maintain and protect a first priority security interest of the Administrative Agent in, to and on the Financed Vehicles and a first priority security interest of the Administrative

Agent in, to and on the Collateral (other than Permitted Liens), (x) take all reasonable action necessary to maximize the returns pursuant to the Insurance Policies and (xi) deliver or cause to be delivered to the Servicer within one Business Day preceding the Closing Date or the date of such Subsequent Loan, as the case may be, the documents to be included in the Receivable Files.  Notwithstanding any other provision of this Agreement, the Servicer may release any Financed Vehicle from the security interest created by the related Receivable when the Servicer deposits into the Collection Account an amount equal to the related Release Price or the entire amount of Insurance Proceeds, Liquidation Proceeds and other Collections it has received or expects to receive with respect to such Receivable and such Financed Vehicle.

(i)      Formation Documents.  Without the prior consent of the Administrative Agent and notice to each Lender, the Servicer will not amend, modify, waive or terminate any provision of its limited liability company agreement or certificate of formation.

(j)      ERISA.  The Servicer will not (i) engage or permit any ERISA Affiliate to engage in any prohibited transaction for which an exemption is not available or has not previously been obtained from the United States Department of Labor, (ii) permit to exist any accumulated funding deficiency, as defined in Section 302(a) of ERISA and Section 412(a) of the Code, or funding deficiency with respect to any Benefit Plan other than a Multiemployer Plan, (iii) fail to make any payments to a Multiemployer Plan that the Servicer or any such ERISA Affiliate may be required to make under the agreement relating to such Multiemployer Plan or any Applicable Law pertaining thereto, (iv) terminate any Benefit Plan so as to result in any liability or (v) permit to exist any occurrence of any Reportable Event.

(k)      Anti-Corruption Laws, Anti-Terrorism Laws and Sanctions.  The Servicer shall not use, nor shall it permit its Subsidiaries and its or their respective directors, officers, employees and agents to use, the proceeds of any Loan (i) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws or Anti-Terrorism Laws, (ii) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country or (iii) in any manner that would result in the violation of any Sanctions applicable to any party hereto.

ARTICLE SEVEN

ADMINISTRATION AND SERVICING OF RECEIVABLES

Section 7.01.  <u>Designation of Servicing</u>.  The Administrative Agent and the Borrower, at the direction of and on behalf of the Administrative Agent, hereby appoint Tricolor as Servicer to manage, collect and administer each of the Receivables and other Collateral, and to enforce its respective rights and interests in and under the Collateral, and Tricolor hereby accepts such appointment and agrees to perform the duties and responsibilities of the Servicer pursuant to the terms hereof.

Section 7.02.  <u>Servicing Compensation</u>.  As compensation for its servicing activities hereunder and reimbursement for its expenses, the Servicer shall be entitled to receive the Servicing Fee to the extent of funds available therefor pursuant to Section 2.07.  The Servicer shall further be entitled to retain as additional servicing compensation any and all ancillary fees (other than extension fees) and payments from Obligors.

Section 7.03.  <u>Duties of the Servicer</u>.

(a)     <u>Standard of Care</u>.  The Servicer agrees that its servicing and collection of the Receivables shall be carried out in accordance with the Credit and Collection Policy, Applicable Law and customary and usual procedures of institutions which service motor vehicle retail installment sale contracts and, to the extent more exacting, the degree of skill and attention that the Servicer exercises with respect to all comparable motor vehicle receivables that it services for itself or others.

(b)     <u>Records Held in Trust</u>.  The Servicer shall hold in trust for the Borrower and the Secured Parties all records in its possession which evidence or relate to all or any part of the Collateral.  In the event that the Backup Servicer assumes servicing responsibilities or a Successor Servicer, as applicable, is appointed, the outgoing Servicer shall promptly deliver to the Backup Servicer or the Successor Servicer, as applicable, and the Backup Servicer or the Successor Servicer, as applicable, shall hold in trust for the Borrower and the Secured Parties all records which evidence or relate to all or any part of the Collateral.

(c)     <u>Collection Practices</u>.

(i)     The Servicer shall be responsible for collection of payments called for under the terms and provisions of the Contracts relating to the Receivables, as and when the same shall become due.  The Servicer, in making collection of Receivable payments pursuant to this Agreement, shall be acting as agent for the Borrower and the Secured Parties, and shall be deemed to be holding such funds in trust on behalf of and as agent for the Secured Parties.  The Servicer, consistent with the Credit and Collection Policy in effect at the time of acting, shall service, manage, administer and make collections on the Receivables on behalf of the Borrower and shall have full power and authority to do any and all things which it may deem necessary or desirable in connection therewith which are not inconsistent with this Agreement.  The Servicer may in its discretion grant extensions, rebates or adjustments on a Contract as permitted by the Credit and

109

Collection Policy then in effect, and amend or modify any Contract but shall not modify the APR or the number or amount of the Scheduled Payments unless required by Applicable Law or court order issued pursuant to Insolvency Proceedings involving the related Obligor or the Servicemembers Civil Relief Act (or similar State law).  The Servicer may in its discretion waive any late payment charge or any other fees, not including interest on the Principal Balance of a Receivable, that may be collected in the ordinary course of servicing a Receivable.  The Servicer shall also enforce all rights of the Borrower under the Purchase Agreement (including each Transfer Agreement) including the right to require Tricolor to repurchase Receivables for breaches of representations and warranties made by Tricolor.  Receivables in respect of which the Servicer has breached the foregoing provisions or the provisions of Section 6.05(h)(i) shall be repurchased by the Servicer pursuant to Section 5.06.

(ii)    If the full amount of a Scheduled Payment due under a Receivable is not received within five Business Days after its due date, the Servicer will make reasonable and customary efforts to contact the related Obligor by telephone.  The Servicer shall continue its efforts to obtain payment from an Obligor whose payment has not been made within five Business Days after the due date for such payment until the related Financed Vehicle is repossessed and sold or the Servicer has determined that all amounts collectable on such Receivable have been collected.  The Servicer shall use its best efforts, consistent with the Credit and Collection Policy and the standard of care set forth in Section 7.03(a), to collect funds on a Defaulted Receivable and, by the close of business on the second Business Day following receipt and identification of such Collections, deposit such amounts into the Collection Account.

(iii)    In the event a Receivable becomes or is reasonably anticipated to become a Defaulted Receivable, the Servicer, itself or through the use of independent contractors or agents shall, consistent with the Credit and Collection Policy, repossess or otherwise convert the ownership of the related Financed Vehicle securing such Receivable as to which the Servicer shall have determined eventual payment in full is unlikely.  All costs and expenses incurred by the Servicer in connection with the repossession of the Financed Vehicles securing such Receivables shall be reimbursed to the Servicer (other than overhead), to the extent not previously recouped by the Servicer from Liquidation Proceeds on the Payment Date immediately succeeding the Collection Period in which the Servicer incurred such costs and expenses.  Notwithstanding the foregoing and consistent with the terms of this Agreement, the Servicer shall not be obligated to repossess or take any action with respect to a Defaulted Receivable if, in its reasonable judgment consistent with the Credit and Collection Policy, the Liquidation Proceeds would not be increased.

(iv)    Except as otherwise provided in Section 7.03(c)(ii), the Servicer shall deposit or cause to be deposited by electronic funds transfer all Collections to the Collection Account no later than two Business Days after its receipt and identification thereof.

(d)    Credit and Collection; Recourse; Sales of Financed Vehicles.  The Servicer, itself or through the use of independent contractors or agents, shall follow practices consistent with the

110

Credit and Collection Policy in its servicing of the Receivables, which may include reasonable efforts to realize rights of recourse against any Originator, or selling a Financed Vehicle at public or private sale; provided, however, that the Servicer, itself or through the use of independent contractor or agents shall, in accordance with its Credit and Collection Policy, use reasonable efforts to maximize the net sales proceeds for each repossessed Financed Vehicle.  The foregoing shall be subject to the provision that, in any case in which a Financed Vehicle shall have suffered damage, the Servicer shall not expend funds for the repair or the repossession of such Financed Vehicle unless the Servicer shall determine in its discretion that such repair or repossession would increase the Liquidation Proceeds in an amount greater than the cost of repairs.

(e)       Subservicers.  With prior notice to the Administrative Agent, the Servicer may delegate in the ordinary course of business any or all of its duties and obligations hereunder to one or more Subservicers; provided, however, that the Servicer shall at all times remain responsible for the performance of such duties and obligations.

(f)       Insurance.  The Servicer shall:

(i)       on behalf of the Borrower, administer and enforce all rights and responsibilities of the Borrower, as owner of the Receivables, provided for in the Insurance Policies relating to the Receivables;

(ii)      in accordance with customary servicing procedures, require that each Obligor shall have obtained physical damage insurance covering the related Financed Vehicle in amounts satisfying any Applicable Law as of the date of execution of the related Contract;

(iii)     in accordance with its customary servicing procedures, monitor physical damage insurance coverage relating to the Receivables;

(iv)     administer the filings of claims under the Insurance Policies by filing the appropriate notices related to claims, including initial notices of loss, as well as claims with the respective carriers or their authorized agents all in accordance with the terms of the Insurance Policies; and use reasonable efforts to file such claims on a timely basis after obtaining knowledge of the events giving rise to such claims;

(v)      utilize such notices, claim forms and claim procedures as are required by the respective insurance carriers;

(vi)     upon receipt of notice that an Obligor's physical damage insurance covering a Financed Vehicle related to a Receivable has lapsed or is otherwise not in force, comply with the Credit and Collection Policy to cause such compliance;

(vii)    not be required to pay any premiums or, other than administering the filing of claims and performing reporting requirements specified in the Insurance Policies in connection with filing such claims, perform any obligations of the named insured under such Insurance Policies;

(viii)    not be responsible to the Borrower or the Secured Parties for any (A) act or omission to act done in order to comply with the requirements or satisfy any provisions of the Insurance Policies or (B) act, absent willful misconduct or negligence, or omission to act done in compliance with this Agreement; and

(ix)    not force place any Insurance Policies against the Financed Vehicles or the related Obligors.

In the case of any inconsistency between this Agreement and the terms of any Insurance Policy, the Servicer shall comply with the latter.

(g)    <u>Obligation to Restore</u>.  In the event of any physical loss or damage to a Financed Vehicle related to a Receivable from any cause, whether through accidental means or otherwise, the Servicer shall have no obligation to cause such Financed Vehicle to be restored or repaired. However, the Servicer shall comply with the provisions of any insurance policy or policies directly or indirectly related to any physical loss or damage to a Financed Vehicle.

(h)    <u>Fidelity Bond</u>.  The Servicer represents, warrants and covenants that it has obtained and shall continue to maintain in full force and effect a fidelity bond in such form and amount as is customary for prudent servicers acting as custodian of funds and documents in respect of consumer contracts similar to the Receivables on behalf of institutional investors.

(i)    <u>Security Interests</u>.  The Borrower hereby directs the Servicer to take or cause to be taken such steps as are reasonably necessary to maintain perfection of the security interest created by each Receivable in the related Financed Vehicle and the security interests created hereunder and pursuant to the Purchase Agreement.  The Servicer shall, at the direction of the Borrower or the Administrative Agent (on behalf of the Secured Parties) take any action reasonably necessary to preserve and protect the security interests of the Borrower, the Secured Parties and the Collateral Custodian in the Receivables, including any action specified in any Opinion of Counsel delivered to the Servicer.

(j)    <u>Realization on Financed Vehicles</u>.  The Servicer represents, warrants and covenants that in the event that the Servicer realizes upon any Financed Vehicle, the methods utilized by the Servicer to realize upon such Receivable or otherwise enforce any provisions of such Receivable, will be conducted in accordance with the provisions of this Agreement, the Credit and Collection Policy and Applicable Law.

(k)    <u>Recordkeeping</u>.  The Servicer shall:

(i)    maintain legible copies (in electronic or hard-copy form, in the discretion of the Servicer) or originals of all documents in its Receivable File with respect to each Receivable and the related Financed Vehicle; and

(ii)    keep books and records, reasonably satisfactory to the Administrative Agent, pertaining to each Receivable and shall make periodic reports in accordance with this Agreement; such records may not be destroyed or otherwise disposed of except as provided herein and as allowed by Applicable Law; all documents, whether developed or originated by the Servicer or not, reasonably required to document or to properly

112

administer any Receivable shall remain at all times the property of the Borrower and shall be held in trust by the Servicer; the Servicer shall not acquire any property rights with respect to such records, and shall not have the right to possession of them except as subject to the conditions stated in this Agreement; and the Servicer shall bear the entire cost of any restoration in the event any Receivable File shall become damaged, lost or destroyed while in its possession or control.

(l)     Inspection.  The Servicer shall permit the Administrative Agent, the Backup Servicer and each Lender, upon reasonable prior notice and during the Servicer's regular business hours and at the reasonable expense of the Borrower, to periodically, at the discretion of the Administrative Agent, the Backup Servicer and/or the Lenders (subject to Section 7.06(c)), review the Servicer's collection and administration of the Receivables in order to assess compliance by the Servicer with the Servicer's written policies and procedures, as well as with this Agreement.  Such review shall be reasonable in scope and shall be completed in a reasonable period of time.

Section 7.04.  Collection of Payments.

(a)     Payment Instructions.  On or before the relevant Funding Date with respect to the Subsequent Receivables, the Servicer shall have instructed all related Obligors to make all payments in respect of the related Receivables directly to the Master Collection Account; provided, however, that such Obligors may also make payments in respect of such Receivables by credit card, which payments are processed by an electronic payment processor and remitted to the Master Collection Account on a daily basis.

(b)     Establishment of the Collection Account and the Hedge Counterparty Collateral Account.  The Servicer shall cause to be established, on or before the Closing Date, and maintain in the name of the Administrative Agent for the benefit of the Secured Parties, with the Account Bank (for so long as the Account Bank is a Qualified Institution), (i) the Collection Account and (ii) the Hedge Counterparty Collateral Account, in each case over which the Administrative Agent shall have sole dominion and control and from which neither Tricolor nor the Borrower shall have any right of withdrawal.  The Servicer and the Borrower are hereby required to ensure that each of the Collection Account and the Hedge Counterparty Collateral Account are established and maintained with a Qualified Institution.  If any institution with which any of the accounts established pursuant to this Section are established ceases to be a Qualified Institution, the Servicer shall within ten Business Days establish a replacement account at a Qualified Institution after notice of such event.

(c)     Adjustments.  If the Servicer (i) makes a deposit into the Collection Account in respect of a collection of a Receivable and such collection was received by the Servicer in the form of a check that is not honored for any reason, (ii) makes a mistake with respect to the amount of any collection and deposits an amount that is less than or more than the actual amount of such collection or (iii) is entitled to reimbursement of any ancillary fees in accordance with Section 7.02, the Servicer shall appropriately adjust the amount subsequently deposited into the Collection Account to reflect such dishonored check or mistake.  Any Scheduled Payment in respect of which a dishonored check is received shall be deemed not to have been paid.

113

Section 7.05.  Payment of Certain Expenses by Servicer.  Except for such amounts and expenses the Servicer is entitled to reimbursement as provided for herein, the Servicer will be required to pay all expenses incurred by it in connection with its activities under this Agreement, including the fees and disbursements of independent certified public accountants, Taxes imposed on the Servicer, expenses incurred in connection with payments and reports pursuant to this Agreement, fees and expenses of Subservicers and agents of the Servicer and all other fees and expenses not expressly stated under this Agreement for the account of the Borrower.  The Servicer will be required to pay all reasonable fees and expenses owing to any bank or trust company in connection with the maintenance of the Collection Account.  The Servicer shall be required to pay such expenses for its own account and shall not be entitled to any payment therefor other than the Servicing Fee.

Section 7.06.  Reports and Due Diligence.

(a)    Monthly Reports.  On each Reporting Date, the Servicer will provide a Monthly Report to the Borrower, each Secured Party, each Agent, the Account Bank and the Backup Servicer.

(b)    Quarterly Data.  The Servicer will provide the Quarterly Data to each Secured Party and each Agent, within ten Business Days of receiving a request therefor, which request may be made quarterly, but not more frequently unless required by regulators or to comply with Applicable Law (including Basel II and Basel III).

(c)    Due Diligence.  Prior to the Closing Date and once during each calendar year commencing in 2021, at such times during normal business hours as are reasonably convenient to the Borrower or the Servicer, as the case may be, at the sole cost and expense of the Servicer (provided that such costs and expenses are reasonable and customary for similar types of inspections in the industry and do not exceed $60,000 per audit) and upon reasonable request of the Administrative Agent or a Lender and prior written notice to the Borrower or the Servicer, as the case may be, the Borrower or the Servicer, as the case may be, shall permit such Person or Persons as the Administrative Agent may designate (including the Backup Servicer), with the approval of the Required Lenders, to conduct, on behalf of all of them, audits or to visit and inspect any of the properties of the Borrower or the Servicer (including any Subservicer) where the Receivable Files are located, as the case may be, to examine the Receivable Files, internal controls and procedures maintained by the Borrower or the Servicer, as the case may be, and take copies and extracts therefrom, and to discuss the affairs of the Borrower and the Servicer (including any Subservicer) with their respective officers and employees (which employees, except after the occurrence and during the continuation of an Amortization Event, Termination Event, Unmatured Termination Event, Servicer Termination Event or Unmatured Servicer Termination Event, shall be designated by the Borrower or the Servicer, as the case may be) and, upon written notice to the Borrower or the Servicer, as the case may be, independent accountants; provided, that after the occurrence and during the continuation of a Termination Event, the Administrative Agent, the Lenders, the Backup Servicer and their respective representatives shall be permitted to take the foregoing actions without being subject to any limitation on the number of audits, visits or inspections that may be conducted during a calendar year and such audits, visits or inspections shall be at the sole cost and expense of the Servicer; provided, further, that the Administrative Agent, the Lenders and their respective representatives

114

shall make reasonable efforts to coordinate, and provide a prior written notice of, such audits, visits and inspections; and provided, further, that any such audit, visit or inspection of a Successor Servicer shall be at the sole cost and expense of the Lenders. The Borrower or the Servicer, as the case may be, hereby authorizes such officers, employees and independent accountants (and the Servicer shall cause each Subservicer to authorize such officers, employees and independent accountants) to discuss with the Administrative Agent, a Lender and their respective representatives the affairs of the Borrower or the Servicer, as the case may be. Any audit provided for herein shall be conducted in accordance with the rules of the Borrower and the Servicer respecting safety and security on its premises and without materially disrupting operations. Nothing in this subsection shall affect the obligation of the Servicer to observe any Applicable Law prohibiting the disclosure of information regarding the Obligors, and the failure of the Servicer to provide access to information as a result of such obligation shall not constitute a breach of this subsection. In addition to the due diligence reviews specified above, the Backup Servicer may, subject to the terms and conditions specified in this subsection conduct its own periodic due diligence reviews at the sole cost and expense of the Servicer (provided that such costs and expenses shall be limited to a maximum of $5,000 per visit in the case of any due diligence review done at the request of the Backup Servicer prior to the occurrence and continuance of a Servicer Termination Event or the automatic occurrence or declaration of the occurrence of the Amortization Date pursuant to Section 10.01(b), and thereafter, without such cost and expense cap). The Servicer will notify the Backup Servicer of any changes to the servicing processes or servicing systems of the Servicer that have occurred since the last due diligence review performed by the Backup Servicer that would reasonably be expected to have a Material Adverse Effect on the Backup Servicer's ability to undertake the servicing of the Receivables as Successor Servicer under this Agreement. The Servicer shall reimburse the Administrative Agent for all reasonable fees, costs and expenses incurred by or on behalf of the Secured Parties in connection with the foregoing actions promptly upon receipt of a written invoice therefor.

Section 7.07. <u>Annual Statement as to Compliance</u>. The Servicer shall deliver to the Administrative Agent, on or before May 30th of each year, beginning in 2021, an Officer's Certificate, dated as of the preceding December 31st, stating that (i) a review of the activities of the Servicer during the preceding 12-month period (or since the Closing Date in the case of the first such Officer's Certificate) and of its performance under this Agreement has been made under such officer's supervision and (ii) to the best of such officer's knowledge, based on such review, the Servicer has fulfilled all its obligations under this Agreement throughout such year (or such shorter period in the case of the first such Officer's Certificate), or, if there has been a default in the fulfillment of any such obligation, specifying each such default known to such officer and the nature and status thereof. Notwithstanding the foregoing, to the extent that in connection with public offerings, Regulation AB under the Securities Act requires the delivery by servicers of an annual report on an assessment of servicing compliance on the basis of detailed servicing criteria or other report, the delivery of a copy of such report by the Servicer to the Administrative Agent shall be deemed to satisfy the provisions of this subsection.

Section 7.08. <u>Annual Independent Public Accountant's Reports</u>. The Servicer will deliver to the Administrative Agent, on or before May 30th of each year beginning in 2021, a copy of a report prepared by a firm of independent certified public accountants, who may also render other services to the Servicer or any of its Affiliates, addressed to the Board of Managers

115

of the Servicer or any of its Affiliates and the Administrative Agent and dated during the current year, to the effect that such firm has examined the Servicer's policies and procedures and issued its report thereon and expressing a summary of findings (based on certain procedures performed on the documents, records and accounting records that such accountants considered appropriate under the circumstances) relating to the servicing of the Receivables and the administration of the Receivables (including the preparation of the Monthly Reports) during the preceding calendar year (or such longer period in the case of the first sale report) and that such servicing and administration was conducted in compliance with the terms of this Agreement, except for (i) such exceptions as such firm shall believe to be immaterial and (ii) such other exceptions as shall be set forth in such report and that such examination (a) was performed in accordance with standards established by the American Institute of Certified Public Accountants, and (b) included tests relating to auto loans serviced for others in accordance with the requirements of the Uniform Single Attestation Program for Mortgage Bankers, to the extent the procedures in such program are applicable to the servicing obligations set forth in this Agreement.  Notwithstanding the foregoing, to the extent that in connection with public offerings, Regulation AB under the Securities Act requires the delivery of an annual attestation of a firm of independent public accountants with respect to the assessment of servicing compliance with specified servicing criteria of the Servicer stating, among other things, that the Servicer's assertion of compliance with the specified servicing criteria is fairly stated in all material respects, or the reason why such an opinion cannot be expressed, the delivery of a copy of such an attestation to the Administrative Agent shall be deemed to satisfy the provisions of this Section.

In the event such independent certified public accountants require the Backup Servicer or the Account Bank to agree to the procedures to be performed by such firm in any of the reports required to be prepared pursuant to this Section, the Servicer shall direct the Backup Servicer or the Account Bank in writing to so agree; it being understood and agreed that the Backup Servicer or the Account Bank will deliver such letter of agreement in conclusive reliance upon the direction of the Servicer, and each of such Backup Servicer and the Account Bank has not made any independent inquiry or investigation as to, and shall have no obligation or liability in respect of, the sufficiency, validity or correctness of such procedures.

Such report shall also indicate that the firm is "Independent" of the Servicer and its Affiliates within the meaning of the Code of Professional Ethics of the American Institute of Certified Public Accountants.

Section 7.09.  Rights of the Backup Servicer Prior to Assumption of Duties by a Successor Servicer.

(a)      On or before each Reporting Date, the Servicer shall deliver to the Backup Servicer an electronic file containing all information sufficient to allow the Backup Servicer to review the Monthly Report related thereto and (i) determine that such Monthly Report contains the information necessary for the Backup Servicer to complete its obligations under this Section and (ii) confirm the mathematical accuracy, as set forth in the Monthly Report, of the Borrowing Base as of the related Reporting Date (calculated as of the last day of the related Collection Period or, with respect to Receivables added to the Collateral following such last day but prior to the date of such Monthly Report, the related Cutoff Dates).  The Backup Servicer shall, within five Business Days of the related Reporting Date, load the electronic file received from the

116

Servicer, confirm such computer tape or diskette is in readable form and verify (i) the aggregate Principal Balance of all Receivables as of the last day of the related Collection Period, and (ii) the Serviced Portfolio Net Loss-to-Liquidation Ratio, the Serviced Portfolio Delinquency Ratio, the Serviced Portfolio Extension Ratio, the Net Loss-to-Liquidation Ratio, the Delinquency Ratio and the Extension Ratio.  In the event of any discrepancy between the information set forth in the two foregoing sentences, as calculated by the Servicer, from that determined or calculated by the Backup Servicer, the Backup Servicer shall promptly notify the Servicer of such discrepancy and, if within five days of such notice being provided to the Servicer, the Backup Servicer and the Servicer are unable to resolve such discrepancy, the Backup Servicer shall promptly notify the Administrative Agent of such discrepancy.  The Backup Servicer shall provide a Monthly Backup Servicer Certificate to the Administrative Agent and the Servicer, on or before the close of business on the fifth Business Day following each Reporting Date.  The Backup Servicer, in its capacity as such, shall not be responsible for delays attributable to the Servicer's failure to deliver information, defects in the information supplied by the Servicer or other circumstances beyond the control of the Backup Servicer.  If the electronic file or the Monthly Report does not contain sufficient information for the Backup Servicer to perform any action hereunder, the Backup Servicer shall promptly notify the Servicer of any additional information to be delivered by the Servicer to the Backup Servicer, and the Backup Servicer and the Servicer shall mutually agree upon the form thereof; provided, however, that the Backup Servicer shall not be liable for the performance of any action unable to be taken hereunder without such additional information until it is received from the Servicer.

(b)     The Administrative Agent or a Lender may request in writing that the Servicer deliver to the Backup Servicer the Test Data File, in a format acceptable to the Backup Servicer. The Backup Servicer and the Servicer will agree upon the file layout and electronic medium to transfer such data to the Backup Servicer.  The Backup Servicer shall confirm to the Servicer and the Administrative Agent in writing that the Test Data File is in the correct format or if any changes or modifications are necessary.  The Backup Servicer shall convert the Test Data File to a servicing system and confirm in writing to the Servicer and the Administrative Agent that it has received and verified the completeness of the Test Data File within 90 days of receipt of such Test Data File; provided, however, that such confirmation shall not be deemed to apply to the accuracy of the Test Data File data as provided by the Servicer, but shall be deemed only to apply to the accuracy of the conversion of the Test Data Files to the Backup Servicer's internal systems.  The cost of loading the Test Data File will be paid by the Servicer and, to the extent not paid by the Servicer, will be paid in accordance with Section 2.07(ii).

(c)     Other than as specifically set forth elsewhere in this Agreement, the Backup Servicer shall have no obligation to supervise, verify, monitor or administer the performance of the Servicer and shall have no liability or responsibility for any action taken or omitted by the Servicer.

(d)     The Backup Servicer shall consult with the Servicer as may be necessary from time to time to perform or carry out the Backup Servicer's obligations hereunder, including the obligation, if requested in writing by the Administrative Agent (acting at the direction of the Required Lenders), to succeed to the duties and obligations of the Servicer pursuant hereto.

117

(e)       Except as provided in this Agreement, the Backup Servicer may accept and rely on all accounting, records and work of the Servicer without audit, and the Backup Servicer shall have no liability or responsibility for the acts or omissions of the Servicer.  If any error, inaccuracy or omission (collectively, "Errors") exists in any information received from the Servicer, and such Errors should cause or materially contribute to the Backup Servicer making or continuing any Errors (collectively, "Continued Errors"), the Backup Servicer shall have no liability or responsibility for such Continued Errors; provided, however, that this provision shall not protect the Backup Servicer against any liability which would otherwise be imposed by reason of willful misconduct, bad faith or gross negligence in discovering or correcting any Error or in the performance of its or their duties hereunder or under this Agreement.  In the event the Backup Servicer has actual knowledge or receives written notice of Errors or Continued Errors, it shall, with the prior consent of the Administrative Agent, use its best efforts to reconstruct and reconcile such data as is commercially reasonable to correct such Errors and Continued Errors and prevent future Continued Errors.  The Backup Servicer shall be entitled to recover its costs thereby expended from the Servicer (or, to the extent not paid by the Servicer, in accordance with Section 2.07(ii)).

(f)       The Backup Servicer shall be indemnified by the Servicer and the Borrower from and against all claims, damages, losses or expenses reasonably incurred by the Backup Servicer (including reasonable attorneys' fees, court costs, losses and expenses incurred in connection with (i) any enforcement (including any action, claim, or suit brought) by the Backup Servicer of any indemnification obligation or other obligation of the Servicer or the Borrower and (ii) a successful defense of any claim that the Backup Servicer breached its standard of care) arising out of claims asserted against the Backup Servicer on any matter arising out of this Agreement to the extent the act or omission giving rise to the claim accrues before the date on which the Backup Servicer assumes the duties of Successor Servicer hereunder, except for any claims, damages, losses or expenses arising from the Backup Servicer's own gross negligence, bad faith or willful misconduct.  Notwithstanding the foregoing, if a successor to the Backup Servicer is appointed hereunder, then the Servicer and the Borrower shall have no obligations to indemnify the successor Backup Servicer except to the extent that the Servicer and the Borrower have consented, in their reasonable discretion, to the selection of the successor Backup Servicer.  The provisions of this Section shall survive the termination or assignment of this Agreement or the resignation or removal of any party.

(g)       If the Backup Servicer is acting as Successor Servicer, it may delegate in the ordinary course of business any or all of its duties and obligations hereunder to one or more subservicers; provided, however, that it shall at all times remain responsible for the performance of such duties and obligations.

Section 7.10.   Rights After Assumption of Duties by Successor Servicer; Liability.  At any time following the assumption of the duties of the Servicer by a Successor Servicer pursuant to Section 7.14 as a result of the occurrence of a Servicer Termination Event or following the resignation of the Servicer pursuant to Section 7.12:

(a)       The outgoing Servicer, on behalf of the Borrower, shall, at the Administrative Agent's request (with the consent of the Required Lenders), (i) assemble the records relating to the Collateral, including all Receivable Files, and shall make the

118

same available to the Administrative Agent or the Successor Servicer at a place selected by the Administrative Agent, and (ii) segregate all cash, checks and other instruments received by it from time to time constituting Collections in a manner acceptable to the Administrative Agent or the Successor Servicer and shall, promptly upon receipt but no later than one Business Day after receipt, remit all such cash, checks and instruments, duly endorsed or with duly executed instruments of transfer, to, or at the direction of, the Administrative Agent.

(b)     The Borrower hereby authorizes the Administrative Agent (as agent for the Secured Parties) to take or cause to be taken any and all steps in the Borrower's name and on its behalf necessary or desirable, in the determination of the Administrative Agent, to collect all amounts due under the Collateral, including endorsing the Borrower's names on checks and other instruments representing Collections and enforcing the Receivables.

Section 7.11.  <u>Limitation on Liability of the Servicer and Others</u>.  Except as expressly provided herein, neither the Servicer nor any of its directors or officers or employees or agents shall be under any liability to the Secured Parties or any other Person for any action taken or for refraining from the taking of any action pursuant to this Agreement; provided, however, that this provision shall not protect the Servicer or any such Person against any liability that would otherwise be imposed by reason of its willful misfeasance, bad faith or gross negligence in the performance of duties or by reason of its willful misconduct hereunder.

Section 7.12.  <u>The Servicer Not to Resign</u>.  The Servicer shall resign only with the prior written consent of the Administrative Agent (acting at the direction of the Required Lenders) or if the Servicer provides an Opinion of Counsel to the Administrative Agent and the Backup Servicer to the effect that it is no longer permitted by Applicable Law to act as Servicer hereunder.  No termination or resignation of the Servicer hereunder shall be effective until a successor Servicer acceptable to the Administrative Agent and the Required Lenders has accepted its appointment as Successor Servicer hereunder and has agreed to be bound by the terms of this Agreement and the Credit and Collection Policy.

Section 7.13.  <u>Servicer Termination Events</u>.  The occurrence and continuance of any of the following events shall constitute a "Servicer Termination Event" hereunder:

(a)     any failure by the Servicer to make any payment, transfer or deposit as required by this Agreement or any other Servicer Basic Document, which failure continues unremedied for one Business Day after such payment, transfer or deposit is due and after the Servicer discovers such failure or is given written notice of such failure by the Administrative Agent;

(b)     any failure by the Servicer to deliver a Monthly Report on any Reporting Date which failure continues for two Business Days;

(c)     any failure by the Servicer duly to observe or perform in any material respect any other covenant or agreement of the Servicer set forth in this Agreement (other than as described in clauses (a) and (b) above) or in the other Servicer Basic Documents,

which failure continues unremedied for 30 days after the Servicer discovers such failure or is given written notice of such failure by any other party to such Servicer Basic Document or by the Administrative Agent;

(d)     any representation, warranty or certification made by the Servicer in any Servicer Basic Document or in any certificate or report delivered pursuant to any Servicer Basic Document shall prove to have been incorrect in any material respect as of the time when the same shall have been made and, if capable of being cured, is not cured within 30 days after the Servicer discovers such failure or is given written notice of such failure by any other party to such Servicer Basic Document or by the Administrative Agent;

(e)     an Insolvency Event shall occur with respect to the Servicer or any of its material Subsidiaries;

(f)     one or more judgments, settlements or consent orders shall be entered against the Servicer by any Governmental Authority (including any such items as a result of the CFPB or State regulator reviews) assessing monetary damages, individually or in the aggregate over any calendar year, in excess of $2,000,000 and such judgments, settlements or consent orders, as applicable, shall not have been discharged, stayed or paid within 30 days;

(g)     the IRS shall file notice of a Lien pursuant to Section 6323 of the Code with regard to any assets of the Borrower or any material portion of the assets of any Tricolor Entity, or the Pension Benefit Guaranty Corporation shall file notice of a Lien pursuant to Section 4068 of ERISA with regard to any of the assets of any Tricolor Entity or the Borrower and, in either case, such Lien shall not have been released within 30 days;

(h)     (i) any Servicer Basic Document shall (except in accordance with its terms), in whole or in part, terminate, cease to be effective or cease to be the legally valid, binding and enforceable obligation of the Servicer or (ii) the Servicer shall, directly or indirectly, disaffirm or contest in any manner such effectiveness, validity, binding nature or enforceability;

(i)     a Change in Control, not effected in accordance with Section 7.15, occurs with respect to the Servicer;

(j)     a Termination Event occurs;

(k)     (i) the Servicer shall fail to pay any principal of or premium or interest on any Indebtedness having a principal amount of $5,000,000 or greater, when the same becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise) and such failure continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Indebtedness and shall not be waived by the requisite holders of such Indebtedness; (ii) any other default under any agreement or instrument relating to any such Indebtedness of the Servicer or any other event shall occur and shall continue after the applicable grace period, if any, specified in such agreement or instrument if the effect of such default or event is to

120

accelerate, or to permit the acceleration of, the maturity of such Indebtedness; or (iii) any such Indebtedness shall be declared to be due and payable or required to be prepaid (other than by a regularly scheduled required prepayment), redeemed, purchased or defeased, or an offer to prepay, redeem, purchase or defease such Indebtedness shall be required to be made, in each case, prior to the stated maturity thereof;

(l)    a Material Adverse Effect occurs with respect to the Servicer;

(m)    the Performance Guaranty shall (except in accordance with its terms), in whole or in part, terminate, cease to be effective or cease to be the legally valid, binding and enforceable obligation of the Performance Guarantor or (ii) the Performance Guarantor shall, directly or indirectly, disaffirm or contest in any manner such effectiveness, validity, binding nature or enforceability; or

(n)    a Key Man Event occurs.

Upon the occurrence of any of the foregoing, notwithstanding anything herein to the contrary, so long as any such Servicer Termination Event shall not have been remedied within any applicable cure period or waived in writing by the Administrative Agent, acting at the request or with the consent of the Required Lenders, the Administrative Agent (acting at the request of the Required Lenders), by written notice to the Servicer (with a copy to the Agents, the Backup Servicer, the Account Bank, the Collateral Custodian and each Rating Agency then rating the Loans (each, a "Servicer Termination Notice")), may (i) terminate all of the rights and obligations of the Servicer as Servicer under this Agreement, (ii) direct the Servicer to cause Collections to be deposited into an account other than the Master Collection Account or the Collection Account; provided, that such other account must be established by the Successor Servicer at the Account Bank or another Qualified Institution and (iii) direct the Servicer to deliver, or cause to be delivered, the Receivable Files and the related accounts and records maintained by the Servicer to the Administrative Agent, or its agent or designee, at such place as the Administrative Agent may reasonably designate with written notice to the Lenders.

Section 7.14.    Appointment of Successor Servicer.

(a)    Upon the resignation of the Servicer pursuant to Section 7.12 or on and after the receipt by the Servicer of a Servicer Termination Notice, the outgoing Servicer shall continue to perform all servicing functions under this Agreement until the date specified in the Servicer Termination Notice or otherwise specified by the Administrative Agent in writing or, if no such date is specified in such Servicer Termination Notice or otherwise specified by the Administrative Agent, until a date mutually agreed upon by the outgoing Servicer, the Backup Servicer and the Administrative Agent, acting with the consent of the Required Lenders.  The Administrative Agent may, with the consent of the Required Lenders, at the time described in the immediately preceding sentence, appoint the Backup Servicer as the Successor Servicer hereunder and the Backup Servicer shall on such date assume all obligations of the Servicer hereunder, and all authority and power of the outgoing Servicer under this Agreement shall pass to and be vested in the Backup Servicer.  In the event that the Administrative Agent does not so appoint the Backup Servicer to succeed the outgoing Servicer as Servicer hereunder or the Backup Servicer is unable to assume such obligations on such date, the Administrative Agent

121

shall, with the consent of the Required Lenders, as promptly as possible appoint a successor Servicer whose regular business includes the servicing of subprime automobile receivables (the Backup Servicer or such other entity as successor Servicer, the "Successor Servicer").

(b)     Each Successor Servicer shall accept its appointment by a written assumption in a form acceptable to the Administrative Agent and the Required Lenders (with a copy to the Account Bank).  In the event that a Successor Servicer has not accepted its appointment at the time when the outgoing Servicer ceases to act as Servicer, the Administrative Agent shall petition a court of competent jurisdiction to appoint any established financial institution whose regular business includes the servicing of subprime automobile receivables as the Successor Servicer hereunder.

(c)     Upon the resignation or termination and removal of the Servicer, the predecessor Servicer shall cooperate with the Successor Servicer in effecting the termination of the rights and responsibilities of the predecessor Servicer under this Agreement, including the transfer to the Successor Servicer for administration by it of all cash amounts that shall at the time be held by the predecessor Servicer for deposit, or shall thereafter be received, with respect to a Receivable, and the related accounts and records maintained by the Servicer.  In the case that the Successor Servicer shall not agree to perform any duties or obligations of the Servicer hereunder, such duties or obligations may be performed or delegated by the Administrative Agent.  The Servicer, if other than Tricolor, shall as soon as practicable upon demand, deliver to the Borrower all records in its possession which evidence or relate to Indebtedness of an Obligor which is not a Receivable.

(d)     The Administrative Agent shall have the same rights of removal and termination for cause with respect to the Successor Servicer as with respect to Tricolor as the initial Servicer.

(e)     All reasonable out-of-pocket costs and expenses (including attorneys' fees and disbursements) incurred in connection with the transferring of Receivables to the Successor Servicer, converting the outgoing Servicer's data to the computer system of the Successor Servicer and amending this Agreement to reflect such succession as Servicer pursuant to this Section shall be paid by the predecessor Servicer upon presentation of reasonable transition expenses not exceeding $150,000 (the "Transition Expenses").  In no event shall the Backup Servicer, if it becomes the Successor Servicer, be responsible for any Transition Expenses.  If the predecessor Servicer fails to pay the Transition Expenses, the Transition Expenses shall be payable pursuant to Section 2.07(ii).

(f)     Upon its appointment, the Successor Servicer shall be the successor in all respects to the outgoing Servicer with respect to servicing functions under this Agreement and shall be subject to all the responsibilities, duties and liabilities relating thereto placed on the Servicer by the terms and provisions hereof, and all references in this Agreement to the Servicer shall be deemed to refer to the Successor Servicer; provided, however, that any Successor Servicer shall have (i) no liability with respect to any obligation which was required to be performed by the predecessor Servicer prior to the date that it becomes the Successor Servicer or any claim of a third party based on any alleged action or inaction of the predecessor Servicer, (ii) no obligation to perform any repurchase or advancing obligations, if any, of the Servicer, (iii) no obligation to pay any taxes required to be paid by the Servicer, (iv) no obligation to pay any of the fees and

122

expenses of any other party to this Agreement or any other Basic Document, (v) no liability or obligation with respect to any Servicer indemnification obligations of any prior Servicer, including Tricolor, and (vi) no obligation to service the Receivables in accordance with the Credit and Collection Policy, but shall use its customary credit and collection policies for similar assets.  If the Backup Servicer becomes the Successor Servicer, the representations, warranties and covenants of the Servicer contained herein shall be modified as follows:  (i) Section 6.04(b) shall be deemed to refer to the Servicer's status as a national banking association in good standing under the laws of the United States, (ii) the statement referred to in Section 6.04(h) shall come from a Responsible Officer of the Successor Servicer, (iii) the covenants in Sections 6.04(g), (l), (m) and (q) shall not apply and (iv) the covenants in Sections 6.05(b), (c), (d), (i) and (j) and 7.08 shall not apply.  The indemnification obligations of the Backup Servicer, upon becoming a successor Servicer, are expressly limited to those instances of gross negligence or willful misconduct of the Backup Servicer in its role as Successor Servicer.

(g)     All authority and power granted to the Servicer under this Agreement shall automatically cease and terminate upon termination of this Agreement and shall pass to and be vested in the Borrower and the Borrower is hereby authorized and empowered to execute and deliver, on behalf of the Servicer, as attorney-in-fact or otherwise, all documents and other instruments, and to do and accomplish all other acts or things necessary or appropriate to effect the purposes of such transfer of servicing rights.  The Servicer agrees to cooperate with the Borrower in effecting the termination of the responsibilities and rights of the Servicer to service the Receivables.

(h)     The Successor Servicer shall act as Servicer hereunder and shall, subject to the availability of sufficient funds in the Collection Account pursuant to Section 2.07 (up to the Servicing Fee), receive as compensation therefor the Servicing Fee pursuant to Section 2.07(i) (or such other fee as agreed to in writing by such Successor Servicer and each Lender, with notice to the Borrower, the Administrative Agent and each Rating Agency then rating the Loans).

Section 7.15.  Merger or Consolidation, Assumption of Obligations or Resignation, of the Servicer.  Any Person (i) into which the Servicer may be merged or consolidated, (ii) which may result from any merger or consolidation to which the Servicer may be a party, (iii) which may succeed to the properties and assets of the Servicer substantially as a whole or (iv) which may succeed to the duties and obligations of the Servicer under this Agreement following the resignation of the Servicer, which Person executes an agreement of assumption acceptable to the Administrative Agent to perform every obligation of the Servicer hereunder, shall, with the prior written consent of the Administrative Agent, acting with the consent of the Required Lenders (in each case which consent shall not be unreasonably withheld), be the successor to the Servicer under this Agreement without further act on the part of any of the parties to this Agreement; provided, however, that:

(a)     prior written notice of such consolidation, merger, succession or resignation shall be delivered by the Servicer to the Administrative Agent, each Lender, each Hedge Counterparty, the Collateral Custodian and each Rating Agency then rating the Loans;

(b)     immediately after giving effect to such consolidation, merger, succession or resignation, no Servicer Termination Event and no event which after notice or lapse of time, or both, would become a Servicer Termination Event shall have occurred and is continuing;

(c)     no Amortization Event, Termination Event, Unmatured Termination Event, Servicer Termination Event or Unmatured Servicer Termination Event would occur as result of such consolidation, merger, succession or resignation;

(d)     the Servicer shall have delivered to the Borrower, the Backup Servicer, each Lender and the Administrative Agent, an Officer's Certificate and an Opinion of Counsel, each stating that such consolidation, merger, succession or resignation and such agreement of assumption comply with this Section and that all conditions precedent provided for in this Agreement and the other Basic Documents to which it is a party relating to such transaction have been complied with and, in the case of the Opinion of Counsel, that such agreement of assumption is legal, valid and binding with respect to the Servicer and such other matters as the Administrative Agent may reasonably request; and

(e)     the Servicer shall have delivered to the Borrower, the Backup Servicer, each Lender and the Administrative Agent an Opinion of Counsel to the effect that either (1) in the opinion of such counsel, all financing statements, continuation statements and amendments and notations on Certificates of Title thereto have been executed and filed that are necessary to preserve and protect the interests of the Borrower and the Secured Parties in the Receivables and reciting the details of such filings or (2) no such action shall be necessary to preserve and protect such interest;

provided, further, however, that if the Backup Servicer becomes the Successor Servicer, clauses (a), (d) and (e) above shall not apply to the Successor Servicer.

Section 7.16.   Responsibilities of the Borrower.   Anything herein to the contrary notwithstanding, the Borrower shall (i) perform, or cause the Servicer to perform, all of its obligations under the Receivables, to the same extent as if a security interest in such Receivables had not been granted hereunder, and the exercise by the Administrative Agent of its rights hereunder shall not relieve the Borrower from such obligations and (ii) pay when due, from funds available to the Borrower under Section 2.07(ix), any Taxes, including any sales Taxes payable in connection with the Receivables and their creation and satisfaction.  No Secured Party or Agent shall have any obligation or liability with respect to any Receivable, nor shall any of them be obligated to perform any of the obligations of the Borrower thereunder.

261320820v.10 94601/30060

ARTICLE EIGHT

BACKUP SERVICER

Section 8.01.  Designation of the Backup Servicer.

(a)      The Borrower and the Administrative Agent, on behalf of the Secured Parties, each hereby appoints Vervent to act as Backup Servicer for the benefit of the Borrower, the Administrative Agent and the Secured Parties.  Vervent hereby accepts such appointment and agrees to perform the duties and obligations with respect thereto set forth herein.

(b)      Upon the occurrence of a Servicer Termination Event, the Administrative Agent (acting at the direction of the Required Lenders) may designate the Backup Servicer to act as Servicer for the benefit of the Secured Parties.  The Backup Servicer shall accept such appointment and agree to perform the duties and obligations with respect thereto set forth herein.

(c)      Until the receipt by the Backup Servicer of a notice from the Administrative Agent (acting at the direction of the Required Lenders) of the designation of a new Backup Servicer pursuant to Section 8.04, the Backup Servicer will not terminate its activities as Backup Servicer hereunder.

Section 8.02.  Duties of the Backup Servicer.  From the Closing Date until the earlier of (i) its removal pursuant to Section 8.04, (ii) its resignation in accordance with Section 8.05, (iii) its appointment as Successor Servicer pursuant to Section 7.14(a) (with respect to Section 7.09) or (iv) the Facility Termination Date, the Backup Servicer shall perform, on behalf of the Secured Parties, the duties and obligations set forth in Sections 7.09 and 7.10.

Section 8.03.  Backup Servicing Compensation.  As compensation for its back-up servicing activities hereunder, the Backup Servicer shall be entitled to receive a monthly fee up to an amount equal to the Backup Servicing Fee in accordance with the priorities set forth in Section 2.07.  The Backup Servicer's entitlement to receive such fee shall cease on the earliest to occur of (i) it becoming the Successor Servicer, (ii) its removal as Backup Servicer pursuant to Section 8.04, (iii) its resignation in accordance with Section 8.05 or (iv) the termination of this Agreement.

Section 8.04.  Backup Servicer Removal.  The Backup Servicer may be removed in connection with a breach of any representation, warranty or covenant of the Backup Servicer under this Agreement, or otherwise in the discretion of the Administrative Agent and the Borrower, by 30 days' prior notice given in writing and delivered to the Backup Servicer from the Administrative Agent (the "Backup Servicer Termination Notice").  On and after the receipt by the Backup Servicer of the Backup Servicer Termination Notice, the Backup Servicer shall continue to perform all backup servicing functions under this Agreement until the date specified in the Backup Servicer Termination Notice or otherwise specified by the Administrative Agent in writing or, if no such date is specified in the Backup Servicer Termination Notice or otherwise so specified by the Administrative Agent, until a date mutually agreed upon by the Backup Servicer and the Administrative Agent.  All actions of the Administrative Agent taken pursuant to this Section shall be made at the direction, or with the consent, of the Required Lenders.

125

Section 8.05.  <u>Backup Servicer Not to Resign</u>.  The Backup Servicer shall resign only with the prior written consent of the Administrative Agent (acting at the direction of the Required Lenders) and, so long as no Servicer Termination Event, Amortization Event or Termination Event has occurred and is continuing, the Borrower, or if the Backup Servicer provides an Opinion of Counsel to the Administrative Agent and the Borrower to the effect that the Backup Servicer is no longer permitted by Applicable Law to act as Backup Servicer hereunder.  No termination or resignation of the Backup Servicer hereunder shall be effective until a successor Backup Servicer, acceptable to the Administrative Agent and the Required Lenders and, so long as no Servicer Termination Event, Amortization Event or Termination Event has occurred and is continuing, the Borrower, has accepted its appointment as successor Backup Servicer hereunder and has agreed to be bound by the terms of this Agreement and the Credit and Collection Policy; provided, however, that in the event a successor Backup Servicer is not appointed within 60 days after the Backup Servicer has given notice of its resignation and has provided the Opinion of Counsel required by this Section, the Backup Servicer may petition a court for its removal, with the cost of such petition to be borne by the Servicer.

Section 8.06.  <u>Monthly Backup Servicer Certificate</u>.  The Backup Servicer shall provide a Monthly Backup Servicer Certificate to each Secured Party, each Agent, the Borrower and the Servicer on or before the close of business on the fifth Business Day following each Reporting Date.  The Backup Servicer, in its capacity as such, shall not be responsible for delays attributable to the Servicer's failure to deliver information, defects in the information supplied by the Servicer or other circumstances beyond the control of the Backup Servicer.

Section 8.07.  <u>Covenants of the Backup Servicer</u>.

(a)      <u>Affirmative Covenants</u>.  From the Closing Date until the Facility Termination Date:

(i)      <u>Compliance with Law</u>.  The Backup Servicer will comply in all material respects with all Applicable Laws.

(ii)      <u>Preservation of Existence</u>.  The Backup Servicer will preserve and maintain its existence, rights, franchises and privileges in the jurisdiction of its formation, and qualify and remain qualified in good standing in each jurisdiction where the failure to preserve and maintain such existence, rights, franchises, privileges and qualification has had, or could reasonably be expected to have, a Material Adverse Effect.

(b)      <u>Negative Covenant</u>.  From the Closing Date until the Facility Termination Date, the Backup Servicer will not change the Backup Servicing Fee without the prior written approval of the Administrative Agent (acting at the direction of the Required Lenders) and, provided that no Termination Event or Amortization Event shall have occurred, the Borrower.

Section 8.08.  <u>Merger of the Backup Servicer</u>.  Any Person into which the Backup Servicer may be merged or converted or with which it may be consolidated, or any Person resulting from any merger, conversion or consolidation to which to Backup Servicer shall be a party, or any Person succeeding to the business of the Backup Servicer, shall be the successor of the Backup Servicer under this Agreement, without the execution or filing of any paper or any

126

further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding.

Section 8.09.  Rights of the Backup Servicer after Assumption of Duties by Successor Servicer; Liability.  At any time following the assumption of the duties of the Servicer by a Successor Servicer pursuant to Section 7.14 as a result of the occurrence of a Servicer Termination Event or following the resignation of the Servicer pursuant to Section 7.12:

(a)     The Backup Servicer shall be liable in accordance herewith only to the extent of its obligations set forth in this Agreement or any obligations assumed by the Backup Servicer from the Servicer pursuant to Section 7.14.  No implied duties (including fiduciary duties), covenants or obligations shall be read into this Agreement against the Backup Servicer and, in the absence of bad faith or gross negligence on its part, the Backup Servicer may conclusively rely on the truth of the statements and the correctness of the opinions expressed in any certificates or opinions furnished to it and conforming to the requirements of this Agreement.

(b)     The Backup Servicer shall not be charged with knowledge of event unless a Responsible Officer of the Backup Servicer obtains actual knowledge of such event or the Backup Servicer receives written notice of such event from the Borrower, the Servicer or the Administrative Agent.

(c)     The Backup Servicer shall not be required to expend or risk its own funds or otherwise incur financial liability in the performance of its duties hereunder, or in the exercise of any of its rights or powers, if it reasonably determines that the repayment of such funds or adequate written indemnity against such risks or liability is not available prior to the expenditure of such funds or the incurrence of financial liability.  Notwithstanding any provision to the contrary, the Backup Servicer, so long as it is not the Successor Servicer, shall not be liable for any obligation of the Servicer contained in this Agreement, and the parties shall look only to the Servicer to perform such obligations.

(d)     The Backup Servicer may execute any of the powers hereunder or perform any duties under this Agreement either directly or by or through agents, subcontractors, subservicers, nominees, attorneys or custodians.  The Backup Servicer shall not be responsible for any misconduct or negligence of any such agents, subcontractors, subservicers, nominees, attorneys or custodians appointed with due care by it.

(e)     The Backup Servicer may consult with counsel of its choice with regard to legal questions arising out of or in connection with this Agreement and the advice or opinion of such counsel shall be full and complete authorization and protection in respect of any action taken, omitted or suffered by the Backup Servicer in good faith in accordance therewith.

(f)     The Backup Servicer need not investigate any statement, representation or warranty or any fact or matter stated in the document and may conclusively rely as to the truth of the statement and correctness of the opinions expressed therein.

(g)     The Backup Servicer shall have no responsibility and shall not be in default hereunder nor incur any liability (i) for any failure, error, malfunction or any delay in carrying out any of its duties under this Agreement if any such failure or delay results from the Backup

127

Servicer acting in accordance with Applicable Laws or from acts of God, war or terrorism, insurrection, strikes, stoppages of labor, power or equipment failure or malfunction (including that of any common carrier or transmission line), loss or malfunction of communications or computer (hardware or software) services, emergency conditions, tornado, flood, fire, earthquake or similar event, adverse weather conditions or any other factor, medium, instrumentality or any cause or circumstances, directly or indirectly, beyond the Backup Servicer's control, it being understood that the Backup Servicer shall use commercially reasonable efforts to resume performance under this Agreement as soon as practicable under the circumstances or (ii) from information prepared or supplied by a Person other than the Backup Servicer as contemplated hereunder or the failure of any such other Person to prepare or provide such information.

(h)     The Backup Servicer offers no representations concerning, and shall have no liability hereunder with respect to, the collectability, enforceability or other characteristics of the Collateral.

(i)     The Backup Servicer will have no responsibility and will not be in default hereunder or incur any liability for any failure, error, malfunction or any delay in carrying out any of its duties under this Agreement if such failure or delay results from the Backup Servicer acting in accordance with information prepared or supplied by any Person other than the Backup Servicer or the failure of any such other Person to prepare or provide such information.  In the event the Backup Servicer becomes aware of errors, which in the opinion of the Backup Servicer, impairs its ability to perform its services hereunder, the Backup Servicer shall immediately notify the Servicer of such errors.  The Backup Servicer will have no responsibility, will not be in default and will incur no liability for (i) any act or failure to act of any third party, including the Servicer and the Successor Servicer (unless the Backup Servicer has become Successor Servicer pursuant to this Agreement), (ii) any inaccuracy or omission in a notice or communication received by the Backup Servicer from any third party, (iii) the invalidity or unenforceability of any obligation under applicable law, (iv) the breach or inaccuracy of any representation or warranty made with respect to any Loan or (v) the acts or omissions of any successor Backup Servicer.  Except for the obligations undertaken by the Backup Servicer in this Agreement, the Backup Servicer will have no obligation to take any action, or to perform any of the duties of the Servicer or the Successor Servicer, under any Basic Document unless and until such time as the Backup Servicer has become a Successor Servicer pursuant to this Agreement.

(j)     The Backup Servicer may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, report, certificate of auditors or any other certificate, statement, instrument, opinion, report, notice, request, consent, order, appraisal, bond or other paper or document reasonably believed by it to be genuine and to have been signed or presented by the proper party or parties.

261320820v.10 94601/30060

ARTICLE NINE

THE COLLATERAL CUSTODIAN

Section 9.01.  Appointment; Duties of the Collateral Custodian.  The Administrative Agent, each Agent, each Lender and the Borrower, at the direction of and on behalf of the Administrative Agent, hereby appoint WTNA to act solely on the Administrative Agent's behalf as Collateral Custodian hereunder, and WTNA hereby accepts such appointment.  The Collateral Custodian shall undertake to perform such duties and only such duties as are specifically set forth in this Agreement.

Section 9.02.  Compensation and Indemnification of the Collateral Custodian.

(a)      The Collateral Custodian shall be compensated for its activities hereunder and reimbursed for reasonable out-of-pocket expenses by receiving the Collateral Custodian Fee.

(b)      The Borrower shall indemnify the Collateral Custodian and its officers, directors, employees and agents for, and hold them harmless against any loss, claim, action, suit or expense (including legal fees and expenses and legal fees and expenses in connection with enforcement of its rights hereunder) incurred, other than in connection with the willful misconduct or gross negligence on the part of the Collateral Custodian, arising out of or in connection with (i) the performance of its obligations under and in accordance with this Agreement, including the costs and expenses of defending itself against any claim or liability in connection with the exercise or performance of any of its powers or duties under this Agreement and (ii) the negligence, willful misconduct or bad faith of the Borrower in the performance of its duties hereunder.  All such amounts shall be payable in accordance with Section 2.07.  The provisions of this Section shall survive the termination of this Agreement and the resignation or removal of the Collateral Custodian.

THE FOREGOING INDEMNIFICATION SHALL APPLY WHETHER OR NOT SUCH LIABILITIES AND COSTS ARE IN ANY WAY OR TO ANY EXTENT OWED, IN WHOLE OR IN PART, UNDER ANY CLAIM OR THEORY OF STRICT LIABILITY, OR ARE CAUSED, IN WHOLE OR IN PART, BY ANY NEGLIGENT ACT OR OMISSION OF ANY KIND BY THE COLLATERAL CUSTODIAN.

Section 9.03.  Liability of the Collateral Custodian.

(a)      The Collateral Custodian shall be liable in accordance herewith only to the extent of the obligations specifically undertaken by the Collateral Custodian in such capacity herein. No implied duties (including fiduciary duties), covenants or obligations shall be read into this Agreement against the Collateral Custodian and, in the absence of gross negligence on the part of the Collateral Custodian, the Collateral Custodian may conclusively rely on the truth of the statements and the correctness of the opinions expressed in any certificates or opinions furnished to the Collateral Custodian pursuant to and conforming to the requirements of this Agreement.

(b)      The Collateral Custodian shall not be liable for:

(i)      an error of judgment made in good faith by one of its officers; or

129

(ii)      any action taken, suffered or omitted to be taken in good faith in accordance with or believed by it to be authorized or within the discretion or rights or powers conferred, by this Agreement or at the direction of a Secured Party relating to the exercise of any power conferred upon the Collateral Custodian under this Agreement in each case unless it shall be proved that the Collateral Custodian shall have been negligent in ascertaining the pertinent facts.

(c)      The Collateral Custodian shall not be charged with knowledge of any Termination Event or Servicer Termination Event unless a Responsible Officer of the Collateral Custodian obtains actual knowledge of such event or the Collateral Custodian receives written notice of such event from the Borrower, the Servicer, any Secured Party or the Administrative Agent, as the case may be.

(d)      Without limiting the generality of this Section, the Collateral Custodian shall have no duty (i) to see to any recording, filing or depositing of this Agreement or any agreement referred to herein or any financing statement or continuation statement evidencing a security interest in the Receivables or the related Financed Vehicles, or to see to the maintenance of any such recording or filing or depositing or to any recording, refiling or redepositing of any thereof, (ii) to see to any insurance of the Financed Vehicles or Obligors or to effect or maintain any such insurance, (iii) to see to the payment or discharge of any Tax, assessment or other governmental charge or any Lien or encumbrance of any kind owing with respect to, assessed or levied against, any part of the Receivables, (iv) to confirm or verify the contents of any reports or certificates of the Servicer or the Borrower delivered to the Collateral Custodian pursuant to this Agreement believed by the Collateral Custodian to be genuine and to have been signed or presented by the proper party or parties or (v) to inspect the Financed Vehicles at any time or ascertain or inquire as to the performance or observance of any of the Borrower's or the Servicer's representations, warranties or covenants or the Servicer's duties and obligations as Servicer and as custodian of books, records, files and computer records relating to the Receivables under this Agreement.

(e)      The Collateral Custodian shall not be required to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if there shall be reasonable ground for believing that the repayment of such funds or adequate indemnity against such risk or liability shall not be reasonably assured to it, and none of the provisions contained in this Agreement shall in any event require the Collateral Custodian to perform, or be responsible for the manner of performance of, any of the obligations of the Servicer under this Agreement.

(f)      The Collateral Custodian may rely and shall be protected in acting or refraining from acting upon any resolution, Officer's Certificate, any Monthly Report, certificate of auditors or any other certificate, statement, instrument, opinion, report, notice, request, consent, order, appraisal, bond or other paper or document reasonably believed by it to be genuine and to have been signed or presented by the proper party or parties.

(g)      The Collateral Custodian may consult with counsel of its choice with regard to legal questions arising out of or in connection with this Agreement and the advice or opinion of such counsel shall be full and complete authorization and protection in respect of any action taken, omitted or suffered by the Collateral Custodian in good faith in accordance therewith.

(h)    The Collateral Custodian shall be under no obligation to exercise any of the rights, powers or remedies vested in it by this Agreement (except to comply with its obligations under this Agreement and the other Collateral Custodian Basic Documents) or to institute, conduct or defend any litigation under this Agreement or in relation to this Agreement, at the request, order or direction of the Administrative Agent pursuant to the provisions of this Agreement, unless the Administrative Agent, on behalf of the Secured Parties, shall have offered to the Collateral Custodian reasonable security or indemnity against the costs, expenses and liabilities that may be incurred therein or thereby.

(i)    The Collateral Custodian shall not be bound to make any investigation into the facts of matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond or other paper or document, unless requested in writing so to do by a Secured Party; provided, that if the payment within a reasonable time to the Collateral Custodian of the costs, expenses or liabilities likely to be incurred by it in the making of such investigation shall be, in the opinion of the Collateral Custodian, not reasonably assured by the Borrower, the Collateral Custodian may require reasonable indemnity against such cost, expense or liability as a condition to so proceeding.  The reasonable expense of every such examination shall be paid by the Borrower or, if paid by the Collateral Custodian, shall be reimbursed by the Borrower upon demand.

(j)    The Collateral Custodian may execute any of the trusts or powers hereunder or perform any duties under this Agreement either directly or by or through agents or attorneys or a custodian.  The Collateral Custodian shall not be responsible for any misconduct or negligence of any such agent or custodian appointed with due care by it hereunder.

Section 9.04.  <u>Limitation on Liability of the Collateral Custodian and Others</u>.  The directors, officers, employees or agents of the Collateral Custodian shall not be under any liability to the Administrative Agent, each Agent, each Lender, the Borrower or any other Person hereunder or pursuant to any document delivered hereunder, it being expressly understood that all such liability is expressly waived and released as a condition of, and as consideration for, the execution of this Agreement; provided, however, that this provision shall not protect the directors, officers, employees and agents of the Collateral Custodian against any liability which would be imposed by reason of willful misconduct or gross negligence in the performance of duties or by reason of reckless disregard of obligations and duties hereunder.  The Collateral Custodian shall not be under any liability to the Administrative Agent, each Agent, each Lender, the Borrower or any other Person for any action taken or for refraining from the taking of any action in its capacity as Collateral Custodian pursuant to this Agreement whether arising from express or implied duties under this Agreement; provided, however, that this provision shall not protect the Collateral Custodian against any liability which would be imposed by reason of willful misconduct or gross negligence in the performance of duties or by reason of reckless disregard of obligations and duties hereunder.  The Collateral Custodian may rely in good faith on any document of any kind, prima facie, properly executed and submitted by any Person respecting any matters arising hereunder.

Section 9.05.  <u>Certain Matters Affecting the Collateral Custodian</u>.

(a)     The Collateral Custodian shall have no duties or responsibilities except those that are specifically set forth herein, and no implied duties (including fiduciary duties), covenants or obligations shall be read into this Agreement against the Collateral Custodian.  The Collateral Custodian shall be under no responsibility or duty with respect to the disposition of any Contract Files delivered to it hereunder while such Contract Files are not in its possession.  If the Collateral Custodian shall request instructions from the Administrative Agent or the Servicer with respect to any act, action or failure to act in connection with and as set forth in this Agreement, the Collateral Custodian shall be entitled to refrain from taking such action and continue to refrain from acting unless and until the Collateral Custodian shall have received written instructions from the Administrative Agent or the Servicer, as applicable without incurring any liability therefor to the Administrative Agent, the Borrower, the Servicer or any other person.

(b)     The Collateral Custodian may act in reliance upon any written communication of the Administrative Agent concerning the delivery of the Contract Files for any of the Receivables and other items of Collateral pursuant to this Agreement.  The Collateral Custodian does not assume and shall have no responsibility for, and makes no representation as to, monitoring the value of the Contract Files relating to any of the Receivables and other Collateral. The Collateral Custodian shall not be liable for any action or omission to act hereunder, except for its own gross negligence or willful misconduct.  In no event shall the Collateral Custodian have any responsibility to ascertain or take action with respect to the Contract Files relating to any of the Receivables or other Collateral, except as expressly provided herein.

THE FOREGOING PARAGRAPH SHALL APPLY WHETHER OR NOT SUCH LIABILITIES ARE IN ANY WAY OR TO ANY EXTENT OWED, IN WHOLE OR IN PART, UNDER ANY CLAIM OR THEORY OF STRICT LIABILITY, OR ARE CAUSED, IN WHOLE OR IN PART, BY ANY NEGLIGENT ACT OR OMISSION OF ANY KIND BY THE COLLATERAL CUSTODIAN.

(c)     If the Collateral Custodian shall at any time receive conflicting instructions from the Administrative Agent and the Servicer or any other party to this Agreement and the conflict between such instructions cannot be resolved by reference to the terms of this Agreement, the Collateral Custodian shall be entitled to rely on the instructions of the Administrative Agent.  In the absence of gross negligence or willful misconduct on the part of the Collateral Custodian, the Collateral Custodian may rely and shall be protected in acting or refraining from acting upon any resolution, officer's certificate, any Monthly Report, certificate of auditors, or any other certificate, statement, instrument, opinion, report, notice request, consent, order, appraisal, bond or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties.  The Collateral Custodian may rely upon the validity of documents delivered to it, without investigation as to their authenticity or legal effectiveness, and the Servicer and the other parties to this Agreement will hold the Collateral Custodian harmless from any claims that may arise or be asserted against the Collateral Custodian because of the invalidity of any such documents or their failure to fulfill their intended purpose.  The Collateral Custodian shall not be bound to ascertain or inquire as to the performance or observance of any of the terms of this Agreement or any other agreement on the part of any party, except as may otherwise be specifically set forth herein.  The Collateral Custodian may consult with counsel of its choice with regard to legal questions arising out of or in connection with this Agreement and

132

the advice or opinion of such counsel shall be full and complete authorization and protection in respect of any action taken, omitted or suffered by the Collateral Custodian in good faith in accordance therewith.

(d)    In the event the Collateral Custodian loses or misplaces any Contract File related to any Receivable or portion thereof, or if any such instruments, documents, or certificates are destroyed or damaged while in the possession of the Collateral Custodian, then, in addition to any other liability the Collateral Custodian may have in respect thereof pursuant to the terms of this Agreement or otherwise, upon the written request of the Administrative Agent, the Collateral Custodian shall execute and deliver to the Administrative Agent an affidavit stating that such instrument, document, or certificate has been lost or destroyed, as applicable, and, if necessary, such other affidavits or certificates as maybe reasonably necessary to obtain replacement certificates of title.

(e)    The Collateral Custodian is authorized, in its sole discretion, to disregard any and all notices or instructions given by any other party hereto or by any other person, firm or corporation, except only such notices or instructions as are herein provided for and orders or process of any court entered or issued with or without jurisdiction.  If any property subject hereto is at any time attached, garnished or levied upon under any court order or in case the payment, assignment, transfer, conveyance or delivery of any such property shall be stayed or enjoined by any court order, or in case any order, judgment or decree shall be made or entered by any court affecting such property or any part hereof, then and in any of such events the Collateral Custodian is authorized, in its sole discretion, to rely upon and comply with any such order, writ, judgment or decree with which it is advised by legal counsel of its own choosing is binding upon it, and if it complies with any such order, writ, judgment or decree it shall not be liable to any other party hereto or to any other person, firm or corporation by reason of such compliance even though such order, writ, judgment or decree maybe subsequently reversed, modified, annulled, set aside or vacated.

(f)    The Collateral Custodian shall have no responsibility and shall not be in default hereunder nor incur any liability (i) for any failure, error, malfunction or any delay in carrying out any of its duties under this Agreement if any such failure or delay results from the Collateral Custodian acting in accordance with applicable laws, regulations or rules or from acts of God, war or terrorism, insurrection, strikes, stoppages of labor, power or equipment failure or malfunction (including that of any common carrier or transmission line), loss or malfunction of communications or computer (hardware or software) services, emergency conditions, epidemic or pandemic, quarantine, shelter-in-place or similar directive, guidance, policy or other action by any Governmental Authority, tornado, flood, fire, earthquake or similar event, adverse weather conditions or any other factor, medium, instrumentality or any cause or circumstances, directly or indirectly, beyond the Collateral Custodian's control, it being understood that the Collateral Custodian shall use commercially reasonable efforts to resume performance under this Agreement as soon as practicable under the circumstances, or (ii) from information prepared or supplied by a Person other than the Collateral Custodian as contemplated hereunder or the failure of any such other Person to prepare or provide such information.

(g)    The Collateral Custodian need not investigate any statement, representation or warranty or any fact or matter stated in the document and may conclusively rely as to the truth of

133

the statement and correctness of the opinions expressed therein.  The right of the Collateral Custodian to perform any permissive or discretionary act enumerated in this Agreement or any related document shall not be construed as a duty.  The Collateral Custodian shall neither be responsible for, nor chargeable with, knowledge of the terms and conditions of any other agreement, instrument, or document other than this Agreement, whether or not an original or a copy of such agreement has been provided to the Collateral Custodian.  The Collateral Custodian shall have no obligation to supervise, verify, monitor or administer the performance of the Servicer, the Borrower, the Administrative Agent or any other Person.

(h)     The Collateral Custodian may terminate its obligations under this Agreement upon 60 days' prior written notice to the Borrower and the Administrative Agent.  In the event of such termination, (i) the Administrative Agent shall appoint, by written instrument, a successor Collateral Custodian that is capable of accepting delivery of copies of the Contract Files and (ii) the Collateral Custodian, promptly upon payment of its unpaid fees, expenses and any other amounts then owed to it, shall transfer to the successor Collateral Custodian, at the expense of the Borrower and as reasonably directed by the Borrower, all copies of the Contract Files being maintained by the Collateral Custodian under this Agreement.  The Collateral Custodian's sole responsibility after the termination of its obligations as aforesaid shall be to safely maintain copies of the Contract Files and to deliver, as reasonably directed by the Borrower, copies of the Contract Files to a Collateral Custodian; provided, however, that if a successor Collateral Custodian has not accepted custodial responsibilities within the period set forth in the first sentence of this Section, the Collateral Custodian at the expense of the Borrower may petition any court of competent jurisdiction to name a successor Collateral Custodian or may deliver copies of the Contract Files in its possession to the Borrower via secure e-mail or by any other method that the Collateral Custodian and the Borrower deem appropriate, upon the later of (A) such court's identification of a successor Collateral Custodian and (B) such delivery of copies of the Contract Files, the Collateral Custodian's resignation shall be deemed effective and the Collateral Custodian shall have no further duties or obligations under this Agreement.  The Collateral Custodian shall not be responsible for the fees and expenses of any successor Collateral Custodian.

Section 9.06.  <u>Documents Held by the Collateral Custodian; Inspection and Release of Contract Files</u>.

(a)     The Collateral Custodian shall hold and maintain physical possession of the Contract Files in accordance with this Agreement.  The Borrower shall deliver, or cause to be delivered, the Contract Files to the Collateral Custodian within three Business Days following the related Funding Date; provided, however, that if application has been made for the issuance of a Certificate of Title and such Certificate of Title has not yet been issued at the time the Contract Files are delivered to the Collateral Custodian, there shall be delivered as part of the Contract Files copies of all correspondence with the appropriate Registrar of Titles, and all enclosures thereto for the issuance of the Certificate of Title, and the Certificate of Title shall be delivered to the Collateral Custodian promptly upon receipt thereof by the Borrower but in no event later than 180 days following the date of origination of the related Contract.

(b)     The Collateral Custodian shall review the related Contract Files delivered to it in connection with each Funding Date to verify the presence of the original Contract and a

134

Certificate of Title (or evidence that such Certificate of Title has been applied for) with respect to the related Financed Vehicle. Each such review shall be completed within 15 Business Days after receipt of the related Contract Files (or portion thereof, in the case of any subsequently delivered Certificate of Title) and, upon completion of such review, the Collateral Custodian shall deliver to the Administrative Agent a Receivable Receipt prior to the end of such 15 Business Day period. In the event that the Collateral Custodian discovers an exception to any of the above items, the Collateral Custodian shall within five Business Days after each Collection Period with respect to each of the foregoing inspections performed by the Collateral Custodian during such Collection Period, deliver a written notice to the Backup Servicer, the Servicer, the Borrower, each Agent and the Administrative Agent, specifying which of the above items have not been received by the Collateral Custodian with respect to each Contract added to the Collateral during such Collection Period. With respect to any Contract for which any of the foregoing documents has not been delivered to the Collateral Custodian or corrected before delivery by the Collateral Custodian of a written notice with respect to such Contract File (or, in the case of Certificates of Title, if the Certificate of Title for the Contract has not been delivered with 180 days of the related Funding Date of such Contract), the Borrower shall remove or cause the removal of the related Contract from the Collateral, and the Borrower shall acquire and repurchase, respectively, such Contract from the Collateral and deposit the Release Price into the Collection Account. Other than the foregoing reviews, the Collateral Custodian shall have no duty or obligation to review any of the Contract Files. The Servicer may request the Collateral Custodian to release the Contract Files with a Request for Contract File Release.

(c)     The Collateral Custodian agrees to maintain the Contract Files which are delivered to it at the office of the Collateral Custodian, which office is located at the location specified on Schedule D, or at such other office as shall from time to time be identified to the Administrative Agent by written notice delivered promptly but in no event later than 20 days after any change in location. Subject to the foregoing, the Collateral Custodian may temporarily move individual Contract Files or any portion thereof without notice as necessary to allow the Servicer to conduct collection and other servicing activities in accordance with its customary practices and procedures. The Borrower shall cause the Servicer and each Successor Servicer to take whatever actions are required subject to the other provisions of this Agreement, including, the filing of financing statements, as a result of relocating the Contract Files, if any, to maintain the perfection of the Administrative Agent's right, title and interest in and to the Contracts and the Contract Files.

(d)     The Collateral Custodian shall have and perform the following powers and duties:

(i)      hold the Contract Files for the benefit of the Administrative Agent, and maintain a current inventory thereof;

(ii)     carry out such policies and procedures in accordance with its customary actions with respect to the handling and custody of the Contract Files so that the integrity and physical possession of the Contract Files will be maintained; and

(iii)    promptly release the original Contract or the original Certificate of Title to a Financed Vehicle then held by it to the Servicer upon receipt of a Request for Contract File Release.

ARTICLE TEN

TERMINATION EVENTS

Section 10.01.  <u>Termination Events</u>.

(a)      Each of the following events shall constitute a "Termination Event":

(i)      failure on the part of the Borrower (A) to make any payment, transfer or deposit required by the terms of this Agreement on the day such payment, transfer or deposit is required to be made and such failure continues for two Business Days after such payment is due or (B) to make any Monthly Principal Payment Amount or reduce the Loans Outstanding to $0 on the Maturity Date, in each case which failure continues for one Business Day after such payment is due;

(ii)      failure on the part of any Tricolor Entity to observe or perform any of its covenants or agreements set forth herein and any other Basic Document to which it is party, and such failure continues unremedied for 30 days after the Borrower discovers such failure or the Borrower or the Borrower and the Seller or the Performance Guarantor, as the case may be, is given written notice of such failure by the Administrative Agent;

(iii)      any representation or warranty (other than the representations and warranties in Section 5.02) made or deemed to be made by any Tricolor Entity under or in connection with this Agreement or any other Basic Document to which it is a party shall prove to have been false or incorrect in any material respect when made, deemed made or delivered, and remains uncorrected for more than 30 days after any Tricolor Entity discovers such failure or any Tricolor Entity is given written notice of such failure by the Administrative Agent;

(iv)      the Administrative Agent shall fail for any reason to have a first priority perfected security interest in the Collateral;

(v)      failure by the Borrower to maintain one or more Hedge Transactions in accordance with Section 6.03 and such failure continues unremedied for 30 days;

(vi)      the occurrence of a Servicer Termination Event;

(vii)      as of any Payment Date or Securitization Date, the Loans Outstanding exceed the Net Eligible Pool Balance;

(viii)      the occurrence of an Insolvency Event with respect to any Tricolor Entity;

(ix)      the Borrower or any Originator shall become required to register as an "investment company" within the meaning of the Investment Company Act or shall become a "covered fund" for purposes of the Volcker Rule;

136

(x)    (A) the Borrower, any Originator or the Performance Guarantor shall fail to pay any principal of or premium or interest on any Indebtedness having a principal amount of (1) $10,000,000 or greater in the case of the Performance Guarantor or any Originator other than the Borrower or (2) $0 or greater in the case of the Borrower, when the same becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise) and such failure continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Indebtedness and shall not be waived by the requisite holders of such Indebtedness; (B) any other default under any agreement or instrument relating to any such Indebtedness of the Borrower, any Originator or the Performance Guarantor or any other event shall occur and shall continue after the applicable grace period, if any, specified in such agreement or instrument if the effect of such default or event is to accelerate, or to permit the acceleration of, the maturity of such Indebtedness; or (C) any such Indebtedness shall be declared to be due and payable or required to be prepaid (other than by a regularly scheduled required prepayment), redeemed, purchased or defeased, or an offer to prepay, redeem, purchase or defease such Indebtedness shall be required to be made, in each case, prior to the stated maturity thereof;

(xi)    one or more judgments, settlements or consent orders shall be entered against the Borrower, the Performance Guarantor or any Originator by any Governmental Authority (including any such items as a result of the CFPB or State regulator reviews) assessing monetary damages, individually or in the aggregate over any calendar year, in excess of, in the case of (A) the Performance Guarantor or any Originator, $1,000,000, or (B) the Borrower, $0, and any such judgments, settlements or consent orders, as applicable, shall not have been discharged, stayed or paid within 30 days;

(xii)    the IRS shall file notice of a Lien pursuant to Section 6323 of the Code with regard to any assets of the Borrower or any material portion of the assets of the Performance Guarantor or any Originator, or the Pension Benefit Guaranty Corporation shall file notice of a Lien pursuant to Section 4068 of ERISA with regard to any of the assets of the Borrower, the Performance Guarantor or any Originator and, in either case, such Lien shall not have been released within 30 days;

(xiii)    (A) any Basic Document, or any Lien granted thereunder, shall (except in accordance with its terms), in whole or in part, terminate, cease to be effective or cease to be the legally valid, binding and enforceable obligation of the Borrower, the Performance Guarantor or any Originator or (B) the Borrower, the Performance Guarantor or any Originator shall, directly or indirectly, disaffirm or contest in any manner such effectiveness, validity, binding nature or enforceability;

(xiv)    a Change in Control shall occur with respect to the Borrower, any Originator or the Performance Guarantor;

(xv)    as of the last day of any fiscal quarter or fiscal year of Tricolor Holdings;

(A)    the Total Indebtedness to Tangible Net Worth Ratio is greater than or equal to 8.25 to 1.0;

137

(B)      the Tangible Net Worth is less than the sum of (1) $36,000,000, (2) 50% of the cumulative positive net income (without deduction for negative net income) of Tricolor Holdings for each calendar quarter ending after the Closing Date and (3) 75% of the aggregate net proceeds of all issuances of Equity Interests by Tricolor Holdings since the Closing Date;

(C)      the unrestricted cash and Cash Equivalents of Tricolor Holdings is less than $3,000,000; or

(D)      the Debt Service Coverage Ratio is less than 1.25 to 1.0;

(xvi)      on any Payment Date, with respect to the related Collection Period:

(A)      the 3-Month Rolling Average Net Loss-to-Liquidation Ratio exceeds 35.00%;

(B) the 3-Month Rolling Average Serviced Portfolio Net Loss-to-Liquidation Ratio exceeds 35.00%;

(C) the 3-Month Rolling Average Delinquency Ratio exceeds 12.00%;

(D) the 3-Month Rolling Average Serviced Portfolio Delinquency Ratio exceeds 12.00%;

(E) the 3-Month Rolling Average Extension Ratio exceeds 7.00%; or

(F) the 3-Month Rolling Average Serviced Portfolio Delinquency Ratio exceeds 7.00%;

(xvii)      the Borrower fails at any time to have at least one Independent Director or any Person shall be appointed as an Independent Director of the Borrower without prior notice thereof having been given to the Administrative Agent in accordance with Section 6.01(m)(viii) or such Person appointed as an Independent Director fails to meet the criteria set forth in the definition herein of "Independent Director"; or

(xviii)      a Borrowing Base Deficiency that is caused solely by a Step-Up Credit Enhancement Trigger Event shall exist and such Borrowing Base Deficiency remains unremedied on the Payment Date in the sixth Collection Period after the Collection Period in which such Borrowing Base Deficiency occurred.

(b)      Upon the occurrence of any Termination Event, the Administrative Agent shall, at the request, or may with the consent, of the Required Lenders, by notice to the Borrower, declare the Amortization Date to have occurred, without demand, protest or future notice of any kind, all of which are hereby expressly waived by the Borrower, and, upon such declaration, all Loans and all other amounts owing by the Borrower under this Agreement shall be accelerated and become immediately due and payable; provided, that in the event that a Termination Event described in Section 10.01(a)(viii) has occurred, the Amortization Date shall automatically

occur, without demand, protest or any notice of any kind, all of which are hereby expressly waived by the Borrower.

(c)     Upon the automatic occurrence or declaration of the occurrence of the Amortization Date in accordance with Section 10.01(b), the following shall immediately occur without further action:  (i) the Revolving Period shall terminate and no further Loans will be made and (ii) Interest on all outstanding Loans shall increase to the Default Rate.

Section 10.02.  <u>Actions Upon Declaration of the Occurrence of the Amortization Date</u>. Upon the automatic occurrence or declaration of the occurrence of the Amortization Date following the occurrence of a Termination Event in accordance with Section 10.01(b), the Administrative Agent may, or at the direction of the Required Lenders, shall, exercise in respect of the Collateral, in addition to any and all other rights and remedies otherwise available to it, including rights available hereunder and all of the rights and remedies of a secured party upon default under the UCC (such rights and remedies to be cumulative and nonexclusive), the following remedial actions:

(a)     The Administrative Agent may, without notice to the Borrower except as required by Applicable Law and at any time or from time to time, charge, set-off and otherwise apply all or any part of the Loans Outstanding, any Interest accrued thereon and or any other amount due and owing to any Secured Party or any Agent against amounts payable to the Borrower from the Collection Account in accordance with the priorities required by Section 2.07.

(b)     The Administrative Agent may take any action permitted under the Basic Documents, including delivering a Notice of Exclusive Control to the Account Bank;

(c)     Consistent with the rights and remedies of a secured party under the UCC (and except as otherwise required by the UCC), the Administrative Agent may, on behalf of itself and the Lenders and without notice except as specified below, solicit and accept bids for and sell the Collateral or any part of the Collateral in one or more parcels at public or private sale, at any exchange, broker's board or at the Administrative Agent's offices or elsewhere, for cash, on credit or for future delivery, upon such terms and conditions and at prices that are consistent with the prevailing market for similar Collateral as it may deem advisable and at such prices as it may deem best.  The Administrative Agent shall give the Lenders and the Borrower at least 15 Business Days' prior written notice of the time and place of any public sale or the time after which any private sale is to be made.  The Administrative Agent shall not be obligated to make any sale of Collateral regardless of notice of sale having been given.  The Administrative Agent may adjourn any public or private sale from time to time by announcement at the time and place fixed for such sale, and such sale may, without further notice, be made at the time and place to which it was so adjourned.  If the proceeds from the sale of the Collateral would be insufficient to fully pay accrued and unpaid Interest and the Loans Outstanding, the Administrative Agent may only proceed with the sale if the Lenders with 100% of the Loans Outstanding have consented to such sale.  Every such sale shall operate to divest all right, title, interest, claim and demand whatsoever of the Borrower in and to the Collateral so sold, and shall be a perpetual bar, both at law and in equity,

139

against the Borrower or any Person claiming the Collateral sold through the Borrower and its successors or assigns.

(d)     Upon the completion of any sale under Section 10.02(c), the Borrower will deliver or cause to be delivered all of the Collateral sold to the purchaser or purchasers at such sale on the date of sale, or within a reasonable time thereafter if it shall be impractical to make immediate delivery, but in any event full title and right of possession to such property shall pass to such purchaser or purchasers forthwith upon the completion of such sale.  Nevertheless, if so requested by the Administrative Agent or by any purchaser, the Borrower shall confirm any such sale or transfer by executing and delivering to such purchaser all proper instruments of conveyance and transfer and release as may be designated in any such request.

(e)     At any sale under Section 10.02(c), Tricolor, any Secured Party or any Agent may bid for and purchase the property offered for sale and, upon compliance with the terms of sale, may hold, retain and dispose of such property without further accountability therefor.  Any Secured Party or Agent purchasing property at a sale under Section 10.02(c) may set off the purchase price of such property against amounts owing to such Secured Party or Agent in full payment of such purchase price.

(f)     The Administrative Agent (with notice to the Lenders) may direct the Servicer to direct Collections to an account other than the Master Collection Account or the Collection Account; provided, that such other account be established by the Servicer or the Successor Servicer at the Account Bank or another national banking association within the United States.

(g)     The Administrative Agent may exercise, at the Borrower's sole expense, any and all rights and remedies of the Borrower under or in connection with the Collateral.

Section 10.03.  <u>Exercise of Remedies</u>.  No failure or delay on the part of the Administrative Agent to exercise any right, power or privilege under this Agreement and no course of dealing between the Borrower, on the one hand, and the Administrative Agent, any Agent or the other Secured Parties, on the other hand, shall operate as a waiver of such right, power or privilege, nor shall any single or partial exercise of any right, power or privilege under this Agreement preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege.  The rights and remedies expressly provided in this Agreement are cumulative and not exclusive of any rights or remedies which the Secured Parties would otherwise have pursuant to law or equity.  No notice to or demand on any party in any case shall entitle such party to any other or further notice or demand in similar or other circumstances, or constitute a waiver of the right of the other party to any other or further action in any circumstances without notice or demand.

Section 10.04.  <u>Waiver of Certain Laws</u>.  The Borrower agrees, to the full extent that it may lawfully so agree, that neither it nor anyone claiming through or under it will set up, claim or seek to take advantage of any appraisal, valuation, stay, extension or redemption law now or hereafter in force in any locality where any Collateral may be situated in order to prevent, hinder

140

or delay the enforcement or foreclosure of this Agreement, or the absolute sale of any of the Collateral or any part thereof, or the final and absolute putting into possession thereof, immediately after such sale, of the purchasers thereof, and the Borrower, for itself and all who may at any time claim through or under it, hereby waives, to the full extent that it may be lawful so to do, the benefit of all such laws, and any and all right to have any of the properties or assets constituting the Collateral marshaled upon any such sale, and agrees that the Administrative Agent or any court having jurisdiction to foreclose the security interests granted in this Agreement may sell the Collateral as an entirety or such parcels as the Administrative Agent or such court may determine.

Section 10.05.  <u>Power of Attorney</u>.  The Borrower hereby irrevocably appoints the Administrative Agent its true and lawful attorney (with full power of substitution) in its name, place and stead and at its expense, in connection with the enforcement of the rights and remedies provided for in this Article as evidenced by a Power of Attorney, upon the occurrence and during the continuation of any Termination Event, to do the following: (i) exercise all rights and privileges of the Borrower under the Purchase Agreement; (ii) pay or discharge any taxes, Liens or other encumbrances levied or placed on or threatened against the Borrower or its property; (iii) defend any suit, action or proceeding brought against the Borrower if it does not defend such suit, action or proceeding or if the Administrative Agent believes that it is not pursuing such defense in a manner that will maximize the recovery to the Administrative Agent, and settle, compromise or adjust any suit, action or proceeding described above and, in connection therewith, give such discharges or releases as the Administrative Agent may deem appropriate; (iv) file or prosecute any claim, litigation, suit or proceeding in any court of competent jurisdiction or before any arbitrator, or take any other action otherwise deemed appropriate by the Administrative Agent for the purpose of collecting any and all such moneys due to the Borrower whenever payable and to enforce any other right in respect of the Borrower's property; (v) sell, transfer, pledge, make any agreement with respect to or otherwise deal with, any of the Borrower's property, and execute, in connection with such sale or action, any endorsements, assignments or other instruments of conveyance or transfer in connection therewith, receipts or acquittance for amounts collected or received thereunder; and (vi) cause the certified public accountants then engaged by the Borrower to prepare and deliver to the Administrative Agent at any time and from time to time, promptly upon the Administrative Agent's request, any reports required to be prepared by or on behalf of the Borrower under this Agreement or any other Basic Document, all as though the Administrative Agent were the absolute owner of its property for all purposes, and to do, at the Administrative Agent's option and the Borrower's expense, at any time or from time to time, all acts and other things that the Administrative Agent reasonably deems necessary to perfect, preserve, or realize upon its property or assets and the Liens of the Administrative Agent, as agent for the Secured Parties thereon, all as fully and effectively as it might do.

ARTICLE ELEVEN

INDEMNIFICATION

Section 11.01.  Indemnities by the Borrower.  Without limiting any other rights which each Secured Party, each Agent, the Backup Servicer (including as successor Servicer), the Collateral Custodian, the Account Bank or any of their respective Affiliates may have hereunder or under Applicable Law, the Borrower and the Servicer hereby agree to jointly and severally indemnify such parties and each of their respective Affiliates and officers, directors, employees and agents thereof (collectively, the "Indemnified Parties") from and against any and all damages, actions, suits, losses, claims, liabilities and related costs and expenses, including reasonable attorneys' fees, court costs, losses and expenses (and, in the case of the Backup Servicer, the Collateral Custodian or the Account Bank, incurred in connection with (i) any enforcement (including any action, claim, or suit brought) by the Backup Servicer, the Collateral Custodian or the Account Bank of any indemnification obligation or other obligation of the Servicer or the Borrower and (ii) a successful defense of any claim that the Backup Servicer, the Collateral Custodian or the Account Bank breached its standard of care (including reasonable legal fees and expenses incurred in actions against the Borrower or the Servicer)) (collectively, the "Indemnified Amounts") awarded against or incurred by, any such Indemnified Party or other non-monetary damages of any such Indemnified Party arising out of or as a result of this Agreement, excluding, however, Indemnified Amounts to the extent resulting from the gross negligence or willful misconduct on the part of any Indemnified Party.  Without limiting the foregoing, the Borrower and the Servicer shall jointly and severally indemnify the Indemnified Parties for Indemnified Amounts relating to or resulting from:

(a)    any Receivable represented by the Borrower to be an Eligible Receivable which is not at the applicable time an Eligible Receivable;

(b)    reliance on any representation or warranty made or deemed made by the Borrower or any of its officers under or in connection with this Agreement, which shall have been false or incorrect in any material respect when made or deemed made or delivered;

(c)    the failure by the Borrower to comply with any term, provision or covenant contained in this Agreement or any other Basic Document or a failure by the Borrower to comply with any term, provision or covenant contained in any agreement executed in connection with this Agreement or any other Basic Document, or with any Applicable Law with respect to any Contract or Receivable, the related Financed Vehicle or the non-conformity of any Receivable or Contract with any such Applicable Law and any failure by the Borrower to perform its duties under the Contracts and Receivables included as a part of the Collateral;

(d)    the failure to vest and maintain vested in the Administrative Agent a valid and enforceable security interest in any or all of the Collateral or a valid and enforceable first priority perfected security interest in any or all of the Collateral;

142

(e)　　the failure of the Borrower to file, or any delay in filing, financing statements or other similar instruments or documents under the UCC of any applicable jurisdiction or other Applicable Laws with respect to the Collateral;

(f)　　any dispute, claim, offset or defense (other than the discharge in bankruptcy of the Obligor) of the Obligor to the payment of any Receivable comprising a portion of the Collateral which is, or is purported to be, an Eligible Receivable (including a defense based on the related Contract not being a legal, valid and binding obligation of such Obligor enforceable against it in accordance with its terms);

(g)　　any failure by the Borrower to perform its duties or obligations in accordance with the provisions of this Agreement;

(h)　　any products liability claim or personal injury or property damage suit or other similar or related claim or action of whatever sort arising out of or in connection with any Contract or the related Financed Vehicle;

(i)　　the failure by the Borrower to pay when due any Taxes for which the Borrower is liable, including sales, excise or personal property Taxes payable in connection with the Collateral, except for any Tax the validity of which is currently being contested in good faith by appropriate proceedings and with respect to which adequate reserves in accordance with GAAP have been provided on the books of the Borrower;

(j)　　any repayment by a Secured Party of any amount previously distributed in reduction of the Loans Outstanding or payment of Interest, any obligation or any other amount due hereunder, in each case which amount such entity believes in good faith is required to be repaid;

(k)　　any litigation, proceeding or investigation (i) before any Governmental Authority in respect of any Contract, Receivable or Financed Vehicle included as part of the Collateral, (A) that is not commenced by the Indemnified Party or (B) if so commenced, in which such Indemnified Party is not the prevailing party; provided, that no Indemnified Party shall be entitled to any indemnification for any item described in this clause resulting from such Indemnified Party's gross negligence or willful misconduct, (ii) relating to arising from the Basic Documents, the transactions contemplated hereby and thereby, the use of proceeds of the Loans by the Borrower or any other investigation, litigation or proceeding relating to the Borrower or Tricolor in which any Indemnified Party becomes involved as a result of any of the transactions contemplated by the Basic Documents or (iii) relating to or arising from any force-placed Insurance Policies;

(l)　　the use of the proceeds of any Loan by the Borrower;

(m)　　any failure by the Borrower to give reasonably equivalent value to Tricolor in consideration for the transfer by Tricolor to the Borrower of any of the Receivables and the related Collateral or any attempt by any Person to void or otherwise avoid any such transfer under any statutory provision or common law or equitable action, including any provision of the Bankruptcy Code;

143

(n)     the failure of the Borrower to remit to the Servicer or the Administrative Agent Collections remitted to the Borrower in accordance with the terms hereof or the commingling by the Borrower of any Collections with other funds;

(o)     all reasonable and documented fees, costs and expense (including reasonable legal fees and expenses) incurred by any Lender or the Administrative Agent in connection with reviewing of Hedge Transactions or entering into or giving or withholding any amendments or supplements or waivers or consents (including review and analysis thereof) with respect to the Basic Documents or any other document or instrument delivered pursuant hereto or thereto (whether or not the same is finally agreed to) if the same is requested by the Borrower or the Servicer, or is required or necessary under the Basic Documents; or

(p)     any and all civil penalties or fines assessed by OFAC against, and all reasonable costs and expenses (including attorneys' fees and disbursements) incurred in connection with the defense thereof by the Administrative Agent or any Lender or Agent as a result of funding all or any portion of the Loans or the acceptance of payments or of Collateral due under the Basic Documents.

Section 11.02.  <u>Indemnities by the Servicer</u>.  In any suit, proceeding or action brought by any Indemnified Party for any sum owing thereto, the Servicer shall save, indemnify and keep such Indemnified Party harmless from and against all Indemnified Amounts suffered in connection with the following:

(a)     by reason of any defense, setoff, counterclaim, recoupment or reduction of liability whatsoever of the Obligor under the Receivables;

(b)     reliance on any representation or warranty made or deemed made by the Servicer or any of its officers under or in connection with this Agreement, which shall have been false or incorrect in any material respect when made or deemed made or delivered;

(c)     the failure by the Servicer to comply with any term, provision or covenant contained in this Agreement or any other Basic Document or a failure by the Servicer to comply with any term, provision or covenant contained in any agreement executed in connection with this Agreement or any other Basic Document, or with any Applicable Law with respect to any Contract or Receivable, the related Financed Vehicle or the non-conformity of any Receivable or Contract with any such Applicable Law and any failure by the Servicer to perform its duties under the Contracts and Receivables included as a part of the Collateral;

(d)     the failure of the Servicer to file, or any delay in filing, financing statements or other similar instruments or documents under the UCC of any applicable jurisdiction or other Applicable Laws with respect to the Collateral, whether the time of a Loan or at any subsequent time and as required by the Basic Documents;

144

(e)      any failure by the Servicer to perform its duties or obligations in accordance with the provisions of this Agreement; and

(f)      Indebtedness or liability at any time owing to or in favor of the Obligor or its successor from the Servicer;

and all such obligations of the Servicer shall be and remain enforceable against and only against the Servicer and shall not be enforceable against any Indemnified Party.

Section 11.03.  <u>Additional Indemnification Provisions</u>.  Notwithstanding the other provisions of this Article, in no event shall any Indemnified Party be indemnified against (i) net income or franchise Taxes or similar Taxes imposed on any Indemnified Party with respect to payments required to be made by the Borrower or the Servicer under this Agreement, by a taxing jurisdiction in which any Indemnified Party is organized, conducts business or is paying Taxes as of the Closing Date (as the case may be) or (ii) except as otherwise provided herein, (A) losses in respect of Receivables that are uncollectible on account of the insolvency, bankruptcy or lack of creditworthiness of the related Obligor, (B) any loss in value of any Financed Vehicle due to changes in market conditions or for other reasons beyond the control of the Servicer or the Borrower and (C) any amount which represents legal, accounting or other costs incurred by an Indemnified Party in respect of any legal action between such party and the Servicer, the Borrower or any of their respective Affiliates if a court of competent jurisdiction makes a final determination that the Servicer, the Borrower or any such Affiliate is the prevailing party.

Any amounts subject to the indemnification provisions of this Article shall be paid by (i) the Borrower solely pursuant to the provisions of Section 2.07 in the order and priority set forth therein or (ii) the Servicer, directly by the Servicer.

261320820v.10 94601/30060

ARTICLE TWELVE

THE ADMINISTRATIVE AGENT AND THE AGENTS

Section 12.01.  <u>Authorization and Action</u>.

(a)      Each Lender and each Secured Party (other than the Administrative Agent)
hereby designates and appoints JPMorgan (and JPMorgan accepts such designation and
appointment) as Administrative Agent hereunder, and authorizes the Administrative Agent to
take such actions as agent on its behalf and to exercise such powers as are delegated to the
Administrative Agent by the terms of this Agreement together with such powers as are
reasonably incidental thereto.  In performing its functions and duties hereunder, the
Administrative Agent shall act solely as agent for the Secured Parties and does not assume nor
shall be deemed to have assumed any obligation or relationship of trust or agency with or for the
Borrower or any of its successors or assigns.  The Administrative Agent shall not be required to
take any action which exposes it to personal liability or which is contrary to this Agreement or
Applicable Law.  The appointment and authority of the Administrative Agent hereunder shall
terminate on the Facility Termination Date.

(b)      Each Lender hereby irrevocably designates and appoints the Agent for its Lender
Group as the agent of such Lender under this Agreement, and authorizes such Agent, as the agent
for such Lender, to take such action on its behalf under the provisions of the Basic Documents
and to exercise such powers and perform such duties thereunder as are expressly delegated to
such Agent by the terms of this Agreement, together with such other power as are reasonably
incidental thereto.

(c)      Notwithstanding any provision to the contrary elsewhere in this Agreement,
neither the Administrative Agent nor any Agent (the Administrative Agent and each Agent being
referred to in this Article as an "Agent") shall have any duties or responsibilities, except those
expressly set forth herein, or any fiduciary relationship with any Lender, and no implied
covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this
Agreement or otherwise exist against the Administrative Agent or any Agent.

(d)      The Administrative Agent shall promptly distribute to each Agent (if such Agent
is not otherwise required to receive such notice), who shall promptly distribute to each related
Lender all notices, requests for consent and other information received by the Administrative
Agent under this Agreement, including copies of each executed amendment, waiver or other
modification to this Agreement.

Section 12.02.  <u>Delegation of Duties</u>.  Each Agent may execute any of its duties under
any of the Basic Documents by or through agents or attorneys-in-fact and shall be entitled to
advice of counsel concerning all matters pertaining to such duties.  No Agent shall be responsible
for the negligence or misconduct of any agents or attorneys-in-fact selected by it with reasonable
care.

Section 12.03.  <u>Exculpatory Provisions</u>.  Neither any Agent nor any of its directors,
officers, agents or employees shall be (i) liable for any action lawfully taken or omitted to be

146

taken by it or them under or in connection with this Agreement (except for its, their or such Person's own gross negligence or willful misconduct or, in the case of any Agent, the breach of its obligations expressly set forth in this Agreement) or (ii) responsible in any manner to any of the Secured Parties for any recitals, statements, representations or warranties made by the Borrower, the Servicer, the Account Bank, the Backup Servicer or Tricolor contained in this Agreement or in any certificate, report, statement or other document referred to or provided for in, or received under or in connection with, this Agreement or any other Basic Document to which it is a party for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other document furnished in connection herewith, or for any failure of the Borrower to perform its obligations hereunder, or for the satisfaction of any condition specified in Article Four.  No Agent shall be under any obligation to any Secured Party to ascertain or to inquire as to the observance or performance of any of the agreements or covenants contained in, or conditions of, this Agreement, or to inspect the properties, books or records of the Borrower.  No Agent shall be deemed to have knowledge of any Termination Event, Amortization Event or Servicer Termination Event unless it has received written notice thereof from the Borrower, the Servicer or a Secured Party.

Section 12.04.  Reliance.

(a)     Each Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, cablegram, telegram, telecopy, telex or teletype message, written statement, order or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including counsel to the Agent), independent accountants and other experts selected by such Agent.

(b)     Each Agent shall be fully justified in failing or refusing to take any action under any of the Basic Documents unless it shall first receive such advice or concurrence of the Required Lenders as it deems appropriate or it shall first be indemnified to its satisfaction by, in the case of (i) the Administrative Agent, the Lenders, or (ii) an Agent for a Lender Group, the Lenders in such Lender Group, against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action.

(c)     Each Agent shall in all cases be fully protected in acting, or in refraining from acting, under any of the Basic Documents in accordance with a request of the Required Lenders, and such request and any action taken or failure to act pursuant thereto shall be binding upon all present and future Lenders.

(d)     Each Agent shall in all cases be fully protected in acting, or in refraining from acting, under any of the Basic Documents in accordance with a request of Lenders in its Lender Group having Invested Percentages aggregating greater than 50.0% of the aggregate Invested Percentages of all Lenders in such Lender Group and such request and any action taken or failure to act pursuant thereto shall be binding upon all present and future Lenders in such Lender Group.

(e)     No Agent shall be deemed to have knowledge or notice of the occurrence of any breach of this Agreement or the occurrence of any Termination Event, Amortization Event or

Servicer Termination Event unless it has received notice from the Borrower, the Servicer, the Backup Servicer or any Lender, referring to this Agreement and describing such event.  In the event that the Administrative Agent receives such a notice, it shall promptly give notice thereof to each Agent, and in any event any Agent receives such a notice, it shall promptly give notice thereof to the Lenders in its Lender Group.  The Administrative Agent shall take such action with respect to such event as shall be reasonably directed by the Required Lenders, and each Agent shall take such action with respect to such event as shall be reasonably directed by Lenders in its Lender Group having Invested Percentages aggregating greater than 50.0% of the aggregate Invested Percentages of all Lenders in such Lender Group; provided, that unless and until such Agent shall have received such directions, such Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such event as it shall deem advisable in the best interests of the Lenders or of the Lenders in its Lender Group, as applicable.

Section 12.05.  Non-Reliance on Agents and Other Lenders.  Each Lender expressly acknowledges that no Agent nor any of its officers, directors, employees, agents, attorneys-in-fact or Affiliates has made any representations or warranties to it, and that no act by any Agent hereafter taken, including any review of the affairs of the Borrower, Tricolor, the Servicer, the Backup Servicer and the Collateral Custodian shall be deemed to constitute any representation or warranty by any Agent to any Lender.  Each Lender represents to each Agent that it has, independently and without reliance upon any Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of the Borrower, the Servicer, Tricolor, the Backup Servicer and the Collateral Custodian and the Receivables and made its own decision to advance the Loans hereunder and enter into this Agreement.  Each Lender also represents that it will, independently and without reliance upon any Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own analysis, appraisals and decisions in taking or not taking action under any of the Basic Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Borrower, the Servicer, Tricolor, the Backup Servicer and the Collateral Custodian and the Receivables.  Except for notices, reports and other documents received by an Agent hereunder, no Agent shall have any duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of the Borrower, the Servicer, Tricolor, the Backup Servicer or the Collateral Custodian or the Receivables which may come into the possession of such Agent or any of its officers, directors, employees, agents, attorneys-in-fact or affiliates.

Section 12.06.  Indemnification.  Each Committed Lender (i) agrees to indemnify the Administrative Agent in its capacity as such (without limiting the obligation (if any) of the Borrower or the Servicer to reimburse the Administrative Agent for any such amounts), ratably according to its respective Commitments (or, if the Commitments have terminated, Invested Percentages) and (ii) in each Lender Group agrees to indemnify the Agent for such Lender Group in its capacity as such (without limiting the obligation (if any) of the Borrower and the Servicer to reimburse such Agent for any such amounts), ratably according to their respective Commitments (or, if the Commitments have terminated, Invested Percentages), in each case

148

from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever which may at any time (including at any time following the Facility Termination Date) be imposed on, incurred by or asserted against such Agent in any way relating to or arising out of this Agreement, or any documents contemplated by or referred to herein or the transactions contemplated hereby or any action taken or omitted by such Agent under or in connection with any of the foregoing; provided, that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of an Agent resulting from its own gross negligence or willful misconduct.  The provisions of this Section shall survive the payment of the obligations under this Agreement, including the Loans Outstanding, the termination of this Agreement, and any resignation or removal of the applicable Agent.

Section 12.07.  <u>Agents in Their Individual Capacities</u>.  Each Agent and its Affiliates may make loans to, accept deposits from and generally engage in any kind of business with the Borrower and any other party to a Basic Document as though it were not an Agent hereunder.  In addition, the Lenders acknowledge that one or more Persons which are Agents may act (i) as administrator, sponsor or agent for one or more Conduit Lenders and in such capacity act and may continue to act on behalf of each such Conduit Lender in connection with its business, and (ii) as the agent for certain financial institutions under the liquidity and credit enhancement agreements relating to this Agreement to which any one or more Conduit Lenders is party and in various other capacities relating to the business of any such Conduit Lender under various agreements.  Any such Person, in its capacity as Agent, shall not, by virtue of its acting in any such other capacities, be deemed to have duties or responsibilities hereunder or be held to a standard of care in connection with the performance of its duties as an Agent other than as expressly provided in this Agreement.  Any Person which is an Agent may act as an Agent without regard to and without additional duties or liabilities arising from its role as such administrator or agent or arising from its acting in any such other capacity.  None of the provisions to this Agreement shall require an Agent to expend or risk its own funds or otherwise to incur any liability, financial or otherwise, in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers if it shall have reasonable grounds for believing that repayment of such funds or indemnity satisfactory to it against such risk or liability is not assured to it.

Section 12.08.  <u>Successor Agents</u>.  The Administrative Agent may assign its rights and obligations hereunder with the consent of the Required Lenders and upon ten days' notice to the Lenders and the Borrower.  The Administrative Agent may resign as Administrative Agent upon ten days' notice to the Agents, the Lenders and the Borrower with such resignation becoming effective upon a successor administrative agent succeeding to the rights, powers and duties of the Administrative Agent pursuant to this Section.  If the Administrative Agent shall resign as Administrative Agent under this Agreement, then the Required Lenders shall appoint a successor administrative agent.  Any Agent may resign as Agent upon ten days' prior written notice to the Lenders in its Lender Group, the Administrative Agent and each other Agent and the Borrower with such resignation becoming effective upon a successor agent succeeding to the rights, powers and duties of the Agent pursuant to this Section.  If an Agent shall resign as Agent under this Agreement, then the Lenders in its Lender Group having Invested Percentages aggregating greater than 50.0% of the aggregate Invested Percentages of all Lenders in such Lender Group

149

shall appoint from among the Lenders in such Lender Group a successor agent for such Lender Group.  Any successor administrative agent or agent shall succeed to the rights, powers and duties of resigning Agent, and the term "Administrative Agent" or "Agent", as applicable, shall mean such successor administrative agent or agent effective upon its appointment, and the former Agent's rights, powers and duties as Agent shall be terminated, without any other or further act or deed on the part of such former Agent or any of the parties to this Agreement. After the retiring Agent's resignation as Agent, the provisions of this Article shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement.

261320820v.10 94601/30060

ARTICLE THIRTEEN

ASSIGNMENTS; PARTICIPATIONS

Section 13.01.  <u>Assignments and Participations</u>.

(a)      Each Lender agrees that the Loans or interest therein owned by such Lender pursuant to this Agreement will be acquired for investment only and not with a view to any public distribution thereof, and that such Lender will not offer to sell or otherwise dispose of the Loans or the interest therein so acquired by it (or any interest therein) in violation of any of the registration requirements of the Securities Act or any applicable State securities laws.  Each Lender hereby confirms and agrees that, in connection with any syndication, offering, transfer or sale by it of any interest in the Loans, such Lender has not engaged and will not engage in a general solicitation or general advertising.

(b)      Each Lender may, upon at least 30 days' notice to the Administrative Agent, assign to one or more banks or other entities all or a portion of its rights and obligations under this Agreement; provided, however, that (i) each such assignment shall be of a constant, and not a varying percentage of all of the assigning Lender's rights and obligations under this Agreement, (ii) the amount of the Commitment or Conduit Funding Limit of the assigning Lender being assigned pursuant to each such assignment (determined as of the date of the Assignment and Acceptance with respect to such assignment) shall in no event be less than the lesser of (A) $1,000,000 (unless otherwise agreed by the Borrower and such Lender) or an integral multiple of $1,000,000 in excess of that amount and (B) the full amount of the assigning Lender's Commitment or Conduit Funding Limit, (iii) each such assignment shall be to an Eligible Assignee, (iv) the parties to each such assignment shall execute and deliver to the Administrative Agent (with a copy to the Borrower), for its acceptance and recording in the Lender Register, an Assignment and Acceptance, together with a processing and recordation fee of $3,500 or such lesser amount as shall be approved by the Administrative Agent (provided, that in the case of an assignment to an Eligible Assignee satisfying clause (i) of the definition of the term "Eligible Assignee", such recordation fee shall not apply), (v) the parties to each such assignment shall have agreed to reimburse the Administrative Agent for all reasonable fees, costs and expenses (including the reasonable fees and out-of-pocket expenses of counsel for the Administrative Agent) incurred by the Administrative Agent in connection with such assignment in an amount not to exceed $5,000, (vi) each Person that becomes a Lender under an Assignment and Acceptance shall agree to be bound by the confidentiality provisions of Article Fourteen, and (vii) there shall be no increased costs, expenses or Taxes incurred by the Administrative Agent or any Lender Group upon assignment or participation.  Upon such execution, delivery, acceptance and recording by the Administrative Agent, from and after the effective date specified in each Assignment and Acceptance, which effective date shall be the date of acceptance thereof by the Administrative Agent, unless a later date is specified therein, (i) the assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment and Acceptance, have the rights and obligations of a Lender hereunder and (ii) the Lender assignor thereunder shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights and be released from its obligations under this Agreement (and, in the case of an

151

Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto).

(c)     By executing and delivering an Assignment and Acceptance, the Lender assignor thereunder and the assignee thereunder confirm to and agree with each other and the other parties hereto as follows:  (i) other than as provided in such Assignment and Acceptance, such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or any other instrument or document furnished pursuant hereto; (ii) such assignee confirms that it has received a copy of this Agreement, together with copies of such financial statements and other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (iii) such assignee will, independently and without reliance upon the Administrative Agent, such assigning Lender or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (iv) such assigning Lender and such assignee confirm that such assignee is an Eligible Assignee; (v) such assignee appoints and authorizes the Administrative Agent to take such action as agent on its behalf and to exercise such powers under this Agreement as are delegated to such agent by the terms hereof, together with such powers as are reasonably incidental thereto; and (vi) such assignee agrees that it will perform in accordance with their terms all of the obligations which by the terms of this Agreement are required to be performed by it as a Lender.

(d)     The Administrative Agent shall maintain at its address referred to herein a copy of each Assignment and Acceptance delivered to and accepted by it and a register for the recordation of the names, addresses and Commitment or Conduit Funding Limit of each Lender and the Principal Amount (and stated interest) of each Loan made by each Lender from time to time (the "Lender Register").  The entries in the Lender Register shall be conclusive and binding for all purposes, absent manifest error, and the Borrower and the Lenders shall treat each Person whose name is recorded in the Lender Register as a Lender hereunder for all purposes of this Agreement.  The Lender Register shall be available for inspection by any Agent or Lender at any reasonable time and from time to time upon reasonable prior notice.

(e)     Subject to the provisions of Section 13.01(a), upon its receipt of an Assignment and Acceptance executed by an assigning Lender and an assignee, the Administrative Agent shall, if such Assignment and Acceptance has been completed, accept such Assignment and Acceptance, and the Administrative Agent shall then record the information contained therein in the Lender Register.

(f)     Each Lender may sell participations to one or more banks or other entities in or to all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment or Conduit Funding Limit and each Loan owned by it); provided, however, that (i) such Lender's obligations under this Agreement (including its Commitment or Conduit Funding Limit hereunder) shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Administrative Agent and the other Lenders shall continue to deal solely and directly with such

152

Lender in connection with such Lender's rights and obligations under this Agreement. Notwithstanding anything herein to the contrary, each participant shall have the rights of a Lender (including any right to receive payment) under Sections 2.11 and 2.12; provided, however, that no participant shall be entitled to receive payment under either such Section in excess of the amount that would have been payable under such Section by the Borrower to the Lender granting its participation had such participation not been granted, and no Lender granting a participation shall be entitled to receive payment under either such Section in an amount which exceeds the sum of (i) the amount to which such Lender is entitled under such Section with respect to any portion of any Loan owned by such Lender which is not subject to any participation plus (ii) the aggregate amount to which its participants are entitled under such Sections with respect to the amounts of their respective participations. With respect to any participation described in this Section, the participant's rights as set forth in the agreement between such participant and the applicable Lender to agree to or to restrict such Lender's ability to agree to any modification, waiver or release of any of the terms of this Agreement or to exercise or refrain from exercising any powers or rights which such Lender may have under or in respect of this Agreement shall be limited to the right to consent to any of the matters set forth in Section 13.01.

Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrower, maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each participant's interest in the obligations under this Agreement (the "Participant Register"); provided, that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any participant or any information relating to a participant's interest in any Commitment, Conduit Funding Limit or Loan or its other obligations under the Agreement) to any person except to the extent that such disclosure is necessary to establish that such Commitment, Conduit Funding Limit, Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as the Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(g)     Each Lender may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section, disclose to the assignee or participant or proposed assignee or participant any information, including Confidential Information, relating to the Borrower furnished to such Lender by or on behalf of the Borrower.

(h)     Nothing herein shall prohibit any Lender from at any time pledging or assigning as collateral (i) any of its rights under this Agreement to (A) any Federal Reserve Bank or other Governmental Authority in accordance with Applicable Law or (B) any other Lender, the Administrative Agent, any Agent or any of their respective Affiliates, or any other bank or other entity in connection with any financing or repurchase agreement entered into by such Lender or (ii) a security interest in all or any portion of its rights under this Agreement to a collateral trustee in order to comply with Rule 3a-7 under the Investment Company Act. In each of the foregoing cases, such pledge or collateral assignment may be made without compliance with Section 12.01(a) or 13.01(b), other than clause (vii) of Section 13.01(b), and without notice to or

153

consent of the Borrower, Servicer or any other Lender; provided, that no such pledge or collateral assignment shall release a Lender from any of its obligations hereunder, or substitute any such pledgee or grantee for such Lender as a party hereto.  Furthermore, nothing herein shall prohibit or limit the ability of any Conduit Lender to sell or assign all or any portion of its Loans (or interests therein) to its Credit Providers (or to an agent on its or their behalf) pursuant to any Liquidity Facilities with respect to such Conduit Lender.

261320820v.10 94601/30060

ARTICLE FOURTEEN

MUTUAL COVENANTS REGARDING CONFIDENTIALITY

Section 14.01.  Covenants of the Borrower, the Servicer, the Backup Servicer, the Collateral Custodian and the Account Bank.  Each of the Borrower, the Servicer, the Backup Servicer, the Collateral Custodian and the Account Bank severally and with respect to itself only, covenants and agrees to hold in confidence, and not disclose to any Person, the terms of this Agreement (including any fees payable in connection with this Agreement or the identity of any Lender under this Agreement), except as the Administrative Agent or any such Lender may have consented to in writing prior to any proposed disclosure and except it may disclose such information (i) to its officers, directors, employees, agents, counsel, accountants, auditors, subservicers, advisors or representatives, (ii) to the extent such information has become available to the public other than as a result of a disclosure by or through the Borrower, the Servicer, the Backup Servicer or the Account Bank, (iii) to a Lender Group or Affiliates of its members or (iv) to the extent it should be (a) required by Applicable Law (including filing a copy of this Agreement and the other Basic Documents (other than the Fee Letter, excluding from any such copy the identity of each Lender)) as exhibits to filings required to be made with the Securities and Exchange Commission, or in connection with any legal or regulatory proceeding or (b) requested by any Governmental Authority to disclose such information; provided, that, in the case of clause (iv)(a) above, the Borrower, the Servicer, the Backup Servicer, the Collateral Custodian and the Account Bank, as applicable, will use all reasonable efforts to maintain confidentiality and will (unless otherwise prohibited by Applicable Law) notify the Administrative Agent, each Agent and each Lender of its intention to make any such disclosure prior to making such disclosure.

Section 14.02.  Covenants of the Secured Parties and the Agents.

(a)     Each of the Administrative Agent, each Agent and each other Secured Party covenants and agrees that it will not disclose any of the Confidential Information now or hereafter received or obtained by it without the Borrower's prior written consent; provided, however, that it may disclose any such Confidential Information (i) in connection with participations and assignments pursuant to Section 13.01(b), (ii) to those of its employees or Affiliates directly involved in the transactions contemplated by the Basic Documents or to any nationally recognized statistical rating organizations, (iii) to its Advisors who need to know such information for the purpose of assisting it in connection with the transactions contemplated by the Basic Documents and (iv) to any collateral trustee appointed by such Lender (or Agent or Administrative Agent on such Lender's behalf) to comply with Rule 3a-7 under the Investment Company Act, provided such collateral trustee is informed of the confidential nature of such information.  Each of the Administrative Agent, each Agent and each other Secured Party agrees to be responsible for any breach of this Agreement by its Affiliates and Advisors, and it agrees that its Affiliates and Advisors will be advised by it of the confidential nature of such information and that it shall cause its Affiliates to be bound by this Agreement.  Notwithstanding the foregoing, with respect to participations and assignments pursuant to Section 13.01(b) involving an Eligible Assignee other than an entity satisfying clause (ii) of the definition of the term "Eligible Assignee", Confidential Information may not be provided to prospective participants or assignees before the execution of an Assignment and Acceptance, unless such

155

Confidential Information is covered under a separate confidentiality agreement between the assigning Lender and such prospective participant or assignee.

(b)        Each of the Administrative Agent, each Agent and each other Secured Party acknowledges and agrees that any Confidential Information provided to it, in whatever form, is the sole property of the Borrower and Tricolor.  Neither any such Person nor its Affiliates or Advisors shall use any of the Confidential Information now or hereafter received or obtained from or through the Borrower, Tricolor or any of their respective Affiliates for any purpose other than for purposes of engaging in, or as otherwise contemplated by, the transactions contemplated by the Basic Documents.  The Administrative Agent, each Agent and each other Secured Party agree that if the Borrower or Tricolor should request that it destroy or return the Confidential Information, it shall return or destroy such Confidential Information as so directed; provided, that it shall be permitted to retain only that portion of the Confidential Information, in accordance with the confidentiality obligations specified in this Agreement, that is necessary for purposes of documenting any due diligence review performed by it in connection with the Basic Documents or as required by any Requirement of Law.

(c)        If the Administrative Agent, any Agent, any other Secured Party or any of their respective Affiliates or Advisors are legally compelled (whether by deposition, interrogatory, request for documents, subpoena, civil investigation, demand or similar process) to disclose any Confidential Information, the related entity shall promptly notify the Borrower and Tricolor in writing (unless it has been advised by an Opinion of Counsel that such notification is prohibited by Applicable Law) of such requirement so that the Borrower or Tricolor, at their sole cost and expense, may seek a protective order or other appropriate remedy and/or waive compliance with the provisions hereof.  The Administrative Agent, each Agent and each other Secured Party agrees to use its reasonable efforts, upon the written request of the Borrower or Tricolor to obtain or assist the Borrower or the Servicer in obtaining any such protective order.  Failing the reasonably timely entry of a protective order or the reasonably timely receipt of a waiver hereunder, it may disclose, without liability hereunder, that portion (and only that portion) of the Confidential Information that it have been advised by an Opinion of Counsel that it is legally compelled to disclose; provided, that it agrees to use reasonable efforts to obtain assurance that confidential information will be accorded such Confidential Information by the Person or Persons to whom it was disclosed.

(d)        Notwithstanding the foregoing, it is understood that the Administrative Agent, any Agent, the other Secured Parties and any of their respective Affiliates may be required to disclose (and may so disclose, without liability hereunder, provided that it complies with the following sentence) the Confidential Information or portions thereof at the request of a bank examiner or other regulatory authority or in connection with an examination of it or its Affiliates by a bank examiner or other regulatory authority, including in connection with the regulator compliance policy of the Administrative Agent, any Agent or such other Secured Party.  Under such circumstances, the related entity agrees to provide notice to Tricolor, to the extent that it is not otherwise prohibited from doing so, as soon as practicable in connection with (and, if possible, before) releasing the Confidential Information to the bank examiner or other regulatory authority pursuant to such request or examination.

(e)      It is understood and agreed that no failure or delay by the Borrower, the Servicer, the Backup Servicer, the Administrative Agent, any Agent, any other Secured Party or the Account Bank in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any right, power or privilege hereunder.

ARTICLE FIFTEEN

MISCELLANEOUS

Section 15.01.  <u>Amendments and Waivers</u>.

(a)      No failure or delay by the Administrative Agent, an Agent or a Lender in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Administrative Agent, each Agent and each Lender hereunder are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or consent to any departure by the Borrower therefrom shall in any event be effective unless the same shall be permitted by Section 15.01(c), and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Amortization Event, Termination Event, Unmatured Termination Event, Servicer Termination Event or Unmatured Servicer Termination Event, regardless of whether the Administrative Agent, any Agent or any Lender may have had notice or knowledge of such Amortization Event, Termination Event, Unmatured Termination Event, Servicer Termination Event or Unmatured Servicer Termination Event at the time.

(b)      Neither this Agreement nor any provision hereof may be amended or modified except pursuant to an agreement or agreements in writing entered into by the Borrower and the Administrative Agent, acting with the consent of the Required Lenders; provided, that no such agreement shall, without the written consent of each Lender:

(i)      change any provision of this Section or the definitions of the terms "Amortization Event", "Commitment Termination Date", "Required Lenders", "Servicer Termination Event", "Termination Event" or any other provision hereof specifying the number or percentage of Lenders required to amend, waive, or otherwise modify any rights hereunder or make any determination or grant any consent hereunder; or

(ii)      amend or change the definition of the terms "Adjusted LIBO Rate", "Borrowing Base", "Borrowing Base Deficiency", "Commitment", "Cured", "Default Rate", "Excess Concentration Amount", "Excess Spread Percentage", "Monthly Interest and Fees", "Monthly Principal Payment Amount", "Required Credit Enhancement Amount", "Required Credit Enhancement Percentage", "Step-Up Credit Enhancement Trigger Event", "Unused Fee" or "Usage Fee" (or, in each case, any component thereof) or amend Sections 2.07 or 2.11;

provided, further, that no such agreement shall amend, modify or otherwise affect the rights or duties of the Servicer, the Backup Servicer, the Account Bank or the Collateral Custodian hereunder without the prior written consent of such party (such consent not to be unreasonably withheld), as the case may be.

158

(c)     Neither this Agreement nor any provision hereof may be waived except pursuant to an agreement or agreements in writing entered into by the Administrative Agent, acting with the consent of the Required Lenders; provided, that no such agreement shall, without the written consent of (i) each Lender, waive any (A) condition set forth in Sections 4.01 or 4.02 or (B) Amortization Event, Termination Event or Servicer Termination Event or (ii) the Servicer, the Backup Servicer, the Account Bank, the Collateral Custodian or any Hedge Counterparty, waive its respective rights or duties hereunder.

(d)     The Borrower shall deliver an Officer's Certificate to the Administrative Agent stating that an amendment, modification or waiver without the prior written consent of the Servicer, the Backup Servicer, the Account Bank, the Collateral Custodian or each Hedge Counterparty will not have a Material Adverse Effect on the rights and duties of such parties.

(e)     The Borrower shall provide a copy of each executed amendment, waiver or other modification to the Servicer, the Backup Servicer, the Account Bank, the Collateral Custodian and each Hedge Counterparty.  No amendment, waiver or other modification which could have a Material Adverse Effect on the rights or obligations of any Hedge Counterparty shall be effective against such Hedge Counterparty without its prior written consent.

Section 15.02.  <u>Notices, Etc.</u>  All notices and other communications provided for hereunder shall, unless otherwise stated herein, be in writing (including e-mail and facsimile communication) and e-mailed, mailed, transmitted or delivered, as to each party hereto, at its address set forth under its name on the signature pages hereof or specified in such party's Assignment and Acceptance or at such other address as shall be designated by such party in a written notice to the other parties hereto.  All such notices and communications shall be effective upon receipt or, in the case of notice by (i) mail, five days after being deposited in the United States mail, first class postage prepaid, (ii) facsimile, when confirmed by telephone, or (iii) e-mail, when receipt is confirmed by telephone or by reply e-mail from the recipient, except that notices and communications pursuant to Article Two shall not be effective until received with respect to any notice sent by mail.

Section 15.03.  <u>No Waiver, Rights and Remedies</u>.  No failure on the part of any Secured Party, any Agent or any of their respective assignees to exercise, and no delay in exercising, any right or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right.  The rights and remedies herein provided are cumulative and not exclusive of any rights and remedies provided by law.

Section 15.04.  <u>Binding Effect; Third Party Beneficiary</u>.  This Agreement shall be binding upon and inure to the benefit of the Borrower, the Servicer, the Backup Servicer, the Account Bank, the Secured Parties, the Agents and their respective successors and permitted assigns.  In addition any Hedge Counterparty (whether or not it is a Secured Party) shall be an express third party beneficiary of this Agreement.

Section 15.05.  <u>Term of this Agreement</u>.  This Agreement shall remain in full force and effect until the Facility Termination Date; provided, however, that the rights and remedies with respect to any breach of any representation and warranty made or deemed made by the Borrower

pursuant to Article Five and the indemnification and payment provisions of Article Eleven, the confidentiality provisions of Article Fourteen, the provisions of Sections 15.09 and 15.10 and any other provision of this Agreement expressly stated to survive, shall be continuing and shall survive any termination of this Agreement or the assignment, resignation or removal by or of the applicable parties hereto.

Section 15.06.  **GOVERNING LAW; CONSENT TO JURISDICTION; WAIVER OF OBJECTION TO VENUE**.  **THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REFERENCE TO ITS CONFLICTS OF LAW PROVISIONS (OTHER THAN §5-1401 AND §5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW).  EACH OF THE PARTIES HERETO HEREBY AGREES TO THE NON-EXCLUSIVE JURISDICTION OF ANY FEDERAL COURT LOCATED WITHIN THE STATE OF NEW YORK IN THE BOROUGH OF MANHATTAN.  EACH OF THE PARTIES HERETO HEREBY WAIVES ANY OBJECTION BASED ON FORUM NON CONVENIENS, AND ANY OBJECTION TO VENUE OF ANY ACTION INSTITUTED HEREUNDER IN ANY OF THE AFOREMENTIONED COURTS AND CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH COURT.**

Section 15.07.  **WAIVER OF JURY TRIAL**.  **TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH OF THE PARTIES HERETO WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE BETWEEN THE PARTIES HERETO ARISING OUT OF, CONNECTED WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP BETWEEN ANY OF THEM IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.  INSTEAD, ANY SUCH DISPUTE RESOLVED IN COURT WILL BE RESOLVED IN A BENCH TRIAL WITHOUT A JURY.**

Section 15.08.  Costs, Expenses and Taxes.

(a)    In addition to the rights of indemnification granted to the Backup Servicer, the Account Bank, the Collateral Custodian, the Secured Parties, the Agents and their respective Affiliates and officers, directors, employees and agents under Article Eleven, except as otherwise provided herein, the Borrower agrees to pay on demand all reasonable out-of-pocket costs and expenses of the Backup Servicer, the Account Bank, the Collateral Custodian, the Secured Parties and the Agents incurred in connection with the administration (including periodic auditing), amendment or modification of, or any waiver or consent issued in connection with, this Agreement and the other documents to be delivered hereunder or in connection herewith, including the reasonable fees and out-of-pocket expenses of counsel for the Secured Parties, each Agent, the Account Bank, the Collateral Custodian and the Backup Servicer with respect thereto and with respect to advising such entities as to their respective rights and remedies under this Agreement and the other documents to be delivered hereunder or in connection herewith, and all costs and expenses, if any (including reasonable counsel fees and expenses), incurred by such entities in connection with the enforcement of this Agreement and the other documents to be delivered hereunder or in connection herewith.

160

(b)      The Borrower shall pay promptly on demand any stamp, sales, excise and other Taxes and fees payable or determined to be payable in connection with the execution, delivery, filing and recording of this Agreement, the other documents to be delivered hereunder or herewith and any agreement or other document providing liquidity support, credit enhancement or other similar support to a Lender in connection with this Agreement or the funding or maintenance of Loans hereunder.

Section 15.09.   <u>No Insolvency Proceedings</u>.

(a)      Notwithstanding any prior termination of this Agreement, no party to this Agreement shall, prior to the date which is one year and one day after the final payment of all Aggregate Unpaids, petition, cooperate with or encourage any other Person in petitioning or otherwise invoke the process of any Governmental Authority for the purpose of commencing or sustaining an Insolvency Proceeding against the Borrower under any federal or State Insolvency Laws or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of the Borrower or any substantial part of its property or ordering the winding up or liquidation of the affairs of the Borrower.

(b)      Notwithstanding any prior termination of this Agreement, each party to this Agreement hereby agrees that it shall not institute against, or join any other Person in instituting against, any Conduit Lender any Insolvency Proceeding, for one year and a day after the latest maturing Commercial Paper Note or other debt security issued by such Conduit Lender is paid.

Section 15.10.   <u>Recourse Against Certain Parties</u>.

(a)      No recourse under or with respect to any obligation, covenant or agreement (including the payment of any fees or any other obligations) of any Secured Party, any Agent, the Backup Servicer, the Collateral Custodian or the Account Bank as contained in this Agreement or any other agreement, instrument or document entered into by it pursuant hereto or in connection herewith shall be had against any such Person or any manager or administrator of such Person or any incorporator, Affiliate, stockholder, officer, employee or director of such Person or of the Borrower or of any such manager or administrator, as such, by the enforcement of any assessment or by any legal or equitable proceeding, by virtue of any statute or otherwise; it being expressly agreed and understood that the agreements of any Secured Party, any Agent, the Backup Servicer or the Account Bank contained in this Agreement and all of the other agreements, instruments and documents entered into by it pursuant hereto or in connection herewith are, in each case, solely the corporate obligations of such Person, and that no personal liability whatsoever shall attach to or be incurred by any administrator of any such Person or any incorporator, stockholder, Affiliate, officer, employee or director of such Person or of any such administrator, as such, or any other of them, under or by reason of any of the obligations, covenants or agreements of such Person contained in this Agreement or in any other such instruments, documents or agreements, or that are implied therefrom, and that any and all personal liability of every such administrator of such Person and each incorporator, stockholder, Affiliate, officer, employee or director of such Person or of any such administrator, or any of them, for breaches by such Person of any such obligations, covenants or agreements, which liability may arise either at common law or at equity, by statute or constitution, or otherwise, is

161

hereby expressly waived as a condition of and in consideration for the execution of this Agreement.

(b)      Notwithstanding anything in this Agreement or any other Basic Document to the contrary, no Conduit Lender shall have any obligation to pay any amount required to be paid by it hereunder or thereunder in excess of any amount received pursuant to this Agreement and available to such Conduit Lender after paying or making provision for the payment of its Commercial Paper Notes.  All payment obligations of any Conduit Lender hereunder are contingent upon the availability of funds received pursuant to this Agreement and in excess of the amounts necessary to pay Commercial Paper Notes, and each party to this Agreement agrees that it shall not have a claim (as defined in Section 101(5) of the Bankruptcy Code) if and to the extent that any such payment obligation exceeds the amount received pursuant to this Agreement and available to such Conduit Lender to pay such amounts after paying or making provision for the payment of its Commercial Paper Notes.

(c)      The provisions of this Section shall survive the termination of this Agreement.

Section 15.11.  <u>Patriot Act Compliance</u>.  The Administrative Agent, the Account Bank and the Backup Servicer hereby notify the Borrower and each other party hereto that pursuant to the requirements of the Patriot Act, it, and each Lender may be required to obtain, verify and record information that identifies the Borrower and each other party hereto, which information includes the name and address of such party, organizational documentation, director and shareholder information, and other information that will allow the Administrative Agent, each Lender, the Backup Servicer and the Account Bank to identify such party in accordance with the Patriot Act.  This notice is given in accordance with the requirements of the Patriot Act and is effective for the Administrative Agent, the Backup Servicer, each Lender and the Account Bank.

Section 15.12.  <u>Execution in Counterparts; Severability; Integration</u>.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same agreement.  The words "execution", "signed", "signature", and words of like import in this Agreement or in any other certificate, agreement or document related to this Agreement or the other Basic Documents shall include images of manually executed signatures transmitted by facsimile or other electronic format (including "pdf", "tif" or "jpg") and other electronic signatures (including DocuSign and AdobeSign).  The use of electronic signatures and electronic records (including any contract or other record created, generated, sent, communicated, received or stored by electronic means) shall be of the same legal effect, validity and enforceability as a manually executed signature or use of a paper-based record-keeping system to the fullest extent permitted by Applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, any State law based on the Uniform Electronic Transactions Act and the UCC.

In case any provision in or obligation under this Agreement shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.  This Agreement, together with the other Basic

Documents, contains the final and complete integration of all prior expressions by the parties hereto with respect to the subject matter hereof and shall constitute the entire agreement among the parties hereto with respect to the subject matter hereof, superseding all prior oral or written understandings other than any fee letter contemplated hereby.

Section 15.13.  <u>Multiple Capacities</u>.  The parties expressly acknowledge and consent to WTNA acting in the dual capacity of Collateral Custodian and Account Bank.  WTNA may, in such dual capacity, discharge its separate functions fully, without hindrance or regard to conflict of interest principles or other breach of duties to the extent that any such conflict or breach arises from the performance by WTNA of express duties set forth in this Agreement in any of such capacities, all of which defenses, claims or assertions are hereby expressly waived by the other parties hereto except in the case of negligence (other than errors in judgment) and willful misconduct by WTNA.

Section 15.14.  <u>JPMorgan CP Rate</u>.

(a)      JPMorgan hereby notifies the Borrower, the Servicer and each other party hereto that (i) JPMorgan and/or its Affiliates may from time to time purchase, hold or sell, as principal and/or agent, Commercial Paper issued by Chariot Funding LLC, (ii) JPMorgan and/or its Affiliates act as administrative agent for Chariot Funding LLC, and as administrative agent JPMorgan manages Chariot Funding LLC's issuance of Commercial Paper, including the selection of amount and tenor of Commercial Paper issuance and the discount or interest rate applicable thereto, (iii) JPMorgan and/or its Affiliates act as a Commercial Paper dealer for Chariot Funding LLC and (iv) JPMorgan's activities as administrative agent and Commercial Paper dealer for Chariot Funding LLC, and as a purchaser or seller of Commercial Paper, affect the interest or discount rate applicable to the Commercial Paper issued by Chariot Funding LLC, which affect the CP Rate paid by the Borrower hereunder.

(b)      By execution of this Agreement, each of the Borrower, the Servicer and each other party hereto hereby (i) acknowledges the foregoing and agrees that JPMorgan does not warrant or accept any responsibility for, and shall not have any liability with respect to the interest or discount rate paid by Chariot Funding LLC in connection with its Commercial Paper issuance, (ii) acknowledges that the discount or interest rate at which JPMorgan and/or its Affiliates purchase or sell Commercial Paper will be determined by JPMorgan and/or its Affiliates in their sole discretion and may differ from the discount or interest rate applicable to comparable transactions entered into by JPMorgan and/or its Affiliates on the relevant date and (iii) waives any conflict of interest arising by reason of JPMorgan and/or its Affiliates acting as administrative agent and Commercial Paper dealer for Chariot Funding LLC while acting as purchaser or seller of Commercial Paper.

261320820v.10 94601/30060

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

THE BORROWER:                          TRICOLOR FUNDING SPV 4 LLC

By: _____

Name: Daniel Chu
Title: President


THE SERVICER:                          TRICOLOR AUTO ACCEPTANCE, LLC

By: _____

Name: Daniel Chu
Title: President

THE ADMINISTRATIVE AGENT
AND JPMORGAN AGENT:

JPMORGAN CHASE BANK, N.A.

By: _____
Name: Cameron Milligan
Title: Executive Director

_____

THE ACCOUNT BANK:                    WILMINGTON TRUST, NATIONAL
                                     ASSOCIATION


By: _____
    Name:  Kevin Ebert
    Title:  Vice President

THE COLLATERAL CUSTODIAN:          WILMINGTON TRUST, NATIONAL
                                   ASSOCIATION

By: _____

       Name:  Kevin Ebert
       Title:   Vice President

THE BACKUP SERVICER:       VERVENT INC.

By: _____

Name:   Louis W Geibel

Title:    Executive Vice President

LENDER AND
JPMORGAN CONDUIT LENDER:

CHARIOT FUNDING LLC

By:  JPMORGAN CHASE BANK, N.A.,
 its attorney-in-fact

By: _____
Name: Cameron Milligan
Title: Executive Director

LENDER AND
JPMORGAN COMMITTED
LENDER:

JPMORGAN CHASE BANK, N.A.

By: _____
Name: Cameron Milligan
Title: Executive Director

SCHEDULE A

CONDUIT LENDER SUPPLEMENT

| | |
|---|---|
| Lender Group: | JPMorgan Chase Bank, N.A. |
| Address for Notices: | JPMorgan Chase Bank, N.A.<br>Chase Tower, 16th Floor<br>10 South Dearborn Street<br>Mail Code IL1-0079<br>Chicago, Illinois  60603<br>Attention:  Asset-Backed Securities Portfolio Management<br>E-mail: abs.treasury.dept@jpmorgan.com;<br>abf.operations@jpmorgan.com;<br>alan.p.english@jpmorgan.com;<br>cameron.milligan@jpmorgan.com;<br>maxwell.geier@jpmchase.com<br>Telephone:  (312) 732-7985<br>Facsimile:  (312) 732-1844 |
| JPMorgan Conduit Lender: | Chariot Funding LLC |
| Conduit Funding Limit for Chariot Funding LLC: | $100,000,000 |
| Address for Notices and Investing Office: | JPMorgan Chase Bank, N.A.<br>Chase Tower, 16th Floor<br>10 South Dearborn Street<br>Mail Code IL1-0079<br>Chicago, Illinois  60603<br>Attention:  Asset-Backed Securities Conduit Group<br>E-mail:  abs.treasury.dept@jpmorgan.com;<br>abf.operations@jpmorgan.com;<br>alan.p.english@jpmorgan.com;<br>cameron.milligan@jpmorgan.com;<br>maxwell.geier@jpmchase.com;<br>Telephone:  (312) 732-7985<br>Facsimile:  (312) 732-1844 |

SA-1

CP Rate:

For any Interest Period (or portion thereof), the per annum rate calculated to yield the Weighted Average Cost (as defined below) for such Interest Period (or portion thereof) in respect of Commercial Paper issued by Chariot Funding LLC; provided, however, that if any component of such rate is a discount rate, in calculating the CP Rate for such Interest Period (or portion thereof), the rate resulting from converting such discount rate to an interest bearing equivalent rate per annum shall be used in calculating such component.

The "Weighted Average Cost" for any Interest Period (or portion thereof) means the sum, without duplication, of (i) the actual interest accrued during such Interest Period (or portion thereof) on outstanding Commercial Paper issued by Chariot Funding LLC (excluding any Commercial Paper issued to and held by JPMorgan or any Affiliate thereof, other than such Commercial Paper held as part of the market making activities of Chariot Funding LLC; Commercial Paper dealer), (ii) the commissions of placement agents and dealers in respect of such Commercial Paper, (iii) any note issuance costs attributable to such Commercial Paper not constituting dealer fees or commissions, expressed as an annualized percentage of the aggregate principal component thereof, (iv) the actual interest accrued during such Interest Period (or portion thereof) on other borrowings by Chariot Funding LLC (as determined by its managing agent), including to fund small or odd dollar amounts that are not easily accommodated in the commercial paper market, which may include loans from Chariot Funding LLC's managing agent or its Affiliates (such interest rate not to exceed, on any day, the Federal Funds Rate in effect on such day plus 0.50%) and (v) incremental carrying costs incurred with respect to Commercial Paper Notes maturing on dates other than those on which corresponding funds are received by Chariot Funding LLC minus any accrual of income net of expenses received from investment of collections received under all receivables purchase facilities funded substantially with Commercial Paper.

| | |
|---|---|
| Wire Information: | Account Title:  Chariot Funding LLC<br>Bank Name:  JPMorgan Chase Bank, N.A.<br>ABA/Routing:  021000021<br>Account Number:  645475500 |
| Committed Lender: | JPMorgan Chase Bank, N.A. |
| Commitment: | $100,000,000 |
| Address for Notices and Investing<br>Office: | JPMorgan Chase Bank, N.A.<br>Chase Tower, 16th Floor<br>10 South Dearborn Street<br>Mail Code IL1-0079<br>Chicago, Illinois  60603<br>Attention:  Asset-Backed Securities Conduit Group<br>E-mail:  abs.treasury.dept@jpmorgan.com;<br>abf.operations@jpmorgan.com;<br>alan.p.english@jpmorgan.com;<br>cameron.milligan@jpmorgan.com;<br>Telephone:  (312) 732-7985<br>Facsimile:  (312) 732-1844 |
| Wire Information: | Account Title: Chariot Funding LLC<br>Bank Name: JPMorgan Chase Bank, N.A.<br>ABA/Routing:  021000021<br>Account Number:  645475500 |

SA-3

SCHEDULE B

ELIGIBLE RECEIVABLE CRITERIA

An "Eligible Receivable" means a Receivable as to which all of the following conditions are satisfied:

(i)     which is payable in Dollars in the United States or one of its territories;

(ii)     for which the related Obligor is a natural Person and not (a) a commercial entity, (b) an employee of Tricolor or an Affiliate thereof or (c) the government of the United States or any State or any agency, department or instrumentality of the government of the United States or any State or other Governmental Authority;

(iii)     which at the time of origination, the related Obligor (a) provided as its most recent billing address an address located in the United States, (b) had been employed at its related job for at least two months, (c) had a combined monthly income of at least $1,000, (d) had a PTI not greater than 30% and (e) had a DTI not greater than 50%;

(iv)     which, as of the related Cutoff Date or the related Funding Date, no Scheduled Payment is greater than 30 days past due and the most recent Scheduled Payment has not been extended or deferred;

(v)     with respect to which, to the knowledge of the Borrower, at the related Cutoff Date, the related Obligor was (a) not the subject of a bankruptcy proceeding since the origination of the related Contract and (b) not deceased;

(vi)     which is not, and has not ever been, a Defaulted Receivable;

(vii)     which was originated in the United States by an Originator and then sold to Tricolor pursuant to a Transfer Agreement in the ordinary course of Tricolor business pursuant to a transaction constituting a bona fide sale and which was created as a result of an advance by such Originator in the ordinary course of its business, directly to or for the benefit of an Obligor for the purchase or refinancing of the related Financed Vehicle;

(viii)     which provides for level monthly, bi-weekly or semi-monthly payments (provided that the payment in the first and last months of the Receivable may be minimally different from the level payment) that fully amortize the Amount Financed pursuant to the Simple Interest Method;

(ix)     which has (a) a Principal Balance of at least $500 and not more than $40,000, (b) a fixed APR of not more than the Maximum Lawful Rate, (c) an original term of at least 12 months and not more than 66 months and (d) an LTV Ratio of no more than 170.0%;

(x)     with respect to Obligors that have non-zero FICO® Scores, each Obligor has a FICO® Score of at least 400;

SB-1

(xi)    is secured by a new or used automobile, light-duty truck, minivan, sport utility vehicle, motorcycle or other passenger vehicle which (a) has a GPS device installed in such vehicle, (b) has not been repossessed from the Obligor or constitutes a total insurance loss on or prior to the related Funding Date, (c) has not been sold by a Tricolor, Ganas or Ganas Ya! Dealership on more than two occasions, (d) does not have a starter interrupter device installed in such vehicle and (e) has not been included in a "fleet" sale (*i.e.*, a sale to any single Obligor of more than five Financed Vehicles);

(xii)    in respect of which the Amount Financed does not include any portion of the required down payment for the related Financed Vehicle;

(xiii)    as of the related Funding Date, is secured by a first priority validly perfected security interest in the Financed Vehicle in favor of the related Originator, as secured party, or all necessary actions have been commenced that would result in a first priority security interest in the Financed Vehicle in favor of such Originator, as secured party, which security interest, in either case, is assignable and has been so assigned by Tricolor to the Borrower and by the Borrower to the Administrative Agent;

(xiv)    as to which the Borrower has good and marketable title thereto and which is not subject to any Lien on the related Financed Vehicle which are Liens prior to, or equal or coordinate with, the security interest in the Financed Vehicle granted by the Receivable, and as to which at any time, the Administrative Agent, for the benefit of the Secured Parties, shall have a valid and perfected first priority security interest, free and clear of all Liens and rights of others;

(xv)    which arises under a Contract which is a fixed rate conditional sale contract or promissory note and security agreement that has been properly executed by the parties thereto and which represents the genuine, legal, valid and binding payment obligation in writing of the Obligor, in full force and effect, enforceable by the holder thereof in accordance with its terms, subject to the effect of bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally;

(xvi)    which was not subject to any right of rescission, cancellation, set-off, claim, counterclaim or defense (including the defense of usury) of the Obligor or any proceedings pending or, to the best of the Borrower's knowledge, threatened;

(xvii)    which shall have complied with all Requirements of Law, including all consumer protection laws;

(xviii)    with respect to which the related Contract (a) had not been modified, extended, amended, waived or altered in any respect, except in accordance with the Credit and Collection Policy and (b) constitutes "tangible chattel paper" or "electronic chattel paper" under and as defined in Article 9 of the UCC as then in effect;

(xix)    with respect to which the related Financed Vehicle was required by the terms of the related Contract to be covered by a comprehensive and collision insurance policy at the time such Contract was entered into;

SB-2

(xx)    with respect to which (a) each of Tricolor and the Borrower has done nothing to impair the rights of the Secured Parties therein, (b) neither Tricolor nor an Affiliate thereof has advanced funds to keep the related Contract current and (c) no selection procedures adverse to the interests of the Secured Parties have been utilized;

(xxi)    which (a) is assignable without the consent of, or notice to, the related Obligor and (b) has not been originated in, or is subject to the laws of, any jurisdiction under which the sale, transfer and assignment of such Receivable under this Agreement or pursuant to a transfer of the Contract shall be unlawful, void or voidable;

(xxii)    with respect to which the related transfer, assignment and conveyance by Tricolor pursuant to the Purchase Agreement is not subject to the bulk transfer or any similar statutory provisions in effect in any applicable jurisdiction;

(xxiii)    with respect to which the related Contract satisfies in all material respects the requirements of the Credit and Collection Policy that was in effect as of the date on which such Contract was originated and it was underwritten by Tricolor in accordance with the Credit and Collection Policy;

(xxiv)    which was originated on or after September 1, 2020;

(xxv)    with respect to which (A) there exists a Contract File pertaining to each Receivable, (B) such Contract File contains the fully executed Contract and each other document specified in the definition of "Contract File", (C) such Contract File will be delivered to the Collateral Custodian in accordance with the requirements of this Agreement and (D) the Collateral Custodian holds the Certificate of Title or a copy of a completed application for a Certificate of Title for the related Financed Vehicle and, in the case of a Receivable as to which the Collateral Custodian is not holding the Certificate of Title, the Collateral Custodian will obtain the Certificate of Title with respect to the Financed Vehicle within 180 days following the date of origination of the related Contract; and

(xxvi)    with respect to any Receivable that constitutes Electronic Chattel Paper, (a) the Authoritative Copy of such Electronic Chattel Paper does not have any marks or notations indicating that such Electronic Chattel Paper has been pledged, assigned or otherwise conveyed to any Person other than Tricolor, the Borrower or the Administrative Agent (on behalf of the Secured Parties) and (b) no party other than the Borrower or Tricolor has "control" (within the meaning of Section 9-105 of the UCC) over the Authoritative Electronic Copy of the Contract evidencing such Receivable.

SB-3

SCHEDULE C

SCHEDULE OF RECEIVABLES

(Original delivered to the Administrative Agent)

261320820v.10 94601/30060

SCHEDULE D

LOCATION OF CONTRACT FILES AND RECEIVABLE FILES

With respect the Contract Files:

Wilmington Trust, National Association
693 Seneca Street, 4th Floor
Buffalo, New York 14210

With respect to the Receivable Files:

Tricolor Auto Acceptance, LLC
1111 W. Mockingbird Lane, Suite 1500
Dallas, Texas 75247

261320820v.10 94601/30060

SCHEDULE E

NOTICE INFORMATION

<u>Borrower</u>

Tricolor Funding SPV 4 LLC
1111 W. Mockingbird Lane, Suite 1500
Dallas, Texas 75247
Attention: Daniel Chu
Facsimile No.: (424) 290-2700
Telephone No.: (214) 290-2200
Email: dchu@tricolorauto.com

<u>Servicer</u>

Tricolor Auto Acceptance, LLC
1111 W. Mockingbird Lane, Suite 1500
Dallas, Texas 75247
Attention: Daniel Chu
Facsimile No.: (424) 290-2700
Telephone No.: (214) 290-2200
Email: dchu@tricolorauto.com

<u>Administrative Agent</u>

JPMorgan Chase Bank, N.A.
Chase Tower, 16th Floor
10 South Dearborn Street
Mail Code IL1-0079
Chicago, Illinois  60603
Attention:  Asset-Backed Securities Conduit Group
E-mail:  abs.treasury.dept@jpmorgan.com; abf.operations@jpmorgan.com;
alan.p.english@jpmorgan.com; cameron.milligan@jpmorgan.com;
Telephone:  (312) 732-7985
Facsimile:  (312) 732-1844

<u>Collateral Custodian</u>

Wilmington Trust, National Association
693 Seneca Street, 4th Floor
Buffalo, New York 14210

SE-1

<u>Account Bank</u>

Wilmington Trust, National Association
1100 North Market Street
Wilmington, Delaware  19800
Attention: Corporate Trust Administration
Facsimile No.:  (302) 636-4140
Email:  cwright1@wilmingtontrust.com

261320820v.10 94601/30060

Backup Servicer

Vervent Inc.
10182 Telesis Court, Suite 300
San Diego, California  92121
Attention:  General Counsel
Telephone No.:  (858) 568-7684
Facsimile No.:  (858) 451-0022
Email:  dgamble@vervent.com

JPMorgan Chase Bank, N.A.

JPMorgan Chase Bank, N.A.
Chase Tower, 16th Floor
10 South Dearborn Street
Mail Code IL1-0079
Chicago, Illinois  60603
Attention:  Asset-Backed Securities Conduit Group
E-mail:abs.treasury.dept@jpmorgan.com;
        abf.operations@jpmorgan.com;
        alan.p.english@jpmorgan.com;
        cameron.milligan@jpmorgan.com;
        maxwell.geier@jpmchase.com
Telephone:  (312) 732-7985
Facsimile:  (312) 732-1844

Chariot Funding LLC

Chariot Funding LLC
c/o JPMorgan Chase Bank, N.A.
Chase Tower, 16th Floor
10 South Dearborn Street
Mail Code IL1-0079
Chicago, Illinois  60603
Attention:  Asset-Backed Securities Conduit Group
E-mail:abs.treasury.dept@jpmorgan.com;
        abf.operations@jpmorgan.com;
        alan.p.english@jpmorgan.com;
        cameron.milligan@jpmorgan.com;
        maxwell.geier@jpmchase.com
Telephone:  (312) 732-7985
Facsimile:  (312) 732-1844

SE-3

SCHEDULE F

PERFECTION REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants, as of the Closing Date and as of each Funding Date:

(i)     This Agreement creates a valid and continuing security interest (as defined in the applicable UCC) in all Receivables in favor of the Administrative Agent, which security interest is prior to all other Liens, and is enforceable as such against creditors of and purchasers from the Borrower.

(ii)     The Borrower has taken all steps necessary to perfect its security interest against the Obligor in the property securing the Receivables.

(iii)     The Receivables constitute "tangible chattel paper" within the meaning of the applicable UCC or Electronic Chattel Paper.

(iv)     The Borrower owns and has good and marketable title to the Receivables free and clear of any Lien (other than Permitted Liens), claim, or encumbrance of any Person.

(v)     The Borrower has caused or will have caused, within ten days after the Closing Date, the filing of all appropriate financing statements in the proper filing office in the appropriate jurisdictions under Applicable Law in order to perfect the security interest in the Collateral granted to the Administrative Agent hereunder.

(vi)     Other than the security interest granted to the Administrative Agent pursuant to this Agreement, the Borrower has not pledged, assigned, sold, granted a security interest in, or otherwise conveyed any of the Receivables.  The Borrower has not authorized the filing of and is not aware of any financing statements against the Borrower that include a description of collateral covering the Receivables other than any financing statement relating to the security interest granted to the Administrative Agent hereunder or that has been terminated.  The Borrower is not aware of any judgment or tax lien filings against the Borrower.

(vii)     The Collateral Custodian has possession of all of the Contracts that constitute "tangible chattel paper" (within the meaning of the UCC) and Tricolor has "control" (within the meaning of Section 9-105 of the UCC) of all Contracts that constitute Electronic Chattel Paper.

(viii)     Tricolor has not communicated an Authoritative Copy of any Contract that constitutes or evidences any Contract Receivable to any Person.

(ix)     Only one Authoritative Copy of each Contract that constitutes Electronic Chattel Paper exists.  Each such Authoritative Copy is unique, identifiable, and unalterable (other than with the participation of the Borrower in the case of an addition or change of an identified assignee and other than a revision that is readily identifiable as an authorized or unauthorized revision).

SF-1

(x)     The Authoritative Copy of each Contract that constitutes Electronic Chattel Paper identifies only Tricolor or the Borrower as the assignee and owner of record thereof.

(xi)     Each copy of the Authoritative Copy of a Contract that constitutes Electronic Chattel Paper and any copy of a copy are readily identifiable as copies that are not the Authoritative Copy.

(xii)     Each Contract that constitutes Electronic Chattel Paper has been established in a manner such that (a) all copies or revisions that add or change an identified assignee of the Authoritative Copy thereof that constitutes or evidences a Receivable must be made with the participation of Tricolor, and (b) all revisions of the Authoritative Copy of each Contract that constitutes Electronic Chattel Paper are readily identifiable as an authorized or unauthorized revision.

(xiii)     The Contracts that constitute "tangible chattel paper" (within the meaning of the UCC) do not have any marks or notations indicating that they have been pledged, assigned, or otherwise conveyed to any Person.

(xiv)     All financing statements filed or to be filed against the Borrower in favor of the Administrative Agent in connection herewith describing the Receivables contain a statement to the following effect: "A purchase of or security interest in any collateral described in this financing statement will violate the rights of the Administrative Agent".

EXHIBIT A

FORM OF FUNDING REQUEST

_____, 202_

JPMorgan Chase Bank, N.A.,
   as Administrative Agent
   and as JPMorgan Agent
Chase Tower
16th Floor
10 South Dearborn Street
Mail Code IL1-0079
Chicago, Illinois  60603
Attention:  Asset-Backed Securities Conduit Group

Chariot Funding LLC,
JPMorgan Chase Bank, N.A.,
 as Lenders
Chase Tower
16th Floor
10 South Dearborn Street
Mail Code IL1-0079
Chicago, Illinois  60603
Attention:  Asset-Backed Securities Conduit Group

> Re:   Tricolor Funding SPV 4 LLC
>        Credit Agreement_____

Ladies and Gentlemen:

The undersigned is a Responsible Officer of Tricolor Funding SPV 4 LLC (the "Borrower") and is authorized to execute and deliver this Funding Request on behalf of the Borrower pursuant to the Credit Agreement, dated as of November 13, 2020 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among the Borrower, Tricolor Auto Acceptance, LLC, as servicer, the lenders from time to time party thereto, the agents from time to time party thereto, JPMorgan Chase Bank, N.A., as administrative agent, Vervent Inc., as backup servicer, and Wilmington Trust, National Association as collateral custodian and account bank.  Capitalized terms used herein that are not otherwise defined shall have the meanings ascribed thereto in the Credit Agreement.

The Borrower hereby requests that a Loan be made under the Credit Agreement on _____, 20__ in the amount of $_____.

A-1

The Cutoff Date with respect to the Receivables to be funded by the Loan is _____, 20___.

In connection with the foregoing, the undersigned hereby certifies, on behalf of the Borrower, as follows:

(a)     As of the date hereof, the Borrowing Base (calculated as of the last day of the most recently ended Collection Period or, with respect to Receivables added to the Collateral following such last day but prior to or on such date of determination, the related Cutoff Date) is $_____.  After giving effect to the requested Loan, the Loans Outstanding will not exceed the Borrowing Base and no Borrowing Base Deficiency will exist.  Attached to this Funding Request is a true, complete and correct calculation of the Borrowing Base and all components thereof.

(b)     The Principal Amount of the requested Loan will not exceed the Available Amount or the Borrowing Base on such day.

(c)     All of the conditions precedent to the requested Loan as set forth in the Credit Agreement have been satisfied as of the date hereof and will remain satisfied to the date of such Loan, including:

(i)     all requirements, conditions and limitations imposed in Section 2.01 of the Credit Agreement in connection with the Borrower's request for, and the Lenders' funding of, such Loan shall have been satisfied and complied with as of the date hereof;

(ii)     each of the representations and warranties contained in Article Five of the Credit Agreement and each of the representations and warranties of the Borrower contained in any other Basic Document is true and correct in all respects on and as of the date hereof, before and after giving effect to the Loan and to the application of the proceeds therefrom as though made on and as of the date hereof;

(iii)     no event has occurred and is continuing, or would result from such Loan or from the application of the proceeds therefrom, that constitutes an Amortization Event, Termination Event or Unmatured Termination Event;

(iv)     no event has occurred and is continuing that constitutes a Servicer Termination Event or an Unmatured Servicer Termination Event; and

(v)     the Borrower has performed all of the agreements contained in the Credit Agreement and the other Borrower Basic Documents to be performed by it at or prior to the date hereof.

A-2

Very truly yours,

TRICOLOR FUNDING SPV 4 LLC


By: _____
    Name:
    Title:


cc:  Wilmington Trust, National Association,
    as Account Bank

EXHIBIT B

FORM OF ASSIGNMENT AND ACCEPTANCE

_____, 202_

Reference is made to the Credit Agreement, dated as of November 13, 2020 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among the Borrower, Tricolor Auto Acceptance, LLC, as servicer, the lenders from time to time party thereto, the agents from time to time party thereto, JPMorgan Chase Bank, N.A., as administrative agent (the "Administrative Agent"), Vervent Inc., as backup servicer, and Wilmington Trust, National Association as collateral custodian and account bank.  Capitalized terms used herein that are not otherwise defined shall have the meanings ascribed thereto in the Credit Agreement.

_____ (the "Assignor") and _____ (the "Assignee") agree as follows:[1]

1.      The Assignor hereby sells and assigns to the Assignee, and the Assignee hereby purchases and assumes from the Assignor, that interest in and to all of the Assignor's rights and obligations with respect to the Loans of such Assignor under the Credit Agreement as of the date hereof which represents the Invested Percentage specified in Section 1 of Schedule 1 of all outstanding rights and obligations of the Assignor in such Loans under the Credit Agreement, including such interest in the Commitment of the Assignor and such Loans made by the Assignor.  After giving effect to such sale and assignment, the Commitment and the amount of Loans made by the Assignee will be as set forth in Section 2 of Schedule 1.

2.      The Assignor represents and warrants that it is the legal and beneficial owner of the interest being assigned by it hereunder and that such interest is free and clear of any Lien.

3.      The Assignor and the Assignee confirm to and agree with each other and the other parties to the Credit Agreement that: (i) other than as provided herein, the Assignor makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with the Credit Agreement or the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Agreement or any other instrument or document furnished pursuant thereto; (ii) the Assignee confirms that it has received a copy of the Credit Agreement, together with copies of such financial statements and other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (iii) the Assignee will, independently and without reliance upon the Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Credit Agreement; (iv) the Assignor and the Assignee confirm that the Assignee is an Eligible Assignee; (v) the Assignee appoints and authorizes the Administrative Agent to take such action as agent on its behalf and to exercise such powers under this Agreement as are delegated to such

---

[1] To the extent the Assignor and/or the Assignee is a Conduit Lender, some provisions may be added or modified.

B-1

agent by the terms hereof, together with such powers as are reasonably incidental thereto; (vi) the Assignee agrees that it will perform in accordance with their terms all of the obligations which by the terms of the Credit Agreement are required to be performed by it as a Lender, including the confidentiality provisions of Article Fourteen; and (vii) this Assignment and Acceptance meets all other requirements for such an Assignment and Acceptance set forth in Article Thirteen of the Credit Agreement.

4.      Following the execution of this Assignment and Acceptance by the Assignor and the Assignee, it will be delivered to the Administrative Agent for acceptance.  The effective date of this Assignment and Acceptance (the "Assignment Date") shall be the date of acceptance thereof by the Administrative Agent, unless a later date is specified in Section 3 of Schedule 1.

5.      The Assignor and the Assignee agree to reimburse the Administrative Agent for all reasonable fees, costs and expenses (including reasonable fees and out-of-pocket expenses of counsel for the Administrative Agent) incurred by the Administrative Agent in connection with this Assignment and Acceptance.

6.      Upon such acceptance by the Administrative Agent, (i) the Assignee shall be a party to the Credit Agreement and, to the extent provided in this Assignment and Acceptance, have the rights and obligations of a Lender thereunder; provided, however, that (ii) the Assignor shall, to the extent such rights have been assigned by it under this Assignment and Acceptance, relinquish its assigned rights and be released from its assigned obligations under the Credit Agreement (and, in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Assignor's rights and obligations under the Credit Agreement, Assignor shall cease to be a party thereto).

7.      Upon such acceptance by the Administrative Agent, from and after the Assignment Date, the Administrative Agent shall make, or cause to be made, all payments under the Credit Agreement in respect of the interest assigned hereby (including all payments of principal, interest and fees with respect thereto) to the Assignee.  The Assignor and Assignee shall make all appropriate adjustments in payments under the Credit Agreement for periods prior to the Assignment Date directly between themselves.

8.      **THIS ASSIGNMENT AND ACCEPTANCE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REFERENCE TO ITS CONFLICTS OF LAW PROVISIONS (OTHER THAN §5-1401 AND §5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW).**

B-2

IN WITNESS WHEREOF, the Assignor and the Assignee have executed this Acceptance and Assignment as of the __ day of _____, 202_.

_____,
   as Assignee


By:_____
   Name:
   Title:



_____,
   as Assignor


By:_____
   Name:
   Title:

B-3

Schedule 1
to
Assignment and Acceptance
Dated _____, 202_

Section 1.

    Invested Percentage:                             _____%

Section 2.

    Assignee's Commitment:                        $_____

    Aggregate Loans Owing to the Assignee:        $_____

Section 3.

    Assignment Date:  _____, 202_

B-4

EXHIBIT C

CREDIT AND COLLECTION POLICY

[On file with the Administrative Agent]

C-1

EXHIBIT D

## FORM OF POWER OF ATTORNEY

This Power of Attorney (this "Power of Attorney") is executed and delivered by Tricolor Funding SPV 4 LLC ("Grantor") to JPMorgan Chase Bank, N.A., as administrative agent ("Attorney"), pursuant to the Credit Agreement, dated as of November 13, 2020 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Grantor, Tricolor Auto Acceptance, LLC, as servicer, the lenders from time to time party thereto, the agents from time to time party thereto, Attorney, as administrative agent, Vervent Inc., as backup servicer, and Wilmington Trust, National Association, as collateral custodian and account bank.  Capitalized terms used herein that are not otherwise defined shall have the meanings ascribed thereto in the Credit Agreement.

No person to whom this Power of Attorney is presented, as authority for Attorney to take any action or actions contemplated hereby, shall inquire into or seek confirmation from Grantor as to the authority of Attorney to take any action described below, or as to the existence of or fulfillment of any condition to this Power of Attorney, which is intended to grant to Attorney unconditionally the authority to take and perform the actions contemplated herein, and Grantor irrevocably waives any right to commence any suit or action, in law or equity, against any person or entity that acts in reliance upon or acknowledges the authority granted under this Power of Attorney.  This Power of Attorney is coupled with an interest and may not be revoked or canceled by Grantor until all Aggregate Unpaids have been indefeasibly paid in full or Attorney has provided its written consent thereto.

Grantor hereby irrevocably constitutes and appoints Attorney (and all officers, employees or agents designated by Attorney), with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in its place and stead and in its name or in Attorney's own name, from time to time in Attorney's discretion, to take any and all appropriate action and to execute and deliver any and all documents and instruments that may be necessary or desirable to accomplish the purposes of the Credit Agreement, and, without limiting the generality of the foregoing, hereby grants to Attorney the power and right, on its behalf, without notice to or assent by it, upon the occurrence and during the continuance of any Termination Event, to do the following:  (a) exercise all rights and privileges of Grantor under the Purchase Agreement (including each Transfer Agreement); (b) pay or discharge any Taxes, Liens or other encumbrances levied or placed on or threatened against Grantor or Grantor's property; (c) defend any suit, action or proceeding brought against Grantor if Grantor does not defend such suit, action or proceeding or if Attorney believes that it is not pursuing such defense in a manner that will maximize the recovery to Attorney, and settle, compromise or adjust any suit, action or proceeding described above and, in connection therewith, give such discharges or releases as Attorney may deem appropriate; (d) file or prosecute any claim, litigation, suit or proceeding in any court of competent jurisdiction or before any arbitrator, or take any other action otherwise deemed appropriate by Attorney for the purpose of collecting any and all such moneys due to Grantor whenever payable and to enforce any other right in respect of Grantor's property; (e) sell, transfer, pledge, make any agreement with respect to or otherwise deal with, any of Grantor's property, and execute, in connection with such sale or action, any endorsements, assignments or other instruments of conveyance or transfer in connection therewith, receipts or

D-1

acquittance for amounts collected or received thereunder; and (f) cause the certified public accountants then engaged by Grantor to prepare and deliver to Attorney at any time and from time to time, promptly upon Attorney's request, any reports required to be prepared by or on behalf of Grantor under the Credit Agreement or any other Basic Document, all as though Attorney were the absolute owner of its property for all purposes, and to do, at Attorney's option and Grantor's expense, at any time or from time to time, all acts and other things that Attorney reasonably deems necessary to perfect, preserve, or realize upon its property or assets and the Liens of the Administrative Agent, as agent for the Secured Parties thereon, all as fully and effectively as it might do.  Grantor hereby ratifies, to the extent permitted by law, all that said attorneys shall lawfully do or cause to be done by virtue hereof.

D-2

IN WITNESS WHEREOF, this Power of Attorney is executed by Grantor as of this __ day of November 2020.

TRICOLOR FUNDING SPV 4 LLC

By:_____

    Name:

    Title:

Sworn to and subscribed before
me this __ day of November, 2020

_____

Notary Public

[NOTARY SEAL]

D-3

EXHIBIT E

FORM OF MONTHLY REPORT

Omitted – Original on file with parties hereto

261320820v.10 94601/30060

EXHIBIT F

FORM OF SECURITIZATION RELEASE

Reference is hereby made to the Credit Agreement, dated as of November 13, 2020 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Tricolor Funding SPV 4 LLC, as borrower, Tricolor Auto Acceptance, LLC, as servicer, the lenders from time to time party thereto, the agents from time to time party thereto, JPMorgan Chase Bank, N.A., as administrative agent ("Administrative Agent"), Vervent Inc., as backup servicer, and Wilmington Trust, National Association, as collateral custodian and account bank.  Capitalized terms used herein that are not otherwise defined shall have the meanings ascribed thereto in the Credit Agreement.

The Borrower and the Servicer hereby represent and warrant that each condition in the Credit Agreement and each other Basic Document to the consummation of the Securitization to which this Securitization Release relates has been satisfied, including delivery of (i) the executed Securitization Date Certificate, in substantially the form attached hereto as Annex 1 and (ii) the executed notice, in substantially the form attached hereto as Annex 2.

Upon deposit in the Collection Account of $_____ in immediately available funds in accordance with Section 2.15(a)(iv) of the Credit Agreement, the Administrative Agent hereby releases all of its right, title and interest, including its Lien, in and to the following:

(a)     the Receivables to be transferred by the Borrower in the related Securitization and described in Schedule I hereto (the "Securitized Receivables" and such Schedule, the "Schedule of Securitized Receivables"), and the related Contracts, whether now existing or hereafter acquired, and any accounts or obligations evidenced thereby, any guarantee thereof, all Collections and all monies due (including any payments made under any guarantee or similar credit enhancement with respect to any such Securitized Receivables) or to become due or received by any Person in payment of any of the foregoing on or after the related Securitization Date;

(b)     the Financed Vehicles related to the Securitized Receivables (including Financed Vehicles that have been repossessed) or in any document or writing evidencing any security interest in any Financed Vehicle and each security interest in each Financed Vehicle, whether now existing or hereafter acquired, securing each such Securitized Receivable, including all proceeds from any sale or other disposition of such Financed Vehicles;

(c)     all Receivable Files and the Schedule of Securitized Receivables, whether now existing or hereafter acquired, and all right, title and interest of the Borrower in and to the documents, agreements and instruments included in the Receivable Files, including rights of recourse of the Borrower against Tricolor and/or any Originator;

(d)     all Records, documents and writings evidencing or related to the Securitized Receivables or the Contracts;

F-1

(e)      all rights to payment under all Insurance Policies with respect to a Financed Vehicle related to a Securitized Receivable, including any monies collected from whatever source in connection with any default of an Obligor with respect to such Financed Vehicle and any proceeds from claims or refunds of premiums on any Insurance Policy, whether now existing or hereafter acquired, and all proceeds thereof;

(f)      all guaranties, indemnities, warranties, insurance (and proceeds and premium refunds thereof) and other agreements or arrangements of whatever character from time to time supporting or securing payment of the Securitized Receivables, whether pursuant to the related Contracts or otherwise;

(g)      all rights to payment under all service contracts and other contracts and agreements associated with the Securitized Receivables and all of the Borrower's interest in all recourse rights against the related Originator;

(h)      all security interests, Liens, guaranties and other encumbrances in favor of or assigned or transferred to the Borrower in and to the Securitized Receivables, whether now existing or hereafter acquired, the related Contracts, whether now existing or hereafter acquired, and Financed Vehicles, whether now existing or hereafter acquired;

(i)      all deposit accounts, monies, deposits, funds, accounts and instruments relating to the foregoing (subject to the Master Collection Account Agreement); and

(j)      all income and proceeds of the foregoing.

F-2

Executed as of _____, 202_.

TRICOLOR FUNDING SPV 4 LLC,
  as Borrower

By: _____
   Name:
   Title:

TRICOLOR AUTO ACCEPTANCE, LLC
  as Servicer

By: _____
   Name:
   Title:

JPMORGAN CHASE BANK, N.A.,
  as Administrative Agent

By: _____
   Name:
   Title:

F-3

ANNEX 1

## TRICOLOR AUTO ACCEPTANCE, LLC

SECURITIZATION DATE CERTIFICATE[1]
PURSUANT TO SECTION 2.15(a)
OF THE CREDIT AGREEMENT

Tricolor Auto Acceptance, LLC ("Tricolor"), as servicer (the "Servicer"), delivers this certificate pursuant to Section 2.15(a) of the Credit Agreement, dated as of November 13, 2020 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Tricolor Funding SPV 4 LLC (the "Borrower"), the Servicer, the lenders from time to time party thereto, the agents from time to time party thereto, JPMorgan Chase Bank, N.A., as administrative agent, Vervent Inc., as backup servicer, and Wilmington Trust, National Association, as collateral custodian and account bank, and hereby certifies, as of the date hereof, the following:

(a)     the Borrower has sufficient funds on the related Securitization Date to effect the Securitization in accordance with the Credit Agreement (taking into account, to the extent necessary, the proceeds of sales of the Collateral in the Securitization);

(b)     after giving effect of the Securitization, the release by the Administrative Agent of the related Receivables on the Securitization Date and the transfer by the Borrower of the related Receivables on the Securitization Date, (i) no adverse selection procedures shall have been used by the Borrower with respect to the Receivables that will remain subject to the Credit Agreement after giving effect to the Securitization, (ii) no Borrowing Base Deficiency exists, (iii) no Amortization Event, Termination Event, Unmatured Termination Event, Servicer Termination Event or Unmatured Servicer Termination Event has occurred on such Securitization Date or results from such Securitization, (iv) the Excess Spread Percentage exceeds the Minimum Excess Spread Percentage, (v) the Excess Concentration Amount shall be zero and (vi) the proportion (rounded to the nearest one hundredth of one percent) of the Pool Balance comprised of Receivables as to which the greater of (a) 10% of any Scheduled Payment or (b) $50.00, is unpaid for 31 or more but less than 61 days past its scheduled due date is not more than 1% greater than such proportion immediately prior to such Securitization; and

(c)     the Borrower has delivered to the Administrative Agent a list specifying all Contracts under which the Receivables not to be released pursuant to such Securitization arose.

Capitalized terms used herein that are not otherwise defined shall have the meanings ascribed thereto in the Credit Agreement.

---

[1] To include a calculation of the Borrowing Base after giving effect to the applicable Securitization.

F-4

IN WITNESS WHEREOF, the Servicer has caused this certificate to be executed on its behalf this ___ day of _____, 202_.

TRICOLOR AUTO ACCEPTANCE, LLC

By: _____
      Name:
      Title:

F-5

ANNEX 2

FORM OF NOTICE

**TRICOLOR FUNDING SPV 4 LLC**
1111 W. Mockingbird Lane, Suite 1500
Dallas, Texas 75247

_____, 202_

JPMorgan Chase Bank, N.A.,
  as Administrative Agent
Chase Tower
16th Floor
10 South Dearborn Street
Mail Code IL1-0079
Chicago, Illinois  60603
Attention:  Asset-Backed Securities Conduit Group
  Portfolio Management

       Re:    Tricolor Funding SPV 4 LLC
           Credit Agreement_____

Ladies and Gentlemen:

Reference is made to the Credit Agreement, dated as of November 13, 2020 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Tricolor Funding SPV 4 LLC (the "Borrower"), Tricolor Auto Acceptance, LLC, as servicer, the lenders from time to time party thereto, the agents from time to time party thereto, JPMorgan Chase Bank, N.A., as administrative agent (the "Administrative Agent"), Vervent Inc., as backup servicer, and Wilmington Trust, National Association, as collateral custodian and account bank.  Capitalized terms used herein that are not otherwise defined shall have the meanings ascribed thereto in the Credit Agreement.

Pursuant to Section 2.15(a)(i) of the Credit Agreement, the Borrower gave notice of its intent to effect a Securitization on or about _____, 202_ (which date is no fewer than 15 Business Days after the date of delivery of this notice to the Administrative Agent).

261320820v.10 94601/30060

Very truly yours,

TRICOLOR FUNDING SPV 4 LLC,
as Borrower

By: _____
    Name:
    Title:

F-7

Schedule I
to
Securitization Release

SCHEDULE OF SECURITIZED RECEIVABLES

EXHIBIT G

FORM OF MONTHLY BACKUP SERVICER CERTIFICATE

_____, 202_

JPMorgan Chase Bank, N.A.,
  as Administrative Agent
Chase Tower
16th Floor
10 South Dearborn Street
Mail Code IL1-0079
Chicago, Illinois  60603
Attention:  Asset-Backed Securities Conduit Group

Tricolor Auto Acceptance, LLC
  as Servicer
1111 W. Mockingbird Lane
Suite 1500
Dallas, Texas 75247
Attention:  Daniel Chu

> Re:     Tricolor Funding SPV 4 LLC
>         <u>Monthly Backup Servicer Certificate</u>

Ladies and Gentlemen:

This certificate is furnished pursuant to Section 7.09(a) of the Credit Agreement, dated as of November 13, 2020 (the "Credit Agreement"), among Tricolor Funding SPV 4 LLC, as borrower, Tricolor Auto Acceptance, LLC, as servicer, the lenders from time to time party thereto, the agents from time to time party thereto, JPMorgan Chase Bank, N.A., as administrative agent, Vervent Inc., as backup servicer, and Wilmington Trust, National Association, as collateral custodian and account bank.  Capitalized terms used herein that are not otherwise defined shall have the meanings ascribed thereto in the Credit Agreement.

The undersigned officer of the Backup Servicer hereby certifies that it has reviewed the Monthly Report and confirmed the information required to be confirmed by it under Section 7.09(a) of the Credit Agreement.

The results of such confirmation are on the attached report.  The Backup Servicer has made no independent examination of the Monthly Report beyond the review specifically required in the Credit Agreement.

G-1

Very truly yours,

VERVENT INC., as Backup Servicer

By: _____
    Name:
    Title:

G-2

EXHIBIT H

FORM OF RECEIVABLE RECEIPT

_____, 202_

JPMorgan Chase Bank, N.A.,
   as Administrative Agent
Chase Tower
16th Floor
10 South Dearborn Street
Mail Code IL1-0079
Chicago, Illinois  60603
Attention:  Asset-Backed Securities Conduit Group

Tricolor Auto Acceptance, LLC,
   as Servicer
1111 W. Mockingbird Lane
Suite 1500
Dallas, Texas 75247
Attention: Daniel Chu

> Re:    Tricolor Funding SPV 4 LLC
>        Credit Agreement_____

Ladies and Gentlemen:

Reference is made to the Credit Agreement, dated as November 13, 2020 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Tricolor Funding SPV 4 LLC, as borrower, Tricolor Auto Acceptance, LLC, as servicer (the "Servicer"), the lenders from time to time party thereto, the agents from time to time party thereto, JPMorgan Chase Bank, N.A., as administrative agent, Vervent Inc., as backup servicer, and Wilmington Trust, National Association, as collateral custodian (in such capacity, the "Collateral Custodian") and as account bank.  Capitalized terms used herein that are not otherwise defined shall have the meaning ascribed thereto in the Credit Agreement.

The undersigned, in its capacity as Collateral Custodian under the Credit Agreement, hereby acknowledges delivery of the items listed in the definition of the term "Contract File", including the executed original counterpart of the Contracts set forth on Schedule 1 hereto evidencing the related Receivables.  All exceptions noted in the review of the Receivables, if any, are set forth on Schedule 2.

The findings expressed herein shall not be deemed to make any representations as to (i) the validity, legality, perfection, priority, enforceability, recordability, ownership, title, sufficiency, due authorization or genuineness of any of the documents contained in any Contract File or (ii) the collectability, insurability, effectiveness or suitability of any such document.

H-1

Very truly yours,

WILMINGTON TRUST, NATIONAL
ASSOCIATION,
as Collateral Custodian


By:_____
    Name:
    Title:

H-2

Schedule 1
to Receivable Receipt

LIST OF CONTRACTS

H-3

Schedule 2
to Receivable Receipt

EXCEPTIONS

261320820v.10 94601/30060

EXHIBIT I

FORM OF REQUEST FOR CONTRACT FILE RELEASE

_____, 202_

Wilmington Trust, National Association
  as Collateral Custodian
1100 North Market Street
Sixth Street and Marquette Avenue
Wilmington, DE  19890
Attention:  Corporate Trust Administration

      Re:    Tricolor Funding SPV 4 LLC
           Credit Agreement_____

Ladies and Gentlemen:

      Reference is made to the Credit Agreement, dated as of November 13, 2020 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Tricolor Funding SPV 4 LLC, as borrower (the "Borrower"), Tricolor Auto Acceptance, LLC, as servicer (the "Servicer"), the lenders from time to time party thereto, the agents from time to time party thereto, JPMorgan Chase Bank, N.A., as administrative agent, Vervent Inc., as backup servicer, and Wilmington Trust, National Association, as collateral custodian (in such capacity, the "Collateral Custodian") and as account bank.  Capitalized terms used herein that are not otherwise defined shall have the meanings ascribed thereto in the Credit Agreement.

      The undersigned, in its capacity as Servicer under the Credit Agreement, hereby requests (check one):

           _____ that the Collateral Custodian release to the Servicer the Contract Files or other documents set forth on Schedule A to this Request for Contract File Release.  All documents so released to the Servicer shall be held by the Servicer in trust for the benefit of the Administrative Agent in accordance with the terms of the Credit Agreement and the Servicer agrees to return to the Collateral Custodian the Contract Files or other documents when the Servicer's need therefor no longer exists.

           _____ that the Collateral Custodian permanently release to the Servicer the Contract Files or other documents set forth on Schedule B to this Request for Contract File Release and the Servicer certifies with respect to such Contract Files that the related Contract has been liquidated, prepaid or repaid and that all amounts received in connection with such liquidated Contract have been credited to the Collection Account as provided in the Credit Agreement.

      The undersigned hereby certifies that all conditions precedent set forth in Credit Agreement have been satisfied in respect of the above requested release.

I-1

The undersigned has executed this Request for Contract File Release as of the date first written above.

TRICOLOR AUTO ACCEPTANCE, LLC,
as Servicer

By: _____
    Name:
    Title:

Acknowledged and Agreed:
JPMORGAN CHASE BANK, N.A.,
as Administrative Agent

By: _____
    Name:
    Title:

261320820v.10 94601/30060

EXHIBIT J

FORM OF NOTICE OF EXCLUSIVE CONTROL

[to be placed on Administrative Agent letterhead]

NOTICE OF EXCLUSIVE CONTROL

_____, 202__

Wilmington Trust, National Association
1100 North Market Street
Wilmington, DE 19890
Attention:  Corporate Trust Department
E-mail:  cwright1@wilmingtontrust.com

Tricolor Funding SPV 4 LLC
1111 W. Mockingbird Lane, Suite 1500
Dallas, Texas 75247
Attention:  Daniel Chu
Facsimile No.: (424) 290-2700
Telephone No.: (214) 290-2200
Email: dchu@tricolorauto.com

> Re:     Tricolor Funding SPV 4 LLC
>         Credit Agreement_____

Ladies and Gentlemen:

Reference is made to the Credit Agreement, dated as of November 13, 2020 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Tricolor Funding SPV 4 LLC, as borrower, Tricolor Auto Acceptance, LLC, as servicer, the lenders from time to time party thereto, the agents from time to time party thereto, JPMorgan Chase Bank, N.A., as administrative agent, Vervent Inc., as backup servicer, and Wilmington Trust, National Association, as collateral custodian and as account bank.  Capitalized terms used herein that are not otherwise defined shall have the meanings ascribed thereto in the Credit Agreement.

This constitutes a Notice of Exclusive Control as referred to in Section 2.17(g) of the Credit Agreement, a copy of which is attached hereto.  Pursuant to such Section 2.17(g), we hereby notify you that we are exercising our rights to assume and exercise exclusive control of account number _____ maintained with you.  [Available funds deposited in such accounts should be sent at the end of each day to _____].

J-1

JPMORGAN CHASE BANK, N.A.,
as Administrative Agent

By: _____

Name:

Title:

EXHIBIT K-1

## FORM OF U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is made to that certain Credit Agreement, dated as of November 13, 2020 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Tricolor Funding SPV 4 LLC, as borrower (the "Borrower"), Tricolor Auto Acceptance, LLC, as servicer, the lenders from time to time party thereto, the agents from time to time party thereto, JPMorgan Chase Bank, N.A., as administrative agent (the "Administrative Agent"), Vervent Inc., as backup servicer, and Wilmington Trust, National Association, as collateral custodian and as account bank.  Capitalized terms used herein that are not otherwise defined shall have the meanings ascribed thereto in the Credit Agreement.

Pursuant to the provisions of Section 2.13 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Advance(s) in respect of which it is providing this certificate, (ii) it is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a "ten percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (iv) it is not a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with a certificate of its non-U.S. Person status on IRS Form W-8BEN or IRS Form W-8BEN-E.  By executing this certificate, the undersigned agrees that (i) if the information provided in this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (ii) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF LENDER]

By: _____
Name:
Title:

Date: _____

261320820v.10 94601/30060

EXHIBIT K-2

FORM OF U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is made to that certain Credit Agreement, dated as of November 13, 2020 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Tricolor Funding SPV 4 LLC, as borrower (the "Borrower"), Tricolor Auto Acceptance, LLC, as servicer, the lenders from time to time party thereto, the agents from time to time party thereto, JPMorgan Chase Bank, N.A., as administrative agent (the "Administrative Agent"), Vervent Inc., as backup servicer, and Wilmington Trust, National Association, as collateral custodian and as account bank.  Capitalized terms used herein that are not otherwise defined shall have the meanings ascribed thereto in the Credit Agreement.

Pursuant to the provisions of Section 2.13 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a "ten percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (iv) it is not a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with a certificate of its non-U.S. Person status on IRS Form W-8BEN or IRS Form W-8BEN-E.  By executing this certificate, the undersigned agrees that (i) if the information provided in this certificate changes, the undersigned shall promptly so inform such Lender in writing, and (ii) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF PARTICIPANT]

By:_____
Name:
Title:

Date: _____

EXHIBIT K-3

FORM OF U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is made to that certain Credit Agreement, dated as of November 13, 2020 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Tricolor Funding SPV 4 LLC, as borrower (the "Borrower"), Tricolor Auto Acceptance, LLC, as servicer, the lenders from time to time party thereto, the agents from time to time party thereto, JPMorgan Chase Bank, N.A., as administrative agent (the "Administrative Agent"), Vervent Inc., as backup servicer, and Wilmington Trust, National Association, as collateral custodian and as account bank.  Capitalized terms used herein that are not otherwise defined shall have the meanings ascribed thereto in the Credit Agreement.

Pursuant to the provisions of Section 2.13 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) with respect such participation, neither the undersigned nor any of its direct or indirect partners/members is a "bank" extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a "ten percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption:  (i) an IRS Form W-8BEN or IRS Form W-8BEN-E or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or IRS Form W-8BEN-E from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (i) if the information provided in this certificate changes, the undersigned shall promptly so inform such Lender and (ii) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF PARTICIPANT]


By:_____
Name:

K-3

EXHIBIT K-4

## FORM OF U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is made to that certain Credit Agreement, dated as of November 13, 2020 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Tricolor Funding SPV 4 LLC, as borrower (the "Borrower"), Tricolor Auto Acceptance, LLC, as servicer, the lenders from time to time party thereto, the agents from time to time party thereto, JPMorgan Chase Bank, N.A., as administrative agent (the "Administrative Agent"), Vervent Inc., as backup servicer, and Wilmington Trust, National Association, as collateral custodian and as account bank. Capitalized terms used herein that are not otherwise defined shall have the meanings ascribed thereto in the Credit Agreement.

Pursuant to the provisions of Section 2.13 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Advance(s) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Advance(s), (iii) with respect to the extension of credit pursuant to the Credit Agreement or any other Basic Document, neither the undersigned nor any of its direct or indirect partners/members is a "bank" extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a "ten percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or IRS Form W-8BEN-E or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or IRS Form W-8BEN-E from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (i) if the information provided in this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (ii) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF LENDER]


By:_____
Name: