IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In Re:<br><br>TRICOLOR HOLDINGS, LLC,<br><br>Debtor. | **Case No. 25-33487-mvl-7**<br><br>Dallas, Texas<br>September 18, 2025<br>3:00 p.m. Docket<br><br>- MOTION FOR JOINT ADMINISTRATION (40)<br>- MOTION FOR ENTRY OF ORDER APPROVING STIPULATION BETWEEN CHAPTER 7 TRUSTEE AND VERVENT, INC. (53) |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE MICHELLE V. LARSON,
UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

| | |
|---|---|
| For Anne Elizabeth Burns, Trustee: | Charles Brackett Hendricks<br>CAVAZOS HENDRICKS POIROT, P.C.<br>900 Jackson Street, Suite 570<br>Dallas, TX 75202<br>(214) 573-7302 |
| For Anne Elizabeth Burns, Trustee: | Charles R. Gibbs<br>Marcus A. Helt<br>Grayson Williams<br>MCDERMOTT WILL & SCHULTE, LLP<br>2801 North Harwood Street, Suite 2600<br>Dallas, TX 75201<br>(214) 295-8063 |
| For JPMorgan Chase Bank, as Administrative Agent: | Gregory Getty Hesse<br>HUNTON ANDREWS KURTH, LLP<br>1445 Ross Avenue, Suite 3700<br>Dallas, TX 75202-2799<br>(214) 468-3300 |
| For JPMorgan Chase Bank, as Administrative Agent: | Nicholas E. Baker<br>SIMPSON THACHER & BARTLETT, LLP<br>425 Lexington Avenue<br>New York, NY 10017<br>(212) 455-2032 |

APPEARANCES, cont'd.:

| | |
|---|---|
| For Fifth Third Bank, N.A., as Administrative Agent: | Rebecca Lynn Matthews<br>FROST BROWN TODD, LLP<br>2101 Cedar Springs Road, Suite 900<br>Dallas, TX 75201<br>(214) 580-8608 |
| For Fifth Third Bank, N.A., as Administrative Agent: | Danielle Juhle<br>Nicole P. Bruno<br>GOLDBERG KOHN LTD.<br>55 East Monroe Street<br>Chicago, IL 60603-5792<br>(312) 863-7131 |
| For Cox Automotive, Inc.: | John Douglas Elrod<br>GREENBERG TRAURIG, LLP<br>Terminus 200<br>3333 Piedmont Road, NE, Suite 2500<br>Atlanta, GA 30305<br>(678) 553-2259 |
| For Vervent, Inc.: | Scott D. Lawrence<br>WICK PHILLIPS GOULD & MARTIN, LLP<br>3131 McKinney Avenue, Suite 500<br>Dallas, TX 75204<br>(214) 420-4449 |
| For Vervent, Inc. | Sam Anderson<br>Adam R. Prescott<br>BERNSTEIN SHUR<br>100 Middle Street<br>P.O. Box 9729<br>Portland, ME 04104-5029<br>(207) 228-7178 |
| For Origin Bank: | John E. Mitchell<br>Yelena E. Archiyan<br>KATTEN MUCHIN ROSENMAN<br>2121 North Pearl Street, Suite 1100<br>Dallas, TX 75201<br>(214) 765-3600 |

APPEARANCES, cont'd.:

| | |
|---|---|
| For TBK Bank, SSB: | Matthew W. Moran<br>Bradley Roland Foxman<br>Sara Zoglman<br>VINSON & ELKINS, LLP<br>2001 Ross Avenue, Suite 3900<br>Dallas, TX 75201<br>(214) 220-7723 |
| For Wilmington Trust: | Gerard S. Catalanello<br>Stephen Blank<br>ALSTON & BIRD, LLP<br>90 Park Avenue, 15th Floor<br>New York, NY 10016<br>(212) 210-9509 |
| For the United States Trustee: | Meredyth Kippes<br>OFFICE OF THE UNITED STATES TRUSTEE<br>1100 Commerce Street, Room 976<br>Dallas, TX 75242<br>(214) 767-1079 |
| For ACD Capital, LLC: | Jason Alderson<br>Jennifer Feldsher<br>MORGAN LEWIS & BOCKIUS, LLP<br>101 Park Avenue<br>New York, NY 10178-0060<br>(212) 309-6758 |
| For ACD Capital, LLC: | Edwin E. Smith<br>MORGAN LEWIS & BOCKIUS, LLP<br>One Federal Street<br>Boston, MA 02110-1726<br>(617) 951-8615 |
| For Clear Haven and One William Street: | Eric Winston<br>QUINN EMANUEL URQUHART & SULLIVAN, LLP<br>865 S. Figueroa Street, 10th Floor<br>Los Angeles, CA 90017<br>(213) 443-3602 |

APPEARANCES, cont'd.:

For 400 N. Riverside, LLC:
Lisa Paige Rothberg
DORE ROTHBERG LAW, P.C.
16225 Park Ten Place Drive, Suite 700
Houston, TX 77084
(281) 829-1555

Recorded by:
Bryon A. Robinson
UNITED STATES BANKRUPTCY COURT
1100 Commerce Street
Dallas, TX 75242
(214) 753-2011

Transcribed by:
Kathy Rehling
311 Paradise Cove
Shady Shores, TX 76208
(972) 786-3063

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

DALLAS, TEXAS - SEPTEMBER 18, 2025 - 3:49 P.M.

THE COURT: Please be seated. All right. Mama said there'd be days like this. All right. Good afternoon, everyone. We are here on our 3:00 o'clock docket. We have one matter on the docket this afternoon, and that is Case No. 25-33487, Tricolor Holdings, LLC.

When we get to the motion for joint administration, we can reference the remaining cases, but I'll go ahead and call them all at once.

I'll take appearances for the record, and I'll start with those folks in the courtroom. Mr. Hendricks?

MR. HENDRICKS: Good afternoon, Your Honor. Chuck Hendricks for Anne Burns, the Trustee. I have several members of my firm here and members of McDermott Will & -- Schulte? Is that the current name?

THE COURT: You've got to keep up.

MR. HENDRICKS: They can make their own appearances, though.

THE COURT: Excellent. Thank you, Mr. Hendricks.

MR. GIBBS: Good afternoon, Your Honor.

THE COURT: Good afternoon, Mr. Gibbs.

MR. GIBBS: Chuck Gibbs with McDermott Will & Schulte. And with are my partners Marcus Helt and my colleague Grayson Williams, on behalf of Anne Burns, the Trustee.

THE COURT: All right. Good afternoon. Thank you.

MR. LAWRENCE: Good afternoon, Your Honor. Scott Lawrence at Wick Phillips on behalf of Vervent, Inc. And on the phone or in the WebEx today should be a representative of Vervent and also counsel at Bernstein Shur. I believe Sam Anderson and potentially others are on the WebEx.

THE COURT: Okay. Thank you very much. And I know I have a number, just for the record, of *pro hac vices* that have been filed within the last probably 24 hours. I've been on the bench pretty nonstop today, so I haven't been able to address many of them. So, if I haven't, I apologize in advance. We'll take care of them as soon as we can.

MR. LAWRENCE: Certainly, Your Honor. And that certainly raises a good point. We do have a pending application for Mr. Anderson and Mr. Prescott of the Bernstein Shur firm. But with your permission today, if they could maybe appear at the hearing, that certainly would be Vervent's preference.

THE COURT: Absolutely.

MR. LAWRENCE: Thank you.

THE COURT: We'll certainly extend that courtesy of the Court.

MR. MORAN: Good afternoon, Your Honor. Matt Moran with Vinson & Elkins for TBK Bank, SSB, as Administrative Payment and Collateral Agent for itself and other lenders.

And also with me today is Brad Foxman and Sara Zoglman.

THE COURT: Welcome.

MR. CATALANELLO: Good afternoon, Your Honor. Gerard Catalanello from Alston & Bird, together with my partner, Steve Blank, on behalf of Wilmington Trust in various capacities under securitizations and warehouse facilities. And we also have *pro hac vice* applications pending, Your Honor.

THE COURT: I'll think about it.

(Laughter.)

MR. CATALANELLO: I had a feeling you were going to say that.

THE COURT: Very nice to see you again.

MS. KIPPES: Good afternoon, Your Honor. Long time no see. Meredyth Kippes on behalf of the United States Trustee. I didn't mean to rhyme.

MS. MATTHEWS: Good afternoon, Your Honor. Rebecca Matthews with Frost Brown Todd appearing on behalf of Fifth Third Bank. Joining us by WebEx today is lead counsel Danielle Juhle with Goldberg Kohn. And I believe Nicole Bruno of Goldberg Kohn is also on WebEx. And they both have their *pro hacs* pending as well.

THE COURT: Excellent. Thank you so much.

Mr. Mitchell?

MR. MITCHELL: Your Honor, good afternoon. John

Mitchell, along with my partner Yelena Archiyan; Katten Muchin Rosenman; for Origin Bank, the Debtors' prepetition working capital lender. And we do not have appearances on WebEx today; just us.

THE COURT: Excellent. Thank you.

Mr. Hesse?

MR. HESSE: Good afternoon, Your Honor. Greg Hesse on behalf of JPMorgan Chase Bank. And I'm appearing with co-counsel who is on the WebEx, Nicholas Baker of Simpson Thacher & Bartlett. And I believe that you have already had a chance to --

THE COURT: Excellent.

MR. HESSE: -- approve his admission *pro hac*.

THE COURT: Yes. I think his -- I remember a few coming in early. Thank you.

MR. BAKER: Thank you, Your Honor.

THE COURT: Thank you.

All right. I'll now take appearances on WebEx, and I'll start with any lawyers, anyone who's here who's representing a client that wishes to make an appearance.

MR. ELROD: Good afternoon, Your Honor. It's John Elrod of Greenberg Traurig on behalf of Cox Automotive, Inc. and its affiliates, including Manheim Remarketing, Inc. It's a pleasure to appear in front of you again, Your Honor.

THE COURT: Yes. It's nice to see you, Mr. Elrod.

MR. ALDERSON: Good afternoon, Your Honor. This is Jason Alderson with Morgan Lewis & Bockius, and I'm joined here today with my colleagues Jennifer Feldsher and Ed Smith. We're appearing today on behalf of ACD Capital, LLC. And I apologize, Your Honor. We represent we'll get our *pro hacs* in order and on file as soon as possible after this hearing concludes. And I also apologize for my state of dress today for this hearing.

THE COURT: It's fine. It's an emergency hearing. I certainly understand. Thank you.

MR. WINSTON: Good afternoon, Your Honor. Eric Winston of Quinn Emanuel Urquhart & Sullivan on behalf of Clear Haven and One William Street, which are holders of notes issued by nondebtor securitization trusts. I have the same problem of we are about to get our *pro hacs* on file and hoping I can be heard. And I do apologize for not having them on file before the hearing.

THE COURT: Oh, fair enough. Again, it's an emergency hearing. The Court will certainly extend the courtesies of the Court to counsel. I appreciate it. Thank you.

MR. WINSTON: Thank you very much.

THE COURT: Any other lawyers who wish to make an appearance?

All right. Is there anyone else who believes they'll have

a speaking role in today's hearings? Of course, I would imagine that we'll get a bit of a status conference by counsel for the Trustee as to the state of the filing, but we're primarily here today to take up the motion for joint administration, which is more logistical in nature, as well as the emergency motion to approve a stipulation between the Chapter 7 Trustee and Vervent.

Is there anyone else who wishes to make an appearance, again, that wishes to be heard today? Most of your lines will have been on mute because we were getting a lot of feedback in the courtroom as they were coming in. So if you're only on the phone, you may have to press *6 to unmute.

MS. ROTHBERG: Yes, Your Honor. I'm sorry. You have one more lawyer here. This is Lisa Rothberg from Dore Rothberg Law, representing 400 N. Riverside, LLC. Just in case I needed to say something, I wanted to go ahead and make an appearance.

THE COURT: Thank you very much, Ms. Rothberg. Appreciate it.

Anyone else wish to make an appearance?

MR. GAMBLE: Hi, Your Honor. This is Derek Gamble. I'm the chief legal officer with Vervent. I'll be presenting as a witness today.

THE COURT: Okay. Thank you, Mr. Gamble. I appreciate that.

MR. GAMBLE: Thank you.

THE COURT: All right. Hearing no further appearances, Mr. Hendricks?

MR. HENDRICKS: Your Honor, I'm going to be extremely brief. I will then turn it over to people that are doing most of the work.

Less than a month ago, Tricolor was the nation's seventh largest independent auto dealer, with 1,500 employees, 60 locations in six states. Had sales lots, reconditioning facilities, auto repair facilities. Its home office in Irving, Your Honor, we were out there, finally got in the day before yesterday, it looks like the Dallas County Tax Office times a hundred, with the number of car titles being processed, loans. It is dead quiet. There's no one there.

By one week ago yesterday, all the employees were gone. All the lots, we believe, we hope, were locked. The company had filed 18 Chapter 7 cases. There are two parallel DOJ investigations underway. And perhaps a hundred thousand, we don't know, customers, many of them desperately needing their cars, and some very unhappy. All have the newly-assigned Chapter 7 Trustee's phone number.

Needless to say, --

THE COURT: The Clerk was getting enough call, and I can only imagine what's happening to Ms. Burns's phone.

MR. HENDRICKS: To say that the Trustee's life

changed in an instant would not be an understatement. Fortunately, we were able to get Chuck Gibbs, Marcus Helt, and all the resources of McDermott Will & Schulte, on very short notice, to agree to drop virtually everything and work with us almost nonstop the last week. And the numbers, as the Court can probably guess from the people here today, are somewhat staggering.

So, with that, painting the picture, I'm going to turn the podium over to the other Chuck: Gibbs.

THE COURT: I do appreciate that you searched the bankruptcy directory for another Chuck, so I can get it straight. Thank you for that.

Mr. Gibbs, it's been a minute.

MR. GIBBS: It has, Your Honor. It's great to see you. My dad, whose name was also Chuck Gibbs, used to introduce himself to all of my friends as "I'm the real Chuck Gibbs."

THE COURT: Love that.

MR. GIBBS: And the corollary to that is you just heard from the real Chuck. So I'll try to play second fiddle.

Your Honor, thank you. Let me first, for the record, Chuck Gibbs with McDermott Will & Schulte. With me are my partners, as I announced, Marcus Helt, and my colleague Grayson Williams.

I want to thank the Court and your chambers for your

responsiveness and your accommodations over the past 48 hours, as we were trying to coordinate potential emergency settings, and thank you for the time today. I know you've had a full day. We'll try to not make it too painful, and maybe still get you out somewhere close to on time.

As you heard from Mr. Hendricks, there's 18 cases that were filed in the afternoon of September 10th, and Ms. Burns was appointed as Trustee for those estates that same day. We were retained -- we being McDermott -- late in the afternoon of the 12th. That's last Friday.

And as Mr. Hendricks indicated, and I'll try not to repeat much what he said, we along with his firm have really worked -- sometimes people say around the clock, and it's euphemistic; this is pretty close to accurate -- since that time to try to help Ms. Burns get to a position where she felt like the business or the operations and assets were at least knowledgeable to her. By a long shot, she can't say that they're under her control as of yet.

Before I get to the specific relief that are the subject of the two motions today, I want to just give the Court a little additional background which might be helpful as we proceed.

THE COURT: Appreciate it.

MR. GIBBS: I've heard it called Tri-color. I've heard it called Tri-colore. I've heard it called Tree-colore.

I'll probably use all of them, hopefully not interchangeably. I'll try to be relatively consistent and call it Tricolor.

It was founded in 2007 by Daniel Chu, who was the chairman and CEO. And as Mr. Hendricks said, it's headquartered out in Los Colinas, off of the 114 access road. The company operated a chain of used car dealerships, and they provided also financing for the vehicles they sold off their retail lots. There were approximately 65 retail locations nationwide, the vast majority of which are in Texas.

Tricolor's business model focused on providing car ownership opportunities to the underserved or subprime borrowers. In addition to its dealerships, Your Honor, they ran two very large -- I mean, really large; airplane hangar kind of large -- reconditioning facilities, one in Wilmer, Texas, south of downtown, and one in Surprise, Arizona. In addition to those what they called recon facilities, the company also had a few repair facilities, because the dealerships, the 60 or so dealerships where they sold cars, did not have any kind of service operations that you would normally see when you went into a car dealership.

So, to the extent that the customer bought a car, financed it through Tricolor, and had a warranty on that car that they paid for and had a problem with the car while it was still under warranty, certain of those vehicles found their way to the repair shops.

And, unfortunately for the owners of those cars, that's where they sit, including some with children's backpacks in them, some with office computers, et cetera. So this has been described as the quintessential melting ice cube. It's not produce, but this case won't do well aging. So we're going to move as quickly as we can.

Since the Trustee's appointment, Ms. Burns has worked to gain access to the headquarters. They tried from the day of her appointment on September 10th. They finally were given access, she was finally given access, a person from my firm as well as Mr. Hendricks and some potential advisors who would provide assistance, got access to the facility. It was Tuesday afternoon, the 16th. So it took six days to get even into the headquarters building. All of the retail facilities that still had cars on their lots were locked also and shut down.

Since she got access to the headquarters, Ms. Burns and her assistants reviewed financial records to the extent they could see them and figure out what was what at the headquarters, and began to receive reach-outs from and then reached out to certain of the key constituents in the case.

To understand Tricolor's operations, I think it's helpful just to describe the financing structure, that Tricolor used floorplan lenders, such as Mr. Foxman's client, to finance vehicle purchases at auctions. They would typically then take

those cars that they purchased at the auction with funds they received from floorplan lenders and take them to what I mentioned is a recon facility. There, they would be reconditioned and put in a position to then take to the retail lots to be sold to the customers.

In addition, at certain times during the lifecycle of the loan, if the borrower didn't pay as promised under the loan documents, those cars would be repossessed and they would typically be brought back to the same recon facilities to be reconditioned in order to be put back out on the lot and resold.

Once the cars are sold at the facilities and acquired by a borrower, typically, in almost every case, the borrower -- the buyer would sign retail installment contracts to buy -- to finance the purchase of the automobile from a Debtor entity.

(WebEx interruption.)

THE COURT: So, please mute your line. Thank you.

MR. GIBBS: Those retail contracts were funded through borrowings from what we will refer to as warehouse lenders. And they funded those receivables, those loan -- the notes, until they reached a certain amount or a certain number of car notes, and then they were securitized.

As you can see -- and let me put it up on the screen. I'm going to have Ms. Burns, in her proffer that I'm going to make, --

THE COURT: Okay.

MR. GIBBS: -- refer to it. But if I can get -- Grayson, can you -- give me one second.

THE COURT: Sure.

MR. GIBBS: If I were doing it, we'd be back tomorrow.

(Pause.)

THE COURT: There you go.

MR. GIBBS: Can you pull it up just a little bit? There we go. That's a bit of an eye chart, Your Honor, and I apologize.

But this was what was filed with -- by the Debtor when they filed the petition. And the boxes in blue -- and you can shrink it back down, Grayson, if you don't mind -- the boxes in blue are the Debtor entities. And if you'll see, if you continue to shrink it, below the blue boxes on the left half, if you will, of the org chart are a series of uncolored boxes. Those are all SPVs, bankruptcy remote special purpose vehicles, that were established and set up by the Debtor for the purpose of receiving the loans that were then sold to those SPVs, and the SPVs would then raise money through the public market by selling ownership certificates in the SPVs. And that's the typical shorthand, the real shorthand version of a securitization structure. And the proceeds from the sale of the security interests in those SPVs would then be paid

back to the warehouse lender to pay down the advances that the warehouse lender had made.

That's typically how this business ran for several years. It got increasingly larger, and the scope got bigger. They used to do maybe one securitization during the year. And these securitizations would literally have thousands and thousands of car notes into one SPV. As they got bigger and the scale got larger, they were doing two, and then last year I believe they did three different securitizations. So if that chart got blown up, you would actually be able to read the year designation of each of those SPVs.

So, in short, Your Honor, floorplan financing funded the acquisition of the inventory; warehouse financing funded the loans created when the inventory was sold; and the securitization then provided long-term funding and liquidity for the continued operations.

Integral to this cycle is the servicer. The servicer collects and processes borrower payments. It applies funds pursuant to contractual waterfalls. It maintains loan level records and reports. It manages delinquencies and repossessions. And it provides required compliance and reporting to lenders and trustees.

For years, one of the Debtors, by the name of Tricolor Auto Acceptance, LLC, and it's one of the two top boxes right under the holding company, and I'll call it TAA, TAA was the

servicer historically for the loans that had been sold into these SPVs, none of which are Debtor entities. These loans, as I said, were generated through auto sales and then sold into the vehicles.

There were a few loans, relatively few compared to the hundred thousand loans that they originated and put into these securitizations, there were a few loans that TAA serviced as a contract servicer for a third party that owned those subprime auto loans. So there's a small piece of the business where they were getting a fee for contract service operation. But the vast majority were the loans that they had originated and sold into the SPVs, and they performed the service as the servicer.

That arrangement was established at the time the securitization vehicle was established. It's set out in all the securitization documents, that TAA would be the servicer for the SPV, collecting and doing those tasks that I delineated a minute ago.

Those same agreements also provided, from inception, that Vervent would be the backup servicer. And under certain events, Vervent would -- the parties with authority under the SPV documents could terminate TAA as the servicer and appoint Vervent as the backup servicer to become the successor servicer. That is what has happened.

Beginning in late August, the Debtors were advised by the

trustee under the securitizations created over the years that they were being terminated as servicer and that Vervent would be replacing them as successor servicer -- as I said, consistent with the provisions contained in the governance documents.

Those discussions and those oral notices of termination were formalized by the delivery of termination letters, and we'll put those into evidence in a few minutes. They were all dated either September, I believe, 8 or 9, but they were all prior to the petition, where the rights and obligations of TAA as servicer under those agreements were formally terminated. Vervent had already been in the process of transitioning per the earlier notices. And pursuant to those notices, they are now the servicer for all those securitization trusts.

Vervent is in the middle of completing what I can only describe as an extraordinarily complex process of stepping into TAA's shoes. And today's emergency motion, Your Honor, to approve the proposed stipulation is merely intended -- it's intended to merely reflect to the public and the vendors, and more importantly, the car owners who owe money on their car loans, that Vervent is now the servicer with whom they should communicate and transact.

One of the Trustee's first priorities has been ensuring that this transaction is -- transition, rather, is formalized and it's transparent. Recognizing Vervent as successor

servicer protects the estate from additional claims, and equally important, it provides clarity to tens of thousands of borrowers who need to know where to make their monthly payment and to direct inquiries.

For avoidance of doubt, Your Honor, and for the record and for everybody listening in to hear, the Trustee is not seeking approval of a new servicing agreement or any kind of postpetition transaction. This emergency motion to approve the stipulation is merely to clarify and confirm and authorize the completion of the transfer of servicing that began prepetition, pursuant to notices given under documents entered into, in some cases, years ago.

THE COURT: So there's no assumption and assignment that's being --

MR. GIBBS: Exactly. That's exactly correct.

THE COURT: Or, excuse me, not assignment; no assumption that's being sought today?

MR. GIBBS: That's exactly right.

THE COURT: Okay.

MR. GIBBS: Importantly also for the Court: This only allows, if Your Honor is to grant this emergency motion, authority for Vervent to complete the collection process of money that's trapped in the system that we believe belongs to the SPVs because they are the owner of the notes receivable when they were sold into those securitizations.

To be clear, we will do our work for the Trustee. We will do the diligence, examine all the securitization documents. We'll determine and come to an independent decision whether we agree with the characterization of all of those transactions as true sales versus disguised financings.

But for this purpose, they will collect all of the money under the assumption that it belongs to nondebtor entities, and it won't be -- it won't go out from then. It won't be disbursed to the thousands and thousands of public securities holders who bought interests in those SPVs and who are entitled to a cash flow stream. It will stay there, subject to further order of the Court. And the proposed order that we've prepared and attached to the motion has a date, depending on the Court's calendar, sometime, you know, 30 days or slightly less, to be back before Your Honor for further instruction.

THE COURT: Okay.

MR. GIBBS: Your Honor, it's our expectation, the Trustee's expectation, that in very short order, hopefully tomorrow, hopefully no later than Monday, we will be back with a motion seeking authority for Ms. Burns to operate the Debtors' businesses in a limited fashion for a limited period of time, pursuant to Section 721. We want to do that, Your Honor, in conjunction with a motion that we would be prepared to file which asks for authority to borrow money under terms

of a borrowing arrangement that we're negotiating with certain key lenders of the Debtor.

We'd come and ask, at the same time as we ask for 721 relief, we'd ask for an interim approval of our motion to borrow from these lenders on less than 14 days' notice, and then we'd come back on full notice to borrow whatever else we may need. That's sort of the next step.

THE COURT: Okay. And would you couple your 721 motion with your borrowing motion, --

MR. GIBBS: Yes.

THE COURT: -- or --

MR. GIBBS: Yeah.

THE COURT: Okay.

MR. GIBBS: Yeah. I mean, --

THE COURT: I didn't know if you were going to seek to have the 721 motion heard earlier.

MR. GIBBS: We may have to if -- you know, I'm a little uncomfortable telling the Trustee "Go get authority to operate the business" if she doesn't have any money to operate the business. So, --

THE COURT: True.

MR. GIBBS: -- they sort of go hand in glove.

THE COURT: True.

MR. GIBBS: But that is our hope, understanding, and belief, and representation to the parties listening, both in

the courtroom and on the phone, that we'll be back in very short order with I'll call it Step 2.

Your Honor, after I spend a minute or two on the joint administration, it would be our intention then to move forward with the evidence that we knew Your Honor would like to have in considering the emergency motion. And in support of the motion, I will proffer the testimony of Anne Burns, the Trustee, and then we'll call Derek Gamble, one of the officers of Vervent, who will testify remotely on video pursuant to the procedures the Court allows. And we'll walk him through certain key documents that are in the evidence book that we handed up to create the record that supports what I've just described to the Court.

THE COURT: Well, I appreciate that, Mr. Gibbs, and I tried to be forthright with Mr. Williams, when he was seeking a hearing from Ms. Harden, that we would expect evidence. And I thought that, at a minimum -- obviously, I knew that Ms. Burns would be here today -- but to basically flesh out the terms of the arrangement, because I thought that that would kind of put some order to the process, which is obviously, given kind of the freefall filing, probably more --

MR. GIBBS: Yes.

THE COURT: -- than a bit chaotic of a process behind the scenes.

MR. GIBBS: No. Sometimes we bankruptcy lawyers get

annoyed when we have to deal with those pesky things called evidence, but we're --

THE COURT: Due process. Evidence.

MR. GIBBS: Yeah, I know. We're fine, and we're prepared to present the evidence we think --

THE COURT: I appreciate that.

MR. GIBBS: -- that supports the request. So, with the Court's permission, I would ask Your Honor to allow me just to briefly address -- I believe it's Docket 40.

THE COURT: Yes. Joint admin?

MR. GIBBS: Motion for joint administration.

As you've seen, I'm sure, hundreds of times already in your time on the bench, this motion, through it the Trustee is seeking procedural consolidation and joint administration of these related Chapter 7 cases, such that the Court can maintain one file and one docket for all of these Chapter 7 cases under the lead case, Tricolor Holdings, LLC.

The Trustee would submit, Your Honor, that joint administration of the Chapter 7 case is warranted and it will ease the administrative burden on the Court and on the parties, without harming the substantive rights of any party in interest.

Furthermore, many of the motions, hearings, and orders filed in these Chapter 7 cases will affect each Debtor entity, meaning the joint administration will reduce fees and costs by

avoiding duplicative filings, objections, and hearings.

Joint administration of the Chapter 7 cases will also allow the U.S. Trustee and all parties in interest to monitor these cases with greater ease and efficiency, and will not adversely affect the Debtors' respective constituencies, because the motion requests administrative, not substantive, consolidation of the Debtors' estates, for procedural purposes only.

So, accordingly, Your Honor, we drew no objection to the motion. We think it's right down the middle of the fairway and consistent with what's been put before you in many cases before. We would ask you to approve our motion for joint administration of these estates and allow them to go forward under the caption of the parent holding company, Tricolor Holdings.

THE COURT: All right. Thank you very much, Mr. Gibbs.

Is there anyone who wishes to be heard with respect to the joint admin order?

Ms. Kippes, I assume everything's in order from the United States Trustee's perspective?

MS. KIPPES: Yes, Your Honor. I've reviewed the form of order and there's nothing out of the ordinary.

THE COURT: Okay. I appreciate that.

And I also appreciate that Ms. Lambert took the time and

your office took the time to recognize that these were all coming in and that 18 different trustees could have probably made this a lot more complicated. So I appreciate that she gave it the time that it needed to see if joint administration was appropriate.

The Court would note for the record that we are -- just in case someone's here on a different case -- we've announced the Tricolor Holdings case number. The additional case numbers are TAG Intermediate Holding Company, LLC, 25-33495; Tricolor Auto Group, LLC, 25-33496; Tricolor Auto Acceptance, LLC, 25-33497; Tricolor Insurance Agency, LLC, 25-33512; Tricolor Home Loans, LLC dba Tricolor Mortgage, 25-33511; Tricolor Real Estate Services, LLC, 25-33514; TAG California Holding Company, LLC, 25-33493; Flexi Compras Autos, LLC, pretty sure I butchered that, 25-33490; TAG California Intermediate Holding Company, LLC, 25-33494; Tricolor California Auto Group, LLC, 25-33502; Tricolor California Auto Acceptance, LLC, 25-33501; Risk Analytics, LLC, 25-33491; Tricolor Tax, LLC, 25-33515; Tricolor Financial, LLC, 25-33510; Tricolor Auto Receivables, LLC, 25-33498; and then the last two, TAG Asset Funding, LLC, 25-33492; and Apoyo Financial, LLC, 25-33489.

For sake of the record, the Court has had an opportunity to review the joint administration motion and the form of order that was attached thereto, and the Court finds

everything to be in order and the Court will jointly administer each of the aforementioned bankruptcy proceedings together in the Chapter 7.

MR. GIBBS: Thank you, Your Honor.

THE COURT: You're welcome.

MR. GIBBS: With that, I will turn to Docket 53, which is the emergency motion we're here for today for entry of an order approving the stipulation between the Chapter 7 Trustee and Vervent.

The first witness I have is --

THE COURT: Mr. Gibbs, if you'd give me one moment.

MR. GIBBS: Absolutely.

(Pause.)

THE COURT: I'm going to go ahead, and if this is in my box, I'm going to sign it.

MR. GIBBS: Okay.

THE COURT: Joint administration requires a great deal of clerk work, and so to get that done I'm going to go ahead, if it's in my box, I'm going to sign the order, and that way it will allow them to jointly administered all of the cases.

MR. GIBBS: All right.

THE COURT: Believe it or not, it still has to be done one by one.

(Pause.)

THE COURT: I don't see that it's been uploaded quite yet, but if it's uploaded in the course of the hearing, I'll go ahead and sign that. But please proceed. Apologies for the interruption.

MR. GIBBS: No. Thank you, Judge.

Your Honor, the Trustee has two witnesses in support of this emergency motion. One is herself, and one is Derek Gamble, who identified himself on the record. He's on WebEx and available to testify. And he is an officer, as I indicated, of Vervent.

So, with the Court's permission, I will proffer the testimony of Ms. Burns. She is here in the courtroom, available for cross-examination, should anybody wish to examine her.

And maybe before I do that, a couple of housekeeping matters.

One, we drew one objection. It was filed shortly after lunch by Mr. Foxman and his firm --

THE COURT: Yes.

MR. GIBBS: -- on behalf of the --

THE COURT: I had an opportunity to review that over the lunch hour.

MR. GIBBS: Okay.

THE COURT: Over the lunch 45 minutes. Keep going.

MR. GIBBS: And notwithstanding the verbiage in the

objection, it boils down to, as I understood it, a request that's contained at the end of the objection for the insertion of language, --

THE COURT: Yes.

MR. GIBBS: -- a new paragraph that they wanted inserted into the order.

With the Court's permission, if you're inclined to approve this motion after hearing the evidence, we may need a few minutes to make sure that proposed compromise language that we've now, and on behalf of Vervent and the other parties in interested, tendered back to Mr. Foxman, that hopefully we can come to an accommodation that resolved the only objection filed.

I will also note, by way of housekeeping or otherwise, that there were three responses that we got -- informal, not objections, but inquiries and inbounds from lawyers for interested parties. Two are on the phone, and one is present in the courtroom. The one present in the courtroom, Mr. Mitchell, represents Origin Bank.

THE COURT: Right.

MR. GIBBS: Mr. Elrod represents Manheim and Cox Enterprise, if I remember right. And the gentleman from Quinn Emanuel represents a whole lot of entities with long names that I couldn't begin to get right. But the request of all three basically -- and this is my words, summarizing -- they

want to be identified as parties in interest that are specifically afforded the same reservation of rights and protections. I'm sure they'll clarify or amplify the way I've described it.

We have no problem with including that. But we thought it was a bit redundant. We thought the paragraph in the proposed order regarding reservation of rights protected parties. But they're doing their job and it's not a problem. What I don't want, hopefully, is a hundred emails in my inbox when we finish the hearing saying, "Me, too," "Me, too," "Me, too," and the order doubles in length. But they are parties in interest with significant financial interests in the case, and we have no problem responding in that fashion.

So, with that, Your Honor, with the Court's permission, I'll proffer the testimony of Ms. Burns.

THE COURT: All right. Thank you.

Any objection to the proffer of the testimony of Ms. Burns?

MR. MORAN: Your Honor, Matt Moran on behalf of TDK Bank.

We were the one party objecting. I think we've got, as I understand it with the emails, I think we are in agreement on the language. If we're not in agreement, we're going to have some objections and some evidentiary issues. But if we're in agreement, --

THE COURT: Do you want to take a moment to clarify?

MR. MORAN: I think that would be helpful. It would speed it up, I think.

THE COURT: Given the hour and the delay in starting the hearing, I'd prefer if I didn't have to leave the bench, if you guys want to just get --

MR. GIBBS: Could we have five minutes?

THE COURT: Absolutely.

MR. GIBBS: Maybe.

THE COURT: I'll stay here. Trust me, I've got things to do.

MR. GIBBS: And Your Honor, before we break, we put up on the screen the same --

THE COURT: Yes.

MR. GIBBS: -- document that I mentioned and talked about in my opening comments. That will be referred in the proffer, and at the conclusion of which -- it's Exhibit 1 in the exhibit book -- I'm going to be offering it. But I just wanted the Court to know why it's sitting on the screen.

THE COURT: Okay. Appreciate it. In fact, it looks like probably Mr. Wilhite has found a way to get the book up here. So I'll probably look at it right there.

MR. GIBBS: Okay.

THE COURT: Appreciate it. Thank you.

MR. GIBBS: Thank you, Judge.

MR. ALDERSON: If I may, Your Honor? This is Jason Alderson with Morgan Lewis.

THE COURT: Yes, Mr. Alderson?

MR. ALDERSON: We -- again, this is Jason Alderson; Morgan Lewis. I'm sorry to interrupt the presentation. Again, we represent ACD Capital, LLC.

We did not file a written objection, but we have concerns similar, I believe, to some of the parties in interest that Mr. Gibbs just iterated to the relief with respect to Vervent. We -- ACD is a floorplan lender to Tricolor Auto Group. They're owed about $18 million.

I don't want to interrupt the flow, but I either -- I can state our issues right now, or I can wait to the end, or I'll take my cue from Your Honor.

THE COURT: Do you think, Mr. Alderson, that it would be preferable to take a five-minute recess, and anyone that has let's just say a similar objection to that of TBK, to address it with the Trustee's counsel prior to moving forward on the evidentiary presentation?

MR. ALDERSON: That would be helpful, Your Honor.

THE COURT: All right. It is 4:30. We'll take maybe a 10-minute recess.

MR. GIBBS: Okay.

THE COURT: And you'll let me know if you need more. I do have somewhere to be tonight, so I don't want it to

expand too much.

MR. GIBBS: Yeah.

THE COURT: But let's see what you can do in 10 minutes.

MR. GIBBS: Thank you, Judge.

THE COURT: All right.

MR. ALDERSON: Thank you.

THE CLERK: All rise.

THE COURT: And Mr. Williams, if you could get that order uploaded, I'll go ahead and sign that quickly when I get back. Thank you.

(A recess ensued from 4:29 p.m. until 4:48 p.m.)

THE CLERK: All rise.

THE COURT: Please, be seated. We're going to go back on the record in Case No. 25-33487.

All right. When we broke, I think that Mr. Gibbs had intended to proffer the testimony of Ms. Burns. Is that still correct?

MR. GIBBS: It is, Your Honor.

THE COURT: Excellent. Is there any objection to the proffer of Ms. Burns' testimony?

MR. MORAN: No objection, Your Honor.

THE COURT: Okay. All right. Hearing no objection, please proceed.

MR. GIBBS: Give me one second, Your Honor, just for

housekeeping.

THE COURT: Take your time.

(Pause.)

ANNE ELIZABETH BURNS, TRUSTEE BURNS' WITNESS, OATH WAIVED

PROFFER OF TESTIMONY

MR. GIBBS: Okay. Here we go. Okay. Ready when you are, Your Honor.

THE COURT: I am.

MR. GIBBS: Your Honor, if called to testify in support of the stipulation, Ms. Burns would testimony as follows.

My name is Anne Burns. I'm the duly-appointed Chapter 7 Trustee in these Chapter 7 cases, and I have served in that capacity since September 10, 2025.

In my role as the Chapter 7 Trustee, I'm responsible for investigating the financial affairs of the Debtor, liquidating the assets of the estate, and making distributions to creditors in accordance with the Bankruptcy Code.

I've served as the trustee in numerous Chapter 7 cases, and I'm familiar with the duties and responsibilities imposed upon me under 11 U.S.C. 704 and related provisions.

Immediately following my appointment as Chapter 7 Trustee, I began an investigation in an effort to identify immediate action items. My guiding principle throughout this initial period has been twofold.

First, to familiarize myself with the Debtors' operations; and second and more importantly, to ensure that the Debtors' assets are preserved and that creditor recoveries are maximized. To that extent, I have made a site visit to the Debtors' headquarters after we were finally granted access on September 16th of this year.

Exhibit 1, which hopefully in a second will come back up the screen, --

THE COURT: And I have it as well.

MR. GIBBS: Okay. Exhibit 1 is an org chart of the business enterprise run by the Debtors that, from, my investigation thus far until about five minutes ago, appears to be accurate. We're doing this in real time, Your Honor. The blue boxes on Exhibit 1 reflect entities that I believe filed Chapter 7 on September 10th --

(WebEx interruption.)

THE COURT: Please mute the line, Mr. Robinson. Thank you.

MR. GIBBS: -- and for which I act as Trustee.

(WebEx interruption.)

THE COURT: Anybody who logs on, could you please mute your line. You're actually coming through in the courtroom, and I know you don't intend to do that.

Please, Mr. Gibbs. Sorry.

MR. GIBBS: Okay. The blue boxes on Exhibit 1 are

entities that I believed as of this morning had filed Chapter 7 on September 10 and for which I act as Trustee. That exhibit was provided to me by professional advisors to the Debtor that worked for the Debtor in the weeks leading up to their filing Chapter 7.

And with the Court's permission, I'm going to interrupt the proffer, just a spoiler alert, I'm going to correct.

THE COURT: Yes.

MR. GIBBS: Certain of the boxes are blue that shouldn't have been blue. I'll do that after I conclude.

THE COURT: Sure.

MR. GIBBS: All right. As I understand thus far, Tricolor's operations were primarily divided into two separate business lines. First, the retail sales of automobiles, and second, the financing of the purchase of those vehicles and the servicing of the loans that were entered into by the car purchasers.

Tricolor Auto Group, LLC, which goes by the acronym TAG, was the primary operating entity in the org chart -- you see that right below Tricolor Holdings --

THE COURT: Uh-huh.

MR. GIBBS: -- through which the Debtors sold cars at retail in approximately 65 locations in several states. Tricolor Auto Acceptance, LLC, TAA, was the entity through which the Debtors financed and serviced the loans executed by

car buyers. From records that I have been provided thus far, I learned that Tricolor Auto Acceptance, LLC, TAA, had recently been terminated as the servicer of the various loan securitizations and that a successor servicer, Vervent, that had been named as backup servicer in the documents forming the SPV vehicles through which the loan securitizations were accomplished, had already been designated as the successor servicer and had begun the process of assuming those responsibilities.

Based upon information made available to me, Vervent's transition into the role of successor servicer began in August, prior to the petition date, and was formalized through the delivery of termination letters prior to the petition date.

The role of a servicer is critically important in the context of securitized loan portfolios. The servicer is responsible for collecting and processing customer payments, maintaining loan records, remitting funds to securitization trusts, and ensuring compliance with the terms of the governing servicing agreements.

The servicer also handles all customer communications and enforces delinquent accounts.

Because customer payments flow through the servicer, it is critically important that Vervent be authorized and empowered to act fully in that role. Doing so ensures the uninterrupted

flow of funds and prevents additional claims from accruing against the estate.

I have directed my counsel to review all of the underlying securitization documents to determine whether those transactions were, in fact, true sales or disguised financings, and whether or not the funds received from customer payments are property of the estate.

Pursuant to the terms of the stipulation and proposed order, the parties agree that the funds received by Vervent will remain with Vervent until further order of the Court.

I determined it appropriate to proceed with the stipulation and to seek Court approval of the same to promote public transparency, minimize potential harm to the estate, and to maximize potential recovery from the Debtor and related parties' assets.

I believe it's important that the public understand this transition and that customers have clear direction that their vehicle payments must continue to be made. There is presently significant customer confusion regarding ongoing payments, the release of titles, and related matters. This stipulation represents the first step in a multistep process designed to provide clarity to customers, ensure transparency, and alleviate concerns, all while protecting the estates' interests and maximizing value for the creditors.

Accordingly, entering into the stipulation, in my opinion,

is in the best interest of creditors.

If called to testify, I would testify truthfully as to these matters, and I am available for cross-examination.

Your Honor, that concludes my proffer of Ms. Burns' testimony. And after cross-examination, if any, I'll tender Exhibit 1 as orally modified in a minute.

THE COURT: Excellent. Thank you very much.

Is there anyone -- well, first of all, I'll note for the record that Ms. Burns is an officer of the Court. I'll dispense with the swearing-in. I'll simply ask Ms. Burns to state on the record: Were you able to hear the proffer that was given by your counsel?

THE WITNESS: Yes, Your Honor.

THE COURT: All right. Do you have anything to change or add?

THE WITNESS: No, Your Honor.

THE COURT: Okay. I appreciate that.

Is there anyone who wishes to cross-examine Ms. Burns with respect to the motion for entry of order approving the stipulation between the Chapter 7 Trustee and Vervent?

(Pause.)

MR. GIBBS: Okay.

THE COURT: All right. Hearing no takers, you may leave the witness stand.

(The witness is excused.)

MR. GIBBS: Your Honor, if I could, I would offer Exhibit 1 into evidence, as modified by the following statements. Apparently, there were corrections suggested to Debtors' counsel immediately before the case was filed to the org chart that we've identified --

THE COURT: Certainly.

MR. GIBBS: -- and put into evidence as Exhibit 1.

THE COURT: Okay.

MR. GIBBS: In the incredible flurry that invariably was occurring at Sidley Austin before the case was actually filed on September 10th, those changes to correct inaccuracies did not get included in the org chart that was attached to the petition, which is all we had to go on.

Let me identify six entities that are in the org chart and marked in blue on Exhibit 1 as Debtor entities that are not, in fact, Debtor entities.

First is Tricolor Auto Receivables II, LLC.

Second is Tricolor Funding SPV 2, LLC.

The third is Tricolor Funding SPV 3, LLC.

The fourth is Tricolor Funding SPV 4, LLC. You notice the pattern.

The fifth is Tricolor Funding SPV5, LLC.

And the sixth is Tricolor Funding SPV 6, LLC.

So, with that oral correction that would ask Your Honor to consider Exhibit 1 with removing the blue shading for those

six identified entities, we would offer for the record Exhibit 1.

THE COURT: All right. Any objection to the admission of Exhibit 1, which the Court would note is filed at Docket 66-1.

Hearing no objection, Exhibit 1 is hereby admitted as modified.

(Trustee's Exhibit 1 is admitted.)

MR. GIBBS: Your Honor, we have one other witness, appearing remotely, and that's Derek Gamble, who's now on the screen. So I'll ask Your Honor to swear him in and we'll proceed at Your Honor's pleasure.

THE COURT: All right. Thank you very much.

Mr. Gamble, could you say "Testing, testing" so it'd appear on the screen?

MR GAMBLE: I'm sorry. Say that again, Your Honor?

THE COURT: You were already on the screen. You're good.

MR. GAMBLE: Okay. Fair enough.

THE COURT: You solved my problem. If you could raise your right hand for me.

MR. GAMBLE: Fair enough. Yes.

DEREK GAMBLE, TRUSTEE'S WITNESS, SWORN

THE COURT: All right. Please. Thank you.

Please proceed, Mr. Gibbs.

MR. GIBBS: Thank you, Judge.

DIRECT EXAMINATION

BY MR. GIBBS:

Q Please state your full name for the record.

A Yep. My name is Derek Robert Gamble.

Q How are you employed, sir?

A I work for Vervent, Inc.

Q Okay. And in what capacity?

A Yep. I am the chief legal officer and chief compliance officer at Vervent.

Q All right. How long have you been an employee of Vervent?

A I have been with Vervent for about six years and two months now.

Q Okay. Briefly describe your duties for Vervent and the performance of your duties under the roles of chief legal officer and chief compliance officer.

A Sure. Under the legal realm, obviously handle any and all contractual engagements. Those include sales cycle agreements along with vendor agreements, and it spans as far as commercial real estate agreements as well.

Beyond that, day in and day out we have a heavy -- we're in a very heavily-regulated industry. We have approximately 149 licenses within the United States at any point in time to be a loan servicer and to perform collections activities and so on. That's where that spills into the compliance front.

And we have several people on my team that handle everything from credit reporting, credit disputes, complaint resolution, and licensing, and regulatory affairs. My team in total is approximately 60 employees here at Vervent under the guise of both legal and compliance.

Q Okay. And I should have asked you at the beginning, just to make sure the record is clear. Do you have any paper in front of you while testifying remotely other than a copy of the exhibits?

A Yes. I have several exhibits spread about my desk right now, and that is it.

Q Okay. Thank you.

A Yes.

Q What was your employment history prior to joining Vervent six years and two months ago?

A Yeah. So, primarily, 12 years was spent in between working as senior attorney at Airbus Defense & Space. Highly-regulated industry there. So a lot of experience on the compliance front in that regard. And then, before that, combined with that tenure was an additional seven years at H&R Block, a Kansas City, Missouri, publicly-traded company there.

Q Okay. What's your educational background, sir?

A Yep. Undergraduate degree at University of Missouri. Degree in finance. Law school at Pepperdine University --

Q Thank you.

A -- School of Law.

Q Tell the Court what Vervent is.

A Yeah. So Vervent is primarily a loan server -- servicer. There are what I would call three legs to the stool that make up the Vervent ecosystem. One is loan servicing, and loan servicing can be broken down to collateralized loans, uncollateralized or unsecured loans, and those can range from student loans, auto loans, just personal loans altogether, sometimes cosmetic loans, things like that, that we do not -- I want to make -- be clear on that, we do not take ownership interest in. We are not an originator, we're not an underwriter, or anything to that effect. Everything we do is third-party loan servicing under that leg of the stool.

In addition to that, we also have a division that is called Capital Market Support. That basically is, in a situation like this, we act as a backup service provider. So in an event where you do have an originator and an underwriter like you did in this specific instance, banking institutions will often insist that there is a backup servicer put into place. And there will be covenants and triggers in place so that, if those are violated, we can step in and try to do our very best to make sure that there's no loss in continuity of service to the consumers.

Third stool -- the third leg of the stool that we have is we also have a credit card business, it's based out of South

Dakota, where we actually issue credit cards directly to consumers.

Q Could you describe Vervent's experience servicing personal auto loans, including any relevant systems or protocols?

A Yes. So, very well versed. We have quite a few clients in the space of both -- everything from RVs, automobiles, personal watercraft, and motorcycles. It is -- we maintain several systems of record that will handle both leases of those vehicles along with standard loan issuances. So those are called systems of record. You might hear that, Your Honor, from time to time, talking about a system of record. We use specific systems of record that then have inputs in them that will have, for example, loan origination dates, due dates, interest rate, automated systems to add in late payment fees, communication cadences, and then there's bolted onto that things like dialers that are used for both dialing for outbound communication and taking calls for inbound communications.

Q What systems or technologies does Vervent use to manage auto loan servicing, including payment tracking, collateral management, and borrower communications?

A Yeah. We primarily use a system produced off the shelf by Nortridge Systems. It's often referred to as NLS for short. It's very well known within the industry, and an industry standard in that regard.

We also have an additional system, like I said, for leases called LeasePak.

Q All right. Are you familiar, sir, with Tricolor Holdings, the Debtors' parent company, and its subsidiaries?

A Yes. Both through just having -- seeing the name in our contractual database, and then obviously with the current state of affairs that caused the triggering events for our backup servicing agreements.

Q All right. How is Vervent involved with Tricolor?

A So, on several agreements, we are listed as a backup servicer. In those agreements, a Tricolor entity was originally listed as servicer. And as I described, with our Capital Market Support program, in all likelihood, these -- some of these contracts go back a number of years. They would have come in through our sales cycle. Ninety-nine percent of the time, these come in from the lenders themselves. They're the ones seeking the what I would call almost insurance policy to have the backup servicer put into place for events such as this.

Q All right. I'm going to skip ahead a little bit. If you'll turn to Exhibit 3 in your binder. And if you can, can you identify what's marked as Exhibit 3?

A Yes. So that is a September 9, 2025 notice of servicer termination. And I believe that one is from Wilmington Trust. Wilmington Trust was listed as indenture trustee and custodian

on several securitized lender deals that we were backup servicer on.
Q And is it terminating the servicing of Tricolor Auto -- well, TAA? I've already forgotten what it stands for.
A That's right. Tricolor Auto Acceptance, LLC.
Q And that's for Securitization Trust 2022-1; is that right?
A That's correct.
Q All right. And what was accomplished by the delivery of this document on September 9th?
A Sure. So the underlying agreement that was called a sale and servicing agreement, that would have certain conditions on which a termination event could occur. And so what's happened here is Wilmington Trust recognized that a termination event had occurred per the underlying contract and they sent this notice out to essentially fire the servicer, terminate their service, and have us, as successor servicer, come in and step in.
Q All right. I'm going to ask you to take just a minute and quickly look at the documents behind Exhibits 4, 5, 6, 7, 8, and 9. And then after you've done that, I'll ask you a couple questions.
A Bear with me here just one sec, because I have them all in front of me but I have a separate table over here that shows the numbers associated with them since I don't have them tabulated.

Q All right.

(Brief pause.)

A Yes. Okay. Got it.

Q All right.

A I have those.

Q Are the provisions of those documents, which are Exhibits 4 through 9, substantially the same as the provisions in Exhibit 3 by which Tricolor Auto Acceptance, TAA, was terminated and Vervent was placed in as the substitute servicer?

A That is correct. All of them indicating the same date as well, of September 9, 2025.

Q All right. Had you, on September 9th, already been in the process of transitioning the service pursuant to earlier discussions with and instructions to Tricolor Auto Acceptance?

A Yes, we had. We had already been notified by another lender of basically a triggering event that would have us step in as a servicer.

Q Okay.

MR. GIBBS: I'd offer Exhibits 3 through 9, Your Honor.

THE COURT: Any objection to the admission of 3 through 9?

All right. Hearing no objection, Debtors' exhibits found at 66-3 through 66-9 are hereby admitted.

MR. GIBBS: Thank you, Judge.

(Trustee's Exhibits 3 through 9 are admitted.)

BY MR. GIBBS:

Q Mr. Gamble, if you'll all the way to the back. And I believe it is Exhibit 22.

A Okay.

Q Can you tell the Court what that is?

A Yeah. So this basically summarizes all of the underlying agreements, those inception dates. That would be the second column that you see, the first row of that showing April 1st, 2022. And then it shows the notice of terminations that we received that are related to those agreements and the dates that we received those notice of terminations.

Q All right. And is it accurate that Exhibit 22 is a demonstrative summarizing what are in Exhibits 3 through 9 that have just been admitted?

A Yes.

Q Okay.

MR. GIBBS: I don't think I need to offer that. It's a demonstrative, Your Honor.

THE COURT: Fair enough.

BY MR. GIBBS:

Q Following your appointment, did Vervent immediately begin providing services to the Debtors as -- the Debtors and the SPVs, as servicer?

A Yes.

Q All right. Can you describe those services for the Court that you immediately began providing?

A Sure. So, the very first thing we do in situations like this is we have a call with the affected clients in that regard so we can get up to speed as much as we can. What we were told and what we subsequently found out in person was that Tricolor was going to be moving quickly to shut down operations altogether.

To that end, we know how important continuity is, not just to our clients and the lenders but to any public consumers that are affected by these events. We made travel plans with a crew of both executive team and operational folks to get down to the Irving office to assess the situation onsite, on premise.

At that point, it was I believe Friday, September 5th, where we learned that a thousand employees were furloughed and/or terminated, let go, on that Friday. And then our folks were there that weekend going into that following Monday and Tuesday. That's when we were told, I believe on Monday, that all additional employees were going to be let go. That, from our perspective, is about as grave and severe as it gets.

Normally, in a situation like this, we are cooperating with an entity like Tricolor when a triggering event happens and they're terminated, and we start getting together with

both cross-functional teams to talk about how we get all of that loan data set, all of the assets, the collateral, the vehicles, the titles, everything that goes with that, transferred effectively over to our organization.

This quickly became a situation that we became aware of that we were going to kind of have to prop up as much as we could of Tricolor to make any sort of effective transition possible.

Q Could you look at Exhibit 20? And tell me when you have found it.

A Yes. I've got it right here.

Q Can you tell the Court what this is?

A Yeah. So this is just a high-level exhibit that kind of describes everything we do from inception to end game on the servicing of a loan portfolio. It's fairly generic, it's not specific necessarily to just vehicles, but it can still be used as talking points and relative to this situation.

Q If you could, just take a couple of minutes and walk the Court what's being shown.

A Sure. So the very first thing that happens for us to start servicing, we have to onboard a file. And I know it talks here about board new consumer accounts into the servicing platform. It doesn't have to be new. In our industry, there are times, such as this event, where systems of record are transferred and/or servicers are transferred.

So what we're really looking at is we have to have an importation of data sets into that system of record, kind of as I described before, that gives a person's information. It will attach the underlying loan agreement into that system of record. It will populate inception -- origination date, payment date. It will have places in there for agents to insert their notes if they have a call that occurs.

It's kind of your one source of truth, or at least the place that will point you in the right direction of truth, in order to service a loan.

So that's the initial onboarding that occurs within our systems of record. And then, just generally speaking, we also do at the same time of onboarding a compliance and verification review. We want to make sure that we have all the documents that we need, they satisfy laws, rules, and regulations. And then we want to make sure, too, that we don't see any issues, glaring issues, right out of the gate, for example, where they might violate any lending laws or anything along those lines. So that's kind of the initial step.

From there, we put together what's called -- and a lot of this happens in parallel, especially if it's a new account and/or a boarding like this. The campaign management is basically, you know, how we service this portfolio. Some portfolios require high touch points. Others are pretty

straightforward of, Here's your payment date. You set up a time period of when there's an additional contact if a payment date is missed. And then we put together calling strategies that we think will both help in our ability to serve the consumer as it relates to voice, text, chat, email communications, and so on.

A lot of things most of the time we do with larger portfolios is they have their own dedicated, for example, email address, telephone number, all of that sort of stuff, so our dialer systems can know, as soon as a call is coming in or an email is coming in, whose account that's related to, it triggers the system of record to pull that account up right away, so things work as seamlessly as possible for the consumer experience.

In addition to that, we've got a document management component that goes into servicing. That, again, is both a -- I look at it as a -- a lot of people call it in the industry an e-vault, but it is a vault that will store all of those loan agreements in a safe and secure place, along with, in a situation like this, title agreements, collateral documents, and things of that effect.

So we put in together -- any time -- we'll have custody reviews and things like that to make sure things aren't missing, and then we work with the client to make sure that we can find those things. If they're not available, we will work

through state regulatory agencies and so on to track those down.

And then, of course, this is where most people kind of understand the meat and potatoes to be, is the account management. And that really is sending out statements, taking the calls. When payments come in, processing those, putting them into potential lock boxes as requested by the client, the requisition schedule when those get swept out to the clients. We also have a whole team that does fraud prevention and identity theft prevention investigations. And we also do credit reporting, process disputes, and so on in that regard, and then also process the titles that go with it.

Finally, there's the collections aspect. Collections and recovery is what I'd call it, if we're talking about vehicles in particular. So that's truly in situations where consumers may be past-due on items, and we work both in compliance with the laws and then the strategies with the lenders to come up with collection strategies that allow us to be able to potentially settle, get a consumer back on track, and if that does not happen, implement things like repossession activities, sale of the vehicles at auction, and then delinquency balances in that regard and what we do there.

And then, finally, we do reporting and payment remittance. And in this particular situation, a lot of what we would do is reporting into the securitizations, especially to the folks

that are listed as like Indenture Trustee and Administrative Agent, so they can see it. They also look and make sure that the monies match on their end with what's coming in with the reporting that we have, so that they then can pay their lenders out accordingly.

Q All right. Before I get to the next topic, just one quick aside. Is it your understanding that the vast majority of the vehicles that collateralize the loans that are in the securitized trusts that you're going to be servicing have GPS devices in them?

A Yes. To date, well, we still do not have a -- again, let's level-set. We have not been fully into the systems yet to understand exactly how many accounts there are. But we have an estimate, we have been told, and we think that this is pretty accurate, of about a hundred thousand total loans here. And we have gotten confirmation from the GPS vendor that was used by Tricolor that they have 89,000 GPS units on vehicles right now.

Q And is the function of the GPS unit to provide the provider and the servicer with the location of the vehicle in the event the borrower fails to timely make payments under the loans?

A That is correct.

Q Okay. Okay. I'm going to ask you a couple questions about the securitization structure generally. And I know I'm

certainly not tendering you as an expert on securitizations. There may be some folks in the room --

A Please don't.

Q -- or on the phone that are. But I want to ask the Court -- ask you to help the Court just understand a little better what I mentioned briefly in the opening remarks.

A Sure.

Q And I'll ask you to do that by turning to Exhibit 21.

A I have it in front of me.

Q Okay. And before I have you kind of walk through the value chain there, are you generally familiar with the operations and business model of Tricolor?

A I am, yes.

Q All right. And are you generally familiar with what a securitization trust is?

A I am, yes.

Q Okay. If you could, take a minute and walk the Court through Exhibit 21. Is that prepared by your company?

A Yes. Myself and our chief financial officer.

Q Okay. So I'm going to just take a drink of water while you teach.

A Okay. Fair enough. Okay. So, first, --

THE COURT: And I don't want to cut anybody off.

THE WITNESS: Uh-huh.

THE COURT: And I understand the need for the

presentation. I do understand securitization. I did this.

MR. GIBBS: Okay. I know you did.

THE WITNESS: That helps, Your Honor.

THE COURT: And I have an event at my home tonight at 7:00 --

THE WITNESS: Okay.

THE COURT: -- that I have to cook for. So I don't want to cut it short. You can walk me through the steps because I think it would be helpful --

THE WITNESS: I'll make it --

THE COURT: -- to others. But I do, on a --

MR. GIBBS: You get it.

THE COURT: -- fairly detailed level, understand securitization work.

MR. GIBBS: Your Honor, recognizing the time of day and your commitment, I'm going to save Mr. Gamble's voice and we'll pass on.

But let me offer Exhibits 20 and 21 so that they're in the record as further explanation of both the value provided by the servicer and the role they play in the securitization value chain.

THE COURT: Does anyone have any objection to the admission of 20 and 21?

Hearing no objection, Exhibits 20 and 21 are hereby admitted.

(Trustee's Exhibits 20 and 21 are admitted.)

MR. GIBBS: Okay. A little more just brief prove-up.

THE COURT: Fair enough.

BY MR. GIBBS:

Q Mr. Gamble, I'm going to ask you to turn back to Exhibit 11.

A Yes.

Q One second.

A Yep, I have it.

Q Okay. Just for the record, we may have misnumbered. I asked you to look through 4 through 9, and you did, and I identified and offered 3 through 9. Can you look at 10 real quick and confirm for the record that 10 is another substantially-similarly termination notice for another one of the securitization trusts?

A Yeah. And that's related to the question you asked earlier. We were already aware, and I had mentioned that another lender group had notified us. That is exactly what that exhibit is. That's the September 5th notice of termination that we received.

Q Thank you.

MR. GIBBS: My apologies for taking it out of order. I'll offer 10, Your Honor.

THE COURT: All right. Anyone have an objection to the admission of Exhibit 10?

MR. GIBBS: Okay.
THE COURT: Hearing no objection, it's admitted.
(Trustee's Exhibit 10 is admitted.)
BY MR. GIBBS:
Q All right. Let's go to 11 real quickly. And can you the Court what this particular document is marked as Exhibit 11?
A Sure. So this is a sales and servicing agreement dated April 1, 2022. It has several Tricolor entities on it, one as issuer depositer and seller and servicer. And then you have Wilmington Trust listed as Indenture trustee and Custodian, along with Vervent as backup servicer.
Q Okay. And it's for Securitization Trust 2022-1, correct?
A That's correct.
Q Okay. Does this agreement provide the specific obligations and rights and responsibilities of the backup servicer and the servicer more generally?
A Yes to both, to both counts.
Q And where would the Court find that?
A Yeah. So, in Article 3, you've got administration on servicing of the trust property. It's outlined there. In Article 6, you've got the servicer, the custodian, and backup servicer, talking about additional duties there. And then -- sorry if I'm going too fast.
Q No.
A Article 7 would be your servicer termination events.

Those are -- as I go through agreements like this, those are the first three sections that really become very relevant to us.

Q Okay. Take a second. Flip through Exhibits 12 through 17, I hope.

A Yep. I have them all in perfect order, so one this works well.

Q Take a minute, look at them, the provisions of Article 3 in particular. And I ask, if you can, after you look at them, if you can identify them.

A Yeah. So the first one I identified as the February 1, 2023. Same titling, but listed it as Tricolor Auto Securitization Trust 2023-1. Has the same sections as it relates to the duties of servicer. And backup servicer.

Q 13?

A The next one is -- the next I'm looking at right now is Tricolor Auto Securitization Trust 2024-1, dated January 1, 2024. The same parties from my look there, and the same Article 3, along with other descriptions, such as Article 6, of the servicer, custodian, and backup servicer.

The next one, the exact same, except that one's related to Tricolor Auto Securitization Trust 2024-2, dated May 1, 2024. The same as far as provisions on administration and servicing of the property and the servicer, the custodian, and backup servicer.

The next one, Tricolor Auto Securitization Trust 2024-3. That one is dated October 1, 2024. The same parties. Article 3 present, Article 6 present, as it relates to duties to the backup service provider and to the servicer.

The next one I have is Tricolor Auto Securitization Trust 2025-1. The same parties. And March 1, 2025 is the date on that. The same articles called out as it relates to duties to the servicer, the backup -- and the backup servicer.

And then the final one I'm looking at is Tricolor Auto Securitization Trust 2025-2. That is dated June 1, 2025. The same articles on 3 and 6 as it relates to the servicer and the backup servicer duties.

Q Are the provisions in Exhibits 12 through 17 substantially similar to those in Exhibit 11?

A Yes. They appear to be that way.

MR. GIBBS: Your Honor, we would offer 11 through 17 into evidence.

THE COURT: All right. Thank you very much.

Is there any objection to the admission of 11 through 17?

MR. GIBBS: All right. Okay.

THE COURT: Hearing no objection, they're admitted.

(Trustee's 11 through 17 are admitted.)

BY MR. GIBBS:

Q A couple more questions, Mr. Gamble. Thank you. If you'll look --

(WebEx interruption.)

BY MR. GIBBS:

Q If you will look at Exhibit 2, which is a copy of the motion that we're here on today, emergency motion. That's Docket 66.

A I have it.

Q I hope. Maybe -- actually, for the record, it's Exhibit 53. So --

THE COURT: Docket 53, yes.

MR. GIBBS: Docket 53, excuse me. Exhibit 2.

BY MR. GIBBS:

Q If you'll look at Exhibit A to that motion. And it looks to be -- it begins, Stipulation Between Chapter 7 Trustee and Vervent. Do you see that?

A Yes.

Q Okay. Can you explain to the Court, as succinctly as possible, what Vervent's understanding is with respect to the stipulation it has entered into with the Trustee for which we're asking the Court's approval?

A Yeah. The stipulation is for us to access as quickly as possible all of the records related to the loans and the collateral as it relates to Tricolor. As I had mentioned before, the continuity of servicing makes a very, very big difference in making sure that these are secured and to avoid consumer confusion and any gaps in what is out there in that

regard.

So this gives us the ability to come in and service, to basically set up the systems of Tricolor that have been mothballed, so to speak, for lack of a better word, and transfer as much data that we can find that's available, along with get individuals from Tricolor to assist on an independent contractor basis as well.

And then, on top of that, being able to access payment systems that were also used by Tricolor so that we can then start assessing the funds and sharing that data with the Trustee.

Q Thank you. A couple of questions. Can you tell the Court what steps Vervent takes to protect customers' personally-identifiable information?

A Yes. So that falls directly under my guise in the compliance department, along with our chief technology officer. Everything we have is under secure systems. We are managed under SOC reporting and heavy regulatory scrutiny of audits, not only by our banks but by our clients and regulators, both in the U.S. and in -- state specific.

So what we do in a situation like this is these systems of record are set up, in our systems when we come in to set up our ISPs to access any data, are set up in a double-encryption secured manner to where we would then be, number one, grabbing that data, securing it behind our closed walls, and

transferring it into our systems of record, where, like I said, we already have an audited SOC-compliant system in place to protect those records.

In addition, as it relates to physical records and physical property, to put proper security in place to secure not just a vehicle but what's inside that vehicle, because there can be consumer personally-identifiable information in there as well.

And then, finally, making sure, insomuch as was described in previous testimony of titles and documents that are laying around those various retail locations and facilities, to get in, grab those, put them in our secure file rooms, which are biometric security that we have based on those, and put those into what is our -- I would call our secure ecosystem.

Q Okay. Is Vervent currently equipped to continue servicing the company's loans during this bankruptcy proceeding?
A Yes, we are.
Q And when I say this company, I mean generically the Debtor and the nondebtor entity SPVs.
A Yes.
Q Okay. Would allowing Vervent to continue as servicer allow for continuity in servicing operations?
A Yes, it would.
Q What's the impact on consumers if servicing is not fully up and running as soon as possible?

A Yeah. The biggest impact is confusion. Where do I pay? How do I pay off my vehicle? How do I get my vehicle back from a repair facility? How do I get contents of my vehicle?
And then insomuch as -- I don't have a positive on this right now at this point in time; when we finally do get in there, we'll know this -- insomuch as there was credit reporting, this puts a big gap in a credit reporting situation also. So it's also making sure that we are helping to assist to make sure those issues are taken care of and corrected on credit reports and we stay anything in that regard to help consumers out and not affect any credit scoring.
Q Thanks. What's the impact on the Debtors' estates if Vervent is not able to complete the transition already started and properly perform servicing?
A Yeah. So, from our historical experience, when you have a situation like this, we had one very -- not as similar to this from a consumer perspective. These were commercial loans on semi-trucks. This was six months ago. And you see a very heavy and fast runoff of obligations continuing after this, even so much as false information that can be spread out there, you don't need to pay anymore, those sorts of things and stuff like that. So to have the continuity out there right away really makes a big difference to get everything back on track.
Q In your opinion, would continuation of servicing by

Vervent, if the stipulation is approved today, help ensure stability, compliance, and efficiency in managing the loan portfolio?

A Yes, it would.

MR. GIBBS: Your Honor, I have no further questions. I'll pass the witness.

THE COURT: Thank you very much, Mr. Gibbs.

Is there anyone who seeks to cross-examine Mr. Gamble?

MR. WINSTON: Your Honor, Eric Winston of Quinn Emanuel. I have a couple of questions, if I may proceed.

THE COURT: Please.

CROSS-EXAMINATION

BY MR. WINSTON:

Q Good afternoon, Mr. Gamble. Eric Winston on behalf of Clear Haven and One William Street. I just have a couple of questions for you. This is more in the way of just education. I think you testified that one of the termination events that led to Vervent being appointed as a backup servicer was on September 5th. Is that correct?

A That's correct.

Q And I think you testified that the lender notified Vervent?

A I used "lender" broadly. I'll have to -- I can shuffle through my notes here. It says it right on the termination notice itself.

Q Since, unfortunately, I'm on Zoom and didn't get a chance to get to Dallas, --

THE COURT: It's Exhibit 10.

MR. WINSTON: Exhibit 10?

(Pause.)

THE WITNESS: Of course, I stacked these up after Mr. Hendricks asked me these questions, so bear with me. If you'd bear with me one sec. I just went through all the September 9th ones, so --

THE COURT: Yes. It looks a little different. It says, Servicer Termination Notice at the top.

THE WITNESS: Yep, I have it now. Yep. So that was the servicer termination notice that I'm looking at right now.

BY MR. WINSTON:

Q Okay. And since I'm not in front of you and I can't see it, can you just remind me who the lender was that sent that notice?

A Yeah. JPMorgan Chase Bank, North America, as Class A Agent. And as Administrative Agent.

Q Was that the first time Vervent had learned that it may be called to be the backup servicer in this matter?

A No. We were given just a head's up, not by a lot of time, but some head's up, I would say within 24 to 48 hours prior to receiving that notice.

Q And who gave you the head's up?

A I beli... that's a great question. It -- I can't say with certainty. It was either one of my outside attorneys that had given me a head's up, or it might have been somebody in our sales office that had a relationship over at JPMorgan.
Q Got it. And so is it fair, then, to say that the way Vervent learned about the possibility of coming into a servicer was within a short period of time before September 5th?
A That would be accurate.
Q Okay. Between September 5th and now, is that enough time for Vervent to act as servicer under all of the various securitizations that listed in the order to do its servicing jobs, in your opinion?
A It's possible, I guess is my best likeliness in this. We have -- we have most certainly been in situations, when there is cooperation and that other side is propped up, that we can transfer servicing within 30 days without any problems.
As I mentioned before, we're -- in a little ways, I've kind of described it to the Trustee's Office as well, it's as if a tornado came through here and we've got to rebuild those -- that infrastructure brick by brick. But so everybody is aware of this very transparently in that regard, we've done a ton of necessary work to, number one, identify all those critical vendors that are involved. Hire on a skeleton crew of former Tricolor employees as independent contractors. And

we have what I consider kind of a SWAT team right now to where, you know, assuming we get this order in place, our goal is to have everything boarded within a 15- to 30-day window into our systems of record.

MR. WINSTON: No further questions, Your Honor.

THE COURT: All right. Thank you very much, Mr. Winston.

Anyone else --

MR. WINSTON: Thank you.

THE COURT: -- wish to cross-examine Mr. Gamble?

Okay. Hearing no further questions, the Court has a simple question, Mr. Gamble.

THE WITNESS: Sure.

EXAMINATION BY THE COURT

THE COURT: Could you explain or point me to the document -- because I would have thought that it was going to be in like a letter agreement, like an assumption of liabilities -- how Vervent were to get paid for its work as backup servicer?

THE WITNESS: Sure. So it's in all of those agreements that we did enter into evidence.

THE COURT: Oh.

THE WITNESS: And there's a -- there's a percentage fee that's applied to total active accounts. Total accounts.

THE COURT: Okay.

THE WITNESS: Servicing.

THE COURT: Okay. Thank you.

THE WITNESS: Yep.

THE COURT: So it's in the sale and servicing agreements?

MR. GIBBS: 11 through --

THE WITNESS: That's right.

MR. GIBBS: 11 through 17, Your Honor.

THE COURT: Excellent. Okay.

THE WITNESS: You can even -- it's a defined term if you look up Servicing Fee, Your Honor, if that'll help.

THE COURT: That is exactly what I was looking for, --

THE WITNESS: Okay. Fair enough.

THE COURT: -- was where the definition of Servicing Fee was.

THE WITNESS: Yeah.

THE COURT: They're very good with the defined term. I was just trying to find the definition itself.

THE WITNESS: Sure.

THE COURT: All right. Thank you.

Any redirect based upon the cross-examination, Mr. Gibbs?

MR. GIBBS: No, Your Honor. And that concludes the evidence that the Trustee has in support of the emergency motion that you've heard us this afternoon on. I'm happy to

make an argument, but I think it's fairly self-evident. We think the evidence clearly shows the need for this.

I think the evidence also, hopefully, clearly allays any concern that the Court had that the Debtor was, on this kind of notice, entering into new agreements with any third-party provider to create new obligations. This is merely what we -- I don't want to call it at all a comfort order, but it's a facilitation order, and it's one that we thought was absolutely necessary pursuant to Section 704, the duties enumerated for the Trustee.

We think it makes inherent sense, both from a protection standpoint for the estate and for the creditors, but also for the lives of the hundred thousand people driving cars that they financed through Tricolor that are having their lives disrupted, and the financial recovery to the thousands of noteholders in the public who bought interests in the securitization, getting as soon as possible an uninterrupted and resumed flow of cash to pay the obligations of the SPVs to their noteholders or their securities holders.

THE COURT: All right.

MR. GIBBS: So we would ask Your Honor to approve this motion.

THE COURT: All right. Thank you very much, Mr. Gibbs.

Is there anyone else who wishes to be heard? Were folks

able to address -- oh, Mr. Mitchell, please.

And thank you for your testimony. I forgot to say so, Mr. Gamble. Thank you.

THE WITNESS: You're welcome.

(The witness is excused.)

MR. MITCHELL: Your Honor, no objection. I know there's some language that's going to get worked on, and I know you're short on time.

I just wanted to point out that Origin Bank might be a little different, just so they don't think everything is all wrapped around securitization. So, as when I announced, I mentioned that Origin Bank was working capital.

THE COURT: Exactly.

MR. MITCHELL: And we've got a $35 million working capital line, traditional borrowing base, secured primarily with its own package of notes, 4,000 to 5,000 retail installment contracts, also held at Wilmington Trust for Origin Bank's benefit, but not serviced -- well, and they were serviced by Tricolor, but there is no backup servicer.

So we are in talks with Vervent, but unlike having out-and-out assignments like you do with a securitization, what we have are pledged retail installment contracts. And we are in talks with Vervent right now. But they may be collecting funds that are ours, and our language addresses that, and we'll just have to get there when we get there.

And then there are also, as we understand, additional retail installment contracts located with the company still. May or may not be our collateral as well, based off of our pledge documents. We're looking into that. A lot of it depends on which Debtor it's with.

THE COURT: Sure.

MR. MITCHELL: So as we talk about operating and borrowing money, we may be coming back up, because we have collateral as opposed to outright ownership, and I just wanted to make sure the Court understood that. A little bit smaller, not on the same scale, but still $35 million in outstandings for us.

THE COURT: Logistically, was it the situation at the Debtors, or perhaps it was just different Debtors, that the notes would initially be the collateral of Origin, and then once it got to a specific number of notes, that they were securitized thereafter, or it was just separate collateral?

MR. MITCHELL: No. Separate collateral, Your Honor. So, notes would be pledged to us specifically.

THE COURT: Okay.

MR. MITCHELL: Now, if a note is originated, I don't know the answer to that, if it would fall -- it depends on where it is within the Debtors' capital structure. And then also, you know, where it is, and if, before being, say, pledged or otherwise sold to an SPV, --

THE COURT: Right.

MR. MITCHELL: -- don't know if it would have been subsumed within our pledge.

THE COURT: Okay. That was my question, --

MR. MITCHELL: And if that would have been our --

THE COURT: -- is if they got to a critical mass where it's time to pull them and securitize them, if those originally were Origin's or not.

MR. MITCHELL: Don't know where they were warehoused and if they would have been Origin's or not. I don't know the answer to that question. There's still a lot that we're all learning, Your Honor.

THE COURT: Fair enough. It's very early. Yes.

MR. MITCHELL: Thank you, Your Honor. Appreciate it.

THE COURT: Thank you very much, Mr. Mitchell. I appreciate that.

All right. Does anyone else wish to be heard with respect to the stipulation or anything else?

MR. ELROD: Your Honor, this is John Elrod --

THE COURT: Please.

MR. ELROD: -- on behalf of Manheim.

Your Honor, we're also somewhat differently situated. Manheim is an auction house. And what occurred here is, when the Debtor would go to purchase vehicles, it would often take possession of those vehicles without paying. The terms and

conditions of participating in the auction provide that title did not pass until Manheim is paid, or the seller is paid, is how they're phrased.

So Your Honor, we don't have an objection other than the one I presented to Mr. Gibbs and (inaudible). I believe we've worked out language, though. Mr. Gibbs earlier this afternoon raised the issue of I'll call it DIP financing, even though it's not a DIP. Postpetition financing. We wanted to ensure that, when that's done, there's no adjudication of rights in those vehicles.

THE COURT: Okay. And I imagine, being an auction house, you'll be able to identify your collateral by then?

MR. ELROD: Correct, Your Honor. And we've provided the Trustee's counsel with a list of those VINs.

THE COURT: Excellent. Excellent. Okay.

All right. Anyone else specially situated that wishes to be heard?

MR. WINSTON: Your Honor, Eric Winston again. May I be heard?

THE COURT: Of course.

MR. WINSTON: For the record, Eric Winston of Quinn Emanuel on behalf of Clear Haven and One William Street.

We had provided Chapter 7 Trustee's counsel with two additions to the form of order. We're not objecting to the substance of the motion. I just got an email from counsel

saying it sounded like those additions are going to be included in the form of order.

Just to state it on the record so that no one is surprised, we added -- we asked, and it sounds like it's going to happen, that in Paragraph 4 of the form of order there's a line that says, "subject to any applicable liens," that the words "and/or competing property interests" be added. That's the first addition.

And then the second addition is a new paragraph that says, "Nothing in the order impacts any rights or obligations that Vervent might have under its governing documents -- sorry, governing agreements for the nondebtor Tricolor Auto Securitization Trusts, including the servicing agreements related thereto."

The idea being, and I take up Mr. Gibbs's mantra, that this is not supposed to be changing anyone's rights and it's more of a facilitation. We think having that additional language would accomplish that, and it sounds like from counsel that they will accept it.

THE COURT: Mr. Gibbs?

MR. GIBBS: A couple of comments. A wise person once told me to let the problems of the day be sufficient. So I'm going to deal with the potential problems that Mr. Elrod raised if and when we get back to you and ask for relief with respect to borrowing to finance the 721 operation we think is

critical for this case.

With respect to the comments of Mr. Winston, the Debtor -- excuse me, the Trustee has no concerns with those additions. And while we were on a break, I was doing some other things, my partner; Mr. Helt, was trying to field all the calls. I'll let him address whether or not those potential language additions were properly socialized.

What I would suggest, Your Honor, is even though I oftentimes am adverse to making sausage in front of the Court, I do think that if Your Honor is inclined to approve the motion and indicate to us that you are, Mr. Williams is ready to put up the draft order that we think has incorporated language that solves the written objection from TBK and it includes the additional "Me, too" -- that's my words; I don't mean to be disparaging -- request by certain parties in interest to amplify on the reservation of rights. And then we can make sure that Mr. Winston's additional language is in there.

If Your Honor would indulge us, I think then we would be in a position to get something in front of the Court that everybody's signed off on and we don't have to upload it later. But, look, if you have to get somewhere, then --

THE COURT: I live an hour away, to be clear. On a good day, I live an hour away.

Here's what I'll do. First of all, is there anyone else

who has any concerns that hasn't been heard?

MR. ALDERSON: Yes. Your Honor, this is Jason Alderson again on behalf of ACD Capital with Morgan Lewis.

We have been reviewing the order in real time. We appreciate the accommodation by Debtors' counsel. And we provided some comments a few minutes ago.

One of those comments pertains to efforts to consolidate the inventory which was underway by TBK prior to this proposed handoff to Vervent under this order. Then, as now, we remain concerned over the cost of that consolidation, whether it's three, four, or five locations. We don't think or wouldn't expect Vervent, as a servicer, has a great deal of expertise in that area. One of our comments goes to this issue.

If we can't reach -- we think our resolution, which is just that we be consulted if there is going to be a consolidation. And what I mean by that, Your Honor, is consolidating 10,000, oh, I don't know how many thousands of cars, 50, 60 locations, whatever the number is, to three or four. The math really starts to add up.

We would like to be consulted before those efforts get -- go underway, to make it as efficient as possible. And that's one of our comments.

THE COURT: All right. Perhaps I missed it. Is there a consolidation of the physical collateral in this agreement?

MR. GIBBS: There is no specific --

MR. ALDERSON: What --

MR. GIBBS: Well, there's no specific mandate to Vervent to continue to consolidate. There were consolidation efforts underway by TBK pursuant to a letter of authority from the Trustee's counsel that I think was given on maybe Saturday the 13th or Friday the 12th. I've lost track of days. And that had been underway until the instruction came to TBK yesterday, I believe it was, that they stopped continuing to consolidate.

But it had been their intention, thinking that it was in the estate's best interest, and it was the Trustee's belief based on those conversations, that taking vehicles from 50 or 60 locations that weren't manned and we weren't sure how well they were secured, with the Trustee being unable to confirm the existence of security and whether or not they're getting paid, that putting them at TBK's expense to a different, better secured, larger Debtor facility, and that's that -- I think it was called Socon.

A VOICE: Recon.

MR. GIBBS: Recon. There you go. The Recon facility south of town made sense and was a proper exercise by the Trustee of their judgment.

Pursuant to the agreement that we've reached, those efforts will stop, but they are where they are. We don't have

a count yet as to how many were relocated. We understand counsel for ACD's concern.

You know, I can't commit Vervent to making them a consultation party. To the extent they think they've got rights that we're not properly addressing or that Vervent is, then -- Vervent is, then obviously they can come back to court.

We're not wanting to shut them out of the process. But it needs to have some guardrails around it. We just don't understand the nature of their claim.

THE COURT: Okay. Well, from the Court's perspective, and I've read and reread the motion, the order, and the stipulation a few times, I don't see anything about the movement of actual vehicles.

MR. ALDERSON: Your Honor, under Services and Receivables, it's in the motion. I believe it's also in the stip in Number 3. I'm looking --

THE COURT: To collect, transport, and dispose, or repurpose collateral related to the receivables?

MR. ALDERSON: Yes. And transport with respect to this issue is what we're focusing on.

And one of the issues is that we don't understand -- we don't know what Vervent's plan is with respect to the transport or providing physical security for the vehicles. We don't know how that's going to take place or be accomplished.

But if transport is involved, we would just like to be plugged into that process. And ACD, that's one thing that we have a great deal of expertise in and knowledge, and we'd like to be involved and plugged into that process for efficiency's sake.

MR. GIBBS: Your Honor, it's my understanding, and I wasn't the primary scrivener of this stipulation, that the transport language being referred to was primarily focused on the ability of the servicer to transport repossessed vehicles. The vehicles that serve as collateral for the receivables are in the hands of -- they're not on the lots, principally. They're principally in the hands of customers who bought the car.

So the transport of those vehicles that's specifically authorized was to protect Vervent in its efforts to retain control of collateral on defaulted loans.

I'm sure there are a number of other examples, but I don't believe it's the intention of Vervent -- they can correct me -- that they're going to be out immediately getting all of the cars from 60 lots and moving them anywhere. But, again, I think that's a problem that we can sort out.

Knowing that you're an hour away and I'm now about to keep talking until it's an hour from when you have to be home, I'm going to change my request and not put the draft order on and just ask the parties to work in good faith tonight to where we can get a consensual uploaded order. If we break down, then

we'll send up what we think all the parties who do consent. It's urgent, we think, that this order get entered and Vervent have the protections and authority they need and that the Trustee wants them to have. And if there's any party who thinks that we left something out that they'd like to have, obviously the Court, you know, would consider an alternative order. But I think we can work this out.

THE COURT: Okay. Thank you, Mr. Gibbs.

Mr. Moran?

MR. MORAN: Your Honor, Matt Moran on behalf of TBK Bank, which is a lender that has a priority security interest in the vehicles.

The provisions about the vehicles and safeguarding the vehicles, that's the additional language that we've worked into the -- to resolve our objection. Our concern, obviously, is that we have collateral in the form of vehicles in six states, on 60 lots across the country, over 10,000 of them, and we just want to make sure they're safe. And Vervent has agreed to be responsible for the security there, and that's the language we've worked out, and the language that they've sent us is acceptable to us.

Thank you, Your Honor.

THE COURT: All right. Thank you. And you've worked out whatever the payment will be and the conversation will be to Vervent for these extra services?

MR. MORAN: That's between the Trustee and Vervent.

THE COURT: Okay. So Mr. Gibbs, is the Trustee aware of what the compensation or consideration will be for Vervent taking on these services that --

MR. GIBBS: No, there's no agreement as to --

THE COURT: -- are outlined in TBK --

MR. GIBBS: No, Your Honor. And to represent to the parties, we have no understanding yet of the costs that will be incurred. We know that Vervent will be fronting that cost. And to the extent that they or the lenders for whom that they are servicing loans seek to be reimbursed from that, that's obviously what the Code provides and they can do that. But we don't have -- they're not -- they haven't sent us a proposed fee structure for additional movement of vehicles to better secure the vehicles.

And so, I mean, the short answer is no, we don't have an agreement on that cost to the estate, but we don't have -- we haven't incurred an obligation that the estate will pay for that cost.

THE COURT: You said we have or have not?

MR. GIBBS: Have not.

THE COURT: Okay. So if there's an order that says Vervent shall immediately take full responsibility for and account for all vehicles owned by the Debtors, including properly securing all vehicles, protecting all vehicles from

theft, vandalism, or damage, and obtaining an accounting for all keys, license plates, and related titles, we're putting a pin in who pays for this?

MR. GIBBS: We have not put a pin for who pays for this, Your Honor.

THE COURT: Then who pays for this, so that I understand?

MR. GIBBS: It will be one of multiple parties. Either the securitization -- the parties to the securitizations for whom Vervent is a servicer, it will be submitted as a claim in the estate that we think will be dwarfed by claims to the estate should these efforts not be undertaken, or they will be paid by parties for whose benefit that security effort is undertaken -- namely, TBK or other floorplan lenders.

THE COURT: Okay. So, so long as it's understood, if the estate is not taking on the obligation, then the estate is not taking on the obligation. Because essentially what I've got is I've got a servicer that, by agreement, is going to work for the estate that is taking on additional obligations that it looks like are for the benefit of parties having separate collateral. And I just want to make sure that I'm not signing an order and then I'm going to be asked to interpret that order down the road because there's some disagreement about who foots the bill

MR. GIBBS: The servicer is performing its contractual obligations under the servicing agreements that were introduced as Exhibits 11 through 17. The, my words, beneficiaries of those agreements are the parties to the securitization, including nondebtor entities, not the Debtors.

THE COURT: Oh, okay. All right. So let me reread the stipulation.

MR. HELT: Your Honor, Marcus Helt for the Trustee.

THE COURT: Uh-huh.

MR. HELT: The language that we're discussing and I think the parties have coalesced around says that Vervent shall use commercially-reasonable efforts to collect and account for all the receivables, not just the receivables that might be the subject of the securitization, and all the vehicles. So, obviously, the estate doesn't have the money to pay for that.

THE COURT: Right.

MR. HELT: The parties that would be the ultimate beneficiaries agreed to this language. There is the open question of, when Vervent quantifies the cost, who is going to pay it. It's our expectation that the ultimate beneficiaries, through a surcharge mechanism, will pay for that. We don't --

THE COURT: Except the language says no.

MR. HELT: Well, the language says that this order is not deciding it, --

THE COURT: Right.

MR. HELT: -- but it's reserving everyone's rights to come back.

THE COURT: Okay.

MR. HELT: To -- and at least that's my expectation.

THE COURT: So we are putting a pin in payment?

MR. HELT: That's my understanding.

THE COURT: Mr. Foxman?

MR. FOXMAN: Your Honor, Brad Foxman on behalf of TBK.

TBK desired to secure these vehicles themselves and it would have to front that cost. It was told no, don't do that, Vervent's going to do it instead. TBK does not consent to surcharge. There's a reservation of rights on that to fight about it in the future.

THE COURT: Right.

MR. FOXMAN: But we're not putting a pin in payment today. It's an open issue to be figured out and disputed in the future.

THE COURT: Okay. I think that we're talking -- I think that my verbiage of "put a pin in" is what's confusing. We are punting the issue of who's paying for it today. When I say put a pin in it, that means we're not talking -- we're just going to stop right here on that. That's the problem. All right.

MR. FOXMAN: Punting, Your Honor. Thank you.

THE COURT: Thank you. Thank you. I knew if I went to football, we'd all talk the same language. All right. Appreciate that.

MR. HELT: Thank you, Your Honor.

THE COURT: Thank you, Mr. Helt.

All right. Anyone else that still needs to be heard that has a unique position?

All right. Hearing no further responses. Here is what I recommend, Mr. Gibbs, is, obviously, you've got the bigger list of players here today. I think that what probably makes sense is for the Debtors to circulate to the interested parties -- obviously, there's only one objector, but there's plenty of interested parties here today -- the form of stipulation and order -- I said the Debtor -- that the Chapter 7 Trustee intends to upload. If there are any comments, see if the verbiage can be worked out.

If that's not possible, we can do this one of two ways. I know this order probably needs to get entered sooner rather than later, given where we are. Time is not the friend of the estate in this instance. I'll be around tomorrow morning to either review the form of order that I know that if you upload to me as an officer of the Court I will know is an agreed form of an order.

And if not, if there are still fights to be had, what I

typically do is you can upload to Ms. Harden your form of order and then whoever the objecting party is can email to Ms. Harden a competing form of order, and then I can just take language in an email as to what the source of the strife is.

If it's really bad, we could probably figure out a way to hop on WebEx tomorrow. Okay.

I think the joint admin order might have had an error in it. But we'll deal with that in due course.

But in any event, we'll do it that way, just a competing form of order. Given that this is a stipulation, I don't want to have a separate hearing.

MR. GIBBS: Uh-huh.

THE COURT: But I also can't have an agreement between the Trustee and Vervent that those parties don't agree to if there's any competing language. So let's think about it. Hopefully it all works out and you're able to come to terms.

But other than that, any other, like, questions or housekeeping?

MR. GIBBS: Just quick logistical. I'm, even at my advanced age, still an optimist. I'm optimistic we'll work the language out this evening and upload a consensual order. In the event it's not, I just want the Court to know, I'll be on an airplane from 9:00 to 11:00 or 8:30 to 11:00, assuming the flights are on time, and available to hopefully not jump

on a WebEx later in the day.

THE COURT: Sure.

MR. GIBBS: Mr. Helt, I'll leave it in his capable hands to work out the competing interests and upload them. And then he's unavailable in the afternoon. So, depending on when and if we have to go to Plan B, you'll see one or the other, and I just want the Court to know that's why I won't be there.

THE COURT: All right. Well, all I can suggest is to keep the parties on a group email so everyone knows where it is. I am not on the bench tomorrow, but I'm at the courthouse.

MR. GIBBS: Okay.

THE COURT: So to the extent that it becomes an emergency, there will be some people in jeans who'll be really mad at y'all. Not me. Not me. I get the muumuu. But so just definitely try to work it out.

MR. GIBBS: Thank you, Judge.

THE COURT: All right.

MR. GIBBS: Appreciate your time. Thank you again.

THE COURT: Absolutely. Thank you. Court will stand adjourned for the day. You guys have a good one.

MR. GIBBS: Thank you.

MR. HELT: Thank you, Your Honor.

THE CLERK: All rise.

(Proceedings concluded at 6:03 p.m.)

--oOo--

CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

**/s/ Kathy Rehling** **09/20/2025**

_______________________________________ ________________

Kathy Rehling, CETD-444 Date
Certified Electronic Court Transcriber

INDEX

PROCEEDINGS 5

WITNESSES

Trustee's Witnesses

Anne Elizabeth Burns
- Proffer of Testimony 35

Derek Gamble
- Direct Examination by Mr. Gibbs 43
- Cross-Examination by Mr. Winston 67
- Examination by the Court 70

EXHIBITS

Trustee's Exhibit 1 Received 42
Trustee's Exhibits 3 through 9 Received 49
Trustee's Exhibit 10 Received 60
Trustee's Exhibits 11 through 17 Received 62
Trustee's Exhibits 20 and 21 Received 58

RULINGS

Motion for Joint Administration (40) - Granted 27

Motion for Entry of Order Approving Stipulation Between Chapter 7 Trustee and Vervent, Inc. (53) 88

END OF PROCEEDINGS 91

INDEX 92