IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS (DALLAS)

| | |
|---|---|
| IN RE: | Case No.: 25-33487-MVL-7 |
| | (Jointly Administered) |
| TRICOLOR HOLDINGS, LLC, AKA GANAS HOLDINGS, LLC, *et al.*, | |
| Debtors. | Friday, October 3, 2025 2:08 P.M. |

TRANSCRIPT OF HEARING ON EMERGENCY MOTION FOR LIMITED AUHTORIZATION TO OPERATE PURSUANT TO 11 U.S.C. SECTION 721 FILED BY TRUSTEE ANNE ELIZABETH BURNS (107) AND EMERGENCY MOTION FOR ENTRY OF AN ORDER (I) EXTENDING TIME TO FILE THE DEBTORS' SCHEDULES OF ASSETS AND LIABILITIES AND STATEMENTS OF FINANCIAL AFFAIRS, (II) AUTHORIZING THE TRUSTEE TO PREPARE AND FILE THE DEBTORS' SCHEDULES OF ASSETS AND LIABILITIES AND STATEMENTS OF FINANCIAL AFFAIRS, AND (III) GRANTING RELATED RELIEF FILED BY TRUSTEE ANNE ELIZABETH BURNS (109)

**BEFORE THE HONORABLE MICHELLE V. LARSON**
**UNITED STATES BANKRUPTCY COURT JUDGE**

APPEARANCES ON THE NEXT PAGE.

Audio Recorder: Bryon S. Robinson
Earle Cabell Federal Building
1100 Commerce Street, Room 1254
Dallas, Texas 75242

Transcription Service: Liberty Transcripts
9107 Topridge Drive
Austin, Texas 78750
(847) 848-4907
DBPATEL1180@GMAIL.COM
www.libertytranscripts.com

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

APPEARANCES:

| | |
|---|---|
| For the Debtors: | McDermott Will & Schulte LLP<br>BY: CHARLES R. GIBBS, ESQUIRE<br>2801 North Harwood Street, Suite 2600<br>Dallas, Texas 75201<br>(214) 295-8063<br>crgibbs@mwe.com |
| | McDermott Will & Schulte LLP<br>BY: GRAYSON WILLIAMS, ESQUIRE<br>2801 North Harwood Street, Suite 2600<br>Dallas, Texas 75201<br>(214) 210-2814<br>gwilliams@mwe.com |
| | McDermott Will & Schulte LLP<br>BY: MARCUS HELT, ESQUIRE<br>2801 North Harwood Street, Suite 2600<br>Dallas, Texas 75201<br>(214) 210-2821<br>mhelt@mwe.com |
| For TBK Bank, SSB: | Vinson & Elkins LLP<br>BY: MATTHEW M. MORAN, ESQUIRE<br>2001 Ross Avenue, Suite 3900<br>Dallas, Texas 75201<br>(214) 220-7723<br>mmoran@velaw.com |
| | Vinson & Elkins LLP<br>BY: BRADLEY ROLAND FOXMAN, ESQUIRE<br>2001 Ross Avenue, Suite 3900<br>Dallas, Texas 75201<br>(214) 220-7784<br>bfoxman@velaw.com |
| | Vinson & Elkins LLP<br>BY: SARA ZOGLMAN, ESQUIRE<br>2001 Ross Avenue, Suite 3900<br>Dallas, Texas 75201<br>(214) 220-7818<br>szoglman@velaw.com |

APPEARANCES (CONTINUED):

For ANC Ventures, LTD. and Bullish Resources:
Jackson Walker LLP
BY: MICHAEL SCOTT HELD, ESQUIRE
2323 Ross Avenue, Suite 600
Dallas, Texas 75201
(213) 953-5859
mheld@jw.com

For DB & BB Properties, LP:
Clark Hill Strasburger LLP
BY: AUDREY LORENE HORNISHER, ESQUIRE
901 Main Street, Suite 6000
Dallas, Texas 75202
(214) 651-2056
audrey.hornisher@clarkhillstrasburger.com

For Vervent, Inc.:
Wick Phillips Gould & Martin LLP
BY: SCOTT D. LAWRENCE, ESQUIRE
3131 McKinney Avenue, Suite 500
Dallas, Texas 75204
(214) 420-4449
scott.lawrence@wickphillips.com

Bernstein, Shur, Sawyer & Nelson, P.A.
BY: ADAM R. PRESCOTT, ESQUIRE
100 Middle Street
P.O. Box 9729
Portland, Maine 04101
(207) 228-7145
aprescott@bernsteinshur.com

Bernstein, Shur, Sawyer & Nelson, P.A.
BY: SAM ANDERSON, ESQUIRE
100 Middle Street
P.O. Box 9729
Portland, Maine 04101
(207) 228-7178
sanderson@bernsteinshur.com

For Origin Bank:
Katten Muchin Rosenman
BY: JOHN E. MITCHELL, ESQUIRE
2121 North Pearl Street, Suite 1100
Dallas, Texas 75201
214) 765-3600
john.mitchell@katten.com

APPEARANCES (CONTINUED):

| | |
|---|---|
| For Origin Bank: | Katten Muchin Rosenman<br>BY: ERIC R. HAIL, ESQUIRE<br>2121 North Pearl Street, Suite 1100<br>Dallas, Texas 75201<br>(214) 765-3638<br>eric.hail@katten.com |
| For ACV Capital LLC: | Bracewell LLP<br>BY: JONATHON LOZANO, ESQUIRE<br>111 Congress Avenue, Suite 2300<br>Austin, Texas 78701<br>(512) 494-3689<br>jonathan.lozano@bracewell.com |
| | Morgan Lewis & Bockius LLP<br>BY: JASON R. ALDERSON, ESQUIRE<br>101 Park Avenue,<br>New York City, New York 10007<br>(212) 309-6758<br>jason.alderson@morganlewis.com |
| For Fifth Third Bank, National Association as administrative agent: | Frost Brown Todd LLP<br>BY: REBECCA LYNN MATTHEWS, ESQUIRE<br>2101 Cedar Springs Road, Suite 900<br>Dallas, Texas 75201<br>(214) 580-8608<br>rmatthews@fbtlaw.com |
| | Goldberg Kohn Ltd.<br>BY: DANIELLE WILDERN JUHLE, ESQUIRE<br>55 East Monroe Street, Suite 3300<br>Chicago, Illinois 60603<br>(312) 201-4000<br>danielle.juhle@goldbergkohn.com |
| | Goldberg Kohn Ltd.<br>BY: NICOLE P. BRUNO, ESQUIRE<br>55 East Monroe Street, Suite 3300<br>Chicago, Illinois 60603<br>(312) 201-3964<br>nicole.bruno@goldbergkohn.com |

APPEARANCES (CONTINUED):

| | |
|---|---|
| For Hesselbein Tire Southwest, Inc., Gateway Tires of Texas, Inc., and XL Parts LLC: | Bradley Arant Boult Cummings<br>BY: RANEEN ABDELGHANI, ESQUIRE<br>1445 Ross Avenue, Suite 3600<br>Dallas, Texas 75202<br>(214) 257-9844<br>rabdelghani@bradley.com |
| For JPMorgan Chase Bank, N.A., as administrative agent: | Hunton Andrews Kurth LLP<br>BY: GREGORY GETTY HESSE, ESQUIRE<br>1445 Ross Avenue, Suite 3700<br>Austin, Texas 75202<br>(214) 468-3300<br>ghesse@huntonak.com |
| | Simpson Thacher & Bartlett LLP<br>BY: NICHOLAS E. BAKER, ESQUIRE<br>425 Lexington Avenue<br>New York, New York 10017<br>(212) 455-2032<br>nbaker@stblaw.com |
| For Wilmington Trust, National Association: | Alston & Bird LLP<br>BY: GERALD S. CATALANELLO, ESQUIRE<br>90 Park Avenue<br>New York, New York 10016<br>(212) 210-9509<br>gerard.catalanello@alston.com |
| | Alston & Bird LLP<br>BY: STEPHEN MARK BLANK, ESQUIRE<br>90 Park Avenue<br>New York, New York 10016<br>(212) 210-9472<br>stephen.blank@alston.com |
| For Cox Automotive, Inc.: | Greenberg Traurig LLP<br>BY: JOHN DOUGLAS ELROD, ESQUIRE<br>3333 Piedmont Road NE, Suite 2500<br>Atlanta, Georgia 30305<br>(678) 553-2259<br>elrodj@gtlaw.com |

INDEX


| | Page |
|---|---|
| MATTERS HEARD | |
| Emergency Motion for Limited Authorization to Operate Pursuant to 11 U.S.C. Section 721 filed by Trustee Anne Elizabeth Burns (107) | |
| **Court's Ruling - Granted** | **114** |
| Emergency Motion for Entry of an Order (I) Extending Time to File the Debtors' Schedules of Assets and Liabilities and Statements of Financial Affairs, (II) Authorizing the Trustee to Prepare and File the Debtors' Schedules of Assets and Liabilities and Statements of Financial Affairs, and (III) Granting Related Relief Filed by Trustee Anne Elizabeth Burns (109) | |
| **Court's Ruling - Granted** | **93** |

WITNESSES

FOR THE DEBTORS:

| | Page |
|---|---|
| ANNE ELIZABETH BURNS | |
| Proffer as Direct Testimony by Mr. Gibbs | 30 |
| Cross-Examination by Mr. Moran | 35 |
| Cross-Examination by Mr. Held | 50 |

FOR ANC VENTURES LTD. AND BULLISH RESOURCES:

(None)

EXHIBITS

FOR THE DEBTORS:

(None)

FOR ANC VENTURES LTD. AND BULLISH RESOURCES:

| | ID | EVD |
|---|---|---|
| 1 - Lease Agreement | 54 | 58 |
| 2 - Commercial Lease | 51 | 58 |
| 3 - Amendment to Lease | 52 | 58 |
| 4 - Second Amendment to Lease | 52 | 58 |

(Proceedings commenced at 2:08 p.m.)

THE COURT: Please be seated.

All right, good afternoon. We are here on our 2:00 docket. We have one matter on the docket. Could whoever's sharing their screen stop sharing for a moment so we can do the appearances and whatso? Thank you, appreciate it.

All right. I'll now take appearances for the record and I'll start with those folks in the courtroom.

MR. GIBBS: Good afternoon, Your Honor.

Chuck Gibbs with McDermott, Will & Schulte. With me as my colleague, Grayson Williams, and I'll make the other introductions in a moment when I start.

THE COURT: Okay, excellent.

MR. GIBBS: Thank you.

THE COURT: On behalf of the Chapter 7 Trustee.

MR. MORAN: Yes, Your Honor, thank you.

THE COURT: Thought it was maybe a secret. Please.

MR. MORAN: Good afternoon, Your Honor.

Matt Moran with Vinson & Elkins representing TBK Bank SSB as administrative payment and collateral agent. Along with me today, Brad Foxman and Sarah Zoglman.

THE COURT: Thank you very much.

MR. HELD: Good afternoon, Your Honor.

Michael Held of the law firm of Jackson Walker LLP here on behalf of two related landlord clients, ANC Ventures,

LTD and Bullish Resources, Inc. And with me, I believe, on Webex is a client representative, Ms. Valerie Tackett, who's the corporate vice president for both of those entities.

THE COURT: Okay, excellent. Thank you very much.

MR. HELD: Thank you, Your Honor.

THE COURT: I appreciate that.

MS. HORNISHER: Good afternoon, Your Honor.

Audrey Hornisher with Clark Hill PLC representing a landlord in this case, DB & BB Properties, LP.

THE COURT: All right, thank you very much. It's been a long time, Ms. Hornisher. It's nice to see you.

MS. HORNISHER: It has. (Indiscernible).

MR. LAWRENCE: Good afternoon, Your Honor.

Scott Lawrence at Wick Phillips appearing on behalf of Vervent, the servicer for the various loan portfolios. Joining me on the Webex today are, I definitely saw Adam Prescott and may also be Sam Anderson at Bernstein Shur and they may make their own appearances. Thank you.

THE COURT: Thank you very much.

Mr. Mitchell.

MR. MITCHELL: Good afternoon, Your Honor.

John Mitchell along with my partner, Eric Hail of Katten Muchin Muchen for the Debtors' prepetition working capital lender, Origin Bank.

THE COURT: All right, thank you.

MR. LOZANO: Good afternoon, Your Honor.

John Lozano of Bracewell LLP on behalf of ACV Capital LLC. I'm also joined today in the courtroom by my co-counsel, Jason Alderson of Morgan Lewis & Bokius.

THE COURT: Okay, thank you.

Mr. Hesse.

MR. HESSE: Good afternoon, Your Honor.

Greg Hesse with Hunton Andrews Kurth on behalf of JPMorgan Chase.

THE COURT: All right. Thank you very much.

All right. I'll now take appearances on Webex. And I know that we have a little over a hundred participants, so let me start with any attorneys who wish to make an appearance today.

MS. MATTHEWS: Good afternoon, Your Honor.

This is Rebecca Matthews with Frost Brown Todd, appearing on behalf of Fifth Third Bank. And I believe lead counsel, Danielle Juhle and Nicole Bruno with Goldberg Kohn are also on via Webex.

THE COURT: Excellent, thank you.

Mr. Catalanello?

MS. ABDELGHANI: Good afternoon.

THE COURT: Oh, okay. Please go ahead.

MS. ABDELGHANI: Oh no, go ahead.

Oh, good afternoon, Your Honor.

Rannen Abdelghani from Bradley Arant Boult and Cummings, appearing on behalf of XL Parts LLC, Gateway Tires of Texas and Hesselbein Tire Southwest.

THE COURT: All right, thank you very much.

MS. ABDELGHANI: Thank you.

THE COURT: Mr. Catalanello?

MR. CATALANELLO: Oh, good afternoon, Your Honor.

Gerard Catalanello from Alston & Bird on behalf of Wilmington Trust as Indenture Trustee and in other capacities under various securitization transactions, Your Honor.

THE COURT: All right, thank you very much.

MR. CATALANELLO: Thank you.

THE COURT: Mr. Elrod, I see you there.

MR. ELROD: Good afternoon, Your Honor.

John Elrod of Greenberg Traurig, LLP on behalf of Manheim Remarketing.

THE COURT: All right, thank you very much.

Mr. Blank?

MR. BLANK: Good afternoon, Your Honor.

Stephen Blank, also from Alston & Bird, along with Gerard, who you just heard from, on behalf of Wilmington in its various capacities. Just full disclosure, there's a chance you might hear from both of us today, but thank you very much.

THE COURT: Well, we'll see. All right, thank you very much.

MR. BLANK: Fair enough.

THE COURT: All right. Mr. Baker, would you like to make an appearance?

MR. BAKER: Yes, Your Honor.

Nicholas Baker, Simpson Thatcher & Bartlett, also on behalf of JPMorgan Chase as administrative agent under the SPV4 warehouse facility.

THE COURT: All right, thank you very much.

Anyone else wish to make an appearance this afternoon?

(No audible response)

THE COURT: All right. I'm hearing -- I know someone just joined. Would you like to make an appearance, sir? Oh, I'm sorry. I don't have my glasses on. Is that you, Mr. Helt? I'm sorry. I didn't have my glasses on. I didn't mean to call you out like that. I'm mean; I'm not that mean.

All right. To be honest, I'm not even sure that I ever called the case number, which is Case Number 25-33487, Tricolor Holdings, LLC. So, we're here today on the Trustee's emergency motion for limited authorization to operate pursuant to 11 U.S.C. 721. I note that there have been a handful of objections and limited objections and jointers that were filed. The Court did have an opportunity to review each of those prior to today's hearing. So, I think that that'll bring us up to speed.

I imagine, Mr. Gibbs, that the parties also wish to have a status conference of sorts to see how far we've come since the 18th. So, with that, I'll turn the floor over to you, sir.

MR. GIBBS: Thank you, Judge. And again, good afternoon. For the record, Chuck Gibbs with McDermott, Will & Schulte along with my colleague, Grayson Williams and apparently my partner, Marcus Helt, who were proposed counsel to Anne Burns, the Chapter 7 Trustee in these cases. I'm joined in the courtroom today by the Trustee as well as Chuck Hendricks of Cavazos Hendricks Law Firm, proposed special counsel to the Trustee. And we're joined virtually by Jim Calandra of Capstone Partners, who's the Trustee's proposed financial advisor.

Before we get into the substance of the relief the Trustee is seeking today, I thought it might be a time well spent and worthwhile to the Court, the consumers, the creditors, and maybe any press following this story to provide as best we could a fulsome update of both where we are and where we intend to go in these cases. To that end, Your Honor, one of the Trustee's primary goals in administering these Chapter 7 cases is to provide transparency to creditors and to take every step necessary to liquidate the state assets as quickly as possible while doing so in the most value-maximizing method possible.

Let me talk briefly, Your Honor, about what these assets are that we seek to dispose of as quickly but as efficiently and in a value-maximizing way as possible, because I think, Your Honor, having that context will ultimately inform the reasoning for the relief we're seeking today.

THE COURT: Yeah, and I think that's a good idea. The Court was left with a few questions of what does operate mean and what portions of the Debtors' business, which I understand were myriad, that the Trustee seeks to operate.'

MR. GIBBS: Absolutely, and I'll get to that in just a moment. Your Honor, Tricolor, which did business as Tricolor, as well as Ganas and Ganas, excuse me, YA! -- and that's with two capital letters and an exclamation point, so I'm not sure how loudly I'm supposed to say the second name -- they operated more than 60 retail dealerships. They specialized in providing auto loans to the members primarily of the Hispanic community with little to no credit history or subpar credit scores, including those without social security numbers.

Tricolor's growth, Your Honor, was no less than astounding. As of 2025, having been in business less than 20 years, Tricolor was the third largest auto dealership in both Texas and California, and you can see the numbers on that slide. Additionally, Your Honor, the Debtors operated two large reconditioning facilities where vehicles that Tricolor

purchased at auction were refurbished before being transported to the various retail lots across the country.

As we discussed at the prior hearing, Your Honor, and recognizing Your Honor's familiarity with securitizations, the demonstrative on the screen next -- there we go. The demonstrative on the screen indicates the financing lifestyle within the Tricolor ecosystem. Tricolor would borrow money from floor plan lenders to purchase used cars at auctions throughout the country.

The cars would then be transported to those reconditioning centers you just saw to be refurbished and then made ready to be put out onto the retail lots for sale. When the car was purchased from those lots, the buyer would execute a purchase contract, which would then be sold or pledged to a warehouse lender who would advance funds to Tricolor to be used to repay the floor plan lender and for operating capital.

Typically, when the amount or the number of those loans got to a certain size, they would be securitized and the proceeds of the securitizations would repay the warehouse lenders. And the cash stream from the customer payments would ultimately service the obligations to the holders of the bonds in those securitizations.

As I told you two weeks ago on September 18th, Your Honor, the Debtor entity, Tricolor Auto Acceptance, that we call TAA, serviced all of those loans up till right before the

bankruptcy was filed. Their rights and duties as servicer were terminated by the parties, the contract counterparties for whom they serviced loans prior to bankruptcy. Your Honor, in very rough numbers, it appears the Debtor owned or held approximately 11,000 vehicles at the time the Chapter 7 was filed and more than 100,000 car loans had been executed by car buyers that remained unpaid as of the petition date.

Your Honor, with that background, we want to provide the Court with a situational overview of the last 23 days since the petitions were filed. It's important to note and not lose sight of is the fact that nearly every single one of the 1,400-plus employees was furloughed on September 5, five days before the petition date.

Therefore, Your Honor, on September 10, when the Trustee was appointed after the Debtor filed Chapter 7 for itself and I think 17 affiliates, there was no one at the company to answer her calls. There was no one at the company to facilitate access to the company headquarters. There were retail lots with cars parked on them, left unlocked and open. There were cars in repair shops on lifts with no one there to finish the repairs. There were repossessed cars sitting on lots with fees accruing daily.

There was no manager or employee to walk the Trustee through the premises for the purpose of assessing the full scope of the Debtors' assets. There was no IT personnel to

grant the Trustee access to the Debtors' operational digital systems, like the company's books and records or loan servicing software. The Trustee immediately retained her firm, Cavazos Hendricks, to act as special counsel and then reached out to our firm and employed us on September 12 to act as her general counsel.

On the 19th of September, the Trustee, after interviewing several candidates, hired Capstone to be her financial advisor and then also retained Veracity, a company that specializes in data preservation, to begin the process of preserving all of the records of the Debtor to assist her in discharging her duties and to assist the various state and federal agencies that have commenced investigations into the activities of the company. Your Honor, all of the firms employed by the Trustee understand that their employment and ultimate ability to get paid is conditioned on Court approval of their retention as well as an ability of the Trustee to pay those fees should they be awarded by the Court.

To give the Court some further idea of the logistical challenges the Trustee has encountered, it took us over a week to gain access to the company's headquarters out in Las Colinas, which is an entire floor of a large office building. When we finally got inside, we found a completely vacant floor that resembled an abandoned DMV office, a very large abandoned DMV office that had over 5,000 car titles in various stages of

completion sitting on desks in the empty office and at least that many sets of license plates and blank registration stickers.

Veracity and Capstone have been able to obtain the necessary privileges to get access to the digital records of the company that were stored online. And we've secured the 250 boxes of physical records of the company just from that location that we have gained access to.

Your Honor, as I told you on the 18th, Tricolor Auto Acceptance had been terminated as a loan servicer on the days preceding the filing. And by the terms of those pre-petition servicing agreements, Vervent would step in contractually to be the replacement servicer and assume responsibility. The stipulation you approved on the 18th was just the first step in accomplishing that transfer.

In a typical situation or typical environment, Your Honor, Vervent steps in as the backup servicer in a very coordinated controlled situation. The pre-existing servicer has personnel on site to facilitate that transfer including ensuring that titles that are being processed or that are stored in various locations get transferred seamlessly. Obviously, that was a complete impossibility given the Debtors' crash landing into Chapter 7 and the prior furlough of every single one of their employees.

Nonetheless, the Trustee recognized the importance of

ensuring the customers had certainty and clarity about their loan obligations as quickly as they could. And to that end, the Trustee immediately began discussions with the various warehouse lenders and indenture trustee for the securitization trust to ensure that the Vervent was empowered to effectuate the transition into their role of servicer as quickly as possible.

Your Honor, make no mistake about what was required of the Trustee to effectuate that transition. The Trustee and her professionals have expended literally thousands of hours to assess and secure the Debtors' physical and digital assets located at the headquarters and elsewhere and to interface with the increasingly desperate customers, the creditors, and the agencies that are conducting investigations. Given that the vast majority of the Debtors' books and records are digitized and that no one from the company remained employed to assist with the production, the Trustee and her advisors had to reach out to vendors, all of whom have outstanding invoices, to ensure that the digital data was not lost by virtue of a lack of licensing or software access.

Taking these steps was critical to empowering Vervent and, therefore, all of the various lender groups to protect value slippage. It was also critical to ensuring compliance with the governmental investigations as well as the Trustee's own investigations into estate causes of action. The Trustee

has retained advisors to ensure that these estate assets are preserved, properly assessed, and sold in the most value-maximizing way.

The Trustee's claim agent, Veritas, that we've retained has created a website shown here on this slide. And Vervent has set up a customer hotline and email address also shown on that slide. We will upload this deck at the conclusion of the hearing today.

THE COURT: Thank you.

MR. GIBBS: They did so to assist customers with questions about how and where to make payments. Vervent has expended significant funds themselves in retaining over 20 key former employees from the loan, title, and inventory operations departments to assist them in properly servicing the loans and trying to re-establish collateral protection insurance and to fully integrate the payment systems.

Let me turn now to next steps. Your Honor, the information on this slide is provided to outline the current and next steps of the Trustee. Phase one, which we are in the middle of doing right now, is described on that slide. We continue to meet daily, every day at 10:00, with Vervent's team to accomplish the first part of what we describe in phase one and then each day brings Vervent, because of that, closer to having servicing of the loan portfolio fully transitioned. Simply put, that alone is a monumental task.

The Trustee is continuing to assess the equipment, the vehicles, the loans, the lease locations, the intellectual property in order to develop and quickly execute on a strategy to liquidate the assets and pay creditors. Phase two of the next steps is what the Trustee is also doing, beginning now, which is to work hand in glove with the various governmental agencies that are investigating what, by all accounts, appears to be a pervasive fraud of rather extraordinary proportions.

At the same time, the Trustee is fielding inbound reach-outs from a significant number of parties with real interest in acquiring some or all of the Debtors' assets. And I'll talk more about that in just a minute. When the Trustee has developed and executed on her strategy to liquidate the company's assets in a cost-effective and value-maximizing manner, she can then turn to phase three, which is the focus on investigation of pre-petition actions in pursuit of potential estate causes of action.

Your Honor, at the hearing on September 18, I represented to Your Honor that we hoped and, frankly, expected to be back before the Court early the very next week with a motion seeking approval of a funding agreement to go hand in hand with an anticipated motion for limited authority to operate under 721. And we fully intended and expected that we would be back with a funding agreement to be approved that would be provided by a group of the key lenders of whose

economic interests are the most significant in this case that we're trying to protect.

That statement, Your Honor, and, frankly, the Trustee's agreement to go first to the Court to get the stipulation approved that paved the way for the transitioning of servicing was made in reliance on assurances from those lenders that they were finalizing internal negotiations and discussions on a mechanism to provide capital to this estate to ensure the efficient and effective administration of these cases. Yet, here we are two weeks later.

The Trustee is no further along in those conversations than we were on the 18th. And shockingly, we have never received a single piece of paper describing the proposed financing that we have been in discussions of with the lenders about prior to the 18th. As a result, Capstone has begun engaging with the market regarding interest in a potential loan from outside sources. The market interest, frankly, has been very, very strong. The form of an illustrative term sheet has been circulated to more than 15 parties this week, and those parties are executing NDAs in furtherance of that funding process. And we're very hopeful to be back before Your Honor seeking approval of a funding arrangement in the very near term.

In addition to significant interest associated with funding these cases, numerous parties have indicated earlier

have reached out in connection with the potential purchases of all or parts of the Debtors' vehicles, their leases, and their unsecuritized loans. We're taking the steps necessary to capitalize on this market interest and have begun outlining what the Trustee hopes will be a fulsome, competitive marketing process done rapidly associated with these assets.

I mean, it brings me to a point, Your Honor, that's relevant to today's hearing, and I want the Court and the parties in the Courtroom and everyone on Webex to hear this loudly and clearly. At the appropriate time, which is not today, the Trustee will be back before the Court seeking orders approving one or more sales under 363, potential financing under 364, rejection of executory contracts and unexpired leases that aren't of interest to third parties, as well as authority possibly to use cash collateral to pay for necessary expenses.

None of that is being sought today. The relief we're seeking today, and I'll turn to that in just a second, is simply to provide the Trustee with the assurance that she has the authority to operate as necessary to protect the estate and to maximize values recovered in the sale process.

Before I turn to the motions that are set today, let me finish with a note about other important estate assets. The Trustee has gained access to the Debtors' operating systems, and the advisors are fast at work in diligencing the Debtors'

business, both on the loan origination front and the acquisition and sales front. Although we're certainly not in a position, Your Honor, to provide conclusions regarding the investigations, we're confident, Your Honor, that estate causes of action may serve as a significant source of recovery to creditors of this estate.

So now, Your Honor, let me turn to the motions before you, and I thank you for your patience. I hope that was illuminating for you as to where what the company did, what we found, and where we are and where we're going.

THE COURT: That was very helpful, Mr. Gibbs. I certainly appreciate, I recognize readily that you're drinking from the fire hose in this case and probably had to get access to the fire hose first. So I readily recognize that.

And likewise, recognizing where we are, recognizing the number of stakeholders at issue, whether those be customers, whether those be employees, creditors, and the like, the Court is certainly, let's just say, taking a more cause-based, relaxed approach to Webex, allowing as many folks as well as probably, I can only assume the press, based upon the number of phone numbers, to listen in.

There will certainly come a time where the Court will employ the regular Webex policies as it relates to folks who can listen in when I'm taking anything of an evidentiary nature. But today, again, for the sake of transparency, for

the good of the public, and for the best interest of maximizing the value for the estate, given the predicament the Trustee was put in by a case of this magnitude, not only going in freefall status but absolutely just being dumped onto the bankruptcy docket, the Court's certainly going to relax its processes to allow for the greater part of the docket, especially because, and I know you're going to get to this.

And I'm so excited to hear that Veritas will be coming on board, because there's certainly been a noticing issue in this particular case, given that the matrix was never properly filed. And so, to this point, anyone that knows about the bankruptcy probably just reads the paper.

So, all of that to say, and the Court is aware of an inkling of what you're going through outside of Court, and going to try to be helpful. We have, as I'm sure you well know, at least put a phone number that the Trustee provided to us on, I think, the judge's hearing page to, number one, give some protection to the Clerk of Court's Office, who's going to get a ton of calls, as well as to the Trustee's staff. I'm sure the phones are ringing off the hook there, as well.

So, all that to say, I'm ready to the motion, but certainly recognize what you guys have been dealing with.

MR. GIBBS: Thank you, Your Honor. I appreciate those comments. Just for housekeeping and clarification, I think you announced it when you called the case that there was

one matter set, which is --

THE COURT: Yes, and there was also a motion to extend, and I apologize.

MR. GIBBS: That's all right.

THE COURT: I didn't mention that. So, please proceed.

MR. GIBBS: Thank you, Judge.

Let me turn first to the motion for limited authority to operate under 721, and I'll proffer in a moment the testimony, which is short of the Trustee in support of the relief that she is seeking today. Before I do, though, I want to just make a couple of sort of general comments and address briefly, in a preliminary fashion the limited objections and joinders that you mentioned earlier that were filed.

Your Honor, the emergency motion for limited authorization, which is Docket 107, and the accompanying proposed order that we uploaded, seeks confirmation that the Trustee is empowered and armed with Court authority to not simply administer the estate as-is, but to also properly preserve the estates that includes over 10,000 cars and inventory scattered across several estates, over 60 leased locations in multiple states, hundreds if not thousands of car loans that were made in just a short period of time before the bankruptcy was filed that we don't believe were ever securitized and may not have ever been pledged, and to take the

necessary steps to investigate and prosecute causes of action.

I view this as really a prophylactic order to help the Trustee be comforted that not knowing what's coming around the corner, she has got the benefit of a Court order that at least allows her to engage in an effort to preserve assets and maximize value for the creditors. The order which we uploaded earlier today at Docket 142 and a copy was sent to all the parties that commented on or that objected to the relief we're seeking, I think the key part is Paragraph 2, and it sets out six or seven specific authorizations that the Trustee seeks.

The most important part of that is the preamble above that, however, which says, "The actions which the Trustee seeks authority to undertake will not alter or impact any party's claims of liens or encumbrances on or ownership of the assets the Trustee is tasked with administering, nor will they alter or impact existing contractual arrangements, nor, and importantly, does the order give the Trustee any authority to liquidate assets or expend money that's now in her possession or that may come into her possession absent further order of this Court."

That's what we're not asking for any authority to do. We are asking for what we purposely put as somewhat broad categories of actions that she believes she might have to take. But if it involves selling an asset, leasing an asset, encumbering an asset, or spending any money, none of that can

happen unless we come back to Your Honor and make a case for it and hopefully get your consent to that.

The motion drew three objections and a joinder. They're found, I think, at Dockets 125, 126, 134, and 136. All of these objections and the joinders to those which were filed under the guise of a limited objection seek to accomplish the same thing. They want the Court to insert language into the order that grants them relief they'd otherwise be required to seek and obtain through the filing of a motion and sustaining the burden that goes with that motion. Instead, they are being required to seek and obtain relief from stay in the case of the floor plan lenders or to seek and obtain an order compelling rejection of the lease in the case of the landlords that have filed objections or to allow for the reclamation of identified goods.

These objectors and the parties joining want language inserted into the order that's simply designed to give the Trustee, instead, just the ability to do her job. It gives them relief, instead, that they should have to file motions to obtain after being required to sustain their burdens of proof. That should not be countenance. We typically would take a break, go out in the hall, try to work out language, come back to Your Honor. But we think the order that we have drafted has addressed all of the concerns that we heard. We have made it crystal clear that we are not going to be able to do anything

that will impair their rights, disadvantage them in any way, diminish the estate in any capacity. It is merely to give the Trustee the ability to do her job.

The objection of ANC Ventures, Bullish Resources, it's at 125, as I indicated, it's an effort of a landlord to predicate the Trustee's operation under 721 on a requirement in the order that she pay post-petition rent under 365. In fact, the landlord even goes so far as to say the Court can't approve the motion unless the Trustee pays rent. Your Honor, relief under 721 is in no way contingent upon any requirement to comply with 365.

To the extent a landlord wants to compel rejection, they know how to file a motion and will set it as quickly as they want to set it and they can bring their motion. We would like the opportunity and very compressed time frame to gauge the market interest as to whether those leases, like the other 58 besides those two, have value to customers or, excuse me, to purchasers which will result in a better recovery to the creditors of this estate.

Same thing with the landlord that joined in that objection. Similarly, both TBK and ACV have filed objections generally requesting the immediate commencement of a liquidation process. I can appreciate the spirit of those objections, but the Trustee has retained professionals to run the sale process. And rest assured, we're going to do so in

the most value-maximizing way as quickly as possible. What these lenders instead want through this limited objection is to dictate the sale process. And they're free to file a motion for relief from stay and obtain relief from stay to run a sale process that they think is better than the one that we're going to propose.

They also want the entry of an order conditioned on a requirement that the Trustee file reports that 721 doesn't require a Trustee to file. We think it's just overreaching, so the relief we're asking for is entirely appropriate, is consistent with the authorities under 721. The objectors have cited no authority for the Court to insert the language they want us to be bound by that we don't think is appropriate.

So, with those opening comments, Your Honor, I'm going to, with the Court's indulgence, proffer the testimony of Ms. Burns, the Trustee.

THE COURT: All right, and of course, Ms. Burns is in the courtroom and available for cross-examination. Is there anyone who objects to the proffer of Ms. Burns' testimony on direct?

MR. MORAN: Your Honor, no objection, just subject to our right to cross-examine.

MR. HELD: I would echo that, Your Honor.

THE COURT: Same. Yes, she's right there. I'm kidding. All right. So with that, please --

MR. GIBBS: I brought my witness.

THE COURT: Yeah, you brought a witness. Excellent. Please proceed, Mr. Gibbs.

PROFFER OF ANNE ELIZABETH BURNS

MR. GIBBS: Thank you, Your Honor.

If called to testify in support of the motions, Ms. Burns would testify as follows. My name is Anne Burns. I'm the duly appointed Chapter 7 Trustee in these Chapter 7 cases, and I've served in that capacity since September 10, 2025. In my role as Chapter 7 Trustee, I'm responsible for investigating the financial affairs of the Debtors, liquidating assets of the estate, and making distributions to creditors in accordance with the Bankruptcy Code.

I've served as a Trustee in numerous Chapter 7 cases, and I'm familiar with the duties and responsibilities imposed under 11 U.S.C. 704 and related provisions. Immediately following my appointment as Chapter 7 Trustee, I began an investigation in an effort to identify immediate action items. My guiding principle throughout this initial period has been two-fold. First, to familiarize myself with the Debtors' operations, and second, and more importantly, to ensure that the Debtors' assets are preserved and that creditor recoveries are maximized.

Based on my preliminary investigation and review of the Debtors' records, I understand that the Debtors operated

approximately 60 retail locations across the U.S. Southwest as well as in Illinois, and they specialized in subprime auto sales and financing. The Debtors' business model involved not only vehicle sales but also in-house financing, with a substantial portfolio of auto loans and related servicing operations. The Debtors' operations were abruptly halted upon the bankruptcy filing, leaving numerous vehicles, loan servicing systems, and customer accounts in limbo.

Additionally, the Debtors' assets are dispersed across various dealerships, service centers, and other locations in various states. A complete accounting of the Debtors' assets has not yet been undertaken and cannot be accurately completed without operating the Debtors' business on a very limited basis. Additionally, these assets are currently at risk of rapid deterioration in value if not actively supervised and managed and insured.

I understand that the Debtors are also the subject of ongoing governmental investigations, including inquiries by federal law enforcement and regulatory agencies related to alleged misconduct in connection with the loan portfolios and financial reporting. Continued access to the Debtors' systems, records, and personnel is essential to preserving the evidence, cooperating with authorities, and ensuring transparency in the administration of the case.

Despite these issues, the Debtors' directors,

officers, and senior management are no longer in place and have ceased all involvement in the business. There is no function in corporate governance or executive leadership remaining to oversee operations, respond to inquiries, draft and file the Debtors' schedules and statements, and assist in asset recovery. As such, the Trustee is the only fiduciary in a position to stabilize the business, preserve value, and ensure compliance with legal obligations.

Additionally, the Debtors failed to file their schedules and statements as required by Section 521 of the Bankruptcy Code and Bankruptcy Rule 1007. The Trustee has worked diligently with her advisors to locate the Debtors' books, records, and documents that contain pertinent information regarding the Debtors' financial affairs and operations. The Trustee has begun this process, but it's still obtaining access to locations that presumably contain the information needed to accurately prepare the Debtors' schedules and statements.

Operating the Debtors' business, Your Honor, is therefore necessary, one, to ensure and assess that the Debtors' inventory at various locations is accurately accounted for, both at locations and in transit. It's necessary to facilitate coordination with creditors, including the thousands of consumers that have purchased vehicles from the Debtors. It's necessary to facilitate maintenance and protection of the

IT systems and data that's critical to the preservation of assets, as well as the government investigations.

It's necessary to facilitate an orderly wind-down and liquidation of the Debtors' estates, including the prosecution of estate claims through, among other things, retaining potential former key employees to provide necessary information. It's necessary to maintain appropriate insurance policies on the assets and necessary to preserve critical licenses. For the foregoing reasons, operating the Debtors' business on this limited basis is in the best interest of the estate, in my opinion, and necessary to facilitate an orderly wind-down of the Debtors' operations.

Additionally, given the complexity of the Debtors' operation and their lack of cooperation in preparing this Chapter 7 cases, additional time is necessary to adequately draft the schedules and statements in accordance with Bankruptcy Rule 1007(k). An extension of time through and including November 10, 2025, provided it is without prejudice to seek further extensions, will allow me to ensure the Debtors' schedules and statements adequately reflect the Debtors' assets and liabilities.

I intend to operate the business for a limited period not to exceed six months, during which time I'll retain as necessary key former employees and other professionals necessary to further stabilize operations, to seek authority to

use cash collateral or obtain DIP financing as needed, to file monthly operating reports in compliance with 704(a)(8), maintain appropriate insurance and comply with all applicable laws and regulations. As of today, I am holding $1,613,747.68 in my bank account. And I have expended the grand total of $1,782 for the purchase of a trustee bond as required by the U.S. Trustee pursuant to Section 322 of the Code.

I've consulted with the Office of the United States Trustee, and I'll continue to coordinate with that office regarding operational oversight, reporting, and bonding requirements. The Trustee's professionals consulted with the Office of the U.S. Trustee, and she is unopposed to the relief sought in this motion to extend the schedules as well as Docket Number 107. If called to testify, I would testify truthfully to these matters, and I'm available for cross-examination.

That would conclude the proffer of Ms. Burns' testimony, Your Honor.

THE COURT: Thank you very much, Mr. Gibbs.

Ms. Burns, if you could approach the microphone.

Given that you're an officer of the Court, I'll dispense with swearing in. Were you able to hear the proffer that was provided by your counsel?

MS. BURNS: Yes, Your Honor.

THE COURT: All right. And do you agree with everything that he stated?

MS. BURNS: I do.

THE COURT: Okay. And do you have any changes or anything further to add with respect to direct?

MS. BURNS: No, Your Honor.

THE COURT: All right. And obviously, I'll put you up for a cross-examination. Is there anyone who wishes to cross-examine the Trustee? And I'll start with those in the courtroom. Mr. Moran?

MR. MORAN: Yes, Your Honor.

THE COURT: Okay, if you could take the stand. Thank you, Ms. Burns. I don't know if there's any exhibits or anything that Ms. Burns will need. If so, make sure you give them to her.

(Pause)

MR. MORAN: Your Honor, may I proceed?

THE COURT: Yes, you may.

CROSS-EXAMINATION

BY MR. MORAN:

Q Ms. Burns, I'm Matt Moran. Nice to see you again. How are you doing today?

A Fine, thank you.

MR. MORAN: Your Honor, may I just approach the witness just with a copy of the org chart? I'm going to ask about some entities, and I certainly don't expect her to have memorized the org chart.

THE COURT: Certainly. Do you want to point me to what she's looking at?

MS. MORAN: It is Exhibit 1 from the original hearing on September 18th. It's filed at Docket 66-1.

THE COURT: Thank you very much.

BY MR. MORAN:

Q Ms. Burns, do you understand in your role as Chapter 7 Trustee that you owe duties to each of the 18 different Debtors over whom you've been appointed as Trustee?

A Yes. But I want to note that I'm not sure that this chart is actually correct.

Q Correct, with the shading and those issues that we talked about at the last hearing, correct?

A Correct.

Q Okay. Yes, and I'm not representing that the shaded ones are the Debtors or any of that. I just -- I didn't want to ask you about a specific box without showing you a picture.

And you agree in your role as a Chapter 7 Trustee that you have to evaluate what is good for any debtor on a debtor-by-debtor basis?

MR. GIBBS: Your Honor, I object for a second just to see if I could get a copy of what you handed to the witness and it wasn't on your exhibit list, so.

THE WITNESS: Could you repeat the question, please?

BY MR. MORAN:

Q Sure. Do you agree that in your duties as a Chapter 7 Trustee that you need to evaluate what's good for any debtor on a debtor-by-debtor basis?

A Generally, yes.

Q Okay. And I want to ask you just some questions. So, Tricolor Auto Group LLC, which is one of the boxes on that chart, I'll represent to you that that's one of our borrowers, TDK's borrowers that used our loan to purchase vehicle inventory. And Tricolor Auto Group LLC would then sell cars to retail customers. Do you understand that?

A Yes.

Q Okay. When you took over as Chapter 7 Trustee on September 10th, that retail sales business was dead, correct?

A When I was appointed, there was nobody at the lots to run those retail locations. That is correct.

Q Okay. And similarly, there was no ability of any of the Debtors to borrow money to make loans for customers to buy cars, correct?

A When a Chapter 7 is filed, the debtor ceases to operate, yes.

Q Okay. And to be clear, are you seeking any authority to operate Tricolor Auto Group LLC in its business of selling cars to retail customers?

A I'm not seeking authority to go out on the corner and sell cars to retail customers.

Q Okay. And that's the same then for Tricolor California Auto Group LLC, which I'll represent to you as another one of our borrowers who bought cars with our loan.
A That is correct.
Q Okay. And that would be the same for Flexi Compras Autos LLC, which I'll represent to you as another borrower?
A I don't have any intention to sell vehicles through the retail locations of any of the Debtor entities.
Q Okay. Are you seeking authority to operate Tricolor Auto Group LLC or Tricolor California Auto Group LLC or Flexi Compras Autos LLC for any other purpose?
A I think this is a complicated question because you have Tricolor Holdings. And my team, my advisory team is still in the process of determining what each of these Debtor entities did. So to the extent that you're asking if I'm going to operate for the purposes of retail sales at these locations, no, that's not part of this operating order.
Q And I guess my question is something different, not retail sales. I understand you're not doing that. I'm talking about for any other purpose, are you seeking authority today as part of this 721 motion to operate Tricolor Auto Group LLC or Tricolor California Auto Group LLC or Flexi Compras Auto LLC for any other purpose as you sit here today?
A Not that I'm aware of.
Q Okay. As you sit here today, are there any specific

entities that you're asking for permission to operate for a specific purpose that are on that chart?
A This is filed under the Tricolor Holdings, LLC case, and the cases are not substantively consolidated. So Tricolor Holdings, LLC.
Q Okay. And what specifically are you asking to operate Tricolor Holdings, LLC, for what purpose?
A In order to facilitate an orderly wind-down.
Q There was a mention of maybe hiring employees or something like that. Who are you intending to hire?
A At this time, I've identified two former employees that hold critical, crucial, and invaluable valuable information that my advisory team and myself will need in order to evaluate the orderly wind-down as well as future investigations for causes of actions that hold value to the estate. There are a number of employees that have been employed by Vervent. I have not yet identified whether or not the estate will need any of those employees, as well.
Q Okay. And what are the names or the positions of the two employees that you would intend to hire?
A Mr. Reed Crow, I believe he was the VP of Accounting. And Mr. Cameron White, and I'm unclear as to what his position was at this time. However, he has been very instrumental in dealing with some of the accounting concerns that my advisory team has had.

Q Okay. And the intent again would be to employ those at Tricolor Holdings, LLC, the top box?
A Yes.
Q Okay. I want to ask you some questions about the 195-day or approximate six-month period that I've seen in the motion. In Paragraph 1 of the motion, the 721 motion that was filed, it says, "Trustee respectfully seeks authority to operate the Debtors' business on a limited basis for a period of approximately 195 days to preserve and locate essential assets."
At the hearing on September 18th, Mr. Gibbs made a statement. I thought it was -- well, I put it in my box, thought maybe I'd use it again. But his comment was, this has been described as a quintessential melting ice cube. It's not produce, but this case won't do well aging. Do you agree with that?
A As to some assets, yes.
Q Okay. And do you agree with that as to vehicles?
A Yes.
Q And when you talk in the 721 motion about wanting to preserve essential assets for 195 days, are you talking about vehicles?
A My team is working to expeditiously come up with a plan to expeditiously market and sell those vehicles with Court authority.

Q And when you say that, you understand that vehicles are depreciating assets, correct?

A Yes.

Q And you understand that if delay in selling those vehicles results in less of a recovery to TBK, that we'd be entitled to adequate protection?

A I can't speak to that right now.

Q Okay. But you agree that the longer they sit on the lots, the more susceptible they are to vandalism and theft?

A I understand that.

Q Okay. And the longer they sit on lots, there's more security, more storage costs, correct?

A Understood.

Q And sitting in the hot Texas sun, batteries die and mechanical deterioration, correct?

A We're coming into fall.

Q That's true. It's still hot though, right?

THE COURT: It would be a crisp 95.

BY MR. MORAN:

Q In the statement about preserving assets, are you in any way asking to delay in the liquidation of vehicle sales?

A No.

Q In Paragraph 2 of the proposed order, there's a reference to preserving this status quo for 195 days. And when you talk about preserving the status quo, are you talking about letting

vehicles sit on the lots for up to 195 days?
A No.
Q Okay. And you're not talking about letting them sit there without starting a, or commencing a liquidation process within that 195-day period, correct?
A Can you rephrase the question?
Q Sure. When you're talking about preserving the status quo, are you asking the Court for permission for the vehicles to sit on the lots for up to 195 days before you start the liquidation process?
A No.
Q Okay. In other words, you intend to start the liquidation process long before that?
A Yes.
Q Okay. And when do you intend to start that process?
A I can't answer that question at this time, but my team is working on determining a plan to get that done as quickly as possible.
Q Okay. And do you, as you sit here today, do you have a plan to liquidate the vehicles?
A I have proposed plans that have been put in front of me.
Q Okay. And do those plans involve -- are there numerous alternatives?
A I have several alternatives.
Q Okay. And can you tell me what those are?

A No.
Q Okay. Is there a reason you can't tell me what they are?
A I haven't vetted them.
Q Okay. But I'm just, I guess maybe big picture, are you considering auction companies as one option?
A I am considering every reasonable option available.
Q Okay. Can you give us names of any of the parties that you've talked to who would be liquidating professionals?
A Not at this time.
Q Okay. And is that because you don't know them or?
A The general concepts have been put in front of me.
Q Okay.
A And just so everyone is aware, I meet every morning with my advisory team to get updates on what has transpired in the previous 24 hours as well as keeping -- getting regular updates throughout the day. I've had discussions about a plan to sell all the vehicles. The names of those particular parties have not been brought up yet, but I know that counsel has them.
Q Okay. And how quickly do you believe that a liquidation process can commence?
A Well, that depends on a number of factors, including the results of today's hearing. So I can't give you that answer yet. But again, we want to move as quickly as possible to liquidate these assets because I do understand the nature of this depreciating asset.

Q Okay. Thank you. In paragraph, well, there's a paragraph in our -- Paragraph 10 of our original objection, and we had supplemental objection, we asked the Court to order the Trustee to take immediate steps to commence, not to sell but immediate steps to commence a liquidation process, including meeting with parties in interest like TBK Bank, interviewing professionals, and establishing procedures for a sale process. Obviously all subject to Court approval.

Is there any reason that you as a Trustee would not be willing to do that?

A I believe you're referring to an email that you sent asking for a meeting with me. I have several meetings next week to discuss the sale process and you can work with counsel to set a meeting with me.

Q And I guess my question was slightly different. Mine was not referring to the letter that we sent you, although we certainly did. I was referring to some language in the order that if the Court was to order you to meet with parties to discuss sales process, sales procedures, how best to liquidate it, would you be opposed to that?

A I will comply with the Court's orders.

Q Okay. Now, in the motion in Paragraph 1, there's a statement, "After extensive consultation with stakeholders and a careful evaluation of the facts and circumstances of these cases, the Trustee has determined that limited operation are

both necessary and in the best interest of the estates."

Who are the stakeholders at Tricolor Auto Group with whom you had extensive consultation?

A Some of the former employees.

Q Okay. And in terms of dollars, do you understand that TBK Group is the biggest creditor at Tricolor Auto Group?

A From the proofs of claim that have been filed to date, yes.

Q Okay. And would that be the same for Tricolor California Auto Group and for Flexi Compras?

A I believe that TBK filed the same proof of claim in each estate.

Q Okay. And going back to the reference about extensive consultation with stakeholders, do you know prior to the filing of the 721 motion, how many communications anyone from TBK Bank had with anyone from the Trustee's side about the 721 motion?

A No, I'm not copying on every email.

Q Would it surprise you if it was zero?

A I don't know.

Q Do you know of any reason why the Trustee or the Trustee's team wouldn't reach out to TBK to talk about its vehicle inventory on which it has liens as one of the largest stakeholders?

A Can you rephrase the question?

Q Sure. Do you know of any reason why they wouldn't reach

out to TBK to talk about their plans to liquidate inventory?
A I don't know that there's a requirement for a conference on a 721.
Q I just saw when they said there was extensive consultation with stakeholders, do you know of any reason why there wouldn't have been even any consultation with TBK Bank?
A Again, I don't know that there's a 721 certificate of conference requirement on this matter.
Q Okay. There was a reference in your proffer to I think it was about $1.6 million of cash?
A Yes.
Q Okay. And what is the source of that cash?
A Insurance and dealer payoffs, mostly.
Q And when you say dealer payoffs, is that proceeds from the sale of vehicles?
A I'm assuming when a consumer takes their car from Tricolor to, you know, Toyota of fill in the blank, Toyota fill in the blank sends a check to Tricolor as a payoff. So, those would be the payoffs.
Q Okay. So, as you sit here today, do you know if those are proceeds of collateral?
A I don't know the answer to that question.
Q I want to ask about the proposed order that's been submitted and a few questions about that. Paragraph 2B of the proposed order references insurance that you want, I think,

authority to purchase. What insurance is that? Is it property? Is it casualty? Is it CGO insurance? What are you asking for there?

A We're currently in the process of assessing the lines of insurance. It includes the D&O insurance, property, casualty, all of the above.

Q Okay. And for what entity are you seeking to purchase insurance?

A So, again, we're in the process of assessing the lines of insurance and which entities were listed as the insureds. As you can imagine, as Mr. Gibbs has mentioned, this crash landed and I was appointed the Trustee. So, I have to sit down and assess all the lines of insurance and who the insureds are and that takes time.

Q Yeah. And as you sit here today, you just don't know.

A Correct.

Q Okay. And do you know how much this would cost?

A I'm not exactly sure yet. We're working on those numbers.

Q Okay. And to the extent that any money is being spent out of the $1.6 million cash, is it your understanding that you have to get Court approval before you spend any of that money?

A Yes.

Q Okay. 2B of the proposed order references rents. As you sit here today, do you have any specific rents that you're intending on paying?

A Not at this time. I don't know if that's going to come around the corner. Again, that's why I would like the authority under 721 operating order to protect those decisions, step a little bit outside of the 704 enumerated duties.
Q Okay. And just to be clear, as you sit here today, you just don't know what leases, if any, you want to pay rent on.
A That is correct.
Q And same thing for utilities needed to assess. As you sit here today, you don't know what utilities you need to pay, if any?
A That is correct.
Q Okay. Paragraph 2C of the order references authority to collect obligations owed to third parties. What third parties does the Trustee want to collect money for?
A I believe that's in reference to the loan servicing process --
Q Okay.
A -- as a whole.
Q Okay. And is the Trustee seeking authority to use estate resources of the Debtors to collect obligations for the benefit of third parties, non-Debtors?
A So, at the end of the day, I think this case is one thing benefits one, it may benefit all. It doesn't help us to cut our nose to spite our face.
Q Okay. My question is slightly different though, because

you told me that you owe duties to each Debtor box individually. And are you proposing using Debtor resources of, for example, our borrower, Tricolor Auto Group, to help collect monies owed to non-Debtor entities?

A So, at this time, the order does not contemplate me expending any funds that are potentially the collateral of a creditor. So, my answer to your question, based on the way the order written now, is no.

Q 2D of the proposed order references gathering and securing business records. And is it fair to say that the purpose of that is to help the Trustee investigate the financial affairs of the Debtors?

A Yes.

Q Okay. 2E requests authority to retain third parties. Other than the two employees that we talked about already, are there other third parties that you're looking at retaining?

A Not at this time.

Q And obviously, to the extent that you were going to retain professionals, you would do that under 327, correct?

A So, 327 for attorneys, financial advisors of that nature, under 721, it would be through the 721. However, funds for that would be through an additional order from the Court.

Q I saw something in the order too about returning vehicles that are not the Debtors' property so that people can get their personal vehicles that may be stored on Debtors' locations,

which obviously is super important.

I saw in one of the objections, I think by ACB, that they suggested that there be like a three-day notice period that everybody could just sort of look at that and make sure that it's not Debtor property. Would there be any objection that you have to something like that before letting vehicles off lots?

A I haven't fully vetted that process, but there does need to be a process by which to determine estate and non-estate property that's expeditious.

Q Thank you, Ms. Burns. That's all the questions I had for you.

THE COURT: Thank you, Mr. Moran.

Mr. Held?

MR. HELD: Thank you, Your Honor. I'll try and be brief here.

CROSS-EXAMINATION

BY MR. HELD:

Q Ms. Burns, thank you very much. Mike Held on behalf of, as I announced when appearances were being taken, for two of your landlords. And I apologize, I'm hoarse, today. One landlord is ANC Ventures LTD and another is Bullish Resources, Inc.

As part of the operations which you seek approval for today, your counsel stated that you intend to utilize leased

premises to store, sell, or return vehicles and maybe to market the leases. Is that correct?
A Yes.
Q Okay. The hope in the marketing piece is that you could find somebody out there that might pay more for a lease than the stated rent in the lease so that essentially the estate could benefit from the delta. Is that correct?
A Correct.
Q Okay. So the estate would benefit if you go ahead and market the leases and find somebody to buy them?
A That's correct.
Q Okay. Are you aware that Tricolor, I'm sorry, Auto Group LLC had a lease with my client Bullish Resources, Inc. for some premises in Laredo, Texas? It was specifically 3720 East Saunders in Laredo?
A Generally, yes.
MR. HELD: In fact, I handed up a binder of a slim binder of exhibits, one for the witness, one for -- may I approach?
THE COURT: Do my clerks have the one for the witness?
MR. HELD: I apologize.
BY MR. HELD:
Q So Ms. Burns, I just handed you a very thin exhibit list. If you could turn to Exhibit 2 and what does that document

appear to be?
A Commercial lease agreement by and between Bullish Resources, Inc. as landlord and Tricolor Auto Group LLC as tenant.
Q And if you turn to Page 2, what premises is that for?
A 3720 East Saunders Laredo in Laredo, Texas.
Q Great. And if you turn to Exhibit 3, what is that document?
A An amendment to the lease.
Q And how about Exhibit 4?
A Second amendment to the lease.
Q Are you aware that I believe on the 16th of September, you had somebody who came, stating under the auspices of Cavazos Hendricks, they came and they retrieved/repossessed 30 or so cars that were located at Laredo. Are you aware of that?
A Not that specific instance, no.
Q Do you -- have you ordered or at least asked for cars to be picked up at certain locations?
A So on the 10th of September, September has gone by quickly. On the 10th of September, TBK reached out to my office within probably an hour of the filing of the bankruptcy case. I'm going to make an assumption, and let me say this an assumption, that it was TBK acting under my direction as the Trustee to secure what they alleged was their collateral.
Q Got it. So you wouldn't be surprised that all of the

vehicles at Laredo had been picked up and moved off of the location?

A I would not be surprised. It was my understanding that TBK was doing it at the time.

Q Okay. Can you do me a favor? Will you open up to Exhibit 2? And I believe on the top of page PDF, Page 31 through 36.

THE COURT: And for sake of the record, ANC Ventures and Bullish Resources witness and exhibit list can be found at Docket 127.

MR. HELD: Thank you, Your Honor.

THE WITNESS: What page did you say?

MR. HELD: I'm sorry. If you look at the top on the ECF line, it will say Page 31 of 41. So it's towards the very end of that exhibit.

THE WITNESS: Exhibit 2?

MR. HELD: It says exhibit -- yeah, I'm sorry, Exhibit 2. Correct.

THE COURT: There is no 41.

MR. HELD: I'm sorry. It says 31 of 37. I'm sorry, Your Honor.

THE COURT: There we go.

MR. HELD: I'm looking at the wrong --

THE COURT: It's Exhibit 2, 31 of 37.

MR. HELD: Correct.

THE COURT: Thank you.

BY MR. HELD:
Q What is that document?
A It says personal property lease.
Q And who is that between?
A Between Bullish Resources as lessor and Tricolor Auto Group as lessee.
Q And on the second page of that document, it's got a description of personal property. Is that correct?
A Yes.
Q And what is that? If you could take a quick look. I can't tell you that I know what those things are, but.
A It looks like ops equipment and work equipment.
Q And then the bottom line is desks, offices, file cabinets, showroom furniture. Is that correct?
A Yes.
Q So it appears that this is a lot of the property, the personal property that's in that location.
A That's what the document says.
Q Got it. Are you aware, let's see, that my other client, related client, ANC Ventures, had a lease with Tricolor Auto Group LLC for some premises located at 6300 East Bandera in Leon Valley, Texas?
A Generally, yes.
Q Okay. And if you could open to Exhibit 1. What is that document?

A Lease agreement.

Q And that's a lease agreement between?

A Bullish Resources as landlord and Tricolor Auto Group LLC as tenant.

Q Got it. And I'm sorry, I said ANC. This is the Bullish lease. The previous lease had been assigned in one of the exhibits that you identified to ANC. And so this is, if you turn the page --

MR. GIBBS: Your Honor, I object to the extent that's testimony into the record as to what the facts are.

MR. HELD: Okay. Understood.

MR. GIBBS: There's been no predicate she's ever seen that document and we object --

THE COURT: Okay.

MR. GIBBS: -- of Counsel indicating certain facts that we know nothing about that he hasn't proven up.

THE COURT: I took it as Mr. Held attempting to identify the documents. But the Court won't take any legal opinion from the question.

MR. HELD: Thank you, Your Honor.

BY MR. HELD:

Q If you look at Page 2 of that lease, Exhibit Number 1. What is the premises address there?

A 6300 East Bandera Road, Leon Valley, Texas.

Q Got it. Are you aware, or were you made aware by your

counsel, without going -- I'm not seeking any attorney-client privileged communications -- that on the 19th, which is the day after I was hired by my landlord clients, that I sent full copies of these documents to your counsel. Did they make you aware of that?

A No.

Q Have you made any October 2025 rent payments? I think you said you have not.

A No.

Q Do you plan on it? On making payments for 2025 October rent this -- in the near future, this week?

A Not at this time.

Q You haven't rejected any leases either, is that correct?

A That's correct.

Q Do you have sufficient funds? I think you said you had 1.16, unless I'm transposing the numbers, 1.16 million, or was it 1.1 --

A That is correct.

Q Okay. But you stated, in response to Mr. Moran's questioning, that you're not planning on using that unless and until you get Court approval to do so?

A That is correct.

Q As a bankruptcy attorney, you are a bankruptcy attorney, correct?

A That is correct.

Q And you're aware of the obligations under 365(d)(3) to make current payments post-petition?
A I am aware.
Q Okay. Are you -- you stated that you're actively marketing the leases?
A That is correct.
Q And have you had interest?
A There is interest.
Q Can you tell me with whom -- with what parties those discussions might have been had?
A I don't have the names of those parties to share with you.
Q So while you're marketing, do you plan -- while you're marketing the leases, do you plan on paying rent?
A That's a discussion I need to have with my legal team.
Q So if you can't successfully market the leases, presumably you're planning on rejecting them?
A I need to take these leases to a fulsome marketing process before I can make any determination about that.
Q So are you setting a time limit on how long you want to try and market them for?
A No.
Q I'm sorry, to clean record, so you're not setting a specific timeline?
A I do not have a timeline or a time limit as of today.
Q So you are aware you need to make rent payments, is that

correct, under 365(d)(3)?

A I am aware of the rent payments, yes.

Q Are the premises and any vehicles or other property on the premises fully insured at this point?

A It's my understanding that they are, but I'm not 100 percent sure.

Q So you have not seen insurance policies at this point, or your team?

A Again, as I've previously testified, I'm actively in the process of understanding the lines of insurance and what lines of coverage we have.

MR. HELD: I'd like to move for admission of the exhibits that would have been identified.

THE COURT: Any objection to the admission of ANC and Bullish's exhibits found at Docket 127?

MR. GIBBS: No, Your Honor.

MR. HELD: Thank you, Mr. Gibbs.

THE COURT: All right.

MR. HELD: I pass the witness, Your Honor.

THE COURT: All right, for sake of the record, ANC and Bullish's 1 through 4 are hereby admitted. Thank you, Mr. Held.

(ANC and Bullish's Exhibit Numbers 1 through 4 admitted into evidence)

THE COURT: Is there anyone else in the courtroom who

wishes to cross-examine Ms. Burns?

(No audible response)

THE COURT: Is there anyone on Webex who wishes to cross-examine Ms. Burns?

(No audible response)

THE COURT: All right. Hearing no takers, you may step down. Thank you very much, Ms. Burns.

(Witness excused)

THE COURT: All right, Mr. Gibbs, any other evidence with respect to the motion to extend or the motion for 721 authority to operate?

MR. GIBBS: No other evidence, Your Honor. And the evidence through the proffer also made reference to the justification for the other request, which is for the extension of time to file schedules and statement of affairs. And we have no further evidence on that motion, as well.

THE COURT: Okay, thank you very much.

Is there anyone else who wishes to put on any evidence with respect to other schedules extension motion or the 721 motion?

(No audible response)

THE COURT: All right. Hearing no responses, and I'll give you the final word, Mr. Gibbs. Is there anyone who wishes to be heard with respect to either of the motions, including the form of order that was proposed by counsel? The

redline can be found at 142-2.

Mr. Moran?

MR. CATALANELLO: Your -- sorry.

THE COURT: I'll go to the folks in the courtroom, and then I'll come to you next, Mr. Catalanello. Thank you.

MR. CATALANELLO: Thank you, Your Honor.

THE COURT: Mr. Moran.

MR. MORAN: Thank you, Your Honor. Again, Matt Moran with Vinson & Elkins on behalf of TBK Bank.

Our objection in the evidence, I think, can be summarized in maybe three major concerns. The first is that the 721 motion and the 721 proposed order doesn't address the Debtors on a Debtor-by-Debtor basis. It doesn't specify which entity they want to operate or why. It's unclear whether the motions in the order they want to operate all 18 entities or not.

And Ms. Burns testified that at least as to the three borrowers, Tricolor Auto Group, Tricolor California Auto Group, LLC, and Flexi Compras, that she's not seeking to operate those as retail car sales lots or for any other purpose here today. And obviously, that makes sense. The car business is dead. There's no need to operate that as a retail sales lot. And it would be obviously inconsistent with the duties under 704 to expeditiously liquidate those assets.

Certainly, the operation of these businesses is not

necessary to expeditiously liquidate the assets. I did a Google search this morning. It's seven to nine million vehicles get sold through auctions in the United States or North America every year. Adding 10,000 vehicles spread out over six different states in various metropolitan areas is not going to flood the market. There's no reason why the sale of vehicles can't commence immediately. And the evidence shows, as Ms. Burns testified, that delay is problematic, right? You have depreciation. You have new model years coming out. You have mechanical deterioration. You have theft, vandalism concerns.

So there's no reason or justification given to operate these entities, particularly the three entities that own the vehicles. And they should concentrate on liquidation of those, consistent with 704. There's no need to operate those entities. No evidence given. No evidence for justification to operate those entities.

Second major concern is this 195-day period. No justification given for six months. No reason why they need six months. You know, they said they're not proposing to delay the liquidation, and they shouldn't be allowed to. That would be inconsistent with 704. And if --

THE COURT: So how much time do you think they should have?

MR. MORAN: I think they should sit down with us next

week and we should get a process. We can sell vehicles starting next week at the auction, but --

THE COURT: Are you the only claimholder with respect to all of the Debtors' cars?

MR. MORAN: ACV also has a claim. We believe they're behind us on vehicles. So there's at least a subset of vehicles that we believe are ours or ACV's and that we can proceed to liquidation in short term. There are other sets of vehicles that there may be other parties that have interest to, as well. Mr. Elrod and Manheim have some interest and they've indicated 399 vehicles at least. But there are different groups of vehicles, some of which we think would be very easy to liquidate.

And there is a readily available method that's recognized around the country of taking vehicles to auctions. And there's numerous options of those. But there's no reason that they should sit on lots for months while we're investigating leases or causes of action or other things while the --

THE COURT: Did I miss the testimony where she said it's going to sit on lots for months and wait? I mean, I guess my question to you, Mr. Moran, is what are you asking of the Trustee? She walked into an empty office with, I think, with titles and license plates strewn about. What would you like her to do if she can't even open a -- I mean, we have no

schedules. We haven't even been able to notice creditors yet. How fast is too fast?

MR. MORAN: Right. Well, what we don't want is the 195 days to be used as a justification for delay.

THE COURT: I grant you that. I grant you 195 days to establish a process would be way too long. I grant you that.

MR. MORAN: And then the second thing we want is consultation, right. We want to sit down with them.

THE COURT: Fair enough.

MR MORAN: We've asked. They said in their motion that there's been extensive consultation. There's been zero with us prior to the filing of that motion. So that is what we want, Your Honor. And that's why we propose in our language in the proposed order that, look, we're not asking them to sell immediately, but we're asking them to sit down immediately and talk to us about how they're going to sell our collateral, as opposed to hearing about it in Court for the first time that they've been talking to numerous people and not including us in those discussions.

And then the final concern we have, Your Honor, is just the nuts and bolts of what they're asking for, right, that as it sits here today, they don't need any money to get insurance or rents or utilities because they haven't yet investigated that. And they've said, hey, we're not going to

spend any money without Court approval. So they're not going to spend any money. They're not going to do anything.

What they're doing, and I carefully worded my question. I said when you are asking under the section here of the order.

THE COURT: Section 2 on Page 3.

MR. MORAN: It was Section 2D when it was about, you know, gathering and securing business records and hiring, you know, the employees for the accounting purposes and all the stuff to get the information. Of course, they need to do that. But my question was, is that to investigate the financial affairs of the Debtors. And the answer is yes, of course it is. It's necessary. But that's what 704 says. 704 gives them the right to do that. They don't need a blanket 721 motion that says we have authority to do, including but not limited to the following things.

It's a blanket order that nobody knows what it means. Nobody knows what they're going to do with it. And they say they're going to come back before they spend any money. Just give them the authority that they have under 704, which, by the way, there was a comment about wanting reports and Mr. Gibbs saying, oh, we don't have to do reports under 721. But 704(a)(8) says, "If the business of the Debtor is authorized to be operated, Trustee must file with the Court ... periodic reports and summaries of the operation of such business,

including a statement of receipts and disbursements and such other information as the U.S. Trustee or the Court requires."

So if they are operating, they have to file those reports. So there's a due process issue that they seem to say, hey, look, we understand you have due process rights. We need to tell everybody what we're spending money on, what we're going to do. Well, if they're going to do that, come back and do it. They don't need blanket authority that says including but not limited to doing all these things today.

And in Mr. Gibbs presentation, he mentioned things like, well, we need comfort and a prophylactic order. Well, 704 gives the Trustee the power to do the things that she is doing today. And we don't need a 721 order that says including but not limited to do all the following things, which nobody knows what that is.

So for those reasons, Your Honor, we would ask that the motion be denied, that the Trustee have the ability to operate under 704, and that they be ordered to sit down with us to talk about the liquidation process and for the other language that we put in our supplemental objection would also be included in the order.

THE COURT: So Mr. Moran, so that I understand, if all you would like me to give to the Trustee is that which the Code provides as duties --

MR. MORAN: I mean the -- go ahead, Your Honor.

THE COURT: Let me take a step back. I understand your bigger issue with the 100, whether it's six months or 195 days. I understand your process concerns, and I understand the clarity that you're asking for. But I guess my question is, do you have a problem with the Trustee securing insurance for property?

MR. MORAN: No, generally, if we had notice and hearing of what they're spending it on, for example, if they were buying insurance at an extraordinary rate to insure vehicles starting a month from now, and we could instead take those vehicles to the auction today and avoid those costs, well, then yes, we would have a problem with it.

But again, they're saying they're going to tell us what they're going to spend it on. They're going to come back with that motion. They don't need this blanket 721 motion today to do that. They just need to investigate the financial affairs of the Debtors, figure out whether or not they need insurance. And then when they need insurance, they come back here and ask for it and we have the opportunity to raise our concerns.

THE COURT: So if she needs to retain any -- again, a case was plopped onto the docket, no schedules, no proper matrix, nothing. At some point, she received some keys and she received the ability to do a walkthrough. If she needs to hire IT that will formally work for the Debtor to figure out how to

get into the system, how to access the accounting records, how to figure out what's been paid, what doesn't, figure out where the insurance is. How does she do that under 704? How does she retain people?

MR. MORAN: Well, 704 says that she can obviously collect the assets. It says that she can investigate the financial affairs of the Debtors. And to be clear, for the two employees, they want to hire at Tricolor Holdings, we're not objecting to that. If the operational motion is they want to hire those two employees to help them, look, we want them to have full information. What we don't want them to have is a blanket order that they say, oh, we have the authority to operate all Debtors for including but not limited to purposes. And nobody knows what that means.

Now, we've heard them and we believe them that they're not going to spend a dollar until they come back and ask for permission. And that gives us great comfort. That is not what the order says, right? The --

THE COURT: Well, the -- okay, okay, well, let's take -- you got a lot of energy. I'm a little slow --

MR. MORAN: Sorry.

THE COURT: I'm a little slow on the pickup. All right. So if it says, "Notwithstanding anything to the contrary herein, any of the following actions and all events remain subject to existing liens, interests and encumbrances of

all third parties, applicable contractual agreements or arrangements with third parties, and the Trustee may not liquidate or expend assets of the Debtors estates or in the Debtors possessions without further order of the Court."

What other restrictions would you like on Ms. Burns?

MR. MORAN: Your Honor, for example, again, this this was the language that was filed right before the hearing. But on 2B, it says that they're going to, in furtherance of 2A, pay insurance, post-petition rents, and utilities. I mean, that's inconsistent with what it says above. But I understand that maybe they're not saying that.

THE COURT: If the lights are not on at the leasehold premises, how does she turn the computers on? I don't mean to be silly.

MR. MORAN: No.

THE COURT: But I want to be practical here. I mean --

MR. MORAN: Right. No, it --

THE COURT: -- it's not the first Chapter 7 Trustee I've ever had come before me.

MR. MORAN: Right. And if they're coming to the Court with authority to spend the money, we're not concerned about that aspect of it. We think that's appropriate. But what does this do? I'm not sure what this does, what this order does. And if the Court's fine with it, I've made my

point. I'm not going to beat the dead horse.

I just want to make sure that there's no ambiguity. And we are really, really focused on the liquidation of the inventory. We would ask that that paragraph be included in the order. And we would -- as reflected in our supplemental objection.

THE COURT: And here's what I'll tell you, Mr. Moran. I would be uncomfortable. I, the Court, would be uncomfortable with a blanket motion that says start selling cars, okay, because what I what I am concerned about in a case that until Veritas and can get up and running and could have a creditor's matrix, okay. Again, I'm not sure that you've got this level of clarity because it's just the level that I have been on. I have been watching the docket every day to see when I'm going to have an actual creditor's matrix of the tens of thousands of people that need notice.

Okay. So, again, if you just let your fingers do the walking through Rule 2002 to figure out the number of people that are going to need notice of asset sales, no way I can get that that blanket authority today. Not to mention, I absolutely 1000 percent believe that your client has lots of security interests in lots of vehicles. But I bet you they're not the only security holder that thinks so.

MR. MORAN: No. And in our proposed language, just to be clear, Your Honor, was we want to sit down and talk. Not

just us but all of the parties in interest.

THE COURT: Right. And I want you to sit down and talk. And we're going to have a recess before there's an order. And you're going to sit down and talk and you're going to see if you can reach language just like you did last time.

And I do believe the lines of communication should be a little bit more open, Mr. Gibbs. I know you guys are drinking from a fire hose. But if you've got a major secure lender, the likes of what I'm being told TBK is, I think that there should be more consultation because this is a pretty broad order. I'm hearing from everything that you're telling me in Court that there's some guardrails around all of this. And I think that your language gets you a lot of way there because the Court would have the same concerns.

But I do believe the lines of communication should be a little bit more open. And maybe, like I said, at a recess, you'll be able to come up with something like that.

MR. MORAN: I bet we will, Your Honor. Thank you.

THE COURT: Thank you, Mr. Moran.

MR. ALDERSON: Your Honor?

THE COURT: Of course, Alderson, right?

MR. ALDERSON: Yes.

THE COURT: it's always interesting to see folks from Webex in court. Welcome to my Court.

MR. ALDERSON: I appeared on the monitor last time so

I don't know if you remember.

THE COURT: Yes.

MR. ALDERSON: But anyway, Jason Alderson, Morgan Lewis. I'm here for ACV Capital.

A little background, ACV Capital was one of the floor finance lenders. Our borrower is Tricolor Auto Group.

THE COURT: Okay.

MR. ALDERSON: We're owed over $18 million.

THE COURT: Okay.

MR. ALDERSON: And one of Mr. Gibbs' slides had the floor financing. There was --

THE COURT: Yes.

MR. ALDERSON: It was a nice slide. And it showed the waterfall and how the business worked. We were in the first two of those slides. I think a lot of Your Honor's comments and comments of Mr. Moran, our primary -- we filed a joinder in part to TBK's limited objection.

THE COURT: Right.

MR. ALDERSON: We also filed a limited objection. Our joinder was primarily requesting, or the thrust of it was a meet-and-confer requirement. Your Honor's already mentioned that she's going to call a recess and we're going to get together and figure out what kind of language needs to go in this proposed order. Put some guardrails on it.

One of the things that we want ACV needs and wants to

have is to be plugged into this process. The Trustee -- again, one of Mr. Gibbs' slides stated something to the fact that --

(Phone ringing)

MR. ALDERSON: Jesus Christ. I put this on silent. I'm sorry, that was my mom. Sorry about that.

(Laughter)

THE COURT: If Judge Larson's mom calls, we're going to take a break.

MR. ALDERSON: I deeply apologize.

THE COURT: So I completely understand.

MR. ALDERSON: I apologize, Your Honor.

One of Mr. Gibbs' slides stated that the Trustee early next week was going to meet and discuss mechanisms for a sale process. We've had one call with the Trustee. We'd like to have more calls with the Trustee. ACV runs an online marketplace. We sell 2300 cars a day in the wholesale market, 70,000 a month. We know how to do this. We're deeply concerned with the depreciation that is -- and it's only going to get worse as the 2026 models hit the showroom floors and are being sold in volume. We're also concerned about the loss.

We have ideas. We know how to sell cars. We have ideas on how to best maximize the value of the inventory. TBK, as mentioned, they're owed over $62 million. ACV is owed over $18 million. Origin Bank, Manheim, they've all claimed interest. This collateral has to go a very long way to make

people whole. It's imperative we come up with the most efficient process possible. It's not even clear if the estate has any equity in the inventory. I hope they do, because if they do, that means ACV is in a pretty good spot.

The other part of the joinder is something we saw today from TBK. They filed a supplemental objection at Docket 139, primarily seeking out of protection and priority administrative expense claim. We join in that objection to the extent they're using or going to sell our collateral or using it going forward on our operations motion. We're entitled to adequate protection. This is hereby noticed that we're demanding adequate protection. And to the extent there is diminution value, we also join in the request for a priority admin claim.

Now, shifting gears just a little bit, and I think most, if not all, of this is going to be covered by the recess, but Your Honor may remember the Vervent order --

THE COURT: Yes.

MR. ALDERSON: -- you entered on September 19th approving the Trustee's stipulation with Vervent as the servicer. And Vervent's, the scope of Vervent's authority was to secure, collect, protect the vehicle assets. And the parties got together online and spilled over the next day to come up with language, safeguards surrounding that order.

The Trustee's already modified their proposed order

for the motion to operate to state that collateral will be sold, or inventory won't be sold or expended during this operations period. But we'd like to see the other protections that were in that Vervent order translated into this order because the orders do overlap such as the ability to ACV as a lender to gain access to the inventory to the extent it needs to for regulatory or accounting purposes.

We also made the request, and this has already been covered in part, that the Trustee seeks to return cars to customers that Trustee believes the Debtor doesn't own. We're not wanting to get in the way of that. We're not wanting to hold that up, but we do want some reasonable advance notice to make sure that those cars are not owned by the Debtor and don't constitute part of our collateral or someone else's collateral. And it sounds like the Trustee in her testimony was not opposed to a vetting process. So we're requesting reasonable notice in that regard.

So, Your Honor, unless you have any additional questions for me, that concludes my remarks.

THE COURT: I don't think I have any other questions. I'm sure the Trustee shares the various parties' and the creditors' concerns about not only liquidating the estate in the quickest way possible but to maximize value, as well.

So I don't pretend to know the car businesses nearly as well as everyone here. But what I take from this process is

what I see from Ms. Burns as a Chapter 7 Trustee in other cases, as well as other Chapter 7 Trustees, is the ability to act under 721 and like statutes to operate and to protect and to establish a process.

And so if there is something more than that I think that can probably get hashed out in language, and I'm going to encourage that at recess. Because, again, as I said from the beginning, I shared the concerns. Obviously, guardrails were put around it once with the language, and I hope it can be further refined on break.

All right. Mr. Held?

MR. ALDERSON: Thank you, Your Honor.

THE COURT: Thank you, Mr. Alderson.

MR. HELD: Thank you, Your Honor.

Again, Michael Held here on behalf of ANC Ventures, LTD, and Bullish Resources, Inc., two of the landlords.

Your Honor, I'd refer you to our objection at ECF Number 125.

THE COURT: Yes.

MR. HELD: Dovetailing and/or transitioning from the lenders who you just heard from --

THE COURT: Sure.

MR. HELD: -- who are concerned, rightfully so, about getting their collateral and realizing upon their collateral, the landlords are in a little different position, which is

we're trying to keep the hole we have from getting bigger.

THE COURT: Of course.

MR. HELD: None of us -- well, I can't say none of us, but my clients, because I don't know, but my clients did not receive September rent. And what we heard from Ms. Burns today and from Mr. Gibbs in the proffer was that we are not likely to get paid our October rent. I mean, there is, they're not, they're going to have to come back to Court. There's not the money to do it right now, I doubt. I don't know what all the rent numbers are, but with 1.16 million and other obligations and no right to use the money, it's a pretty presumptive conclusion that we're not getting paid for October.

365(d)(3) is clear that the Trustee needs to pay their obligations post-petition as they come due. Obviously, we had the stub rent month, which we all know that is what it is, but October should have been paid timely. We know that's not going to happen. And so I'd like to refute what Mr. Gibbs said when he characterized our motion, and I know the joinder to our motion, as asking for relief that we need to file an affirmative motion for to get. I mean, 365(d)(3) says what it says. It's supposed to be self-effectuating. I don't think that we have to file a motion.

Yes, if they -- and oftentimes in cases, if rent is not paid timely, somebody will file a motion to compel rejection. But here, the writing was on the wall. And

frankly, in conversations, and not to go into any 408 conversations, but it became clear that October rent is not forthcoming. And so we are asking the Court to take the prophylactic measure in that we are going to be the vehicle, to quote a pun, but the vehicle upon which these vehicles are going to be either sold, returned, or what have you.

And essentially -- well, not essentially, Ms. Burns testified that they're going to try and market those. They're going to use the leases. They're going to try and market the leases to see if there's anything there. I applaud her. That's what Chapter 7 Trustees do and Trustees in 11s do. But here, we stand to lose not only the rent we haven't been paid so far, but we've got this month of October coming up. We're not getting paid. And that's in contravention of 365(d)(3). No requests have been made to abate that.

And we need some kind of guardrails, because what I heard Ms. Burns respond to me and questioning to was that there's no plan for how long those are going to be marketed. There needs to be structure here, and there needs to be some absolute cutoffs. Because again, what we would be entitled to, I'm sure they would argue, is an administrative claim. In this case, pardon me, but I don't put that much faith in it, at least right now, right.

I mean, this may be something where litigation goes on for a while, but administrative claims here are really at

risk. And again, not to say, boy, the lenders have it great, but the lenders at least have some collateral to look to. We do not. We just have our leases. And we have the desire to mitigate and get our premises back and find a tenant that can pay.

And so we'd really like to have this Court set up some type of parameters for either payment or rejection on a very short time frame. I mean, again, I know 23 days is not a long time, as I was listening to Mr. Gibbs speak. And I have no doubt that it is a fire hose that you have mentioned several times. But it is one of those situations where, with 60 locations, that certain of them in their Laredo location, which I was kind of harping on in my questioning, is one where there are no vehicles.

We own the personal property that's inside, which was leased to the Debtor pursuant to a lease that was admitted. There's nothing there. It's a small lot. That should be let go of. I mean, that should be rejected immediately. We just need to have some parameters here, and it needs to be established because we can't dig a deeper hole.

THE COURT: Thank you, Mr. Held.

MR. HELD: Thank you, Your Honor.

THE COURT: Ms. Hornisher, I'd like to hear from you now, because I figure you'd have similar concerns also being a landlord creditor.

MS. HORNISHER: Yes, Your Honor.

For the record, Audrey Hornisher with Clark Hill PLC, representing DB & BB Properties LP.

I won't belabor the point, Your Honor. You have heard today the situation that the landlords are put in. We're involuntary creditors. At this point, we're essentially financing the case. The Trustee has stated that she does not have intentions to pay October rent. We understand the Trustee's obligations and her duties to look through the finances, but we also understand the Trustee's obligation under Bankruptcy Code 365(d)(3) to timely satisfy lease obligations. It was stated in the record that that will not be satisfied.

We join with Mr. Held and his clients in certain parameters, whether that's the end of October, having to have lease rejections. These assets are quickly depreciating. We do have a number of vehicles on our premises. We are willing to work with the Debtor to quickly and efficiently either remove those vehicles or to get to a position where we can have this lease ready to be rejected or marketed. We understand it's their right to do so, but we need to have those parameters.

Right now, we've been left with nothing but wishes and dreams. And if we can have parameters, a timeline set forth in the order to give us some understanding of where we're going, that is at least something that these involuntary

creditors can hold on to instead of having the weight of this case put on their backs. Thank you, Your Honor.

THE COURT: Thank you, Ms. Hornisher. I appreciate that. Anyone else in the courtroom?

Mr. Catalanello on behalf of Wilmington?

MR. CATALANELLO: Thank you, Your Honor.

Gerard Catalanello from Alston & Bird on behalf of Wilmington Trust. Can you hear me okay, Your Honor?

THE COURT: I can. Thank you.

MR. CATALANELLO: Thank you. Well, first, Your Honor, I want to thank Mr. Gibbs and his team for working with Wilmington over the concerns that we had related to the proposed order.

And in fact, Your Honor, the language that you read from the redline in Paragraph 2 is language that we have proposed and worked on with Mr. Gibbs and his team. And we're comfortable that that language addresses the concerns that we've heard a lot about today, namely, that the Trustee's authority is limited by liens, claims, and interests; of course, contractual arrangements with third parties; and then the showstopper, Your Honor, that the Trustee will not liquidate or expend any assets without further order of the Court. And so, again, we want to thank Mr. Gibbs and the team for working with us to address those concerns. That's first.

Second, Your Honor, you know, I just feel obligated

to put on the record because of the statements by Mr. Moran and the colloquy between you and he regarding his client. You know, just to be clear, our client believes it has a material interest in the vehicles. Probably no shocker to you, but we do. We think we've got an interest. That's number one. Number two, Your Honor, and we've made this clear to the Trustee's counsel, that it's our position that only Vervent, as the backup servicer, has the ability, the authority, Your Honor, to service those vehicles and the property.

Again, that's not before the Court today. We look forward to working with Mr. Gibbs and his team to try to coordinate, come up with a protocol, a process that I think Your Honor is asking us to do so that we can address gating issues like what is and is not property of the estate. We're confident that we will have that process in coordination with Mr. Gibbs, and hopefully we can achieve that. If we can, great and, if not, of course, all rights are reserved, Your Honor.

And with that, I have nothing further to say at the hearing.

THE COURT: Thank you very much, Mr. Catalanello.

Is there anyone else who wishes --

MR. CATALANELLO: Thank you.

THE COURT: -- to be heard?

MR. ELROD: Briefly, Your Honor. This is John Elrod for Manheim.

THE COURT: Yes, please.

MR. ELROD: Your Honor, it's been alluded to several times, I believe by Mr. Moran, regarding Manheim's interest in certain vehicles that are in the Debtors' possession. We just want to make certain that to the extent any relief is granted, or any contemplated liquidation of vehicles goes forward, that Manheim is given an opportunity to review and object to any disposition of the vehicles.

We would also like to see the proposed language, I think the parties will be hashing out in the hall in a few moments. And I've emailed Mr. Gibbs, Mr. Helt, and Mr. Moran about that separately. So I just wanted to let the Court know.

THE COURT: All right. Thank you very much.

MR. ELROD: Thank you.

THE COURT: Anyone else on Webex who wishes to be heard today?

(No audible response)

THE COURT: All right. What I'm going to do is, first, Mr. Gibbs, do you wish to be heard before the Court takes a recess?

MR. GIBBS: Knowing that I'm holding up a quick recess, I'll be real brief. And hopefully we can spend some time that's productive. Just a couple of responsive comments.

The comments you heard from counsel for TBK, I think are symptomatic of what we've heard from TBK from, as I think

Ms. Burns said, an hour after she was appointed Trustee. That is, we want to take the collateral. We want to liquidate it immediately. And my opposition to their language in Paragraph 10 of their supplemental objection is that we're being ordered to go meet with them. We know what they're going to say. That is, give me the collateral, let us sell it immediately.

Your Honor asked the appropriate question of counsel for TBK. Do you claim that it's all yours, in so many words. Here's what we know. We know that they were attempting to exert control and move and secure all vehicles. Let me go through the VIN numbers and match them up with what's on the lot. We're only going to move those. We're going to move the vehicles. That process changed pursuant to the stipulation where the burden to secure those vehicles rests with Vervent, the servicer.

The servicer knows that not all vehicles that the Debtor owns are the collateral securing the loans that they are charged with servicing. That is, at its root, the problem. From what we know, a significant portion of the 10 or 11 thousand vehicles that have been identified as unsold have VIN numbers that match VIN numbers on the retail installment contracts that were sold and securitized. That's maybe one part of what the government's investigating.

And to say, let's immediately liquidate this, and you heard unsubstantiated testimony from counsel that the cars are

depreciating every day and they're subject to vandalism, subject to theft, and they're uninsured, all of that does not, I believe, make it appropriate to force the Debtor, the Trustee, to sell in a fire sale fashion at a bare rock bottom price when there are multiple competing claims to these same collateral, pieces of collateral. What we are trying to do is, as we said over and over, is run an expeditious process to maximize value.

I know the Debtor carried this inventory on its books at $140 million. We know the TBK is owed $60 million and got a $30 million paydown within 90 days of bankruptcy, we believe, although we're still trying to go through the records to verify. And what we know is that Manheim is claiming approximately 400 is their property. We know the other secured lender here today says 800 or 900 of it, we think we've got the first claim to. We've got the representatives of securitized lenders saying thousands of these cars may be, in fact, our collateral and not the collateral of the warehouse lenders.

We're trying to see and respond to significant interest in the public to see whether there is a quick whole co-sale that will bring to the estate more value than would get from rejection of the leases and a fire sale liquidation of the assets. We put six months into this operating order for one reason. We didn't want to have to come back after 30 days and say, can I have another 30 days, can I have another 30 days.

We thought it would take some period of time to do this. If Your Honor says that's too long, we'll live with what Your Honor believes. We thought it was appropriate.

It's certainly not, as was inferred, to give us the authority to let cars sit around for six months while we figured out what to do. It was to give us the opportunity to correctly analyze the assets, correctly analyze the causes of action, correctly try to figure out who's got the prior claims to it and what is the best way to sell these assets. That was the reason for the six months.

Your Honor, I'll hold off and we'll see where we go to see if there are additions that need to be had. The reason we didn't try to accomplish that before the hearing is we didn't think that the restrictions that were being asked for were appropriate in this order or needed. We put in what we thought to be all the assurance they needed, which was you just heard from counsel for Wilmington recite in the preamble of Paragraph 2.

There's no inconsistency because that language that Your Honor read to counsel for TBK says, "notwithstanding anything to the contrary, the Trustee cannot." There's no ambiguity. We have to come back. We have to come back and give notice to the parties who are claiming interest in anything we want to sell or encumber, and that's the way the process should work. This gives the Trustee the ability to do

the things that you were focused in on, and nothing more. And without spending any of the estate's money.

So, if we can't work it out, we're going to ask Your Honor to A, approve the motion. We're going to ask Your Honor to approve the request for extension of schedules. I don't think I need to spend any time on that. And we'd ask Your Honor to enter the order as we upload it. We'll, in good faith, like we always do, like we did on the 18th, see if there's suggested language that we think is A, necessary, B, appropriate and, C, doesn't unnecessarily and inappropriately hamstring the Trustee in the performance of her duties. If we can get there, great. If we can't, you know where we are. We think the order is appropriate. We'd ask Your Honor to approve it.

THE COURT: All right. Here's what I'm going to do. I am going to give the parties a recess. I'll give you 20, 30 minutes to see if you can come to language or at least get yourself, let's just say, a flow chart of what the bid and ask is between the parties.

I want to give you guys a little bit of guidance because I think that hopefully it'll short-circuit some otherwise bigger fights on recess is number one, I think that three months is more appropriate than six months. And the reason is we can come back in 90 days and, frankly, the Trustee will have something to report. You'll have a better idea of

what's been done, how long it took to secure and what, if any, other operational authority the Trustee is seeking.

I am very attuned to the need of the Trustee to not only do her 704 duties, but to have, let's just say, the toolbox necessary -- so we can stick with the car analogies -- to essentially protect, collect to the -- and I'm not trying to impede upon Vervent's territory, but to protect, collect, and do the necessary to essentially get her hands around what she has, what she doesn't have. And as strongly as I think that TBK and some of the other creditors believe that they have security interests in these vehicles, and I know that there is some, hindsight tells me that there's going to be some competition over these issues.

Likewise, I believe that, not that it's necessarily going to take a full 90 days, but I think that what this case likely needs in addition to just access to information, of course, is a little bit time to develop the best process, right? Whether that process is a straight sale where you try to sell everything at one time and collect the money subject to everyone's security interests, or if it's to piecemeal things because lots can be sold at higher value in smaller pieces. I don't know why that would be the case, but it certainly could be.

But I think that the case needs a little bit of time for that. Obviously, all of these things are to come because I

don't have the pleadings in front of me, but if the Trustee is going to seek to hire Capstone, if the Trustee is going to seek the potential for a DIP, things of this nature change the landscape in which we're all kind of operating and may change people's minds about things. It also brings, so we can take a trip to the 365 path, it also gives a little bit more clarity, comfort, and the like to the real estate landlords.

The Court is very cognizant -- we see this a lot in retail cases where you're running GOB sales off of the backs of landlords. The Court is cognizant of that. I'm unfortunately familiar with 365(d)(3). I've had to litigate it a number of times in my life before I sat on the bench. But what I'll say with respect to 365 is this. If there's anything the Code gives you it's a whole toolbox of things for the real estate landlords, whether that be motions to compel.

And at the end of the day, at a minimum, the Chapter 7 Trustee has 60 days to assume or reject. We're still well within that time period. I recognize your 365(d)(3) rights, but I also don't believe that there's any authority that they're so self-effectuating that they can be imposed under any order. And so I don't want to go too far into that because, again, I recognize that there are probably more motions to come with respect to those issues.

I am certain that this is an issue, especially as the sale process would be crystallized, that is going to be on the

Trustee's mind as to when to reject various leases once she's able to collect the assets. And I think that we all need to kind of understand the deep breath that we have to take to allow Ms. Burns to collect the information, to access the information necessary without the benefit of a single schedule, without the benefit of even a creditor's matrix to figure out what the estate has here.

I certainly want to maximize for all constituencies, but I think that unfortunately what that means is it's going to need a little time. I do believe that that needs some consultation. So if you think about this in the way we would think about a DIP process or a plan process or even a sale process, there's always going to be those consultation parties and who gets to be under the tent and gets to talk with people. I think that's important here.

But I also, again, I'll tell you, Mr. Moran, I don't -- and Mr. Alderson, I don't like to dictate those things. I like it to be a little bit more organic than that. But I do believe that secured creditors of the nature of your client obviously deserve to be kept in the loop and consulted with and conferred with as the process unfolds for the bigger part of the sale process that's to come. All of that is a long walk to a recess. The Court will plan to come back out at 4:30. If y'all need more time than that, you let me know.

Mr. Gibbs is back.

MR. GIBBS: I forgot to say one --

THE COURT: Have you already done it?

MR. GIBBS: No. I forgot to put on the record one thing. The order that we uploaded does not have a sentence that we agreed to put in it.

THE COURT: Okay.

MR. GIBBS: And so if we can't work something out, what we upload will have an additional sentence which just says what we think is obvious, that nothing in this order would contravene any of the relief granted on the 18th in the earlier order.

THE COURT: Okay, fair enough. Does everyone that needs a copy of what's at 142, does anyone else need extra copies? Mr. Williams seems to have about 300 of them.

Anything else?

(No audible response)

THE COURT: All right. Is there anything else that the folks want guidance on before recess?

(No audible response)

THE COURT: All right. So with that, Court will stand in recess until at least 4:30. Like I said, if you tell Mr. Robinson you need more time, you'll get it.

MR. GIBBS: Thank you.

MR. MORAN: Thank you, Your Honor.

THE COURT: You're very welcome.

THE CLERK: All rise.

(Recess at 4:09 p.m./Reconvened at 4:47 p.m.)

THE CLERK: All rise.

United States Bankruptcy Court for the Northern District of Texas is once again in session with the Honorable Michelle Larson now presiding.

THE COURT: Please be seated.

All right. We're going to go back on the record -- give me one moment -- in Case Number 25-33487. When we last broke, the parties wanted time to consider a proposed form of order for the Trustee's 721 motion. And we also have to, before we finish up, address the Trustee's motion to extend time to file schedules. Mr. Gibbs?

MR. GIBBS: Thank you, Judge, and for the courtesies extended to give us time to visit to see if we could narrow issues or maybe --

THE COURT: Sure.

MR. GIBBS: -- even resolve them. I'm not sure exactly where we are other than we didn't want to have this run on interminably. We took comments that were give to us after we broke from various of the parties. We met by ourselves. We've incorporated those changes which we thought we could live with, sent it back to everybody at the same time. It was five minutes ago or so.

THE COURT: Sure.

MR. GIBBS: So I believe maybe the best -- I'll learn it in real time when they come up and tell us whether they're okay with these changes or not. So maybe that's the best next step.

Just to respond to a comment you just made, do we need to take up the motion for extension of time after this or were you prepared to rule just kind of --

THE COURT: I am prepared to rule. I don't think that I saw any objection to that relief. I think you stated in your presentation or in your proffer of Ms. Burns' testimony that you did have an opportunity to address it with the United States Trustee. I appreciate that the government shutdown there on a skeleton crew, at best. So given that there is no objection, the Court will grant the order as requested to extend the time to file the schedule of assets and liabilities and the statement of financial affairs and authorizing but not directing the Trustee to prepare and file those. I think the extension is requested through November 10th, and the Court will grant that.

MR. GIBBS: Before I yield the podium, one suggestion or guidance that Your Honor gave us was that you thought 90 days sounded like a fair amount of time. We agree, 90 days I think is New Year's Day. So what we have done is --

THE COURT: Sure.

MR. GIBBS: -- propose language that gave her

authority under this order until January 9th which is 98 days, but I didn't want Your Honor to see that if you get to an agreed order and say, oh, you just took liberties with my suggestion, so.

THE COURT: No. I can't work a calendar very well, but I do appreciate my holidays. Thank you very much.

All right. Mr. Foxman?

MR. FOXMAN: Good afternoon, Your Honor.

Brad Foxman on behalf of TBK Bank. We were able to exchange comments with the Trustee's counsel in the hall. All of our comments except one was accepted. They circulated a proposed order that we are okay with, subject to the one comment that I believe is in dispute.

THE COURT: Sure.

MR. FOXMAN: And that comment for which we'd seek Your Honor's ruling is that the evidentiary cross-examination, the testimony elicited by Mr. Moran reflected that the Trustee was only seeking 721 authority with regard to Tricolor Holdings, LLC. The order is drafted as authority for all Debtors to have -- or for the Trustee to have 721 authority as to all Debtors. So we object to that authority being for all Debtors --

THE COURT: Okay.

MR. FOXMAN: -- and request that the order provide that it only be for Tricolor Holdings, LLC. Mechanically, that

can be addressed through one small change in the order in Paragraph 2 where it says "to operate the Debtors' business," we would request that it say, "to operate the business of Tricolor Holdings, LLC."

THE COURT: Okay. Well, I guess that kind of begs the question, though, Mr. Foxman, and I do understand that from an evidentiary perspective the request. So if we make the change in Paragraph 2 that you're requesting and then we get down to 2A when it says "securing all of the Debtors' locations and assets," do you object to the securing of the locations and assets?

MR. FOXMAN: We do not object to the securing of locations and assets, but as to the other 721 relief. I mean, we're not objecting to securing the data and business records or securing the data and access. I mean, I guess Your Honor's point is if we're limiting to a defined list, then it should resolve our objection to some extent.

THE COURT: Okay.

MR. FOXMAN: We think --

THE COURT: Well, I think that that's where we probably need the clarity is if we're going to limit it -- and I understand the evidentiary record. If we're going to limit it, then what are we going to do with the other A through F?

MR. FOXMAN: Fair comment, Your Honor. Fair comment.

THE COURT: If you want time to consider it, that's

fine, too.

MR. FOXMAN: I think that if we're limiting to the specifics of A through F, then it's moot.

THE COURT: Okay.

MR. FOXMAN: Thank you, Your Honor.

THE COURT: All right. Thank you, Mr. Foxman.

Is there anyone else who wishes to be heard with respect to the form of order? I know that there's one been circulated. I'm not sure how many of the folks on Webex. I'll start with you, Mr. Alderson.

MR. ALDERSON: Thank you, Your Honor.

Jason Alderson, Morgan Lewis, for ACV Capital.

I think this comment stems from my confusion on how the language in the revised draft that states something to the fact that the Vervent order controls to the extent not, or to the extent it's not inconsistent or -- anyway, the Vervent order will control over the new order to the extent that it's not inconsistent.

This has to do with the control securing of the Debtors' assets. There was language in their Vervent order that stated that Vervent had to provide ACV and other creditors, lenders with its plan to secure those assets. At the time, there was a lot of discussion about consolidating the vehicles across locations, the three, four, handful of sites. ACV was extremely concerned with the expense of doing that,

particularly when we're trying to run an efficient sale process. And that's why that language was put in there.

The Vervent order has other language with states that it expires, it's either going to expire on its own as to Paragraphs 4 and 5 in the middle of the month. There's also language in there that states that there's going to be a hearing as to the order itself, whether that would be continued. And that hearing is going to be scheduled for October 15. So just to make sure those safeguards that we negotiated over 36 hours on September 18th and 19th are brought into this order, I think they need to be actually brought into this order.

And that means that we request to the extent that there's any plan to consolidate the assets that we're given prior notice of that. We also would want the ability to inspect the collateral for accounting or regulatory purposes. These are two safeguards that are in the Vervent order, and I'm now concerned that those are going to be lost.

THE COURT: Okay.

MR. ALDERSON: Thank you, Your Honor.

THE COURT: Thank you, Mr. Alderson.

Mr. Lawrence?

MR. LAWRENCE: Your Honor, I hope I'm not stepping on anybody's toes. But the language that we had asked for and that the Trustee had agreed to in a new Paragraph 11 is,

Mothing in this order modifies this Court's order granting Chapter 7 Trustee's motion for entry of order approving stipulation between Trustee and Vervent at Docket Number 79." So I think that's pretty clear as far as the language that's going to be submitted to the Court that we are not proposing to make any modification to that order or to any of the periods or access rights or anything else that are set forth in that order.

THE COURT: All right. Thank you.

MR. GIBBS: Your Honor, just a brief response to Counsel's request that the agreements they reached with Vervent that resulted in the inclusion of language in the order approving the stipulation that's binding on Vervent, that was between them and Vervent. This is our motion. This is the request that we made for authority from you to take the limited actions even though we have no money to do any of that right now, and we think it's inappropriate to craft or graft into our order obligations that and impose it on Vervent when they're not a party to this motion.

So I don't see the appropriateness or the benefit of somehow taking a portion of an order approving the stipulation and making it binding on the Trustee here when that was an obligation that Vervent agreed to with respect to the collateral that Vervent was given authority to take and secure. And they have the authorities that the stipulation and order

give them, and there is a sunset provision as you were just reminded of.

And to the extent that there are concerns that arise because of the sunset of that order, it will be taken up at a subsequent hearing. But I don't think it's appropriate to include those provisions that counsel just referred you to into our order.

THE COURT: Okay. Thank you, Mr. Gibbs.

Does anyone else wish to be heard with respect to the 721 order?

MR. CATALANELLO: Your Honor, may I be heard?

THE COURT: Yes, you may.

MR. CATALANELLO: Thank you. Gerard Catalanello again from Alston & Bird on behalf of Wilmington Trust.

Your Honor, we're looking at this obviously in real time and, of course, I wasn't in the Court when this language was getting bandied around.

THE COURT: I haven't seen it either --

MR. CATALANELLO: Yeah.

THE COURT: -- if that helps.

MR. CATALANELLO: I mean, just a quick reaction to Paragraph 4, and that's a paragraph I'm looking at right now.

I guess number one where it talks about the Trustee filing a notice of intent to return, I assume that notice will be on all parties in interest. I mean, it has to be broad

notice to allow folks to, you know, raise any concerns to the extent that they have them. So number one, make sure that the notice goes out to all parties in interest.

And then secondly, it talks about 48 hours to object. That does seem to be a very short period of time to object to what could be a substantial issue in this case. And so I'd ask folks to think about a longer period of time. But really, maybe the main point, Your Honor, it talks about returning the asset "to the appropriate owner." I don't know what that means. I think that, for example, for a property that we belong -- that belongs to the trust, it would be serviced by Vervent. So we, of course, would want Vervent to be inserted into Paragraph 4. So maybe it's appropriate owner or Vervent, as applicable.

But it's a long way of saying that I think this paragraph, I understand the intent and I certainly don't have a problem with it, but I think it needs to be refined a little bit. And I would just ask that, you know, the Debtors take into consideration some thoughts and comments that Wilmington and I'm sure others may have in that regard.

THE COURT: All right. Thank you, Mr. Catalanello.

MR. GIBBS: Could I respond, Your Honor?

THE COURT: Yes, please.

MR. GIBBS: The concept was suggested by one or more of the objectors, and the language was an attempt to craft an

acceptable compromise. The interests that have to be balanced are the appropriate notice to the parties who make claim and interest in the car that we believe, the vehicle we believe is not property of the estate. The 48 hours is trying to balance that prior need I just mentioned with the need of a consumer to get their car back. It's stuck here. And whether it's --

THE COURT: Do you want to put the language up on the screen? Because I'll be honest, it's not in my Paragraph 4 that I know of.

MR. GIBBS: Yes, Your Honor.

THE COURT: Thank you, Mr. Williams.

MR. GIBBS: It probably would be helpful if you saw what we were arguing about.

MR. WILLIAMS: I have to rejoin the meeting. Just one moment.

THE COURT: Okay.

(Pause)

MR. BAKER: Your Honor, if I may, while we wait? Your Honor, if I may, for the record, Nicholas Baker of Simpson Thacher on behalf of JPMorgan while we wait?

THE COURT: Sure.

MR. BAKER: I've requested to get a copy of this revised order. I have not seen it yet. So if I could just respectfully ask someone from the Trustee's side to distribute that to us.

THE COURT: All right. And --

MR. GIBBS: We will, Mr. Baker. It's oversight on our part.

THE COURT: All right. Do you and Mr. Hesse --

MR. BAKER: No, of course. Thank you.

THE COURT: -- represent the same client?

MR. HESSE: Yes.

THE COURT: Yes, okay. All right. And has it been sent at least to Mr. Hesse?

MR. HESSE: No, it has not.

THE COURT: No.

MR. GIBBS: No.

THE COURT: Okay. Send to one of them.

MR. GIBBS: Two apologies.

THE COURT: Yes. Thank you.

MR. GIBBS: One virtual and one in the courtroom.

THE COURT: Sure.

MR. GIBBS: The copy is on the way to Mr. Hesse and Mr. Baker.

THE COURT: Okay.

MR. GIBBS: They hadn't filed an objection and we were sending stuff out to people that had appeared and made comments or objected and we just, moving too fast.

This new paragraph, Your Honor, we think it's a very limited subset of vehicles where there's a car trapped on the

lots that doesn't belong. It belongs to a customer who bought it. And to the extent that they want a return of the vehicle, we want to be able to accommodate them and lessen their disruption that's gone on because of this freefall into Chapter 7. We thought it was a process of getting the VIN number and we'd have to get it from Vervent.

We currently don't have the ability with the manpower of the Trustee to go out to each lot and deal with it. We're going to be dependent on a third party giving us the VIN number which we were going to blast out to people and say, match it against your records, 48 hours should be fast enough. And if Your Honor thinks it's not fast enough, when we think it's a matter of getting the VIN number on the vehicle and matching it against your records, then we're certainly going to take the Court's direction on it.

We were trying to balance the harm to the consumer and the opportunity for a party on this limited, what we think is a limited subset of vehicles, to have a chance to verify that what we're being burdened with the task of then filing the notice out and abandoning or returning the property was the right balance.

THE COURT: And this is not necessarily like a vehicle that's been put in the shop for repairs. This is a vehicle that is on a retail lot that you think may have been sold to a third-party customer.

MR. GIBBS: We're not certain.

THE COURT: Okay.

MR. GIBBS: We're dealing with a bit of an unknown, trying to craft language to deal with what we hope is a limited, maybe hypothetical problem. It may be a car sitting up on one of the repair bays and there was nobody to bring it back down to the ground and nobody had the ability to go in and get their car back.

It may be one that's been purchased and that's sitting on the lot and hasn't been delivered. That seems to be a little more unlikely, but we can't really articulate all the potential situations that this is intending to govern. We were just trying to figure out a way to, when it's appropriate, get property that isn't in the Debtors' estate, that has no ownership interest in or right to claim, back to the rightful owner.

THE COURT: All right. Mr. Foxman?

MR. FOXMAN: Thank you, Your Honor. One comment on this language. We had understood that the intent was to return to consumers and customers the vehicles, which we're absolutely fine with. We did not think the intent was to deliver those vehicles to Vervent or to a trust or to other financial entities.

THE COURT: Certainly.

MR. FOXMAN: And so we would ask that this language

be tinkered with instead of to the appropriate owner, something along the lines of the appropriate consumer, customer, owner, as I think that's the intent. Thank you, Your Honor.

THE COURT: Yes, essentially something that's not property of the estate at all. Well, I think that taking the collective comments from Mr. Alderson and Mr. Foxman, et cetera, I guess what I'm having a little bit of trouble with is we have an order that says, "From the date of this order, Vervent shall take responsibility for and account for all vehicles owned by the Debtors, including properly securing all vehicles, protecting all vehicles from theft, vandalism, or damage, and obtaining and accounting for all keys, license plates, and related titles."

And then maybe this is part of the Court's confusion. If Vervent is doing this, then what is the Trustee doing with respect to the cars themselves? Or is there a subset of cars that Vervent is doing this for that is not the same vehicles that the Trustee would otherwise be securing?

MR. GIBBS: We don't believe there's a separate subset that the Trustee should have the primary burden of protecting.

THE COURT: Okay.

MR. GIBBS: We did believe that that burden and responsibility shifted to Vervent and that their request and their client's request, they wanted that over all vehicles,

even though we think it's clear that the parties that Vervent represents under the servicing agreements don't have an ownership or lien position on all vehicles. But they took that responsibility.

So one of the things this provision was attempting to do was if they're going to then, we've got to go get that VIN number and we have to notice it out rather than rely on Vervent noticing it out to all parties. We wanted to, if we're going to take that burden on it, at least be able to pretty promptly get it back to the customer.

And I have no problem with Mr. Foxman's suggestion that we limit it to consumers, because that was the intent of the discussion. It wasn't, oh, we're looking at this one now, and it looks like it might be a repo car belonging to -- or the loan was owned by an entity that's not a Debtor. That's not what Paragraph 4 was trying to do to say, okay, any of those cars, they're going back to somebody else, not the consumer on 48 hours' notice.

THE COURT: All right. Thank you, Mr. Gibbs.

MR. ALDERSON: Your Honor, if I may?

THE COURT: Please.

MR. ALDERSON: Jason Alderson for ACV Capital.

Your Honor, you hit the issue right on the head in that Vervent took control of the vehicle assets, and that's a defined term in that order approving the stipulation. It's the

Debtors' inventory. This order, the operations order, gives that same duty to the Trustee. So we look at that as the same overlap. We negotiated those protections, safeguards, procedural, whatever you will, with Vervent. We view them, they apply in the same degree, the same applicability to the Trustee.

And what we're asking for are just accounting -- this is not onerous relief or an onerous request. We view this as eminently reasonable. We're just asking for accounting rights. And if the Trustee is going to embark on an endeavor to consolidate cars and move them all over the country, we'd like to be plugged into that process to understand why we're doing that. It's part of the same reason why we wanted the meet-and-confer rights on a sale process so that's run efficiently and we maximize the value of the assets.

Thank you, Your Honor.

THE COURT: Okay. Well, I think that one of the issues is literally in the language itself, which is in the Vervent order at Docket 79, Paragraph 7, it specifically says, "Vervent shall take responsibility for and account for all vehicles owned by the Debtors." And I think that what -- the language is gone. But that said, essentially, assets that do not belong to the Debtors, if they are determined to be owned by, I assume, a third-party consumer, then the Trustee shall be authorized to do X after 48 hours.

Obviously, giving the Trustee the authority to -- thank you very much, Mr. Williams -- to file a notice of intent to return physical possession of a vehicle asset that doesn't belong to the estate, I don't think has the same touch to the Vervent order that it otherwise would have. But, I do believe that some time could be spent with Paragraph 4 that gives the parties a little bit more time to consider whether or not they agree that something belongs or doesn't belong to the estate.

And so I guess the question is I don't want to watch the sausage get made necessarily. But I believe that there's obviously, there should be some process by which the determination is made that it's not property of the estate, that the estates hold no ownership rights in something, whether that's coupling it with Vervent's records and the various secured creditor records.

I think an abandonment process is too extreme on one end because that's going to be way too onerous and too long for, frankly, a consumer to get their vehicle back if the Debtor has no ownership interest in it.

I guess the question is, do the parties want to take a shot at agreeing upon some language or do you want the Court to draft it? I mean, I'm happy to. I just don't know that it would serve everyone's purposes, but I'm happy to do it myself.

Mr. Foxman?

MR. FOXMAN: Thank you, Your Honor.

I think our suggestion would be to limit the language to just the consumer-customer assets and then have Your Honor decide the appropriate amount of time for the return, and we think that could bridge the gap.

Mr. Alderson, does that address your objection?

MR. ALDERSON: Your Honor, I think we were talking about two different issues --

THE COURT: Let's get to a mic if you don't mind. Thank you.

MR. ALDERSON: Your Honor, Jason Alderson, ACV Capital. Mr. Foxman's suggestion works for ACV.

THE COURT: Okay.

MR. ALDERSON: But I think we were talking about two different issues. I was speaking to the language in the Vervent order granting ACV and other lenders with accounting -- ability to inspect the collateral for accounting or regulatory purposes and also to be given prior notice of the Trustee's plan for the collecting and securing and the protecting of the assets, which includes the Debtors' inventory, because that's going to be the Trustee's job now.

And the Vervent order is --

THE COURT: We're not changing the Vervent order is my understanding from Mr. Lawrence.

MR. ALDERSON: That is correct, Your Honor.

THE COURT: Okay. I think that what we have on

display here is what the Court was concerned about from the beginning, which is to give some time for there to be a process, give some time for there to be a thoughtful process, and I'm not sure that doing it from the bench is the very best way to do that. Like I said, I'm happy to go back to my chambers and start drafting, but I don't think that I'm going to have in my head everything that every party needs or wants in this process.

I think that the best plan at this juncture to address the Trustee's need to operate to honor the previously negotiated and ordered Vervent order is to, A, we're going to keep the Vervent order in place as per the language. Obviously, the various lenders, TBK, SSB, Origin, and ACV still have all of the rights that they have under that order, whether it be for regulatory purposes, vehicle collateral inspection, and the like.

And I think that what I'm going to do for this order in that Paragraph 4 language is, number one, relegate it to consumer -- it returns to consumers. Why don't you give me the language, Mr. Williams, and I'll just draft it.

MR. ALDERSON: I had nothing else, Your Honor. Thank you.

THE COURT: Okay, thank you, Mr. Alderson. I appreciate that.

MR. CATALANELLO: Your Honor, may I be heard?

THE COURT: Yes.

MR. CATALANELLO: Yeah, I think the concern that Wilmington still has is, and I understand the intent is to return cars to consumers to the extent that the consumers are entitled to them. But I am concerned about any collision between this Paragraph 4 and the Vervent order, called the Vervent order. I'm concerned about that. And secondly, in terms of returning cars to the appropriate owner, we have to be sure that if there are subject to liens or repossession rights, that those rights and claims are not being avoided or ignored.

I just think, Your Honor, we're putting something in an order here that could be misinterpreted, that could be used in a way that folks don't intend it. And I'm just not certain why we need to address that now, meaning it seems to me that this process, this protocol, should better be dealt with by a separate motion that folks can look at and weigh in on when it comes to dealing with returning vehicles to consumers. I just feel like we're putting a square peg in a round hole, for lack of a better phrase.

THE COURT: Okay. Thank you, Mr. Catalanello.

Mr. Gibbs?

MR. GIBBS: Your Honor, I don't believe the Trustee has any problem with deleting Paragraph 4. We tried to put it in on the fly to accommodate some requests from parties. Everything that I just heard from Wilmington's counsel has a

ring of logic to it.

THE COURT: Okay. Is there anyone who was the proponent of Paragraph 4 that wishes to be heard?

MR. ELROD: Your Honor, we would support -- this is John Elrod on behalf of Manheim. We think Paragraph 4 is more appropriately addressed in a separate motion. We certainly don't want to hang up consumers whose vehicles are caught in the machinations of this case, but I don't know that it's appropriate for the Court to consider this on the fly with parties with competing interests this afternoon or this evening, as the case may be.

THE COURT: All right. Thank you, Mr. Elrod.

Well, again -- please, Mr. Foxman?

MR. FOXMAN: Your Honor, there is a part of the defined list of authority in 2F to return customer vehicles not owned by the Debtors. And I think this --

THE COURT: And that's what --

MR. FOXMAN: -- this is how this develops.

THE COURT: Okay.

MR. FOXMAN: So if we take out Paragraph 4, then our request is we also need to take out 2F to conform.

THE COURT: Okay. Mr. Gibbs?

MR. GIBBS: Your Honor, I hate to disagree at 5:00 on Friday, but I disagree. I don't think one follows the other. The order gives us the authority but doesn't order us to return

the vehicles. We can't, with the prohibitions you identified when you quizzed counsel for TBK, we can't -- we don't believe we can do it without further order of the Court. In any event, we tried to craft this here to create an opportunity to not further disadvantage consumers here, but we can do it with a separate order.

I don't think it's appropriate if we take 4 out to then take out the authority given when we're not going to do it unless there's further order of the Court. So I would leave 2 the way it is and just decide yes or no whether 4 -- the best thing to do now is take 4 out.

THE COURT: Mr. Foxman?

MR. FOXMAN: Your Honor, the limitation above in the lead-in is regarding liquidating or expending assets of the Debtors' estates. So it doesn't limit customer vehicles not owned by the Debtors. So it would not --

THE COURT: Okay, so let's take it apart. It says, "The Trustee is authorized to take actions which may include but not limited to undertaking the following actions" -- which the former English teacher in me is literally, my head's blowing up right now --

MR. FOXMAN: Your Honor?

THE COURT: -- is A through F --

MR. FOXMAN: There's changes to that, as well.

THE COURT: Right. And then in the middle of that is

a "Provided, however, that notwithstanding anything to the contrary and the following actions and all events remain subject to existing liens, applicable contractual arrangements, and the Trustee may not liquidate or expend assets of the estate or in the Debtors' possession without further order from the Court."

I think I know what the intent is. Again, I'm happy to spend some time with this if you'd like me to, and it will have better grammar and English at the end.

But I think, and correct me if I'm wrong, Mr. Gibbs, you are couching A through F with the "provided however" that the Trustee shall -- that all of this shall remain subject to existing liens, interest, et cetera, applicable contractual agreements and arrangements with third parties, and that you're not going to liquidate or expend any assets of the estate or in the Debtors' possession without further order of the Court?

MR. GIBBS: That's exactly right. And the key phrase that Mr. Foxman glossed over is "or in the Debtors' possession." And I think Vervent holding it is constructive possession for the Debtor, and we did think that F was something we couldn't do without further order of the Court. It's not just property that's in the Debtors' estate. It's in the possession of the Debtor. So we have the burden on that, and that's what we're trying to accommodate.

THE COURT: Mr. Foxman?

MR. FOXMAN: If that's the intent, that it's without further order of the Court, then that satisfies our concern.

THE COURT: Okay. Thank you.

All right. Anyone else wish to be heard with respect to the language in the order?

(No audible response)

THE COURT: Okay. Hearing no further responses.

I am going to give the Trustee authority to operate pursuant to Section 721 of the Bankruptcy Code. I believe that for a number of the reasons that the Court has articulated on the record, as well as those that are articulated in the motion, the Trustee needs some rope to do the necessary to investigate and access the books and records, use those books and records to prepare schedules of assets and liabilities and based upon what she finds the possibility of purchasing insurance and the like if the same is not there to protect the estate's assets.

Likewise, I think she needs this authority, this limited authority to operate, to be able to assess the leases, eventually assess causes of action and the like. But without some minimal operating authority, I'm just not sure how in an instance such as this where Ms. Burns has been essentially not just handed the keys, handed thousands of sets of keys at least constructively, that she can otherwise do the necessary to move this case forward.

I certainly understand and take to heart each of the secured creditors' positions, the landlords' positions, as to essentially the holding pattern that puts the parties in. And we already have one hearing on the 15th. It looks like we're going to be having more hearings in the coming weeks with respect to the various professionals that the Trustee has indicated that she wants to hire. I think that that process will give us a lot more information.

I think that the other things that the parties need to do as they sit down and confer is focus on that which is in front of the Trustee in terms of protection and securing and things of that nature but then, immediately after that or commensurate with that process, focus on what I'll just call logistics and process. What is the sale process going to look like? Have everyone give their import on that.

Obviously, as Mr. Alderson was saying, you have a lot of people here that are in the business of selling vehicles and that probably could kind of be helpful in that regard. But at the same time, I think that the Trustee has to do her own diligence and make sure that she is proceeding with a process that ensures the maximization of the value of all of the estates. And I recognize that everyone has not only competing interests but has competing hands out and hands up at this time.

So I think that in this particular instance, Ms.

Burns is more than capable Trustee. And I believe that the Trustee is doing her level best. With that, obviously, I think this hearing has been helpful in that it just highlights or cements for her what the competing issues are, the various issues that you may think you have a handle on everything and then your landlords pop up and say, hey, what about us? What about your 365(d)(3) obligations and the like?

So all of this to say, I think that over the coming weeks, the Court will want to see more progress, should I say, as to the processes that the Trustee plans to put in place to kind of bring some order to it. I mean, we have obviously Vervent on board as it pertains to the loan process and the security of the vehicles. But there's just a lot more to come and that's what the Court is going to give some time for.

I will allow you, Mr. Gibbs, to circulate the form of order that you have. It looks like Mr. Hesse, Mr. Baker, a few others probably are seeing it for the first time. And then once you send it up to the Court, I'll know as an officer of the Court that that is not subject to any further objections.

Likewise, as it pertains to the issues relative to cars being returned to consumers and the like, I think that's just another really good area where an agreed-upon process kind of makes sense. Forty-eight hours may be too quick. Five business days may be too long. I think that there's something -- if everyone has a point of contact that we could establish

what does and doesn't belong to the estate and develop a process, it's not unlike Chapter 11 cases where we have streamlined processes for drawing out objections, so that we can do that on an expeditious path. So maybe that's what we do for the consumer vehicles.

Similarly for leases, if there were at least 60 locations, as I've heard, maybe a process for rejection of leases makes sense in this Chapter 7. If not, we do have a red letter day coming up under 365 with the 60-day period. So all of those are just suggestions of things that we can talk about in the future as the case progresses a bit.

I will tell the parties, because I know things are happening urgently and quickly in the case, the Court will not -- I will not be on the bench next Thursday and Friday. So if you file motions to expedite, it will not be next Thursday and Friday. I'll be off the bench.

Is there any other questions for the Court? Anything else for us to discuss today?

MR. GIBBS: Hang on one second, Your Honor.

THE COURT: Of course.

MR. GIBBS: We just circulated the order we think incorporating the changes that --

THE COURT: Okay.

MR. GIBBS: -- we put on the record and hopefully we'll hear back and we'll wait to upload till people have had a

chance to respond.

THE COURT: Excellent. Do you think it's urgent that you receive it tonight or can it wait until Monday? Be honest.

MR. GIBBS: It can wait until Monday.

THE COURT: It can wait until Monday?

MR. GIBBS: Yes.

THE COURT: Okay. Signing is easy. Entry is something that takes a minute. So Ms. Harden appreciates my question.

MR. GIBBS: Well, we --

THE COURT: And my job here is to keep Ms. Harden happy.

MR. GIBBS: We have imposed on your time and your staff's time and we appreciate it.

THE COURT: All right. Anything else, ladies and gentlemen?

MR. GIBBS: No, Your Honor.

THE COURT: All right. Well, with that, I know I'll be seeing more of you all soon, so.

MR. GIBBS: Thank you.

(Proceedings adjourned at 5:30 p.m.)

* * * * *

C E R T I F I C A T I O N

I, DIPTI PATEL, court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.



______________________

DIPTI PATEL, AAERT CET-997

Expires: December 6, 2026

Liberty Transcripts                Date: October 6, 2025