**HUNTON ANDREWS KURTH LLP**
Timothy A. ("Tad") Davidson II (Texas Bar No. 24012503)
Gregory G. Hesse (Texas Bar No. 09549419)
Ashley L. Harper (Texas Bar No. 24065272)
1445 Ross Avenue, Suite 3700
Dallas, Texas 75202
Telephone: (214) 979-3000
Email: taddavidson@hunton.com
      ghesse@hunton.com
      ashleyharper@hunton.com

**SIMPSON THACHER & BARTLETT LLP**
Elisha D. Graff (admitted *pro hac vice*)
Alan Turner (admitted *pro hac vice*)
Nicholas E. Baker (admitted *pro hac vice*)
425 Lexington Avenue
New York, New York 10017
Telephone: (212) 455-2000
Email: egraff@stblaw.com
      aturner@stblaw.com
      nbaker@stblaw.com

*Attorneys for the SPV 4 Agent*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | : | Chapter 7 |
| | : | |
| TRICOLOR HOLDINGS, LLC, *et al.*,[1] | : | Case No. 25-33487-MVL |
| | : | |
| Debtors. | : | (Jointly Administered) |

**LIMITED STATEMENT IN SUPPORT AND RESERVATION OF RIGHTS OF THE SPV 4 AGENT WITH RESPECT TO THE CHAPTER 7 TRUSTEE'S <u>CASH COLLATERAL MOTION</u>**

---

[1] The Debtors in these chapter 7 cases are as follows: Tricolor Holdings, LLC, TAG Intermediate Holding Company, LLC, Tricolor Auto Group, LLC, Tricolor Auto Acceptance, LLC, Tricolor Insurance Agency, LLC, Tricolor Home Loans LLC dba Tricolor Mortgage, Tricolor Real Estate Services, LLC, TAG California Holding Company, LLC, Flexi Compras Autos, LLC, TAG California Intermediate Holding Company, LLC, Tricolor California Auto Group, LLC, Tricolor California Auto Acceptance, LLC, Risk Analytics LLC, Tricolor Tax, LLC, Tricolor Financial, LLC, Tricolor Auto Receivables LLC, TAG Asset Funding, LLC, and Apoyo Financial, LLC.

JPMorgan Chase Bank, N.A. (the "**SPV 4 Agent**"), in its capacity as Administrative Agent for the warehouse financing lenders (the "**SPV 4 Lenders**") under the SPV 4 Credit Agreement (as defined below), through its undersigned counsel, files this limited statement in support and reservation of rights with respect to the *Chapter 7 Trustee's Emergency Motion for Entry of Interim and Final Orders Authorizing the Use of Cash Collateral and Granting Related Relief* (ECF No. 255) (the "**Cash Collateral Motion**").[2]

## PRELIMINARY STATEMENT

1. The SPV 4 Lenders are currently owed over $612 million in principal on account of loans advanced to non-Debtor Tricolor Funding SPV 4 LLC ("**SPV 4**") under a warehouse financing facility. The SPV 4 Agent is supportive of certain of the Trustee's efforts described in the Cash Collateral Motion to protect and conserve vehicles currently in the Debtors' possession, regardless of whether they are owned by the estate, by SPV 4, or by other non-Debtor entities. Specifically, the SPV 4 Agent does not object to the Trustee's one-time use of approximately $275,000 to pay certain insurance premiums, subject to the terms set forth in the modified forms of orders filed by the Trustee at ECF No. 267-1 (the "**Revised Cash Collateral Order**").

2. The SPV 4 Agent, the other Secured Parties (as defined in the Revised Cash Collateral Order) and the Trustee worked constructively in recent days to negotiate the form of Revised Cash Collateral Order that preserves the Secured Parties' rights while ensuring the Trustee can pay these critical expenses. The Revised Cash Collateral Order now includes: (i) clarification that the purported cash collateral may not constitute estate property and fully reserving all parties' rights as to the ownership of and interests in such cash; (ii) a review period for the Secured Parties

---

[2] All capitalized terms used but not defined herein shall have the definition set forth in the Cash Collateral Motion.

1

to examine the source of cash, based on the Trustee's available information, before the Trustee seeks future use of cash in the Trust Account; and (iii) further obligations for the Trustee to use proceeds from the sale of estate vehicles or other estate assets to reimburse any Secured Party that funds a disproportionate amount of the Insurance and Consultant Obligations.

3. Notwithstanding these changes, the SPV 4 Agent files this Reservation of Rights because the Cash Collateral Motion mischaracterizes the estate's ownership of the cash held in the Trust Account and the vehicles on Debtors' lots by describing them as assets of the estate, when a significant portion of the cash and vehicles likely belong to the non-Debtor-SPVs, including SPV 4, or the Secured Parties. To the extent the estate has an interest in the cash or other assets, the Cash Collateral Motion also fails to support the Trustee's assertion that the Secured Parties are adequately protected. The Trustee has not identified any unencumbered assets that would fully compensate a Secured Party for the use of its cash, nor does the Trustee adequately explain how the Secured Parties benefit from the Trustee's employment of the Consultants. Nonetheless, the SPV 4 Agent does not object to entry of the Revised Cash Collateral Order, but fully reserves the rights of the SPV 4 Secured Parties (as defined below) with respect to any future use of cash by the Trustee.

## BACKGROUND

### A. Debtors' Financing Facilities

4. Prior to the Petition Date, the Debtors operated a number of businesses relating to the sale and financing of vehicles.[3]

---

[3] *See* Hr'g Tr. at 14:3-20 (Bankr. N.D. Tex. Sept. 18, 2025) (ECF No. 81).

2

5. The Debtors utilized three main categories of financing for their business.[4] First, the Debtors obtained loans from floorplan lenders to fund the Debtors' acquisition of their inventory of vehicles. Second, the Debtors received funds from special purpose, bankruptcy remote entities ("**SPVs**") that borrowed under warehouse facilities. The warehouse lenders loaned money to these SPVs, which in turn purchased auto loans that the Debtors originated to customers in conjunction with their vehicle sales. These warehouse facility SPVs pledged those purchased auto loans, the underlying vehicles financed by those loans, and all proceeds thereof to the warehouse lenders. Finally, the Debtors periodically repurchased bundles of auto loans from the warehouse facility SPVs and sold them to securitization trust SPVs that issued notes secured by the bundles of loans.

6. The off-balance sheet financing structure which the Debtors utilized is a common way for customer finance businesses such as Tricolor to access funding sources with low costs of capital. It was recently estimated that over $14 trillion of warehouse and securitization financing is outstanding in the United States.[5] This structure relies on "true sales" and the preservation of corporate separateness between the originator and the SPVs that incur debt, such that the SPVs and their assets remain outside any bankruptcy of the originators.[6]

---

[4] *See id.* at 15–18.

[5] Gary Gensler, "A Feature, Not a Bug: The Important Role of Capital Markets in the U.S." (Oct. 22, 2024), *available at* https://www.sec.gov/newsroom/speeches-statements/gensler-remarks-bloomberg-global-regulatory-forum-102224.

[6] In accordance with customary practice in warehouse lending, the SPV 4 Agent obtained opinions of counsel confirming that the transfers of receivables from the Debtors to the warehouse facility SPVs were "true sales" and would be treated as such in bankruptcy.

### B. SPV 4

7. To effect this financing structure, Tricolor established a number of SPVs. One of those is SPV 4, a non-Debtor, that financed the purchase of certain auto loans from the Debtors with funds borrowed under a financing credit facility (the "**SPV 4 Warehouse Facility**"). The SPV 4 Warehouse Facility is governed by a Credit Agreement dated November 13, 2020 (the "**SPV 4 Credit Agreement**"),[7] which includes SPV 4 as the Borrower, the SPV 4 Agent as the administrative agent, and the SPV 4 Lenders (together with the SPV 4 Agent, the "**SPV 4 Secured Parties**"). Tricolor Auto Acceptance, LLC ("**TAA**") was the initial servicer, Vervent, Inc. ("**Vervent**") was named as the back-up servicer, and Wilmington Trust, National Association serves as the collateral custodian and the account bank which holds collections on behalf of SPV 4 and the SPV 4 Secured Parties.

8. Borrowings under the SPV 4 Warehouse Facility were subject to a "borrowing base" tied to the principal amount of eligible "**receivables**" (*i.e.*, auto loans meeting certain conditions) owned by SPV 4, which fluctuated as the Debtors periodically sold or repurchased receivables. As of August 15, 2025, there was $612,748,356 in principal outstanding under the SPV 4 Warehouse Facility supported by a borrowing base purportedly in excess of that amount.[8] Unfortunately, as this Court is aware, it now appears that many of the auto loans that were sold to

---

[7] *See* Credit Agreement, dated as of Nov. 13, 2020 (ECF No. 66-18).

[8] From time to time, SPV 4 would repay a portion of the SPV 4 Warehouse Facility to release some of the receivables in the borrowing base so that those loans could be sold into a securitization trust. SPV 4 is also required to repay the SPV 4 Secured Parties if the receivables in the borrowing base fail to satisfy eligibility criteria. *See* Credit Agreement, Section 5.06.

the SPVs, including SPV 4, may be double-pledged or even fictitious, although the extent of this remains to be determined.[9]

9.  The auto loans acquired by SPV 4 were originated by certain of the Debtors, which then sold all right, title, and interest free and clear to SPV 4, as verified through representations and warranties given by the originators, SPV 4 and TAA, and confirmed by multiple legal opinions provided by nationally recognized law firms. Each auto loan sold to SPV 4 is secured by a lien on the underlying financed vehicle, and SPV 4 became the lienholder upon its acquisition of the loans (which rights as lienholder were assigned to the SPV 4 Agent). The diagram below shows the flow of auto loans from the customers to the SPV 4 Secured Parties under the SPV 4 Warehouse Facility.



---

[9] *See* Hr'g Tr. at 8:1–5 (Bankr. N.D. Tex. Oct. 15, 2025) (ECF No. 234).

10. Under the SPV 4 Warehouse Facility, the SPV 4 Secured Parties have a first priority lien on the auto loans purchased by SPV 4, the underlying vehicles financed by those loans (the "**SPV Vehicles**"), all related files, all payments from customers or on account of the SPV Vehicles (including insurance proceeds) and the collection accounts in which those payments are deposited, among other assets.[10]

11. The servicer under the SPV 4 Warehouse Facility (the "**Servicer**") is responsible for managing, collecting and administering the receivables on behalf of SPV 4 and the SPV 4 Secured Parties.[11] The SPV 4 Credit Agreement sets forth the rights and obligations of the Servicer. In collecting receivable payments, the Servicer is acting as agent for SPV 4 and the SPV 4 Secured Parties and is deemed to hold such funds in trust on their behalf.[12] The Servicer is required to have collections from the receivables deposited into specified, segregated accounts that the SPV 4 Agent controls.[13]

12. When SPV Vehicles are sold, damaged or repossessed, the resulting proceeds are required to be collected by the Servicer and deposited into the collection account from which funds are distributed to repay the SPV 4 Warehouse Facility.[14] Until it receives payment, the SPV 4

---

[10] *See* SPV 4 Credit Agreement at Section 3.01 and 3.07.

[11] *See id.* at Section 7.01.

[12] *See id.* at Section 7.03(c)(i).

[13] *See id.* at Section 2.09(a).

[14] *See id.* at Section 7.03(c)(iv).

6

Agent is not required to release its lien on the repossessed or damaged vehicle.[15] On September 5, 2025, TAA's role as initial Servicer was terminated and Vervent became the successor Servicer.[16]

13. Despite Vervent having taken over as Servicer, it appears that certain customers and insurance companies continue to send physical checks to the Debtors on account of loan payments or damaged vehicles. As described in the Cash Collateral Motion, the Trustee has taken these physical checks and deposited them into the Trust Account. The Trustee's professionals have not yet determined the rightful owners of these proceeds, but since most auto loans were sold to the SPVs as part of Tricolor's financing arrangements, it stands to reason that the SPVs and not the Debtors are the rightful owners of much of these amounts.

## RESERVATION OF RIGHTS

14. The Trustee seeks authority to use the funds in the Trust Account to pay insurance premiums to the insurer of vehicles held at Debtor lots and to pay certain Consultants who have facilitated access to the Debtors' books, records, databases, and technology systems.[17] The SPV 4 Agent does not object to paying the insurance premiums but only on the terms and conditions set forth in the Revised Cash Collateral Order. While the SPV 4 Agent does not have enough information to assess the benefits of paying the Consultant Obligations, given the relatively small amount at issue, the SPV 4 Agent does not object to those payments either.

15. Despite the SPV 4 Agent's lack of objections, it is critical to clarify a number of issues raised in connection with the Cash Collateral Motion.

---

[15] *See id.* at Section 3.02(a).

[16] *See Emergency Motion for Entry of Order Approving Stipulation Between Chapter 7 Trustee and Vervent, Inc.* (ECF No. 53).

[17] *See* Cash Collateral Motion at ¶ 16.

16.     *First*, the Trustee refers to the cash in the Trust Account as "cash collateral" and states that "[c]ertain prepetition lenders and other parties in interest…have asserted a **security interest** in the cash collateral deposited in the Trust Account."[18] The SPV 4 Agent disagrees with this characterization. As described above, SPV 4 acquired all rights, title and interest to certain auto loans and the related rights and interests (including in the SPV Vehicles), and to the extent funds currently on deposit in the Trust Account are the proceeds of such assets, those amounts are the property of SPV 4 and are not cash collateral.[19] *See Begier v. IRS*, 496 U.S. 53, 59 (1990) ("Because the debtor does not own an equitable interest in property he holds in trust for another, that interest is not 'property of the estate.'").[20]

17.     *Second*, even if those funds are cash collateral, the Trustee has not carried her burden of proving that she has provided the SPV 4 Secured Parties with adequate protection, and therefore the consent of the SPV 4 Secured Parties is necessary. *See* 11 U.S.C. § 363(c)(2). Despite the Trustee's assertion that "the proposed Adequate Protection" consisting of replacement liens and superpriority claims is sufficient,[21] she has not provided a basis for those statements. The Trustee asserts that "given the magnitude of the fraud," it will take some time to ascertain the Debtors' ownership interest in the assets of their estate.[22] If the Trustee cannot ascertain what the Debtors actually own and whether any of their assets are unencumbered, the adequate protection

---

[18] *Id.* at ¶ 18 (emphasis supplied).

[19] For the avoidance of doubt, all payments on account of the auto loans should properly be remitted to PayNearMe or Vervent.

[20] *See* SPV 4 Credit Agreement at Section 7.03(c)(i).

[21] Cash Collateral Motion at ¶ 26.

[22] *Id.* at ¶ 18.

8

liens and superpriority claims may not be worth anything. The Trustee also argues that the act of insuring the Vehicle Assets constitutes a separate source of adequate protection. But given that the ownership of the Vehicle Assets and purported cash collateral will likely be disputed, the Trustee can neither guarantee that their value is a source of "adequate protection," nor identify whom it would benefit.

18.     *Third,* the Trustee states that she was "appointed to administer an estate comprised of, among other things, approximately 10,000 vehicles…"[23] However, based on information provided by the Servicer and figures cited by TBK Bank, SSB,[24] many of those are repossessed vehicles that secure auto loans pledged to the SPV Secured Parties. As explained above, when SPV 4 acquired auto loans, it also acquired the rights of a lienholder in the SPV Vehicles securing those loans, including the rights of repossession if the customer defaulted. Those rights were pledged and assigned to the SPV 4 Agent. The Trustee does not explain how the Debtors would have acquired a superior title to those repossessed vehicles nor why the Trustee should undertake any servicing roles that are reserved for Vervent.[25]

19.     *Finally*, the SPV 4 Agent's limited consent to the Revised Cash Collateral Order does not constitute (i) consent by any SPV 4 Secured Party to any future use of cash proceeds the Trustee currently holds, or may hold in the future, for the benefit of the SPV 4 Secured Parties, or (ii) an agreement by any SPV 4 Secured Party that any funds in the Trust Account or any other

---

[23] *Id.* at ¶ 1.

[24] Assuming the accuracy of figures cited in *TBK Bank, SSB's Motion for (I) Relief From The Automatic Stay And (II) Adequate Protection* (ECF No. 202), approximately 3,776 of the vehicles on the Debtors' lots are repossessed vehicles. *See id.* at ¶ 23.

[25] *See Order Granting Chapter 7 Trustee's Motion for Entry of Order Approving Stipulation Between Trustee and Vervent, Inc.* (ECF No. 79), at ¶ 8.

9

property currently classified as the Debtors' property is actually property of the Debtors' estate or correctly characterized as "cash collateral" under the Bankruptcy Code. Moreover, the SPV 4 Secured Parties reserve their rights with respect to determining the existence, perfection and priority of any security interests in any of the estate's purported assets or any purported assets of the Debtors' affiliates, including the SPVs.

## CONCLUSION

20. For the reasons stated above, the SPV 4 Agent does not object to entry of the Revised Cash Collateral Order but reserves all rights and remedies otherwise in connection with the relief sought in the Cash Collateral Motion, including all procedural and substantive rights, defenses, arguments, and claims in respect of the foregoing, and nothing in this Reservation of Rights shall constitute a waiver of such rights and remedies.

**HUNTON ANDREWS KURTH LLP**

Dated: October 27, 2025

By: */s/ Timothy A. ("Tad") Davidson II*

_____

Timothy A. ("Tad") Davidson II (Texas Bar No. 24012503)
Gregory G. Hesse (Texas Bar No. 09549419)
Ashley L. Harper (Texas Bar No. 24065272)
1445 Ross Avenue, Suite 3700
Dallas, Texas 75202
Telephone: (214) 979-3000
Email: taddavidson@hunton.com
    ghesse@hunton.com
    ashleyharper@hunton.com

and

**SIMPSON THACHER & BARTLETT LLP**

Elisha D. Graff (admitted *pro hac vice*)
Alan Turner (admitted *pro hac vice*)
Nicholas E. Baker (admitted *pro hac vice*)
425 Lexington Avenue
New York, New York 10017
Telephone: (212) 455-2000
Email: egraff@stblaw.com
    aturner@stblaw.com
    nbaker@stblaw.com

*Attorneys for the SPV 4 Agent*

## CERTIFICATE OF SERVICE

    I certify that on October 27, 2025, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Northern District of Texas on those parties registered to receive electronic notices.

                                        */s/ Timothy A. ("Tad") Davidson II*
                                        Timothy A. ("Tad") Davidson II