IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In Re:<br><br>TRICOLOR HOLDINGS, LLC,<br>et al.,<br><br>Debtors. | **Case No. 25-33487-mvl-7**<br>Jointly Administered<br><br>Dallas, Texas<br>October 27, 2025<br>3:00 p.m. Docket<br><br>MOTIONS |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE MICHELLE V. LARSON,
UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

| | |
|---|---|
| For Anne Elizabeth Burns, Trustee: | Charles Brackett Hendricks<br>CAVAZOS HENDRICKS POIROT, P.C.<br>900 Jackson Street, Suite 570<br>Dallas, TX 75202<br>(214) 573-7302 |
| For Anne Elizabeth Burns, Trustee: | Charles R. Gibbs<br>Grayson Williams<br>MCDERMOTT WILL & SCHULTE, LLP<br>2801 North Harwood Street,<br>Suite 2600<br>Dallas, TX 75201<br>(214) 295-8063 |
| For Anne Elizabeth Burns, Trustee: | Anne Elizabeth Burns<br>CAVAZOS HENDRICKS POIROT, P.C.<br>900 Jackson Street, Suite 570<br>Dallas, TX 57202<br>(214) 573-7340 |
| For JPMorgan Chase Bank, as Administrative Agent: | Nicholas E. Baker<br>Elisha D. Graff<br>SIMPSON THACHER & BARTLETT, LLP<br>425 Lexington Avenue<br>New York, NY 10017<br>(212) 455-2032 |

APPEARANCES, cont'd.:

| | |
|---|---|
| For JPMorgan Chase Bank, | Ashley Lindsay Harper<br>HUNTON ANDREW KURTH, LLP<br>600 Travis, Suite 4200<br>Houston, TX 77002<br>(713) 220-4013 |
| For Vervent, Inc.: | Scott D. Lawrence<br>WICK PHILLIPS GOULD & MARTIN, LLP<br>3131 McKinney Avenue, Suite 500<br>Dallas, TX 75204<br>(214) 420-4449 |
| For Vervent, Inc.: | Adam R. Prescott<br>BERNSTEIN SHUR<br>100 Middle Street<br>P.O. Box 9729<br>Portland, ME 04104-5029<br>(207) 228-7178 |
| For Chiyo Inoue Trust, et al.: | Audrey Hornisher<br>CLARK HILL, PLC<br>901 Main Street, Suite 6000<br>Dallas, TX 75202<br>(214) 651-2056 |
| For TBK Bank, SSB: | Matthew W. Moran<br>Bradley Roland Foxman<br>VINSON & ELKINS, LLP<br>2001 Ross Avenue, Suite 3900<br>Dallas, TX 75201<br>(214) 220-7723 |
| For Wilmington Trust: | Stephen Blank<br>ALSTON & BIRD, LLP<br>90 Park Avenue, 15th Floor<br>New York, NY 10016<br>(212) 210-9472 |
| For ANC Ventures, Ltd., et al.: | Michael S. Held<br>JACKSON WALKER, LLP<br>2323 Ross Avenue, Suite 600<br>Dallas, TX 75201<br>(214) 953-5859 |

APPEARANCES, cont'd.:

| | |
|---|---|
| For Leasing Corporation of America: | Michelle E. Shriro<br>SINGER & LEVICK, P.C.<br>16200 Addison Road, Suite 140<br>Addison, TX 75001<br>(972) 380-5533 |
| For Clay Cooley Motor Company: | Sidney H. Scheinberg<br>GODWIN BOWMAN, P.C.<br>500 N. Akard, #1100<br>Dallas, TX 75201<br>(214) 939-4400 |
| For Manheim Remarketing, Inc. (Cox Automotive, Inc.): | John Douglas Elrod<br>GREENBERG TRAURIG, LLP<br>Terminus 200<br>3333 Piedmont Road NE, Suite 2500<br>Atlanta, GA 30305<br>(678) 553-2259 |
| For 603 San Fernando Road, LLC: | Ivan M. Gold<br>ALLEN MATKINS LECK GAMBLE MALLORY & NATSIS, LLP<br>Three Embarcadero Center, 12th Floor<br>San Francisco, CA 94111-4074<br>(415) 273-7431 |
| For 603 San Fernando Road, LLC and Fifth Third Bank, N.A.: | Rebecca Lynn Matthews<br>FROST BROWN TODD, LLP<br>2101 Cedar Springs Road, Suite 900<br>Dallas, TX 75201<br>(214) 580-8608 |
| For Fifth Third Bank, N.A.: | Danielle Wildern Juhle<br>GOLDBERG KOHN, LTD.<br>55 East Monroe Street, Suite 3300<br>Chicago, IL 60603<br>(312) 201-4000 |
| For Origin Bank: | John E. Mitchell<br>Eric R. Hail<br>KATTEN MUCHIN ROSENMAN<br>2121 North Pearl Street, Suite 1100<br>Dallas, TX 75201<br>(214) 765-3600 |

APPEARANCES, cont'd.:

| | |
|---|---|
| For ACV Capital, LLC: | Jason R. Alderson<br>MORGAN LEWIS & BROCKIUS, LLP<br>101 Park Avenue<br>New York City, NY 10007<br>(212) 309-6758 |
| For ACV Capital, LLC: | William "Trey" A. Wood, III<br>BRACEWELL, LLP<br>711 Louisiana, Suite 2300<br>Houston, TX 77002<br>(713) 221-1166 |
| For BV NWH, LP: | Garrick C. Smith<br>MUNSCH HARDT KOPF & HARR, P.C.<br>500 N. Akard Street, Suite 4000<br>Dallas, TX 75201<br>(214) 740-5110 |
| For Thomas Living Trust: | Sean A. O'Keefe<br>O'KEEFE & ASSOCIATES LAW CORPORATION, P.C.<br>26 Executive Park, Suite 250<br>Irvine, CA 92614<br>(949) 334-4135 |
| For AFCO Credit Corporation: | Joel L. Perrell, Jr.<br>WOMBLE BOND DICKINSON (US), LLP<br>100 Light Street, 26th Floor<br>Baltimore, MD 21202<br>(410) 545-5854 |
| Recorded by: | Bryon A. Robinson<br>UNITED STATES BANKRUPTCY COURT<br>1100 Commerce Street<br>Dallas, TX 75242<br>(214) 753-2011 |
| Transcribed by: | Kathy Rehling<br>311 Paradise Cove<br>Shady Shores, TX 76208<br>(972) 786-3063 |

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

DALLAS, TEXAS - OCTOBER 27, 2025 - 3:04 P.M.

THE COURT: Please be seated. Good afternoon, everyone. We're here on our 3:00 o'clock docket. We have one matter on the docket this afternoon, and that is Case No. 25-33487. I'll take appearances for the record, and I'll start with those folks in the courtroom.

MR. GIBBS: Good afternoon, Your Honor. Chuck Gibbs with McDermott Will & Schulte, along with my colleague Grayson Williams, proposed counsel for Anne Burns, the Trustee. I'm joined here in the courtroom today, in addition to Mr. Williams, by Ms. Burns, by also Chuck Hendricks, proposed co-counsel for the Trustee, and James Calandra, who is a managing director of Capstone, who is the proposed financial advisor for the Trustee.

THE COURT: All right. Thank you very much, Mr. Gibbs.

MR. GIBBS: Uh-huh.

THE COURT: Mr. Foxman?

MR. FOXMAN: Good afternoon, Your Honor. Brad Foxman and Matt Moran of Vinson & Elkins appearing on behalf of TBK Bank, as Lender and Agent.

THE COURT: Thank you.

MS. HORNISHER: Good afternoon, Your Honor. Audrey Hornisher with Clark Hill, PLC, representing Chiyo Inoue Trust Dated February 17, 2010, and DB & BB Properties, LP, two

Landlords in this case.

THE COURT: All right. Thank you very much.

MR. BLANK: Hi, Judge.

THE COURT: Hi.

MR. BLANK: Steve Blank from Alston & Bird on behalf of Wilmington Trust in its various capacities.

THE COURT: All right. Thank you.

MR. LAWRENCE: Good afternoon, Your Honor. Scott Lawrence at Wick Phillips appearing on behalf of Vervent. Today in the courtroom I'm pleased to report we have Derek Gamble, the CFO of Vervent, in person. And then on the WebEx is Adam Prescott of Bernstein Shur, also counsel for Vervent.

THE COURT: All right. Thank you.

All right. I will now take WebEx appearances. I'll start with the folks I can see. Mr. Held?

MR. HELD: Thank you, Your Honor. Good afternoon. Michael Held of Jackson Walker, here with my colleague also on WebEx, Bill Butler, on behalf of three different Landlords, Your Honor: ANC Ventures, Ltd., Bullish Resources, Inc., and CICF III-TX1B01, LLC. Made that really simple to roll of the tongue. I think between those three Landlords we've got four different locations, Your Honor.

THE COURT: All right. Thank you very much, Mr. Held.

MR. HELD: Thank you.

THE COURT: If there's a quiz after on these letters, I'm going to fail, I'll tell you all right now. I'll be searching the docket for names, no worries.

Ms. Shriro?

MS. SHRIRO: Yes, Your Honor. Michelle Shriro for Leasing Corporation of America, a landlord.

THE COURT: Okay. Thank you.

All right. Mr. Scheinberg?

MR. SCHEINBERG: Good afternoon, Mr. Honor. Sid Scheinberg on behalf of various Clay Cooley Motors dealerships.

THE COURT: All right. Thank you.

All right. Mr. Elrod?

MR. ELROD: Good afternoon, Your Honor. John Elrod of Greenberg Traurig on behalf of Manheim Remarketing, Inc.

THE COURT: All right. Thank you very much.

Mr. Gold?

MR. GOLD: Good afternoon, Your Honor. It's been too long. Ivan Gold of Allen Matkins for Landlord 603 San Fernando Road, one of the Debtors' California landlords. And Ms. Matthews, who is my local counsel, is also on the line.

THE COURT: Excellent. Good afternoon to you both.

All right. That's probably about as many as I can see. Is there anyone else who would like to make an appearance?

MS. MATTHEWS: Your Honor, this is Rebecca Matthews

with Frost Brown Todd. I did also want to appear on behalf of Fifth Third Bank, with lead counsel Danielle Juhle joining with Goldberg Kohn by WebEx.

THE COURT: Okay. Thank you.

MR. MITCHELL: Good afternoon, Your Honor. John Mitchell. Can you hear me?

THE COURT: Yes, I can. Thank you.

MR. MITCHELL: Thank you. Good afternoon. John Mitchell, my partner Eric Hail, with Katten, for Origin Bank.

THE COURT: All right. Thank you.

MR. MITCHELL: Thank you.

MR. ALDERSON: Good afternoon, Your Honor. Jason Alderson with Morgan Lewis. I'm here today for ACV Capital. And I'm joined by Trey Wood, co-counsel, of the Bracewell firm.

THE COURT: All right. Thank you.

MR. BAKER: Your Honor, Nicholas Baker; Simpson Thacher & Bartlett; on behalf of JPMorgan Chase Bank as Administrative Agent to Nondebtor Tricolor Funding SPV 4, LLC. I'm joined with my colleague Elisha Graff and co-counsel Ashley Harper from Hunton Andrews Kurth.

THE COURT: All right. Thank you.

MR. SMITH: Good afternoon, Your Honor. Garrick Smith of Munsch Hardt Kopf & Harr on behalf of BV NWH, LP, a Landlord in these Chapter 7 cases.

THE COURT: Thank you.

Anyone else wish to make an appearance?

Mr. O'Keefe, would you like to make an appearance?

MR. O'KEEFE: This is Sean O'Keefe on behalf of the Thomas Living Trust.

THE COURT: All right. Thank you very much.

Anyone else?

All right. If there's anyone on the phone that would like to make an appearance, if you'll press *6 to unmute.

All right. Given there are no further takers, Mr. Gibbs?

MR. GIBBS: Thank you, Judge. And, again, for the record, Chuck Gibbs, proposed counsel for Ms. Burns, the Trustee.

We have three matters, I believe, on the docket. One is the hearing that Your Honor set when we were here a little over a week ago to extend the order originally entered in September approving the proposed stipulation with Vervent and the estate.

We are here also on I believe it's Docket 255, which is our Motion for Authority to Use Cash Collateral. And I believe there is a motion filed by Certain Landlords for a status conference.

My suggestion is that we take them up in that order. And I'll bring the Court, with the Court's permission, just spend a minute or two trying to make sure everybody is up to speed

as to where the estate finds itself today and what has transpired since we were last here.

Other than the matters that we're going to talk about today, the only other thing I think that I want to make sure the Court is aware of: When I was at the podium last, I indicated to the Court that it was the Trustee's intention at that time to come to the Court in fairly short order with a motion seeking approval of certain bid procedures that would contemplate a sale of the various assets of the Debtor, which would constitute that portion of the vehicle fleet that constituted property of the estate, as well as locations that the Debtor had operated and leased prepetition, as well as a series of promissory notes signed by borrowers in the weeks before bankruptcy.

As we've continued to understand and get our arms around the scope and extent of the Debtors' assets and the claims against the estate, as well as better understand the valuation proposition regarding the vehicle fleet, the Trustee has pivoted somewhat from what I reported to the Court last. And the result of that is we are in active conversations with all parties in interest who claim an interest in the vehicles. That would be several of the Landlords -- no, excuse me, several of the secured creditors that are on the phone and present in the courtroom.

The intention and expectation and hope of all the parties

is that we will be before the Court in fairly short order with an agreed set of procedures that will involve the disposition and sale of all of the vehicles through an auction process, rather than keeping them, as many as possible, in place at Debtor locations while we ran a more extensive and lengthy sale process.

The results of our continued investigation is that there would not be a material benefit to the estate by running that type of process, and in fact it may have resulted in the diminution in recovery to the estate. So what we are attempting to embark on is to get to an agreement between all the parties as to a protocol by which the vehicles will be gathered at one or more auction lots and locations and auctioned pursuant to a set of procedures that everyone agrees to.

There are multiple competing claims to almost every dollar that we likely will receive from the sale of those cars, and that protocol that we hope to come back to court with will provide a mechanism for the reconciliation and determination of who has prior rights to the sale proceeds and the disposition of the cash in accordance with that procedure.

So, more to come on that. I just wanted the Court to know that you shouldn't be checking your inbox for a bid procedure motion that would call for the retention of Capstone to be the investment bank selling certain of the assets, but rather

we'll pivot to an auction process for these vehicles.

That's probably the only material update from the last time I was here. As I indicated, we have three matters before the Court.

It is our request, and I believe supported by all parties, that the stipulation between the Trustee and Vervent be continued and extended further. The current proposal would be to have Your Honor approve and sign an additional amended order that extends their authority, exactly like it exists in the current stipulation that you last approved a week or so ago, and continue that authority through November 18th.

It's our hope that Your Honor has time on her docket sometime on Monday, the 17th, so that we could have a placeholder to resolve any further continuance needed beyond the 18th. We think, as you'll hear in a moment regarding the use of cash collateral, you'll hear more about the current expected timeline for the completion of the removal of the vehicles from all of the Debtors' locations to various auction locations. And that hope is that it will be substantially completed by the middle of November, hence the need for the cash collateral motion that we're about to talk about.

But we think it's in everybody's best interest to continue the status quo. It's working. We talk with them every day to continue to try to coordinate our efforts to maximize the recovery for creditors and minimize the loss that might

otherwise exist if we weren't in coordination.

So, as I said, I don't believe there are -- we've socialized this with everybody, the timeline and the intent, and I don't think anybody is opposed to it. So our request with respect to the first matter set today is just simply to present to the Court a further agreed order that continues the authority of Vervent pursuant to the original stipulation through the end of the day on the 18th of November, with the hope that we get a setting possibly Monday, the 17th.

THE COURT: All right. While Ms. Harden is looking at that time, which, oddly, looks empty on my calendar, but that could possibly be because I'm supposed to be somewhere that I don't know. So let me do that level of checking, and then we'll see if anyone else wishes to be heard with respect to the Vervent stipulation.

MR. GIBBS: All right.

THE COURT: Does anyone else wish to be heard? I'll start with folks in the courtroom.

MR. BLANK: Your Honor, Steve Blank from Alston on behalf of Wilmington.

No issue, just subject to seeing the actual language in what gets submitted.

THE COURT: Okay. Thank you.

Anyone else on WebEx wish to be heard with respect to the Vervent stipulation?

MR. GIBBS: Your Honor, if I wasn't clear, I'll just represent to the Court and all parties listening, the only change to the order that Your Honor signed a week ago will be the change of the date for the next hearing. It's identical in all other respects. But we'll certainly circulate it to everybody --

THE COURT: Okay.

MR. GIBBS: -- to make sure they lay eyes on it.

THE COURT: Thank you very much, Mr. Gibbs.

All right. Anyone else wish to be heard?

All right. Hearing no takers, Ms. Harden has confirmed that we do have availability on the 17th. Would you like morning or afternoon?

MR. GIBBS: Since it's a Monday, and since people may feel the need to be here, depending on what transpires between now and then, I think it's best to do it in the afternoon --

THE COURT: Okay.

MR. GIBBS: -- so they don't have to travel on Sunday night.

THE COURT: All right. 1:30?

MR. GIBBS: Sure.

THE COURT: Okay. All right. So, based upon the lack of objection, the Court will grant the motion to approve the further stipulation between the Chapter 7 Trustee and Vervent, on the same terms as before, and will set that for

further hearing on November 17th at 1:30.

MR. GIBBS: Your Honor, the second matter on the docket today is our Emergency Motion for Authority to Use Cash Collateral. I believe it's at Docket 255. Mr. Williams will cover that.

But before I turn the podium to him, I just want to make sure to just kind of level-set for everybody: The Debtor has what's called a Dealer Open Lot Policy, and it insures all vehicles on lots that are controlled and leased by the Debtor against loss for a variety of reasons: hail, theft, whatever. We think it's important to continue that insurance, and it was -- it's the subject of a lift stay hearing that's set tomorrow, --

THE COURT: Okay.

MR. GIBBS: -- filed by the premium finance company that financed the premiums to cover that Dealer Open Lot. So it covers cars that may not turn out to be property of the estate but rather property of nondebtor entities that are pledged or owned by creditors in this case, as well as Debtor assets.

So the purpose of the motion was to make sure that the Trustee had the ability to avoid the termination, potentially retroactively, of that insurance. And we thought it was in the best interest of all parties. That's the reason we asked for a hearing today. And as Mr. Williams will take you

through, we believe it's a fully-consensual request, but it took quite a bit of talking and effort and coordination with all the parties.

So, with that predicate, I'll turn the podium over to Mr. Williams.

THE COURT: All right. Thank you very much, Mr. Gibbs.

MR. GIBBS: Uh-huh.

THE COURT: Mr. Williams?

MR. WILLIAMS: Your Honor. Good afternoon, Your Honor. Grayson Williams of McDermott Will & Schulte. I'm here on behalf of the Chapter 7 Trustee.

I just want to emphasize and echo a couple comments that Mr. Gibbs made. Specifically, that AFCO policy, AFCO advanced the Debtor the entirety of the four-month policy, and in return the Debtor would pay a monthly premium in the amount of $122,000.

So, specifically what we're after here today is the payment of the September 16th payment, which was the first $122,000, and then the October 16th payment, which just became past-due, for a total amount of $244,000.

THE COURT: And the lift stay that's before me tomorrow or that would be on the docket for tomorrow would have been to terminate that, given the nonpayment?

MR. WILLIAMS: That's right, Your Honor.

THE COURT: Okay.

MR. WILLIAMS: And part of the agreement that we've worked out with AFCO's counsel is we're going to upload a form of -- we'll call it a consent order, a proposed consent order, --

THE COURT: Okay.

MR. WILLIAMS: -- where we agree to remit that payment, and they will receive that payment no later than Wednesday.

And if the November payment is not remitted by November 17th, or maybe it's perhaps November 16th, then AFCO is permitted to terminate the stay without seeking leave of Court and cancel the policy effective as of November 17th.

And as Mr. Gibbs indicated, we think we're in a position where the vast, vast majority of all of the cars will be relocated from the Debtors' properties by November 16th. If that changes or if that's wrong, we'll be back before Your Honor with a --

THE COURT: Such that somebody else's insurance would kick in with respect to the cars that they removed?

MR. WILLIAMS: That's right.

THE COURT: Okay.

MR. WILLIAMS: As soon as Vervent is onsite and picks up a car, that car is then under the umbrella of Vervent's policy. And then when it's relocated to one of the auction

lots, both Vervent and the auctioneer's insurance policy kicks in. So as soon as all of the cars are off our sites, then the need for continuing coverage for the Debtors ceases.

THE COURT: Okay. If you were negotiating a consent order with respect to AFCO and the November payment, if something happens and the November payment is not paid, such that they would have the ability to lift stay, I'd require a notice be filed on the docket that it occurred.

MR. WILLIAMS: Very good.

THE COURT: So if you've established whatever the consent procedures are, just the same way I would do under a DIP if a DIP were terminated for some reason, just put a notice on the docket that it occurred, just so that the Court would be aware.

MR. WILLIAMS: Okay. Very good, Your Honor.

Mr. Perrell is on the line.

THE COURT: Okay.

MR. WILLIAMS: He is a Womble Bond Dickinson counsel to AFCO, and will incorporate that revision into the proposed order and send it to chambers tonight or tomorrow morning.

THE COURT: Okay. Thank you.

MR. WILLIAMS: In addition to the AFCO premium payments, the cash collateral motion also seeks to pay the two former employees that we've employed, the Trustee has employed, who have provided critical services in assimilating

us into the infrastructure of the Debtors and introducing us to the various software programs. And it's -- although both of them were in the accounting department, the services that they've provided the Trustee are far beyond mere accounting services.

It may make sense, I'll have some additional comments at the end, but I'd like to go ahead and proffer the testimony of Mr. James Calandra of Capstone Partners.

THE COURT: Okay. Is there any objection to the proffer of Mr. Calandra's testimony?

All right. Hearing no objection, please proceed.

MR. WILLIAMS: Thank you, Your Honor.

PROFFER OF TESTIMONY OF JAMES CALANDRA, TRUSTEE'S WITNESS

MR. WILLIAMS: If called to testify in support of the Chapter 7 Trustee's Emergency Motion for Entry of Interim and Final Orders Authorizing the Use of Cash Collateral and Granting Related Relief, Mr. Calandra would testify as follows.

My name is James Calandra. I am the managing director and head of financial advisory services at CRS Capstone Partners, LLC, the Trustee's proposed financial advisor. Capstone was engaged by the Trustee on September 19, 2025, and has been advising the Trustee since their engagement.

I have served as a financial advisor in a number of bankruptcy cases and am familiar with the Trustee's duties and

obligations under the Bankruptcy Code.

In my role as financial advisor, I have reviewed the Debtors' financial records, assessed the estate's assets, and worked closely with the Trustee to identify and preserve value for creditors.

The Debtors' vehicle inventory represents a significant portion of the overall value of the estates. Currently, these vehicles are either located at the Debtors' various dealerships or reconditioning facilities or have been moved or are in the process of being moved by Vervent pursuant to the Order Granting Chapter 7 Trustee's Motion for Entry of an Order Approving Stipulation between Trustee and Vervent, Inc. and the subsequently-amended order by which Vervent was given responsibility for properly securing the Debtors' vehicle inventory.

Over the last several weeks, Vervent has been securing and transporting vehicles to third-party locations pursuant to the order and amended order. Vervent expects it will have secured and removed all vehicles from the Debtors' various dealership locations and reconditioning facilities by approximately the middle of November.

The Debtors maintain a Dealer Open Lot Policy, financed by AFCO Credit Corporation, that provides comprehensive coverage of the vehicle inventory for losses arising from non-collision events, such as theft, vandalism, weather, floods,

earthquakes, other accidental damages, and false pretenses, as well as collision coverage for damage resulting from a crash or impact.

The Debtors were current on their premium payments to AFCO as of the petition date, but have since missed two payments of $122,374.42 each, totaling $244,748.84.

Currently, based on information provided by Vervent, there are approximately 8,000 vehicles that remain at the Debtors' dealerships and reconditioning facilities out of a total inventory of 10,000 vehicles.

On information and belief, a significant portion of the vehicles will remain at the dealership locations and reconditioning facilities between today and November 16th, and thus require insurance coverage.

The total value of the vehicle inventory is in excess of $125 million.

In addition, it is possible that losses in respect of the vehicle inventory have already occurred, though I am unaware of any losses to date.

Failure to pay the Dealer Open Lot premiums would risk retroactive termination to September 16th by AFCO and uninsured losses that may have already occurred. Protecting the value of the vehicle inventory still located at the Debtors' dealership locations and reconditioning facilities through maintaining the Dealer Open Lot Policy is critical to

preserving the overall value of the estates. If the vehicle inventory were to become uninsured, the estates could suffer irreparable harm and diminution in value that would negatively impact the interests of all creditors.

When Capstone commenced its engagement to provide financial advisory services to the Trustee, she had no means by which to assess the Debtors' books and records, online databases and Cloud storage, or general operational information. To enable her to fulfill her duties, the Trustee retained two former employees of the Debtors as consultants. These individuals have facilitated critical access to the Debtors' books and records, and numerous online databases and informational technology systems, as well as provided key insight into the Debtors' operations.

Each consultant was retained on an hourly basis for his services. The consultants are owed approximately $30,000 in the aggregate on account of postpetition services provided to the Trustee.

I recommended that the Trustee seek authority to pay the past-due premiums on the Dealer Open Lot Policy and the fees owed to the consultants.

The Trustee currently holds just over $2.7 million in a segregated trust account. The Trustee's motion proposes to pay the insurance premiums and the consultants from such funds. The funds in this account have come from deposited

checks that were received at the Debtors' headquarters over the past several weeks. These checks consist primarily of insurance proceeds from property and casualty insurance on customer vehicles subject to loans and refinancings, or payoffs from other lenders against certain loans. A small number of checks consist of payments from borrowers.

I have provided a detailed list and description of all checks received and deposited by the Trustee to all parties claiming an interest in those funds. Together with the Trustee, Capstone is in the process of evaluating which parties may have security interests in the cash deposited in the trust account. Those that have asserted a security interest in the cash include Wilmington Trust, JPMorgan Chase Bank, Fifth Third Bank, TBK Bank, ACV Capital, Manheim Remarketing, and Origin Bank, among others.

I am currently assisting the Trustee in completing a reconciliation of the cash deposited in the trust account. Although we are endeavoring to complete the reconciliation as expeditiously as possible, we expect that it may take some time, given the magnitude of fraud in these Chapter 7 cases.

The hearing on AFCO's Motion for Relief from the Automatic Stay with respect to unearned insurance premiums is scheduled for October 28th. By its motion, AFCO seeks to cancel the Dealer Open Lot Policy effective as of September 16, 2025. The premium payments proposed to be made from the cash held in

the trust account would avoid the need for hearing on AFCO's motion and provide coverage on the vehicle inventory through November 16th, the approximate date by which Vervent will have moved substantially all of the vehicles.

It is my professional opinion that the funds requested by the Trustee to pay the Dealer Open Lot premiums and the consultants' fees are essential to preserving the value of the estate's assets and to the Trustee's fulfillment of her duties.

If called to testify, I would testify truthfully to these matters, and I would be available for cross-examination.

Your Honor, that concludes the proffer of Mr. Calandra's testimony.

THE COURT: Thank you very much, Mr. Williams.

As part of the proffer, you said approximately 8,000 vehicles out of 10,000 are located at ... and I missed it.

MR. WILLIAMS: At the Debtors' reconditioning and retail lots.

THE COURT: Okay. Thank you very much.

All right. Mr. Calandra, can you come to the mic so I can swear you in, sir?

MR. CALANDRA: Good afternoon, Your Honor.

THE COURT: Good afternoon. Could you raise your right hand for me?

JAMES CALANDRA, TRUSTEE'S WITNESS, SWORN

THE COURT: Thank you very much.

Were you able to hear the proffer there was provided by your counsel?

THE WITNESS: Yes, ma'am.

THE COURT: Thank you. Do you have anything to alter or to amend with respect to the proffer?

THE WITNESS: No, Your Honor.

THE COURT: And do you agree with everything in it?

THE WITNESS: Yes, ma'am.

THE COURT: All right. Thank you very much.

THE WITNESS: Thank you.

THE COURT: Is there anyone who wishes to cross-examine Mr. Calandra?

All right. Hearing no takers, thank you for your testimony, sir.

(The witness is excused.)

MR. WILLIAMS: Your Honor, on Wednesday, this past Wednesday, October 22nd, the Trustee held a conference with representatives from a large majority of the parties in interest and the primary case constituents: namely, counsel and the financial advisors to ACV, TBK, Origin, Manheim, JPMorgan, Fifth Third, Wilmington Trust, and two separate Ad Hoc Bondholder Groups.

At that time, in addition to a long discussion about the sale process, we previewed our cash collateral request and

discussed the associated issues at length with the various parties.

Following the filing of the motion and carrying into the weekend, we received comments from nearly every party. We worked to synthesize those comments as well as add additional language on behalf of the Trustee. And I really do want to thank the parties for their constructive feedback, their prompt responses, which ensured that we could appear before you on a basically-uncontested basis.

The revised proposed interim order appears at Docket No. 267, along with a redline against the as-filed version included in the cash collateral motion. I think that a copy has been passed up to you --

THE COURT: Yes. Thank you very much.

MR. WILLIAMS: -- in a spiral-bound notebook. Of course.

Just briefly with respect to the changes in that redline, most relate to a reconciliation construct whereby the Trustee will work with the various parties to identify the source of the funds held by the Trustee as well as, in the event that such proceeds are determined by the consent of all parties to not constitute property of the estate, it also contemplates that such payments would be remitted to the appropriate owner.

In addition to the general reporting and reconciliation obligations, we added consent rights to all of the parties to

ensure that everyone who believes that they have a stake in the funds held by the Trustee are a part of that reconciliation process. And it may be the case that it will only be by order of the Court that such funds are allowed to move, but we wanted everyone to have a seat at the table.

Lastly, the other major change I want to note comes with the insertion of a surcharge right. I think that it's indisputable that the cash collateral will be used to preserve the interests of all parties because of the fact that the policy applies to both estate and non-estate vehicles, but what is subject to dispute is whether those proceeds themselves are estate property.

Therefore, to the extent that it's later determined that one party disproportionately bore the costs of preserving the collateral, the Trustee is entitled to ensure appropriate distribution of costs throughout through a surcharge mechanism. And based on the discussions that we've had with all of the parties, I believe that everyone thinks that that concept is fair and appropriate.

One more sort of procedural point I want to make. Although we believe we've mustered the necessary consent for this motion, we wanted to set it for both interim and final hearing, just to make sure that every single party in interest has an opportunity to review the motion, and if they need to, reach out to us or file an objection. We have -- the only

comments we have received to date were -- well, the only objection is -- well, the statement in support --

THE COURT: The Limited Statement in Support and Reservation of Rights.

MR. WILLIAMS: That's right.

THE COURT: It's definitely not an objection.

MR. WILLIAMS: Definitely.

And it may make sense to set the final hearing on that concurrently with the Vervent stipulation, to the extent time allows. We could probably have a hearing before that, but for administrative ease, it might make sense to just put those on the same date.

I think with that, and for the reasons I've discussed, and for the reasons set forth both in the motion and described in Mr. Calandra's proffer, the Trustee would respectfully request entry of the revised proposed order found at Docket No. 267.

And I want to add one minor nit that was pointed out by counsel to ACV.

THE COURT: Okay.

MR. WILLIAMS: We'll upload a form of revised order. There's an errant reference to a "secured lender" in Paragraph 11 which should be a "secured party."

THE COURT: Okay.

MR. WILLIAMS: But we will revise that in the form of proposed order.

THE COURT: All right. Thank you. If that's the only change, I don't require a filing of a redline on the docket. To the extent that you want to for whatever reason, I wouldn't be opposed to it, but I don't require it from my perspective.

MR. WILLIAMS: Thank you, Your Honor.

THE COURT: All right. Well, I'll have a few other comments for you when we get there, but let me hear from any other parties that might want to be heard.

MR. GOLD: Your Honor, if I may?

THE COURT: Mr. Gold?

MR. GOLD: Yes. Again, good afternoon, Your Honor. Ivan Gold of Allen Matkins for one of the Debtors' Landlords.

I do not have an objection to the use of cash collateral to pay insurance premiums for the Debtors' vehicle inventory sitting on the Landlords' leased property. I do not have any objection to the payment of the two former employees who are assisting the Trustee.

What I have a problem with, and I'll just make it by way of comment or reservation of rights or however we want to label it, is this motion represents the beginning of a slippery slope. This motion, while important, is simply too narrow. The Trustee is effectively picking winners and losers here.

The estate has plenty of other administrative obligations,

not only to my client but to many other administrative creditors, and it's been the subject of discussion I know at prior hearings in this case. But here we have a very narrow, very discrete motion. And not to take away from the two targets of this motion, but I just want to express the concern.

As I once discussed with Judge Perez recently in a case that turned out to be administratively insolvent, saying "I told you so" is hardly an effective remedy under the Bankruptcy Code.

But my concern is that this motion doesn't do enough, and I would reserve my rights, if we don't see similar motions or if there's another motion that tends to pick and choose who's going to get paid among similarly-situated creditors. Under the Bankruptcy Code, there is no fundamental difference in terms of priority of distribution between insurance premiums that arise and are payable postpetition and something like rent. And picking and choosing and making subclassifications of administrative creditors is worrisome. And I'll just leave it at that for today. We'll talk more at the status conference.

Thank you, Your Honor.

THE COURT: All right. Thank you, Mr. Gold.

Anyone else wish to be heard with respect to cash collateral?

MR. BAKER: Your Honor? Again, for the record, Nicholas Baker from Simpson Thacher & Bartlett for JPMorgan Chase.

We filed the "non-objection" reservation of rights, which I know we didn't give you a lot of time with it. Hopefully, you had a chance to read it.

THE COURT: I did. Thank you.

MR. BAKER: Yeah, and I'll be brief, Your Honor. I think we've heard the term "cash collateral" and "security interests" thrown around a lot today, and I think we're using that as shorthand.

Obviously, as we set forth in the reservation of rights, we believe a lot of this cash and the vehicles on the lots may not be estate property at all, and I think this reservation of rights adequately reserves on this issue, and I think that's important, as I think it reserves on the issue of what happens going forward with this cash, because although we're supportive of entry of this order and we want to thank the Trustee's counsel for working very hard over the weekend to get this in a form that we could all agree to, going forward, that may not be the case, certainly when we don't have a reconciliation of whose cash this belongs to.

So, again, Your Honor, we are supportive, but I did not want it to be lost that there's potentially disagreement or at least a reconciliation that's needed on whose assets these

belong to.

THE COURT: All right. Thank you very much, Mr. Baker. And one of the reasons I enjoy giving people WebEx rights is because I love their artwork, and your artwork is fantastic, Mr. Baker.

MR. BAKER: I'll convey it to the artist. Thank you.

THE COURT: Excellent.

All right. Ms. Hornisher?

MS. HORNISHER: Good afternoon, Your Honor. Once again, for the record, Audrey Hornisher with Clark Hill, PLC representing Chiyo Inoue Trust Dated February 17, 2010 -- I'm challenging Mr. Held on the names of our Landlords -- DB & BB Properties, LP.

We would just echo Mr. Gold's comments. We don't take opposition at this time. But call it scars from all these retail cases, we just want to put on the record that we reserve our rights to the extent that there are issues as we move forward through these cases. We've all seen administrative insolvencies.

So thank you, Your Honor.

THE COURT: All right. Thank you, Ms. Hornisher.

MR. BLANK: Hi, Judge. Steve Blank from Alston & Bird on behalf of Wilmington again.

I want to piggyback on some of Mr. Baker's comments. I hear everything he says. We also continue to reserve our

rights for all of the same issues. And I believe that there's a reservation in the order as well which should capture that as well.

THE COURT: Thank you very much.

All right. Anyone else on WebEx wish to be heard?

MS. JUHLE: Yes, Your Honor. Just briefly. This is Danielle Juhle on behalf of Fifth Third Bank, one of the Warehouse Lenders to the nondebtor affiliates SPVs -- in our case, SPV 6.

We'll be very brief. Largely duplicative of the concepts that Mr. Baker and Mr. Blank have reiterated. But there's obviously the use of the words, as described in this case, when you've got debtors and nondebtors can get confusing. I very much appreciate everyone's efforts, including throughout the weekend, to make sure that the order really parsed through that and made clear that we've got a lot of uncertainty still to sort through and that everybody is onboard to work toward that and ultimately figure out who's got what and where it belongs.

So, supportive of the revised order as described, but just wanted to reserve the rights as well.

THE COURT: All right. Thank you very much.

All right. Anyone else wish to be heard?

Mr. Gibbs?

MR. GIBBS: Your Honor, maybe I should continue the

theme and also make sure that the Court knows the Trustee reserves all of her rights.

THE COURT: I'd like to reserve mine as well. All right.

(Laughter.)

MR. GIBBS: One housekeeping matter. To the extent Your Honor is inclined to grant this motion -- and we reiterate our earlier thanks to the parties for working through the language in getting this to a consensual situation, with full reservation of everybody's rights -- there is a bit of a logistical issue. The Trustee needs to get a check cut and overnighted in order to comply with the agreement we've made with counsel for the premium finance company that has the hearing set tomorrow.

So, to the extent the Court has time at the end of the day to make sure that the order, if you're inclined, is entered and uploaded, that would be helpful.

THE COURT: All right. Well, if anyone is back at the office, if they upload it right now, I can make sure that it happens even while we're addressing the real estate issues.

MR. GIBBS: Okay.

THE COURT: So, a few comments. First, a reservation of rights, of course. I'm kidding with you guys.

The Court will grant the interim order with respect to cash collateral. I will likewise set this, unless anyone

wishes to be heard about an alternative setting, I'll just set it with the hearing on the Vervent stipulation for November 17th at 1:30 on a final basis.

I do think it's a good idea to have interim and final approval. I certainly appreciate everything that's happened so far with the various secured lenders in reaching a resolution. Everything, I think, happened so quickly between the filing of the motion and the filing of the redline, the Court just read it clean in terms of the volume of comments.

I do really appreciate that there are just so many competing parties with respect to whether the liens on or ownership of the various collateral in the case, that parties are coming together to the best of their abilities to figure out a reconciliation procedure. As I've echoed time and again at our various hearings, I think that that's what this case needs, is process, procedure. And I don't expect that the various secured parties can come to agreements on an asset-by-asset, collateral-by-collateral basis, but I do believe that there is something to be said about an agreement towards a process, and I think that's where you guys are getting.

With respect to the Landlords' comments with respect to cash collateral, I certainly understand where the Landlords are coming from and we'll address their issues in a moment. But at least as narrow as this motion is for today, and that's all that's before me today, the Court will note that I think

that there is something to be said about insurance. And in bankruptcy, we're value-maximizing, and without insurance, I think that that is certainly a detriment that could befall the estates.

So, from that perspective, the Court will certainly, on an interim basis, grant the cash collateral relief that the Trustee [Court edit throughout] negotiated with the various secured lenders for payment of the insurance as well as to pay the two employees who have been acting as consultants for the Trustee.

As I said, I have had an opportunity prior to the hearing to go through the form of order.

The one thing that I'd also like to say is, with respect to the motion to lift stay, if you don't intend to have the preliminary hearing tomorrow and you're going to enter into any sort of consent or agreed order, there is a process that you guys might or might not know about because you don't play on the preliminary lift stay docket that often, where you can file an announcement of an agreement, and that way it doesn't come on for hearing. It's called a Docket of a Notice of Announcement.

So if you all do that, Ms. Harden -- Mr. Grayson Williams, you should remember how things fall off of dockets. But in any event, if you file that notice, it'll come off of the docket and we won't have to have a hearing tomorrow. But if

not, I'll be here on WebEx, bright-eyed and bushy-tailed.

All right. So, with that, the Court will grant the interim relief as requested by the Trustee and as agreed to by the form of order or substantially the form of order that was filed at Docket 267-1. And we'll have to set that final hearing for November 17th at 1:30, and ask that the Trustee file a new notice of hearing for both of the motions on that score. All right.

MR. GIBBS: Your Honor, thank you very much. Appreciate it.

The last thing on the docket is the motion for -- Emergency Motion for Status Conference filed by a group of Landlords --

THE COURT: Yes.

MR. GIBBS: -- seeking a procedure to handle a myriad of motions for relief from stay that have been filed in the last couple weeks, as well as a couple of motions to compel --

THE COURT: Right.

MR. GIBBS: -- on behalf of various landlords.

The Court may have been busy this morning and not seen, or doing the noon hour, --

THE COURT: Your rejection procedures?

MR. GIBBS: Yes.

THE COURT: Yes.

MR. GIBBS: We filed at Docket 269 an omnibus motion

for an order authorizing us to reject certain unexpired leases and abandon associated certain real property.

That exhibit to that motion, if we did it right, lists all but two of the locations that the Debtor currently has under lease, and those would be the -- what we call the Recon Facilities, the reconditioning facilities, one south of town in Wilmer and one south of town on 635, over close to 45. We have the financial advisor, which the Debtor -- I mean, which the Trustee has sought to employ, has been actively attempting to market the Debtors' interest in all of the leases. We've been moving as quickly as possible, trying to determine if the leases are under market or over market, whether there was potential value to the estate through a process of assumption and assignment of those leases. We have active conversations going with respect to the two leases that we have not listed on this motion. But all of the others, we've moved, I think, quite expeditiously. In roughly 45 days of the case being filed, or less, we have now brought this motion on for authority to reject those leases.

I think that should substantially moot the motion that you're about to hear, but it's not my motion and I'll respond to whatever comments the various Landlords have on the motion they have set for today.

THE COURT: All right. Thank you very much, Mr. Gibbs.

I look forward, actually, to the status conference on this. I think it's a good idea. Again, we've heard from the secured lenders as a bit of a collective from time to time because they have a lot of shared interests, and I think the Landlords do as well. So I actually welcome the status conference on this point.

I do believe that perhaps rejection procedures perhaps moot some of the issues with respect to compelling assumption and rejection and the like. But I think it's as good a time as any to hear, like I said, from the collective. And there's a lot of Landlords whose counsel is here today.

So, with that, do you have an interim leader? Is that you, Mr. Held?

MR. HELD: Well, I think of LBJ and the old, you know, "If nominated, I will not run; if elected, I will not serve." But yes. Like it or not, you get to hear from me. And I may have attributed that to LBJ incorrectly.

But once again, Your Honor, on behalf of ANC Ventures, LP, Bullish Resources, Inc., and CICF III-TX1B01, LLC, which I'll just refer to as "ANC," "Bullish," and "CICF," respectively, three Landlords -- and I misspoke, Your Honor, there are three locations -- and the last of those, CICF, is one of the two, as Mr. Gibbs put it, the recon facility. That is their Landlord.

So, just to set the table, Your Honor, along with other

similarly-situated Landlords, 603 San Fernando Road, which I believe Mr. Gold and his co-counsel here in Dallas filed a similar motion to compel, as did BV NWH, LP, which Mr. Smith, Garrick Smith over at Munsch Hardt, filed a similar motion to compel, we've got five different locations that are affected, at least by the motions to compel. That's not including the dozen or so, there may be more, I believe I counted a dozen different motions for relief from stay.

Our motion we filed jointly to have this status conference, and I'm glad the Court is receptive and eager to hear from us, because, as was stated by Mr. Gibbs a moment ago, and actually Mr. Williams, that, you know, there's a lot of agreement going on between the secured lenders and the other parties in the case. We haven't heard anything about the Landlords, and we're the ones who are involuntarily creditors here whose land is either being used to store vehicles or, and in a lot of cases, and I think one of our particular locations, ANC Ventures' location in Laredo, I think cars have been off of that lot for some time. But nonetheless, address something kind of backwards here in the order.

Mr. Gibbs just told you that they had filed a motion to reject. And he didn't mention that was motion to reject *nunc pro tunc*. They're seeking to reject all but two of the leases back to the petition date, which I won't go into the merits of

that right now with regard to their use of the facility either as storage or it's certainly stiff-arming all of the Landlords in being able to have their leases rejected.

But I wanted to address the Court's comment first about the mooting of that motion, in part at least, by this -- I'm sorry, the mooting of our motion to compel in part by this motion to reject, which I think ought to more appropriately be called a motion for additional free storage and marketing, because what they're asking to do, Your Honor, is they're asking -- you know, first of all, the motion contains 24-day negative notice language.

And so that rejection, under their request, wouldn't occur until at least November 20th, and my guess is they'd seek to have a hearing at some time after that date, and basically chew up the month of November without paying November rent. Right?

And the motion doesn't lock in rejection prior to that hearing, so it gives the Trustee most of November to continue to market and use the lots for storage, if that's the case. And it doesn't bind them, so they can essentially, any time before the negative notice language expires, and, frankly, before the hearing takes place, if there is a hearing, would allow them to pull any or all of the leases, these all-but-two leases, off. Right?

And we didn't -- you didn't hear Mr. Gibbs say -- he gave

you an update on what's going on with marketing the cars, but he -- I think I heard him say that they're in discussions with somebody about the marketing of the two recon centers but not -- maybe not the others, but I didn't hear him say 'and not the others.'

But again, I don't doubt for a second that, with that time, they'd seek to -- they'd seek to continue to market. If they were very serious about (a) not causing further damage to the estate, they would have moved with an emergency or some type of expedited notice to get a procedure on file that would allow for the immediate rejection, before the end of this month, for some or all of those all-but-two locations, right, I mean, so as not to incur another month's worth of postpetition rent, which, under 365(b)(3), the Landlords are entitled to.

The motion also doesn't -- the motion to reject, I'm sorry, doesn't address tendering possession of the premises, which, as the Court knows, is required in order to effectively reject.

And, again, it doesn't moot the request for payment of all the Landlords with regard to the October rent and the soon-to-be-due November rent, unless these are indeed rejected before the end of this month, which I don't think has been requested at this point.

Your Honor, again, what we're dealing with here are six --

well, actually, not six, I guess it's four different motions to compel both payment and rejection. And then you've got, like I said, another dozen or so motions for relief from stay. Now, in fairness, we asked for the status conference to really combine the various motions to compel, but I don't for a second think that the issues raised by the motions for relief from stay are that different. I think, at their core, the real issues under 365(b)(3) and related issues are going to be the same under all these, you know, call it 16-plus motions at this point.

Just to go back, Your Honor, I know that the response to rejecting these various lots, other than the recon centers, by the end of this month is likely to be, well, we have cars on some of them. I don't know which they have cars on and which they don't. I know my last intel from my clients were, at least one of the premises, no cars.

But regardless, I think most Landlords, and I can speak only for mine, at least my Landlord with no cars would absolutely -- and the one, one of them with, would accommodate secured lenders if the need is there to get their cars off of the lots.

I mean, the issue is this is not the motion that's filed. I mean, I know we're not arguing the motion to reject at this point, but the motion as filed, you know, is not irrevocable. In fact, it's just the opposite. It's very flexible.

In any event, Your Honor, to the heart of why we asked for the status conference, we thought, with all these common issues, that it made sense to go ahead and combine, and hopefully, the way these motions lined up, I think the earliest of which was our original motion for ANC and Bullish, and then shortly, I mean, within the span of an hour or two, I think Mr. Gold had filed his motion. And I think the response on the 21-day notice would expire, unless this Court shortens it, on I believe it would be November 7th.

And the idea we had and wanted to propose to the Court was, you know, it makes little sense from judicial economy and costs to the Landlords and the Chapter 7 estates to try each of these separately, when the issues are so similar, if not identical.

And so we thought about having an omnibus response to the Chapter 7 -- I'm sorry, for the Chapter 7 Trustee, which I think would make sense, and then some very limited expedited period for us to, as Landlords, to reply. And more than anything else, in the reply, besides for dealing with whatever 365(d)(3) arguments might be raised or against 365(d)(3) and the plain language of it, to also give the Court an update on what's going on real-time on the ground as far as, you know, vandalism or cars being there, not being there, et cetera.

And what we had kind of sketched out, Your Honor, is the idea of maybe the 10th of November being an omnibus response

deadline, then giving the Landlords to the 14th, and then having a hearing or looking actually at the 18th, which we thought was clear on your Court's calendar, if the Court can accommodate us, to really deal with these, like I said, very similar if not the same issues for the multitude of Landlords that are dealing with this.

And one of the reasons, Your Honor, I neglected to mention as to why it's so important to us to get this done quickly, besides from the fact that we're, you know, the party not mentioned, that's not being paid their administrative expense claims or their rent, which is supposed to be paid under 365(d)(3), the Court made a comment about giving the Debtor -- or I'm sorry, the Trustee, their 60 days. And I took that to mean the 60-day rent holiday, which they didn't ask for but nonetheless got under 365(d)(3). That 60th day, if you will, is November 9th. So November 10th, which I propose as the omnibus response deadline, is the day under which or by which, under 365(d)(3), really, the obligations that have amassed during this first 60 days, the October rent and the November rent, should be paid.

And, again, I can only confirm the rent, and Mr. Gold, who will be quick to correct me, it's not just that. I mean, again, it's been less of a documented issue for my clients as of yet, but I know Mr. Smith, Mr. Gold, had filed motions where there is -- there are security issues and there's

vandalism issues.

And just all of those issues, they need to be abided by, or the lease obligations need to be recognized and complied with by this Debtor.

And, again, I know they're saying, hey, we're going to reject, but that's not really what this motion for additional free storage and marketing really says.

With that, I'll pass. And I'm sure there's many other Landlords that are more eloquent than I that have other issues to address.

THE COURT: And I'll certainly hear from them. And let me be clear. My comment about them being mooted is that essentially you've got -- the Trustee has essentially staked a flag in the ground as to what it proposes with respect to various of the real estate leases, recognizing that the motion could be changed, the exhibit could be changed if they found a taker for any of the properties or if there was any further negotiation with respect to the Landlords.

However, again, we have some sort of response from the Debtor by way of their rejection motion, but by no means are the legal issues, I think, necessarily moot, especially before the Court has had an opportunity to hear it.

So, with that, I'll start with Ms. Hornisher, because she's in the courtroom, and then I'll go to the various other Landlords and see if they wish to be heard.

Ms. Hornisher?

MS. HORNISHER: Good afternoon again, Your Honor. Three times is a charm. Audrey Hornisher with Clark Hill, PLC, representing Chiyo Inoue Trust Dated February 17, 2010, and DB & BB Properties, LP.

I will not repeat all of what Mr. Held --

THE COURT: Sure.

MS. HORNISHER: -- eloquently said, but I do want to note that there are glaring omissions from the motion to reject. We have not filed motions to compel at this juncture. We've not filed a motion for relief from the automatic stay at this juncture. Those are things that we're considering. We understood the motion to reject is going to come down the pipeline, as it did. We're pleased that there is one, but we think that there are some glaring omissions from it.

As stated by Mr. Held, it lacks a process for turnover of any keys, possession of the property, date of the property. Additionally, as discussed, the rent holiday is going to quickly expire. The drop-dead date is November 10th. So the payment of rent for both of our properties are going to come due at that time. And we are gravely concerned that there is already administrative insolvency. Our clients are going to be left with their premises retained by the Trustee, probably until December, and we have not been given adequate information, no assurances that there is going to be a

payment.

And in fact, we've now been told that there won't be a payment.

We don't think that that's appropriate. While we haven't taken a direct stance on it yet because the motion was just filed, it is something we want to bring to the Court's attention that it's something that we're concerned about. And we're certain have the Trustee has utilized emergency procedures in this case multiple times. So if they were authentic about wanting these to be rejected as of October 31st, which we've seen in multiple other cases, and in this case already we've seen things by emergency motion, they know how to do so.

So we think that there might be some altering of the properties that are ultimately rejected, which does just put us as involuntary creditors on the line. And we are holding up the case at this point. It's on our backs. So we would just appreciate the Court's attention, and reservation of rights for things that might come down the pipeline.

Thank you, Your Honor.

THE COURT: All right. Thank you very much.

All right. Let me see if I can go into maybe the orders of appearance. Ms. Shriro, do you wish to be heard?

MS. SHRIRO: Yes, Your Honor. Michelle Shriro for the Leasing Corporation.

We have not filed a motion for relief from stay or a motion to compel, either. And I echo the comments of my other fellow Landlord colleagues. I don't really want to repeat that. But, and certainly the motion was just filed. But we are very concerned about payment of rent and that we're going to have to wait another few weeks before the motion is heard for the rejection.

And so if there is any way that the rejection could be heard earlier, that would be great. And we are also very concerned about payment. And certainly, they're using our property at least for storage.

And so that's my only comment.

THE COURT: All right. Thank you very much, ma'am.

All right. Mr. Gold?

MR. GOLD: Thank you again, and good afternoon again, Your Honor. Ivan Gold for 603 San Fernando Road.

I'll start with the basic procedures that brought us before you with the request for status conference. And I won't repeat what Mr. Held, who ably led off the batting order with, but we were looking to coordinate these multiple motions and create a streamlined and orderly process, given the circumstances of this case, and, really, just as much for the benefit of the estate, too.

A coordinated calendar, an omnibus response by the Chapter 7 Trustee, would just simply save money. And a single hearing

in front of Your Honor would simply save money. And all we hear is how dear it is in the case, and there are multiple claims against it, so let's do something that fits in with that narrative.

And that's why I think, it's not used that often, but I think 105(d) speaks to this type of status conference to create a scheduling order and a streamlined process. So we would ask for that.

As for whether the motion that was filed earlier today moots our motions, the simple answer is absolutely not. The one scenario that hasn't been discussed is what if the Trustee's motion simply loses because it does not meet the standards for retroactive rejection that have been applied in multiple cases?

I don't want to argue the merits of the motion, and several of my Landlord colleagues have mentioned it, but just the mere fact that possession has yet to be returned is a major factor in all of the cases. The motion is silent as to the tender of possession.

It gets worse based on the comments today. If I've got a parking lot full of cars, which my client as of the weekend had, how can possession be returned? What is the equity in doing that retroactively to the petition date? It's simply a mechanism. You know, creative does not always equate with meritorious. It's a creative mechanism to avoid rent payment,

to avoid the reality of the fact that the Debtor marketed these spaces for the benefit of the estate. The fact that the premises are being used for storage, for the benefit of the estate.

And it's even better that, 40 years ago, 365(d)(3) was added to the Code to make benefit to the estate irrelevant while the Trustee decides what to do.

And the retroaction rejection cases must be viewed as a narrow exception to that.

So I think we have to prepare ourselves for the possibility that maybe the Trustee doesn't get what she wants. And then we have to deal with the consequences of that. And I think, while several of my colleagues have mentioned it should be heard on accelerated time, and I think it should, but I think it can't, because that's the Trustee's strategy, let's string this out so we can remove the cars by mid-November. Mr. Held laid out the timeline.

So even if they're rejected the end of October, there are still administrative rent issues that need to be addressed. Even if it's the date of the filing of the motion, retroactive to that, even though my client doesn't have keys today, maybe we have that. But as an administrative expense avoidance issue, just the mere storage of the vehicles creates 503 claims.

So I'm not sure the motion accomplishes what the Trustee

thinks she's going to achieve.

So, as to coordinating schedules on the pending motions and maybe any motion that's filed in the next day or so, I'm all in, Your Honor. But as for whether or not this motion moots the request for relief, absolutely not.

And as several counsel have mentioned, rejection is not merely an accounting entry that removes the rent obligation. There's the risk of loss. If the lease is rejected as of the petition date, the Debtor no longer has an insurable interest in the premises as of that date. So the Landlords, who are already unreasonably bearing some of the expenses of this case, as several counsel have mentioned, now we get the risk of vandalism, we get those risks of loss, the security issues. If the Debtor is permitted to time travel to the petition date, that's further imposition on the Landlords.

So mootness is a hard no, Your Honor. Thank you.

THE COURT: All right. Thank you, Mr. Gold.

All right. Let's see. Mr. Smith, do you wish to be heard today?

MR. SMITH: Your Honor, I'll be very brief. Garrick Smith on behalf of BV NWH, LP.

I don't intend to a retread the arguments, standards, that Mr. Gold and Mr. Held and others have emphasized. I would just note two things from our Landlord my client's position, which is, one, there has in fact been vandalism and broken

glass on the premises. We have security (garbled) the premises the longer this goes on. In the motions that we filed at Dockets No. 243, 244, and 247, we included pictures of that vandalism.

There have been different assurances that Vervent or others would, I think, be taking care of that, or that there would be security or some kind of, you know, security of the premises. I am not aware of that occurring, and we're just worried that there's going to be further value -- to the property as long as this goes on and drags out.

And then, two, echoing others, our concern kind of dovetails with the first point, is that these motions could potentially be amended, withdrawn, delayed, further into November or December. And as a result, our hope was, in coordination with Mr. Gold and Mr. Held and Ms. Matthews, was that we could get a hearing date set, ideally as quickly as possible in November, but at least as a backstop in November at some point, so that if these motions are modified, amended, withdrawn, we have a hearing on our motions already set and we have responses and replies that have occurred, so due process has occurred.

I'll reserve any comments about administrative expenses and other issues that Mr. Gold and Mr. Held raised, because, like I say, we've conferred on those, we agree on those, and Your Honor doesn't need to hear those from us again, and I

candidly wouldn't articulate them as artfully.

So, thank you, Your Honor.

THE COURT: Thank you very much, Mr. Smith.

All right. Let's see. Just going down my list. Mr. O'Keefe, do you wish to be heard today?

I think you're on mute, sir.

MR. O'KEEFE: (garbled)

THE COURT: You're kind of going in and out. Can you try getting maybe a little closer to the speaker? Or the microphone, excuse me.

MR. O'KEEFE: (garbled). I agree with all the suggestions regarding expedition and coordination. What I also have a suggestion is for the Debtor. Queuing up a battle over the retroactive rejection doesn't make any sense at this point in time, because there may be nothing left. The Trustee has a graveyard priority, and I don't want to spend my client's money battling over a retroactive motion which seeks to vitiate my client's claim when there may be nothing to pay that claim.

So I really think the Trustee should simply say, look, file your proof of claim. If there's something left at the end of the case, then we'll fight over it. But I don't want to spend any more of my client's money, because I'm concerned that there is going to be nothing. It is clear to me that what's happening here is 8,000 cars are being warehoused for

free, and that really should be a surcharge to the secured creditors who have liens on those. But that's all for another day. I just think this motion shouldn't queue up a battle which is premature.

THE COURT: All right. Thank you, Mr. O'Keefe.

MR. O'KEEFE: Thank you, Your Honor.

THE COURT: I appreciate you.

Is there anyone else who wishes to be heard, any other Landlords who wish to be heard that I may have missed?

(No response.)

THE COURT: Okay. With that, Mr. Gibbs, let's respectfully summarize that they disagree.

MR. GIBBS: A couple of comments, Your Honor, and we'll just -- we'll do what the Court wants us to do.

My earnest young colleague, Mr. Williams, when he told me that he was approached by one or more of the Landlords' counsel seeking to have their emergency status conference motion put on the calendar with this motion, I said the reason they want to be set with this motion is not to talk about a procedure but rather to complain about the fact that they weren't being paid out of any cash collateral today, and also to argue the merits, get a first bite at the apple.

Their estimate for time necessary to talk about -- at the status conference, to talk about a proposed agreement, was 10 to 15 minutes. We estimated to the Court that our two motions

would be done in less than an hour, and I think we were done in 50 minutes, and their 10 to 15 minutes for a status conference, we're now at 45 minutes, and all we heard was the merits of their case and the lack of merits of our case, none of which is on the docket today.

So rather than rebut and stake out our position, in contravention to all of what you just heard from several Landlords, to the extent there were a couple of comments that actually were constructive about a proposed procedure to streamline and save expense, we're all for it. We'll do an omnibus objection. That's fine.

There was one concrete date proposed for I think an omnibus hearing. That happens to be the day that the 341 Meeting in this case is set. That won't work.

THE COURT: That date won't work for the Court, so --

MR. GIBBS: Yeah.

THE COURT: -- I'll just -- that way, you don't have to be the fall guy.

MR. GIBBS: Yeah. Thank you.

THE COURT: I looked, and all I saw on that one was red, so that date won't work for the Court. But we'll get one.

MR. GIBBS: So to the extent the Court has time in November, after that date, other than Thanksgiving Day, you'll get the Trustee and her counsel here to argue the motion. To

the extent that the inference -- it wasn't an inference; it was actually an accusation -- that the Trustee's strategy was to string things out, I'll remind the parties -- and they've been here at every hearing, they know it, but let me make sure the record is clear -- the Trustee entered into an agreement with Vervent that was brought before the Court within a week of the case, that transferred to Vervent, who was the contractual backup servicer for the Debtor for all of the loans the Debtor had written, the hundreds of thousands or more than a hundred thousand loans that were either owned by securitized trusts or pledged to warehouse lenders, and those agreements that put TAA in as the servicer established Vervent as the backup servicer. And what we came -- the very first week of the case was to transfer the responsibility and authority pursuant to those agreements to Vervent.

Vervent has been the sole party in charge of the transfer and the retention and protection of all of the vehicles claimed by the various parties in the case.

So the Trustee takes issue and frankly resents the accusation that our goal was to string things out. If they could have moved ten thousand cars by today, God bless them, they're working as hard as they can. It's a lot of cars in a lot of places, and they're at it, and they've got a plan, as I indicated to the Court, that they believe those cars can be, if not completely, then substantially moved by the 16th of

November, which was why we came before the Court today to get authority to protect the estate's interest and the creditors' interest in those vehicles until that date.

We're fine with the request, to the extent that was the reason they came here, for a consolidated, streamlined procedure to get it before the Court as expeditiously as possible. We're fine with a procedure that saves expense. As I indicated, we can't have a hearing on the 18th. To the extent the Court wants to set an omnibus reply date, we'll file that reply, and we'll file whatever briefing the Court wants, and we'll be ready to argue the motions whenever the Court gives us time.

THE COURT: All right. Thank you very much, Mr. Gibbs.

Anyone else wish to be heard?

MR. BLANK: Again, Your Honor, Steve Blank, hopefully for the final time, from Alston & Bird for Wilmington.

Again, reservation of rights. We don't want a dog in this fight. To the extent our stuff is on these premises, we have one. We'll reserve our rights and see how it all shakes out.

THE COURT: All right. Thank you. Okay.

MR. HELD: Your Honor? Your Honor, Michael Held.

One last comment. I just thought I'd throw it in there because it's an important issue that I raised just slightly before, which is, to the extent there are locations where

there are no cars, no vehicles, I don't understand if, given Mr. Gibbs' comments, where the resistance to going ahead and rejecting those immediately would be. I mean, it seems like it would save some heartache for the estate later in this argument of rent and so forth.

THE COURT: Okay. Thank you very much, Mr. Held.

Let me say a few words. Number one, with respect to the status conference, again, the Court welcomed the status conference. I still think it's a good idea, even though it was a little bit less of a *Kumbaya* moment than it otherwise could have been.

I actually think it's good, because first and foremost, when you start thumbing through everything that has been filed by the various Landlords, including those who have appeared today and who have been heard but haven't filed anything yet, obviously, there's a ton of ways that these kind of issues can come to the Court, whether it's a motion to compel assumption or rejection, a response to a motion to reject, a motion to lift stay, a motion to compel administrative payment, and everything in between those, I do believe that, similar to the way that things have been treated to date, sooner rather than later the Trustee needs to look at the real estate issues.

These are not unlike we'll see in retail cases with going out of business sales and things of that nature. And I'm sure that at least, if not the Landlords, all of the folks

representing the Landlords, have seen cases where these issues have not, let's just say, gone profitably for the landlords.

But, again, I think there needs to be some process. As you know, we're approaching the statutory rejection date in any event. We're going to have to, at some juncture, hear out all the Landlords.

I don't want to be cute, but to be talking administrative insolvency in a Chapter 7 within a month of the case, administrative insolvency at this juncture doesn't surprise me in any way. Perhaps it surprises people because of the size of the case, but if the case were to be administratively insolvent today, it doesn't surprise me. We have a lot of collateral, number one, to figure out who owns. We have a lot of collateral to dispose of.

But with that said, I totally recognize that, from the Landlords' perspective, I think the term, I think Ms. Hornisher may have coined it at the last hearing an "involuntary creditor," or maybe it was Mr. Held, is a fairly good analogy to what's going on.

On the *nunc pro tunc* rejection, I won't say too much about it. I think it was the first thing I ever had to have a contested hearing on, and the litigant on the other side was Judge Abramson. So I understand very acutely what that could mean.

What I'll say to the parties is I do believe that it's

time to probably have a call to figure out what's the best process going on. Like I said, the Trustee staked a flag in the ground with its rejection motion. All locations, all Landlords, they're not fungible. Every one is a little bit different. Those who still have cars on the lots is different; those who perhaps the Trustee has attempted to market and don't see a market for.

Perhaps some stipulated rejections might be a way to go if agreements can get made. Otherwise, I think that we need to set a process. But with that process, I want people to be intellectually honest here. If I've got what looks to be, according to the motion, dozens of Landlords, not all have filed things but all eventually will, I have dozens of Landlords and they probably have at least a half a dozen different arguments, that's going to be a major hearing.

So I think that more time should be spent on process and agreement for at least the low-hanging Landlords that we could do a quick rejection on, that there's some version of an agreement.

But other than that, the Court is happy to schedule a hearing. We've got considerable time on November 25th, I think, which is the Tuesday before Thanksgiving. Well, I say that. Wait a minute. Oh, it looks like the morning of Tuesday, the 25th, is open.

But, again, the question is how much are we going to get

done. So I'm happy to set some omnibus reply dates, set some hearings. But I think that what this case needs more than fights and contested hearings is some conferencing and kind of figuring out what are the next best steps.

I think when it comes to rejection procedures, other than the *nunc pro tunc* relief and addressing things like how do you get your property on and off and how do I get the keys back and secure the premises, that's an area of the law where I think that there's very few issues to retread. I think that there's lots of procedures going out in the complex cases that parties would be familiar with to kind of get there.

On the bigger issues with respect to rent and the like, we'll just have to try that. *Nunc pro tunc* back to the rejection date, that's a fact-specific issue. It's going to be an issue that's going to have to be determined on a landlord-by-landlord basis, and it's going to have to be subject to evidence by the Trustee. I think the case law bears that out.

So, with that said, do the parties wish for me to set deadlines now, or do the parties wish to speak and come back and -- or reach out to Ms. Harden and figure out how much time you're looking for and when you want to have the motion set?

I'm not trying to give you guys the Heisman at all. I'm just trying to recognize that rushing ourselves to a hearing, I'm not sure that that's in anyone's best interest. I don't

want to spend the Landlords' money, nor do I want the Trustee to incur the attorneys' fees. So you guys tell me what you're looking for.

I'll start with you, Mr. Held.

MR. HELD: Your Honor, I think, as it stands right now, at least with regard to the discrete number of motions to compel that are on file, there are already 21-day negative notice language, so I think that spans from the earliest motions that need to be responded to by November 7th to perhaps November 11th, as far as response deadline.

And, again, I am fine talking with the Trustee's counsel with regard to establishing a date in that time frame to doing some kind of omnibus response.

THE COURT: Okay.

MR. HELD: And I also would -- I would like to see, if it all possible, and I appreciate Your Honor just giving us some insight of your calendar, but setting a hearing, even if we need to -- just to pencil it in, to have something on the calendar. Because I think it's vitally important to each one of the Landlord clients to make sure that this doesn't somehow bleed into December.

I think I heard Ms. Shriro or maybe it was Ms. Hornisher state I think that they were concerned that things might bleed into December, and that made the hairs on the back of my neck stand up.

THE COURT: Fair enough.

MR. HELD: So I think we need to get this resolved.

THE COURT: Again, I think you're rejected by statute by that time, but yes.

So in terms of the filed motions to compel, not the motions for relief from stay, which I don't have before me -- come up, Mr. Gibbs.

MR. GIBBS: Your Honor, I believe 365 gives me 60 days to reject executory contracts and residential real estate leases. I think I have 120 days to reject nonresidential. And I did that just to make sure Mr. Held's hair on the back of his neck stands up.

THE COURT: Yes. Now he's mad.

MR. GIBBS: But we do, you know, --

THE COURT: You are correct. You are correct.

MR. GIBBS: No, I will --

THE COURT: Misthinking on that one.

MR. GIBBS: What I said earlier goes. We'll --

THE COURT: Okay.

MR. GIBBS: We'll be here whenever the Court tells us to be here.

THE COURT: All right. You're correct. That's my fault.

All right. Okay. So --

MR. GOLD: Your Honor, if I may be briefly heard.

Again, Ivan Gold for 603 San Fernando Road.

THE COURT: Sure.

MR. GOLD: As Mr. Held said, an omnibus response date on the 10th I think is a good idea. If the Court is not available, although the joy of DFW a few days before Christmas is really exciting to me, if the 25th is the only day that works, we can't do it over --

THE COURT: The giant eyeball will have a garland around it. You'll love it, Mr. Gold.

MR. GOLD: Your Honor, it may come as no surprise to you, I've seen it.

It'll also, if we're going to go that way, then we will have the Debtor at its word as to the status of vehicle removal by mid-month. And the Landlords could update the Court, as Mr. Held in his initial outline, that not only would we address -- we would address these issues in terms of the legal issues, we would have some factual updates for Your Honor. Because certainly it will simplify things if all the cars are removed. That's one less set of potential dividing issues among the Landlords.

The question that I would ask is coordinating this hearing, particularly if you're going to block out a significant period of time for it, is that we would have the request for retroactive rejection heard on the same date, or a different date? And that's really the reason I wanted to

throw that out there. I could give you arguments either way. But I think we should address that elephant in the room before we start setting consolidated schedules with respect to the motions to compel and the related motions for relief from stay from the various Landlords.

THE COURT: All right. Thank you, Mr. Gold.

All right. So to bring a little bit more order to the chaos, in terms of an omnibus reply, my staff has attempted to pull together for me, not on the lift stay side, but at least on the issue of motions to compel, I think each of these is at least styled as a motion to compel in some shape or form, that's Docket 226, which is Mr. Gold's and Ms. Matthews' clients; Docket 229, which is Mr. Held and Mr. Butler's clients; Docket 245, also Mr. Butler's client; and then Docket 247, which is Mr. Smith's clients.

So BV NWH, CICF III-TX1B01, ANC Ventures, Bullish Resources, and then 603 San Fernando Road, that's what I have in terms of asking the Trustee to do an omnibus response. Or are we proposing that the Trustee also file an omnibus response to the motions to lift stay? Which, I'll be honest, I don't have a catalog of before me.

Is there any Landlord here that's filed a motion to lift stay that wishes to be heard on that?

MR. O'KEEFE: Your Honor, this is Sean O'Keefe. Yes, I have filed a motion for relief from stay. I believe it was

set for November 24th.

THE COURT: Okay.

MR. O'KEEFE: And it just seems to make sense that we would be on the same track as the other motions, since we're all seeking the same relief.

THE COURT: Okay. All right. So I don't have a problem with -- so with respect to the lift stays, the lift stays are a different process than the motions to compel and what. So the lift stays go through a preliminary lift stay process, which essentially is a competing-affidavit process, and then you go from that to an evidentiary hearing. So if you want to waive the lift stay, the preliminary process, you have to do the necessary to get the agreements there.

Other than that, again, I'm not opposed to having these all together. In my mind, if experience is a marker, we won't finish this in half a day. And so I can tell you what the Court has. There are 14 lift stay motions that are currently set throughout next month. Not every one of those is going to be Landlords, but I'm not sure what they all are.

I've got the morning of the 17th. Which, obviously, I've got the full day, given I've scheduled things in this case in the afternoon.

I have got the morning of the 25th.

Now, I might have other than that. And then we go, from there, we obviously go to December, and I've got time in

December.

Now, I also have time -- I have time in my trial week I could do as well, but, again, that's the week of November 10th. That's even earlier, so that wouldn't work with the response period you have.

Do you guys want to start -- we could start a hearing on the 17th and then take anything back up on the 25th. What would you like to do?

MR. GOLD: I have a conflict on the 17th, Your Honor, a confirmation hearing in front of Judge Isicoff in Miami in, not surprisingly, a retail case.

I could manage it if we did this in the afternoon. Given the time difference and the estimate in that case, I could appear by WebEx. But I would otherwise generally prefer to be here live. So I know I'm only one cog in the machine, but I wanted the Court to be aware of that.

THE COURT: Okay. Thank you, Mr. Gold.

Do we want to do the 25th in the morning? Mr. Gibbs?

MR. GIBBS: Your Honor, it's difficult to herd the group, but I would suggest that parties at least either react to this suggestion or have the Court consider it, that we take as much time as you can give us on the 25th. I think trying to jam something in on the 17th is going to be a long putt. But it might make sense to essentially bifurcate the issues and have possession be the issue fought on the 25th, whether

or not a stay should be given, relief should be given or if we should be compelled in those current pleadings, asked to assume or reject, and have that issue decided hopefully by the end of that hearing on the 25th, and bifurcate for a claim amount, which really is the issue of *nunc pro tunc* rejection, to a later hearing.

To the extent that they want to get possession as quickly as possible, I think that schedule may accommodate the parties' interests. And as you indicated, it's a fact-intensive, landlord-by-landlord question as to whether or not the Trustee is entitled to have that rejection be *nunc pro tunc* back to the petition date.

I'm like you. I think there's slim, if any, chance that we would complete that evidentiary presentation in the time available on the Court's calendar in November, and I wouldn't want that issue to hold up the determination of how quickly the Landlords can get back their premises.

I've heard a lot of concern about potential administrative insolvency and the ability to get paid postpetition rent. Part of the balance that we've attempted to try to move quickly to achieve is to determine whether or not there's an ability to assume and assign, which presumes cure of any default. And I thought that might be actually preferable to all of the parties that you heard from today than having a claim in this case. So we were attempting to continue that

workstream at the same time.

So I think bifurcating the possession question from the claim question makes some sense, and I'll throw it out.

THE COURT: Okay. Thank you, Mr. Gibbs.

Anyone want to be heard? That is one way to just deal with timing issues, because --

MR. GOLD: Your Honor, if I may react initially. Again, Ivan Gold for 603 San Fernando.

Let us not forget, it is the Debtors' burden for retroactive rejection. It is extraordinary relief under the Code, and it is the Debtors' burden to justify the equitable relief sought. It is not the Landlords' burden.

I think that can be accomplished in a fraction of the time that is being proposed here. Yes, you can go through the list, but this is not *Party City* with hundreds of leases. This is a relatively finite amount. The schedule on the proposed order, the rejection motion, is not that long a list, and you go down *seriatim*: What's the situation at this location? What is the situation at this location? It is not a full-day evidentiary hearing.

So I don't -- I understand the appeal of the approach by Mr. Gibbs, but I would also note that it's -- very subtly writes (d)(3) out of the Code, that the admin rent not being paid and just merely reduced to a claim, Congress sought to fix that 40 years ago.

The Debtor has already self-helped its way or relied on comments from the Court, and I appreciate the first -- the early stages of this case. But Landlords have obligations, too. The purpose of bankruptcy is not to create more collateral damage.

And so I don't -- I have no problem with bifurcation, but we should not lose sight of the payment requests and the unambiguous "shall" language in 365(d)(3).

So while I don't oppose bifurcation, I don't oppose the focus on possession, we should not lose sight of the rest of the process and push it to the back of the line, as suggested.

THE COURT: And I hear what you're saying, Mr. Gold, and I appreciate where you're coming from. I guess the question is, with the amount of time that the Court has to give on the various days, and I can tell you where I have it, what is the best way to move forward?

MR. GOLD: I think -- I think, Your Honor, --

THE COURT: Again, three hours in the morning on the 25th? Let me tell you, three hours in the morning on the 25th in this case is not going to be enough time to get to bottom, just the four motions to compel that I have.

MR. GOLD: Oh, Your Honor, I think if we --

THE COURT: Not with all of the issues.

MR. GOLD: If we focus on possession, retroactivity, et cetera, and mindful of Your Honor's comments that we confer

and try and do one-off stipulations, some Landlords will choose to reserve their rights as to claims, some won't, I think we address further proceedings at the end of whatever time you have budgeted for us on the 25th.

We can always schedule the money part. Because one of the things about retroactive rejection, it will help guide the money part.

So I think we have to get possession out of the way. I agree with that. It's just I don't -- I don't agree it's reserved for the claims process. I think it's reserved for a hearing that you set after you hear all the other stuff.

MR. GIBBS: Maybe I misspoke. I wasn't suggesting we reserve it to the claims process, which is a long ways off. It was --

THE COURT: I didn't understand that, either.

MR. GIBBS: -- to a separate, discrete hearing that could be done as soon as possible. I just didn't think everything could get resolved by the 25th. And I heard loudly and clearly that they were driven by an end-of-November desire. So --

THE COURT: Right. All right. So perhaps I'll do it this way. And, again, the Court is -- I'm open to further discussions. I can certainly set, if the November 10th omnibus response date and the November 14th reply date work, the Court could then give you a morning hearing on the 25th.

We can set rejection procedures there, we can set these various motions to compel there, recognizing every issue won't be brought to bottom at that hearing.

And what the Court could also do is set a status conference on these issues on the 17th. That will be the last thing that we kind of take up on the 17th. And at that status conference, we can discuss how best to utilize our time. If there are any agreements that have been made prior to that, we could announce them then, to narrow issues for the 25th.

Because, other than that, I need to read each of these motions that's not set for today in earnest and figure out how to divvy the issues up myself. Which I can do; I just can't do it while I sit here today.

MR. GIBBS: Yeah.

THE COURT: So I think that that might be another way. And I know that you said, Mr. Gold, that you might be available by WebEx for a portion of that day, or if not, if you want to give your marching orders to Ms. Hornisher or Mr. Held or anywhere else to fight the good fight for you at a status conference, we could do it that way. Because, again, I think that there are ways to slice up these issues, but as I understand it, you probably have at least six issues under each motion.

MR. GIBBS: Correct.

MR. GOLD: I think the status conference approach on

the 17th works, Your Honor.

THE COURT: Okay.

MR. GOLD: I mean, call it a -- you know, it's like a pretrial on the issues conference, is really what we'll be doing.

THE COURT: Okay.

MR. HELD: Your Honor, Michael Held for the three Landlords: ANC, Bullish, and CICF.

That approach works for us. And I think the status conference, you know, can set the table more appropriately.

THE COURT: Okay. And, again, that will allow the parties to do as the Court has asked, which is, number one, confer. Number two, allow folks to have discussed, at least in terms of presentation of evidence, what's contested, what's not contested.

I think once the parties have an opportunity to talk, there will be some legal issues that could be put to another hearing where it's more oral argument in nature and the like. By bifurcating the hearing, I'm by no means changing a burden that is on any party, whether it be a motion to compel, the motion to reject, et cetera.

Do the parties agree that I would set the motion for rejection procedures with this, or do you wish to have it heard some other way?

At least in terms of those folks who have moved to compel

rejection, if I set the procedures that day -- again, I'm not going to use the term "moot;" no one liked that one -- but it will at least allow things to be heard one way or the other.

MR. HELD: And Your Honor, for clarification -- I'm sorry, Mike Held -- for clarification, are you talking about the rejection procedures to be considered on the 25th or on the afternoon of the 17th at the status conference?

THE COURT: Mr. Gibbs, would the Trustee be prepared to have their motion for rejection procedures heard on the 17th?

MR. GIBBS: I thought the Court was suggesting the morning of the 25th. That's far preferable to the estate.

THE COURT: I think Mr. Gibbs was thinking the 25th, to put it on with that one, to the extent that we could hear them at the same time.

MR. HELD: Understood. Your Honor, I was just a little concerned about the, again, between the holiday and the proximity to December 1, as I said, sliding into December is, at least from the Landlords' perspective, not really an option. So the earlier -- the sooner, the better. But, again, we intend to -- as soon as Mr. Gibbs and his team are ready to have a discussion as to where they are vis-à-vis our locations.

THE COURT: Okay. Thank you, Mr. Held.

Anyone else wish to be heard?

All right. So here's what the Court will do. On November 17th -- we're just going to give you the balance of that afternoon -- we will hear by way of pretrial conference or status conference, sort of similar to what we've done today, we'll set both the motion for rejection procedures and the various motions to compel for status conference that day. And then, again, that will allow us to discuss what to expect in terms of an evidentiary presentation. It will give the parties time to kind of catalog the list of factual and legal issues, and streamline and maximize the time available on the 25th, which will be the full morning session, but I do have afternoon hearings that day.

So I think that that will give us a little bit of clarity. I think that will give the Trustee the opportunity to understand what the bid and ask is. I think you hear today what's really kind of motivating most of the Landlords, which is (a) possession, and (b) postpetition rent, for lack of a better word, but there's obviously some security issues and the like.

I would certainly encourage the Trustee to establish a dialogue with the Landlords, now that you have at least a big group of them, to establish a dialogue with them to see what can be addressed, whether from a procedure and process perspective, if not ultimate decisions on various properties,

all of that leading towards, again, the omnibus response and reply dates that the parties have agreed to.

And I think those work well. And normally I would give you more time with a hearing that's being put out a little bit, but the 14th would be a Friday, with a status conference on the 17th. Actually, that gives people -- again, everybody's positions are kind of staked in the ground at the point.

And then, from the 25th, we would move into probably the week of December -- I've got time on the 1st, and then I should have time during the week of the 8th, although that's my trial week. Again, we can try to do those more into kind of oral argument issues, again, so we can try to front in possession issues as best we can. And I'll -- I think I already said that. I'll set the motions to compel and the motions for rejection procedures.

To the extent that -- again, I don't have all of the motions to lift stay in front of me -- if they can be made as part of any of this process, all the better in terms of responsiveness. But, again, I don't understand everything that's going on in each of those the way I understand what's going on in these motions to compel.

All right. Any other questions? Any points that need to be made?

MR. GIBBS: No, Your Honor.

THE COURT: Thank you, Mr. Gibbs.

All right. Well, again, I'll ask that the parties notice up both the status conference with the other two motions, and then the motion for rejection procedures.

And when it comes to rejection and these issues, to the extent parties entered into stipulations and you want to upload those, I'm not sure this is the kind of thing that needs a broader amount of due process, that anyone probably needs to be heard if we're just talking about especially turning over possession of empty facilities.

MR. GIBBS: Understood.

THE COURT: If folks' collateral is there, if cars are there, that's a different issue. But empty facilities, I think that those could probably be turned over by stipulation with rejection procedures, to the extent an agreement can be reached.

MR. GIBBS: Understood. And I just wanted the Court to know, we have uploaded the order.

THE COURT: I have signed it.

MR. GIBBS: Okay. Oh, thank you.

THE COURT: Thank you. It just needs to be entered.

All right. Anything else?

MR. GIBBS: No, Your Honor.

THE COURT: All right. Well, thank you all for your time. The Court will see you soon, it looks like. So, with

that, the Court will stand in recess.

(Proceedings concluded at 4:58 p.m.)

--oOo--

CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

**/s/ Kathy Rehling** **10/28/2025**

______________________________________ ________________

Kathy Rehling, CETD-444 Date
Certified Electronic Court Transcriber

INDEX

PROCEEDINGS 5

WITNESSES

Trustee's Witnesses

James Calandra
- Direct Testimony by Proffer 19

EXHIBITS

-none-

RULINGS

Emergency Motion for Entry of Order Approving Stipulation Between Chapter 7 Trustee and Vervent, Inc. filed by Trustee Anne Elizabeth Burns (53) - *Granted; Continued to 11/17/2025 @ 1:30 p.m.* 14

Order (generic) filed by Debtor Tricolor Holdings, LLC (196) - *Granted* 14

Chapter 7 Trustee's Emergency Motion for Entry of Interim and Final Orders Authorizing the Use of Cash Collateral and Granting Related Relief Filed by Trustee Anne Elizabeth Burns (255) - *Granted* 34

Emergency Status Conference Requested by Certain Landlord Parties filed by Creditor ANC Ventures, Ltd. (Related Documents 226 Motion to Compel, 229 Motion to Compel, 245 Motion to Compel, 247 Motion to Compel) - *Granted* 76

Motion to Set Hearing filed by Creditor ANC Ventures, Ltd. (256) - *Granted* 76

END OF PROCEEDINGS 79

INDEX 80