Docusign Envelope ID: 9BD94456-18A3-A1F4-A23F-3586969CE6E8

Case 25-33487-mvl7    Doc 278-1    Filed 10/28/25    Entered 10/28/25 10:16:09    Desc
Exhibit A    Page 2 of 28

---

ORIGIN BANK,
as the Lender,

VERVENT INC.,
as the Successor Servicer,

and

ANNE BURNS,
as the duly appointed Chater 7 Trustee in the Cases of Tricolor Holdings, LLC, et al.

_____

AMENDED AND RESTATED SUCCESSOR SERVICING AGREEMENT

Dated as of October 24, 2025

_____

---

Exhibit 01 of
Origin Bank, Vervent Inc. and Chapter 7 Trustee

## AMENDED AND RESTATED SUCCESSOR SERVICING AGREEMENT

This Successor Servicing Agreement, dated as of October 24, 2025 (as amended, restated, supplemented or otherwise modified from time to time, this "Agreement"), is by and between Origin Bank, as the lender (the "Lender"), Vervent Inc., as successor servicer (the "Successor Servicer"), and Anne Burns, in her capacity as the duly appointed Chapter 7 Trustee in the cases of Tricolor Holdings, LLC, et al., jointly administered under Case No. 25-33487-7 (respectively, the "Trustee," and the "Debtors"). The "Effective Date" of this Agreement is October 24, 2025.

### WITNESSETH:

WHEREAS, Tricolor Auto Acceptance, LLC, with its agents and affiliates ("Prior Servicer") has been servicing motor vehicle retail installment sale contracts;

WHEREAS, the Lender has the right to control the servicing of such motor vehicle retail installment sale contracts and desires that the Successor Servicer service such contracts; and

WHEREAS, the Successor Servicer has agreed to service such contracts upon the terms and subject to the conditions set forth herein.

WHEREAS, the Trustee consents to the servicing of such contracts upon the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

### ARTICLE ONE

### DEFINITIONS; CONSTRUCTION

Section 1.01.  <u>Definitions</u>.  Whenever used herein, unless the context otherwise requires, the following words and phrases shall have the following meanings:

"<u>Account Bank</u>" means Wells Fargo Bank, N.A.

"<u>Affiliate</u>" means, with respect to a Person, any other Person controlling, controlled by or under common control with such Person.  For purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" or "controlled" have meanings correlative to the foregoing.

"<u>Agreement</u>" has the meaning given to such term in the Preamble.

"<u>Annual Percentage Rate</u>" or "<u>APR</u>" means, with respect to a Receivable, the rate per annum of finance charges stated in such Receivable as the "annual percentage rate" (within the meaning of the Federal Truth-in-Lending Act).  If the rate per annum of finance charges with

respect to a Receivable is reduced (i) as a result of an Insolvency Proceeding involving the related Obligor or (ii) pursuant to the Servicemembers Civil Relief Act or similar State law, "Annual Percentage Rate" or "APR" shall refer to such reduced rate.

"Anti-Corruption Laws" means all laws, rules and regulations of any jurisdiction applicable to each of Tricolor, the Servicer and their respective subsidiaries from time to time concerning or relating to bribery or corruption.

"Anti-Terrorism Laws" means each of: (i) Executive Order 13224 of September 23, 2001, (ii) the Patriot Act, (iii) the Money Laundering Control Act of 1986, 18 U.S.C. Sect. 1956, (iv) the Proceeds of Crime (Money Laundering) and Terrorist Financing Act (Canada), (v) the Bank Secrecy Act, and the rules and regulations promulgated thereunder, and (vi) any other Requirements of Law of the United States, Canada or any member state of the European Union now or hereafter enacted to monitor, deter or otherwise prevent (a) terrorism or (b) the funding or support of terrorism or (c) money laundering.

"Applicable Law" means, with respect to any Person, all existing and future applicable laws, rules, regulations (including proposed, temporary and final income tax regulations), statutes, treaties, codes, ordinances, permits, certificates, orders and licenses of and interpretations by any Governmental Authority (including usury laws, the Federal Truth in Lending Act, Regulation Z and Regulation B of the CFPB, the Securities Act, including Regulation AB, and the Exchange Act), and applicable judgments, decrees, injunctions, writs, orders or line actions of any court, arbitrator or other administrative, judicial or quasi-judicial tribunal or agency of competent jurisdiction.

"Bankruptcy Code" means the United States Bankruptcy Code (Title 11 of the United States Code).

"Bankruptcy Court" means the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, in the case *In re Tricolor Holdings, LLC, et al.*, jointly administered under Case No. 25-33487.

"Business Day" means any day other than a Saturday or a Sunday on which commercial banking institutions are not required or authorized to be closed in New York, New York, Chicago, Illinois and San Diego, California.

"Certificate of Title" means, with respect to a Financed Vehicle, (i) the original certificate of title relating thereto, or copies of correspondence to the applicable registrar of titles, and all enclosures thereto, for issuance of the original certificate of title or (ii) if the applicable registrar of titles issues a letter or other form of evidence of lien in lieu of a certificate of title (including electronic titling), the original lien entry letter or form or copies of correspondence to such registrar of titles, and all enclosures thereto, for issuance of the original lien entry letter or form, which, in either case, name the related Obligor as the owner of such Financed Vehicle and the Lender, Tricolor, or one of their agents as secured party unless otherwise ordered by a court of competent jurisdiction.  For Financed Vehicles registered in States that issue confirmation of the lienholder's interest electronically, the "Certificate of Title" may consist of notification of an electronic recordation, by either a third party service provider or the relevant registrar of titles,

which indicates that the lien of the secured party on the Financed Vehicle is recorded on the original certificate of title on the electronic lien and title system of the applicable State.

"CFPB" means the Consumer Financial Protection Bureau.

"Code" means the Internal Revenue Code of 1986.

"Collateral" means the collateral of Lender, including the Contracts and Receivables and other collateral of Lender described herein.

"Collection Account" means Servicer's client trust deposit account for loans originated by Tricolor and segregated from Servicer's or its Affiliates' own funds and general assets maintained by Servicer at any federally-insured banking institution for the benefit of Servicer's clients, or such other additional or replacement account or accounts segregated from Servicer's or its Affiliates' own funds and general assets as may from time to time be maintained by Servicer for the benefit of Servicer's clients, into which Collections shall be deposited.

"Collection Period" means with respect to any Payment Date, the immediately preceding calendar month.

"Collections" means (i) all cash collections or other cash proceeds of any Receivable received by Tricolor or the Successor Servicer from or on behalf of any Obligor in payment of any amounts owed in respect of such Receivable, including all  amounts deposited in the Collection Account, Insurance Proceeds, Liquidation Proceeds and (ii) any other funds received by the Successor Servicer (including from Tricolor) with respect to any Receivable, including ancillary fees, the related Financed Vehicle or any other related Collateral.  Notwithstanding the foregoing, no "phone pay fees" in respect of ACH transactions shall constitute Collections.

"Continued Errors" has the meaning given to such term in Section 4.07.

"Contract" means any retail installment sale contract or conditional sale contract executed by an Obligor for a Financed Vehicle under which an extension of credit by the applicable Originator has been made in the ordinary course of business to such Obligor, which is secured by the related Financed Vehicle in which the related Originator shall have been granted a security interest in the Financed Vehicle.

"Contract File" means, with respect to each Contract, the original executed Contract, the original Certificate of Title or evidence that such Certificate of Title has been applied for, and the original endorsements or assignments showing the chain of ownership of such Contract.

"Contractual Obligation" means, with respect to any Person, any provision of any securities issued by such Person or any indenture, mortgage, deed of trust, contract, undertaking, agreement, instrument or other document to which such Person is a party or by which it or any of its property is bound or is subject.

"Defaulted Receivable" means any Receivable or Serviced Portfolio Receivable (i) with respect to which 10% or more of any Scheduled Payment remains unpaid for 120 days or more from its original due date as of the last day of the most recent Collection Period, (ii) with respect

3

Docusign Envelope ID: 9B2944561A3-A1F47A23F3586969Q6E6E8

to which the related Financed Vehicle has been repossessed and the Servicer has either liquidated such Financed Vehicle or held such Financed Vehicle in its inventory for more than 90 days as of the last day of the most recent Collection Period, (iii) which has been or should otherwise be charged-off or is deemed uncollectible by the Servicer in accordance with the credit and collection policy or (iv) the Obligor is the subject of an Insolvency Proceeding.

"Dodd-Frank Act" means The Dodd-Frank Wall Street Reform and Consumer Protection Act (Pub.L. 111-203, H.R. 4173), including all requests, rules, guideline, regulations and directives thereunder.

"Dollars" or "$" means the lawful currency of the United States.

"Errors" has the meaning given to such term in Section 4.07.

"Financed Vehicle" means, with respect to a Receivable or Serviced Portfolio Receivable, any new or used automobile, light-duty truck, minivan, sport utility vehicle, motorcycle or other passenger vehicle, together with all accessions thereto, securing the related Obligor's indebtedness thereunder.

"Force Majeure Event" means an act of God or the public enemy, acts of declared or undeclared war (including acts of terrorism), public disorder, rebellion or sabotage, epidemics, landslides, lightening, fire, hurricanes, earthquakes, floods or similar causes.

"GAAP" means generally accepted accounting principles as in effect from time to time in the United States; provided, that with respect to generally accepted accounting principles related to the determination of the carrying value of finance receivables (and corresponding balance sheet and income statement entries, including members' equity or net worth affected directly thereby) such principles as in effect as of the applicable date of determination.

"Governmental Authority" means, with respect to any Person, any nation or government, any State or other political subdivision thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, any central bank or comparable agency and any court or arbitrator having jurisdiction over such Person.

"Insolvency Event" means with respect to a specified Person, (i) the filing of a decree or order for relief by a court having jurisdiction in the premises in respect of such Person or any substantial part of its property in an involuntary case under any Insolvency Law now or hereafter in effect, or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official for such Person or for any substantial part of its property, or ordering the winding-up or liquidation of such Person's affairs, and such decree or order shall remain unstayed and in effect for a period of 60 consecutive days or (ii) the commencement by such Person of a voluntary case under any Insolvency Law now or hereafter in effect, or the consent by such Person to the entry of an order for relief in an involuntary case under any such Insolvency Law, or the consent by such Person to the appointment of or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official for such Person or for any substantial part of its property, or the making by such Person of any general assignment for the benefit of creditors, or the failure by such Person generally to pay its debts as such debts become due, or the taking of action by such Person in furtherance of any of the foregoing.

"Insolvency Laws" means the Bankruptcy Code and all other applicable liquidation, conservatorship, bankruptcy, moratorium, arrangement, rearrangement, receivership, insolvency, reorganization, suspension of payments, marshaling of assets and liabilities or similar debtor relief laws from time to time in effect affecting the rights of creditors generally.

"Insolvency Proceeding" means, with respect to any Person, any bankruptcy, insolvency, arrangement, rearrangement, conservatorship, moratorium, suspension of payments, readjustment of debt, reorganization, receivership, liquidation, marshaling of assets and liabilities or similar proceeding of or relating to such Person under any Insolvency Laws.

"Insurance Policy" means, with respect to any Receivable or Serviced Portfolio Receivable, (i) an insurance policy covering physical damage to or loss of the related Financed Vehicle or (ii) any lender's single interest, credit life, disability, hospitalization and similar insurance policies with respect to the related Obligor.

"Insurance Proceeds" means any amounts payable or any payments made under any Insurance Policy.

"Investment" means, with respect to any Person, any direct or indirect loan, advance or investment by such Person in any other Person, whether by means of share purchase, capital contribution, loan or otherwise, and excluding commission, travel and similar advances to officers, employees and directors made in the ordinary course of business.

"Investment Company Act" means the Investment Company Act of 1940.

"IRS" means the U.S. Internal Revenue Service.

"Lien" means any mortgage, lien, pledge, charge, claim, security interest or encumbrance of any kind.

"Liquidation Proceeds" means, with respect to any Defaulted Receivable, the amount (which shall not be less than zero) received by the Servicer and deposited into the Collection Account after a Receivable becomes a Defaulted Receivable, in connection with the attempted realization of the full amounts due or to become due under such Receivable, whether from the sale or other disposition of the related Financed Vehicle, the proceeds of repossession or any collection effort, the proceeds of recourse or similar payments payable under the related Receivable, receipt of Insurance Proceeds or otherwise, net of any reasonable out-of-pocket expenses (exclusive of overhead) incurred by the Servicer with respect to the collection and enforcement of such Receivable, in each case to the extent not previously reimbursed to the Servicer in connection with servicing such Receivable.

"Obligor" means each Person obligated to make payments pursuant to a Receivable or Serviced Portfolio Receivable, including any guarantor thereof.

"Originator" means the Tricolor entity (or any other entity that sold, transferred, or assigned a Financed Vehicle contract to Tricolor) that entered into a Contract for a Financed Vehicle with an Obligor.

"Patriot Act" means the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)).

"Payment Date" means the 15th day of each calendar month or, if any such day is not a Business Day, the next succeeding Business Day, commencing October 15, 2025.

"Person" means an individual, partnership, corporation, limited liability company, joint stock company, trust (including a business or statutory trust), unincorporated association, sole proprietorship, joint venture, government (or any agency or political subdivision thereof) or other entity.

"Receivable" means indebtedness owed to an Originator by an Obligor under a Contract and the obligation of an Obligor and associated right of payment evidenced thereby secured by a first priority security interest in a Financed Vehicle that was originated by an Originator and subsequently sold, transferred (or purported to be sold or transferred), or otherwise encumbered by a security interest recoverable in favor of Lender.

"Receivable File" means, with respect to each Receivable and the related Contract, a file containing, to the extent received by Successor Servicer, among other things, (i) a copy (but not the original) of the Contract and all amendments thereof; provided, however, that the Successor Servicer shall deliver any original amendments to the Contract to the Lender immediately following execution thereof, (ii) the application of the Obligor for credit, (iii) all original instruments modifying the terms and conditions of such Receivable or the related Contract, (iv) a copy of the Certificate of Title with a Lien notation or an application therefor (to the extent applicable State law permits or requires the Servicer to hold the Certificate of Title), (v) proof of insurance or application therefor if available, or agreement to provide insurance to the extent not incorporated in the Contract, with respect to the related Financed Vehicle, (vi) the Obligor's order for such Financed Vehicle and an indication of the down payment, if applicable, and (vii) such other documents as the Servicer may reasonably determine are necessary in order to accomplish its duties under this Agreement.

"Records" means, with respect to any Contract, all documents, books, records and other information (including computer programs, tapes, disks, punch cards, data processing software and related property and rights) maintained with respect to any related item of Collateral and the related Obligor.

"Requirements of Law" means, with respect to any Person, any law, treaty, rule or regulation, or order or determination of an arbitrator or Governmental Authority, in each case applicable to or binding upon such Person or to which such Person is subject, whether federal, State or local (including usury laws, the Federal Truth in Lending Act, the Equal Credit Opportunity Act, the Fair Credit Billing Act, the Fair Credit Reporting Act, the Fair Debt Collection Practices Act, the Federal Trade Commission Act, the Magnuson-Moss Warranty Act, the Servicemembers Civil Relief Act, Regulations U and T of the Federal Reserve Board and Regulations X and Z of the CFPB, State adaptations of the Uniform Consumer Credit Code and all other consumer protection and usury laws).

"Responsible Officer" means, when used with respect to any Person, any officer of the such Person, including any president, vice president, assistant vice president, chief financial officer, treasurer, secretary, assistant secretary, corporate trust officer or any other officer thereof customarily performing functions similar to those performed by the individuals who at the time shall be such officers, respectively, or to whom any matter is referred because of such officer's knowledge of or familiarity with the particular subject, and, in each case, having direct responsibility for the administration of this Agreement.

"Sanctioned Country" means, at any time, a country or territory which is the subject or target of any Sanctions (at the time of this Agreement, Crimea, Cuba, Iran, North Korea and Syria).

"Sanctioned Person" means, at any time, (i) any Person currently the subject or the target of any Sanctions, including any Person listed in any Sanctions-related list of designated Persons maintained by OFAC (or any successor thereto) or the U.S. Department of State, or as otherwise published from time to time, (ii) that is 50% or more owned, directly or indirectly, in the aggregate by one or more Persons described in clause (i) above, (iii) that is operating, organized or resident in a Sanctioned Country, (iv) with whom engaging in trade, business or other activities is otherwise prohibited or restricted by Sanctions or (v) (a) an agency of the government of a Sanctioned Country, (b) an organization controlled by a Sanctioned Country, or (c) a Person resident in a Sanctioned Country, to the extent subject to a sanctions program administered by OFAC.

"Sanctions" means all economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (i) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (ii) the United Nations Security Council, the European Union, any European Union member state, Her Majesty's Treasury of the United Kingdom or other relevant sanctions authority.

"Scheduled Payments" means regularly scheduled payments to be made by an Obligor pursuant to the terms of the related Contract.

"Serviced Portfolio" means the portfolio of Collateral of Lender that was previously serviced by the Prior Servicer and/or in which Lender otherwise owns or has a first priority security interest.

"Serviced Portfolio Liquidation Proceeds" means, with respect to any month and any Serviced Portfolio Defaulted Receivable, the amount (which shall not be less than zero) received by the Successor Servicer during such month after a Serviced Portfolio Receivable becomes a Serviced Portfolio Defaulted Receivable in connection with the attempted realization of the full amounts due or to become due under such Serviced Portfolio Receivable, whether from the sale or other disposition of the related Financed Vehicle, the proceeds of repossession or any collection effort, the proceeds of recourse or similar payments payable under the related Serviced Portfolio Receivable, receipt of Insurance Proceeds or otherwise, net of any reasonable out-of-pocket expenses (exclusive of overhead) incurred by the Servicer with respect to the collection

Docusign Envelope ID: 9B294456-18A3-A1F4-A23E-3586960CE6E8

and enforcement of such Serviced Portfolio Receivable, in each case to the extent not previously reimbursed to the Successor Servicer.

"Serviced Portfolio Receivable" means any motor vehicle receivable included in the Serviced Portfolio.

"Servicer" means the Successor Servicer or any Tricolor entity that previously serviced any Contracts or Receivables.

"Successor Servicer" has the meaning given to such term in the Preamble.

"Servicing Fee" means the fee payable to the Successor Servicer on each Payment Date in an amount equal to the sum of the product of (i) one-twelfth, (ii) the Servicing Fee Rate and (iii) the aggregate Principal Balance of all Receivables that are not Defaulted Receivables as of the first day of the related Collection Period provided, however, that the Servicing Fee shall not be less than $15,000 on any of the first six Payment Dates, and $10,000 thereafter.

"Servicing Fee Rate" means 3.50% per annum.

"Solvent" means, as to any Person at any time, having a state of affairs such that (i) the fair value of the property owned by such Person is greater than the amount of such Person's liabilities (including disputed, contingent and unliquidated liabilities) as such value is established and liabilities evaluated for purposes of Section 101(32) of the Bankruptcy Code; (ii) the present fair salable value of the property owned by such Person in an orderly liquidation of such Person is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured; (iii) such Person is able to realize upon its property and pay its debts and other liabilities (including disputed, contingent and unliquidated liabilities) as they mature in the normal course of business; (iv) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay as such debts and liabilities mature; and (v) such Person is not engaged in business or a transaction, and is not about to engage in a business or a transaction, for which such Person's property would constitute unreasonably small capital.

"Tricolor" means Tricolo Auto Acceptance, LLC, Tricolor Holdings, LLC, and any of their subsidiaries or affiliates.

"Vervent" means Vervent Inc.

Section 1.02. Computation of Time Periods. Unless otherwise stated in this Agreement, in the computation of a period of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding".

ARTICLE TWO

REPRESENTATIONS AND WARRANTIES

8

Section 2.01.  <u>Representations and Warranties of the Successor Servicer</u>.  The Successor Servicer represents and warrants, as of the date hereof, as follows:

(a)  <u>Organization and Good Standing</u>.  The Successor Servicer has been duly organized and is validly existing as a corporation in good standing under the laws of the State of Delaware, with all requisite power and authority to own or lease its properties and to conduct its business as such business is presently conducted and to enter into and perform its obligations pursuant to this Agreement.

(b)  <u>Due Qualification</u>.  The Successor Servicer is duly qualified to do business and is in good standing as a corporation, and has obtained all necessary licenses and approvals in all jurisdictions in which the ownership or lease of its property and or the conduct of its business, including the origination and servicing of the Receivables requires such qualification, licenses or approvals.

(c)  <u>Power and Authority; Due Authorization</u>.  The Successor Servicer (i) has all necessary corporate power, authority and legal right to (A) execute and deliver this Agreement and (B) carry out the terms of this Agreement and (ii) has duly authorized by all necessary limited liability company action the execution, delivery and performance of this Agreement.

(d)  <u>Binding Obligation</u>.  This Agreement constitutes a legal, valid and binding obligation of the Successor Servicer enforceable against the Successor Servicer in accordance with its respective terms, except as enforceability may be limited by Insolvency Laws and except as such enforceability may be limited by general principles of equity (whether considered in suit at law or in equity).

(e)  <u>No Violation</u>.  The execution and delivery of this Agreement, the consummation of the transactions contemplated by this Agreement and the fulfillment of the terms hereof will not (i) conflict with, result in any breach of any of the terms and provisions of, or constitute (with or without notice or lapse of time or both) a default under, the Successor Servicer's formation documents or, in any material respect, any Contractual Obligation of the Successor Servicer, (ii) result in the creation or imposition of any Lien upon any of the Successor Servicer's properties pursuant to the terms of any such formation documents or Contractual Obligation, which could reasonably be expected to have a material adverse effect on Lender or Lender's interests or (iii) violate any Applicable Law, the violation of which could reasonably be expected to have a material adverse effect on Lender or Lender's interests.

(f)  <u>No Proceedings</u>.  There is no litigation, proceeding or investigation pending or, to the best knowledge of the Successor Servicer, threatened against the Successor Servicer, before any Governmental Authority (i) asserting the invalidity of this Agreement, (ii) seeking to prevent the consummation of any of the transactions contemplated by this Agreement, or (iii) seeking any determination or ruling that could reasonably be expected to have a material adverse effect on Lender or Lender's interests.

(g)　　<u>All Consents Required</u>.  All approvals, authorizations, consents, orders or other actions of any Person or of any Governmental Authority, including the Trustee, required for the due execution, delivery and performance by the Successor Servicer of this Agreement have been obtained.

(h)　　<u>Investment Company Act</u>.  The Servicer is not an "investment company" within the meaning of the Investment Company Act.

(i)　　<u>Anti-Corruption Laws, Anti-Terrorism Laws and Sanctions</u>.  The Successor Servicer has implemented and maintains in effect policies and procedures designed to ensure compliance by the Successor Servicer and its subsidiaries, directors, officers and employees with Anti-Corruption Laws, Anti-Terrorism Laws and applicable Sanctions, and to the knowledge of the Successor Servicer, its agents, are in compliance with Anti-Corruption Laws, Anti-Terrorism Laws and applicable Sanctions in all material respects.  None of the Successor Servicer or any of its subsidiaries, directors, officers or employees, or to the knowledge of the Successor Servicer, any agent of the Successor Servicer that will act in any capacity in connection with or benefit from this Agreement, is a Sanctioned Person.

(j)　　<u>Solvency</u>.  The transactions contemplated by this Agreement do not and will not render the Servicer not Solvent.

(k)　　<u>Taxes</u>.  The Successor Servicer has filed, caused to be filed or received an extension of time for filing that has not yet expired for all material tax returns that are required to be filed by it.  The Successor Servicer has paid or made adequate provisions for the payment of all material Taxes made against it or any of its property (other than any amount of Tax the validity of which is currently being contested in good faith by appropriate proceedings and with respect to which adequate reserves in accordance with GAAP have been provided on the books of the Successor Servicer), and no tax lien has been filed and, to the Successor Servicer's knowledge, no claim is being asserted, with respect to any such Tax.

ARTICLE THREE

COVENANTS

Section 3.01.  <u>Affirmative Covenants of the Successor Servicer</u>.  From the date hereof:

(a)　　<u>Compliance with Law</u>.  The Successor Servicer will comply in all material respects with all Applicable Laws, including those with respect to the Contracts, the Receivables, the related Financed Vehicles and the Receivable Files or any part thereof, as well as all orders of the Bankruptcy Court.

(b)　　<u>Preservation of Corporate Existence</u>.  The Successor Servicer will preserve and maintain its existence, rights, franchises and privileges in the State of Delaware, and qualify and remain qualified in good standing as a foreign corporation in each jurisdiction where the failure to preserve and maintain such existence, rights,

10

franchises, privileges and qualification has had, or could reasonably be expected to have, a material adverse effect on Lender or Lender's interests.

(c) <u>Keeping of Records and Books of Account</u>.  The Successor Servicer will maintain and implement administrative and operating procedures (including an ability to recreate records evidencing Receivables, including the Receivable Files, in the event of the destruction of the originals thereof), and keep and maintain all documents, books, records and other information reasonably necessary or advisable for the collection of all Receivables, including the Receivable Files.

(d) <u>Anti-Corruption Laws, Anti-Terrorism Laws and Sanctions</u>.  The Successor Servicer will maintain in effect and enforce policies and procedures designed to ensure compliance by the Successor Servicer and each of its subsidiaries and its or their respective directors, officers, employees and agents with Anti-Corruption Laws, Anti-Terrorism Laws and applicable Sanctions.

Section 3.02.  <u>Negative Covenants of the Servicer</u>.  From the date hereof:

(a) <u>Change of Name</u>.  The Successor Servicer shall not change its name or its State of organization, move the location of its principal place of business and chief executive office and the offices where it keeps records concerning the Receivables (other than the Receivable Files) from the location referred to on the signature pages hereof. Notwithstanding the above, nothing stated herein shall prevent the Successor Servicer from attempting to lawfully obtain and use the Tricolor trademarks to assist in performing its obligations hereunder.

(b) <u>Extension or Amendment of Contracts</u>.  The Successor Servicer will not, except as otherwise permitted in this Agreement, extend, amend or otherwise modify the terms of any Contract.

(c) <u>No Liens</u>.  The Successor Servicer shall not sell, pledge, assign or transfer to any other Person, or grant, create, incur, assume or suffer to exist any Lien (other than Liens permitted by Lender) on the Collateral or any interest therein, the Successor Servicer will promptly notify the Lender of the existence of any Lien (other than Liens permitted by Lender) on any portion of the Collateral immediately upon discovery thereof, and the Servicer shall defend the right, title and interest of the Lender in, to and under the Collateral against all claims of third parties claiming through or under the Successor Servicer.

ARTICLE FOUR

ADMINISTRATION AND SERVICING OF RECEIVABLES

Section 4.01.  <u>Designation of Servicing</u>.  The Lender hereby appoints Successor Servicer as servicer to manage, collect and administer each of the Receivables and other Collateral, and to enforce its respective rights and interests in and under the Collateral, and the Successor Servicer hereby accepts such appointment and agrees to perform the duties and responsibilities of the Servicer pursuant to the terms hereof.

Section 4.02. <u>Servicing Compensation</u>.  The Successor Servicer shall be paid a setup fee of $50,000 on the date hereof.  As compensation for its servicing activities hereunder and reimbursement for its expenses, the Successor Servicer shall be entitled to receive the Servicing Fee, along with all third-party expenses incurred in connection with servicing, from the Lender.  The Successor Servicer shall further be entitled to retain as additional servicing compensation any and all ancillary fees or payment (other than extension fees or payment) from Obligors.  The Servicing Fee shall not apply to a Contract or Receivable that is fraudulent, that is not a bona fide obligation of an Obligor, and/or is recovered for the benefit of another secured party of Tricolor to the exclusion of Lender collecting same.  In the event a Contract or Receivable is duplicative of a Contract or Receivable held by another secured party under contract with Successor Servicer, Successor Servicer shall service such Contract or Receivable and any Collections shall be placed in a suspense account until it is determined, in consultation with the Trustee, which party is entitled to such Collections.  The Successor Servicer may only assess one Servicing Fee to only one secured party as to any such Contract or Receivable with proceeds deposited into a suspense account.  The Successor Servicer shall be reimbursed by Lender for Lender's pro rata share of any unpaid and documented transition expenses in connection with this Agreement, in accordance with (i) that certain Order Granting Chapter 7 Trustee's Motion For Entry of Order Approving Stipulation Between Trustee and Vervent, to be entered by the Bankruptcy Court on September 19, 2025 (the "<u>Stipulation Order</u>") and (ii) that certain budget in relation to the Transition Costs attached hereto as <u>Exhibit A</u> (as the same may be updated or modified from time to time, the "<u>Transition Budget</u>"); <i>provided</i>, that, unless otherwise agreed to by Lender in its sole discretion, Lender shall not be responsible for more than its pro rata share of the aggregate costs set forth in the Transition Budget as of any date of determination, which as of the date hereof is 1.6%, provided further, that, neither the Debtors' estates nor the Trustee shall be responsible for any of the aforementioned expenses or fees, unless otherwise ordered by the Bankruptcy Court, following notice and a hearing.

Section 4.03. <u>Duties of the Successor Servicer</u>.

(a)    <u>Standard of Care</u>.  The Successor Servicer agrees that its servicing and collection of the Receivables shall be carried out in accordance with its existing policies, Applicable Law and customary and usual procedures of institutions which service motor vehicle retail installment sale contracts and, to the extent more exacting, the degree of skill and attention that the Servicer exercises with respect to all comparable motor vehicle receivables that it services for itself.

(b)    <u>Records Held in Trust</u>.  The Successor Servicer shall hold in trust for the Lender all records in its possession which evidence or relate to all or any part of the Collateral.

(c)    <u>Collection Practices</u>.

(i)    The Successor Servicer shall collect payments called for under the terms and provisions of the Contracts relating to the Receivables, as and when the same shall become due.  The Successor Servicer, in making collection of Receivable payments pursuant to this Agreement, shall be acting as agent for the Lender, and shall be deemed to be holding such funds in trust on behalf of and as agent for the Lender.  The Successor Servicer shall service, manage, administer and make collections on the Receivables on behalf of the Lender and shall have full power and authority to do any and all things

which it may deem necessary or desirable in connection therewith which are not inconsistent with this Agreement. The Successor Servicer may in its discretion grant extensions, rebates or adjustments on a Contract, and amend or modify any Contract but shall not modify the APR or the number or amount of the Scheduled Payments unless required by Applicable Law or court order issued pursuant to Insolvency Proceedings involving the related Obligor or the Servicemembers Civil Relief Act (or similar State law). The Successor Servicer may in its discretion waive any late payment charge or any other fees, not including interest on the Principal Balance of a Receivable, that may be collected in the ordinary course of servicing a Receivable.

(ii)    In the event a Receivable becomes or is reasonably anticipated to become a Defaulted Receivable, the Successor Servicer, itself or through the use of independent contractors or agents shall, consistent with its policies, repossess or otherwise convert the ownership of the related Financed Vehicle securing such Receivable as to which the Successor Servicer shall have determined eventual payment in full is unlikely. All costs and expenses incurred by the Successor Servicer in connection with the repossession of the Financed Vehicles securing such Receivables shall be reimbursed to the Successor Servicer (other than overhead), to the extent not previously recouped by the Successor Servicer from Liquidation Proceeds on the Payment Date immediately succeeding the Collection Period in which the Successor Servicer incurred such costs and expenses. Notwithstanding the foregoing and consistent with the terms of this Agreement, the Successor Servicer shall not be obligated to repossess or take any action with respect to a Defaulted Receivable if, in its reasonable judgment, the Liquidation Proceeds would not be increased.

(iii)    The Successor Servicer shall deposit or cause to be deposited by electronic funds transfer all Collections to the Collection Account no later than two Business Days after its receipt and identification thereof.

(iv)    The Successor Servicer shall not transfer or cause to be transferred out of the Collection Account any funds deposited into the Collection Account, except in accordance with Bankruptcy Court orders.

(d)    Credit and Collection; Recourse; Sales of Financed Vehicles. The Successor Servicer, itself or through the use of independent contractors or agents, shall follow practices consistent with its policies in its servicing of the Receivables, which may include reasonable efforts to realize rights of recourse of any Originator, or selling a Financed Vehicle at public or private sale; provided, however, that the Successor Servicer, itself or through the use of independent contractor or agents shall, in accordance its policies, use reasonable efforts to maximize the net sales proceeds for each repossessed Financed Vehicle. The foregoing shall be subject to the provision that, in any case in which a Financed Vehicle shall have suffered damage, the Successor Servicer shall not expend funds for the repair or the repossession of such Financed Vehicle unless the Successor Servicer shall determine in its discretion that such repair or repossession would increase the Liquidation Proceeds in an amount greater than the cost of repairs.

(e)    Insurance. The Successor Servicer shall:

Case 25-33487-mvl7    Doc 386-1    Filed 11/15/25    Entered 11/15/25 15:13:33    Desc
Exhibit 1    Page 15 of 27

Docusign Envelope ID: 9B294456-18A3-A1F4-A23F-35869696E6E8    Filed 10/28/25    Entered 10/28/25 10:16:09    Desc
Exhibit A    Page 16 of 28

(i)     administer and enforce all rights and responsibilities of the Lender, as owner of the Receivables, provided for in the Insurance Policies relating to the Receivables;

(ii)     in accordance with customary servicing procedures, require that each Obligor shall have obtained physical damage insurance covering the related Financed Vehicle in amounts satisfying any Applicable Law as of the date of execution of the related Contract;

(iii)     in accordance with its customary servicing procedures, monitor physical damage insurance coverage relating to the Receivables;

(iv)     administer the filings of claims under the Insurance Policies by filing the appropriate notices related to claims, including initial notices of loss, as well as claims with the respective carriers or their authorized agents all in accordance with the terms of the Insurance Policies; and use reasonable efforts to file such claims on a timely basis after obtaining knowledge of the events giving rise to such claims;

(v)     utilize such notices, claim forms and claim procedures as are required by the respective insurance carriers;

(vi)     upon receipt of notice that an Obligor's physical damage insurance covering a Financed Vehicle related to a Receivable has lapsed or is otherwise not in force, comply with its policies to cause such compliance;

(vii)     not be required to pay any premiums or, other than administering the filing of claims and performing reporting requirements specified in the Insurance Policies in connection with filing such claims, perform any obligations of the named insured under such Insurance Policies;

(viii)     not be responsible to the Lender for any (A) act or omission to act done in order to comply with the requirements or satisfy any provisions of the Insurance Policies or (B) act, absent willful misconduct or negligence, or omission to act done in compliance with this Agreement; and

(ix)     not force place any Insurance Policies against the Financed Vehicles or the related Obligors.

In the case of any inconsistency between this Agreement and the terms of any Insurance Policy, the Successor Servicer shall comply with the latter.

(f)     Obligation to Restore.  In the event of any physical loss or damage to a Financed Vehicle related to a Receivable from any cause, whether through accidental means or otherwise, the Successor Servicer shall have no obligation to cause such Financed Vehicle to be restored or repaired.  However, the Successor Servicer shall comply with the provisions of any insurance policy or policies directly or indirectly related to any physical loss or damage to a Financed Vehicle.

Docusign Envelope ID: 9B294456-18A3-41F4-A23B-3586969GE6E8

(g)     Fidelity Bond.  The Successor Servicer represents, warrants and covenants that it has obtained and shall continue to maintain in full force and effect a fidelity bond in such form and amount as is customary for prudent servicers acting as custodian of funds and documents in respect of consumer contracts similar to the Receivables on behalf of institutional investors.

(h)     Security Interests.  The Lender hereby directs the Successor Servicer to take or cause to be taken such steps as are reasonably necessary to maintain perfection of the security interest created by each Receivable in the related Financed Vehicle and the security interests created hereunder.  The Successor Servicer shall, at the direction of the Lender take any action reasonably necessary to preserve and protect the security interests of the Lender in the Receivables.

(i)     Realization on Financed Vehicles.  The Successor Servicer represents, warrants and covenants that in the event that the Successor Servicer realizes upon any Financed Vehicle, the methods utilized by the Successor Servicer to realize upon such Receivable or otherwise enforce any provisions of such Receivable, will be conducted in accordance with the provisions of this Agreement and Applicable Law.

(j)     Recordkeeping.  The Successor Servicer shall:

(i)     maintain legible copies (in electronic or hard-copy form, in the discretion of the Successor Servicer) or originals of all documents in its Receivable File with respect to each Receivable and the related Financed Vehicle as delivered by the Prior Servicer or from any other source; and

(ii)     keep books and records pertaining to each Receivable and shall make periodic reports in accordance with this Agreement; such records may not be destroyed or otherwise disposed of except as provided herein and as allowed by Applicable Law; all documents, whether developed or originated by the Successor Servicer or not, reasonably required to document or to properly administer any Receivable shall remain at all times the property of the Lender and shall be held in trust by the Successor Servicer; the Successor Servicer shall not acquire any property rights with respect to such records, and shall not have the right to possession of them except as subject to the conditions stated in this Agreement.

(k)     Inspection.  The Successor Servicer shall permit the Lender, upon reasonable prior notice and during the Successor Servicer's regular business hours and at the expense of the Lender, to review the Servicer's collection and administration of the Receivables in order to assess compliance by the Successor Servicer with the Successor Servicer's written policies and procedures, as well as with this Agreement.  Such review shall be reasonable in scope and shall be completed in a reasonable period of time, and shall not occur more than one time in any twelve-month period.

Section 4.04.  Collection of Payments.

(a)     Payment Instructions.  The Successor Servicer shall instruct all  Obligors to make all payments in respect of the Receivables directly to the Collection Account; provided, however, that such Obligors may also make payments in respect of such Receivables by credit card, which

payments are processed by an electronic payment processor and remitted to the Collection Account on a daily basis.

(b)     Establishment of the Collection Account.  The Successor Servicer shall have established, on or before the Effective Date, with the Account Bank, the Collection Account.

(c)     Adjustments.  If the Successor Servicer (i) makes a deposit into the Collection Account in respect of a collection of a Receivable and such collection was received by the Successor Servicer in the form of a check that is not honored for any reason, (ii) makes a mistake with respect to the amount of any collection and deposits an amount that is less than or more than the actual amount of such collection or (iii) is entitled to reimbursement of any ancillary fees in accordance with any other terms of this Agreement, the Successor Servicer shall appropriately adjust the amount subsequently deposited into the Collection Account to reflect such dishonored check or mistake.  Any Scheduled Payment in respect of which a dishonored check is received shall be deemed not to have been paid.

Section 4.05.  Payment of Certain Expenses by Successor Servicer.  Except for such amounts and expenses the Successor Servicer is entitled to reimbursement as provided for herein, the Successor Servicer will be required to pay all expenses incurred by it in connection with its activities under this Agreement, including the fees and disbursements of independent certified public accountants, Taxes imposed on the Successor Servicer, expenses incurred in connection with payments and reports pursuant to this Agreement, fees and expenses of subservicers and agents of the Servicer and all other fees and expenses not expressly stated under this Agreement for the account of Tricolor.  The Successor Servicer will be required to pay all reasonable fees and expenses owing to any bank or trust company in connection with the maintenance of the Collection Account.  The Successor Servicer shall be required to pay such expenses for its own account and shall not be entitled to any payment therefor other than the Servicing Fee.

Section 4.06.  Reports and Due Diligence.  The Successor Servicer shall provide a monthly report to Lender and the Trustee setting forth in detail all collections achieved with respect to the Contracts and Receivables.

Section 4.07.  Rights of the Successor Servicer .

(a)     Except as provided in this Agreement, the Successor Servicer may accept and rely on all accounting, records and work of the Prior Servicer without audit, and the Successor Servicer shall have no liability or responsibility for the acts or omissions of the Prior Servicer.  If any error, inaccuracy or omission (collectively, "Errors") exists in any information of the Prior Servicer, and such Errors should cause or materially contribute to the Successor Servicer making or continuing any Errors (collectively, "Continued Errors"), the Successor Servicer shall have no liability or responsibility for such Continued Errors; provided, however, that this provision shall not protect the Successor Servicer against any liability which would otherwise be imposed by reason of willful misconduct, bad faith or gross negligence in discovering or correcting any Error or in the performance of its or their duties hereunder or under this Agreement.  In the event the Successor Servicer has actual knowledge or receives written notice of Errors or Continued Errors, it shall, with the prior consent of the Lender, use its best efforts to reconstruct and

Docusign Envelope ID: 9BD94456-18A3-A1F4-A23F-3586969658E8

reconcile such data as is commercially reasonable to correct such Errors and Continued Errors and prevent future Continued Errors.

(b)    The Successor Servicer may delegate in the ordinary course of business any or all of its duties and obligations hereunder to one or more subservicers; provided, however, that it shall at all times remain responsible for the performance of such duties and obligations.

(c)    Successor Servicer may take or cause to be taken any and all steps in the Prior Servicer's name and on its behalf necessary or desirable, in the determination of the Lender and Successor Servicer, to collect all amounts due under the Collateral, including endorsing the Prior Servicer's names on checks and other instruments representing Collections and enforcing the Receivables.

(d)    The Successor Servicer shall be liable in accordance herewith only to the extent of its obligations set forth in this Agreement. Such liability is limited to only those actions taken or omitted to be taken by the Successor Servicer and caused through its gross negligence, bad faith or willful misconduct. No implied duties (including fiduciary duties), covenants or obligations shall be read into this Agreement against the Successor Servicer and, in the absence of bad faith on the part of the Successor Servicer, the Successor Servicer may conclusively rely on the truth of the statements and the correctness of the opinions expressed in any certificates or opinions furnished to the Successor Servicer and conforming to the requirements of this Agreement.

(e)    The Successor Servicer shall not be charged with knowledge of event unless a Responsible Officer of the Successor Servicer obtains actual knowledge of such event or the Successor Servicer receives written notice of such event from the Prior Servicer or the Lender.

(f)    The Successor Servicer shall not be required to expend or risk its own funds or otherwise incur financial liability in the performance of its duties hereunder, or in the exercise of any of its rights or powers, if it reasonably determines that the repayment of such funds or adequate written indemnity against such risks or liability is not available prior to the expenditure of such funds or the incurrence of financial liability.

(g)    The Successor Servicer need not investigate any statement, representation or warranty or any fact or matter stated in any document delivered to it and may conclusively rely as to the truth of the statement and correctness of the opinions expressed therein.

(h)    The Successor Servicer offers no representations concerning, and shall have no liability hereunder with respect to, the collectability, enforceability or other characteristics of the Collateral.

(i)    The Successor Servicer will have no responsibility and will not be in default hereunder or incur any liability for any failure, error, malfunction or any delay in carrying out any of its duties under this Agreement if such failure or delay results from the Successor Servicer acting in accordance with information prepared or supplied by any Person other than the Successor Servicer or the failure of any such other Person to prepare or provide such information.  In the event the Successor Servicer becomes aware of errors, which in the opinion of the Successor Servicer, impairs its ability to perform its services hereunder, the Successor

17

Docusign Envelope ID: 9BD94456-18A3-A1F4-A23F-358696D6E6E8

Servicer shall immediately notify the Lender of such errors. The Successor Servicer will have no responsibility, will not be in default and will incur no liability for (i) any act or failure to act of any third party, including the Prior Servicer, (ii) any inaccuracy or omission in a notice or communication received by the Successor Servicer from any third party, (iii) the invalidity or unenforceability of any obligation under Applicable Law, (iv) the breach or inaccuracy of any representation or warranty made with respect to any loan or (v) the good faith acts or omissions of Successor Servicer.

(j)     The Successor Servicer may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, report, certificate of auditors or any other certificate, statement, instrument, opinion, report, notice, request, consent, order, appraisal, bond or other paper or document reasonably believed by it to be genuine and to have been signed or presented by the proper party or parties.

(k)     The Successor Servicer may execute any of the powers hereunder or perform any duties under this Agreement either directly or by or through agents, subcontractors, subservicers, nominees, attorneys or custodians. The Successor Servicer shall not be responsible for any misconduct or negligence of any such agents, subcontractors, subservicers, nominees, attorneys or custodians appointed with due care by it.

(l)     The Successor Servicer may consult with counsel of its choice with regard to legal questions arising out of or in connection with this Agreement and the advice or opinion of such counsel shall be full and complete authorization and protection in respect of any action taken, omitted or suffered by the Successor Servicer in good faith in accordance therewith.

(m)     The Successor Servicer shall have no responsibility and shall not be in default hereunder nor incur any liability (i) for any failure, error, malfunction or any delay in carrying out any of its duties under this Agreement if any such failure or delay results from the Successor Servicer acting in accordance with Applicable Laws or from acts of God, war or terrorism, insurrection, strikes, stoppages of labor, power or equipment failure or malfunction (including that of any common carrier or transmission line), loss or malfunction of communications or computer (hardware or software) services, emergency conditions, tornado, flood, fire, earthquake or similar event, adverse weather conditions or any other factor, medium, instrumentality or any cause or circumstances, directly or indirectly, beyond the Successor Servicer's control, it being understood that the Successor Servicer shall use commercially reasonable efforts to resume performance under this Agreement as soon as practicable under the circumstances or (ii) from information prepared or supplied by a Person other than the Successor Servicer as contemplated hereunder or the failure of any such other Person to prepare or provide such information.

(n)     The Successor Servicer will have no responsibility and will not be in default hereunder or incur any liability for any failure, error, malfunction or any delay in carrying out any of its duties under this Agreement if such failure or delay results from the Successor Servicer acting in accordance with information prepared or supplied by any Person other than the Successor Servicer or the failure of any such other Person to prepare or provide such information. In the event the Successor Servicer becomes aware of errors, which in the opinion of the Successor Servicer, impairs its ability to perform its services hereunder, the Successor Servicer shall immediately notify the Servicer of such errors. The Successor Servicer will have

no responsibility, will not be in default and will incur no liability for (i) any act or failure to act of any third party, including the Prior Servicer, (ii) any inaccuracy or omission in a notice or communication received by the Successor Servicer from any third party, or (iii) the invalidity or unenforceability of any obligation under applicable law.

(o)    The Successor Servicer may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, report, certificate of auditors or any other certificate, statement, instrument, opinion, report, notice, request, consent, order, appraisal, bond or other paper or document reasonably believed by it to be genuine and to have been signed or presented by the proper party or parties.

Section 4.08.  The Successor Servicer Not to Resign.  The Successor Servicer shall resign only with the prior written consent of the Lender, if it is no longer permitted by Applicable Law to act as Successor Servicer hereunder or if the Successor Servicer is not paid any amounts when due.

Section 4.09.  Successor Servicer Termination Events.  The occurrence and continuance of any of the following events shall constitute a "Successor Servicer Termination Event" hereunder:

(a)    any failure by the Successor Servicer duly to observe or perform in any material respect any other covenant or agreement of the Successor Servicer set forth in this Agreement, which failure continues unremedied for 30 days after the Successor Servicer discovers such failure or is given written notice of such failure by the Lender;

(b)    any representation, warranty or certification made by the Successor Servicer in this Agreement shall prove to have been incorrect in any material respect as of the time when the same shall have been made and, if capable of being cured, is not cured within 30 days after the Servicer discovers such failure;

(c)    an Insolvency Event shall occur with respect to the Servicer or any of its material subsidiaries;

(d)    one or more judgments, settlements or consent orders shall be entered against the Successor Servicer by any Governmental Authority (including any such items as a result of the CFPB or State regulator reviews) assessing monetary damages, individually or in the aggregate over any calendar year, in excess of $2,000,000 and such judgments, settlements or consent orders, as applicable, shall not have been discharged, stayed or paid within 30 days;

(e)    (i) this Agreement shall (except in accordance with its terms), in whole or in part, terminate, cease to be effective or cease to be the legally valid, binding and enforceable obligation of the Successor Servicer or (ii) the Successor Servicer shall, directly or indirectly, disaffirm or contest in any manner such effectiveness, validity, binding nature or enforceability;

(f)    (i) the Successor Servicer shall fail to pay any principal of or premium or interest on any indebtedness for borrowed money having a principal amount of

$5,000,000 or greater, when the same becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise) and such failure continue after the applicable grace period, if any, specified in the agreement or instrument relating to such indebtedness and shall not be waived by the requisite holders of such indebtedness; (ii) any other default under any agreement or instrument relating to any such indebtedness of the Successor Servicer or any other event shall occur and shall continue after the applicable grace period, if any, specified in such agreement or instrument if the effect of such default or event is to accelerate, or to permit the acceleration of, the maturity of such indebtedness; or (iii) any such indebtedness shall be declared to be due and payable or required to be prepaid (other than by a regularly scheduled required prepayment), redeemed, purchased or defeased, or an offer to prepay, redeem, purchase or defease such indebtedness shall be required to be made, in each case, prior to the stated maturity thereof; or

(g)       the Agreement shall be terminated as set forth in Section 5.02.

Section 4.10.  _Indemnification_.  The Successor Servicer shall be indemnified by the Lender from and against all claims, damages, losses or expenses reasonably incurred by the Successor Servicer in connection with the Receivables and other Collateral or otherwise pursuant to this Agreement (including reasonable attorneys' fees, court costs, realized losses and reasonable and documented third-party expenses incurred in connection therewith) that constitute (a) Reimbursable Litigation Costs or (b) that result from (i) any successful enforcement (including any action, claim, or suit brought) by the Successor Servicer of any indemnification obligation or other obligation of the Lender pursuant to this Agreement or (ii) a successful defense of any claim that the Successor Servicer breached its standard of care arising out of claims asserted by Lender against the Successor Servicer on any matter arising out of this Agreement; except, in each case for any claims, damages, losses or expenses arising from the Successor Servicer's own gross negligence, bad faith or willful misconduct, as determined by a final, non-appealable judgment by a court of competent jurisdiction, in case, subject to the following conditions:

The following terms shall have the meanings indicated below:

"_Approved Owner Litigation_" means, any litigation or any regulatory, administrative, governmental, investigative or other proceeding or inquiry (a)(i) relating in any way to or otherwise involving the Lender (as a named party), and the Receivables and (ii)(A) not involving the Successor Servicer as a named party and/or (B) if adversely determined, would not otherwise reasonably be expected to result in any material claims, actions, liability, judgments, penalties, or damages to or against the Successor Servicer, and (b) with respect to which the Lender has, in writing (which may be via email), consented to the Successor Servicer instituting, undertaking, prosecuting, defending, and/or otherwise maintaining (or requested that Successor Servicer institute, undertake, prosecute, defend, and/or otherwise maintain) such litigation or any regulatory, administrative, governmental, investigative or other proceeding or inquiry, in the name of and on behalf of Lender.

"*Comparably Serviced Securitization Loans*" means loans similar to the Serviced Portfolio originated by Tricolor that are serviced by the Successor Servicer for an indenture trustee in an offering that has been securitized.

"*Comparably Serviced Warehouse Loans*" means, collectively, (a) the Serviced Portfolio and (b) all other similar loans originated by Tricolor that are serviced by the Successor Servicer for an administrative agent, trustee lender or group of lenders under a warehouse or other credit facility that is not securitized.

"*Cross-Portfolio Litigation*" has the meaning set forth in the definition of "Reimbursable Litigation Costs" herein.

"*Reimbursable Litigation*" means, collectively, any Approved Owner Litigation and/or any Servicer-Related Litigation.

"*Reimbursable Litigation Costs*" means, any liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever which may at any time (including at any time following the termination of this Agreement) be imposed on, incurred by or asserted against the Successor Servicer in any way relating to or arising out of Reimbursable Litigation or incurred in connection with any litigation or any regulatory, administrative, governmental, investigative or other proceeding or inquiry constituting Reimbursable Litigation; *provided, however*, that for purposes hereof, with respect to any such costs incurred in connection with any such Reimbursable Litigation that involve (a) the Serviced Portfolio and (b) any other Comparably Serviced Warehouse Loans or Comparably Serviced Securitization Loans (any such litigation referenced herein as "*Cross-Portfolio Litigation*"), any such costs incurred by the Successor Servicer will be allocated to Lender (for purposes of this Agreement and any right of the Successor Servicer to reimbursement or indemnification for such amounts) *pro rata*, based on (i) the aggregate outstanding principal amount of the Receivables, as a share of (ii) the aggregate outstanding principal amount of all Comparably Serviced Warehouse Loans (inclusive of, for the avoidance of doubt, the Receivables serviced hereunder) involved in such Cross-Portfolio Litigation and, to the extent indemnification funds are paid with respect to the Comparably Serviced Securitization Loans, the aggregate outstanding principal amount of the Comparably Serviced Securitization Loans. Notwithstanding the foregoing, the parties understand and agree that Lender's pro rata share of Reimbursable Litigation Costs shall not exceed 3.2% of such Costs.

"*Servicer-Related Litigation*" means any litigation or any regulatory, administrative, governmental, investigative or other proceeding or inquiry (a) relating in any way to or otherwise involving Tricolor, Lender (as a named party) or the Receivables, and (b)(*x*) involving the Successor Servicer (whether as a named party or otherwise) and/or (*y*) if adversely determined, would otherwise reasonably be expected to result in claims, actions, liability, judgments, penalties, or damages to or against the Successor Servicer.

## ARTICLE FIVE

## MISCELLANEOUS

Section 5.01.  Notices, Etc.  All notices and other communications provided for hereunder shall, unless otherwise stated herein, be in writing (including e-mail and facsimile communication) and e-mailed, mailed, transmitted or delivered, as to each party hereto, at its address set forth under its name on the signature pages hereof or at such other address as shall be designated by such party in a written notice to the other parties hereto.  All such notices and communications shall be effective upon receipt or, in the case of notice by (i) mail, five days after being deposited in the United States mail, first class postage prepaid, or (ii) e-mail, when receipt is confirmed by telephone or by reply e-mail from the recipient.

Section 5.02.  Term of this Agreement.  This Agreement shall remain in full force and effect until all Receivables have been paid in full.  Notwithstanding the foregoing, Lender may terminate this Agreement (1) at any time after the six (6) month anniversary of the date of this Agreement; or (2) if Reimbursable Litigation Costs reach $500,000, by providing sixty (60) days' advance notice to Successor Servicer. In the event of termination under this Section 5.02. Successor Servicer shall cooperate with Lender to promptly provide all records relating to Successor Servicer's activities as Successor Servicer for Lender, including the servicing records pertaining to the Serviced Portfolio.

Section 5.03.  **GOVERNING LAW; CONSENT TO JURISDICTION; WAIVER OF OBJECTION TO VENUE**.  **THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REFERENCE TO ITS CONFLICTS OF LAW PROVISIONS (OTHER THAN §5-1401 AND §5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW).  EACH OF THE PARTIES HERETO HEREBY AGREES TO THE NON-EXCLUSIVE JURISDICTION OF ANY FEDERAL COURT LOCATED WITHIN THE STATE OF NEW YORK IN THE BOROUGH OF MANHATTAN.  EACH OF THE PARTIES HERETO HEREBY WAIVES ANY OBJECTION BASED ON FORUM NON CONVENIENS, AND ANY OBJECTION TO VENUE OF ANY ACTION INSTITUTED HEREUNDER IN ANY OF THE AFOREMENTIONED COURTS AND CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH COURT.**

Section 5.04.  **WAIVER OF JURY TRIAL**.  **TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH OF THE PARTIES HERETO WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE BETWEEN THE PARTIES HERETO ARISING OUT OF, CONNECTED WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP BETWEEN ANY OF THEM IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.  INSTEAD, ANY SUCH DISPUTE RESOLVED IN COURT WILL BE RESOLVED IN A BENCH TRIAL WITHOUT A JURY.**

Section 5.05.  <u>Execution in Counterparts; Severability; Integration</u>.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same agreement.  The words "execution", "signed", "signature", and words of like import in this Agreement or in any other certificate, agreement or document related to this Agreement shall include images of manually executed signatures transmitted by facsimile or other electronic format (including "pdf", "tif" or "jpg") and other electronic signatures (including DocuSign and AdobeSign).  The use of electronic signatures and electronic records (including any contract or other record created, generated, sent, communicated, received or stored by electronic means) shall be of the same legal effect, validity and enforceability as a manually executed signature or use of a paper-based record-keeping system to the fullest extent permitted by Applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, any State law based on the Uniform Electronic Transactions Act and the UCC.

In case any provision in or obligation under this Agreement shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.  This Agreement contains the final and complete integration of all prior expressions by the parties hereto with respect to the subject matter hereof and shall constitute the entire agreement among the parties hereto with respect to the subject matter hereof, superseding all prior oral or written understandings other than any fee letter contemplated hereby.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

THE LENDER:                                    ORIGIN BANK

By:  _Jim Crotwell_____
                                               BD2721FA299D44C...
     Name:  Jim Crotwell
     Title: Senior Executive Officer

Address for Notices:

Origin Bank
500 South Service Road East,
Ruston LA 71270
Attention: Derek McGee, Chief Legal Counsel
Email: dmcgee@origin.bank

23

Case 25-33487-mvl7    Doc 386-1    Filed 11/15/25    Entered 11/15/25 15:13:33    Desc
Exhibit 1    Page 25 of 27

Docusign Envelope ID: 95B944E8-18A3-41F4-A235-3B86060CE6E8
Case 25-33487-mvl7    Doc 278-1    Filed 10/28/25    Entered 10/28/25 10:16:09    Desc
Exhibit A    Page 26 of 28

THE SUCCESSOR SERVICER:            VERVENT INC.

                                   By: _____Louis Geibel_____
                                       Name: Louis W. Geibel
                                       Title: Executive Vice President

                                   Address for Notices:

                                   Vervent Inc.
                                   10182 Telesis Court, Suite 300
                                   San Diego, California 92121
                                   Attention: General Counsel
                                   Email: dgamble@vervent.com

THE TRUSTEE:                       ANNE ELIZABETH BURNS

                                   By: _____Anne Burns, Trustee_____

                                       Name: Anne Elizabeth Burns
                                       Title: Chapter 7 Trustee

                                   Address for Notices:

                                   Cavazos Hendricks Poirot, P.C.
                                   Founders Square, Suite 570
                                   900 Jackson Street
                                   Dallas, Texas 75202-4425
                                   Email: aburns@chfirm.com

24

Exhibit A

Transition Budget

Docusign Envelope ID: 9BD944E6-18A3-4EE4-833 Case 25-33487-mvl7    Doc 278-1    Filed 10/28/25    Entered 10/28/25 10:16:09    Desc
Exhibit A    Page 28 of 28

DRAFT - SUBJECT TO MATERIAL CHANGE | CONFIDENTIAL
SUBJECT TO FRE 408 AND LOCAL EQUIVALENTS

**Tricolor**
**Estimated Vervent Transition Cost Summary**

*($ in thousands)*

| Vendor | Updated Estimate Low | High | Initial Funding | Actuals as of 10/6 |
|---|---|---|---|---|
| **I  Vehicle Management** | | | | |
| 1.) Holman - Pickup | $ 2,000 | $ 3,000 | $ 1,000 | $ 1,257 |
| 2.) Holman - Impound, repair, storage | 1,200 | 3,000 | 600 | 838 |
| 3.) Ituran (GPS) | 250 | 750 | 250 | 247 |
| 4.) RDN Repo software/Auto IMS | 10 | 25 | 10 | - |
| Physical Security of Sites | - | - | - | 271 |
| B-Box Security Cameras | - | - | - | 86 |
| **5.) Subtotal: Vehicle Management** | $ 3,460 | $ 6,775 | $ 1,860 | $ 2,699 |
| **II  Vendor Costs** | | | | |
| 6.) TechZenIT | 612 | 1,000 | 612 | 252 |
| 7.) Five9 Call Center | 267 | 534 | 85 | 174 |
| 8.) Microsoft Azure | 228 | 456 | 171 | 55 |
| 9.) DealerTrack | 200 | 400 | 100 | 45 |
| 10.) Microsoft O365 | 156 | 234 | 120 | 38 |
| 11.) IDMS | 100 | 200 | 100 | - |
| 12.) SecureClose | 100 | 200 | 19 | 43 |
| 13.) Outside Legal Counsel | 40 | 200 | 40 | 126 |
| 14.) PayNearMe | 75 | 150 | 50 | 25 |
| 15.) Zscaler | 10 | 30 | 10 | - |
| 16.) Triconet | 2 | 3 | 2 | - |
| 17.) Ethos/ Omnique | - | - | - | - |
| 18.) Buckeye | - | - | - | - |
| **19.) Subtotal: Vendor Costs** | $ 1,790 | $ 3,407 | $ 1,308 | $ 757 |
| **III  Unperfected Title** | | | | |
| 20.) Irving Building | 50 | 50 | 50 | - |
| 21.) Titling Vendor | 150 | 200 | 75 | 107 |
| 22.) Supplemental Staff | 75 | 150 | 38 | 95 |
| 23.) FedEx | 8 | 15 | 8 | 15 |
| **24.) Subtotal: Unperfected Title** | $ 283 | $ 415 | $ 170 | $ 217 |
| **IV  Other** | | | | |
| 25.) Vervent | 1,230 | 1,230 | 820 | 820 |
| 26.) Independent Contractors | 180 | 550 | 180 | 125 |
| 27.) Rent Expense (Amount rec'd from Trustee) | - | - | - | 220 |
| 28.) Contingency | - | - | 500 | - |
| **29.) Subtotal: Other** | $ 1,410 | $ 1,780 | $ 1,500 | $ 1,164 |
| **V  Total** | $ 6,942 | $ 12,377 | $ 4,838 | $ 4,838 |