IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In Re: | **Case No. 25-33487-mvl-7** |
| | Jointly Administered |
| TRICOLOR HOLDINGS, LLC, et al., | Dallas, Texas |
| | November 13, 2025 |
| | 10:30 a.m. Docket |
| Debtors. | |
| | APPLICATIONS TO EMPLOY [143, 166] |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE MICHELLE V. LARSON,
UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

| | |
|---|---|
| For Anne Elizabeth Burns, Trustee: | Charles Brackett Hendricks<br>CAVAZOS HENDRICKS POIROT, P.C.<br>900 Jackson Street, Suite 570<br>Dallas, TX 75202<br>(214) 573-7302 |
| For Anne Elizabeth Burns, Trustee: | Grayson Williams<br>MCDERMOTT WILL & SCHULTE, LLP<br>2801 North Harwood Street, Suite 2600<br>Dallas, TX 75201<br>(214) 210-2814 |
| For Anne Elizabeth Burns, Trustee: | Charles R. Gibbs<br>MCDERMOTT WILL & SCHULTE, LLP<br>2801 North Harwood Street, Suite 2600<br>Dallas, TX 75201<br>(214) 295-8063 |
| Recorded by: | Bryon A. Robinson<br>UNITED STATES BANKRUPTCY COURT<br>1100 Commerce Street<br>Dallas, TX 75242<br>(214) 753-2011 |

Transcribed by: Kathy Rehling
311 Paradise Cove
Shady Shores, TX 76208
(972) 786-3063

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

DALLAS, TEXAS - NOVEMBER 13, 2025 - 10:30 A.M.

THE COURT: Please be seated. Good morning, everyone. We are here on our 10:30 docket. We have one matter on the docket this morning, and that is Case No. 25-33487, Tricolor Holdings, LLC. I'll take appearances for the record, and I'll start with those folks in the courtroom.

MR. HENDRICKS: Good morning, Your Honor. Chuck Hendricks for the Trustee, Anne Burns.

THE COURT: Excellent.

MR. WILLIAMS: Good morning, Your Honor. Grayson Williams with McDermott, Will & Schulte, proposed counsel for the Trustee. And I'm joined virtually by Mr. Gibbs.

THE COURT: Excellent. Thank you very much.

All right. Is there anyone else who wishes to make an appearance? All right.

MR. GIBBS: Your Honor, I don't know if you can hear me, but I can't hear the courtroom.

THE COURT: You cannot? Okay. We may be still on mute. I do some of my best work like that. I'm sorry. We're still on mute there, Mr. Gibbs.

Well, good morning. Your colleague, Mr. Williams, has announced for both you and him on behalf of the Chapter 7 Trustee. And I also have -- Mr. Hendricks has made an appearance as well.

Is there anyone else on WebEx who would like to make an

appearance?

All right. Hearing no takers, again, the Court called for the hearing on the two applications that were filed by counsel for the Chapter 7 Trustee, not because I don't intend to grant the applications, but because the Court just had a little interest in how things were going to be divvied up between the two firms.

I know that I think one or both of the applications certainly did say that there would be an intent not to duplicate services and all efforts would be made in that way. But I did want to kind of better understand what the division of labor was going to be, just for the Court's interest.

So I didn't mean to drag everybody here, but I just thought that it was probably worth kind of thinking through. So I'll start with you, Mr. Hendricks.

MR. HENDRICKS: Thank you, Your Honor. I certainly understand the Court's question as to what do you do with a case like this.

THE COURT: Uh-huh.

MR. HENDRICKS: And from our standpoint, let me give you a little bit from the Trustee's standpoint how this case developed, and I think it will answer some of your questions.

As we now know, the case was initially filed the afternoon of Wednesday, September 10th. Within an hour, we were on the phone with the U.S. Trustee and lawyers for TBK saying,

Whatcha going to do, Trustee? You've got 18 entities that ceased business and just walked away. We have no schedules. We have no personnel willing to talk to us at that point. No employees. We've got a beginning fraud investigation by the DOJ and the SEC. And maybe as many as a billion dollars in assets.

You know, within 24 hours I was on the phone with I think I counted 35 lawyers for various lenders, and the U.S. Trustee. And frankly, we were, you know, is this -- can the Chapter 7 Trustee -- can the Chapter 7 process even bring any meaningful result to a situation like this?

And, frankly, we told the lenders, we can file a motion to dismiss, and that's the easiest way to resolve this bankruptcy case, because there's no schedules, no people, total chaos, everyone claiming they own virtually everything. And that's not what the lenders wanted to do. So we proceeded to try to do the things that Chapter 7 trustees do: How to get your hands on the collateral. Security things. Figuring out where things are. We've got 4,500 titles in process that need to be, you know, registered with the State of Texas. And we've got the substitute servicer for the SPVs trying to -- needing access to the Debtors' records. And we've got 75,000 people out there needing to make payments and be collected.

So, and on top of that, which is fine, they normally do that, the Clerk's Office immediately posted the Trustee's

phone number, which is our law firm, and the phone started ringing.

So what did we do? Immediately, we worked most of that weekend trying to figure out -- we worked with TBK on authorizing at least the secured lenders to go out and, you know, secure your collateral, because, for all we know, we had 60 locations with open gates. We didn't have any way to control that.

So we worked over the weekend. We wrote letters. We responded. And we tried to do what we could to at least immediately triage the situation.

Then there was the question of the records. We had records that we didn't have any access to that obviously were critical. And we got a -- hired a contractor that had a data storage and retention firm to begin immediately trying to get a handle on collecting, securing, and preserving records.

We had the DOJ subpoena. They said, oh, by the way, your grand jury subpoena is due next Monday.

We went to the headquarters. We couldn't get into the headquarters. Eventually, we did. Fortunately, they were secure, with all the DMV titles and plates, stickers, and everything imaginable there.

We coordinated all of that, and realized very quickly that we didn't have the resources to handle this case from a legal standpoint. The Trustee talked to several different law

firms, and she selected McDermott as the one both experienced in the car bankruptcy world and the resources to jump in. And they were available immediately. Not everybody can drop everything at once and jump into the middle.

I spoke with the DOJ. I spoke with the SEC. You know, we're here. We're going to do what we can. And they were very happy, I think, generally, to see that there was someone that they could talk to, that being the Chapter 7 Trustee's counsel.

And I think within about the first 10 days after that, we handed off to McDermott most all of the legal work, once we had -- as the Court knows, the landlords, the lenders, the sub --

THE COURT: Very interested parties.

MR. HENDRICKS: Yes. Very interested parties. And we tried to figure out what to do with all the consumers that really had horrible stories about their access to their cars and personal property. And communicated with the U.S. Trustee's Office and how to try to stabilize the chaos.

And we kind of got to a certain point, and really, Chuck Gibbs and the McDermott folks kind of jumped in, said, I'll take this, I'll take the landlords, I'll take the consumer stuff, I'll take the SEC, and we'll just divide it up and try to address all these issues.

And by and large, no one else in my firm is working on it

at this point. Just I am helping guide from a Chapter 7 Trustee standpoint this sort of unique animal that's not a Chapter 11, there are no businesspeople running a business, and yet in Chapter 7 it's territory that I don't know that many Chapter 7 Trustees have ever been, in fact, the Trustee. Contacted her bonding company yesterday with the sale of the vehicles in mind, and they said, we've never written a bond like that before. And there are unique issues.

You know, the retention applications, I think, to be honest, were -- we -- about two or three weeks into it, hey, we need to get something on file --

THE COURT: Certainly. Certainly. Right. Because if --

MR. HENDRICKS: -- because we're doing all -- doing this work.

THE COURT: Yes.

MR. HENDRICKS: And I know with the 30-day window with the Northern District, there's some comfort that you don't have to --

THE COURT: Of course.

MR. HENDRICKS: -- do that immediately.

So we said, well, what do we call this? And I said, well, I'm -- our firm really is not going to do the majority of the work, but my role is sort of more special counsel to help the Trustee. I'm down the hall from the Trustee. All the issues

that come up, like what do I do with the 150 checks they brought in today?

THE COURT: No, and --

MR. HENDRICKS: And that kind of stuff.

THE COURT: And everything you're saying, Mr. Hendricks, is exactly what --

MR. HENDRICKS: Yes.

THE COURT: -- what the Court expected. Obviously, your firm has an immense amount of very Chapter-7-Trustee-specific experience, and I know that Ms. Burns benefits from that, both in her mentorship along the way --

MR. HENDRICKS: Yeah.

THE COURT: -- and to where she is today, as well as going forward. That's what I assumed. But I just didn't know if there was any other kind of specific tasks. And maybe it's early in the process, and maybe later it will come more to fore to where we can -- I don't want to say put boxes around what the categories are.

MR. HENDRICKS: Yeah.

THE COURT: But just so that I think, from the Court's perspective, I was just -- it wasn't prurient interest. It was certainly employment interest. But it was just to better understand.

I didn't know if McDermott was going to be primarily, obviously, maybe litigation counsel down the road when that

kind of happened, or if it was more of the day-to-day work was going to be handled by McDermott and you were going to handle everything that was more relative to Ms. Burns' role as a Chapter 7 Trustee and that kind of generalist kind of viewpoint.

MR. HENDRICKS: Yeah.

THE COURT: Or if there was going to be other separation of tasks.

MR. HENDRICKS: Yeah. No, you -- the way you described it is the reality of it.

THE COURT: Okay.

MR. HENDRICKS: They've got, actually, people all over the country working on this. And we, there's no way we could cope --

THE COURT: Y'all all are at the same country.

MR. HENDRICKS: I think so. That's right.

THE COURT: Right over there.

MR. HENDRICKS: That's right.

THE COURT: Got you. Okay.

MR. HENDRICKS: But, you know, what do I bring? You know, I think the guidance. You know, it's Chapter 7. Litigation usually over most things isn't productive in Chapter 7. You work out a consensus.

I think it still remains to be seen whether we can get all these lenders on the same page to do what we hope will

maximize the result for everyone. But that's the challenge, Your Honor, and that's kind of where we are.

THE COURT: Okay. Fair enough, Mr. Hendricks. I really appreciate it.

Mr. Williams, anything on behalf of McDermott?

MR. WILLIAMS: I'm going to pass the virtual podium to Mr. Gibbs.

THE COURT: All right. Mr. Gibbs? I think we muted everyone else except for you, because we were getting a little feedback. So, please, go ahead, Mr. Gibbs.

MR. GIBBS: Thank you, Your Honor. I appreciate it. And apologies for not being there in person. I had a previously-scheduled trip that I couldn't change.

THE COURT: No, that's fine.

MR. GIBBS: So I'm here virtually with the Court's permission, and I appreciated that.

I don't have much to add to the comments that Mr. Hendricks just gave you, other than to echo them and also to confirm to the Court what your assessment likely would be the division of labor.

We are taking great pains to make sure there's no duplication of effort. And as you heard from Mr. Hendricks, within, really, the first few days of the case, the role of his firm changed in that it became more of Mr. Hendricks acting -- you know, my words -- as general counsel, sort of

in-house counsel to Ms. Burns, in order for her to take advantage of his vast experience in the Chapter 7 world on the Chapter-7-specific issues that she's running into. It's much less expensive and better for her to be able to go down the hall and bounce an idea off of Mr. Hendricks or to get a question answered, as it is for us.

The only manpower duplication, really, that's occurring is that we are having daily calls that really are principally just Mr. Williams, myself, Mr. Hendricks, and Ms. Burns, just to make sure we know who's on first and who's in charge of which workstream and where the status of each of those workstreams are.

But not only the laboring oar, but really, the work of processing this case, advancing it, prosecuting causes of action, is being undertaken by our law firm.

We -- obviously, our respective fee applications will be on full notice, with everybody having an opportunity to confirm that there's no duplication of effort. But given the uniqueness of the case and the speed with which the Trustee had to act in order to try to preserve value, then maximize recoveries, that Mr. Hendricks and Ms. Burns wisely, I think, decided that they needed a firm with our size and scope and expertise to assist them in the efforts. And so we've proceeded along that path, working I think extremely well together.

And the two applications probably, in hindsight, didn't give the Court enough guidance on delineation of tasks, and hence this session today, which is entirely appropriate. But I'm happy to answer any further questions. Hopefully, that assuages any concern the Court has, and I think things are working the way we had hoped and the Court will find acceptable when you see our fee applications in this case as it progresses.

THE COURT: All right. Thank you very much, Mr. Gibbs.

Is there anyone else that wishes to be heard with respect to the applications today?

Again, obviously, the hearing was on the Court's request, so I didn't expect that a lot of folks would otherwise want to weigh in, and they were unobjected-to.

I think that some of the words that you guys mentioned kind of really hit the nail on the head. This is a very unique case. We receive calls all the time to find out when the omnibus days are for the case. It's not a complex Chapter 11; it just kind of feels like that.

I certainly understand the triage that happened, that needed to happen at the beginning of the case. I can only imagine what the first probably four weeks were like. Hopefully, that is at least finding some level of stasis, or at least where you can control the water hose, I guess.

I appreciate that the Trustee will benefit from both firms in two very different ways. There is a case where there's enough zeroes behind something that it requires the resources of a firm the size of McDermott, although I certainly hope you guys don't teach the Hendricks firm the word "workstream." That's a new one that I started to hear in Big Law in the last five years, and it makes me chuckle. But I do understand it. And I think that your description of Cavazos Hendricks almost as in-house counsel to Ms. Burns probably does make a lot of sense.

I thought that it was a good idea to kind of have this hearing. I recognized early on that it would probably take not only two firms, or just kind of two different mindsets: the Cavazos Hendricks with that long history of Chapter 7 experience that could really -- that Ms. Burns could benefit from, or just the day-to-day of how a Chapter 7 trustee handles this, how they typically respond. And then maybe the massage on what has to happen in this particular case, again, given the number of zeros, number of cars, number of loans, and everything. Because this freefall filing, I know, was very, very difficult.

So, all of that to say, as the case progresses, if there becomes a clearer delineation, whether it be objections to claims, or we think that Cavazos Hendricks should handle some of those things, or once we get procedures in place, whether

or not the Cavazos Hendricks firm should handle things once the procedures have been set in stone -- again, all towards maximizing the value of the estate -- the Court would appreciate that level of thought, which I know you guys will put into it anyway.

And I don't know that it's going to necessarily require further disclosures or amendments to employment applications. I don't want to make this harder than it is. But I do obviously want the parties to make their best efforts not to duplicate, with the Court recognizing that until we can get to a point of statis, and I don't think that we've probably gotten there yet given that we certainly have very hot landlord issues going on and we don't have all the cars in one place, we don't have sale procedures, any of that, that once we can kind of get to that level of statis, that the parties kind of cabin off their respective areas of responsibility so that we can not duplicate and then maximize value. That's all the Court would ask.

MR. GIBBS: Absolutely, Your Honor.

THE COURT: Thank you, Mr. Gibbs.

So, with that, the Court is going to grant each of the applications, the application that was filed at 143 for the employment of the Cavazos Hendricks firm as special counsel, as well as the application that was filed at 166 on behalf of McDermott, Will & Schulte as counsel for the Chapter 7

Trustee, both of those on a *nunc pro tunc* basis back as of September 21st.

And, again, the Court would note that those were both timely filed under the Local Rules so as to get *nunc pro tunc* treatment.

Anything else while I have you and you have me?

MR. GIBBS: Your Honor, if I could, just to make sure I understood, I think you said *nunc pro tunc* to the 21st. The case was filed on the 10th.

THE COURT: That was my -- I have a typo in my head. It's the 12th. Apparently, I have also developed dyslexia, in addition to everything else.

MR. HENDRICKS: I think it's actually the --

THE COURT: But yes, September 21st.

MR. HENDRICKS: I think it's actually the 10th, but --

MR. GIBBS: Thank you, Judge. That reduces my anxiety.

THE COURT: Oh, I was going off of the application. So is it the 10th? Let me look.

MR. HENDRICKS: The 10th was the filing date, Your Honor.

THE COURT: Okay. So the 10th, probably the 10th for your firm. I don't know if they -- maybe they contacted McDermott after that. So it would be the 10th for Cavazos

Hendricks and the 12th for McDermott.

MR. HENDRICKS: I think that's right.

MR. GIBBS: I think that's correct, Your Honor.

THE COURT: All right. Appreciate that.

MR. GIBBS: Thank you.

THE COURT: All right. And I have had an opportunity to review both the disclosures and the orders in both cases, and I'll sign those as they were submitted.

Anything else?

MR. HENDRICKS: That's it for today, Your Honor.

MR. GIBBS: No, Your Honor.

THE COURT: All right. No more verbal flubs? All right. Appreciate it. You guys have a good one. Court will stand in recess until 11:00.

THE CLERK: All right.

MR. GIBBS: Thank you.

(Proceedings concluded at 10:51 p.m.)

--oOo--

CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

**/s/ Kathy Rehling** **11/15/2025**

______________________________________ ________________

Kathy Rehling, CETD-444 Date
Certified Electronic Court Transcriber

INDEX

PROCEEDINGS 3

WITNESSES

-none-

EXHIBITS

-none-

RULINGS 15

Application to Employ Cavazos Hendricks Poirot, P.C. as Attorney filed by Trustee Anne Elizabeth Burns (143)

Application to Employ McDermott Will & Schulte, LLP as Attorney (166)

END OF PROCEEDINGS 17

INDEX 18