**MCDERMOTT WILL & SCHULTE LLP**
Charles R. Gibbs (TX Bar No. 7846300)
Marcus A. Helt (TX Bar No. 24052187)
Grayson Williams (TX Bar No. 24124561)
Michael Wombacher (TX Bar No. 24120434)
2801 North Harwood Street
Suite 2600
Dallas, Texas 75201
Telephone: (214) 295-8000
E-mail: crgibbs@mwe.com
        mhelt@mwe.com
        gwilliams@mwe.com
        mwombacher@mwe.com

**MCDERMOTT WILL & SCHULTE LLP**
Darren Azman (admitted *pro hac vice*)
Timothy C. Cramton (pending *pro hac vice*)
One Vanderbilt Avenue
New York, New York 10017-3852
Telephone: (212) 547-5400
E-mail: dazman@mwe.com
        tcramton@mwe.com

**MCDERMOTT WILL & SCHULTE LLP**
Julia M. Beskin (admitted *pro hac vice*)
919 Third Avenue
New York, New York 10022
Telephone: (212) 756-2000
Email: julia.beskin@srz.com

*Counsel to the Chapter 7 Trustee*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 7 |
| TRICOLOR HOLDINGS, LLC, *et al.*, | Case No. 25-33487 (MVL) |
| Debtors. [1] | (Jointly Administered) |

**TRUSTEE'S OBJECTION TO DANIEL CHU'S MOTION**
**FOR ORDER AUTHORIZING USE OF PROCEEDS OF**
**DIRECTORS AND OFFICERS LIABILITY INSURANCE POLICIES**
**FOR DEFENSE EXPENSES AND OTHER LOSS AMOUNTS**

---

[1]    In addition to appearing on behalf of Tricolor Holdings, LLC ("Tricolor Holdings") in the above-captioned case, Anne Elizabeth Burns, serves as Chapter 7 Trustee for the following related debtor entities: TAG Intermediate Holding Company, LLC (Case No. 25-33495), Tricolor Auto Group, LLC (Case No. 25-33496), Tricolor Auto Acceptance, LLC (Case No. 25-33497), Tricolor Insurance Agency, LLC (Case No. 25-33512), Tricolor Home Loans LLC dba Tricolor Mortgage (Case No. 25-33511), Tricolor Real Estate Services, LLC (Case No. 25-33514), TAG California Holding Company, LLC (Case No. 25-33493), Flexi Compras Autos, LLC (Case No. 25-33490), TAG California Intermediate Holding Company, LLC (Case No. 25-33494), Tricolor California Auto Group, LLC (Case No. 25-33502), Tricolor California Auto Acceptance, LLC (Case No. 25-33501), Risk Analytics LLC (Case No. 25-33491), Tricolor Tax, LLC (Case No. 25-33515), Tricolor Financial, LLC (Case No. 25-33510), Tricolor Auto Receivables LLC (Case No. 25-33498), Tricolor Asset Funding, LLC (Case No. 25-33492), and Apoyo Financial, LLC (Case No. 25-33489) (collectively, "Tricolor" or the "Debtors").

Anne Elizabeth Burns, the Chapter 7 trustee (the "<u>Trustee</u>") of the estates of the Debtors in the above-captioned Chapter 7 proceedings (the "<u>Chapter 7 Cases</u>"), by and through her undersigned counsel, hereby files this objection (the "<u>Objection</u>") to the *Motion for Order Authorizing Use of Proceeds of Directors and Officers Liability Insurance Policies for Defense Expenses and Other Loss Amounts* (the "<u>Motion</u>") (Dkt. No. 469) filed by Movant Daniel Chu ("<u>Mr. Chu</u>"). In support of this Objection, the Trustee relies on the Declaration of Julia M. Beskin filed concurrently herewith ("<u>Beskin Decl.</u>"), and respectfully states as follows:

## PRELIMINARY STATEMENT

1.      Mr. Chu seeks a Court order authorizing Insurers to advance defense costs and other unspecified amounts to him from the proceeds of the Debtors' D&O Policies in connection with claims and investigations relating to the fraud that led to Tricolor's bankruptcy. (Mot. ¶¶ 5-7.) His request for unrestricted access to the proceeds should be denied for multiple reasons, including because: (1) contrary to his assertion, the Policy proceeds are property of the Debtors' Estate; (2) it is inequitable to grant Mr. Chu, the putative perpetrator of the fraud, unfettered access to the same $15 million D&O insurance tower shared by the Debtors and over a dozen other former directors and officers who will also need to draw upon it, which would permit Mr. Chu (who has plenty of money to fund his own defense) to exhaust the coverage while leaving the Debtors and other Insureds with little or nothing for their own defense; and (3) the Trustee's alternative proposal—which would allow the Court to oversee the fair and equitable distribution of the proceeds for all Insureds, including by capping the total amount of proceeds each individual Insured (Mr. Chu included) can draw upon—is a far better option, and consistent with binding Fifth Circuit precedent requiring Court oversight over the distribution of limited policy proceeds in such circumstances.

2

2.      For nearly two decades, Mr. Chu exercised near-total control as Tricolor's founder, CEO, and President, overseeing all lending, accounting, securitization, and financial reporting functions. It therefore comes as no surprise that the evidence the Trustee has obtained to date places Mr. Chu firmly at the center of the fraud that led to Tricolor's sudden collapse and caused hundreds of millions (if not billions) of dollars in losses. As discussed below, this fraud involved dramatically misrepresenting the value of Tricolor's finance receivables through the creation of thousands of fictitious and duplicate customer loans and double-pledging collateral across multiple warehouse facilities, in violation of its contractual obligations to its lenders (among other things), in order to fraudulently obtain hundreds of millions of dollars in additional financing from them.

3.      Due to his apparent role in Tricolor's demise, Mr. Chu's legal fees alone threaten to exhaust the Policy limits. Mr. Chu is already under investigation by the DOJ and SEC, and will soon face hundreds of millions of dollars in claims that will inevitably be brought against him by lenders, investors, creditors, and other stakeholders. The Trustee, for one, expects to file an adversary complaint against Mr. Chu by the end of this month. Yet even with all the evidence against him, Mr. Chu has the audacity to ask this Court to open up the D&O piggy bank to fund his defense at the expense of the Debtors' and other Insureds' own limited coverage.

4.      The Trustee does not dispute Mr. Chu's general right to advancement under the Policies. The Trustee objects to granting him unfettered access to shared proceeds that must be preserved and fairly allocated for the benefit of all Insureds, including the Debtors, while they still last. Indeed, in addition to the Debtors themselves, there are over a dozen other D&O Insureds who will need Policy proceeds to cover legal expenses incurred in responding to (i) ongoing requests for information in connection with the DOJ's and SEC's investigations into fraudulent activities at Tricolor; and (ii) civil claims for hundreds of millions of dollars in losses by lenders,

investors, creditors, and other stakeholders. As discussed in greater detail below, Mr. Chu's

Motion should be denied for at least the following reasons.

5.      *First*, contrary to his assertions, the Policy proceeds are property of the Debtors'

Estate. "The overriding question when determining whether insurance proceeds are property of the

estate is whether the debtor would have a right to receive and keep those proceeds when the insurer

paid on a claim." *In re OGA Charters, LLC*, 901 F.3d 599, 603 (5th Cir. 2018). Unlike the cases

Mr. Chu relies on, including *In re Goodman Networks, Inc.*, Case No. 22-31641 (MVL), this is not

a "Side A-only" policy. The D&O Policies provide direct coverage for the Debtors under Side B

and, most important, Side C, which covers third-party claims asserted directly against the Debtors.

For that reason alone, the proceeds are Estate property.

6.      *Second*, under controlling Fifth Circuit law, liability policy proceeds are property

of the estate when the policy limit is insufficient to cover a multitude of claims. That is the case

here. Compared to the $15 million Policy limit, the Debtors and other Insureds under the Policies

are facing hundreds of millions of dollars in defense costs and damages from claims and

government investigations relating to the fraud that caused Tricolor's collapse.

7.      *Third*, Mr. Chu's Motion is premised on the faulty notion that the Debtors have not

submitted any Claims under the Policies, and that any potential claims against them are purely

speculative and hypothetical. In fact, the Trustee has already provided notice of potential claims

triggering coverage for the Debtors and other Insureds under the Policies. And these claims are

anything but speculative or hypothetical. The fraud has already resulted in real, publicly disclosed

losses by lenders that will almost certainly give rise to claims against the Debtors and other

Insureds, not to mention the ongoing investigations (which, according to Travelers, have already

prompted several other Insureds to submit their own Claims under the Policies).

8.      *Fourth*, Mr. Chu relies heavily on the Policy's Order of Payments clause in arguing that the proceeds are not Estate property. But this provision does not apply to defense costs. By its express terms, the priority waterfall excludes the "Defense Expenses" he seeks here.

9.      *Fifth* (and finally), Mr. Chu cannot possibly show sufficient "cause" to allow him unfettered access to the insurance proceeds. Far from demonstrating need or irreparable harm, the evidence shows that Mr. Chu has tens of millions of dollars available to fund his own defense. By comparison, Mr. Chu ignores the imminent risk of irreparable harm to the Debtors and other Insureds if his request is granted. Like him, they face imminent claims for hundreds of millions of dollars arising from the fraud, as well as the ongoing DOJ and SEC investigations. Even in a best-case scenario, the proceeds will soon be exhausted—largely by Mr. Chu himself, if he gets his way. The balance of equities also weighs heavily against Mr. Chu, considering the evidence to date shows or at least strongly suggests that he is largely responsible for the fraud that took place, and which, if proven, would make any advancements to him subject to clawback.

10.     Granting his request would not only give Mr. Chu unrestricted access to insurance proceeds, which he would almost certainly soon deplete, but also lead to a free-for-all by all of the other individual Insureds to secure funds for their own defense. This scenario can and should be avoided. As the Fifth Circuit has explained, "when there are multiple claimants to the policy proceeds…oversight by the court is necessary to assure an equitable distribution of the available assets." *OGA Charters*, 901 F.3d at 605. Accordingly, Mr. Chu's Motion should be denied unless and until a procedure is established to oversee the equitable allocation and distribution of the proceeds among the Insureds while they still last. The Trustee's proposal would accomplish that here, including by capping the total amount of proceeds any single individual Insured (including Mr. Chu) can draw upon.

5

## BACKGROUND

**A.      Massive Fraud Leads to Tricolor's Collapse and Bankruptcy**

11.      Mr. Chu is the founder and former CEO and President of Tricolor. Until its recent Chapter 7 filing, Tricolor operated a collateralized auto-lending business by originating and warehousing consumer auto loans, which it offered to customers with little or no credit history. These loans were then used as collateral for securitized, asset-backed lending facilities supplied by institutional lenders, including Fifth Third Bank, JPMorgan, and Barclays, with revenue coming from interest payments on the underlying customer loans (*i.e.*, "finance receivables"). As CEO, President, and founder, Mr. Chu exercised ultimate authority over Tricolor's lending platform, financing structures, accounting practices, and managerial operations.

12.      In August 2025, JPMorgan began investigating suspicious activity at Tricolor, and hired FTI Consulting to run a forensic analysis, which revealed that Tricolor had dramatically misrepresented its finance receivables base by creating hundreds of millions of dollars' worth of "cloned" and otherwise fabricated loans to secure more financing from Tricolor's lending banks. This shocking revelation was followed by a wave of customer defaults, saddling Tricolor with a large influx of liabilities. Due to the excessive collateralization, Tricolor's debts and lending obligations far exceeded its actual receivables, rendering the company (and other Debtors) insolvent.

13.      On September 10, 2025, Fifth Third Bank disclosed it was writing off nearly $200 million in loans to Tricolor as a complete loss due to fraudulent activity it had discovered. That same day, Tricolor filed for Chapter 7 bankruptcy protection, listing between $1 billion and $10 billion in assets and liabilities, and naming over 25,000 creditors.

**B.      The Trustee's Investigation**

14.      Following the bankruptcy filing, the Trustee retained consulting firm CRS
Capstone Partners, LLC ("Capstone") to investigate the facts and circumstances which led to
Tricolor's demise, including analysis of financial and corporate records, custodial emails, and
other relevant documents, as well as interviews and discussions with former employees. While
still ongoing, this investigation brought to light the sheer magnitude of the fraud, revealing fake
loans with a receivable value of well-over half a billion dollars. These fake loans allowed Tricolor
to borrow hundreds of millions of dollars more than the value of the receivables it actually had to
pay off its liabilities. This was not only fraudulent, but also in direct violation of Tricolor's
contractual obligations to its lenders, which prohibited Tricolor from collateralizing more than
80% of its loan receivable base.

15.      The Trustee is still investigating these fraudulent activities. Among other things,
Capstone is undertaking a detailed review of Tricolor's corporate books and records, financial
statements and balance sheets, as well as certain custodial emails. While this examination is not
yet complete, the evidence to date places Mr. Chu firmly at the center of the fraud that led to
Tricolor's demise, including implicating him in: (a) knowingly double-pledging tens of thousands
of loans; (b) misrepresenting collateral, portfolio performance, and financial results to lenders;
(c) overriding internal controls; (d) using false data to obtain and maintain securitization credit;
and (e) directing subordinates to falsify, manipulate, or ignore accounting irregularities.

**C.      Mr. Chu's History of Deceitful Business Activity**

16.      Mr. Chu has a long history of engaging in questionable business practices. He began
his career as the head basketball coach at the University of the South in Sewanee, Tennessee, where
he was fired after less than two years following an investigation into payments made to student
athletes in violation of NCAA rules and University policies. (Beskin Decl. Ex. 1.) Mr. Chu then

7

founded Paaco, a used-car chain in Dallas, which he sold to the Crown Group in 1998; Crown later reported to the SEC that Paaco's books were riddled with "accounting errors and irregularities" under Mr. Chu's watch. (*Id*. Ex. 2 at 32.) After selling Paaco, Mr. Chu started a general partnership to invest in Broadband Utilities, LP; in 2012, his business partners sued him for selling their stakes in the company to allegedly settle a personal debt. *See Schlachter v. Chu*, No. DC-12-09679 (Tex. Dist. Ct. Aug. 24, 2012) (Dkt. No. 1). And when Mr. Chu founded Tricolor in 2007, he did so with business partner Ken Weaver, who previously served prison time for selling stolen cars and was forced to leave Tricolor in 2022 when his criminal history came to light.  (*Id*. Ex. 3.)

17.     Mr. Chu also served on the board of directors of Origin Bank ("Origin"), which, along with JPMorgan, Fifth Third Bank, and Barclays, was one of Tricolor's main institutional lenders. He resigned his board seat at Origin on September 6, 2025, shortly after the fraud was discovered in August 2025. (*Id*. Ex. 4.) At the time, Origin Bank had provided Tricolor with approximately $25 million in warehouse financing and another $5 million in term financing.

**D.    Mr. Chu has Tens of Millions of Dollars in Available Assets That He is Actively Working to Protect From Creditors**

18.     Over the course of his tenure as president and CEO, Mr. Chu received millions of dollars in performance-based bonuses on top of his executive salary. These bonuses enabled Mr. Chu to fund his lavish lifestyle, including multi-million dollar homes in Aspen, Highland Park, Beverly Hills, and Miami, and spending on other luxury items.

19.     Moreover, evidence the Trustee has obtained to date strongly suggests that Mr. Chu has been actively working to conceal, convey, and protect his assets from creditors since the fraud first came to light in August 2025:

- Mr. Chu apparently persuaded Origin to execute a swap agreement for his property at 1612 Gilcrest Drive, Beverly Hills, CA 90210.  Origin received the property valued at $2,650,000, and Mr. Chu received cash in exchange. The swap agreement

8

closed on August 29, 2025, less than two weeks before Tricolor filed for bankruptcy. (*Id*. Ex. 5.)

- On September 9, 2025, Mr. Chu listed for sale his property located at 4208 Beverly Drive, Highland Park, TX 75205 for $10,990,000.  The property remains listed for sale as of this filing, and with Mr. Chu recently dropping the price by $2,000,000. (*Id*. Ex. 6.)

- On September 15, 2025, Mr. Chu received an email from a law firm specializing in asset protection at his Tricolor email address sending a flow chart for a Family Limited Partnership to own investment assets. On September 16, 2025, Mr. Chu instructed the law firm to communicate through his Gmail email address (tricolorchu@gmail.com). (*Id*. Ex. 7.)

- On September 17, 2025, Mr. Chu sent an email to his personal account at tricolorchu@gmail.com, including a link to an article from law firm Adler Law titled "Florida Homestead Law Guide," which "protects a Florida resident's primary home from judgment creditors." (*Id*. Ex. 8.)

- On September 24, 2025, Mr. Chu executed a Termination and Release Agreement with Elephant Aspen Residences Inc., terminating the purchase of White Elephant Aspen Chalets Unit No. 3, located at 115 W. Bleeker Street, Aspen, CO 81611. The seller retained Mr. Chu's earnest money deposit of $1,750,000 and returned to Mr. Chu the remainder of the $25,000,000 purchase price. (*Id*. Ex. 9.)

**E.      Government Investigations**

20.      The U.S. Department of Justice has launched a criminal investigation into potential securities fraud and other felony offenses in connection with Tricolor's collapse, and has issued subpoenas to Tricolor and its outside accountant, as well as to Mr. Chu and nearly a dozen other former officers and directors. The Securities and Exchange Commission has also opened its own formal investigation into the matter.

**F.      The D&O Policies and the Instant Motion**

21.      At all relevant times, Tricolor maintained a $15 million D&O insurance tower comprised of: (i) a primary $5 million policy issued by Travelers Casualty & Surety Company of America ("Travelers"); (ii) a $5 million excess policy issued by CNA Insurance ("CNA"); and (iii) a $5 million excess policy issued by Old Republic Professional Liability, Inc. ("Old

Republic") (collectively, the "D&O Policies" or "Policies"; individually, each a "Policy").[2] As the primary Policy, the provisions in the Travelers Policy apply by extension to the CNA and Old Republic excess policies. (*See* Chu Mot. ¶ 14; Ex. C at 7 of 17; Ex. D at 7 of 17.)

22.    The D&O Policies are claims-made policies with Side A, B, and C coverage. Side A covers directors and officers directly, while Side B provides secondary coverage to Tricolor for indemnifying covered officers and directors. Importantly, Side C provides direct coverage to Tricolor for third-party claims against the company itself. Insureds under the Policies (including the Debtors) all share the same $15 million insurance tower regardless of claims or coverage. While the Policy includes an Order of Payments clause, it expressly excludes defense costs from the priority waterfall. (Ex. B at 55 of 113.)

23.    The Policies are subject to a "Notice of Potential Claims" provision that treats any future claim or related claims as made when notice of a potential claim is given. (*See* Ex. B at 22 of 113). In accordance with these terms, the Trustee delivered a comprehensive Notice of Circumstances to Travelers, CNA, and Old Republic on October 8, 2025 (the "Notice"). (Beskin Decl. Ex. 10.) Among other things, the Notice advised that (i) Tricolor had filed for Chapter 7 bankruptcy with between $1 billion and $10 billion in assets and liabilities, and listing over 25,000 creditors; (ii) the bankruptcy filing followed on the heels of Fifth Third's public disclosure regarding its write-off of nearly $200 million in loans after discovering fraudulent activity; and (iii) the DOJ had issued multiple subpoenas in connection with a criminal investigation into potential securities fraud, and that the SEC had also opened a formal investigation into the matter. (*Id.*) The Notice further advised that these and other circumstances may give rise to potential

---

[2] The D&O Policies are attached as Exhibit B-D to Mr. Chu's Motion and are as such referenced herein. (*See* Dkt. Nos. 469-2 ("Ex. B"), 469-3 ("Ex. C"), and 469-4 ("Ex. D").)

claims against Insureds under the Policies, including, without limitation, Mr. Chu and thirteen other current and former directors and officers. (*Id*.)

24.     Against this backdrop, Mr. Chu seeks unfettered access to the D&O Policies' proceeds in order to fund his criminal and civil defense in connection with the fraud that took place at Tricolor under his watch. According to Mr. Chu, he has been advised by Travelers that, in light of the automatic stay in place pursuant to 11 U.S.C. § 362(a), it requires a "comfort order" from the Court before it will advance or pay out any proceeds to him under the Policies. (Mot. ¶¶ 19-21.) In response, Mr. Chu filed the instant Motion. The Trustee now objects.

## OBJECTION

## I.   THE POLICY PROCEEDS ARE ESTATE PROPERTY

25.     Mr. Chu first contends that stay relief is not necessary "because the Policy Proceeds are *not* property of the Debtors' estates." (Mot. ¶ 25.) He argues that "(i) the Debtors do not have a covered claim for themselves and any prospective claim is hypothetical and speculative; and (ii) even if the Debtors had such a Claim, the D&O Policies' priority of payment provision would subordinate it." (*Id*.) Mr. Chu is wrong on all counts.

### A.  The Policies Provide Direct Coverage to the Debtors

26.     "The overriding question when determining whether insurance proceeds are property of the estate is whether the debtor would have a right to receive and keep those proceeds when the insurer paid on a claim." *OGA Charters*, 901 F.3d at 603 (quoting *Edgeworth*, 993 F.2d at 55-56). In this case, the D&O Policies provide not only secondary coverage to the Debtors for indemnification paid out to any Insureds under Side B, but also direct coverage for third-party claims asserted against the Debtors under Side C. *See In re Allied Digital Techs., Corp.*, 306 B.R. 505, 511 (Bankr. D. Del. 2004) ("When a liability insurance policy provides direct coverage to a debtor the proceeds of the policy are property of the bankruptcy estate. Thus, the debtor is entitled

11

to payment of the proceeds and those proceeds should be protected as property of the estate."). Because the Debtors have the right to the proceeds on any such claims, they are Estate property.

**B. The Shared Policy Limit is Insufficient to Cover the Sheer Size and Volume of Claims**

27.    Mr. Chu argues that because he is seeking coverage under Side A of the Policies, which is exclusively for the benefit of officers and directors, the proceeds from *his* claims are not Estate property. (Mot. at 10.) This is not a serious argument.

28.    *First*, "when a liability insurance policy provides direct coverage to the debtor as well as the directors and officers, the general rule is that since the insurance proceeds may be payable to the debtor they are property of the debtor's estate." *Allied Digital*, Corp., 306 B.R. at 511. This rule applies with all the more force here. Because the Policies' proceeds are not segregated by claim, a single Insured (including Mr. Chu) could deplete the entire tower and leave other Insureds (including the Debtors) without any coverage. As Mr. Chu himself points out, "there is no Side A-only policy" here. (Mot. ¶ 27.) Unlike in *In re Goodman Networks, Inc.*, Case No. 22-31641 (MVL), which Mr. Chu heavily relies on here, the Side A, B, and C coverages are combined in a single Policy with equal access to the same shared insurance tower. *See In re Sacred Heart Hosp. of Norristown*, 182 B.R. 413, 420 (Bankr. E.D. Pa. 1995) ("Proceeds available for the Debtor's liability exposure are not segregated from the proceeds available to the directors and officers."). "Thus, the Debtor is indeed an insured and has a sufficient interest in the Proceeds as a whole to bring them into the estate." *Id*.

29.    *Second*, under controlling Fifth Circuit law, liability policy proceeds are property of the estate when the policy limit is insufficient to cover a multitude of claims. *See OGA Charter*, 901 F.3d at 603-04; *Sosebee v. Steadfast Ins. Co*., 701 F.3d 1012, 1023 (5th Cir. 2012); *In re World Health Alternatives, Inc.*, 369 B.R. 805, 810 (Bankr. D. Del. 2007) ("When a policy covers the debtor and its directors and officers, and there is risk that payment of proceeds to the directors and

12

officers will result in insufficient coverage of the debtor, then the proceeds are property of the estate and any attempts to obtain the proceeds are prohibited under the automatic stay") (citing *Allied Digital*, 306 B.R. at 511). So too, here.

30.    Compared to the $15 million Policy limit, the Debtors and other Insureds under the Policies are facing hundreds of millions of dollars in defense costs and damages from claims arising out of the fraudulent scheme, not to mention the related government investigations. Because the Policy limit cannot possibly cover the full exposure faced by the Insureds (including the Debtors) here, the Policy proceeds must be considered Estate property. *See Law Office of Rogelio Solis PLLC v. Curtis*, 83 F.4th 409, 413 (5th Cir. 2023) ("the present case is still clearly one in which 'the policy limit is insufficient to cover the multitude of claims' faced by the estate. Thus, the bankruptcy court correctly concluded that, under binding precedent…the Policy Proceeds would be considered property of the estate.") (citing *OGA Charter*, 901 F.3d at 603-04).

**C.  The Potential Claims Against The Debtors are Not Speculative or Hypothetical**

31.    Mr. Chu's assertion that the Policies' proceeds are not Estate property is also premised on the faulty notion that the Debtors have not submitted any Claims under the Policies, and that any potential Claims are purely speculative and hypothetical.  (Mot. ¶¶ 38-31.) In fact, the Trustee has already provided notice of potential claims that would trigger coverage under Side A, Side B, and Side C of the Policies.

32.    The Notice states that the "current government investigations of Tricolor…as well as recent public disclosures, media reports, and legal filings indicate various bases for potential Claims that the Trustee could bring against certain directors and officers." While Mr. Chu focuses on these potential claims (particularly against him) (Mot. ¶ 30), the Notice specifically identifies other circumstances that would plainly implicate the Policies' Side C coverage for potential claims against the Debtors—including, most notably, claims for hundreds of millions of dollars in losses

13

by lenders like JPMorgan and Fifth Third Bank.[3] Likewise, the Notice broadly states that it is intended to provide "notice for such potential suits and other claims that may arise in the future relating in whole or in part to the above-referenced circumstances," which includes claims brought against the Debtors based on the same fraud. That these are only potential claims at this time is irrelevant. The "Notice of Potential Claims" provision treats any future claim or related claims as made when the notice of potential claim is given—as it was here. (Ex. B at 43 of 113; Beskin Decl. Ex. 1.)

33.    These potential claims are not speculative or hypothetical. The Trustee's investigation has uncovered extensive evidence that Tricolor's financial reporting and collateral practices were materially misstated for years, including through the creation of tens of thousands of fictitious or duplicate receivables, double-pledging of collateral across multiple warehouse facilities, and systemic irregularities in internal controls, data integrity, and securitization reporting. As a result, the Debtors face the very real and imminent risk of claims for fraud, misrepresentation, violations of fiduciary duties, securities-related misconduct, and operational failures causing losses to warehouse lenders and investors being brought against them and other Insureds covered under the Policies.

34.    The fraud has already resulted in publicly disclosed losses that will almost certainly give rise to substantial claims against the Debtors and other Insureds. Fifth Third Bank announced that was writing off nearly $200 million in exposure after identifying fraudulent activity tied to Tricolor's warehouse lines, while JPMorgan and other lenders announced similar losses. This alone makes lender claims against the Debtors all but inevitable. In addition, Tricolor has

---

[3] For this reason alone, the cases Mr. Chu relies on here are inapposite. For example, in *In re Mountain Express Oil Co.*, No. 23-90147, 2025 WL 3030303, at *10 (Bankr. S.D. Tex. Oct. 29, 2025), the trustee failed to provide the insurer with notice of any claim to trigger Side C coverage for the debtors under the policy. That is not the case here.

been served with subpoenas from the DOJ and a formal document-preservation notice from the SEC. These government investigations encompass Tricolor's lending, warehousing, securitization, and disclosure practices. Other civil claims by lenders, investors, noteholders, and other stakeholders are bound to follow, likely seeking hundreds of millions of dollars in additional damages and added defense costs already far in excess of the Policy limits.

### D.  The Order of Payments Provision Does Not Impact the Estate's Property Interest

35.    Finally, Mr. Chu relies on the Policy's Order of Payments provision in arguing that the Policy proceeds are not Estate property and that he is entitled to advancement of defense costs. (Mot. ¶¶ 32-35, 38, 40, 42-43.) This argument fails because that provision expressly excludes "Defense Expenses". The Order of Payment provision plainly states that:

> "If Loss, other than Defense Expenses, from any Claim exceeds the remaining applicable limit of liability…
>
> (1) the Company will first pay Loss for such Claim to which [Side A coverage] applies; then
>
> (2) to the extent that any amount of the applicable limit of liability will remain available, the Company will pay Loss for such Claim to which [Side B and Side C coverage] apply."

(Ex. B at 55 of 113.)

36.    Mr. Chu attempts to downplay the significance of this exclusion in a footnote. (Mot. ¶ 33 n.4.) But it clearly means what it says: the priority waterfall applies only when "Loss, *other than Defense Expenses*…exceeds the remaining applicable limit of liability." (Ex. B at 55 of 113) (emphasis added). While Mr. Chu conveniently reads this provision to apply the priority waterfall to Defense Expenses *within* the Policy limits, that is not what it says. By its plain terms, the priority waterfall applies only where "Loss…*exceeds* the remaining applicable limit of liability." (*Id.*) (emphasis added). It does not apply for losses within the Policy limits, as Mr. Chu contends. This makes sense. In standard D&O practice, this carve-out exists to ensure coverage for individual

officers and directors in the event of a large settlement or judgment that exceeds the policy limits, which, unlike Defense Expenses, are not paid out continuously "as incurred."

37.     In short, the waterfall provision does not confer any special priority on the defense costs that Mr. Chu has or will incur here—and it certainly does not eliminate the Estate's property interest in the proceeds.

## II.   MR. CHU SHOULD NOT BE ALLOWED UNFETTERED ACCESS TO THE POLICY PROCEEDS

38.     Because the Policy proceeds are property of the Debtors' estate, the Court must determine whether Mr. Chu has demonstrated sufficient "cause" to lift the automatic stay under Section 362(d). He has not done so here, as the balance of both the harms and the equities weigh decisively against granting the relief he seeks here.

39.     To be clear, while the Trustee does not challenge his right to advancement and coverage, the Trustee objects to Mr. Chu's request for unfettered access to the Policy proceeds, without any safeguards in place to protect the rights of other Insureds to the Policy. Granting his request would not only effectively give Mr. Chu unrestricted, priority access to the proceeds, but also lead to a scramble by other Insureds to secure proceeds for their own defense. This scenario can and should be avoided. As the Fifth Circuit has explained, where "there are multiple claimants to the policy proceeds…oversight by the court is necessary to assure an equitable distribution of the available assets." *OGA Charters*, 901 F.3d at 605. That is the case here.

### A.   The Balance of Harms Weighs Decisively Against Mr. Chu

40.     "Bankruptcy courts that have considered whether to advance defense costs in this situation have balanced the harm to the debtor if the automatic stay is modified, with the harm to directors and officers if they are prevented from executing on their rights to defense costs." *SEC v. Narayan*, No. 16-CV-1417, 2017 WL 447205, at *5-6 (N.D. Tex. Feb. 2, 2017) (collecting

16

cases). In this case, Mr. Chu asserts that he is "presently experiencing a 'clear, immediate, and on-going' need for Defense Expenses under the D&O Policies, while the estates have no such current claim or defense needs." (Mot. ¶ 41.) None of that is true.

41.    *First*, Mr. Chu does not even attempt to substantiate his claim that he has a "'clear, immediate, and on-going' need for Defense Expenses under the D&O Policies." (Mot. ¶¶ 33-43.) Mr. Chu's reliance on *Narayan* is misplaced, because the movants in that case demonstrated they were "without money to fund a defense." 2017 WL 447205, at *5-6.  The same cannot be said for Mr. Chu, who, for good reason, has made no such showing here.

42.    Far from demonstrating need, Mr. Chu is clearly capable of funding his own defense—and is certainly at no risk of being "irreparably harmed" without immediate and unrestricted access to the insurance proceeds. As describe above, during his tenure as Tricolor's President and CEO, Mr. Chu received tens of millions of dollars in salary and performance-based bonuses, which he used to amass substantial holdings and fund a lavish lifestyle, all while a massive fraud was taking place under his watch. *(See*, *supra* ¶¶ 18-19.) And when the fraud began to surface in August 2025, Mr. Chu left a paper trail indicating that he took immediate action to shield and monetize his assets, including: (i) swapping a Beverly Hills property for cash; (ii) listing his Highland Park residence for nearly $11 million; (iii) consulting asset-protection counsel about transferring investments into a family limited partnership; (iv) exploring Florida homestead protections; and (v) unwinding a $25 million Aspen home purchase to recover additional funds. (*Id*. (citing Beskin Decl. Exs. 5-9).)

43.    *Second*, Mr. Chu's arguments on relative harm elide the rights of the Debtors and other Insureds to coverage under the Policy. By a conservative estimate, the fraud that led to Tricolor's sudden demise caused hundreds of millions of dollars in verifiable losses to lenders,

investors, and other stakeholders. The cost Debtors and more than a dozen of other Insureds will incur defending against their claims and the ongoing government investigations will alone exceed the Policy limits. There is simply not enough money to cover everyone.

44.     If Mr. Chu's request for unrestricted access to the insurance proceeds is granted, the Debtors' Estate will be irreparably harmed through the loss of critically-needed funding to defend against claims asserted against the Debtors, as well as coverage that could be used to satisfy claims brought by unsecured creditors. *See OGA Charters*, 901 F.3d at 604 ("Here, over $400 million in related claims threaten the debtor's estate over and above the $5 million policy limit, giving rise to an equitable interest of the debtor in having the proceeds applied to satisfy as much of those claims as possible."). The other Insureds, including thirteen other directors and officers named on the Trustee's Notice (many of whom have already received government subpoenas and filed their own notice of claims) face irreparable harm for much the same reason.

45.     Like Mr. Chu, these individuals have already begun incurring defense costs in connection with the government investigations. But if and when criminal charges and civil claims are brought, Mr. Chu will almost certainly be targeted first. Because he will have a head start (and require a fortune to defend), there is a substantial risk that the insurance tower will run out before many claims are even asserted against some Insureds. And while Mr. Chu points to cases where officers and directors faced substantial and irreparable harm for lack of funding, those cases are far more applicable to the other covered individuals here, who presumably do not have tens of millions of dollars in cash and other assets on hand to fund their defense.

**B. The Balance of the Equities Also Cuts Against Mr. Chu**

46.     Mr. Chu's position is even more untenable in light of the balance of equities. As discussed above, the Trustee's investigation strongly implicates Mr. Chu in the fraud that led to Tricolor's sudden collapse. Mr. Chu will get his day in Court. But until then, he should not be

18

given free rein to exhaust insurance proceeds that must be shared by all Insureds (including the Debtors), particularly when there is good reason to believe that he will be found largely or ultimately responsible for the fraud in the first place. His track record of questionable business dealings and other potentially fraudulent conduct also lends credence to the evidence against him, and further cautions against allowing him to dig into a shared insurance tower without any oversight or restriction.

47.     Moreover, the primary Policy issued by Travelers contains a standard conduct exclusion that bars coverage for losses arising from fraudulent, intentionally dishonest, criminal, or willful misconduct, or from any profit or advantage to which an Insured Person was not legally entitled, once such conduct is established by a final adjudication. (Ex. B at 54 of 114). While this exclusion does not apply to defense costs, the Policy requires that advanced Defense Expenses must be repaid to the insurer in the event and to the extent the Insured is later determined not to be entitled to coverage, which would apply in such cases. (*Id*. at 21 of 113.) In addition, the Policy expressly preserves Travelers' right to pursue subrogation directly against an Insured Person if a final adjudication establishes deliberate fraud, criminal acts, or illegal personal profit. (*Id*. at 34 of 113). These provisions confirm that coverage for Mr. Chu is conditional and subject to clawback. If so, the Trustee will be forced to expend time and scarce resources securing proceeds that Mr. Chu was never entitled to in the first place and could have been utilized by the Debtors or other Insureds without having to claw them back first.

**C.  Insurance Proceeds Should Not Be Paid or Advanced Without Court Oversight**

48.     Granting Mr. Chu's request would not only give Mr. Chu unrestricted access to insurance proceeds, which he will likely soon deplete, but also lead to a free-for-all by all of the other individual Insureds (many of whom have already submitted Claims under the Policies) to secure funds for their own defense. This scenario can and should be avoided. *See, e.g.*, *Landry v.*

19

*Exxon Pipeline Co.*, 260 B.R. 769, 795 (Bankr. M.D. La. 2001) (holding that allowing recovery of insurance proceeds on a first-come-first-served basis would result in unequitable distribution).

49.    The Fifth Circuit has recognized that where, as here, "there are multiple claimants to the policy proceeds, the court should be able to oversee the allocation of the proceeds among claimants." *OGA Charters*, 901 F.3d at 605. Indeed, the Court of Appeals stated that in such circumstances "oversight by the court is necessary to assure an equitable distribution of the available assets." *Id*. For that reason alone, Mr. Chu's request for unrestricted access to the insurance proceeds should be denied unless and until a workable procedure is established to oversee the allocation and distribution of the proceeds among the Insureds.

**D. The Trustee's Proposed Order Will Ensure the Preservation and Equitable Distribution of Policy Proceeds to All Insureds**

50.    Unlike the relief Mr. Chu seeks here, the Trustee's *Proposed Order for Limited Relief from the Automatic Stay to Allow for Advancement of Defense Costs from Proceeds of the Debtors' Directors and Officers Liability Insurance Policies*, attached as **Exhibit A** hereto (the "Proposed Order"), would best ensure the preservation and equitable distribution of Policy proceeds. If adopted, the Proposed Order will permit the Insurers to advance defense costs incurred by all Insureds under the Policies, including Mr. Chu and the Trustee, in accordance with their terms and conditions—subject to several key limitations.

51.    *First*, under the Proposed Order, no individual Insured with Claims covered under Side A of the Policies would receive more than ten percent (10%) of the $5 million limit for each Policy, equivalent to $500,000 per Policy, and $1,500,000 in aggregate coverage. This would prevent a single individual Insured like Mr. Chu from depleting the shared pool of proceeds by capping the total amount that can be paid out to any one Insured. Such limitations have been imposed by bankruptcy courts when facing similar requests for coverage by one or more insureds,

where "other insureds also have rights to coverage, and the total claims for coverage may exceed the policy limit…such that not all claims can be paid in full." *In re Bos. Reg'l Med. Ctr., Inc.*, 285 B.R. 87, 95-97 (Bankr. D. Mass. 2002) (capping initial amount of D&O insurance proceeds that certain covered officers and directors could access for their defense at $600,000 of the total policy limit of $20 million); *In re Petters Co., Inc.*, 419 B.R. 369, 380 (Bankr. D. Minn. 2009) (limiting the percentage of the aggregate coverage of D&O policies that CEO accused of perpetrating massive Ponzi scheme could use for his own defense).

52.     *Second*, the Proposed Order provides the Court with oversight over the process through which advancement requests are made on a monthly basis (much like interim fee applications made in the ordinary course under 11 U.S.C. § 331), and allows a mechanism for objections and dispute resolution. Such basic procedures are typical and consistent with the Fifth Circuit's directives on Court oversight. *See OGA Charters*, 901 F.3d at 605. The Court should adopt and implement them pursuant to the Proposed Order here.

## CONCLUSION

WHEREFORE, for the foregoing reasons, the Trustee respectfully requests that the Court deny Mr. Chu's Motion and enter an *Order for Limited Relief from the Automatic Stay to Allow for Advancement of Defense Costs under the Debtors' Insurance Policies* in the form of, or substantially similar to, **Exhibit A** hereto, and grant such other and further relief as may be just and proper.

Dated: Dallas, Texas
December 9, 2025

**MCDERMOTT WILL & SCHULTE LLP**

*/s/ Charles R. Gibbs*
Charles R. Gibbs (TX Bar No. 7846300)
Marcus A. Helt (TX Bar No. 24052187)
Grayson Williams (TX Bar No. 24124561)
Michael Wombacher (TX Bar No. 24120434)
2801 North Harwood Street, Suite 2600
Dallas, Texas 75201
Telephone: (214) 295-8000
E-mail: crgibbs@mwe.com
          mhelt@mwe.com
          gwilliams@mwe.com
          mwombacher@mwe.com

- and -

Julia M. Beskin (admitted *pro hac vice*)
919 Third Avenue
New York, New York 10022
Telephone: (212) 756-2000
Email: julia.beskin@srz.com

- and -

Timothy C. Cramton (pending *pro hac vice*)
One Vanderbilt Avenue
New York, New York 10017-3852
Telephone: (212) 547-5400
E-mail: tcramton@mwe.com

*Counsel to the Chapter 7 Trustee*

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that on December 9, 2025, a true and correct copy of the foregoing document was served via CM/ECF for the United States Bankruptcy Court for the Northern District of Texas on all parties authorized to receive electronic notice in this.

<u>*/s/ Julia M. Beskin*</u>
Julia M. Beskin