**MCDERMOTT WILL & SCHULTE LLP**
Charles R. Gibbs (TX Bar No. 7846300)
Marcus A. Helt (TX Bar No. 24052187)
Grayson Williams (TX Bar No. 24124561)
2801 North Harwood Street
Suite 2600
Dallas, Texas 75201
Telephone: (214) 295-8000
E-mail: crgibbs@mwe.com
  mhelt@mwe.com
  gwilliams@mwe.com

*Counsel to the Chapter 7 Trustee*

**MCDERMOTT WILL & SCHULTE LLP**
Darren Azman (admitted *pro hac vice*)
Jared M. Gerber (*pro hac vice* forthcoming)
One Vanderbilt Avenue
New York, New York 10017-3852
Telephone: (212) 547-5400
E-mail: dazman@mwe.com
  jmgerber@mwe.com

**MCDERMOTT WILL & SCHULTE LLP**
Julia M. Beskin (admitted *pro hac vice*)
919 Third Avenue
New York, New York 10022
Telephone: (212) 756-2000
Email: julia.beskin@srz.com

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 7 |
| TRICOLOR HOLDINGS, LLC, *et al.*, | Case No. 25-33487 (MVL) |
| Debtors. [1] | (Jointly Administered) |
| ANNE ELIZABETH BURNS, as Chapter 7 Trustee for Tricolor Holdings, LLC, *et al.*, | |
| Plaintiff, | |
| v. | Adversary No. _____ |
| DANIEL CHU, JEROME KOLLAR, DAVID GOODGAME, and AMERYN SEIBOLD, | |
| Defendants. | |

---

[1]   The Debtors in these Chapter 7 cases are as follows: Tricolor Holdings, LLC, TAG Intermediate Holding Company, LLC, Tricolor Auto Group, LLC, Tricolor Auto Acceptance, LLC, Tricolor Insurance Agency, LLC, Tricolor Home Loans LLC dba Tricolor Mortgage, Tricolor Real Estate Services, LLC, TAG California Holding Company, LLC, Flexi Compras Autos, LLC, TAG California Intermediate Holding Company, LLC, Tricolor California Auto Group,

## COMPLAINT

Anne Elizabeth Burns, Chapter 7 Trustee for the above-referenced Chapter 7 bankruptcy case and plaintiff herein ("**Trustee**" or "**Plaintiff**"), files this *Complaint* against Daniel Chu, Jerome Kollar, David Goodgame, and Ameryn Seibold (the "**Complaint**"), and in support thereof, respectfully submits as follows:

## NATURE OF THE ACTION

1.      This Complaint arises from a brazen fraud of over $600 million at Tricolor, perpetrated by Daniel Chu ("**Chu**"), the founder and former Chief Executive Officer ("**CEO**") and President, Jerome Kollar ("**Kollar**"), the former Chief Financial Officer, Vice President and Secretary, David Goodgame ("**Goodgame**"), the former Chief Operating Officer ("**COO**"), and Ameryn Seibold ("**Seibold**"), the former Director of Treasury (collectively "**Defendants**"). Defendants blatantly misrepresented the amount of finance receivables on Tricolor's books to secure more and more financing from its lending banks and to issue more and more asset-backed securities to investors.  This scheme ultimately led to an avalanche of liabilities and an ensuing liquidity crisis, which resulted in the above-captioned Bankruptcy.

2.      During Chu's nearly two-decade tenure as the CEO of Tricolor, he further defrauded Tricolor by using corporate funds to pay for lavish personal expenses and by forcing the company into paying him tens of millions of dollars in bonuses (on top of his executive salary), premised on his ability to deliver exceptional financial results—results that were the product of the fraud that he committed alongside Kollar, Goodgame, and Seibold.  Chu's quest for multimillion dollar bonuses and regular use of corporate funds for personal expenses, against a backdrop of towering liabilities, allowed him to fund his lavish lifestyle—including opulent homes

---

LLC, Tricolor California Auto Acceptance, LLC, Risk Analytics LLC, Tricolor Tax, LLC, Tricolor Financial, LLC, Tricolor Auto Receivables LLC, TAG Asset Funding, LLC, and Apoyo Financial, LLC. (collectively, "**Tricolor**").

in Highland Park, Beverly Hills, and Miami (collectively worth approximately $38 million), as well as other personal luxuries such as private jet travel, expensive European vacations, cars, and even a personal ski chalet.

3.      This fraud is part of a practice of deceit and self-enrichment by Chu.  He began his career as a college basketball coach, until he was fired for allegedly directing an assistant coach to make improper payouts to student athletes.  Following that, he founded a used-car chain that a subsequent buyer discovered was riddled with "accounting errors and irregularities" under Chu's watch.  In connection with a subsequent business venture that was purportedly to invest in broadband utilities, Chu was sued by his business partners who claimed Chu sold their stakes in the company to settle a personal debt.

4.      Chu then founded Tricolor in 2007.  It was a "buy here, pay here" subprime auto finance company—*i.e.*, it is both an auto dealer and an auto finance company, offering in-house financing directly to its customers.  Tricolor Auto Group, LLC operated over sixty dealerships in the United States, principally in Texas and California.

5.      Tricolor's business model targeted "underbanked" borrowers, two-thirds of which lacked savings, consistent income, and credit scores.  Tricolor was marketed as a community-focused company that gave auto loans to mainly Hispanic immigrants, attempting to cast aside the typical reputation of used car salesmen targeting vulnerable communities with promises of no credit-check loans.

6.      Tricolor relied on short-term warehouse lending to originate auto loans for its customers.  These loans were then bundled as collateral for asset-backed securities ("**ABS**").  These proceeds from ABS sales were, in turn, used to pay off the warehouse loans.

7.      This economic model appeared to be a winning formula for Tricolor.  Tricolor was among the fastest-growing auto lenders in the United States, quadrupling in size from 2018 through 2025.  In 2025, it closed two term securitization transactions with notes sold for $328,100,000 and $217,180,000 (Tricolor Auto Receivables Trust 2025-1 and 2025-2, respectively).

8.      But on the inside, Tricolor was a fraud, as Defendants perpetuated a double-pledging scheme, pursuant to which identical auto loans were pledged as collateral for separate warehouse credit lines with different banks, and Tricolor duplicated vehicle identification numbers to generate multiple fictitious loans per vehicle.

9.      Tricolor warehouse lenders Fifth Third Bancorp and JPMorgan have each disclosed nearly $200 million in losses based on Tricolor's defaults on their warehouse loans.  Tricolor's lenders have attributed these losses to "alleged fraudulent activity" at Tricolor.

10.      To uncover the scope of this blatant fraud, the Trustee has retained consulting firm CRS Capstone Partners LLC ("**Capstone**"), and Captone's forensic accounting expert Jim Calandra (the "**Forensic Accounting Expert**"), to investigate the facts and circumstances that led to Tricolor's bankruptcy.  While the investigation is ongoing, to date, the Forensic Accounting Expert has analyzed Tricolor's finance receivables, loan servicer reports, and Tricolor's historical financial statements, and his preliminary analysis reveals cloned or entirely fabricated loans with a receivable value of over $683 million, which allowed Tricolor to receive hundreds of millions of dollars more in credit from its lending banks than it had lent in auto loans to its consumers.

11.      On December 16, 2025, the Department of Justice ("**DOJ**") unsealed a detailed indictment charging Chu and Goodgame with operating a financial crimes enterprise, conspiring to commit bank fraud and wire fraud affecting a financial institution, committing bank fraud, and committing wire fraud affecting a financial institution.  (Ex. 1.)  As explained in more detail below,

the DOJ's indictment cites specific text messages, voice recordings, and other documents in which Defendants orchestrated and executed this wide-ranging fraud, all while mocking the victims of that fraud.  The charges brought against Chu in particular carry a maximum potential sentence of life in prison. Kollar and Seibold have pleaded guilty to fraud and are cooperating with the DOJ's investigation.

12.     The Trustee now brings this action against Defendants for (1) fraud, (2) breach of the fiduciary duty of care, (3) breach of the fiduciary duty of loyalty, (4) breach of the Fifth Amended and Restated Limited Liability Agreement, (5) breach of the implied duty of good faith and fair dealing, (6) turnover of estate property, (7) avoidance of preferential transfers, (8) actual fraudulent transfer, (9) constructive fraudulent transfer, (10) civil conspiracy, (11) unjust enrichment, (12) constructive trust, and (13) an accounting, for the benefit of Debtors' estates and their creditors.

## PARTIES

13.     Plaintiff Anne Elizabeth Burns is the duly qualified and acting Chapter 7 trustee for the bankruptcy estate of Debtors, which is being administered under the Bankruptcy Case, and may be served with any further pleadings or documents in this Adversary Proceeding through the undersigned counsel.

14.     Daniel Chu is a natural person and a resident of Florida.  Chu resides at The Four Seasons Residences, The Surf Club, 9001 Collins Ave #S-201, Miami Beach, FL 33154.  Chu was at all relevant times Chief Executive Officer and President of Tricolor Holdings, as well as a Manager of Tricolor Holdings.  Chu also served as the Chief Executive Officer and President—as well as a Manager—of each of the other Debtors.

15.     Jerome Kollar is a natural person residing in Texas.  On information and belief, Kollar resides at 1301 McClintock Drive, Denton, TX 76208-5292.  Kollar was at all relevant times Chief Financial Officer, Vice President and Secretary of Tricolor Holdings, as well as the CFO, and Manager of each of the other Debtors.

16.     David Goodgame is a natural person residing in Texas.  On information and belief, Goodgame resides at 601 Arrowhead Road, Waxahachie, TX 75167-8595.  Goodgame served as the Vice President of Supply Chain and Analytics at Tricolor before being promoted to Chief Operating Officer in 2019—a position he held until Tricolor's bankruptcy.

17.     Ameryn Seibold is a natural person residing in Texas.  On information and belief, Seibold resides at 616 Saddle Club Way, Princeton, TX, 75407.  Seibold was at all relevant times the Director of Treasury of Tricolor Holdings.

## RELIEF REQUESTED

18.     The Trustee seeks a judgment awarding recovery from Defendants for (1) fraud, (2) breach of the fiduciary duty of care, (3) breach of the fiduciary duty of loyalty, (4) breach of the Fifth Amended and Restated Limited Liability Agreement, (5) breach of the implied duty of good faith and fair dealing, (6) turnover of estate property, (7) avoidance of preferential transfers, (8) actual fraudulent transfer, (9) constructive fraudulent transfer, (10) civil conspiracy, (11) unjust enrichment, (12) constructive trust, and (13) an accounting, awarding Trustee's reasonable costs and attorney's fees, and granting such other and further relief at the Court deems just and proper.

## JURISDICTION AND VENUE

19.     The Court has jurisdiction to consider this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and the *Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc* dated August 3, 1984, entered by the United States District Court for the Northern

District of Texas.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and

the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

20.     The legal predicates for the relief requested herein are Sections 105(a), 542, 544,

547, 548, and 550 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 7001 of

the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and the Local Bankruptcy

Rules of the United States Bankruptcy Court for the Northern District of Texas (the "**Local**

**Rules**").

## PROCEDURAL BACKGROUND

21.     On September 10, 2025, Tricolor filed a voluntary petition in this Court under

Chapter 7 of the United States Bankruptcy Code, 11 U.S.C. § 101, *et seq.*

22.     On the same day, a Notice of a Chapter 7 Bankruptcy Case was entered, appointing

Anne Elizabeth Burns as the Chapter 7 trustee for Tricolor.

23.     Tricolor's petition indicated that it has more than 25,000 creditors and between $1

and $10 billion in liabilities.

24.     A meeting pursuant to Section 341 of the Bankruptcy Code (the "**341 Meeting**")

was held in the Bankruptcy Case on November 18, 2025.  In advance of that meeting, the Trustee

specifically requested that Chu serve as the Debtors' representative at the 341 Meeting.

Nonetheless, Chu failed to attend this meeting.  The 341 Meeting was therefore rescheduled to

January 13, 2026, and Chu's counsel has indicated that Chu "will not voluntarily appear" at the

rescheduled 341 Meeting and that if he is compelled to attend, he "will most certainly be advised

to assert his rights under the Fifth Amendment as to most, if not all, questions that may be posed."

On December 9, 2025 the Trustee filed a motion to compel Chu's attendance at the rescheduled

341 Meeting, or if Chu refuses to cooperate, the Trustee requests that the Court compel Kollar to

attend (Dkt. 523), and on December 16 filed a notice for a hearing on that motion scheduled for January 7, 2026, (Dkt. 549).

## FACTUAL ALLEGATIONS

**A.    Chu's History of Suspect and Fraudulent Business Practices.**

25.    Even before engaging in the fraud he perpetrated at Tricolor alongside Kollar, Goodgame, and Seibold, Chu's professional career has been marred by wrongdoing in seemingly every professional position he has ever held.

26.    Chu began his career coaching basketball at the University of the South in Sewanee, Tennessee. However, in 1992 he was fired for allegedly directing an assistant coach to give $4,000 to an athlete's parent to cover part of tuition; giving improper benefits to student athletes; and wielding improper influence over the financial aid process for need-based students. Chu violated both University and NCAA rules in orchestrating these payouts, and the NCAA infractions panel explicitly found that he engaged in unethical conduct. *See* David Adams, *Coach Dismissed for Alleged NCAA Violations*, The Sewanee Purple, dated April. 6, 1992, available at 1, dated April. 6, 1992, available at: https://dspace.sewanee.edu/server/api/core/bitstreams/8eee286e-efbe-4231-a85e-b69e9c743e67/content.

27.    In 1992, Chu then founded Paaco Automotive Group, LLC, a used car chain like Tricolor that similarly targeted Hispanic buyers, and served as its President. After Paaco was sold to the Crown Group, Inc. ("**Crown**"), Chu initially stayed on as President. However, when Crown discovered that Paaco's financial records contained accounting errors and irregularities that arose under Chu's watch, it announced Chu's retirement in 1999 and reported these issues to the US Securities and Exchange Commission. *See* Crown Group, Inc., Annual Report (Form 10-K) (Apr. 30, 2001), at https://tinyurl.com/5n79tsdd.

8

28.     After his exit from Crown, Chu and a group of partners founded Corona Broadband Partners II in 2000, for the purpose of investing in Broadband Utilities, LP.  This project was short lived, however, as a lawsuit was filed by his fellow partners accusing Chu of misusing the $45,000 they gave Chu to invest.  Chu allegedly never chartered the partnership, and he failed to report to investors that he instead traded the investment for forgiveness of a personal debt.  *See* Plaintiffs' Original Petition, *Schlacter et al. v. Chu et al.*, DC-12-09679 (Tex. Dist. Ct. Aug. 24, 2012).

29.     In 2007, Chu founded Tricolor, where he worked with Defendants to continue his pattern of fraudulent and self-dealing activities that have inflicted hundreds of millions of dollars of harm and forced the company into bankruptcy.

**B.      Tricolor's Business and Corporate Organization.**

30.     Tricolor Holdings is a limited liability company founded in 2015 and organized under the laws of the State of Delaware with a principal place of business at 6021 Connection Drive, 4th Floor, Irving, Texas 75039.  It is the direct or indirect parent entity of the other Debtors. *See* Appendix A.  The majority member of Tricolor Holdings is Ganas Investors, LLC, an LLC in which Chu was the sole manager.

31.     Tricolor was a "buy here, pay here" subprime auto finance company, which meant that it was both an automobile dealer and finance company, offering in-house financing directly to its customers who purchased its used vehicles.

32.     As a subprime finance company, Tricolor's customers were typically those with poor or little credit history, and often are lower-income individuals.

33.     In particular, Tricolor focused its business toward undocumented immigrants, who traditionally had limited access to most automobile financing and no available credit history. Tricolor positioned itself as an ESG-focused (environmental, social, and governance focused)

company that allowed otherwise vulnerable communities to achieve vehicle ownership without the typical reputation of used car salesmen with promises of no credit-check loans.

**C.    Tricolor's Warehouse Loans.**

34.    Tricolor funded its auto lending operations through warehouse loans. A warehouse loan is a revolving line of credit extended by a financial institution to a lender to fund consumer loans. These lines of credit are seen in a variety of industries but are commonly used in auto lending and mortgage lending.

35.    Because Tricolor was a buy-here, pay-here dealer, Tricolor could originate auto loans to the purchasers of the vehicles it sold (represented on Tricolor's books as finance receivables) and then finance those loans through the warehouse line of credit. Tricolor's lending process followed a cyclical pattern in which: (1) Tricolor would take a loan application from a prospective automobile consumer, (2) Tricolor would draw on the warehouse line of credit in order to fund the auto loan, (3) the auto loan would serve as collateral for the warehouse line of credit, (4) the auto loans would be securitized into asset-backed securities to be sold to investors, and (5) the warehouse line of credit would be repaid with funds from selling the asset-backed securities.

36.    Tricolor's warehouse lending process was enumerated in its Credit Agreement dated November 13, 2020, between Tricolor Funding SPV 4 LLC (borrower), Tricolor Auto Acceptance, LLC (servicer), lenders (from time to time), agents (from time to time), JPMorgan Chase Bank, N.A. (as the administrative agent) ("**JPM**"), and Vervent Inc. (as the backup servicer), and Wilmington Trust, N.A. (as the collateral custodian and account bank) (the "**Credit Agreement**") (Ex. 2), as well as in other substantially similar agreements concerning Tricolor's other SPV entities. Tricolor's lending banks included JPM, Fifth Third Bank, and Origin Bank (each a "**Lender**," and collectively, the "**Lenders**").

37.    Chu signed the Credit Agreement on behalf of both Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC.

38.    Per the Credit Agreement, Tricolor Auto Acceptance, LLC (a Debtor) was the servicer of the warehouse loans, while another subsidiary, Tricolor Funding SPV 4 LLC, was the borrower.

39.    By the Credit Agreement's terms, Tricolor Funding SPV 4 was obligated to not exceed a collateralization rate of 80%—that is, the Lenders agreed to extend a line of credit to Tricolor for amounts less than or equal to 80% of the value of Tricolor's recorded finance receivables (*i.e.*, its auto loans to Tricolor customers).

40.    Because the auto loans themselves were the collateral for the Lenders' warehouse line of credit, the collateralization rate of 80% was intended to limit Lenders' exposure in the event of consumer defaults on those auto loans.  Putting a cap on the line of credit that could be advanced to Tricolor for a given amount of collateral was vital, as Tricolor's customer base consisted of those with poor (or no) credit history.  As a result, defaults on the auto loans which served as the collateral for the warehouse line of credit were a common occurrence.

41.    At the same time, this collateralization rate was also vital to Tricolor's overall financial health, as Tricolor was ultimately responsible for paying off its warehouse line of credit. Limiting the rate of collateralization acted to prevent Tricolor from taking on too many liabilities at one time.  In the event of a default on an auto loan from a Tricolor customer, Tricolor would repossess the vehicle and try to sell it to a new customer—but by capping the amount of liabilities Tricolor could take on, Tricolor could better absorb the shocks of individual consumer auto loan defaults.

42.     In addition to his roles at Tricolor, Chu was also a board member of one of Tricolor's Lenders, Origin Bank, and upon information and belief, he used his influence at this Lender for both Tricolor's and his own personal gain.

43.     Chu used his influence to persuade Origin to become one of Tricolor's top Lenders, and pledging in return collateral that had already been committed to other Lenders.

44.     As of August 2025, Origin Bank had loaned $25,000,000 in warehouse financing and $5,000,000 in term financing to Tricolor.

**D.      Defendants' Hands-On Involvement in and Total Control Over All Aspects of Tricolor's Business.**

45.     Tricolor Holdings was a "manager-managed" LLC, whereby a Board of Managers was empowered pursuant to the Fifth Amended and Restated Limited Liability Agreement of Tricolor Holdings LLC (the "**LLC Agreement**") (Ex. 3) to manage the business and affairs of Tricolor Holdings.  The Board of Managers, in turn, was empowered by the LLC Agreement to appoint Officers to manage the day-to-day affairs of the Company.  The other Debtors, too, were manager-managed LLCs.

46.     Defendants each managed the day-to-day operations of Tricolor.

47.     Chu was at all relevant times the Chief Executive Officer and President of Tricolor Holdings, as well as a Manager of Tricolor Holdings.  Chu also served as the Chief Executive Officer and President—and a Manager—of each of the other Debtors.  As CEO and President, Chu oversaw all aspects of Tricolor's business.  Chu was also the public face of Tricolor, regularly speaking for the company in a wide variety of publications and podcasts regarding Tricolor's business strategies and other substantive issues facing the company, for example on October 18, 2019, Chu appeared on the Lend Academy Podcast to discuss building a customer base that did not focus on repeat customers.  (Ex. 4.)

48.     Kollar was at all relevant times the Chief Financial Officer, Vice President and Secretary of Tricolor Holdings and each of the other Debtors.  Kollar also served as a Manager of each of the other Debtors.

49.     David Goodgame was at all relevant times the Vice President of Supply Chain and Analytics (until 2019) and the Chief Operating Officer of Tricolor Holdings (from 2019 until Tricolor's bankruptcy).   As COO, Goodgame was responsible for managing the day-to-day operations of Tricolor, and he personally oversaw the supply chain, loan servicing, customer experience, and sales operations of Tricolor.

50.     Ameryn Seibold was at all relevant times the Director of Treasury of Tricolor Holdings.  As Director of Treasury, Seibold answered directly to Kollar and worked closely alongside him in managing the reporting of Tricolor's financial condition to the Lenders, stakeholders, and others at Tricolor.

51.     At virtually every Tricolor Board meeting, Defendants Chu and Kollar presented regarding financial position of the company, including investments, hiring, and macroeconomic conditions. Defendants Chu and Kollar therefore controlled the financial narrative that was presented to the Board, meeting after meeting.

52.     Defendants Chu and Kollar also led the process for securitizing Tricolor's auto loans, demonstrating their familiarity with Tricolor's financial standing, collateral available for pledging, and collateral already pledged.  On at least one occasion, Defendants Chu and Kollar worked together to develop materials for the Board concerning Tricolor's securitizations to financial institutions.

53.     Marketing materials for the ABS Social Bond, highlighted that Chu and Kollar, and other executives on the company's Credit Risk Committee would oversee the creation of each loan portfolio and ultimately approve the loan portfolio.  (Ex. 5.)

**E. Defendants' Wide-Ranging Fraud.**

54.     As set forth in the DOJ indictment, from 2018 through 2025, Defendants perpetuated a brazen double-pledging scheme to defraud Tricolor, its lenders, and other investors.

55.     In or about 2018, Chu instructed Kollar to pledge past-due loans that Tricolor had already charged-off as losses.  Chu instructed Kollar to create a fictitious portfolio company in Tricolor's dealer management system, transfer the charged-off loans to the new portfolio company, and arrange for other Tricolor employees to manually enter fake payments from customers on those charged-off loans in the dealer management system.  In order to pay back the loans it secured from Lenders through the collateralized car loans, Tricolor used funds from one Lender to pay back another Lender to make it appear as though the fake payments were not fabricated by Defendants.

56.     In January 2021, Chu asked Kollar over text if there was "anything we can pledge" from one lender to another lender to "get some liquidity."  Kollar responded, "I will look.  What is 'there' typically is [inelligible] for those."   The DOJ concluded in their indictment that this text was referring to charged-off loans that were manipulated to appear as though they were actively performing loans.

57.     At around the same time, others at Tricolor became concerned with the possibility of fraudulent activity and inadequate internal controls at the company.  For example, as early as January 2021, Defendants were informed of material weaknesses identified by Tricolor's Chief Process Officer, Vanessa Mata.  In a spreadsheet she presented to Defendants, she raised, among

other things, concerns with the lack of internal review protocols to compare inventory to finance receivables to ensure appropriate reclassification. (Ex. 6.) This lack of internal review was by design, allowing Defendants to alter data manually as part of their fraudulent scheme. Mata also sounded the alarm that certain users had access to multiple accounting systems which "can cause undetected errors, or allow the ability to commit fraud or theft." Mata also raised that "[s]tandard accounting controls were not documented or performed (such as account reconciliations performed and reviewed[)]. [The] Team lacked strong CPA and Accounting Bachelors / Masters expertise to under[stand] and record accounting transactions to US GAAP requirements." Finally, she raised that the lack of an internal audit department could lead to a lack of compliance or "bad business practices continuing without identification." In response, Defendants tasked Kollar—one of the main perpetrators of the fraud—with supposedly remediating the issues identified by Mata. He never did so, and the Defendants continued their wrongdoing.

58. In or about 2021, Defendants manipulated data related to Tricolor's collateral for inventory loans (*i.e.*, the vehicles themselves). Chu and Kollar retained vehicles on Tricolor's borrowing base for inventory credit lines even after they were sold, allowing for Tricolor to draw on lines of inventory credit for illusory collateral. For example, on April 20, 2021, Chu texted Kollar and others that, "[i]n an ideal scenario, we buy and increase inventory by $10mm and then we move the sold units off the borrowing base." That is, Tricolor would increase its inventory by $10 million to allow it to remove sold units that were fraudulently misrepresented in its borrowing base for inventory credit lines. At the same time, Defendants also caused Tricolor to pledge to other lenders the finance receivables for cars that had been sold and financed but were nonetheless pledged to inventory lines of credit.

59.     From at least 2022 onwards, Defendants further manipulated financial data as to Tricolor's borrowing base, including data on loan performance, and pledged the same collateral across multiple warehouse facilities to draw more from its warehouse credit lines.  Defendants submitted manipulated borrowing base reports to Lenders which misrepresented the loan receivables that formed Tricolor's borrowing base.

60.     Defendants texted openly about the ongoing fraud.  For example, Chu texted Kollar on July 25, 2022 asking him, "Can we work the >60s"?  That is, he asked if data for loans over 60 days past due could be "worked."  In response, Kollar and Seibold manually changed the data fields in borrowing base reports related to whether a loan was performing or past due, such that loans that were more than 60 days past due appeared to be current or paid within the last 60 days. (Ex. 1).

61.     Chu and Kollar also regularly texted about efforts to obtain more liquidity by making misrepresentations to Lenders.  On April 26, 2022, Kollar texted Chu: "We maxed the [Lender] one [*i.e.*, the SPV4 warehouse] for tomorrow by adding $1M when we should have only received $300k and working on [another Lender] [*i.e.*, the SPV 3 warehouse] today."  This meant that Defendants' collateral manipulation had obtained $1 million more from the SPV 4 warehouse than would have been possible without fraud.  On November 16, 2022, Chu texted Kollar for an update on Tricolor's liquidity, and Kollar responded that Tricolor has "$2.1m to [pledge] and with working DQ [delinquency] buckets we are getting $2.77M or ~$1.3m more.  Will do a Bb [borrowing base] tomorrow and work to squeeze a little more out."  (Ex. 1 at 8.)  This meant that by manipulating delinquency data in borrowing base reports, Kollar increased the volume of eligible loans, generating an additional $1.3 million in advanced funds from lenders.

62.     Defendants also double pledged the same loans as collateral to multiple lenders and securitizations.  On March 1, 2023, Seibold described double-pledging efforts to Goodgame, writing that Seibold was "taking accounts from SPV6 and pledging on SPV3 to get liquidity out of SPV3," to which Goodgame replied jokingly with a crying emoji.  Seibold then stated that he was then "possibly taking SPV5 accounts and double pledging on SPV6."  In both instances, the same loans were being applied to multiple securitizations.  On September 8, 2023, Goodgame messaged Seibold about needing to sell more inventory each week, and Seibold explained that "[w]e are bringing in between 6-8M a week on the main spvs right now," but that "[i]t's been tight just because of how close we are to maxing out the facilities."  Seibold further explained that "Spv6 is capped out.  Spv4 is making it hard with this notional inter[e]st rate cap.  Spv3 is capped out. We have some room on SPV5 but are trying to keep it relatively clean.  Doing everything I can to make sure we still have as much as we can coming in.  The audits are going to be tough."  In response, Goodgame responded, "ugh."  Seibold, in turn, joked that "[h]opefully after this securitization we can keep them a bit cleaner," and Goodgame responded "Lol"—both joking about how Tricolor's lines of credit were not clean of fraud.  (Ex. 1 at 9.)

63.     To help prevent the fraud from being discovered, Defendants also falsified backup records to keep when audits were performed, including loan payment ledgers and system records indicating to which lender a loan had been pledged.  During audits over the years this fraud was ongoing, Defendants would communicate about the possibility of having the fraud come to light. For example, on July 22, 2021, when an auditing firm was auditing Tricolor's prior year financial statements, Kollar texted Chu, "We will need to make sure [the auditor] does not try to [t]ie out [Lender]," because a comparison of the manipulated data that was provided to one of the Lenders to the real data in Tricolor's internal dealer management system would have revealed the fraud.

Chu responded: "I know."  (Ex. 1 at 9.)  Similarly, on December 12, 2022, Kollar sent a Teams message to an employee regarding an audit conducted by TBK, one of Tricolor's lenders.  Kollar instructed the employee alter information in the sales report to be sent to TBK's auditing team by entering "a [vehicle identification number] that would not be searchable to the BBs [borrowing base spreadsheet]."  (Ex. 7.)  Later, on July 28, 2023, in connection with a different audit, Chu texted Kollar: "Can you reconstruct [Lender's] BB," referring to the borrowing base of purported collateral pledged to one of the Lenders.  Kollar responded, in part, "It includes loans that are not active."  Over the relevant period, Seibold at various times raised concerns about the fraud being discovered.  Goodgame, in response, would reassure Seibold so that Seibold would continue perpetuating the fraud.  (Ex. 1 at 9.)

64.    In February 2024, JPM performed an audit of Tricolor collateral pledged to JPM and alerted Kollar and Tricolor to serious material weaknesses in its accounting practices.  JPM's findings revealed approximately $13 million in double pledged loans on collateral pledged JPMorgan.  In a consulting report dated February 23, 2024, addressed to Kollar, JPM's auditor noted that of the 25 accounts on which it performed an aging test, three accounts were repossessed as of January 31, 2024, but were not marked as such.  This consulting report also cited some of the very same material weaknesses that were identified in the 2021 Chief Process Officer report discussed above, including lack of internal review protocols to ensure accuracy of finance receivables.  Of course, Defendants did not correct these errors identified by JPM, but in fact continued to perpetuate their double-pledging fraud.

65.    A year later, on April 23, 2025, a Tricolor employee notified Kollar that during the course of an audit he discovered vehicle identification numbers ("**VINs**") changing between 2023 and 2024 for the same vehicle.  The employee stated that the VIN was changed in the Tricolor

system such that a duplicate would not be picked up if Tricolor's system ran a duplication check. Kollar hypothesized that the VIN may have been changed in the database because it "does not make sense to have two [accounts] with [the] same VIN." (Ex. 8.) This, however, was a lie meant to conceal Defendants' fraud.

66.     Kollar also used his position as CFO and Treasurer to perpetuate Defendants' fraud by instructing Tricolor employees and consultants to manipulate data. For example, on June 17, 2025, Kollar corresponded over email with Srinivas Mutyala (who worked in software development for consulting firm Tekzenit, Inc.), whose duties, among others, were to assist in preparing Tricolor's reports to loan servicers. Mutyala presented Kollar with a list of active auto loan accounts among several ABS portfolios which were to be transferred into the TAST2025-2 securitization, and Kollar explicitly instructed Mutyala to leave those accounts attributable to the TAST2022-1 securitization "on both the TAST2025-2 and TAST2022-1 reports"—i.e., these same loans would serve as collateral for two entirely different securitizations, double-pledging 3,225 auto loans to both TAST 2022-1 and TAST 2025-2. (Ex. 9.) Because this was facially suspect, Mutyala asked Kollar to confirm that Kollar indeed wanted Mutyala wanted to attribute 3,225 loan contracts to two *different* securitizations. Kollar replied that, indeed, this was what he was instructing Mutyala to do. (Ex. 9.)

### F. The Fraud is Revealed.

67.     In August 2025, JPM began investigating whether Tricolor pledged the same collateral multiple times, thus significantly overrepresenting the amount of collateral pledged in support of the JPM warehouse loans. A banker from JPM called Chu about these problems. Chu, at the time, was on a luxury vacation in Italy, and he denied knowledge of the fraud. JPM retained FTI Consulting to run a forensic analysis of Tricolor and alerted the Department of Justice.

68.     Chu, Kollar and other executives spoke over the phone on August 17, 2025 to discuss how to reconcile the irregularities in the records.   Per audio recordings reflected in the DOJ's indictment, Chu urged the team to find a solution, observing that "rather than conform all of our records to meet the audit, I think we need to, we need to rethink, kind of holistically, all of the processes that are resulting in this" delay. Chu then drew an "analogy" to when the team managed to obscure Tricolor's fraudulent use of "dead loans on the balance sheet" to borrow capital during the 2022 financial statement audit.   Chu emphasized that his "point in that analogy" was that "**rather than scrambling" to figure out, "okay, how are we gonna fabricate these loans?   How are we gonna make up these loans?   We just basically created around the problem with a structure, or I would say in this case, a policy, which, which made it, made all the math work.**"   Chu then said, "we have a similar math problem today" and discussed with Kollar the buckets of manipulated loans and confirming exactly what fake data had been sent to the lenders on the SPV 4 Warehouse.  (Ex. 1 at 11.)

69.     During this August 17 call, Chu proposed that the manipulated data could be falsely attributed to a "Trump administration deferment" policy.   Chu explained, "All I'm trying to do is, is alleviate the need to mess with any of these things and create a policy."   Chu acknowledged, however, that "where we would have an issue is if, if they sent an auditor and they said, pull this up on your screen, right, that would be a problem."   Kollar agreed, stating, "Yes. That would be bad." (Ex. 1 at 11.)

70.     During another call on August 18, 2025, between Chu, Goodgame, Kollar, and other Tricolor executives, Chu described that one of the Lenders identified that "$63 million of loans that have not had a payment in 180 days that are marked as current in the borrowing base." Chu complained that he did not understand how Seibold could "be doing this and not thinking that

the balance has to reduce," saying it was "the stupidest fucking thing [he had] ever heard." Once Seibold was added to the call, Chu, in effect, demanded to know why Seibold had not thought to falsely reduce the balances in the borrowing base provided to Lenders when Seibold fraudulently marked the loans as current. Seibold responded: "I've been holding 8,000 outstanding charge-offs on every report for about a long time." When Chu asked whether Seibold ever reduced the balance, Seibold explained: "We do, but some we don't. . . . I can't reduce by a full 8,000 without having us have millions of dollars in debts that we need to pay down. . . . I'm doing what I thought was what we needed." (Ex. 1 at 12.)

71.    On another call the next day between Chu, Goodgame, Kollar, and other executives, Chu recounted that he had spoken to one of the Lenders the prior evening and relayed to the Lender's representative. Chu said: "Look, if we were trying to commit fraud, we wouldn't be so stupid as to keep the same balances on there. . . . Nobody would be that stupid. And he [the Lender representative] goes, 'you're right.'" The participants on the August 19 call laughed in response. Chu also recounted how he told the representative of the Lender that it must be a "system issue." Of course, these were lies. As all participants on the call were aware, these inconsistencies were due to intentionally manipulated data, not a system issue. (Ex. 1 at 12.)

72.    As the walls closed in on Defendants, Chu and Goodgame attempted to devise ways that Tricolor could settle with Lenders such as JPM who had caught on to their fraud. On August 28, 2025, Goodgame and Chu emailed each other the results of questions posed to "Grok AI," X's (formerly Twitter) AI chatbot, as to fiduciary duties owed by lending banks and circumstances where lending banks may be held liable for failure to investigate red flags. This search yielded precedents in which plaintiffs sought to recover from lending banks, including in litigation

21

concerning the collapse of Enron, in which JPM faced allegations of breach of fiduciary duty.  A

portion of the search results are below:

| | |
|---|---|
| **From:** | David Goodgame [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=A9E2D80DEC644E59989AB3324A517E6E-DGOODGAME] |
| **Sent:** | 8/30/2025 2:25:34 PM |
| **To:** | Daniel Chu [dchu@tricolor.com]; Mauricio Delgado [mdelgado@tricolor.com] |
| **Subject:** | Grok Answers (Round 4) |

Some good ones in here.

### Precedents Similar to Enron Corp. Securities Derivative & ERISA Litigation (2005)

The 2005 Enron litigation (e.g., In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F. Supp. 2d 549) involved banks like JPMorgan Chase, Citigroup, and Merrill Lynch accused of aiding Enron's accounting fraud by structuring deceptive transactions (e.g., prepays disguised as trades) despite red flags in financials, such as off-balance-sheet debt and inflated revenues. Courts held that sophisticated banks could not ignore obvious signs of collapse while profiting, leading to massive settlements (e.g., $7.2B class action). Below are similar U.S. precedents where banks faced liability for aiding corporate fraud by ignoring red flags in audited financials (e.g., manipulated statements, hidden debt) and assisting in misconduct for financial gain. These often involve securities fraud, aiding and abetting, or conspiracy claims under federal laws like the Securities Exchange Act. I've focused on key cases from searches, emphasizing parallels like bank knowledge via financial access and substantial assistance.

(Ex. 10.)

73.     On August 29, JPM's investigation revealed that Tricolor had failed to reconcile its

bank statements with the company's internal financial records.  This mismatch was an intentional

practice for years by Defendants in order to prevent their fraud from being uncovered.  (Ex. 11.)

74.     On August 30, Chu spoke again with Goodgame, Kollar, and other Tricolor

executives and discussed the possibility of blaming Tricolor's Lenders for ignoring red flags of

Tricolor's activities and use that as leverage for a settlement with the Lenders, likening Tricolor's

situation to that of Enron, buoyed by the results of his and Goodgame's searches from Grok AI.

Specifically, Chu and the others discussed the possibility that they could blame the banks for

purportedly ignoring red flags of their frauds and use that threat as leverage to extract a favorable

settlement.  Chu was optimistic about that outcome, stating on the call, "Enron obviously has a

nice ring to it, right? <laugh>, I mean, Enron, Enron raises the blood pressure of the lender when

they see that <laugh>.  It, it has to, right?  I'm not-[. . .] Cause who wants to be thrown in the category?"  **Chu later said, "That Enron case is fucking perfect, I think."**  (Ex. 1 at 13.)

### G. Capstone's Investigation To Date Confirms the Staggering Scope of Defendants' Fraud.

75.    Capstone is an industry-leading investment banking and financial advisory firm retained by the Trustee to conduct a forensic accounting and fraud investigation.  Capstone's investigation is headed by Mr. Jim Calandra, CPA, CTP, CFF.  Mr. Calandra serves as Capstone's Managing Director and Head of Capstone's Financial Advisory Services practice, and he has more than 25 years of experience in turnaround management consulting, interim management, fraud and forensic accounting, mergers and acquisitions, and recapitalizations.  Capstone's investigation has begun to reveal the massive scope of the fraud at Tricolor.

76.    While Capstone's investigation is not yet complete, it has already revealed the massive scope of Defendants' fraud. To date, this investigation has uncovered 38,368 false finance receivable accounts, which represents loans that Capstone has classified as either "clone loans" or otherwise fictitious loans.  In total, these loans represented *$683 million* in reported value on Tricolor's books.

77.    The "clone loans" identified by Capstone were loans contained in Tricolor's warehouses and securitizations that had modified account IDs, but which otherwise had all of the other same attributes (e.g., the same vehicle identification numbers, vehicle make, and vehicle number).  Capstone identified 31,408 clone loans with a finance receivable value of $547,928,874 and concluded they were the result of intentional misrepresentation of loans in Tricolor's books. An example is depicted below, which demonstrates the same make, model, mileage, and other information across multiple Tricolor warehouse facilities and securitizations, but with different account IDs.

Clone used in the same facility

Altered account ID

Identical across 4 loans

| Pool | Acct_ID | VIN | Make | Model | Year | Mileage | Principal | LTV_% | Note Date |
|------|---------|-----|------|-------|------|---------|-----------|-------|-----------|
| SPV 6 | 306974 | 3FA6POH75JR262885 | Ford | Fusion | 2018 | 101570 | 14,937 | 109.44 | 4/15/2023 |
| SPV 6 | 3069742 | 3FA6POH75JR237316 | Ford | Fusion | 2018 | 101570 | 14,937 | 109.44 | 4/15/2023 |
| SPV 4 | 306974 | 3FA6POH75JR262885 | Ford | Fusion | 2018 | 101570 | 14,937 | 109.44 | |
| TAST 2024-3 | 306974 | 3FA6POH75JR262885 | Ford | Fusion | 2018 | 101570 | 14,937 | 109.44 | 4/15/2023 |

Re-used VINs. VINs correspond to make, model and year*.

VIN returns an error*.

*According to nhtsa.dot.gov. Error message: Error Text: 1 – Check Digit (9th position) does not calculate properly.

78.     The other fictitious loans that Capstone's investigation uncovered took the form of loans with vehicle identification numbers listed in servicer reports that were completely absent from finance receivable records—implying that these loans were fabricated entirely.  The internal investigation has revealed that there were at least 6,960 such loans, with a finance receivable value of $135,488,888.  An example is depicted below, where VINs were found listed in multiple warehouse facilities, but were not listed with the vehicles sold by Tricolor, however they did appear in the finance receivable records.

VINs return errors*.

| Pool | Acct_ID | VIN | Make | Model | Year | Mileage | Principal | LTV_% | Note Date |
|------|---------|-----|------|-------|------|---------|-----------|-------|-----------|
| SPV 6 | 290576 | 1N4AL3AP5FN366000 | Nissan | Altima | 2015 | 115882 | 14,140 | 152.95 | 12/17/2022 |
| SPV 6 | 3507527 | 4T1B11HK0JU074481 | TOYOTA | CAMRY | 2018 | 78285 | 24,145 | 129.16 | 2/17/2024 |
| SPV 6 | 2922131 | 1FTEW1CP8JKE15411 | Ford | F-150 | 2018 | 84952 | 22,039 | 130.09 | 1/3/2023 |

*According to nhtsa.dot.gov. Error message: Error Text: 1 – Check Digit (9th position) does not calculate properly.

79.     Capstone's investigation further uncovered that in June 2025, when Tricolor had $1.4 billion in finance receivables (which would imply a collateralization base of $1.1 billion with a collateralization rate of 80%), Tricolor falsely reported the finance receivables in its credit

facilities to show $1.7 billion total obligations—an upward variance of approximately $600 million.  This variance is depicted below:



In USD thousand, financial reporting as at 06/30/25.

80.    In other words, Tricolor was given advance loans from its warehouse Lenders premised on Tricolor's falsely inflated receivables base.

81.    This reckless and risky practice put greater pressure on Tricolor's *actual* loans to cover the new liabilities caused by the loans which did not exist.

82.    Because the fraud excessively leveraged Tricolor, the company was put into a precarious economic situation where Tricolor could suddenly find itself unable to pay for the loans if a significant number of defaults occurred.

83.    Capstone's investigation also revealed the rapid timeline of Tricolor's overleverage.



*In USD thousand, financial reporting as at 06/30/25.*

84.    Prior to September 2020, the ratio between the finance receivable balance to the obligations reported to credit facilities (the "**collateral coverage ratio**") sat at approximately 125%, meaning there were greater auto loan receivables than there were outstanding liabilities under the warehouse loans and the securitization trusts.

85.    After September 2020, the collateral coverage ratio rapidly declined, falling below 100% and reaching approximately 87% in March 2023, meaning that Tricolor was receiving more in financing from its warehouse line of credit than it had in finance receivables.

86.    In December 2023, Tricolor reported a $196 million increase in finance receivables, which temporarily improved the ratio from approximately 89% to approximately 96%.

87.    From there, however, Tricolor's obligations under its credit facilities grew at a breakneck pace, with a rapidly declining collateral coverage ratio (represented by the red line in the above graph).  This implies that the creation of fictitious loans increased considerably during

this period, and further that Tricolor used funds lent by Lenders to make fictitious loan payments to other Lenders.

## H.      The Fraud Bankrupts Tricolor.

88.      When this fraudulent accounting came to light, Fifth Third and other Lenders terminated their warehouse lending agreements with Tricolor in August 2025.

89.      In excessive debt to Lenders and with excessive collateralization of its meager receivables—far greater than the required rate of 80% and with borrowed amounts from lending banks far greater than its own receivables base—Tricolor found itself with far more liabilities than its liquidity could support.

90.      As a result, Tricolor defaulted on its payment obligations to the Lenders. Indeed, JPM and Fifth Third each logged nearly $180 million in net charge-offs in their financial reporting in the third quarter of 2025, as a result of Tricolor's defaults on the advance loans issued to Tricolor.  Fifth Third executives referred to the Tricolor loans as clear "fraud," and Fifth Third's CEO has stated that they were "defrauded" by Tricolor with respect to these loans.  JPM's Chief Financial Officer similarly stated: "There clearly was, in my opinion, fraud involved in a bunch of these things."

91.      On September 7, 2025, just days before Tricolor filed its Chapter 7 petition, Chu resigned from the board of directors of Origin Bank, one of Tricolor's Lenders.  (Ex. 12.)

## I.      Chu Leverages the Fraud to Extract Excessive Bonus Compensation and to Use Corporate Funds for Lavish Personal Expenses.

92.      In the years leading up to Tricolor's bankruptcy, as the scope of the above-described fraud became unsustainable and the company was poised for collapse, Chu fixated on his compensation, demanding outsized bonuses, spending company funds on personal expenses,

and using his power as Manager of Ganas Investors, LLC to unilaterally force out any Board members that voiced opposition to his demands.

93.     In or around January 2022, Chu demanded a bonus for his performance for 2021 from Tricolor's Board of Managers, in the amount of $1.5 million.  (Ex. 13.)

94.     In response to his concerns, the Board of Managers of Tricolor retained consulting firm Meridian Compensation Partners ("**Meridian**") to determine a fair compensation package for Chu.  Meridian's analysis, provided to the Board in July 2022, offered ranges of compensation for private and public companies by various revenue sizes, which showed that Chu's compensation was in line with the 50th percentile of private US companies.  However, Chu demanded that he receive compensation in at least the top 10th percentile for ***public*** companies in the analysis— including a base salary of $1 million, with a bonus of $1.5 to 2 million, and $2.5 million in equity— even though Tricolor was not a public company at that time.

95.     Chu's demand for increased compensation was initially considered by the Board's Compensation Committee, which at the time consisted of two now-former Board members: Dann Adams and Antonio Garza.

96.     Adams, who was the chair of the Compensation Committee, expressed skepticism about the level of compensation demanded by Chu, worrying about the optics of a company whose brand image has been focused on high social impact paying its CEO a compensation package substantially higher than that of the average private company CEO.

97.     In response, Chu prepared a fourteen-slide presentation for the Board meeting on March 17, 2023, taking credit for Tricolor's financial performance, and claiming that the Compensation Committee process related to his bonus has been "grossly mismanaged."  In this

presentation, he referred to Adams as a "top imbecile" for daring to challenge his proposed compensation.  (Ex. 14.)

98.     Chu demanded, among other things: (1) a reallocation to cash compensation for 2022 and increase his bonus by $3 million, to reach a total of $5 million in 2022; (2) a new equity plan in 2023 with structure; (3) a base pay of $1.5 million and bonus of $750,000 in 2023; and (4) a three year severance of $1 million per year upon departure for any reason.  (Ex. 14.)

99.     And, in a further sign of his attempts to bully the Board with respect to his compensation, Chu included a final demand in his slide deck that would have required Adams personally to submit a written explanation on the appropriate use of "their, there, and they're," enroll in a local community college, and achieve a 2.5 GPA in a curriculum of English composition and grammar, and statistics.  (Ex. 14.)

100.    When he received continued pushback on his compensation demands, Chu threatened to leave the company and raised the prospect of forcing the Board to "agree to put the company up for sale immediately."  (Ex. 15.)

101.    On the morning of March 25, 2023, Board member Derrick Weatherspoon emailed Chu to notify him that a new compensation package was approved by the Board, which included, among other things, (1) a one-time grant of Restricted Stock Units valued at $1.5 million as compensation for 2022 in lieu of a cash bonus, and (2) a base salary of $750,000 and a cash bonus of $750,000 to $1.5 million (maximum) for 2023.  (Ex. 16.)  Weatherspoon further promised to return a response regarding some of Chu's additional asks.  Chu replied late that day attempting to explain why the current compensation proposal was "undeniably absurd."  (Ex. 17.)

102.    Subsequently, in May 2023, in the course of Tricolor's annual audit, the Board discovered that Chu had made millions of dollars' worth of seemingly personal purchases on his

company American Express credit card without reimbursing the company. These expenses, which Chu claimed were "completely business-driven" and necessary business expenses, included over the course of just 2022:

- Hundreds of thousands of dollars worth of private jet and first-class commercial air travel for himself and his family, including over 240 purchases from American Airlines totaling $185,000;

- Hundreds of stays at luxury hotels and resorts costing more than $300,000, including spending more than $20,000 at the Sky Residences at Aspen; more than $65,000 at Four Seasons hotels in Boston, Surfside, Las Vegas, Irving, New York, Chicago, and Denver; more than $30,000 at the Trump International in New York; and more than $140,000 for 100 charges at Hotels.com; in addition to stays at the Garden of the Gods Resort in Colorado Springs, the Peninsula in New York, the Hall Arts Hotel in Dallas, the L'Auberge in Del Mar, Mandarin Oriental hotels in Boston and Paris, the Cosmopolitan in Las Vegas, Mansion on Turtle Creek in Dallas, the Grand Beach Hotel in Surfside, the Wynn in Las Vegas, the Waldorf Astoria in Las Vegas, and the Beverly Hills Hotel;

- Over 200 meals at high-end restaurants, including extravagant meals costing hundreds or thousands of dollars at Salt Bae's restaurant in Dallas, Nobu in New York, Prime 112 in Miami, Le Bilboquet in New York, Los Fuegos in Miami, Chef Tania private dining in Miami, Hakkasan in Las Vegas, Hutong in Miami, Carbone in Dallas, Novikov in Miami, Pao by Paul Qui in Miami, Mr. Chow's in Miami, Cote in Miami, and Le Coucou in New York;

- Thousands of dollars of alcohol and wine purchases from Silver Oak Cellars in Napa Valley, the Opus One Winery in Oakville, Del Dotto Vineyards in Napa Valley, Big Daddy's Liquor in New York, the Kenzo Estate Winery in Napa Valley, Crown Liquors in New York, and VinPorter in Napa Valley;

- Thousands of dollars of healthcare and beauty expenses, including skin revitalization at Skincare by Amy Peterson, vitamin infusions at Vitality IV Bar, dental work at The Prosthodontic Center of Beverly Hills, biochemical testing at DHA Laboratory, wellness treatments at Tierra Santa Healing House in Miami, multiple visits to the Exhale spa in Bar Harbour, and recurring payments for Nutrafol hair growth products;

- Tens of thousands of dollars of purchases from a woman's clothing store in Bal Harbour (Intermix), a countertop supply store in Phoenix (Lee's Counter Tapps Tops), a general contractor in Miami (Vera Castell Services), an air purifier company (Molekule), an art gallery in Dallas (Artemis Fine Arts), a designer coffee table book store (Assouline), a wool sweater store in Portland (Dehen), a home automation company in Miami (Systems Design & Integration), a luxury home staging company in California (Meredith Baer Home), and a florist in Del Ray Beach (Camden Gardens of Florida);

- Simultaneous monthly subscriptions to television services from YouTube Tv, FuboTv, Hulu Tv, and Spectrum; streaming subscriptions from Netflix, Peacock, Hulu, and Spotify; and dozens of purchases from Prime Video;

- Simultaneous memberships in ClassPass, Peloton, Equinox, SoulCycle, and StretchZone;

- More than $18,000 in purchases from Apple and the Apple Store;

- 874 charges to Uber, 314 charges to Lyft, 231 charges to Doordash, and 205 charges to Uber Eats;

- Regular dry-cleaning at Dryeco dry cleaning in Sunny Island;

- Dog-training services from Elite K9 Service in Florida; and

- Personal storage and moving charges totaling over $140,000.

(Ex. 18; Ex. 19.)

103.    On May 9, 2023, Chu emailed Tricolor's counsel at the law firm Reed Smith regarding the ongoing audit, copying Board audit committee member Beth Brooke, attempting to pass off his personal expenses as necessary business expenses. Chu attempted to justify (among other things) over $422,000 in travel expenses by explaining that when he chooses to travel, he travels with his immediate family, and thus multiple airline tickets and larger hotel accommodations for his family should be paid by the company. (Ex. 18.)

104.    On May 11, 2023, Brooke emailed Reed Smith and Tricolor Board members expressing concern about Chu's bonuses in 2021 and 2022 as well as the personal American Express expenses. Brooke questioned who would have authorized an advance of $400,000 to Chu, considering the Board had instructed the compensation committee to "hold up on finalizing" his compensation and bonus pending the investigation into his American Express expenses. Brooke closed her email with a sober reflection of Chu's self-interested leadership of Tricolor: "If this is all because what [Chu] says, people do, with or without proper processes and approvals. If that is the case, [the auditor] is going to question everything. Rightfully so." (Ex. 20.)

105.    On May 14, 2023, Chu once more attempted to justify his personal spending as business expenses. He even went so far as to say that household expenses like a nanny and even

intravenous vitamin treatments were "the most practical" way for him to "cope" with his executive responsibilities. (Ex. 21.)

106.    On May 31, 2023, in an effort to coerce the Board into ending its investigation into his improper use of his corporate card and to otherwise strong-arm the Board into complying with his outsized compensation demands, Chu threatened the Board by submitting a purported letter of resignation. (Ex. 22.)

107.    The Board ultimately agreed to resolve its investigation into his personal expenses on favorable terms in order to keep Chu at the company, motivated by the veneer of financial success identified by Chu that was actually a result of Defendants' fraud. The Board ultimately agreed that Chu would only need to repay Tricolor $2,141,556 of the millions of dollars of personal expenses he attempted to pass off as business expenses on his corporate American Express credit card.

108.    Chu then utilized his power as the sole manager of Ganas Investors LLC, the majority member of Tricolor, to extract egregiously large bonus compensation from the company just as the fraud was beginning to take the company down.

109.    Pursuant to the LLC Agreement, holders of "at least a majority of the total Percentage Interests" in Tricolor Holdings LLC could remove and replace a Manager in the Board, with the restriction that: (1) two Managers who are to be appointed by members holding a majority of "senior preferred" shares of Tricolor Holdings, (2) one Manager is to be appointed by Ganas Investors, LLC, and (3) one of the Managers appointed by the majority of the Percentage Interests must be someone who is not employed by or consultants to the Company or Ganas Investors LLC (or any of their affiliates). Thus, with respect to most Members of the Board, Chu had an unfettered ability to shape the Board, as Ganas Investors, LLC held 75% of the Percentage Interest in Tricolor

Holdings LLC.  (Ex. 2, at Schedule A-1.)  As Chu, in turn, was the sole Manager of Ganas

Investors, LLC, and was empowered by Ganas Investors, LLC's limited liability agreement to

have sole decision-making authority, this meant effectively that *Chu* had the sole ability to appoint

and remove Tricolor Holdings Board members.

110.    Exercising this power, in retaliation for Brooke questioning his personal spending

of company funds, Chu executed a Consent on behalf of Ganas Investors, LLC on September 17,

2023, removing Brooke from the Tricolor Board of Managers.  In her place, Chu appointed

Andrew DeLuca, Tricolor's General Counsel, to the Board, writing in an email, "Neither the

removal [n]or appointment is subject to [B]oard vote."  (Ex. 23.)

111.    Next, on December 27, 2023, just days before the Board meeting where the

Managers would vote on Chu's compensation package, Chu executed two more consents on behalf

of Ganas Investors, LLC, removing Antonio Garza and Dann Adams, the only members of the

Compensation Committee, from the Board effective immediately.  (Ex. 24; Ex. 25.)

112.    With the Board members who had previously questioned Chu's demands for

excessive compensation removed and with the remaining members well aware that any opposition

to Chu would be met with their removal, Chu took the opportunity to again demand even more

compensation from the Board.

113.    On January 3, 2024, the Board held a special meeting to vote on Chu's 2023 and

2024 compensation.  The Board approved his 2023 salary of $1.5 million and a 2023 bonus of $1.5

million.  The Board also approved a 2024 salary of $1.5 million.  In a further boon to Chu, the

Board voted to reduce the balance of Chu's promissory note to repay Tricolor for his personal

expenses on his corporate American Express credit card from $2,141,556 to $1,443,057.

114.    On January 24, 2025, Chu presented a new proposal that demanded a bonus of at least $13 million—many multiples greater than his prior compensation—purportedly to compensate him for Tricolor's growth between 2018 and 2025. Chu's compensation demands were premised entirely on the fabricated appearance of massive growth that was, in reality, a result of Defendants' fraud.

115.    On February 12, 2025, the Board held a meeting to discuss Chu's 2025 compensation.  The Board did not retain a compensation consultant nor negotiate with Chu, but instead acceded to Chu's demand for a base salary of $2 million and a bonus of $2 million; a one-time grant of profit interest in Tricolor to vest over a four-year period; **and a one-time special bonus of $15,000,000**, offset by the $1,443,057 owed by Chu via Promissory Note to compensate for some of Chu's personal American Express purchases.  (Ex. 26.)

116.    While Chu demanded that the Board grant him his windfall compensation, Tricolor's collateralization rate and credit advances from Lenders were increasing at a fever pitch (*see* Sections E to G, *supra*).

117.    Thus, from 2023 until the time of Tricolor's bankruptcy filing, as the Company was engaging in a rapidly growing and unsustainable fraud under Chu's leadership, Chu squeezed as much money as he could out of Tricolor by misrepresenting Tricolor's financial condition and unilaterally removing Board members that questioned him.  In 2025 alone, Chu received over $17,000,000 in compensation, far out of line with both his prior compensation and the compensation of executives at similar private companies, as reflected by the analysis conducted in prior years by Tricolor's consultants.



118.    Given the fraud occurring behind the scenes, and Chu's outsized compensation, Tricolor did not receive reasonably equivalent value from Chu's services.

119.    In the year leading up to the bankruptcy, Tricolor made payments to Chu in a total amount of $29,605,737. Of that total, $13,464,025 was paid out to Chu just over the ninety days leading up to the bankruptcy. This amount comprised not only his compensation but also a bonus of $2 million paid on February 28, 2025. It also comprised the aforementioned special bonus of $15 million paid to Chu less the $1,443,057 offset, which was paid to him in four installments: $500,000 paid on January 28, 2025; $1,500,000 paid on February 10, 2025; $4,000,000 paid on March 6, 2025; $500,000 paid on May 21, 2025; and $5,556,943 paid on June 11, 2025.

120.    On July 1, 2025—just two months before Tricolor finally declared bankruptcy— Chu made a short-term loan to Tricolor in the amount of $6,500,000. Despite Tricolor's mounting liabilities and Chu's knowledge of the poor financial health of Tricolor, Chu directed Kollar to repay this amount in full in installments over the month of August: $250,000 on August 11, 2025; $4,250,000 on August 19, 2025; and $2,000,000 on August 20, 2025. Even as Chu observed in

August 2025 that Tricolor was "definitely insolvent," Chu made sure that his short-term loan was repaid before any of Tricolor's other creditors received money from the company.

121.    Chu also continued to use corporate funds for personal purchases even after reaching the prior resolution with the company regarding his American Express purchases.  Even as late as August 2025, when it was clear to Chu that Tricolor was in financial distress, he continued to make personal purchases on his corporate American Express card, including a $603.92 Oura ring, over $5,000 at Accent Gallery & Framing in Dallas (luxury art framing), over $3,000 in July in storage unit rent, and $18,000 for membership to Core Club in New York (a member's only social club).  (Ex. 27.)

122.    When Tricolor paid over $29,000,000 to Chu in the one year leading up to the bankruptcy, and especially when it paid over $13,000,000 of that amount in the ninety days leading up to the bankruptcy, these payments substantially diminished the amount of money Tricolor had remaining to pay its creditors.

123.    Ultimately, Tricolor's Board requested on September 5, 2025, that Chu return the 2025 special bonus that was paid to him.

124.    To date, Chu has not made this repayment, nor has he indicated that he intends to do so.

**J.    Chu Uses His Fraudulently Obtained Compensation to Fund Lavish Personal Expenses.**

125.    Chu used the compensation he defrauded from Tricolor to fuel his lavish lifestyle, purchasing multiple homes during his tenure as Tricolor's CEO, and maintaining multiple other properties at the same time.

126.    In 2022, Chu purchased a property at The Four Seasons Residences, The Surf Club, 9001 Collins Ave #S-201, Miami Beach, FL 33154 for approximately $18,000,000.

127.    In March 2023, the same month the Board approved Chu's increased 2023 compensation package, he purchased a property at 4208 Beverly Drive, Highland Park, TX 75205 with a tax assessment of $4,599,440 in 2023.

128.    In December 2024, when Chu was lobbying for his massive 2025 compensation package that was approved in January 2025, he purchased property at 4544 Westway Ave, Highland Park, TX 75205, with a tax assessment of $2,063,260 in 2024.  A background check obtained by the Trustee shows the owner as Daniel Chu and his wife Constance Chu, and the owner's address is 6021 Connection Dr., Irving, TX 75039.  6021 Connection Dr. is the address of Tricolor's headquarters.

129.    On February 18, 2025—just days after his $15,000,000 special bonus was approved—on information and belief, Chu executed a purchase agreement for a ski chalet at 115 W. Bleeker Street, Aspen, CO 81611, for approximately $25,000,000.

130.    On June 12, 2025, Chu purchased via holding entity 1431 Cobb Parkway South, Marietta, Georgia 30067, and shortly thereafter on June 26, 2025, sold the property for more than $7,000,000.

**K.    Chu's Alienation of Assets from Potential Judgment Creditors.**

131.    Beginning in July 2025, as it became clear that the fraud at Tricolor was unsustainable and about to be revealed, Chu began alienating his assets in an effort to protect from them Tricolor's creditors.

132.    On July 10, 2025, Chu listed for sale his property located at 4544 Westway Ave., Highland Park, TX 75205, for $2,099,999.  The property remains listed for sale as of this filing, and his daughter Katie Chu is the real estate agent for this property.  (Ex. 28.)

133.    On August 29, 2025—just days before Tricolor's bankruptcy—a limited liability company operated by Chu called Chu Family Investments LLC purchased a property at 1612 Gilcrest Drive, Beverly Hills, CA 90210, for $2,650,000, with Origin Bank financing $2.12 million of the purchase.  Upon information and belief, the remaining $530,000 came from Chu's own funds, and this property was purchased through an LLC in an attempt to shield it from any personal liability of Chu.

134.    On September 9, 2025, Chu listed for sale his property located at 4208 Beverly Drive, Highland Park, TX 75205, for $10,990,000.  The property remains listed for sale as of this filing, and Chu has agreed to drop the price by $2,000,000 in a desperate attempt to sell this asset. (Ex. 29.)

135.    On September 15, 2025, Chu received an email from a law firm specializing in asset protection at his Tricolor email address sending a flow chart for a Family Limited Partnership to own investment assets.  On September 16, 2025, Chu instructed the law firm to communicate through his Gmail email address (tricolorchu@gmail.com).  (Ex. 30.)

136.    On September 17, 2025, Chu sent an email to himself at tricolorchu@gmail.com, including a link to an article from law firm Adler Law titled "Florida Homestead Law Guide," which "protects a Florida resident's primary home from judgment creditors."  (Ex. 31.)

137.    A few days later, on September 24, 2025, Chu discussed a Termination and Release Agreement with Elephant Aspen Residences Inc., terminating the purchase of White Elephant Aspen Chalets Unit No. 3, located at 115 W. Bleeker Street, Aspen, CO 81611.  Upon information and belief, the seller retained Chu's earnest money deposit of $1,750,000 and returned to Chu the remainder of the $25,000,000 purchase price.

138.    Upon information and belief, after Chapter 7 Bankruptcy was declared, Chu sent a former employee of Tricolor to the headquarters to collect the titles to vehicles in Chu's name. The former employee stated that Chu asked him to retrieve the titles to his vehicles that Chu left in his office at Tricolor.  Tricolor is currently in possession of those titles.

139.    Most recently, in December 2025, Chu called former Board member Richard Anderson requesting to sell his custom Land Rover Defender.  Despite Anderson expressly disclaiming any desire to purchase the vehicle, Chu shipped the vehicle to Anderson's home.

**L.  Defendants are Indicted.**

140.    On December 16, 2025, the DOJ unsealed its indictment charging Chu and Goodgame with charges including wire fraud, bank fraud, and conspiracy.

141.    Both Chu and Goodgame were arrested on December 17, 2025.  Goodgame faces up to thirty years in prison, and Chu faces a maximum potential sentence of life in prison.

142.    Kollar and Seibold have pleaded guilty to fraud charges and are cooperating with the DOJ investigation.

143.    Following the indictment and arrest, U.S. Attorney Jay Clayton said in a statement: "Fraud became an integral component of Tricolor's business strategy.  The resulting billion-dollar collapse harmed banks, investors, employees, and customers."

**M. The Trustee's Investigation Continues.**

144.    As of the date of filing this Complaint, the Trustee's investigation is ongoing as she and her advisors sift through more than two terabytes of data at the Company, and pursue Rule 2004 discovery and other investigatory methods to uncover the full scope of Defendants' misconduct.

## COUNT I
### Fraud (against all Defendants)

145.    Defendants, in each of their capacities as Officers of Tricolor, created or caused to be created nearly 40,000 fake loans valued at over $683 million.

146.    Defendants knowingly, and with the intent to defraud, made or caused to be made misrepresentations and omissions of material fact, or were made on Defendants' behalf.

147.    In his capacity as Officer and as Tricolor's CEO and President, Chu created or caused to be created nearly 40,000 fake loans valued at over $683 million.  Each one of these loans contained false statements of material fact that Chu falsely represented to Tricolor as accurate.

148.    In his capacity as Officer and as Tricolor's CFO and Vice President, Kollar created or caused to be created nearly 40,000 fake loans valued at over $683 million.  Each one of these loans contained false statements of material fact that Kollar falsely represented to Tricolor as accurate.

149.    In his capacity as Officer and as Tricolor's COO, Goodgame created or caused to be created nearly 40,000 fake loans valued at over $683 million.  Each one of these loans contained false statements of material fact that Goodgame falsely represented to Tricolor as accurate.

150.    In his capacity as Officer and as Tricolor's Director of Treasury, Seibold created or caused to be created nearly 40,000 fake loans valued at over $683 million.  Each one of these loans contained false statements of material fact that Seibold falsely represented to Tricolor as accurate.

151.    These false loans were given the appearance of legitimate loans, but with fabricated or duplicated attributes.

152.    Defendants knew that these loans were fabricated or represented that they were accurate with a reckless indifference to the truth.

153.    Defendants intended to deceive, and did deceive, others at Tricolor into believing these loans were legitimate.

154.    Tricolor relied in good faith on the misrepresentations of Defendants to issue further asset-backed securities based upon these fake loans.

155.    In reliance on these misrepresentations, Tricolor paid Chu a bonus of $15 million in 2025 and a lavish compensation package as a reward for contributing to (what appeared to be) several years of resounding success at Tricolor which was based on the fabricated loans.

156.    Moreover, in reliance on these misrepresentations, Tricolor became overleveraged by fake loans that were not backed by any real customers or collateral.

157.    As a result, Tricolor became vulnerable to customer defaults, and finds itself in Chapter 7 bankruptcy after having insufficient cash or assets to repay its liabilities.

158.    If not for Defendants' misrepresentations, Tricolor would not be bankrupt today.

159.    Accordingly, the Court should grant judgment in favor of Plaintiff, finding that Defendants are liable for common law fraud and ordering Defendants to pay Plaintiff damages in an amount to be determined, and expenses to which Plaintiff is entitled, in an amount to be determined at trial.

## COUNT II
### Breach of Fiduciary Duty of Care (against all Defendants)

160.    Plaintiff hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth herein.

161.    Chu was at all times a Manager of Tricolor Holdings and the CEO and President of Tricolor Holdings (and of each of Debtors).  As an Officer of Tricolor, and/or as the CEO and President of Tricolor, Chu occupied a position of trust and confidence and owed a Tricolor and its members a fiduciary duty of care.

42

162. Kollar was at all times the CFO and Vice President of Tricolor Holdings. As an Officer of Tricolor, and/or as the CFO and Vice President of Tricolor, Kollar occupied a position of trust and confidence and owed a Tricolor and its members a fiduciary duty of care.

163. Goodgame was at all times an Officer of Tricolor Holdings. Goodgame served as the Vice President of Supply Chain and Analytics at Tricolor before being promoted to Chief Operating Officer in 2019—a position he held until Tricolor's bankruptcy. As an Officer of Tricolor, and/or as the COO of Tricolor, Goodgame occupied a position of trust and confidence and owed a Tricolor and its members a fiduciary duty of care.

164. Seibold was at all times the Director of Treasury of Tricolor Holdings. As an Officer of Tricolor, and/or as the Director of Treasury of Tricolor, Seibold occupied a position of trust and confidence and owed a Tricolor and its members a fiduciary duty of care.

165. Defendants owed Tricolor and its members a duty of care, including but not limited to, a duty to that a reasonably prudent person would exercise in similar circumstances.

166. Defendants breached this duty of care by intentionally making, or causing others to make, or failing to properly oversee others who made, false loans reported in Tricolor's accounting, and collateralizing them into asset-backed securities at a rate far greater than 80%, so that Tricolor could sell more asset-backed securities.

167. Defendants' actions in generating—or failing to properly oversee others who generated—false loans and collateralizing warehouse facilities at a rate greater than 80% had no business justification.

168. Tricolor has been, and continues to be, damaged as a direct and proximate result of Defendants' breach of their fiduciary duty of care, in an amount to be determined at trial.

## COUNT III
### Breach of Fiduciary Duty of Loyalty (against all Defendants)

169.    Plaintiff hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth herein.

170.    Chu was at all times a Manager of Tricolor Holdings and the CEO and President of Tricolor Holdings (and of each of Debtors).  As an Officer of Tricolor, and/or as the CEO and President of Tricolor, Chu occupied a position of trust and confidence and owed a Tricolor and its members a fiduciary duty of loyalty.

171.    Kollar was at all times the CFO and Vice President of Tricolor Holdings.  As an Officer of Tricolor, and/or as the CFO and Vice President of Tricolor, Kollar occupied a position of trust and confidence and owed a Tricolor and its members a fiduciary duty of loyalty.

172.    Goodgame was at all times an Officer of Tricolor Holdings.  Goodgame served as the Vice President of Supply Chain and Analytics at Tricolor before being promoted to Chief Operating Officer in 2019—a position he held until Tricolor's bankruptcy.  As an Officer of Tricolor, and/or as the COO of Tricolor, Goodgame occupied a position of trust and confidence and owed a Tricolor and its members a fiduciary duty of loyalty.

173.    Seibold was at all times the Director of Treasury of Tricolor Holdings.  As an Officer of Tricolor, and/or as the Director of Treasury of Tricolor, Seibold occupied a position of trust and confidence and owed a Tricolor and its members a fiduciary duty of loyalty.

174.    Defendants owed Tricolor and its members a duty of loyalty, including but not limited to, a duty to take actions on a disinterested and independent basis, in good faith, and with an honest belief that the action is in the best interest of Tricolor and its members.

175.    Defendants breached their fiduciary duty of loyalty to Tricolor and its members by knowingly tolerating inadequate internal controls at Tricolor and failing to monitor subordinates' compliance to ensure that Tricolor did not make fictitious loans and overleverage itself.

176.    Chu separately and independently breached his fiduciary duty of loyalty to Tricolor and its members by securing himself an outsized compensation package, including a $15 million special bonus.  Chu additionally violated his fiduciary duty of loyalty by failing to disclose to the Board accurate information about the loans when pursuing his outsized compensation package.

177.    Defendants separately and independently breached their fiduciary duty of loyalty by failing to disclose to Tricolor that the loans were fictitious.  As Officers and employees of Tricolor, Defendants had a duty to disclose all material information to Tricolor.  However, through acts and omissions, Defendants both concealed the fictitious loans from Tricolor and also failed to disclosure the true status of the loans.

178.    Tricolor has been, and continues to be, damaged as a direct and proximate result of Defendants' breach of their fiduciary duty of loyalty, in an amount to be determined at trial.

## <u>COUNT IV</u>
### Breach of the Fifth Amended and Restated Limited Liability Agreement
### (against all Defendants)

179.    Plaintiff hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth herein.

180.    Pursuant to the LLC Agreement, Chu served as both a Manager and an Officer of Tricolor Holdings.  Kollar, Goodgame and Seibold served as Officers of Tricolor Holdings.

181.    Chu, in particular, served as the Chief Executive Officer and President of Tricolor Holdings.

182.    As a Manager and Officer of Tricolor Holdings, Chu was bound by the LLC agreement.

45

183.    Kollar served as the Chief Financial Officer and Vice President of Tricolor Holdings.

184.    Goodgame served as the Chief Operating Officer of Tricolor Holdings.

185.    Seibold served as the Director of Treasury of Tricolor Holdings.

186.    Pursuant to Section 11.3 of the LLC Agreement, each Defendant owed "fiduciary duties to [Tricolor Holdings] of the same kind and to the same extent" as he would "owe fiduciary duties to [Tricolor Holdings] and its Members if [Tricolor Holdings] were a corporation formed under the General Corporation Law of the State of Delaware and its Members were shareholders of [Tricolor Holdings]."

187.    If Tricolor Holdings were a corporation formed under the General Corporation Law of the State of Delaware and its Members were shareholders of Tricolor Holdings, Defendants would owe fiduciary duties of care and loyalty in each of their roles as Officers of Tricolor Holdings, and Chu would also owe fiduciary duties of care and loyalty in his role as Manager.

188.    Defendants therefore had a contractual duty to perform their roles commensurate with those fiduciary duties.

189.    Defendants breached this contractual duty of care by intentionally making—or causing others to make—false loans reported in Tricolor's accounting, and collateralizing them into asset-backed securities at a rate far greater than 80%, so that Tricolor could sell more asset-backed securities.

190.    Defendants breached their contractual duty of loyalty to Tricolor and its members by knowingly tolerating inadequate internal controls at Tricolor and failing to monitor subordinates' compliance to ensure that Tricolor did not make fictitious loans and overleverage itself.

191.    Chu separately and independently breached his contractual duty of loyalty to Tricolor and its members by removing the Board directors adverse to him and securing himself an outsized compensation package, including a $15 million special bonus.

192.    As a direct and proximate result of Defendants' breach, Tricolor was forced to default on its loans from its Lenders and declare bankruptcy.

193.    Accordingly, the Court should grant judgment in favor of Plaintiff, finding that Defendants are liable for breach of contract and ordering Defendants to pay Plaintiff damages in an amount to be determined, and expenses to which Plaintiff is entitled, in an amount to be determined at trial.

## COUNT V
**Breach of the Implied Covenant of Good Faith and Fair Dealing (against all Defendants)**

194.    Plaintiff hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth herein.

195.    On December 30, 2021, the Fifth Amended and Restated Limited Liability Company Agreement of Tricolor Holdings, LLC dated December 30, 2021 sets out the powers and obligations of Managers and Officers of Tricolor.

196.    Chu is a signatory to this agreement on behalf of Ganas Investors, LLC.

197.    Chu was appointed by the Board of Managers to serve as the Chief Executive Officer of Tricolor, with powers enumerated under Section 5.12 and 5.13.

198.    As Chief Executive Officer, Chu was empowered to have the "general executive powers concerning all the operations and business of [Tricolor]."

199.    Kollar was appointed by the Board of Managers to serve as the Chief Financial Officer of Tricolor, with powers enumerated under Section 5.12.

200.    Goodgame was appointed by the Board of Managers to serve as the Chief Operating Officer of Tricolor, with powers enumerated under Section 5.12.

201.    Seibold was appointed by the Board of Managers to serve as the Director of Treasury of Tricolor.

202.    As Treasurer, Seibold was empowered to have the "exercise such powers and duties as may be conferred upon, or assigned to, him or her by the Board or the Chief Executive Officer."

203.    Defendants' obligations as officers of Tricolor required that their conduct comport with the implied covenant of good faith and fair dealing in exercising his executive powers concerning the business and operation of Tricolor.

204.    Defendants breached the implied covenant of good faith and fair dealing by faking nearly 40,000 loans and overleveraging Tricolor.

205.    Defendants also breached the implied covenant of good faith and fair dealing by failing to implement adequate internal controls to prevent fictitious loans and overleverage.

206.    Defendants also breached the implied covenant of good faith and fair dealing by securing himself outsized compensation at the detriment of Tricolor's financial health,

207.    As a result of the foregoing breach, Plaintiff has sustained damages in an amount to be determined at trial.

## <u>COUNT VI</u>
### Turnover of Estate Property (against Chu)
### Pursuant to 11 U.S.C. § 542(a)

208.    Plaintiff hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth herein.

209.    Under Section 542(a) of the Bankruptcy Code, an entity in possession of a debtor's property or an entity that owes a debt to the debtor shall deliver such property or pay such debt.

210.    As of the date of this Complaint, Chu is in possession of property of Tricolor's estate.  Such property and debts include, without limitation, cash, accounts receivable, and other matured payment obligations due and payable to the creditors, and any proceeds thereof.

211.    Under Section 542(a), Chu shall deliver to Tricolor and account for such property or the value of such property.

212.    Chu's refusal to deliver property impedes administration of the estate.  Turnover is appropriate because the property is estate property within Section 541 and is necessary to the administration of this case.

213.    Accordingly, Tricolor seeks an order compelling an immediate turnover and full accounting, with appropriate safeguards for any proven lienholder's interest.  This includes, but is not limited to, the properties Chu owns that were acquired from proceeds of his fraud that are rightfully property of the estate, including the properties at 4544 Westway Ave., Highland Park, TX 75205; 1612 Gilcrest Drive, Beverly Hills, CA 90210; 4208 Beverly Drive, Highland Park, TX 75205; The Four Seasons Residences, The Surf Club, 9001 Collins Ave #S-201, Miami Beach, FL 33154; or, that recently sold including the property at 1431 Cobb Parkway South, Marietta, Georgia 30067.

<u>**COUNT VII**</u>
**Avoidance of Preferential Transfers (against Chu)**
**Pursuant to 11 U.S.C. §§ 547(b), 550**

214.    Plaintiff hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth herein.

215.    Pursuant to section 547(b) of the Bankruptcy Code, a debtor in possession may avoid any transfer of an interest of the debtor in possession in property (a) to or for the benefit of a creditor, (b) for or on account of an antecedent debt owed by the debtor before such transfer was made, (c) made while the debtor was insolvent, (d) made on or within 90 days before the date of

the filing of the petition, (e) that enables such creditor to receive more in satisfaction of its claims than it would receive in a case under chapter 7 of the Bankruptcy Code if the transfer had not been made.  11 U.S.C. § 547(b)(1)–(5).

216.    From June 12, 2025 to Tricolor's bankruptcy filing on September 10, 2025 (the "**Preference Period**"), Tricolor made the transfers (the "**Chu Transfers**") to or for the benefit of Chu in an aggregate amount of not less than $13 million, as listed in Appendix B.

217.    Each Chu Transfer was made from Tricolor or one of its subsidiaries and constituted transfers of an interest in property of Tricolor.

218.    The Chu Transfers were made to or for the benefit of Chu within the meaning of 11 U.S.C. § 547(b)(1) because the Chu Transfers either reduced or fully satisfied a debt or debts then owed by Tricolor to Chu.

219.    Each of the Chu Transfers was made from a bank account owned by Tricolor, out of Tricolor's funds, and constituted a transfer of an interest in property of Tricolor.

220.    Chu was a creditor of Tricolor at the time of each of the Chu Transfers by virtue of supplying the goods and services detailed above, for which Tricolor was obligated to pay.  Each Chu Transfer was thus made for or on account of an antecedent debt owed by Tricolor before such Chu Transfer.

221.    The Chu Transfers were made at a time when Tricolor was insolvent.  Plaintiff is entitled to the presumption of insolvency for the Chu Transfers made during the Preference Period pursuant to 11 U.S.C. § 547(f).  Each of the Chu Transfers was made during the Preference Period, as set forth in Appendix B.

222.    The Chu Transfers enabled Chu to receive more in satisfaction of his claim against Tricolor than he would have received in a case under chapter 7 of the Bankruptcy Code had the

Chu Transfers not been made.  As evidenced by the Bankruptcy Petition, Tricolor's liabilities exceed their assets to the point that unsecured creditors will not receive a full payout of their claims from its bankruptcy estate.

223.    By reason of the foregoing, each of the Chu Transfers are avoidable pursuant to Section 547 of the Bankruptcy Code.

**COUNT VIII**
**Actual Fraudulent Transfer (against Chu)**
**Pursuant to 11 U.S.C. §§ 548(a)(1)(A), 544(b), 6 Del. Code § 1304(a)(1), Tex. Bus. & Com.**
**Code § 24.005(a)(1)**

224.    Plaintiff hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth herein.

225.    Chu secured funding from the Lenders for Tricolor while knowingly and intentionally misrepresenting Tricolor's financial condition.

226.    Based on these misrepresentations, Chu persuaded the Board to pay him a $15,000,000 special bonus just months before Tricolor was forced to declare bankruptcy.

227.    Chu also caused Tricolor to transfer millions of dollars to his personal bank account at Origin Bank and pay his Tricolor American Express card that he used for personal expenses.

228.    At the time of each transfer from Tricolor to Chu's personal bank account and American Express card, Tricolor had at least one general unsecured creditor holding an allowable claim who, but for Debtors' bankruptcy filing, would have standing to bring claims to avoid and recover actual fraudulent transfers.

229.    Chu directed Tricolor to transfer money to his personal bank account and to pay off his American Express card with the actual intent of hindering, delaying, and/or defrauding Tricolor's creditors and investors.

230.    The payments to Chu are voidable pursuant to Section 548(a)(1)(A) and may be recovered from Defendants pursuant to Section 550.

231.    Accordingly, Tricolor is entitled to a judgment (1) avoiding the fraudulent transfers under Section 548(a)(1)(A) and/or Section 544(b), and (2) recovering and preserving all such avoided transfers under Sections 550 and 551.

**COUNT IX**
**Avoidance of Constructive Fraudulent Transfer (against Chu)**
**Pursuant to 11 U.S.C. §§ 548(a)(1)(B), 544(b), 6 Del. Code § 1304(a)(2), Tex. Bus. & Com.**
**Code § 24.005(a)(2)**

232.    Plaintiff hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth herein.

233.    Plaintiff seeks to avoid the fraudulent transfers made on numerous occasions from Tricolor's accounts to Chu's personal bank account and his American Express credit card and to recover and preserve the value thereof.

234.    On information and belief, Chu caused Tricolor to complete numerous transfers to benefit himself.

235.    Tricolor did not receive reasonably equivalent value in exchange for the transfers.

236.    Each of the transfers was made within the applicable lookback period.

237.    On the date of each relevant transfer, Tricolor: (1) was insolvent or became insolvent as a result of such transfer; or (2) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

238.    At the time of each of the fraudulent transfers, Chu was an insider given his role as CEO and President of Tricolor Holdings and the other Debtors.

239.    These transfers were not made in the ordinary course of business.

240.     At the time of each of the fraudulent transfers, Tricolor had numerous unsecured creditors holding an allowable claim who, but for Tricolor's bankruptcy filing, would have standing to bring claims to avoid and recover constructive fraudulent transfers.

241.     Accordingly, Tricolor is entitled to a judgment (1) avoiding the fraudulent transfers under Sections 548(a)(1)(B) and/or 544(b) of the Bankruptcy Code, and (2) recovering and preserving all such avoided transfers under Sections 550 and 551 of the Bankruptcy Code.

## COUNT X
### Civil Conspiracy (against all Defendants)

242.     Plaintiff hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth herein.

243.     Defendants were members of a combination of two or more persons, with an object to accomplish an unlawful purpose, or a lawful purpose by unlawful means, in their efforts to double pledge collateral, overleverage Tricolor, and conceal this information from Tricolor.

244.     Specifically, Defendants worked together to falsify nearly 40,000 loans that were falsely represented to Tricolor as accurate.

245.     In addition, through acts and omissions, Defendants worked in concert to conceal information about the actual status of the loans from Tricolor.  With Chu's knowledge, Goodgame, Kollar and Seibold also fabricated and falsified backup records when audits of the borrowing bases were conducted to try and hide their fraud from Tricolor.

246.     As direct and proximate result of their object, Defendants have caused Tricolor to sustain damages in an amount to be determined at trial.

## COUNT XI
### Unjust Enrichment (against Chu)

247.     Plaintiff hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth herein.

248.    Chu was enriched and received direct, concrete economic benefits without legal or equitable justification, including, but not limited to, through receipt of funds from Tricolor.

249.    Chu has unjustly retained the sums procured through, funded by, or serviced with Tricolor's assets—sums to which Chu had no lawful claim and for which Tricolor received no reciprocal benefit—to the detriment of Tricolor and its creditors, thereby shifting value from the company to Chu.

250.    Tricolor suffered financial losses as a result of these transactions.  Tricolor did not receive reasonably equivalent value for any of the transfers, the conduct at issue siphoned substantially all of Tricolor's assets; and the bankruptcy estate was left burdened with liabilities without corresponding assets or value.

251.    There is a direct, proximate, and traceable relationship between Chu's enrichment and the losses accrued by Tricolor: the transfers emanated from Tricolor's accounts and were made directly to Chu.

252.    No legitimate corporate purpose, consideration, or fair value supports these transfers.  They were the product of self-dealing and other misconduct, conferred unique personal benefits upon Chu that were not shared by Tricolor, and were not supported by reasonably equivalent value or fair consideration.

253.    Tricolor conferred a benefit in the form of corporate funds and value, Chu appreciated and accepted that benefit, and Chu's continued retention of that benefit in the form of real property, funds, and other property would be inequitable under the circumstances.

254.    Equity and good conscience do not permit Chu to retain the benefits he wrongfully obtained at Tricolor's expense.  Legal remedies are inadequate to the extent the relief required is

restitutionary and equitable in nature, including the recovery of specific, identifiable funds or assets traceable to Chu's unjust enrichment.

255.    Accordingly, Tricolor is entitled to judgment for restitution in the amount of the benefits unjustly obtained, together with disgorgement of all proceeds traceable to the transfers, the imposition of a constructive trust and/or equitable lien over assets and proceeds in Chu's control, an accounting, and pre- and post-judgment interest at the maximum rate permitted by law, as well as such other and further equitable relief as the Court deems just and proper.

## COUNT XII
### Constructive Trust (against Chu)

256.    Plaintiff hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth herein.

257.    A constructive trust is an equitable remedy imposed to prevent unjust enrichment where a defendant, through fraud, breach of fiduciary duty, unfair or unconscionable conduct, or abuse of confidence, acquires or retains property that which in equity and good conscience belongs to another.

258.    As detailed in this Complaint, Chu engaged in fraudulent, unfair, and unconscionable conduct, including the diversion and misappropriation of Tricolor's funds.

259.    As a result of this misconduct, Chu was directly and materially enriched. Chu obtained and continues to retain specific, identifiable property traceable to Tricolor.

260.    Chu received and retains the fraudulent transfers by fraud, self-dealing, and wrongful diversion. Continued possession of such property is inequitable and would unjustly enrich Chu at the expense of Tricolor and its creditors.

261.    Therefore, equity deems Chu a constructive trustee of the fraudulent transfers and all traceable proceeds, substitutions, products, and property (collectively, the "**Constructive Trust Property**") for the benefit of Plaintiff in its chapter 7 case.

262.    The Constructive Trust Property is sufficiently specific and traceable: the transfers originated from identified Tricolor accounts and were directed to Chu, and can be followed into property acquired therewith.

263.    Included in the Constructive Trust Property are the real estate properties held by Chu and Chu Family Investments LLC at (1) 9001 Collins Ave #S-201, Miami Beach, FL 33154; (2) 4208 Beverly Drive, Highland Park, TX 75205; (3) 4544 Westway Ave, Highland Park, TX 75205; and (4) 1612 Gilcrest Drive, Beverly Hills, CA 90210 (together, the "**Chu Real Estate**").

264.    These properties were purchased with Tricolor funds which were fraudulently transferred from Tricolor to Chu for Chu's personal benefit.

265.    Legal remedies are inadequate because Tricolor seeks restitutionary, in-kind relief as to specific funds and assets; equitable relief is necessary to permit tracing, preserve the Constructive Trust Property, and avoid dissipation.  An accounting is warranted to identify all property constituting or derived from the Constructive Trust Property.

266.    Accordingly, Tricolor seeks entry of judgment:  (a) declaring and imposing a constructive trust over the Constructive Trust Property and all proceeds, products, offspring, and substitutions; (b) directing Chu, as constructive trustee, to convey, transfer, and turn over the Constructive Trust Property to Tricolor, including that the Court convey—or grant an interest in— each of the Chu Real Estate properties; (c) imposing, in the alternative, an equitable lien to the extent any portion of the Constructive Trust Property cannot be specifically traced; (d) ordering

an accounting and tracing of all relevant accounts and assets; and (e) awarding pre- and post-judgment interest and such other equitable relief as the Court deems just and proper.

## COUNT XIII
### Accounting (against all Defendants)

267.     Plaintiff hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth herein.

268.     The facts surrounding Defendants' unlawful actions and the accounts mentioned herein are so complex that adequate relief may not be obtained through standard discovery procedures, such as production and interrogatories.

269.     Accordingly, Tricolor is entitled to an equitable accounting.

## PRAYER FOR RELIEF

WHEREFORE, for the foregoing reasons, Plaintiff respectfully requests that this Court enter judgment against Defendants:

a)  Granting damages for common law fraud, in an amount to be determined at trial;

b)  Granting damages for breach of fiduciary duty, in an amount to be determined at trial;

c)  Granting damages for breach of the Fifth Amended and Restated Limited Liability Company Agreement, in an amount to be determined at trial;

d)  Granting damages for breach of the implied covenant of good faith and fair dealing, in an amount to be determined at trial;

e)  Avoiding the avoidable Chu Transfers and directing Chu to return to Plaintiff the amount of the Chu Transfers, plus interest from the date of demand at the maximum legal rate and to the fullest extent allowed by applicable law;

f) Avoiding and recovering the fraudulent transfers as actual or constructive fraudulent transfers, in an amount to be determined at trial;

g) Granting damages for civil conspiracy, in an amount to be determined at trial;

h) Imposing a constructive trust upon Chu's Constructive Trust Property;

i) Ordering an equitable accounting;

j) An award of pre- and post-judgment interest; and

k) Such other and further relief as this Court deems just and equitable.

Dated: New York, New York
December 19, 2025

**MCDERMOTT WILL & SCHULTE LLP**

 /s/ Julia M. Beskin
Julia M. Beskin (admitted *pro hac vice*)
919 Third Avenue
New York, New York 10022
Telephone: (212) 756-2000
E-mail: julia.beskin@srz.com

Darren Azman (admitted *pro hac vice*)
Jared M. Gerber (*pro hac vice* forthcoming)
One Vanderbilt Avenue
New York, New York 10017-3852
Telephone: (212) 547-5400
E-mail: dazman@mwe.com
         jmberger@mwe.com

Charles R. Gibbs (TX Bar No. 7846300)
Marcus A. Helt (TX Bar No. 24052187)
Grayson Williams (TX Bar No. 24124561)
2801 North Harwood Street
Suite 2600
Dallas Texas 75201
Telephone: (214) 295-8000
E-mail: crgibbs@mwe.com
         mhelt@mwe.com
         gwilliams@mwe.com

*Counsel to the Chapter 7 Trustee*

**APPENDIX A**



## **APPENDIX B**

**Transfers**

| Type | Bank Account/Source | Entity | Amount | NOTES |
|---|---|---|---|---|
| Reimbursements | PER G/L.  Bank unknown | Tricolor Auto Group, LLC | $ 435,721 | G/L - 1 Year |
| (Estimated) Comp PR x 22 pay periods | 8/15/24 ADP | Tricolor Auto Group, LLC | 1,376,760 | Payroll x 22 Periods (9/15/24 to 9/1/25) |
| (Estimated) Comp PR x 24 pay periods | 8/15/24 ADP | Tricolor Auto Acceptance, LLC | 464,728 | Payroll x 22 Periods (9/15/24 to 9/1/25) |
| Annual Bonus paid 2/28/25 | 2/28/25 ADP | Tricolor Auto Group, LLC | 550,000 | Per ADP |
| Annual Bonus paid 2/28/25 | 2/28/25 ADP | Tricolor Auto Acceptance, LLC | 550,000 | Per ADP |
| Annual Bonus paid 2/28/25 | 2/28/25 ADP | Tricolor Auto Group, LLC | 450,000 | Cameron's notes say 11/24 Prepay, processed 2/28/25 |
| Annual Bonus paid 2/28/25 | 2/28/25 ADP | Tricolor Auto Acceptance, LLC | 450,000 | Cameron's notes say 11/24 Prepay, processed 2/28/25 |
| Note Reduction, netted in other payments - payment-in-kind | Via Origin payment on 6/11/25 | Tricolor California Auto Group, LLC | 698,499 | Netted in the 6/11 $5.56M payment |
| reimbursements | Origin Bank-4151 | Tricolor California Auto Group, LLC | 20,956,943 | 1 Yr Detail below |
| reimbursements | Wells Fargo-5026 | Tricolor Auto Group, LLC | 3,673,086 | 1 Yr Detail below |
| **Total Payments - 1 Year Lookback** | | | **$ 29,605,737** | |
| | | | | |
| (Estimated) Comp PR x 22 pay periods | 8/15/24 ADP | Tricolor Auto Group, LLC | 375,480 | Payroll x 6 Periods (6/15/25 to 9/1/25) |
| (Estimated) Comp PR x 24 pay periods | 8/15/24 ADP | Tricolor Auto Acceptance, LLC | 126,744 | Payroll x 6 Periods (6/15/25 to 9/1/25) |
| Payments incl. Expense reimbursements | Origin Bank-4151 | Tricolor California Auto Group, LLC | 12,056,943 | 90 Day Detail below |
| Payments incl. Expense reimbursements | Wells Fargo-5026 | Tricolor Auto Group, LLC | 904,858 | 90 Day Detail below |
| **Total Payments - 90 Day Lookback** | | | **$ 13,464,025** | |

| STATEMENT_NUMBER | BANK_ACCOUNT_NAME | BANK_ACCOUNT_NUM | _18 | LINE_NUMBER | BOOKING_DATE | AMOUNT | ADDENDA_TXT | _18_3 | Category | Payee 6 | YY | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2024-01-04 | 4151 - ORIGIN BANK - GANAS HOLDINGS | Origin Bank-4151 | | 2 | 1/4/2024 | 650,000 | TRANSFER TO DEPOSIT ACCOUNT 00020613477 | | Transfer | DANIEL CHU 3477 | | Jan-24 Origin |
| 2024-01-16 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | | 30 | 1/16/2024 | 669 | OTHER REFERENCE: IA000012886916AMEX EPAYMENT ACH PMT 240116 COP000005694075 DANIEL CHU | | Other | AMEX DANIEL CHU | | Jan-24 Wells Fargo |
| 2024-01-29 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | | 32 | 1/29/2024 | 50,000 | OTHER REFERENCE: IA000012395644AMERI CAN EXPRESS ACH PMT 240129 S2012 DANIEL CHU | | Other | AMEX DANIEL CHU | | Jan-24 Wells Fargo |
| 2024-01-30 | 4151 - ORIGIN BANK - GANAS HOLDINGS | Origin Bank-4151 | | 1 | 1/30/2024 | 200,000 | TRANSFER TO DEPOSIT ACCOUNT 00020613477 | | Transfer | DANIEL CHU 3477 | | Jan-24 Origin |
| 2024-02-15 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | | 29 | 2/15/2024 | 44,958 | OTHER REFERENCE: IA000012449120AMERI CAN EXPRESS ACH PMT 240215 S2100 DANIEL CHU | | Other | AMEX DANIEL CHU | | Feb-24 Wells Fargo |

| 2024-02-16 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | 13 | 2/16/2024 | 119 | DANIEL CHU OTHER REFERENCE: IA000013519171AMEX EPAYMENT ACH PMT 240216 COP000005725540 | Other | AMEX DANIEL CHU | Feb-24 Wells Fargo |
| 2024-03-04 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | 35 | 3/4/2024 | 75,000 | DANIEL CHU OTHER REFERENCE: IA000014782396AMERI CAN EXPRESS ACH PMT 240304 S6616 | Other | AMEX DANIEL CHU | Mar-24 Wells Fargo |
| 2024-03-15 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | 18 | 3/15/2024 | 124 | DANIEL CHU OTHER REFERENCE: IA000018278131AMEX EPAYMENT ACH PMT 240315 COP000005752137 | Other | AMEX DANIEL CHU | Mar-24 Wells Fargo |
| 2024-03-26 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | 23 | 3/26/2024 | 62,703 | DANIEL CHU OTHER REFERENCE: IA000016228099AMERI CAN EXPRESS ACH PMT 240326 S0422 | Other | AMEX DANIEL CHU | Mar-24 Wells Fargo |
| 2024-04-01 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | 34 | 4/1/2024 | 70,000 | DANIEL CHU OTHER REFERENCE: IA000010550243AMERI CAN EXPRESS ACH PMT 240401 S0222 | Other | AMEX DANIEL CHU | Apr-24 Wells Fargo |
| 2024-04-08 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | 31 | 4/8/2024 | 20,452 | DANIEL CHU OTHER REFERENCE: IA000159935790AMERI CAN EXPRESS ACH PMT 240408 A2614 | Other | AMEX DANIEL CHU | Apr-24 Wells Fargo |
| 2024-04-22 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | 25 | 4/22/2024 | 124 | DANIEL CHU OTHER REFERENCE: IA000016086047AMEX EPAYMENT ACH PMT 240422 COP000005786843 | Other | AMEX DANIEL CHU | Apr-24 Wells Fargo |
| 2024-05-10 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | 27 | 5/10/2024 | 350 | DANIEL CHU OTHER REFERENCE: IA405510252307CAPIT AL ONE CARD ONLINE DEP SW05A5D0B86B1D | Other | DANIEL CHU | May-24 Wells Fargo |
| 2024-05-15 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | 26 | 5/15/2024 | 179 | DANIEL CHU OTHER REFERENCE: IA000010030073AMEX EPAYMENT ACH PMT 240515 COP000005808661 | Other | AMEX DANIEL CHU | May-24 Wells Fargo |
| 2024-05-17 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | 19 | 5/17/2024 | 50,000 | DANIEL CHU OTHER REFERENCE: IA000011938978AMERI CAN EXPRESS ACH PMT 240517 S4628 | Other | AMEX DANIEL CHU | May-24 Wells Fargo |
| 2024-06-03 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | 46 | 6/3/2024 | 102,749 | DANIEL CHU OTHER REFERENCE: IA000018588497AMERI CAN EXPRESS ACH PMT 240603 S1810 | Other | AMEX DANIEL CHU | Jun-24 Wells Fargo |
| 2024-06-14 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | 22 | 6/14/2024 | 124 | DANIEL CHU OTHER REFERENCE: IA000015000655AMEX EPAYMENT ACH PMT 240614 COP000005837351 | Other | AMEX DANIEL CHU | Jun-24 Wells Fargo |

| Date | Account | Bank | | Amount | Date | Amount | Description | Type | Name | Memo |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | OTHER REFERENCE: IA009969579754WT FED#02064 ORIGIN BANK /FTR/BNF=DANIEL CHU SRF# EC24061950088603 TRN#240620024895 | | | |
| 2024-06-20 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | | 103 | 6/20/2024 | 43,130 | RFB#155308 OTHER REFERENCE: IA000016464333AMERI CAN EXPRESS ACH PMT 240701 S3536 | Other | DANIEL CHU | Jun-24 Wells Fargo |
| 2024-07-01 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | | 34 | 7/1/2024 | 75,000 | DANIEL CHU OTHER REFERENCE: IA000015338999AMEX EPAYMENT ACH PMT 240711 COP000005860534 | Other | AMEX DANIEL CHU | Jul-24 Wells Fargo |
| 2024-07-11 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | | 20 | 7/11/2024 | 124 | DANIEL CHU OTHER REFERENCE: IA000015322814AMERI CAN EXPRESS ACH PMT 240725 S1796 | Other | AMEX DANIEL CHU | Jul-24 Wells Fargo |
| 2024-07-25 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | | 27 | 7/25/2024 | 25,000 | DANIEL CHU OTHER REFERENCE: IA000015322736AMERI CAN EXPRESS ACH PMT 240725 S6494 | Other | AMEX DANIEL CHU | Jul-24 Wells Fargo |
| 2024-07-25 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | | 29 | 7/25/2024 | 38,773 | DANIEL CHU OTHER REFERENCE: IA009986011038WT FED#09027 ORIGIN BANK /FTR/BNF=DANIEL CHU SRF# EC24080637473126 TRN#240806158869 | Other | AMEX DANIEL CHU | Jul-24 Wells Fargo |
| 2024-08-06 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | | 72 | 8/6/2024 | 90,015 | RFB#161049 OTHER REFERENCE: IA009987905475WT FED#05127 ORIGIN BANK /FTR/BNF=DANIEL CHU SRF# EC24081322721358 TRN#240813049245 | Other | DANIEL CHU | Aug-24 Wells Fargo |
| 2024-08-13 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | | 66 | 8/13/2024 | 64,000 | RFB#161779 OTHER REFERENCE: IA000018643297AMERI CAN EXPRESS ACH PMT 240826 S8210 | Other | DANIEL CHU | Aug-24 Wells Fargo |
| 2024-08-26 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | | 37 | 8/26/2024 | 50,000 | DANIEL CHU OTHER REFERENCE: IA000015239081AMEX EPAYMENT ACH PMT 240827 COP000005905351 | Other | AMEX DANIEL CHU | Aug-24 Wells Fargo |
| 2024-08-27 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | | 29 | 8/27/2024 | 124 | DANIEL CHU OTHER REFERENCE: IA000012986671AMERI CAN EXPRESS ACH PMT 240828 S3594 | Other | AMEX DANIEL CHU | Aug-24 Wells Fargo |
| 2024-08-28 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | | 34 | 8/28/2024 | 44,497 | DANIEL CHU | Other | AMEX DANIEL CHU | Aug-24 Wells Fargo |

| Date | Account | Name | Num | Date2 | Amount | Reference | Type | Payee | Period |
|------|---------|------|------|-------|--------|-----------|------|-------|--------|
| 2024-08-28 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | 40 | 8/28/2024 | 86,366 | DANIEL CHU OTHER REFERENCE: IA000012989661AMERI CAN EXPRESS ACH PMT 240828 S4520 | Other | AMEX DANIEL CHU | Aug-24 Wells Fargo |
| 2024-09-09 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | 36 | 9/9/2024 | 124 | DANIEL CHU OTHER REFERENCE: IA000016088626AMEX EPAYMENT ACH PMT 240909 COP000005917158 | Other | AMEX DANIEL CHU | Sep-24 Wells Fargo |
| 2024-09-16 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | 45 | 9/16/2024 | 90,589 | DANIEL CHU OTHER REFERENCE: IA000017299416AMERI CAN EXPRESS ACH PMT 240916 S7272 | Other | AMEX DANIEL CHU | Sep-24 Wells Fargo |
| 2024-09-23 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | 33 | 9/23/2024 | 24,000 | DANIEL CHU OTHER REFERENCE: IA000013495172AMERI CAN EXPRESS ACH PMT 240923 A5748 | Other | AMEX DANIEL CHU | Sep-24 Wells Fargo |
| 2024-09-23 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | 35 | 9/23/2024 | 65,000 | DANIEL CHU OTHER REFERENCE: IA000013494763AMERI CAN EXPRESS ACH PMT 240923 A2412 | Other | AMEX DANIEL CHU | Sep-24 Wells Fargo |
| 2024-09-30 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | 39 | 9/30/2024 | 43,143 | DANIEL CHU OTHER REFERENCE: IA000016139129AMERI CAN EXPRESS ACH PMT 240930 A1598 | Other | AMEX DANIEL CHU | Sep-24 Wells Fargo |
| 2024-10-07 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | 30 | 10/7/2024 | 124 | DANIEL CHU OTHER REFERENCE: IA000014595553AMEX EPAYMENT ACH PMT 241007 COP000005944714 | Other | AMEX DANIEL CHU | Oct-24 Wells Fargo |
| 2024-10-09 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | 68 | 10/9/2024 | 71,278 | DANIEL CHU OTHER REFERENCE: IA009906762828WT FED#04992 ORIGIN BANK /FTR/BNF=DANIEL CHU SRF# EC2410098007257 TRN#241009128017 RFB#169312 | Other | DANIEL CHU | Oct-24 Wells Fargo |
| 2024-10-23 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | 28 | 10/23/2024 | 65,000 | DANIEL CHU OTHER REFERENCE: IA000010649583AMERI CAN EXPRESS ACH PMT 241023 S0184 | Other | AMEX DANIEL CHU | Oct-24 Wells Fargo |
| 2024-10-23 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | 29 | 10/23/2024 | 74,625 | DANIEL CHU OTHER REFERENCE: IA000010649491AMERI CAN EXPRESS ACH PMT 241023 S7478 | Other | AMEX DANIEL CHU | Oct-24 Wells Fargo |
| 2024-10-31 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | 41 | 10/31/2024 | 49,335 | DANIEL CHU OTHER REFERENCE: IA000019183789AMERI CAN EXPRESS ACH PMT 241031 S0668 | Other | AMEX DANIEL CHU | Oct-24 Wells Fargo |
| 2024-11-08 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | 18 | 11/8/2024 | 471 | DANIEL CHU OTHER REFERENCE: IA000017288671AMEX EPAYMENT ACH PMT 241108 COP000005974700 | Other | AMEX DANIEL CHU | Nov-24 Wells Fargo |

| Date | Account | Bank | Num | Post Date | Amount | Description | Type | Name | Memo |
|---|---|---|---|---|---|---|---|---|---|
| 2024-11-22 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | 34 | 11/22/2024 | 100,000 | OTHER REFERENCE: IA000018022539AMERICAN EXPRESS ACH PMT 241122 S4762 DANIEL CHU TRANSFER TO DEPOSIT ACCOUNT | Other | AMEX DANIEL CHU | Nov-24 Wells Fargo |
| 2024-11-26 | 4151 - ORIGIN BANK - GANAS HOLDINGS | Origin Bank-4151 | 2 | 11/26/2024 | 900,000 | 00020613477 | Transfer | DANIEL CHU 3477 | Nov-24 Origin |
| 2024-11-27 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | 31 | 11/27/2024 | 85,100 | OTHER REFERENCE: IA000018173948AMERICAN EXPRESS ACH PMT 241127 A9082 DANIEL CHU | Other | AMEX DANIEL CHU | Nov-24 Wells Fargo |
| 2024-12-09 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | 40 | 12/9/2024 | 199 | OTHER REFERENCE: IA000014617424AMEX EPAYMENT ACH PMT 241209 COP00000600636 DANIEL CHU | Other | AMEX DANIEL CHU | Dec-24 Wells Fargo |
| 2024-12-16 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | 42 | 12/16/2024 | 80,577 | OTHER REFERENCE: IA000017001079AMERICAN EXPRESS ACH PMT 241216 A4162 DANIEL CHU | Other | AMEX DANIEL CHU | Dec-24 Wells Fargo |
| 2024-12-23 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | 41 | 12/23/2024 | 150,000 | OTHER REFERENCE: IA000012812610AMERICAN EXPRESS ACH PMT 241223 S5478 DANIEL CHU | Other | AMEX DANIEL CHU | Dec-24 Wells Fargo |
| 2025-01-02 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | 38 | 1/2/2025 | 60,221 | OTHER REFERENCE: IA000011184201AMERICAN EXPRESS ACH PMT 250102 S8064 DANIEL CHU | Other | AMEX DANIEL CHU | Jan-25 Wells Fargo |
| 2025-01-02 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | 40 | 1/2/2025 | 75,000 | OTHER REFERENCE: IA000012776045AMERICAN EXPRESS ACH PMT 250102 S1480 DANIEL CHU | Other | AMEX DANIEL CHU | Jan-25 Wells Fargo |
| 2025-01-06 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | 13 | 1/6/2025 | 60,000 | OTHER REFERENCE: IA000013177016AMERICAN EXPRESS ACH PMT 250106 S8590 DANIEL CHU | Other | AMEX DANIEL CHU | Jan-25 Wells Fargo |
| 2025-01-06 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | 4 | 1/6/2025 | 674 | OTHER REFERENCE: IA000010548974AMEX EPAYMENT ACH PMT 250106 COP000006020922 DANIEL CHU | Other | AMEX DANIEL CHU | Jan-25 Wells Fargo |
| 2025-01-17 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | 24 | 1/17/2025 | 75,000 | OTHER REFERENCE: IA000019124826AMERICAN EXPRESS ACH PMT 250117 S6186 DANIEL CHU | Other | AMEX DANIEL CHU | Jan-25 Wells Fargo |
| 2025-01-21 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | 137 | 1/21/2025 | 136,363 | OTHER REFERENCE: IA009937323687WT FED#06077 ORIGIN BANK /FTR/BNF=DANIEL CHU SRF# EC25012180482607 TRN#250121302861 RFB#183282 TRANSFER TO DEPOSIT ACCOUNT | Other | DANIEL CHU | Jan-25 Wells Fargo |
| 2025-01-28 | 4151 - ORIGIN BANK - GANAS HOLDINGS | Origin Bank-4151 | 2 | 1/28/2025 | 500,000 | 00020613477 | Transfer | DANIEL CHU 3477 | Jan-25 Origin |

| Date | Account | Bank | # | Date2 | Amount | Reference | Type | Name | Memo |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | OTHER REFERENCE: IA000011092810AMEX EPAYMENT ACH PMT 250129 COP000006043642 | | | |
| 2025-01-29 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | 18 | 1/29/2025 | 124 | DANIEL CHU OTHER REFERENCE:IA000013 675624UNIQUE ID:00000091005475621 667AMERICAN EXPRESS ACH PMT 250131 A7964 DANIEL | Other | AMEX DANIEL CHU | Jan-25 Wells Fargo |
| 2025-01-31 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | 25 | 1/31/2025 | 150,000 | CHU OTHER REFERENCE:IA000013 675340UNIQUE ID:00000091005475624 964AMERICAN EXPRESS ACH PMT 250131 A7104 DANIEL | Other | AMEX DANIEL CHU | Jan-25 Wells Fargo |
| 2025-01-31 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | 30 | 1/31/2025 | 73,886 | CHU TRANSFER TO DEPOSIT ACCOUNT 00020613477 | Other | AMEX DANIEL CHU | Jan-25 Wells Fargo |
| 2025-02-10 | 4151 - ORIGIN BANK - GANAS HOLDINGS | Origin Bank-4151 | 2 | 2/10/2025 | 1,500,000 | OTHER REFERENCE: IA000019400263AMERI CAN EXPRESS ACH PMT 250210 A1928 | Transfer | DANIEL CHU 3477 | Feb-25 Origin |
| 2025-02-10 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | 54 | 2/10/2025 | 80,000 | DANIEL CHU OTHER REFERENCE: IA000011506134AMERI CAN EXPRESS ACH PMT 250218 S8142 | Other | AMEX DANIEL CHU | Feb-25 Wells Fargo |
| 2025-02-18 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | 75 | 2/18/2025 | 100,000 | DANIEL CHU TRANSFER TO XXXXX3477 | Other | AMEX DANIEL CHU | Feb-25 Wells Fargo |
| 2025-03-06 | 4151 - ORIGIN BANK - GANAS HOLDINGS | Origin Bank-4151 | 2 | 3/6/2025 | 4,000,000 | OTHER REFERENCE: IA000012127514AMEX EPAYMENT ACH PMT 250310 COP000006080496 | Transfer | DANIEL CHU 3477 | Mar-25 Origin |
| 2025-03-10 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | 34 | 3/10/2025 | 127 | DANIEL CHU TRANSFER TO XXXXX3477 | Other | AMEX DANIEL CHU | Mar-25 Wells Fargo |
| 2025-03-17 | 4151 - ORIGIN BANK - GANAS HOLDINGS | Origin Bank-4151 | 2 | 3/17/2025 | 1,500,000 | OTHER REFERENCE: IA000013645126AMERI CAN EXPRESS ACH PMT 250317 A9902 | Transfer | DANIEL CHU 3477 | Mar-25 Origin |
| 2025-03-17 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | 50 | 3/17/2025 | 110,000 | DANIEL CHU OTHER REFERENCE: IA000013458117AMEX EPAYMENT ACH PMT 250407 COP000006107400 | Other | AMEX DANIEL CHU | Mar-25 Wells Fargo |
| 2025-04-07 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | 37 | 4/7/2025 | 127 | DANIEL CHU OTHER REFERENCE: IA009962326756WT FED#03647 ORIGIN BANK /FTR/BNF=DANIEL CHU SRF# EC25041138431762 TRN#250411123081 | Other | AMEX DANIEL CHU | Apr-25 Wells Fargo |
| 2025-04-11 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | 83 | 4/11/2025 | 228,080 | RFB#196193 | Other | DANIEL CHU | Apr-25 Wells Fargo |

| Date | Account | Bank | | Num | Date | Amount | Reference | Type | Name | Memo |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | OTHER REFERENCE: IA000010140939AMERI CAN EXPRESS ACH PMT 250414 A8926 | | | |
| 2025-04-14 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | | 49 | 4/14/2025 | 150,000 | DANIEL CHU OTHER REFERENCE: IA000012416652AMERI CAN EXPRESS ACH PMT 250423 A0630 | Other | AMEX DANIEL CHU | Apr-25 Wells Fargo |
| 2025-04-23 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | | 37 | 4/23/2025 | 130,000 | DANIEL CHU OTHER REFERENCE: IA000012725037AMERI CAN EXPRESS ACH PMT 250501 A7476 | Other | AMEX DANIEL CHU | Apr-25 Wells Fargo |
| 2025-05-01 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | | 63 | 5/1/2025 | 49,504 | DANIEL CHU OTHER REFERENCE: IA000012726435AMERI CAN EXPRESS ACH PMT 250501 A5102 | Other | AMEX DANIEL CHU | May-25 Wells Fargo |
| 2025-05-01 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | | 71 | 5/1/2025 | 149,370 | DANIEL CHU OTHER REFERENCE: IA000015984638AMEX EPAYMENT ACH PMT 250513 COP000006144320 | Other | AMEX DANIEL CHU | May-25 Wells Fargo |
| 2025-05-13 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | | 22 | 5/13/2025 | 182 | DANIEL CHU TRANSFER TO | Other | AMEX DANIEL CHU | May-25 Wells Fargo |
| 2025-05-21 | 4151 - ORIGIN BANK - GANAS HOLDINGS | Origin Bank-4151 | | 1 | 5/21/2025 | 500,000 | XXXXXX3477 OTHER REFERENCE: IA000012408232AMERI CAN EXPRESS ACH PMT 250521 A8406 | Transfer | DANIEL CHU 3477 | May-25 Origin |
| 2025-05-21 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | | 56 | 5/21/2025 | 160,000 | DANIEL CHU OTHER REFERENCE: IA000016724702AMERI CAN EXPRESS ACH PMT 250602 A8278 | Other | AMEX DANIEL CHU | May-25 Wells Fargo |
| 2025-06-02 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | | 202 | 6/2/2025 | 80,000 | DANIEL CHU OTHER REFERENCE: IA000019261705AMEX EPAYMENT ACH PMT 250609 COP000006170687 | Other | AMEX DANIEL CHU | Jun-25 Wells Fargo |
| 2025-06-09 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | | 30 | 6/9/2025 | 127 | DANIEL CHU TRANSFER TO | Other | AMEX DANIEL CHU | Jun-25 Wells Fargo |
| 2025-06-11 | 4151 - ORIGIN BANK - GANAS HOLDINGS | Origin Bank-4151 | 90 days | 1 | 6/11/2025 | 5,556,943 | XXXXXX7061 OTHER REFERENCE: IA000014425153AMERI CAN EXPRESS ACH PMT 250616 A5744 | Transfer | DANIEL CHU 7061 | Jun-25 Origin |
| 2025-06-16 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | | 45 | 6/16/2025 | 150,000 | DANIEL CHU OTHER REFERENCE: IA000017392771AMERI CAN EXPRESS ACH PMT 250627 A9412 | Other | AMEX DANIEL CHU | Jun-25 Wells Fargo |
| 2025-06-27 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | | 30 | 6/27/2025 | 150,000 | DANIEL CHU OTHER REFERENCE: IA000015442403AMERI CAN EXPRESS ACH PMT 250714 A0892 | Other | AMEX DANIEL CHU | Jun-25 Wells Fargo |
| 2025-07-14 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | | 80 | 7/14/2025 | 54,603 | DANIEL CHU OTHER REFERENCE: IA000015442374AMERI CAN EXPRESS ACH PMT 250714 A5184 | Other | AMEX DANIEL CHU | Jul-25 Wells Fargo |
| 2025-07-14 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | | 86 | 7/14/2025 | 250,000 | DANIEL CHU | Other | AMEX DANIEL CHU | Jul-25 Wells Fargo |

| Date | Account | Bank | # | Txn Date | Amount | Reference | Type | Name | Period |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | OTHER REFERENCE: IA000016952635AMEX EPAYMENT ACH PMT 250714 COP000006205015 | | | |
| 2025-07-14 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | 32 | 7/14/2025 | 127 | DANIEL CHU | Other | AMEX DANIEL CHU | Jul-25 Wells Fargo |
| | | | | | | OTHER REFERENCE: IA000010648857AMERI CAN EXPRESS ACH PMT 250805 A7560 | | | |
| 2025-08-05 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | 31 | 8/5/2025 | 175,000 | DANIEL CHU | Other | AMEX DANIEL CHU | Aug-25 Wells Fargo |
| 2025-08-11 | 4151 - ORIGIN BANK - GANAS HOLDINGS | Origin Bank-4151 | 1 | 8/11/2025 | 250,000 | TRANSFER TO XXXXXX3477 | Transfer | DANIEL CHU 3477 | Aug-25 Origin |
| 2025-08-19 | 4151 - ORIGIN BANK - GANAS HOLDINGS | Origin Bank-4151 | 2 | 8/19/2025 | 4,250,000 | TRANSFER TO XXXXXX3477 | Transfer | DANIEL CHU 3477 | Aug-25 Origin |
| 2025-08-20 | 4151 - ORIGIN BANK - GANAS HOLDINGS | Origin Bank-4151 | 2 | 8/20/2025 | 2,000,000 | TRANSFER TO XXXXXX3477 | Transfer | DANIEL CHU 3477 | Aug-25 Origin |
| | | | | | | OTHER REFERENCE: IA000012999884AMEX EPAYMENT ACH PMT 250820 COP000006243416 | | | |
| 2025-08-20 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | 7 | 8/20/2025 | 127 | DANIEL CHU | Other | AMEX DANIEL CHU | Aug-25 Wells Fargo |
| | | | | | | OTHER REFERENCE: IA000014685683AMERI CAN EXPRESS ACH PMT 250825 A9250 | | | |
| 2025-08-25 | 5026 - WELLS FARGO - TAG OPERATING | Wells Fargo-5026 | 31 | 8/25/2025 | 125,000 | DANIEL CHU | Other | AMEX DANIEL CHU | Aug-25 Wells Fargo |

| | | | |
|---|---|---|---|
| Origin Bank-4151 | Tricolor California Auto Group, LLC | $ | 21,806,943.00 |
| Wells Fargo-5026 | Tricolor Auto Group, LLC | $ | 4,667,790.12 |