IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In Re: | ) | **Case No. 25-33487-mvl-7** |
| | ) | Jointly Administered |
| TRICOLOR HOLDINGS, LLC, et al., | ) | Dallas, Texas |
| | ) | December 18, 2025 |
| | ) | 2:30 p.m. Docket |
| Debtors. | ) | MOTIONS (53, 537, 538, 540) |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE MICHELLE V. LARSON,
UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:


For Anne Elizabeth Burns, Trustee:
Charles R. Gibbs
Grayson Williams
MCDERMOTT WILL & SCHULTE, LLP
2801 North Harwood Street, Suite 2600
Dallas, TX 75201
(214) 295-8063

For Anne Elizabeth Burns, Trustee:
Julia Beskin
MCDERMOTT WILL & SCHULTE, LLP
919 Third Avenue
New York, NY 10022
(212) 756-2218

For Anne Elizabeth Burns, Trustee:
Charles Brackett Hendricks
CAVAZOS HENDRICKS POIROT, P.C.
900 Jackson Street, Suite 570
Dallas, TX 75202
(214) 573-7302

For TBK Bank, SSB:
Bradley Roland Foxman
VINSON & ELKINS, LLP
2001 Ross Avenue, Suite 3700
Dallas, TX 75201
(214) 220-7784

For Vervent, Inc.:
Scott D. Lawrence
WICK PHILLIPS GOULD & MARTIN, LLP
3131 McKinney Avenue, Suite 500
Dallas, TX 75204
(214) 420-4449

APPEARANCES, cont'd.:

| | |
|---|---|
| For Vervent, Inc.: | Adam R. Prescott<br>BERNSTEIN, SHUR, SAWYER & NELSON, P.A.<br>100 Middle Street<br>P.O. Box 9729<br>Portland, ME 04101-5029<br>(207) 228-7145 |
| For Vervent, Inc.: | Matthew W. Moran<br>Sara Zoglman<br>VINSON & ELKINS, LLP<br>Trammell Crow Center<br>2001 Ross Avenue, Suite 3900<br>Dallas, TX 75201<br>(214) 220-7723 |
| For Holman: | Ricardo A. "Richard" Aguilar<br>ADAMS & REESE<br>Hancock Whitney Center<br>701 Poydras Street, Suite 4500<br>New Orleans, LA 70139<br>(504) 585-0239 |
| For the United States Trustee's Office: | Liz Ziegler Young<br>OFFICE OF THE UNITED STATES TRUSTEE<br>1100 Commerce Street, Room 976<br>Dallas, TX 75242<br>(214) 767-8967 |
| For Manheim Remarketing, Inc. (Cox Automotive, Inc.): | John Douglas Elrod<br>GREENBERG TRAURIG, LLP<br>Terminus 200<br>3333 Piedmont Road NE, Suite 2500<br>Atlanta, GA 30305<br>(678) 553-2259 |
| For Dallas County, et al.: | John Turner<br>LINEBARGER GOGGAN BLAIR & SAMPSON, LLP<br>3500 Maple Avenue, Suite 800<br>Dallas, TX 75219<br>(214) 880-0089 |

APPEARANCES, cont'd.

| | |
|---|---|
| For the Texas Department of Insurance: | Layla Danielle Milligan<br>TEXAS OFFICE OF ATTORNEY GENERAL<br>12221 Merit Drive, Suite 650<br>Dallas, TX 75251<br>(832) 701-8418 |
| For the Texas Department of Insurance: | Stephanie Marie Eberhardt<br>TEXAS OFFICE OF ATTORNEY GENERAL<br>P.O. Box 12548<br>Austin, TX 78711-2548<br>(512) 475-4297 |
| For Wilmington Trust, National Association: | Gerard S. Catalanello<br>Stephen Mark Blank<br>ALSTON & BIRD, LLP<br>90 Park Avenue<br>New York, NY 10016<br>(212) 210-9509 |
| For JPMorgan Chase Bank as Administrative Agent: | Nicholas E. Baker<br>SIMPSON THACHER & BARTLETT, LLP<br>425 Lexington Avenue<br>New York, NY 10017<br>(212) 455-2032 |
| For Fifth Third Bank: | Danielle Wildern Juhle<br>GOLDBERG KOHN LTD.<br>55 East Monroe Street, Suite 3300<br>Chicago, IL 60603<br>(312) 201-4000 |
| For ACV Capital, LLC: | Jonathan Lozano<br>BRACEWELL, LLP<br>111 Congress Avenue, 23rd Floor<br>Austin, TX 78701<br>(512) 494-3698 |
| For ACV Capital, LLC: | Jason R. Alderson<br>MORGAN LEWIS & BOCKIUS, LLP<br>101 Park Avenue<br>New York, NY 10007<br>(212) 309- 6758 |
| For BPG Arizona 1, LLC: | David Trausch<br>HAYNES AND BOONE, LLP<br>1221 McKinney Street, Suite 4000<br>Houston, TX 77010<br>(713) 547-2248 |

APPEARANCES, cont'd.:

| | |
|---|---|
| For SMBC Nikko Securities America, Inc.: | Nicholas J. Sabatino<br>ORRICK, HERRINGTON & SUTCLIFFE, LLP<br>51 West 52nd Street<br>New York, NY 10019<br>(212) 506-5000 |
| For Ad Hoc Activist Investor Group: | Nicholas Hardiman<br>QUINN EMMANUEL URQUHART & SULLIVAN, LLP |
| For Origin Bank: | Yelena Archiyan<br>KATTEN MUCHIN ROSENMAN, LLP<br>2121 North Pearl Street, Suite 1100<br>Dallas, TX 75201-2591<br>(214) 765-3657 |
| Recorded by: | Bryon A. Robinson<br>UNITED STATES BANKRUPTCY COURT<br>1100 Commerce Street<br>Dallas, TX 75242<br>(214) 753-2011 |
| Transcribed by: | Kathy Rehling<br>311 Paradise Cove<br>Shady Shores, TX 76208<br>(972) 786-3063 |

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

DALLAS, TEXAS - DECEMBER 18, 2025 - 3:33 P.M.

THE COURT: Please be seated.

All right. Good afternoon, everyone. We are here on our 1:30 docket. We have one matter on the docket this afternoon, and that is Case No. 25-33487, Tricolor Holdings, LLC.

I'm going to take appearances for the record. I'll start with those folks in the courtroom. For everybody on WebEx, thanks for hanging in there. All right. Mr. Gibbs.

MR. GIBBS: Good afternoon, Your Honor. Chuck Gibbs with McDermott Will & Schulte. I'm joined today by my partner Julia Beskin, who's been admitted *pro hac vice*, and also my colleague Grayson Williams. I'm also joined in the courtroom by Anne Burns, the Chapter 7 Trustee, and Mr. Hendricks, my co-counsel in this case.

I'm going to be mercifully brief. I want to first thank the Court for your indulgence and your flexibility in giving us the time to continue to work. It's been productive, and where we are now, I'm quite happy to say, is in a good place. It was not known probably until about two minutes ago that that's where we were going to land, but I believe that's where we are.

Nothing has been easy in this case, including the fact my phone is going off while I'm standing here talking to the Court.

And also, like is always the case, we have tried to keep

our eye on the ball and make sure that the perfect isn't the enemy of the good. And where we've landed, I think, as I said, is in a good place. I didn't want to miss the party, so I thought I'd come. But I believe, if I played my cards right, I'm done. And I'm going to sit down and hand it off to my colleagues who are going to do the work.

THE COURT: Excellent. Thank you very much, Mr. Gibbs.

MR. GIBBS: Thank you.

THE COURT: Mr. Lawrence?

MR. LAWRENCE: Good afternoon, Your Honor. I'm Scott Lawrence at Wick Phillips, appearing on behalf of Vervent, Inc. And in the courtroom with me today is Adam Prescott at the Bernstein Shur law firm. And we also have with us our client, Vervent, the chief legal officer, Derek Gamble, as well as Anthony --

MR. SPERELAKIS: Anthony Sperelakis, Your Honor.

MR. LAWRENCE: -- Sperelakis, thank you.

THE COURT: Sperelakis. Thank you.

Mr. Foxman?

MR. FOXMAN: Thank you, Your Honor. Good afternoon. Brad Foxman, Matt Moran, and Sara Zoglman on behalf of TBK Bank as Agent.

THE COURT: All right. Thank you.

MR. AGUILAR: Good afternoon, Your Honor. Richard

Aguilar. I have a pending *pro hac* motion. I hope you would allow me to speak, if needed. I'm from New Orleans, so I'm in here for the day. I know I'm close to your home.

THE COURT: Yes, you are.

MR. AGUILAR: And so I hope you make it back down to South Louisiana soon. But I represent Holman.

THE COURT: Okay.

MR. AGUILAR: Thank you, Your Honor.

THE COURT: Thank you very much. And I think that I signed at least one *pro hac*. I'm not sure if it's hit the -- are you with Adams and Reese?

MR. AGUILAR: Yes. Yes, Your Honor.

THE COURT: Yes, I --

MR. AGUILAR: And then we had two of them, one for me and one for the lawyer that works with me, Mark Chaney.

THE COURT: Okay. Yes. I know I signed one yesterday, and I can't -- I just received word that there are two more being sent to me.

MR. AGUILAR: Okay. Great.

THE COURT: Excellent.

MR. AGUILAR: Thank you, Your Honor.

THE COURT: Well, you will certainly be granted the courtesies of the Court, though. Thank you.

MR. AGUILAR: Thank you, Your Honor.

MS. YOUNG: Good afternoon, Your Honor. Liz Ziegler

Young for the U.S. Trustee.

THE COURT: Thank you very much.

All right. I'll now take appearances on WebEx. I can't see anyone, hardly. Mr. Elrod, would you like to make an appearance?

MR. ELROD: Thank you, Your Honor. John Elrod of Greenberg Traurig on behalf of the Cox Automotive Entities, including the Manheim Remarketing, Inc.

THE COURT: Okay. Thank you. Mr. Turner, would you like to make an appearance?

MR. TURNER: Yes, Your Honor. John Turner with Linebarger, appearing on behalf of Bexar County, Dallas County, Ector County Appraisal District, Fort Bend County, City of Frisco, Gainesville ISD, Grayson County, Hidalgo County, City of Houston, Houston City College, Houston ISD, Irving ISD, Kaufman County, Lewisville ISD, Lone Star College System, City of McAllen, Navarro County, Nueces County, Parker County Appraisal District, City of Richardson, Rockwall County Appraisal District, Tarrant County, and Wise County.

THE COURT: All right. Thank you, Mr. Turner. Unless you're willing do those with your eyes closed, we're just going to call those the Taxing Authorities. Thank you very much.

All right. Ms. Milligan, would you like to make an appearance?

MS. MILLIGAN: Good afternoon, Your Honor. Yes. Layla Milligan along with my colleague, Stephanie Eberhardt, with the Texas Attorney General's Office appearing on behalf of the Texas Department of Motor Vehicles.

THE COURT: All right. Thank you. Mr. Catalanello?

MR. CATALANELLO: Good afternoon, Your Honor. Gerard Catalanello from Alston & Bird, together with my partner Stephen Blank, on behalf of Wilmington Trust as Indenture Trustee and in various related capacities.

THE COURT: All right. Thank you. Anyone else wish to make an appearance?

MR. BAKER: Your Honor, Nicholas Baker; Simpson Thacher & Bartlett; on behalf of JPMorgan Chase Bank as the Administrative Agent under the SBV4 facility.

THE COURT: All right. Thank you.

MS. JUHLE: And good afternoon, Your Honor. Danielle Juhle from Goldberg Kohn on behalf of Fifth Third Bank, the Administrative Agent under the SBV6 warehouse facility.

THE COURT: Thank you.

MR. LOZANO: Jon Lozano with Bracewell, LLP on behalf of ACV Capital. I'm also joined by my co-counsel, Jason Alderson at Morgan Lewis.

THE COURT: Okay. Thank you. Anyone else?

All right. Well, I think that is critical mass.

All right. Mr. Williams, run up before your deal dies.

MR. WILLIAMS: Thank you, Your Honor. Grayson Williams of McDermott Will & Schulte as counsel to the Chapter 7 Trustee.

Let me just start -- I've got a few Christmas presents I need to give out. First, I have to tell you, your courtroom staff has been terrific and accommodating in not just getting these settings in the first place, but in communicating with us throughout the day as we had to keep pushing back, so a special thank you to your staff.

Second, as we'll kind of get into today, I have to commend the professionalism of everyone that's involved in this case. We just about locked people in a conference room today and said, you know, you're not allowed to leave until the white smoke comes from the top of the building. And I think we're happy to report that, for the most part, we think that's true. So it's been a great honor working with this group, and I think you'll see some of that throughout the day.

Let me just kind of chart out how we want to do this from a process perspective. Obviously, I know you didn't quite approve the order for expedited consideration, so maybe from a process standpoint, we can take that on first.

THE COURT: Sure. Is there anyone who wishes to be heard with respect to the motion to expedite what the Trustee, I think, filed as an Amended Emergency Sale Motion or the Motion to Expedite the Application to Employ Automotive

Rentals, Inc. T.A. Holman as auctioneer?

Hearing no objections, the motion is expedited.

MR. WILLIAMS: Thank you, Your Honor. That was easy.

With respect to the sale motion first, we'll handle the sale motion. You'll hear from my colleague, Julia Beskin, who will put Jim Calandra from Capstone on.

THE COURT: Yes.

MR. WILLIAMS: We'll have, hopefully, you know, 20 to 30 minutes of questions for him on direct, and then we'll move from Mr. Calandra to Mr. Steve Nolan of Holman Remarketing so you can get a sense of what Holman's responsibilities are as the auctioneer, and then we'll close up there.

One more thing. After we get through the sale motion, we'll have -- you'll hear from a few people to talk about some revisions that were made to the Vervent stipulation.

THE COURT: Okay.

MR. WILLIAMS: And I have to apologize. That redline, we just finished the terms, it just got filed, the notice of redline on that, so we'll talk about some of those changes generally --

THE COURT: Okay.

MR. WILLIAMS: -- and we'll represent that all the parties have reviewed and signed off.

Now, like I said, turning to the sale motion, you'll hear from Mr. Calandra, but let me just give you a real brief

background of procedurally how we got here today.

When the Trustee took over in mid-September, there were around 10,000 cars spread across 65 locations, retail facilities, reconditioning facilities, repair shops. At the time, there were no personnel at those retail locations, at the reconditioning facilities. There were no security onsite. And we knew that the company was accruing about $2-1/2 million or around about postpetition rent that may become due. And so, at the time, Capstone reached out to market participants to discuss the contours of what could have been a WholeCo or a sale of all of the inventory with a stalking horse and an auction process. And it became pretty obvious over the next month or so, as we began to relocate the collateral and secure the collateral, that that process just really wasn't going to work out. And we heard loud and clear from the Lenders that they wanted to run an expedited sale process to get these cars sold.

And so, to accommodate that, we took your Court's, we took Your Honor's direction a couple months ago and we started hosting weekly, sometimes daily, calls with 80 or 90 professionals. Those meetings have continued since that time. And in addition to those meetings, I can assure you that I have utterly exhausted the majority of the Lenders with the sheer number of emails.

But it was important to us that everyone had a voice in

this, everyone's edits were put before everybody else, and it was a very democratic process.

To that end, we filed our original sale motion in late November. And at that time, we -- and we sought an expedited hearing on the 3rd, I believe it was. And we began to have conversations with the United States Trustee, who provided just invaluable comments to this process that have shaped the past couple of weeks, and I want to describe what those are.

First, one of the United States Trustee's big concerns was that they wanted to ensure that the moment proceeds entered the sales pipelines, the moment a buyer at auction paid over proceeds, that those funds were bonded all the way through until they reached the Trustee's account. And I have to applaud the efforts that Holman has gone to to solidify that bond, to ensure that the entire pipeline of proceeds are bonded. And we believe that we're in a place today, even with edits as late as this afternoon, but recommendations from the U.S. Trustee that they hopefully are comfortable with the form of bond. And we'll hear from Ms. Young on that as well.

The other big consideration, and it's one of transparency, and the United States Trustee wanted to ensure that the auctioneer was retained under Section 327 of the Code. And we have labored to make that possible. You saw on Monday evening we filed our Emergency Application to Retain Holman, giving the sorts of disclosures and ensuring that we had a very

transparent process with respect to all of the fees that would be due to the auctioneers under this sale process. And when we get into the specifics of the sale procedures that we've signed off on, you'll see that transparency is the name of the game. I mean, at all points, we're all parties in interest. Everyone who is an economic stakeholder in this process will have the opportunity to review exactly how much cars were selling for, the gross proceeds that resulted from those sales, and they'll be able to see all of the auction-related fees. And they'll be given an opportunity to object to the extent that there's anything objectionable.

Just generally speaking, the parties have continued, as you can see today, have continued to refine those sale procedures in light of comments received from a whole slew of parties. And some, in particular over the past couple of days, we've received comments from the Texas DMV, the Texas Taxing Authorities, all of which I believe have had their comments fully addressed. And of course, they'll have the opportunity to speak to that.

But we feel very comfortable and confident that what we are bringing before you today is a process that has the overwhelming support of every party in interest.

THE COURT: I assume that the form of order has continued to be refined since that which was filed on the docket? Okay.

MR. WILLIAMS: Yes, Your Honor. So we have the original version that was filed -- well, we have the original version that was filed along with our sale motion in November.

THE COURT: Right.

MR. WILLIAMS: And then, of course, we had the amended version, which was filed on Monday evening. I believe another version was uploaded this afternoon, maybe 12:00 or 1:00 o'clock.

THE COURT: Right. I saw that one.

MR. WILLIAMS: Right.

THE COURT: I already viewed that one.

MR. WILLIAMS: And that has continued to be refined as well.

THE COURT: Great.

MR. WILLIAMS: And I want to make the record clear, because I know there's a few parties in interest that weren't in our caucus today that have had and have sent in comments which need to be addressed.

THE COURT: Sure.

MR. WILLIAMS: They're minor, they're nits, but they're important. And just for the sake of process, it is our intention that, after today's hearing, we'll continue to modify and tweak a little bit. We want to make sure that those comments are incorporated, or at least addressed.

THE COURT: Sure.

MR. WILLIAMS: And then the form of version, if Your Honor approves of it, the uploaded form of order, as an officer of the Court, will represent to you has the consensus and sign-off of all the parties in interest.

THE COURT: Excellent.

MR. WILLIAMS: So I just want to give folks comfort about that.

THE COURT: Right. And for today, given that we will have a number of witnesses, as I have been forecasting for quite a few hearings now, I will have to, once the evidentiary portion begins, I'm going to have to disconnect all of the phone numbers, because we just don't have the ability to basically triage 50 phone numbers.

So if somebody wants to participate in the hearing and hear the hearing, once the evidentiary portion begins, it'll have to be somebody that is either a party in interest or represents same and is able to put their name down so that the Court can do that. Because once we start the evidentiary portion, that's what's going to happen.

MR. WILLIAMS: Sure. And just for the benefit of anyone who is on their phone, we'll start the evidentiary portion in five-ish minutes.

THE COURT: Yeah.

MR. WILLIAMS: So if you want to go ahead and port over to another device, now would be the time to do that.

THE COURT: Yes.

MR. WILLIAMS: Before I pass the podium to my colleague, Julia, let me just say that, unequivocally, this sale is in the best interest of creditors, and the Trustee has spent an incredible amount of time arriving at these procedures, in furtherance of her business judgment.

And actually, before I pass to my colleague, Julia, I know we have some time considerations. And I know Ms. Young wanted to get some comments in before she has to head out. So maybe it makes more sense for me to pass the podium to her.

THE COURT: Yes. I think yes. From here -- yes, and we can certainly hear from Ms. Young now. I was just going to basically open the floor up to anyone who has anything by way of opening.

MR. WILLIAMS: Sure.

THE COURT: And then we'll tackle the witnesses.

MR. WILLIAMS: Okay.

THE COURT: And I don't know if Ms. Beskin wanted to be heard by way of opening first or just then to put the witnesses on.

MS. BESKIN: No, thank you, Your Honor. I only intend to put the witness on.

THE COURT: Okay. Excellent. Thank you.

Ms. Young, please.

MS. YOUNG: Thank you, Your Honor. Liz Young for the

U.S. Trustee.

And again, we are so thankful and grateful for all of the parties to work with us on the concerns that we had, which really go to the protection of not only the estate but also Ms. Burns as the Chapter 7 Trustee. And by putting this bonding in place and getting this bonding in place, it is crucial to ensure that the process works the way it's anticipated and that there is the transparency and also the protections in place.

We are very close on the bond. I think we've just got a few nits. So we're hopeful that we can get the bonding completed within the next few days. But certainly, I think we are coming here saying that we have no objections to the 327 application. Same. The parties listened to us on the concerns that we had about the original sale procedures. They have been incorporated and adopted into the procedures that are set forth before you today.

We do not have any concerns or questions about the procedures that are going to be set forth for approval here today. I just wanted to make the record clear that we have been working very, very closely with the parties to ensure that all of our concerns are met. And at this point, I can say they have been addressed and we are here with agreements on all of these motions.

THE COURT: Awesome. Thank you very much, Ms. Young.

MS. YOUNG: Thank you.

THE COURT: Good to hear. Again, I know the bonding process is not simple and it is not cheap, and so I'm certainly glad that everyone could come to some sort of consensus. I got a flavor for it as I was going through the redline, at least in its then-form. It was right before 1:00 o'clock this afternoon. So I kind of got a flavor for what was happening there. I thought it might be an issue that was relative to the United States Trustee, so that makes sense to me.

Does anyone else want to be heard by way of opening?

MS. MILLIGAN: Your Honor, can you hear me? This is Layla Milligan.

THE COURT: Yes, I can, Ms. Milligan. Please proceed.

MS. MILLIGAN: I just want to make a really brief statement.

First, we have been in communication with Trustee's counsel, and I appreciate their willingness to meet and discuss matters. We did pose one question that hopefully will be addressed throughout the testimony today, and that is there are references in the sale procedures and documents to non-estate vehicles.

The reason that we want to understand exactly what that means is because the DMV, Department of Motor Vehicles, has

received a number of complaints and questions about vehicles that were, for instance, in repair shop or vehicles -- you know, we want to make sure that these don't include vehicles that may have been purchased by individuals but not picked up for some reason. I don't think that's what is intended through these references, but I just want to confirm that. And I think we've reached out to counsel, but they've been caucusing internally.

So that's the only issue that I think that may be able to be addressed by the witnesses throughout today.

But, again, our interest is just making sure that the individual consumer customers aren't impacted by the processes and having their vehicles inadvertently sold, if that makes sense to the Court.

THE COURT: All right. Thank you, Ms. Milligan.

MS. MILLIGAN: Thank you.

THE COURT: Anyone else wish to be heard by way of opening?

MR. ELROD: Just briefly, Your Honor. This is John Elrod on behalf of Manheim Remarketing, Inc.

Your Honor, Manheim has a number of different roles in this case. But essentially, at the outset, in one of, I suppose, the first day hearings, if you want to call it that, one of the initial hearings, Manheim identified itself as an auctioneer that provided auction services to the Debtor.

Manheim does believe that it owns a limited number of vehicles, in the hundreds of vehicles, that will be subject to this sale process. Manheim does not have possession of those. Because it wasn't paid under the terms and conditions of Manheim's auction procedures, which the Debtor agreed to, title did not pass. And in fact, Manheim holds the titles to those vehicles, the physical titles.

So that's one issue, Your Honor. I don't know if that's for the Court today, but we would reserve all rights with respect to those vehicles. And I believe the sale procedures contemplate the Court's adjudication of those issues down the line.

Your Honor, the next issue is something that came up over the last couple of days when we were trading drafts of the proposed order that the Court will consider at the conclusion of the hearing. And that relates to storage fees on I believe it's approximately 1,500 or 1,600 vehicles that are in Manheim's possession on Manheim's lots that have been on Manheim's lots since before the petition date.

There is an issue with respect to whether Manheim is entitled to storage fees. Manheim obviously maintains that it is entitled to contractual storage fees, as agreed by the Debtor prepetition. We have discussed the issue with the Debtors' counsel -- or, excuse me, with the Trustee's counsel, and we intend to file an administrative expense motion at the

appropriate time to have that issue adjudicated. But we wanted to confirm that nothing in these procedures, because they do deal with storage fees, nothing in these procedures would preclude or prejudice our assertion of administrative expense claim at the appropriate time.

THE COURT: All right. Thank you.

MR. ELROD: So that's our opening. I don't know if the Debtor wants to -- or the Trustee wants to address that now or later in the hearing, but we would -- we have suggested some language to the proposed order shortly before the hearing that would preserve those rights and have not heard back. But I understand that Trustee's counsel was en route to the courthouse.

THE COURT: Mr. Williams?

MR. WILLIAMS: Yes, Your Honor. Both of those points.

So, first, the ownership issue. He's exactly right. Our sale procedures call for a process for that determination to be made. It's going to be made at a later date.

The same is true for storage fees. He's certainly free to seek that. And if we need to put some sort of reservation of rights, we're happy to take that back. I don't think anyone's really going to have issue with that. We're not foreclosing anyone's rights to assert those, and they're free to assert them. And every party here is free to object to those -- to

that request.

THE COURT: Okay. And looking at the storage fees that are listed and the estimated auction fees, it does look like that that is what's secured at an auction house engaged by Holman. So they wouldn't necessarily be part of the storage fees that Mr. Elrod is speaking of.

But again, that would and can be addressed by an administrative expense application at the right time. And from the Court's perspective, I don't see a problem with the reservation of rights on that.

MR. WILLIAMS: If it makes sense, I might just go ahead and address Ms. Milligan's concerns, too.

THE COURT: Please.

MR. WILLIAMS: I think I can -- to give her some peace of mind.

So, Ms. Milligan, with respect to the non-estate vehicles, what we're talking about is this ownership determination phase, which is forthcoming. It will happen in a few months. It may be the case that a portion of the vehicles are owned by certain lenders and nondebtor SBVs that would not be considered estate vehicles.

So when we use that definition, we're just referring to the possibility that the Debtor actually has no ownership interest in those vehicles. That process is all forthcoming.

On the consumer side of things -- and I'm only addressing

this because I don't really think it will come out in witness testimony today -- I want you to have peace of mind that Vervent is doing a really terrific job of interfacing with consumers who are calling and saying, you know, I've left a vehicle in a repair shop or I haven't been able to relocate my car. Maybe it was in an impound lot. And Vervent is facilitating those conversations directly.

And also with respect to the cars that are subject to this auction process, there's a lot of stopgaps in place to ensure that if a car is going across a lot, it's been appropriately surrendered or it meets certain criteria that there's no risk of ownership disputes from consumers. And that is ordinary course of business for these folks. And they want to protect themselves as well. So there's -- it certainly would never be the case that that sort of issue would arise, but I just wanted to address your concern. And sorry I didn't get a chance to get back to you a little bit earlier.

THE COURT: All right. Thank you, Mr. Williams. Anything further on that point, Ms. Milligan?

MS. MILLIGAN: No. Again, Layla Milligan for the Texas Department of Motor Vehicles.

I appreciate those comments. Just for the Court's information and for Trustee, I'm sure we'll reach out to work through what those processes are, just to ensure we're all on the same page and continue to work together to protect these

consumers that hopefully are not impacted by this. But I do appreciate that assurance. Thank you.

THE COURT: All right. Thank you, Ms. Milligan.

All right. Anyone else before we take evidence?

MR. TRAUSCH: Good afternoon, Your Honor. David Trausch from Haynes and Boone on behalf of BPG Arizona 1, LLC. I apologize. I tried to make my appearance at the outset, but apparently I was not heard on your end. I could hear the Court.

But we filed an objection at 503. My understanding is the Trustee's counsel is going to make a joint announcement. I just wanted to make sure that the Court could hear me. But I'll leave it to the Trustee's counsel to do it at the time they want to, but I'm on so that I can confirm when the time is correct.

THE COURT: All right. Thank you very much, Mr. Trausch. I'll add you to the appearances on behalf of BPG Arizona. And I did have an opportunity to review your objection prior to the hearing.

Mr. Williams?

MR. WILLIAMS: Yes, Your Honor. And that's right. In an effort to resolve that objection, we have agreed to a sort of reconciliation process with respect to postpetition rent that may be due to BPG. And we're going to both engage in good faith efforts to quantify that number, and we'll be

back with a motion, a 9019 settlement motion, in the near term.

THE COURT: All right. Thank you very much.

All right. Anyone else?

All right. So this is the time where, if you are just on a phone, I'll give you one quick opportunity, because we have a lot to get through in the next couple hours, I'll give you one quick opportunity if you were on a phone to press *6 to unmute and tell me if you represent a party in this case or if you are a party in this case. But otherwise, we're going to disconnect all the lines. Anyone want to make an appearance?

(No response.)

THE COURT: All right. Mr. Robinson, you can disconnect the phone lines.

Oh, wait, there is one that's trying, I think, trying to -- the 916 ending in 62 number.

MR. SABATINO: My apologies, Your Honor. Nick Sabatino of Orrick, Harrington & Sutcliffe on behalf of SMBC. We've entered an appearance in the case.

THE COURT: Yes.

MR. SABATINO: I would like to stay on, if possible.

THE COURT: Okay. Yes. Thank you, Mr. Sabatino.

MR. SABATINO: Thank you.

THE COURT: And so you can leave that one on, Mr. Robinson.

Is there anyone else who wishes to identify themselves so that they're not disconnected?

MR. HARDIMAN: Yeah. Nick Hardiman, Quinn Emanuel, on behalf of the Ad Hoc Activist Investor Group.

THE COURT: Okay. Could you give your name again for the record?

MR. HARDIMAN: Yeah, sorry. Nicholas Hardiman.

THE COURT: Thank you very much.

MR. HARDIMAN: Okay. Thanks.

THE COURT: All right. Anyone else?

MS. ARCHIYAN: Your Honor, good afternoon. This is Yelena Archiyan of Katten Muchin Rosenman on behalf of Origin Bank.

THE COURT: Okay. Thank you.

MS. ARCHIYAN: Thank you.

THE COURT: Anyone else? All right. So anyone who is not identified as a -- otherwise identified and is on the phone is going to be disconnected at this time as we go into the evidentiary phase.

Can the participant that's noted as a dot identify themselves? I appreciate the effort, but -- all right.

Mr. Williams, do you want to call your first witness?

MR. WILLIAMS: Your Honor, I'm going to pass the podium to my colleague Julia Beskin.

THE COURT: Excellent.

MS. BESKIN: Good afternoon, Your Honor. Julia Beskin, McDermott Will & Schulte, for the Chapter 7 Trustee. I'd like to call as our first witness Mr. James Calandra.

THE COURT: All right. Mr. Calandra, if you could come and take the witness stand, I'll swear you in, sir. Thank you.

JAMES CALANDRA, DEBTORS' WITNESS, SWORN

THE COURT: All right. Thank you very much. Please be seated.

THE WITNESS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. BESKIN:

Q Good afternoon, Mr. Calandra. You're the managing director and head of Capstone Partners Financial Advisory Services; is that correct?

A Yes, it is.

Q And Capstone was retained as financial advisor to the Chapter 7 Trustee in mid-September of this year; is that correct?

A Yes, it is.

Q Can you describe for me generally the nature of Capstone's business?

A Capstone Partners is a middle market investment banking firm with restructuring, turnaround, transaction advisory, and special situations or distressed M&A functions as well.

Q And what is your role in particular at Capstone as a managing director and head of financial advisory services?
A I'm responsible for the entire financial advisory services group, which is, excuse me, turnaround and restructuring, transaction advisory, and distressed M&A.
Q And how long have you held those responsibilities at Capstone?
A Ten -- more than 10 years.
Q And how long in the course of your career have you worked in turnaround, special situations, transaction advisory services?
A Twenty-three years.
Q Okay. Can you describe the work that Capstone has been performing for the Chapter 7 Trustee to date in its capacity as financial advisor?
A Yes. Initially, Capstone was involved in securing the physical books and records of the Debtors. We also supervised the transition of the physical title and registration packets that were to be processed by Vervent. We have sorted mail that has been delivered postpetition and managed the process associated with that mail.

We did a financial statement close as of the petition date, prepared statements and schedules for 18 Debtors, have done various financial analyses in support of the Trustee and her professionals for decision-making, and we've done some

preliminary forensic analysis to explore the presence or potential presence of fraud and its nature.

Q I'd like to turn now to the vehicle inventory that's the subject of the Trustee's motion. Capstone is advising the Trustee on the sales process for the Debtors' vehicle inventory, correct?

A Yes.

Q Can you describe the scope and nature of the vehicle inventory?

A The vehicle inventory consists of approximately 9,500 used vehicles with vintages between 2020 and 2025. They have an average acquisition cost of approximately $11,500 per vehicle. They're currently situated, as I understand it, in nearly a hundred locations in connection with the potential auction of those -- wholesale auction of those vehicles, awaiting consideration of the motion before the Court today.

Q And what is the approximate aggregate value at acquisition cost of these vehicles?

A The aggregate acquisition cost of the vehicles is $125 million, approximately.

Q And where did you derive this information from regarding these vehicles, their vintage, their value?

A Early on in the case, we extracted data from the Debtors' dealership management system, IDMS. It gave us a list of the vehicle inventory. That list was our starting point, which we

ultimately have been reconciling to the physical collection and identification of the vehicles.
Q What sale options with respect to the vehicle inventory has Capstone pursued?
A Initially, when we were first engaged, we undertook a market survey of participants to determine whether there was an interest in acquiring the dealership locations and the used vehicle inventory that at that point was still located at those dealership locations. Our investment bankers determined that there was interest in the marketplace.
We spent a few weeks speaking with the potential buyers, mostly strategic buyers. We prepared marketing material. We signed, I think, eight of them, buyers to NDAs, provided marketing material and some limited due diligence material. And over the course of five to six weeks, the population was winnowed down to two. And ultimately, we got one letter of intent and one indication of interest, neither of which was feasible from an economic or timeline standpoint.
Q And do I understand correctly that this process lasted approximately four or five weeks, from late September through late October?
A That's correct.
Q Why did you not continue with the attempt to sell to a strategic buyer after that time period?
A There were time and cost considerations that were putting

pressure on the estate to move the vehicles and sell them. Rent at the dealership locations was accruing at around $2, $2-1/2 million per month; there was a question of physical security of the vehicles and the cost of maintaining that physical security; and there was the cost of ensuring the value of the property that were all factors in ultimately deciding that it was best to pursue a wholesale auction strategy.
Q So at that point, did Capstone begin advising the Trustee regarding a sale of the vehicle inventory at a wholesale auction?
A Yes, we did.
Q And can you describe for me the benefits of pursuing a wholesale auction through the sales procedures as proposed in the motion before the Court?
A The process for staging the vehicles and preparing them for wholesale auction allowed the estate to secure the vehicles through a third party, and that third party provided physical storage, insurance, and protection, with the presumption that at a later date they would have the ability to bid on auctioning those vehicles.
Q Did you consider any other sale options other than the two we've just discussed?
A Theoretically, yes. We obviously had a limited number of options available to us, given the cost, the resources that

the estates possessed, and the time. Because these are an asset that declines in value over time, that was also a consideration.

The only other option we could identify would be -- would have been a retail sale of the vehicles, which was not part of the, I think, the authority that was available. And it would have taken a long time.

Q What is the current status of the vehicle inventory?

A As I understand it right now, they are staged at storage facilities across multiple states, I think eight, and spread out in a manner that will allow them to be auctioned in various markets as to not flood a particular market and potentially dilute the value of the vehicles at auction.

Q Can you please describe your understanding of Vervent's role with respect to the vehicle inventory?

A Yes. Initially, Vervent took the responsibility to secure the vehicles and ultimately to transport them to storage facilities. They, along the way, inventoried them and provided us with data to reconcile back to the inventory that we had extracted from IDMS.

Q What is your understanding as to why Vervent relocated the vehicle inventory in the manner it did -- that is to say, among 60 different locations across several states?

A Part of it had to do with where they were at the time they were collected, their proximity to individual markets where

the wholesale auction houses have active markets. And purposefully, they were distributed in a manner that would avoid glutting too many of them in one marketplace.
Q Was insurance a factor?
A Yes. Essentially, from the time that Vervent and their contractors collected the vehicles to transport, they were covered by the insurance of those parties. And then when they arrived at the wholesale auction house locations for storage, they're covered by them.
Q And what is your understanding as to the role of Holman in the auction process that's being presented in the Trustee's motion?
A Holman is the auctioneer, the proposed auctioneer in the sale process.
Q I'd like to turn now to the process by which you and others developed the sales procedure that is now before the Court.
A Uh-huh.
Q What was Capstone's role with respect to developing these sales procedures?
A Once it was determined that we should pursue a wholesale auction strategy, Capstone collected bids from five different wholesale vehicle auction houses. We took those five bids and we reduced them to a common set of terms, homogenized them, and we then distributed that common set of terms back out to

the same five auction houses and asked them to re-bid on the same terms so that we had an ability to compare apples-to-apples and also foster some competition among them.

Q And what was the result of introducing competition among them and structuring the proposals in the way you just described?

A Ultimately, it drove incremental price transparency. And it did foster competition that saved the estates approximately a million dollars in costs of auctioning the vehicles.

Q And what will Capstone's role be in the sales process in the event that the Court approves the Trustee's motion?

A Capstone will monitor the auction process and the results, and in the end will be responsible for full accounting and a reconciliation of the claims against the proceeds.

Q Over the course of your 23-year career as a restructuring professional, how many times have you oversaw the auctioning of a debtor -- of debtors' assets?

A Dozens of times.

Q I'd like to turn now to the role of other stakeholders in developing the sales procedures that are before the Court. To what extent did the Trustee engage with these stakeholders regarding the procedures?

A The involvement of the stakeholders with the Trustee was numerous and frequent video conferences and teleconferences that happened weekly to multiple times a week involving 70,

80, 90 participants, mostly professionals for various stakeholders. That would be the warehouse lenders, JPMorgan, Fifth Third, and Origin Bank. That would be Wilmington Trust in their capacity as trustee for the securitization trusts. It also involved the floorplan lenders, TBK as administrative agent on one, ACV as a lender on another. And it also involved outside counsel representing two groups of bondholders or securities holders from the various asset-backed security sales.

Q And do I understand correctly that all of these stakeholders had the opportunity to comment on the proposed sales procedures?

A They did.

Q And to the best of your knowledge, were these stakeholders represented by outside counsel? Well, inside or outside counsel?

A To my understanding, everybody was represented by counsel in these deliberations, yes.

Q Do you think it's fair to say that it was a collaborative process by which these sales procedures were developed?

A I think that's a fair characterization, yes.

Q In the event that the proposed sales process is not approved, what are collateral consequences that you would anticipate?

A Well, for starters, there's an uncertainty as to whose

assets they are to some extent and whose claims against them as collateral prevails. Due to the extent of that uncertainty, it's hard to imagine what it would be like to unscramble the egg here. I can only imagine it would be chaotic.
Q What is the Trustee's goal in selling the vehicle inventory in the manner set forth in the proposed sales procedures?
A Maximizing the value of the assets for the benefit of the creditors.
Q And in your opinion, are these sales procedures indeed the best option available to maximize creditor recovery?
A Yes, they are.
Q And why is that?
A Well, for starters, we can't identify a better alternative or another alternative that's actually feasible. We exhausted the possibility of selling them in a strategic transaction. And at this point, the timeliness of disposing of these vehicles is important because of the declining value, the introduction of a new model year, and just the passage of time.
Q Thank you very much, Mr. Calandra.
MS. BESKIN: I don't have any further questions.
THE COURT: Thank you very much.
MS. BESKIN: Thank you, Your Honor.

THE COURT: Is there anyone who wishes to cross-examine Mr. Calandra?

All right. Hearing no takers, thank you very much for your testimony, sir.

THE WITNESS: Thank you, Your Honor.

(The witness steps down.)

THE COURT: Mr. Williams?

MR. WILLIAMS: Hello, Your Honor. Grayson Williams of McDermott Will & Schulte on behalf of the Chapter 7 Trustee. The Trustee next will call Mr. Steve Nolan from Holman.

THE COURT: Thank you. Good afternoon, sir.

MR. NOLAN: Good afternoon, Your Honor.

THE COURT: Thank you.

STEVEN THOMAS NOLAN, DEBTORS' WITNESS, SWORN

THE COURT: Thank you very much. Please be seated.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q Good afternoon.

A Good afternoon.

Q Please state your name for the record.

A Steven Thomas Nolan.

Q And Mr. Nolan, what is your occupation?

A I am the remarketing manager for Holman.

Q Let's talk for a minute about Holman. What exactly are

the scope of services that Holman has, generally?

A Broadly, Holman is a 100-year-old family-owned automotive services business. We work in many verticals within the automotive space, anything from retail dealers to upfitting, manufacturing, insurance, and fleet management. Specific to this engagement, we're here to discuss our expertise in the remarketing of wholesale inventory.

Q Can you go a little bit, for the benefit of the Court, can you go a little bit more into what that remarketing process will look like in this case?

A Sure. So, Holman leverages a network of whole car auctions across the United States, and we employ trained professionals in the process of liquidating that inventory, wholesale inventory, through those channels.

Specifically, I think some of the key tenets here are the logistics and transportation of inventory to those auctions, preparing the vehicles for sale, managing the actual sale of the asset to ensure it is sold for maximum value at market-based pricing, and administering title-related work that's a prerequisite for those sales.

Q So what sort of safeguards does Holman have in place to protect the value of an asset that's ultimately put on an auction block?

A Holman controls the entire process. So everything from the auction that is selected to sell the vehicle to

reconditioning decisions that are made to maximize the value of the asset, setting reserve prices, and representing every sale as it takes cross -- across the auction block to ensure that the vehicle is sold for a price that we approve.

Q Can you explain to the Court and everyone listening what the reserve price refers to?

A Reserve price is a market-based price that Holman establishes to effectively not allow a vehicle to be sold below its market value. We arrive at that number based on, certainly, the asset itself and its condition, age, mileage, usage, things along those lines. And we look at all those variables, compare those to industry guidebooks to determine a vehicle's value, and then we set that as kind of a benchmark price that the vehicle should sell around.

Q And you sort of already mentioned this, but how will Holman ensure that that reserve price is protected during the auction process?

A Our trained remarketers are the decision-maker in that process. The auctions are not allowed to sell a vehicle for a sale price that we don't approve.

Q I've only got a few more minutes with you, but tell me a little bit about the fees that are built into these sale procedures. So there is a $295 administrative fee that the sale procedures call to be split between you and Vervent. Can you just generally describe what is -- what's that

consideration for?
A That fee covers the services that Holman and Vervent are offering collectively. And that includes things like managing the logistics, which certainly involve a lot of coordination with the auctions, securing not just the physical capacity to store these vehicles as they were moved to the auctions, but we had to hire, obviously, transportation brokers and secure capacity with respect to that.
You know, obviously, the staff and personnel, the professionals who would be involved in making those remarketing decisions, whether it's pricing, reconditioning, et cetera.
And then, certainly, Vervent does a lot in this process as well. They're very much involved in determining, you know, where assets are, where they're being picked up from, providing vehicle titles. So Vervent is heavily involved in that process.
The fee is generally, you know, in place to cover all of the work that goes into managing this process.
Q If you can back up for us a little bit, describe the conversations and the work that Holman has done with respect to the transportation of vehicles from the onset of the case.
A So you're asking the conversations that we've had with --
Q Let me be more specific. How does Holman facilitate the transportation? Are they subcontractors you work with? What

does that look like?
A Yeah. We work with a network of brokers across the United States, and those brokers have subcontractors or carriers who work for them. And so we work with them to coordinate a process where, you know, as Vervent finds and locates vehicles at various locations, Tricolor retail locations, our vendors are then dispatched to those locations, provided a list of VINs and the auctions that those should be delivered to. And then we oversee and manage that process as vehicles are moving through that pipeline.
Q All right. Let's briefly discuss the auction fees that are included in the sales procedures. Can you give me a sort of general description of what the itemized auction fees are intended to compensate for?
A Those are designed to cover the work that the auction itself facilitates. Everything from kind of just like the general goings-on at the auction, marshaling vehicles around the yard, preparing a vehicle for sale. All of the kind of pre-work that goes into building a buyer base, marketing a vehicle. All the stuff that needs to happen just to hold an event like an auction.
There are itemized fees that cover things like removal of any sort of personally identifiable information from the vehicles, technology fees that cover the cost of the various technology platforms that are leveraged to sell vehicles in

this manner.
Q And then the last fee that I want you to give us a little bit of insight into is the titling fees. The sale procedures call for three different tiers. If you can just describe what that's intended to compensate for.
A Yeah. So there is a fee where there is no -- rather, a tier where there is no fee for title services.
There is another tier where there is a $40 title-flipping fee, effectively. And those -- that fee would apply in scenarios where Holman needs to flip a title out of a, you know, borrower's name into I guess in this case Tricolor's name or whatever name it needs to be flipped into. And in many cases, that's a state requirement for consumer repossessions, where a vehicle -- or a title, rather, needs to be flipped out of the borrower's name into the bank's name.
And then in other situations there would be a $125 fee that would be intended to cover any sort of additional title work that is more complicated. And this is typically things like there is no title, so you need to go find one or get one from the state. Or there may be an imperfected title that needs to go through some sort of DMV-related process to get a title in Tricolor's name.
Q Got it. The pipeline of what I've been referring to as the proceeds pipeline, what's your understanding of the timeline from when an auctioneer receives payment until the

time the Trustee receives payment? What's the timeline and what happens in between?

A The timeline is roughly six business days. The flow of funds is, obviously, the auction pays the buyer -- or I'm sorry, the buyer pays the auction. The auction then pays Holman. And then Holman remits those proceeds to the Trustee. And during that process, Holman is doing extensive audit to make sure that the appropriate amount of money was received from the auction and that the appropriate amount of money gets remitted back to the Trustee.

Q Mr. Nolan, I'm just going to hand you a copy of your declaration that was attached to the retention application.

MR. WILLIAMS: Your Honor, if I can approach the witness?

THE COURT: Please.

MR. WILLIAMS: Your Honor, may I approach the bench as well? This is just Exhibit B --

THE COURT: With extreme caution.

(Laughter.)

THE COURT: Thank you.

BY MR. WILLIAMS:

Q Mr. Nolan, do you recognize this document?

A I do.

Q And was this the declaration that was attached to the retention application filed earlier this week?

A It is.

Q And in reviewing this document, did you give your authority to sign this document?

A I did.

Q To the best of your knowledge, do you have any changes to this document?

A I do not.

MR. WILLIAMS: Your Honor, I would move for the admission of the declaration which was attached to the retention application. And we'll just call that Exhibit A.

THE COURT: All right, thank you. Is there any objection to the admission of Exhibit A, which can be found at Docket 538-2?

Hearing no objections, that exhibit is admitted. Thank you.

(Debtors' Exhibit A is received into evidence.)

MR. WILLIAMS: And with that, Your Honor, I'll pass the witness.

THE COURT: All right. Do you want to discuss the bonding process with him on direct? Because I understood by looking through the --

MR. WILLIAMS: Sure.

THE COURT: Okay.

BY MR. WILLIAMS:

Q Mr. Nolan, can you briefly describe Holman's efforts over

the past few weeks to obtain a bond?

A Yeah, I'd be happy to. So, it was shared with Holman two to three weeks ago that in order to proceed as the auctioneer under the 327 retention application that we would be required to obtain a bond to cover the proceeds in transit, right, the money that is kind of in that pipeline from the auction to the Trustee.

So we worked closely with the Trustee, the U.S. Trustee's Office, to better understand the form and requirements of that bond and put forward a good faith estimate of what we believe the amount of the bond would need to be, and then worked very diligently with the Trustee, our bonding broker, Gallagher, and the surety Liberty Mutual, to ultimately get a bond in place that met the needs of the U.S. Trustee.

Q So let's talk about what those needs specifically are. After your analysis, what was the amount that you -- that Holman believes would be in transit at any given moment? And then --

A Roughly $10 million.

Q And so the bond itself is for how much?

A $12.5 million.

Q So what does that 25 percent premium represent?

A It allows a buffer to account for fluctuations in volume, ultimately, which would be a good thing, increase in market value. So if the vehicles end up being worth more than we

anticipate, we have some buffer within the bond to cover those additional proceeds that would result from that additional selling price.

Q In the context of this five-to-six-month sale period, why do you -- how did you arrive at the fact that $10 million would be a sufficient amount to cover the proceeds at any given time?

A It's basic math. We looked at the estimated value of the assets, anticipated the kind of flow or sequence of when we believe those sales will take place, and then effectively estimated how much money would be in transit at any given time -- again, taking into consideration the timeline for moving money from the auction to Holman to the Trustee, the value of the assets, the timeline of the project.

And we even got down to kind of the nitty-gritty of, you know, many auctions run Tuesday through Thursday, and it'll take them three days to send us proceeds. So if you do the math, like, there will be certain days of the week where we'll have more money in the pipeline than others.

Q Right.

A And so we kind of, you know, graphed that out and looked for the highs and lows of the total amount that could be in the pipeline at any given time and made a conservative effort to find the high watermark, if you will.

Q Okay. And will you give the Court a sense of where those

negotiations stand with respect to any outstanding edits or -- from your perspective?

A The last edit from the U.S. Trustee this morning was a request to have the obligee have a signature block on the bond.

Q Uh-huh.

A That was approved by the surety. Their only contingency there was that they get a signed copy.

Q Very good. So is it your understanding that that bond will be finalized and executed soon after entry of the order approving the sale?

A It is.

Q Okay.

MR. WILLIAMS: And with that, Your Honor, I'll pass the witness.

THE COURT: Okay. Thank you, Mr. Williams. Is there anyone who wishes to cross-examine Mr. Nolan?

MS. MILLIGAN: Your Honor, can you hear me okay?

THE COURT: I can.

MS. MILLIGAN: This is Layla Milligan.

THE COURT: Yes, thank you.

MS. MILLIGAN: Thank you. I just have a few questions for the witness, if I may.

CROSS-EXAMINATION

BY MS. MILLIGAN:

Q You mentioned a process of determining the title of the vehicles that will be auctioned through these processes. Can you describe the process of verifying the title of the car? Or the vehicles, I should say. And -- I guess, can you describe that process for the Court?
A Yeah. Vervent would be primarily involved in that process.
Q Okay.
A We work at their direction with respect to the titles.
Q Oh, okay. If -- okay. So Vervent is the entity that will be doing the title and review related to whether it was owned by Tricolor or another entity; is that right?
A That's correct.
Q Okay. Do you know that -- whether a vehicle is not titled with Tricolor and cannot become titled with Tricolor, if that vehicle will be removed from the auction, or is (inaudible)?
A Certainly, it's the case that we would require a title, you know, under a Tricolor entity prior to offering the vehicle for sale.
Q And just to clarify, Vervent will be the one that verifies that and they provide that information to Holman?
A Correct.
Q Okay. Thank you. That's all the questions I had.

THE COURT: All right. Thank you, Ms. Milligan.

Is there anyone else who wishes to cross-examine Mr.

Nolan?

EXAMINATION BY THE COURT

THE COURT: All right, Mr. Nolan, just a few questions. And I apologize, I'm probably looking at a copy of auction procedures that are not even dated; they're just a little stale by hours. So the last -- the redline that I was able to see was about 1:00 o'clock this afternoon.

With respect to the cost per vehicle, I understand that your company, Holman, and Vervent are going to be sharing a $295 fee, and that's along the split of tasks that you've testified to in terms of it seems like Holman is going to be doing transportation and then a running of auction services; Vervent is going to do more of the verification and everything that they've been doing to date. Is that correct?

THE WITNESS: That's correct, Your Honor.

THE COURT: And will Vervent be doing any transportation or moving of vehicles?

THE WITNESS: We're a subcontractor of Vervent to do that.

THE COURT: Oh, okay. All right. So that I understand, the $295 is a separate fee from the title processing fee and a separate fee from the auction fee, correct?

THE WITNESS: That's correct.

THE COURT: And these are additive?

THE WITNESS: Correct.

THE COURT: Okay. And with respect to the bond that Holman was required to get, that will be a separate compensation request? Is that still how that's set up under the current procedures?

THE WITNESS: I believe the current procedures have a provision that ensure that Holman can be reimbursed for their out-of-pocket expenses in obtaining the bond. So it would be limited to the amount, the premium paid, not --

THE COURT: Yes. Of course.

THE WITNESS: Yeah.

THE COURT: Of course. Of course. But that's going to be part of an interim compensation request and not on a per-car or anything like that basis?

THE WITNESS: That's exactly right, Your Honor.

THE COURT: Okay. Is the amount still 25 percent of actual and necessary expenses incurred by Holman to obtain the bonding?

THE WITNESS: Oh, oh, I see, Your Honor. The procedure that we had negotiated over the past 24 hours was that they could seek to have that paid on an accelerated basis, the premium payment. So beginning, I think, on their first interim compensation, they could request the 25 percent reimbursement. The original sale procedures had the reimbursement of that expense in connection with the final fee

application, --

THE COURT: Okay.

THE WITNESS: -- and this just pushes that up and allows for a 25 percent payment to be paid over the course of the --

THE COURT: So, in other words, Holman will be requesting a hundred percent of its actual and necessary expenses to obtain the bond, but just the front end of that will be the January or February interim compensation ask? Okay.

THE WITNESS: That's right, Your Honor.

THE COURT: All right. The next question that I have, and I'll give you a little flexibility here, Mr. Williams, between you and the witness, is there are a number of spots in the form of order that was uploaded earlier today. For example, it says that you'll be establishing a bar date by which parties other than Holman must assert interest in the sales proceeds. Are we intimating any sort of like lien or other interest in the proceeds, or just their rights for compensation?

THE WITNESS: I think the concern, and Mr. Aguilar on behalf of Holman is here and he can --

THE COURT: Okay.

THE WITNESS: -- certainly correct the record if I'm wrong, but I believe that the point of that was to ensure that

Holman didn't forfeit a right to recover on the final -- at the final request. They didn't have to file -- their rights were preserved. I think it's just --

THE COURT: Okay.

THE WITNESS: -- protective language that they would like to see.

THE COURT: Okay. And there is an expectation, whether it be Holman or whether it be Capstone, that each of these types of fees, the $295 and the title fees, the auction fees, et cetera, are going to be maintained on a VIN-by-VIN basis?

THE WITNESS: Yes, Your Honor, absolutely.

THE COURT: Because that will be important with respect to all the Secured Lenders as well. Okay.

THE WITNESS: Yes, Your Honor.

THE COURT: All right. And let's see. I'm sorry. I'm kind of going a little scattershot. Okay. The last thing, the last question that I have, Mr. Nolan, goes to the declaration itself.

Could you explain to the Court, I saw that you've obviously done work with certain of the creditors over the years. I think you've mentioned JPMorgan, Manheim, et cetera, and Wilmington Trust, at least those names that I recognize, in your declaration. Did you say that Holman also has a preexisting or relationship of sorts with Vervent? Could you

explain that to the Court?

THE WITNESS: Yes. So Holman and Vervent are partners. We were under a master services agreement where we offer remarketing services to Vervent.

THE COURT: Okay. All right.

I don't see that in the declaration. So, Mr. Aguilar, if you could have Mr. Nolan's disclosures updated and file a supplemental disclosure or supplemental declaration that explains that prepetition relationship.

MR. AGUILAR: No problem, Your Honor. What we have is we have a remarketing agreement with Vervent.

THE COURT: Okay.

MR. AGUILAR: So we remarket some of their other vehicles and things like that. So I could just describe that in an amended declaration. Or just a supplement.

THE COURT: Yes, no, and I'd appreciate that, because I don't -- again, the sharing, everything that goes into the procedures I think is very well fleshed out, and the Court understands why the $295 would be shared. But I think in a situation where Vervent to date has such a major role in the case, that we would list them the same way that we would list and address any creditors or any other parties in interest.

MR. AGUILAR: And Judge, do you see any issues with that, or --

THE COURT: I don't necessarily see an issue with it,

but I think it should be disclosed.

MR. AGUILAR: No, no, I get it.

THE COURT: Yes.

MR. AGUILAR: I just wanted to know. Thank you, Your Honor.

THE COURT: No, it's more disclosure than it is a problem.

MR. AGUILAR: I got you.

THE COURT: I just think that, again, given the role and given the varied tasks that Vervent is -- well, the duties they're tasked with, should I say, I think it's important that if they had a master services agreement, that it's listed here.

MR. AGUILAR: Yes, Your Honor.

THE COURT: Thank you.

All right. Does anyone have any questions of the witness based upon the Court's questions?

Hearing none, thank you very much for your testimony, sir.

THE WITNESS: Thank you, Your Honor.

(The witness steps down.)

MR. WILLIAMS: Your Honor, before we wrap up the sale motion, I think it makes sense for us to discuss a somewhat significant revision of what took most of the afternoon to arrive at.

THE COURT: Okay.

MR. WILLIAMS: And you'll see it in the form of revised proposed order that we'll file with the Court. And there's certainly a lot of people here that may want to amend what I tell the Court, but I'll just take a crack at it.

There was a provision in the as-filed motion and the sale procedures on Monday night that effectively said that the aggregate of the auction fees and the titling fee and the administrative fee could not exceed the sale proceeds. So that is to say the fees, if a car went across the lot for $1,100 and the fees were $1,400, that that simply wouldn't be allowed for.

THE COURT: Uh-huh.

MR. WILLIAMS: And we heard very valid considerations from a few parties and concerns with that. And so we have worked to iron out an accommodation there that, if that were to occur, then a very specific set of rules apply. And maybe I'll just go ahead and read them in, if you'll just give me one moment.

THE COURT: Are we essentially getting to surcharge issues? Is that the issue?

MR. WILLIAMS: I don't think that's --

THE COURT: Is it more basic than that?

MR. WILLIAMS: It's, in that scenario, where fees exceeded proceeds, there'd be a deficiency, right? And so the deficiency would be -- the question becomes, from where is

that deficiency cured? And so the procedures that we've discussed, if I can make sure I've got the right email, --

THE COURT: Sure. Because it seems like this goes to a portion of Mr. Nolan's testimony with what I'll just call the floor, the floor bid, that he said that no vehicle could be sold without Holman establishing what that price is, to make sure that they were getting the fair value.

MR. WILLIAMS: I think that's right, and sometimes I think it's difficult to anticipate the reconditioning fees that will -- you know, even after a reserve price is set. So this may be much ado about nothing, because it may be the case that a very small population of vehicles would be subject to this.

THE COURT: Because certain of the fees will be incurred essentially after the sale. Am I wrong? Is like titling fees and things like that could be incurred after the sale?

MR. AGUILAR: Your Honor?

THE COURT: Mr. Aguilar?

MR. AGUILAR: Yes, Your Honor. So there's going to be a lot of the fees incurred before the sale.

THE COURT: Right.

MR. AGUILAR: The vehicle has a market value, and whatever that market value is. In some circumstances, the vehicle's market value may be less than the total amount

incurred in connection with that sale. And in that event, there's a deficiency that would be due to Holman and to Vervent, I guess, through the -- so we've come into -- we've come to an agreement where that deficiency would be reimbursed from the other proceeds, vehicle proceeds. And in that case, the fee would go -- would be reduced, the $295 fee would be reduced, and that reduced amount would be shared between Vervent and Holman.

THE COURT: Okay. Have we -- I mean, so what, what is -- I mean -- that was super-articulate. What are the guardrails that we're putting around this? Is it a certain percentage of the vehicles, or --

MR. AGUILAR: No guardrails, Your Honor.

THE COURT: Okay.

MR. AGUILAR: It's unlimited. But we don't anticipate it to be a lot.

THE COURT: Okay.

MR. AGUILAR: But we can't -- we're a service -- Holman is only a service provider, and we're trying to monetize these vehicles for the benefit of the estate, but we don't want to have any risk associated with that monetization, with those fees. And so that was the agreement that we all arrived at, the one I just described.

So I don't know, you know, what guardrails you mean, other than --

THE COURT: Well, I'm trying to figure out. I mean, we have to sell -- obviously, you're attempting to maximize value of the estate. We're trying to sell the assets to reduce the storage fees, the insurance, and everything else that goes with that. We're also not trying to incur losses as they are sold, because in that instance the Trustee has another handy bag of rights --

MR. AGUILAR: No, I get it.

THE COURT: -- where she could abandon and things of that nature --

MR. AGUILAR: Right.

THE COURT: -- before we start incurring sales at losses.

MR. AGUILAR: Well, I think -- I think -- and I don't know if we have testimony, but I think the overall view is that the overall fleet has value that's going to more than exceed the amount of the fees, --

THE COURT: Okay.

MR. AGUILAR: -- or else we wouldn't be doing this. It's just that there may be some vehicles, Your Honor, that that's not the case. And so, to make Holman whole, there's been an agreement made that we would be reimbursed for those instances where there's a deficiency from the other sales proceeds. But I don't think we would have undertaken -- oh, I'm sorry, the Trustee would have undertaken this if she

thought that the vehicles had no value. So I think the value of the vehicles, according to the testimony we heard today, was in the hundred -- the acquisition cost was in the hundred-plus million.

THE COURT: Right.

MR. AGUILAR: I think you're going to get, you know, tens of millions of dollars from these vehicles. It's just those instance --

THE COURT: So my question is, are we talking about one percent of the vehicles, are we talking about a half a percent of the vehicles?

MR. AGUILAR: We don't know, Your Honor.

THE COURT: Okay.

MR. AGUILAR: We don't know a percentage. That was a good question and everybody's asked that, but that's not the -- we haven't done that analysis yet.

THE COURT: Okay. Because the other question -- and again, this is -- and I'm catching you a little cold so I'm just kind of spit-balling, --

MR. AGUILAR: No, I get it.

THE COURT: -- and this is more of an issue for the Lenders to think of. Because I don't have a concern in the general sense with Holman and Vervent getting paid out of other sales proceeds, so long as those other sale proceeds are subject to the same liens and security interests as the cars

that were sold that what I'll just generally refer to as a short sale. Am I making sense?

MR. AGUILAR: Well, Your Honor, I think -- I think -- I didn't understand your question, and it was just maybe my fault, but I think what you're saying -- I think -- I don't -- I think all the proceeds are going to be subject to a debate later as to who's on first, who gets the money first.

THE COURT: Oh, that, I have no doubt about, --

MR. AGUILAR: Right.

THE COURT: -- yes.

MR. AGUILAR: So whether that -- whether those claims exceed the value of the vehicles, that's a different issue. This is the claims of Holman as the service provider monetizing the vehicles. So I don't know if I've --

THE COURT: Okay. But let's say I have three banks.

MR. AGUILAR: Right.

THE COURT: I probably have 33. But if I have three banks, okay, and they have liens on different vehicles, and so if you take a -- let's say you short-sale again, just my terminology, --

MR. AGUILAR: Right.

THE COURT: -- on vehicles that the liens are covered by Bank A, then are you going to take the money out of the sale proceeds from the sales of the vehicles of Bank B? Are we just going to reserve that for later, too?

MR. AGUILAR: That's reserved for later.

THE COURT: Okay.

MR. AGUILAR: And that's just -- that issue of allocation is an issue for them to take care of, but we get reimbursed, Holman gets reimbursed.

THE COURT: Okay.

MR. AGUILAR: And as I recall, the last version of the provision that addresses this says -- because the reimbursement process by which Holman will get reimbursed for those deficiencies will be through the periodic interim payment compensation applications.

THE COURT: Sure.

MR. AGUILAR: And in that -- and when we file for those, then I guess the Lenders and everybody can argue about how it's allocated. We don't really care about the allocation. We just care about recovering the deficiency.

THE COURT: No, that tracked.

MR. AGUILAR: No, I understand, but I think that's -- I think that's what was addressed in the latest provision.

THE COURT: Okay.

MR. AGUILAR: If I'm wrong, anybody speak up. But I think that how it's allocated amongst the constituents who have an interest in the vehicle is going to be determined at that time, --

THE COURT: Okay.

MR. AGUILAR: -- I guess through objections or whatever.

THE COURT: All right. Thank you, Mr. Aguilar.

Mr. Foxman?

MR. FOXMAN: Good afternoon, Your Honor. This is the provision and issue that's been discussed at length. And the resolution is a pin, --

THE COURT: I'm not that bright.

MR. FOXMAN: -- a pin in it. And so the agreement, the agreed language puts the final fee application of Holman as the time to determine the application.

THE COURT: Okay. All right. Well, again, and I think it makes sense. So long as we are talking about a small percentage of vehicles -- or I don't want to say small; it could be a material amount; it could be five percent -- so long as we're embarking on a process where the folks that are controlling the process and setting the reserve prices are recognizing that we should be setting reserve prices that are going to be, on the majority, in excess of what the fees would otherwise be on the aggregate.

MR. WILLIAMS: I think that's right, Your Honor. And I think Holman will be able to identify -- their alarm bells start going off because the reserve price --

THE COURT: Sure.

MR. WILLIAMS: And to answer your question from

earlier, there are a small amount of post-auction fees that are assessed. So it certainly could be the case that it ticks up after auction.

THE COURT: Well, I would have assumed the titling, for example, would be post-auction.

MR. WILLIAMS: Uh-huh.

THE COURT: I could be wrong on that. I would imagine reconditioning and things of that nature would probably be pre-auction. But again, I'm sure that it could happen more than one way.

Okay. Well, if the parties have an agreement on these issues, I certainly won't stand in the way of an agreement of the collective that we've spoken about. And then, likewise, I recognize that there will have to be at some point a reservation of rights to have these fights and establish these processes down the road.

MR. WILLIAMS: I think that's right, Your Honor.

THE COURT: All right.

MR. WILLIAMS: Now, with that, maybe I'll just go ahead and close up --

THE COURT: Okay.

MR. WILLIAMS: -- with respect to the sale motion and Holman's retention. The testimony bore out this is a process that has -- hundreds of man hours have gone into refining these sales procedures, and I think what you have before you

today is there's a little bit of compromise from everybody, right? Not everyone's getting exactly the terms that they wanted. But this is indisputably in the best interest of creditors at this juncture.

And with that, Your Honor, Holman as well, all of the parties have agreed that Holman is the horse to go with, and we think that the process that they're going to run will achieve the most value for the estate and will do so on an expedient basis, but ensuring and protecting the value of the collateral that's liquidated.

And with that, we would ask the Court to enter both -- well, to enter the revised retention order and then approve the sale motion.

And again, just for the record, we will consult with the parties on refining and agreeing on all of the language, including some folks that reached out with some outstanding issues. And we'll upload the order at the appropriate time.

THE COURT: All right. Thank you very much.

MR. AGUILAR: Your Honor, if I can --

THE COURT: Mr. Aguilar?

MR. AGUILAR: On the retention order, --

THE COURT: Yes?

MR. AGUILAR: -- there were some -- it was edited a little bit this afternoon and I haven't seen it. So I don't know -- I know it's been uploaded. Could you just give me a

chance just to review it?

THE COURT: Oh, absolutely, yes.

MR. AGUILAR: Yeah. So if you just give me through tomorrow to get it -- to upload, and I'll let, you know, and I'll let --

THE COURT: Yes.

MR. AGUILAR: -- Mr. Williams know.

THE COURT: Yes. And it's like Mr. Williams said, that which is uploaded as an officer of the Court, I'll know that it's a -- and it's an agreed-upon form, we have processes for competing forms of order, but it shouldn't be something that we probably need in this instance.

MR. AGUILAR: That's fine. I was just -- the order that he uploaded I think on the approval of the application of Holman to be --

THE COURT: Right. I think we saw that --

MR. AGUILAR: I haven't seen the final version, so I --

THE COURT: Oh, you haven't seen the one that's been uploaded?

MR. AGUILAR: I -- no. No, Your Honor.

THE COURT: Okay. So that redline is, just for your record, is at 557.

MR. AGUILAR: We talked about -- we did talk -- yeah, we did talk about it, but I haven't seen it.

THE COURT: Okay. Excellent.

MR. AGUILAR: So if you just, if you could wait until we have a chance to --

THE COURT: Oh, no, no, no. To be clear, that which is on the system isn't necessarily what's uploaded to me.

MR. AGUILAR: Okay. Thank you, Your Honor.

THE COURT: It goes through about three levels before it gets to me.

MR. AGUILAR: Okay. Thank you, Your Honor.

THE COURT: Thank you, Mr. Aguilar.

Mr. Foxman?

MR. FOXMAN: Your Honor, on a similar note, that order has to conform to the way the -- sale procedures as well.

THE COURT: Of course.

MR. FOXMAN: So they're kind of tied together.

THE COURT: Exactly. Yes.

MR. FOXMAN: But we reserve -- thank you.

THE COURT: I'm sure they both have to be tightened up. All right.

Is there anyone else who wishes to be heard?

All right. Well, from the Court's perspective, the Court had concerns with respect to the sale procedures. Obviously, we're here on an expedited time consideration, but it's obvious to the Court that the expedition is only because so

much work was happening outside of court, and so that can only give the Court further relief.

Likewise, as the evidence shows, the Court was very pleased to be able to at least hear what Capstone did. Because, obviously, as the Court has said a number of times, I recognize the situation that the Trustee was put into without any good books and records that she could rely upon from the start. And so it's clear to the Court that Capstone, probably with Vervent's help, did a great deal of work to establish what the vehicle inventory is, and then from that perspective went on to attempt to maximize value, first by attempting to sell certain dealership locations, and then after that to kind of weigh its options in terms of what sort of auction made sense. And then even further from that, obviously engaged in discussions with at least five different auction houses to attempt to get the best deal running.

And so the Court does feel good that the chosen horse, so to speak, of Holman is going to be that which maximizes the value for the estate and maximizes the value for creditors.

Likewise, having taken a look at the fees and just the number of redlines, I have to take heart, with the number of Secured Lenders that we have in this instance, that no stone has been left unturned. I have no doubt that -- I think that Mr. Calandra said that you saved about a million dollars just shopping and requiring auction houses to kind of compete with

one another. I can only imagine the money that was saved having the Secured Lenders piece and parse through the procedures as well. That's all good to hear from the Court's perspective.

As I said, the only -- and again, thanks to the Trustee. Obviously, getting the bonds and things of that nature is certainly going to increase the cost to the estate at the end of the day by the amount of the bonds and the like, or the premiums thereon, should I say. However, with that, given where we are in the case, it probably does make sense to maintain that level of protection throughout the entirety of the proceeds process, turning one collateral into another.

So all of that to say that, the Court believes that it's certainly within the Trustee's good business judgment to sell the vehicle inventory free and clear of all liens, claims, and encumbrances, in accordance with the collective procedures that the parties agreed upon, and in connection therewith retain Holman Automotive Rentals, Inc., or doing business as Holman as the auctioneer for the estate.

Again, the only thing that I ask is, based upon Mr. Nolan's testimony about the relationship that Holman has with Vervent, I think that that should be disclosed by supplemental declaration. And not to say that there's anything untoward about that, but I do think it's worthy of disclosure.

So, with that, the Court will approve both the employment

and the sale procedures once they are fine-tuned.

MR. WILLIAMS: Thank you very much, Your Honor.

THE COURT: All right.

MR. WILLIAMS: With that, let's briefly talk about the Vervent stipulation.

THE COURT: Yes. I understand one's been uploaded while we were here.

MR. WILLIAMS: That's right. It's at Docket 559.

THE COURT: Okay.

MR. WILLIAMS: And the redline is at 559-2. And these are much more substantial revisions to the proposed order than you have seen with the previous iterations of this, and so maybe it makes sense, I'll just generally describe the genesis for these redlines and then --

THE COURT: That's a whole different case.

MR. WILLIAMS: Oof, I don't want to talk about that case.

THE COURT: I'm kidding with you.

MR. WILLIAMS: And then I'll pass the podium to Mr. Adam Prescott, if he wants to add anything about this.

But, generally speaking, the stipulation that the parties entered into with Vervent at the beginning of the case came together in a quick effort by the parties to get something in place that ensured that the customer accounts were continuing to be serviced and that payments were being timely made and

that folks knew where to be remitting payment. And obviously, as we've discussed before, Vervent was tasked with securing the collateral.

We're at the point in the case where we're realizing the deficiencies of that order in not quite containing the scope of services that Vervent needs to be doing.

To that end, the majority of the redlines are providing comfort to Vervent that they can fulfill their obligations in furtherance of this order and with more specific language. And further, Vervent is at a point now where they're servicing these agreements and need to be able to start taking action to talk about repossession to be -- now that they've gotten their hands around the customer accounts. And I think that's a value-add for everyone.

For example, one of the revisions, the terms of the original order provided that the payment process or Pay-Near-Me, that Vervent could divert fund flow from Tricolor to the trust account held at Vervent. Well, it's come to our attention over the past couple of months that there were other payment processors in place. And so under the terms of the order, Vervent just needs comfort --

THE COURT: Repay.

MR. FOXMAN: That's right, that Vervent can -- to take the steps necessary to ensure that those accounts are being serviced.

And then you'll see some -- there's a few things I want to specifically touch on if you happen to have the redline in front of you.

THE COURT: I do.

MR. FOXMAN: Looking at Page 5 of the redline, which is PDF Page 28 of 41, --

THE COURT: That's where I am.

MR. FOXMAN: -- this section is a really important one. We've come back to the Court through cash collateral and we've -- not through cash collateral. We've come back to the Court to make specific requests and requests of the Secured Lenders that could ensure that the CPI and the collateral protection insurance premiums were paid to ensure that the collateral itself was preserved, right? And Vervent needs the comfort to be able to continue to make those payments, tracking them on a VIN-by-VIN basis, and communicating with the parties about those payments going out.

And just for purposes of the order generally, there are a number of provisions that ensure that all of the parties in interest are able to review these disbursements before they're made and ensure that the money that is flowing out is a fair and accurate number.

In addition to the CPI, in the State of Texas there are deferred sales taxes that are due and have begun accruing, not just prepetition but postpetition as well. And we want to --

we're been in communication with the taxing authority and want to be able to start making those payments timely on a go-forward basis.

And again, like I mentioned in the beginning -- I'm now on Page 6 of the PDF, 9(a).

THE COURT: Uh-huh.

MR. WILLIAMS: Vervent needs to be empowered to begin collecting and repossessing to the extent those determinations are made as necessary. And Part (b) is an important one, too. All of the dealership payoffs, all of the customer payments that may be coming in through the mail, all of that mail needs to be diverted to Vervent, who can begin processing that and ensuring that those payments are accounted for.

So, just generally speaking, that was the genesis of this desire to change this and make it a little bit more geared to the facts and circumstances of today as we see them.

And with that, if Mr. Prescott has anything to add, he's free to do so.

THE COURT: Mr. Prescott?

MR. PRESCOTT: Good afternoon, Your Honor. Adam Prescott on behalf of Vervent. I appreciate the opportunity to be here in person, having attended a few of these by video.

Your Honor, I have very little to add. Attorney Williams did a great job of explaining of what this is. But I think the stipulation was maybe one of the first orders entered into

this case under, you know, very tight circumstances, and it hasn't really been refreshed in any material sense. We've extended dates through, I think, four or five iterations.

And through that process, Vervent has been working with the various parties and the Trustee to carry out its service duties sort of the best that it can within the confines of the complexities of the case and the automatic stay and everything else that goes in.

And so we thought, in light of kind of where we are in the case and what Vervent has learned about the case and some of those touch points, things like the collateral protection insurance, which Vervent has been able to pay and has paid through a process of getting consent from various parties, we've just tried to simplify and streamline the process, Your Honor, in order to get those payments made, and same with the sales tax, while making sure, of course, Your Honor, that all parties are getting the reporting and information that they've received and continued to seek and that rights are being reserved as to some of the broader issues Your Honor has heard about at many of these hearings.

So I think, Your Honor, in my mind, there's sort of three real buckets that the changes fall into.

One is just clarifying around how some of the accounts are actually working, since we've learned sort of the account structure and the trust account where receivables are going

into. You'll see that early on.

The second piece Attorney Williams talked about is around the process for paying collateral protection insurance and the sales tax. But again, you know, it's just sort of streamlining a process in place.

And then the final section, Your Honor, which has, I think in Paragraph 9, just has some more specific language about what Vervent's duties are that kind of tie out with what the servicing agreements do, Your Honor. And some of that was certainly in the prior order and stipulation, but we thought it would be helpful both for the Court and all the parties to make it very clear that Vervent has the authority. And I think that's helpful not only for the parties but also for Vervent when it goes out and deals with third parties and other vendors, that it can say, okay, we have this order and it's very specific about what we can do, Your Honor.

So that's really the process for it. And I think it would be immensely helpful for Vervent to have this revised stipulation so it can continue its work. I think it can talk less to me and get back to the work it wants to be doing, Your Honor, which is not talking to me, Your Honor.

We did circulate various versions of the stipulation, as has been the case throughout these cases, to the parties that are affected and the Trustee. The version that was uploaded reflects various comments and clarifications that have been

received, which were generally all acceptable to Vervent. And I believe it's acceptable to the Trustee as well, Your Honor.

So I think the only open issue, and I haven't seen the final version but I see in front of me, is whether we need to set some outside dates. I think we've taken the stipulation kind of week-to-week at times. I have not discussed this with the Trustee's counsel, but my suggestion would just be, given kind of the work that's gone into this, is we kind of continue this out a little further into the future than we have, maybe some point in later January or February. But again, that issue has not been vetted, so I don't want to jump in front of any parties or Your Honor.

But with that, I'm happy to answer any questions the Court has.

THE COURT: No, I don't have any questions today, and the reasons I don't have any questions today is because we're going to set it for hearing.

I completely understand and appreciate, again, I can see by just the number of parties listed that this has been vetted by a number of folks. I see the ABS Holders, JPMorgan, ACV, TBK, and lots of other lenders on this, and I recognize that many of those folks were party to the original stipulation. And I don't disagree with you that more fleshing out and vision and transparency as to everything that Vervent is doing is a good idea.

However, before I give Vervent the right to begin to collect, disburse, repossess, and things of that nature, I think that should go out on notice. And so my recommendation is, if there is any further amendment or revision that's going to be made to this, put that out there and then notice it up. And then I would believe that, under these circumstances, once you have the version that you are going to seek entry of, we can set it out maybe on 14 days' notice or so and then have that heard in early January. And at that point, you can better flesh out how long you want it to be in effect and things of that nature.

I'm not trying to signal that I have a problem with anything in here. It was filed during the hearing. I don't know what I have a problem with. I was able to skim it while we were talking about it, but I certainly haven't had an opportunity to look at it with the fine-toothed comb that I otherwise would. Plus, it sounds like there may be some further refinement that the parties may want to make.

So my suggestion is, if there is any further refinement, get that form of amended stipulation on the docket and then we'll set it. And if you guys want to get your calendars out, I'll take a walk through the calendar. I don't have Ms. Harden available right now, but she'll be available tomorrow and she'll be able to either thumbs up or thumbs down anything I do today.

So, with that, --

MR. PRESCOTT: Just --

THE COURT: -- would the parties like me to look for dates?

MR. PRESCOTT: Yes. And maybe I'll turn it back over to Attorney Williams on that part of it.

THE COURT: Okay.

MR. PRESCOTT: Just briefly, Your Honor, two points. One is I have mentioned the servicer agreement, and there's references to that. Vervent and the Trustee are in the process of negotiating and hopefully finalizing a servicer agreement.

THE COURT: Okay.

MR. PRESCOTT: Based on discussions with Trustee's counsel, our expectation is that the Trustee does intend to and will enter into that service agreement in the near future.

THE COURT: Okay.

MR. PRESCOTT: We need to finalize it. And I think it'll be subject to a motion and to be heard by Your Honor, obviously, before the Trustee can enter into it. So just one preview of coming attractions.

The other piece, Your Honor, is we're going to not enter the revised stipulation today. I believe the current one that's on the docket is set to expire.

THE COURT: Okay.

MR. PRESCOTT: And my request would be, at a minimum, we extend under the terms of the existing stipulation, just to make sure there's no lapse in coverage between whenever that next one is heard.

THE COURT: No, I think that makes sense, that we can probably, at a minimum, carry the existing one. I haven't seen any objections on that point. We can carry the existing one through whatever hearing date we select for this. Because, I mean, it was set. And I don't have a problem with that, so we could do that. It's just to make the level of changes that have been made -- and correct me if I'm wrong, Mr. Williams, the first time this went out was 3:50, during the hearing?

MR. WILLIAMS: Yes.

THE COURT: Okay. Fair enough. No criticisms. I know you guys are working hard. But it's just I have to do that whole due process thing that I sort of do.

MR. PRESCOTT: And it was, Your Honor, circulated to the parties on the hearing and stuff, but not to your Court, yes.

THE COURT: Of course. No, no, no. I see the level, I see just by the names involved, everyone that has had their hands in it. It's like I said, there's just a broader, obviously, audience.

MR. PRESCOTT: Of course. Thank you, Your Honor.

THE COURT: Thank you, Mr. Prescott.

All right. Mr. Williams?

MR. WILLIAMS: I don't really have anything to add, Your Honor, unless we want to go ahead and talk about dates for --

THE COURT: Yes. So, obviously, in terms of entering an extension of the existing Vervent stipulation, is there anyone who wishes to be heard in objection to that?

All right. Hearing no objections, let's see what we have. When do you think that there'll be any material refinement to this?

MR. WILLIAMS: Um, --

THE COURT: "Material" being the operative word. I mean, if this is going to be substantially what you're going to be -- I'll set my objection period in my head from there. But if you think that it's going to come in a day or two, well, maybe we need to just look for dates.

MR. WILLIAMS: Sorry, Your Honor. I'm just being a little bit dense.

So the first thing I was thinking was we would find a hearing date or at least an extension date for the Vervent stipulation, kind of the original, which would be continued.

THE COURT: Yes. Yes.

MR. WILLIAMS: And then --

THE COURT: And my thought is we would marry that

extension date to the hearing on this new amended stipulation. Am I wrong?

MR. WILLIAMS: No, I think that's right.

THE COURT: Okay.

MR. WILLIAMS: But ultimately, I think that Mr. Prescott has to -- I mean, I'm not sure when that would be filed, and if it's on 14 days' notice. I'm not sure when that --

THE COURT: No. So that was my question to you, Mr. Prescott. This one that was filed at 559-2, how close is this?

MR. PRESCOTT: I believe, Your Honor, it's final as to the Lenders and the Trustee, and certainly for Vervent.

THE COURT: Okay.

MR. PRESCOTT: So, you know, I can't anticipate that people might not change their mind, but from our perspective, it's final and ready to go out as soon as possible. And certainly Vervent desires to have it heard as soon as we possibly can because there's important relief in there.

THE COURT: Of course. All right. So then, from that perspective, we could notice out -- put the stipulation on the docket and notice that out for hearing. And so if that goes out in the neighborhood of today, we could try to find a hearing the first week of January.

MR. WILLIAMS: That's great, Your Honor. I spoke

with Dawn earlier in the week and she --

THE COURT: Okay.

MR. WILLIAMS: I mean, this might have been late last week, actually. And the first available was January 9th. It's --

THE COURT: Well, it depends on how much time do you need.

MR. WILLIAMS: Oh. Oh.

THE COURT: I think the last time you were looking for potential movement for the sale --

MR. WILLIAMS: Good point.

THE COURT: -- hearing, which is -- do we think we need more than an hour for this?

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay. So I'll ask Mr. Wilhite to keep me honest here. It looks like I have one hour the morning of January 5th, that would be 9:30, because I have second days that start at 10:30. So I have like an hour then.

I think I could probably do something on the 6th, Tuesday the 6th, probably at 11:00. Correct me if I'm wrong, Mr. Wilhite. Okay. And I might be able to do something -- well, so that's probably the time I have then.

MR. WILLIAMS: Let's just go ahead and lock in January 5th. I think all the parties are wanting to get this thing --

THE COURT: January 5th? Because the other thing is I see you guys have time on the 7th.

MR. WILLIAMS: Uh-huh.

THE COURT: You've got an entire afternoon starting at 2:00 on that motion to compel. But that may take up some time. So do you want to -- you don't want to be there for that?

MR. WILLIAMS: Yeah. Let's just, let's, for the sake of everyone, let's just go ahead and do January 5th.

THE COURT: All right. We will take January 5th -- welcome back to the new year -- at 9:30. And again, I have an hour of time. I do have that second days at 10:30. So if we get a lot of objections, let's think about that, but --

MR. WILLIAMS: Okay.

THE COURT: -- it doesn't sound like we probably will, based upon the level of work that you've done so far. So we will set this. And Mr. Wilhite, it's your job to let Ms. Harden know what I did. And we're going to set the stipulation, and essentially it will be like to be filed and noticed.

MR. WILLIAMS: Very good.

THE COURT: All right. And if you want to set an objection deadline of -- I think you can probably set that for the 2nd.

MR. WILLIAMS: Okay. We'll do it.

THE COURT: All right?

MR. WILLIAMS: All right. I think that's all we have, Your Honor.

THE COURT: Anything else, ladies and gentlemen? All right. Well, if I don't see you guys before then, have happy holidays and I'll see you in 2026.

MR. WILLIAMS: Okay. Thank you, Your Honor.

THE COURT: All right.

MR. FOXMAN: Thank you, Your Honor.

THE COURT: Thank you very much. All right. Court will stand adjourned for the day.

(Proceedings concluded at 5:21 p.m.)

--oOo--

CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

**/s/ Kathy Rehling** **12/21/2025**

_______________________________________ ________________

Kathy Rehling, CETD-444 Date
Certified Electronic Court Transcriber

INDEX


PROCEEDINGS 5

WITNESSES

Debtors' Witnesses

James Calandra
- Direct Examination by Ms. Beskin 28

Steven Thomas Nolan
- Direct Examination by Mr. Williams 38
- Cross-Examination by Ms. Milligan 49
- Examination by the Court 50

EXHIBITS

Debtors' Exhibit A Received 45

RULINGS

Amended Emergency Sale Motion or the Motion to Expedite the Application to Employ Automotive Rentals, Inc. T.A. Holman as Auctioneer 11

Chapter 7 Trustee's Amended Emergency Motion to (I) Sell Estate Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (II) Establish Sale Procedures, and (III) Granting Related Relief filed by Trustee Anne Elizabeth Burns (537) 67

Application to Employ Automotive Rentals, Inc. T/A Holman as Auctioneer: Chapter 7 Trustee's Emergency Application for Entry of an Order Authorizing the Employment and Retention of Automotive Rentals, Inc. T/A Holman as Auctioneer, Effective as of December 18, 2025 filed by Trustee Anne Elizabeth Burns (538) 67

Chapter 7 Trustee's Motion for Expedited Consideration of (I) Chapter 7 Trustee's Amended Emergency Sale Motion [Docket No. 537] and (II) Chapter 7 Trustee's Application to Employ Automotive Rentals, Inc. T/A Holman as Auctioneer [Docket No. 538] filed by Trustee Anne Elizabeth Burns (540) 67

INDEX
Page 2

RULINGS, cont'd.

Emergency Motion for Entry of Order Approving Stipulation Between Chapter 7 Trustee and Vervent, Inc. filed by Trustee Anne Elizabeth Burns (53) 76

END OF PROCEEDINGS 85

INDEX 85-86