IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS (DALLAS)

| | | |
|---|---|---|
| IN RE: | . | Case No. 25-33487 (MVL) |
| | . | |
| | . | (Jointly Administered) |
| TRICOLOR HOLDINGS, LLC, | . | |
| AKA GANAS HOLDINGS, LLC, | . | Earle Cabell Federal Building |
| ET AL., | . | 1100 Commerce Street |
| | . | Dallas, Texas 75242 |
| Debtors. | . | |
| | . | Tuesday, February 17, 2026 |
| . . . . . . . . . . . . . . . . . | | 2:05 P.M. |

TRANSCRIPT OF SHOW CAUSE HEARING (754)
RE: MOTIONS TO LIFT AUTOMATIC STAY AND
MOTIONS TO ENFORCE THE AUTOMATIC STAY
BEFORE THE HONORABLE MICHELLE V. LARSON
UNITED STATES BANKRUPTCY COURT JUDGE

For Chapter 7 Trustee          Cavazos Hendricks Poirot, P.C.
Anne Elizabeth Burns:          BY: CHARLES HENDRICKS, ESQ.
                               900 Jackson Street, Suite 570
                               Dallas, TX 75202

For the Debtors:               McDermott Will & Schulte LLP
                               BY: MEGAN ROBERTSON, ESQ.
                               919 Third Avenue
                               New York, NY 10022

For Vervent, Inc.:             Wick Phillips Gould & Martin LLP
                               BY: SCOTT D. LAWRENCE, ESQ.
                               3131 McKinney Avenue, Suite 500
                               Dallas, Texas 75204

For the United States          Office of the United States
Trustee:                       Trustee
                               BY:  MEREDYTH KIPPES, ESQ.
                               1100 Commerce Street, Room 976
                               Dallas, Texas 75242

Audio Operator:                Bryon A. Robinson

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjCourt@jjcourt.com**

**(609) 586-2300        Fax No. (609) 587-3599**

2

**INDEX**

**PAGE**

WITNESSES:

FRANCISCO AGUIRRE
  Examination by the Court                          10
  Cross-Examination by Mr. Hendricks                30
  Cross-Examination by Mr. Lawrence                 39
  Cross-Examination by Ms. Kippes                   42
  Examination by the Court                          48

BRISA VIRIDIANA MARTINEZ
  Examination by the Court                          52
  Cross-Examination by Mr. Hendricks                62
  Cross-Examination by Mr. Lawrence                 66

MARIA ISABEL VASQUEZ
  Examination by the Court                          72
  Cross-Examination by Mr. Lawrence                 75
  Cross-Examination by Mr. Hendricks                77

JORGE ENRIQUE AGUIRRE
  Examination by the Court                          79
  Cross-Examination by Mr. Hendricks                82
  Cross-Examination by Ms. Kippes                   83

YOSVANYS GARCIA DIAZ
  Examination by the Court                          85
  Cross-Examination by Mr. Hendricks                92

(Proceedings commenced at 2:05 p.m.)

THE COURT:  Good afternoon, everyone.  We are here on our 2:00 docket.  We have one matter on the docket this afternoon, and that is Case Number 25-33487, Tricolor Holdings, LLC.

I'll take appearances for the record, and I'll start with those folks in the courtroom.

MR. HENDRICKS:  Good afternoon, Your Honor.  Happy Mardi Gras.

Chuck Hendricks here on behalf of the Trustee with Megan Robertson from McDermott.  And the Trustee is also present.

THE COURT:  All right, good afternoon.  And it is my high holiday, you know that.

MR. HENDRICKS:  I'm impressed that you're here.

MR. LAWRENCE:  Good afternoon, Your Honor.

Scott Lawrence at Wick Phillips appearing on behalf of Vervent, Inc.  I believe I'm flying solo today, so -- but we are here to answer questions as the Court may have.

THE COURT:  Thank you very much, Mr. Lawrence.

All right, Ms. Kippes.

MS. KIPPES:  Good afternoon, Your Honor.

Meredyth Kippes on behalf of the United States Trustee.  And (In French).

THE COURT:  We'll see how it goes.

(Laughter)

THE COURT:  All right, thank you.

I'll now take appearances on Webex.  I'll start with any attorneys.  Are there any attorney who wish to make an appearance?

(No audible response)

THE COURT:  Okay.  I'll now take anyone -- let's start with this.  I know that there are perhaps one or more Spanish-speaking or non-English speaking, should I say, individuals on the line.  Is there a federally-approved interpreter on the line?

(No audible response)

THE COURT:  Okay.  Then is there anyone here from Beyond Attorneys, LLC?

(No audible response)

THE COURT:  Is Mr. Francisco Aguirre on?

UNIDENTIFIED SPEAKER:  He's on mute, Your Honor.

THE COURT:  Okay.  You may be on mute, sir.

MR. F. AGUIRRE:  How is that, Your Honor?

THE COURT:  I can hear you now.  Thank you, sir.

MR. F. AGUIRRE:  As you can see and because of my age, I'm a little bit technically challenged.  But we'll fix that very quickly.  I appreciate it, Your Honor.

THE COURT:  All right, thank you.

MR. F. AGUIRRE:  Francisco Aguirre for Beyond

Attorneys.  And Lluvia Celeste Beltran, she is unfortunately in the hospital, very grave as a matter of fact.  We're praying for her speedy recovery.  She suffers from amenia -- I'm sorry, anemia, and she was hospitalized late last night.  And her husband called me very late last night and, of course, told me about this situation and of course, ask the Court for its indulgence in her nonappearance.  But she is hospitalized at this point and we don't know in fact when she will be discharged.

THE COURT:  All right.  Well, I certainly wish her a very speedy recovery.  And so you're the principal, sir, of Beyond Attorneys, LLC?

MR. F. AGUIRRE:  I am not, Your Honor.  Ms. Beltran is.

THE COURT:  Okay.  And do you work with Beyond Attorneys, LLC?

MR. F. AGUIRRE:  I do.

THE COURT:  Okay, thank you.

All right.  Just one moment.  So I'll go ahead and call the movants of the other motions.  Is Mr. Jorge Aguirre on?

(No audible response)

THE COURT:  What about Yosvanys Diaz?

MR. HENDRICKS:  Your Honor, they're on mute.

THE COURT:  Mr. Diaz, would you like to make an

appearance?

MR. DIAZ:  Yes, Your Honor.

THE COURT:  Good afternoon, Mr. Diaz.  Thank you for being here today.

MR. DIAZ:  (Indiscernible).

THE COURT:  All right.  Richard Armenta?

(No audible response)

THE COURT:  Is Mr. Richard Armenta on?

(No audible response)

THE COURT:  Salomon Oviedo?

MR. OVIEDO:  Yes.

THE COURT:  Thank you.

Ms. Mayra Alejandra Moreno?

MS. MORENO:  Yes, (indiscernible).

THE COURT:  Okay.  Good afternoon, Ms. Moreno.

MS. MORENO:  Yes, good afternoon.

THE COURT:  Thank you.

MS. MORENO:  Thank you.

THE COURT:  Mr. Angel Ceronio or Ceronio?

MR. CERONIO:  Yes, I'm here.

THE COURT:  Okay, thank you.

All right, Johanna Zermeno?

MS. ZERMENO:  Yes, I'm here.

THE COURT:  Okay, thank you.

Brisa Ibarra?

MS. IBARRA: Here, Your Honor.

THE COURT: Okay, thank you.

All right, Jose Alberto Suarez?

MR. SUAREZ: Yes.

THE COURT: Okay, thank you.

Jose Eduardo Linares?

MR. LINARES: Yes, I'm here.

THE COURT: Okay, thank you very much.

Geronimo Isidro? I could be slaughtering that one.

(No audible response)

THE COURT: Is there a Geronimo Gonzalez Isidro?

(No audible response)

THE COURT: Erminio Morales?

MR. MORALES: Yes, I'm here.

THE COURT: Thank you very much.

Evaristo Mendoza?

MR. MENDOZA: Yes, I'm here.

THE COURT: Okay, thank you.

Juan Pablo Campos?

MR. CAMPOS: Yes, I'm here, Your Honor.

THE COURT: Thank you.

German Augusto Baquero?

MR. BAQUERO: Yes.

THE COURT: Okay, thank you, and I apologize. I probably got your name wrong.

Maria Ortega?

MS. ORTEGA:  Yes, I am here.

THE COURT:  Thank you.

Juan Martinez?

MR. MARTINEZ:  Yes, I'm here.

THE COURT:  Thank you.  Felipe Villareal?

(No audible response)

THE COURT:  Is Mr. Felipe Villareal on?

(No audible response)

THE COURT:  Jose Manuel Moreno?

(No audible response)

THE COURT:  Maria Isabel Vasquez?

MS. VASQUEZ:  I'm here, Your Honor.

THE COURT:  Thank you.

Karla Celina Chavez?

MS. CHAVEZ:  I'm here.

THE COURT:  Thank you.

And Jose Alberto Aguirre?

(No audible response)

THE COURT:  Is Mr. Jose Alberto Alvarez Aguirre on?

(No audible response)

THE COURT:  Okay.  And I think a name that I may have already called, Jorge Enrique Aguirre?

(No audible response)

THE COURT:  Okay.  Again, thank you all for being on.

The Court's order did require if anyone was --

UNIDENTIFIED SPEAKER:  Sorry, Your Honor.

THE COURT:  Yes, ma'am.

UNIDENTIFIED SPEAKER:  Geronimo Isidro is here. Geronimo Isidro is here, Gonzalez.

THE COURT:  Oh, Geronimo.  Thank you very much.  I appreciate it.  Thank you.

UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

THE COURT:  You're welcome.

So again, we're here in the Tricolor Holdings case. Is there anyone else who wishes to make an appearance whose name I did not call?

(No audible response)

THE COURT:  Is there anyone who could hear the Court but I couldn't hear them that are on a phone?  Because if so, you may need to press *6 to unmute.

(No audible response)

THE COURT:  All right.  So the Court called for this status conference for a number of reasons.  First, I wanted to speak with the folks at Beyond Attorneys, LLC to better understand their role with respect to these filings.  Then, I wanted to talk about the motions logistically and what they require in terms of local practice in terms of fees for filing and the like.

And then, at some point, we can talk about the

F. Aguirre - Examination by the Court        10

substance of the underlying motions because after the Court issued its order to show cause with respect to everything that I just called, another dozen or so motions were filed.  So the Court is trying to bring some order to these filings and to better understand what the various parties are asking to do.

So I am going to start with you, Mr. Francisco Aguirre.  So what does Beyond Attorneys, LLC do, sir?

You're on mute again, sir.

MR. F. AGUIRRE:  Okay.  I think you can hear me now.

THE COURT:  Yes.  So let me go ahead and swear you in, and then I'll let you tell me about your company.  So if you could raise your right hand for me.

FRANCISCO AGUIRRE, WITNESS, SWORN

THE COURT:  All right, thank you very much.

EXAMINATION

BY THE COURT:

Q    So please tell me a little bit about what Beyond Attorneys, LLC does.

A    Yes, Your Honor.  Thank you very much for the opportunity today.  I really appreciate it.  And we also want to commend the courage of the folks that are here today because they certainly are the Davids to the Goliath that they're confronting right now.

The role of Beyond Attorneys, my role personally as well as Ms. Beltran's, we're certainly not attorneys.  We do not

provide any legal advice.  We do not provide any type of counsel whatsoever.  We're merely administrative coordinators, intake document organizing, filing logistics, and so forth, translation coordination to some of these folks.  And that's really merely our -- our role, Your Honor.

Q     Okay.  So you say that you're intake coordinators.

A     Yes.

Q     So it's my understanding from discussions with the fine folks that work in the Clerk of Courts Office that it is one of your folks that comes and files each of these documents physically, correct?

A     That is correct, Your Honor.

Q     Okay.

A     Ms. Beltran who is, as I explained to the Court, hospitalized today.

Q     Okay.  And that's what I understand.  And I think that she provided your business card to the Clerk of Court and I appreciate that.  And so, your office prepares these documents for the filers?

A     We do not provide any type of legal advice.  Our role is merely to provide translation services, administrative coordination.  The borrowers are preparing these documents in a pro se capacity.  We merely try to coordinate the filings for them.  Most of them do not have -- in fact, all of them do not have an outlet where to voice their concerns.

F. Aguirre - Examination by the Court        12

They have found us to essentially, we become some sort of repository of their complaints, of their many complaints and hopefully to be able to hear some of them today, Your Honor. And that's really merely our capacity.  Again, we do not provide any legal advice but rather just administrative coordination.

Q    Did you prepare the documents that were filed with the Court?

A    We gather all the documentation that was provided to us. We put it together and we prepare the documents for them.  They are appearing in pro se, all of them.

Q    So you create the documents for them?

A    We prepare the documents.  We do not create the documents per se.  And I don't know whether there's a distinction themselves.  I don't want to get into the weeds.  But we do not come up with the documents.  We merely put the information that is provided to us, Your Honor.  And we send it to them for their signature and they appear pro se.

Q    Is there any attorney on staff?

A    On the staff of Beyond Attorneys?

Q    Beyond Attorneys.  Yes, sir.

A    No, Your Honor.

Q    Do you prepare the documents using something like ChatGPT or Claude or Gemini?

A    The way that we gather the documentation is by taking the

F. Aguirre - Examination by the Court        13

information that is sent to us, either via email or by text message.  And we assemble it based on a format that is being used to prepare the documentation.  Whether artificial intelligence is used in assisting the gathering of the information, I believe there may be.  I don't know to what extent it is being used, though.

Q    Okay.  And so as an example, I'm going to read to you from Docket Number 720.  It's one of the motions to enforce the automatic stay.

It begins with an introduction that says, "The Movant's an individual consumer borrower defined as the Movant whose motor vehicle loan was originated by or through Tricolor Entities.  The Movant files this non-emergency fee-free motion seeking enforcement of the automatic stay, clarification of the scope of prior orders, authorizing successor servicing, and preservation of the status quo as applied solely to Movant."

And I'm reading to you from Docket 720, but it is almost identical to a number of the other motions to enforce the stay that were filed.  Who wrote that information?

A    I do not know.  I cannot tell you, Your Honor.

Q    Okay.  So if I were to put Mr. Villareal, if I were to swear him in, do you think that's his language or was that given to him by Beyond Attorneys?

A    I cannot speak for him, but that's certainly a language

F. Aguirre - Examination by the Court        14

that I don't know what level of sophistication he has, but that might be something that came from my office.  I certainly personally did not prepare that, but I don't know whether Mr. Villareal had anything or any input with it.

Q    Okay.  That particular motion, it probably cites maybe give or take seven to ten different statutes.  It cites Section 362 of the Bankruptcy Code, Section 105 of the Bankruptcy Code, Section 9014 of the Federal Rules of Bankruptcy Procedure, Section 1827 of Title 28.  Did you provide this information to the Movants or did they provide this information to you?

A    That would be information that probably came through our research, Your Honor.

Q    Okay.  So when you said that you gathered information from them, is the information that you gathered primarily the information with respect to the individual loans and the motor vehicles that the Movants might hold?

A    That is correct.  Some of the information that is provided to us may include copies of their contracts which, incidentally, many of them do not recall signing.

Some of the information that they may present to us would be a screenshot of the payments that they might have made to Tricolor or Vervent.  Some of the information that they would present to us would be any other miscellaneous information that might be related to their contracts or loans.

Q    Okay.  So am I correct that after gathering the

F. Aguirre - Examination by the Court          15

information from the Movants and putting them into these forms of motion that you presented these documents to the Movants for -- you or someone at Beyond Attorneys, LLC presented these documents to the Movants for signature?

A     That is correct, Your Honor.  There's one more -- just for further transparency, there's one more information that we pulled out through an app called Bumper.com.

Q     Okay.

A     And what that application does, it brings about a report of the history of the vehicle, the number of liens that may be outstanding on the vehicle.  It may have a sales history of the vehicle.  And in many cases, naturally shows the many loans that Tricolor might have placed on that particular vehicle.

Q     Okay.

A     And we provide that information.

Q     Okay, all right.  Does your company, Beyond Attorneys, do they take a fee for their work?

A     We do not take a fee, per se, Your Honor.  We have a structure of our compensation based on a future outcome of this case.

Q     And what future outcome would that be?

A     Most of these folks are hoping that the balances that are being presented to them by the people of Vervent or whoever's represented themselves as Tricolor, that they are accurate. That's number one.  Number two, that hopefully, and at some

F. Aguirre - Examination by the Court          16

point, the identity of the true lender or the true creditor is revealed or presented in such a way that at some point, they are able to obtain the true title to their vehicles.

As it is right now, most of these folks are being confronted by very, shall I say -- I thought I'd find a diplomatic word, but they're being harassed unnecessarily by the folks at Tricolor.  And in many cases, they're being lied to as to how or why they need to pay, what amounts they need to pay.  And those are things that, again and again, I personally have spoken to over 1,500 of these folks that have somehow or another a loan with Tricolor.  And the stories seem to have the same (indiscernible).

And it is, to me, inconceivable how somebody like Tricolor who perpetrated this fraud, and somebody like Vervent, who has been authorized by the Court to collect on these folks, how the injury that they're perpetrating for the second time, that is after having been lied to on the first time by Tricolor, and secondly now by being collected on, how incredible that experience is for these folks.

So going back to your question, Your Honor, how are we compensated is, again, hopefully there is some outcome whereby their balances are reduced, seeing as there's no clear identity of who the creditor is holding their paper.  And so that hopefully will happen at some point in time.  And the lender or lenders who -- or creditors who presumably lent the money on

F. Aguirre - Examination by the Court        17

these contracts, hopefully at some point they will see that it will be better to enter in some type of settlement agreement with all these folks rather than trying to collect on something that they themselves presumably were victims of Tricolor themselves.

Q   So Beyond Attorneys did not take any sort of fee for the preparation and filing of these documents?

A   I will clarify when you say a fee is a compensation that is directly generated to us based on an outcome.  That we do not take.  There is a cost that the individuals that come to us that they're assessed.  As you see, there's a $299 fee that is a direct cost for the Court and there is an administrative fee.  So altogether, yes, there is a fee that is collected at the -- on the upfront.  That fee is $1,500.

MR. HENDRICKS:  I'm sorry, what --

Q   Did you say $1,500?

A   One thousand five hundred dollars.  That is correct.

MR. HENDRICKS:  Thank you.

THE COURT:  Thank you, Mr. Hendricks.

Q   I just asked you to repeat it.  One of the attorneys in the courtroom hadn't heard.

A   Sure.

Q   All right.  And for those motions to lift stay for which the filing fee was paid, did that filing fee come out of this $1,500 upfront fee?

F. Aguirre - Examination by the Court          18

A     That is correct, Your Honor.

Q     And you collected this fee from each of the Movants for which you filed the motions to lift stay or the motions to enforce the automatic stay?

A     Some of these folks have very limited means and they don't pay this fee upfront.  So they are -- some of them make payments as they can.  And that's how we collect that fee itself, which is certainly a far cry of the 1,500, 2,000 an hour fees that the attorneys for Vervent, et cetera, et cetera, are being collected.

Q     The motions that Beyond Attorneys, LLC prepared are referred to the pursuit of state court adjudication of fraud, rescission, declaratory relief, lien ownership, and recoupment.  So as part of the relief that was set forth in these motions, it's your understanding that the Movants intend to pursue state court litigation?

A     It is my understanding, Your Honor, that what the Movants' intention is, rather than lifting the stay, is to get a clarification from the Court whether that stay extends to them, as well.  And I believe that that's probably where the confusion arises with the Court and what the intent is.  But that, I believe, is the intent of the motions before Your Honor.

And I believe, if I may, Your Honor, just one additional item is that what they're -- I think that part of the issue is

F. Aguirre - Examination by the Court          19

that the -- it is my understanding, and again, forgive my naivete, Your Honor, but under Article 9 of the UCC Code adopted by Texas, Arizona, California, Nevada, New Mexico, is that repossession or repossessing a collateral is ruled by state commercial codes.  And those codes are very, very specific and perhaps may be in conflict with what the Trustee or what the Court is trying to do.

There is no -- because of the fact that there is no specific creditor, I think that each state, and I know here in Arizona, it is very, very clear that if you're going to repossess my vehicle because of lack of payment or whatnot, that that creditor needs to be identified.  But that, to my understanding, from my reading all the filings and the complaint with the Trustee against Tricolor, that, in fact, I believe is the problem, isn't it?  That there's no distinct creditor, there's no distinct lender that can be identified.

Say in the Tricolor or Vervent, who's now passing themselves as Tricolor number two, by the way which is I believe --

Q    As the servicer.

A    As the servicer, but it's also -- the servicer is one thing, but also as the repossessor, without identifying who, in fact, is the lender.  Is it Chase?  Is it First Bank?  Is it Barclays?  Who is it?  They can't identify that because that, in fact, is at the heart of the fraud that Tricolor did.

F. Aguirre - Examination by the Court          20

And I believe that these folks, the intention for them is, look, if you have this multi-billion-dollar company filing for bankruptcy under the protection of -- a Chapter 7 bankruptcy, that that protection should be extended to them, that that stay should be extended to them until there is clarification in there.  And I get that, Your Honor.

Again, my advantage, I guess, over anybody in this Court, quite humbly, I will tell you, is that I've spoken to over 1,500 of these folks, and I hear their stories.  When I read in Vervent's motion that there's certainly no irreparable damage, I cannot disagree more.  They're here.  These folks are here because they want to tell their story.

And I know that Your Honor's time is very limited, but believe me, Your Honor, it's something that -- it breaks your heart.  There is irreparable damage if that stay is not extended to these folks, and that's truly what the nature of your motion is.  Just cool things down.  Let things sort out without getting too fast because for these folks, their vehicles, their vehicles is not an option.  They go to work on these vehicles.

They're here.  Some of these folks, and I will not identify them by name, but some of these folks are here really thinking of their own risk because of their immigration status. When their vehicle got repossessed --

Q    And you will note that I will not ask about immigration

F. Aguirre - Examination by the Court         21

status during the course of this hearing.  I will not ask it.

A     And, Your Honor, thank you for saying that because these folks needed to hear that.  We're really --

THE COURT:  Well, I will not ask about immigration status during the course of this hearing.  As I tried to open with, and I'll repeat for the sake of the Movants and for everyone else on, the Court is concerned strictly with the bankruptcy court process here.  I am very concerned.

I will not bury the lead.  I am very concerned that I now have a couple dozen, at least, pleadings that were prepared by non-attorneys for which a fee was taken, and that these motions are all filed as if these folks are pro se.  I guess, in a way, they might be given that they don't have attorneys, but legal documents were prepared for them.  There is no question in the Court's mind that these are legal documents.

I appreciate your candor today, sir, but I can tell you that these are pleadings.  These are pleadings that should be filed by lawyers at a minimum, if not bankruptcy practitioners more specifically.  I have dozens of documents that were filed on the Court's docket.  A handful of them, the fee was paid for.  I'll certainly hear from any of the Movants that wish to be heard.

But I can tell you that based upon what is requested in the pleading itself, which I have every reason to believe was primarily generated using artificial intelligence that was

F. Aguirre - Examination by the Court          22

trying to get to the point of what these motions were asking for, asked for things that require a fee to file the motion.  I believe that fee, my Clerk of Court might correct me, but I believe the fee is $199 for a motion for relief from stay.  It was paid a few times.

And then there seems to be a shift in the documents that indicates that the relief was being requested was different, which substantively having read all of them, that doesn't seem to be different.  It just seems to be that the term "non-emergency fee-free motion" was inserted, which I'll be honest, there is no such thing as a fee-free motion in my Court.  There is either a fee attached to it by the substance of that which is requested, or there is not.

The Court has a number of concerns.  I want to better understand what the Movants are asking for, but I can tell you, I am frankly very concerned, Mr. Aguirre, about the unauthorized practice of law.  Perhaps your heart is in the right place, but I'm not sure about the methods.

So, let me do this.  Mr. Aguirre, I appreciate you being here.  I appreciate you answering the Court's questions. Let me hear first from the Trustee, Mr. Hendricks, and then I'll hear from the United States Trustee and Mr. Lawrence if they wish to be heard.

MR. HENDRICKS:  Thank you, Your Honor.

Chuck Hendricks for Anne Burns, the Trustee.

F. Aguirre - Examination by the Court          23

May I ask the witness a few questions?

THE COURT:  I'll allow you to ask the witness a few questions, but let me just hear you by way of opening if you wish to make any sort of opening first.  And I recognize I jumped right into the questions.  Yes.

MR. HENDRICKS:  Thank you, Your Honor.

MS. BURNS:  Mr. Hendricks, I'm sorry.  Was Mr. --

THE COURT:  Aguirre?

MS. BURNS:  -- Aguirre sworn in?

THE COURT:  Yes, he was.

MS. BURNS:  Okay, I'm sorry.

THE COURT:  Thank you.  I know sometimes I forget, so I didn't this time.  Thank you, Ms. Burns.

All right.  Did you wish to be heard by way of opening, Mr. Hendricks?

MR. HENDRICKS:  Yes, Your Honor.

THE COURT:  Okay.

MR. HENDRICKS:  Thank you.  This is probably the tip of the iceberg of a pretty big iceberg.  And the Trustee has been dealing with the concerns, and we very much feel for the consumers on this in a lot of ways.  This was a disaster and chaos.  And the Trustee ultimately, I think as Chapter 7 Trustee, the buck probably stops with her as the Trustee for these estates.

But we, as the Court knows, have an organization that

**WWW.JJCOURT.COM**

F. Aguirre - Examination by the Court         24

has an army of people working on these called Vervent.  And in fact, our immediate response on each of these was to check with Vervent, can you call these people, find out what their questions, concerns, needs are, and try to address them.  And in fact, we insisted that Vervent, prior to the hearing, try to contact and come up with the history of all today, 22 of these files.  And by the way, I think there's 27 more that have been filed since --

THE COURT:  Oh, okay.  I didn't know the number. Yes, thank you.

MR. HENDRICKS:  -- the order.  So that's a total of 49 of them.  And I guess to show the Court what the Trustee is doing, Vervent has come with the history of all 22 of these, and they're not uniform.  There are lots of issues.  People don't answer their phone, all the stuff that you can imagine. But an attempt has been made to figure out what the needs are of each of these and address them.

And I hear Mr. Aguirre.  I'm concerned about the math.  Forty-nine of them at $1,500 a pop is already $73,500. And if he's talked to 15 hundred of these consumers, and there are perhaps as many as 50 or 60 thousand of them out there, this could become a nightmare for the Court, for the Trustee. And believe me, Vervent is trying to help these people.

THE COURT:  Hence the order to show cause.

MR. HENDRICKS:  Hence the order to show cause.  Thank

F. Aguirre - Examination by the Court          25

you, Your Honor.  And I do very much appreciate the Court's concern that there needs to be some order to the chaos.  And we thank the Court for that.  But it's not for the lack of the Trustee doing what she can, and Vervent, as well.

And frankly, somebody drafted this thing.  There's 49 of them that are almost word-for-word identical, except for the name of the borrower.  And I understand there's a lot in the papers about fraud and this and that.  But the fact is probably each one of these Movants has an automobile or bought an automobile and borrowed money from somebody to pay it.  And I think that's kind of the bottom line.  I know lots of things happen, but we're still, you buy a car, you sign an agreement to pay for it, and you need to pay.

And if there's confusion, I understand.  When a new company comes in and takes over the servicing, but that really doesn't change the bottom line.  And I'm concerned that the consumers -- there's a lot going on on the internet and who gets a free car, and what happens.  And Tricolor's perpetrated fraud, but the underlying transaction is a car loan.  So --

THE COURT:  And I'll give you an opportunity to question the witness in a bit.

MR. HENDRICKS:  Okay, thank you.

THE COURT:  Thank you, Mr. Hendricks.

Mr. Lawrence, do you wish to be heard by way of opening, sir?

F. Aguirre - Examination by the Court          26

MR. LAWRENCE:  Yes, Your Honor.  If I may have a moment, please?

THE COURT:  Of course.

MR. LAWRENCE:  Thank you, Your Honor.  And echo everything that Mr. Hendricks said.

You probably did not have an opportunity to review before coming out on the bench today, but we did file at ECF Number 815, a short exhibit that summarizes the Vervent records about communication efforts tracked to the VINs that the Consumer Movants placed in their promotions, and summarizes some of the notes that the representatives at Vervent had on those phone calls.

In several cases, these Movants are explaining to Vervent that they don't agree with the payment amounts that are being charged, or that they won't be able to make the payments. And so that kind of information is included in that exhibit.

THE COURT:  I have it.  I did not have an opportunity to review it prior to the hearings.  I had dockets earlier. But yes, thank you for that.

MR. LAWRENCE:  Well, and Your Honor, I certainly appreciate that.  I figured it would be useful to kind of summarize it.

THE COURT:  Sure.

MR. LAWRENCE:  You know, just the only other thing I'll say is that Vervent is certainly empathetic to folks who

F. Aguirre - Examination by the Court          27

have had to deal with this, right?  I mean, Vervent's been having an experience in this case, as well.  And we are doing our best to service the loans in these portfolios and preserve value for the benefit of stakeholders in this case.

And like Mr. Hendricks said, it's our understanding for the most part that these are folks who legitimately purchased a vehicle, borrowed money for it, and signed a sales contract.  In many cases, those contracts are attached to the motions that the Movants filed.  I don't know if those are the correct ones, the latest ones, the final ones, et cetera.  There's a lot of diligence that's going on there.

But in any event, we certainly are trying to be responsive to folks who are calling with questions, asking for information, or expressing confusion or disagreements regarding these loans.  And again, if there are any other questions that I can answer or that we do have a Vervent representative on the phone today just in case the Court has any questions.  But that's the sum of my opening statement.

THE COURT:  Thank you very much, Mr. Lawrence.

Ms. Kippes, do you wish to be heard?

MS. KIPPES:  Thank you, Your Honor.

Meredyth Kippes on behalf of the United States Trustee.  And for the benefit of the people on the phone and on the Webex who may not be familiar with the United States Trustee, we are a division of the United States Department of

F. Aguirre - Examination by the Court          28

Justice.  And the U.S. Trustee Program is charged with overseeing bankruptcy cases and enforcing bankruptcy law.

The United States Trustee is, as the Court is, concerned about the unauthorized practice of law.  And also, as Mr. Hendricks and Mr. Lawrence have said, has great sympathy for the consumers in this case.  Nobody's a winner in this case.  And I agree with Mr. Hendricks that there's going to be a, this has the potential to snowball.  And perhaps there needs to be some mechanism whereby people who have concerns about their debts can lodge those in some way.

I mentioned to Mr. Hendricks and Ms. Burns out in the hallway that there was a procedure in the Reagor-Dykes case about five years ago.  I don't think that it is -- I don't think it would fit exactly here, but it might be something for the Trustee to look at and consider.  Because flooding the Court's docket with duplicate pleadings created by somebody asserting and making legal arguments, it is probably not the best way to handle these sorts of concerns.

So I don't have any -- that's my way of saying I don't really know what to do, Your Honor.  But I do think that it was -- as the Court is always wise, it was wise to issue the show cause and try to figure out what's going on, A, including the unauthorized practice of law and all that that entails.  And to try to figure out what to do here that doesn't result in 60,000 identical motions seeking, I guess, the extension of the

F. Aguirre - Cross/Hendricks                          29

automatic stay to consumers, customers of Tricolors.

But yeah, anyway, this is an inartful way of finishing my statements, Your Honor, but we need to address the issues with regard to the practice of law.  And I think that we do need to think about some way to efficiently deal with the questions that are coming up because.

And I really appreciate Mr. Lawrence having filed what he filed and his client's efforts to figure out what's going on.  But I would imagine, and maybe his representative can attest that that was perhaps a little bit inefficient and maybe there's a more efficient way to go about it.  These are me just throwing out ideas.

THE COURT:  Right.  There are a number of issues. There has to be a forum of some measure to address the issues, right?  And from the Court's perspective, we have a servicer. And so the servicer has been granted by court order and the retention by the Trustee and the various other trusts, a certain bucket of rights to collect.

And so I appreciate that Vervent's response may not be perfect.  And again, I haven't had time to get into kind of the weeds of the response, but it's certainly a start.  And the Court can certainly not efficiently hear 60-some-odd, 70-some-odd individual loan grievances.  And they're going to be different.  And I totally understand that whether one is a collection, whether one is a loan amount dispute and what these

F. Aguirre - Cross/Hendricks                    30

are.  But right now, what I have is 70 or so motions asking me to either lift, enforce, or extend the automatic stay to folks when I'm not sure that any of that is what they really want.

MS. KIPPES:  Yes.

THE COURT:  But I appreciate your comments.  Thank you.

MS. KIPPES:  Thank you.

THE COURT:  All right.  Mr. Hendricks, you said you had some questions of Mr. Aguirre.

CROSS-EXAMINATION

BY MR. HENDRICKS:

Q    Mr. Aguirre, my name is Chuck Hendricks.  I represent Anne Burns, the Chapter 7 Trustee.  Can you hear me okay?

A    I can hear you.

Q    And where are you located, Mr. Aguirre --

A    I'm in Arizona.

Q    -- right now?

A    Yes, I am.

Q    Are you in Arizona right now?

A    Yes.

Q    And is that the office you're in a Beyond Attorneys office?

A    I'm in a co-working space called Industrious.

Q    I'm sorry, I didn't quite understand your answer.

THE COURT:  A co-working space?

F. Aguirre - Cross/Hendricks          31

MR. HENDRICKS:  Co-working.

THE COURT:  And you said that you gave the name of it, Mr. Aguirre.  I did not catch that.

THE WITNESS:  Industrious.  Industrious, Your Honor.

THE COURT:  Okay, thank you.

BY MR. HENDRICKS:

Q    Okay.  And how did you become involved with the Tricolor consumer car loans business here?

A    There was a friend of mine who called me a few months ago and mentioned that he had purchased a vehicle through Tricolor and that he had not received his registration or license plates.  And he's -- despite numerous calls to the folks at Tricolor, that those calls were answered and that he never received those -- those plates or the -- the registration of the vehicle.  And he asked me to look into it.

Q    What's the name of that friend, please?

A    I don't recall at this point.

Q    Is that one of the people for which you filed a motion in the bankruptcy court?

A    I don't remember, Mr. Hendricks.

Q    Mr. Aguirre, you're under oath.  You understand that?

A    I understand that I am under oath, Mr. Hendricks.  I also understand that there are thousands of victims, that when I hear the Trustee say that nobody's a winner and that there should be some type of mechanism to handle the concerns of

F. Aguirre - Cross/Hendricks                              32

these folks, I think that we should focus on that.

But if you insist on quizzing me about who the individual is and asking me whether I understand that I am under oath, then I would answer those questions.

Q    And you're telling the Court that this friend who got you started on the Tricolor consumer car loan, all these issues, you can't even tell the Court his name?

A    I do not recall the name.  I didn't say that I cannot tell the names.  I just don't recall the name.

Q    How long ago was this contact?

A    Right about the time that Tricolor filed for bankruptcy.

Q    Which was when?

A    I believe it was sometime in September.

Q    And what did you do next after this friend told you of his problem with Tricolor?

A    I began looking into it and then I mentioned to him that Tricolor had filed for bankruptcy and that he should investigate further.

Q    And did you investigate further yourself?

A    Oh, yes, I did.  The bankruptcy dockets are there for everyone to see.

Q    Have you been involved in other bankruptcy cases, Mr. Aguirre?

A    No, Sir.

Q    This is the very first bankruptcy case that you've ever

F. Aguirre - Cross/Hendricks                    33

been personally involved in?

A    I was involved in my own personal bankruptcy case many years ago.

Q    And where was that, Mr. Aguirre?

A    In California.

Q    California.  And so, since September, you said you've talked to about 1,500 Tricolor car purchasers.  Is that what your testimony was?

A    That is my testimony.  That is correct.

Q    And how did you find these 1,500 Tricolor customers?

A    They contact me.  They contact me.  That's my friend.

Q    And how did they find you?

A    They find me through word of mouth.

Q    Word of mouth.  Do you advertise?

A    I do not advertise.

Q    Does Beyond Attorneys advertise?

A    No, Mr. Hendricks.

Q    So, these 1,500 people all found your phone number somehow by word of mouth?  Is that your testimony?

A    Mr. Hendricks, I appreciate your question.  I just don't appreciate your line of questioning.  Here's what you should be doing, Mr. Hendricks, is concentrating on the victims.

        MR. HENDRICKS:  Your Honor, I would ask the Court to instruct the witness to answer my questions.

        THE COURT:  Okay.  This is --

F. Aguirre - Cross/Hendricks                           34

A     I'm answering your question, Mr. Hendricks.  I'm answering your question, Mr. Hendricks.  But I think that you are deviating from the issue at hand and the issue at hand is how are you going to deal with these victims?  What type of mechanism are you going to find in order for all these folks to at least avoid coming to me, actually, Mr. Hendricks?

I am secondary, tertiary, probably not important in this process.  What you should be concentrating on, Mr. Hendricks, is figuring out how these folks can go directly to the Court and find a mechanism, according to the trustee, to handle their concerns, to handle concerns such as, I'm hearing that from Mr. Lawrence's testimony, that Vervent is doing everything that they can.

And that these folks went out, they got a car, when in fact, most of these folks, they never even received the documents, Mr. Hendricks.  They never received copies of the documents, Mr. Hendricks.

Q     Well, how is it that their documents are attached to your motions?

A     Most of these folks, Mr. Hendricks, how do they know that they received all the documents?  Those are the documents that they receive.  We don't know.  They don't know whether those are complete documents, Mr. Hendricks.

Furthermore, the balances that Vervent is collecting, they're in many cases inaccurate, according to their own

F. Aguirre - Cross/Hendricks                    35

accounting.

Q    Okay.

A    So, that's where you focus --

Q    Mr. Aguirre?

A    -- (indiscernible).

Q    Have you -- do you have signed contracts with each of these people for whom you have helped file pleadings?

A    What type of contracts, Mr. Hendricks?

Q    Any kind of written contract?

A    I do have authorization from them to pull out reports that I explained to the Court from Bumper, not a --

Q    And do you have a contract with anyone saying that they need to pay you $1,500 for your services?

A    They don't need to pay me a dime, Mr. Hendricks.  I mentioned to you -- I mentioned to the Court very specifically that those are administrative fees that are being assessed to each one of them.  They don't need to pay me anything.

Q    $1,500 in administrative fees?

A    Mr. Hendricks, how much are you getting paid per the hour right now?  $1,500?  $2,000?

Q    Mr. Aguirre?

A    And who pays that to you, Mr. Hendricks?

Q    Mr. Aguirre, have you collected $1,500?

A    Answer me.  I'm asking you the question.  How much are you getting paid per hour, and who's paying you that money, Mr.

F. Aguirre - Cross/Hendricks                    36

Hendricks?  You want to be combative?  I could be here all day long.

THE COURT:  Mr. Aguirre, I'll remind you that you are here on an order to show cause, an order that was issued sua sponte by the Court.

We are not here to discuss Mr. Hendricks' fee, which I will note for the record is below $1,500 an hour.  And so, because I know that because he's an officer of the Court and I've seen plenty fee applications on behalf of his firm, which is the only reason that I'll interject that.

I'll ask Mr. Aguirre, it is okay to not like the questions.  It's not okay not to answer the questions that you don't like.  So, let's tone down the argumentative nature of the answers and we'll try to get through this.

So, Mr. Hendricks, please proceed.

Q   Mr. Aguirre, my question is, have you received $1,500 from any person for which you have filed papers in this Court?

A   I don't like your question and I'm not going to answer it. Next question.

MR. HENDRICKS:  Your Honor, I would have the Court instruct the witness to answer the question.

THE COURT:  Mr. Aguirre, have you received $1,500 from any -- as an up from administrative fee for many of these movants?

THE WITNESS:  From some of them, yes, Your Honor.

F. Aguirre - Cross/Hendricks                    37

THE COURT:  Please proceed, Mr. Hendricks.

Q    And do you have a signed contract from each of the persons for which you have charged or expect to receive any compensation or fee, administrative fee or not?

A    Yes, yes.

Q    How many?

A    I don't know at this point.  There are not that many, Mr. Hendricks.  There are not that many.

Q    My count, Mr. Aguirre, is that there are 49 of these that have been filed and you say you've talked to 1,500 people.  How many more should we expect to see filed?

A    The fact that I've spoken to more of these victims than you have, Mr. Hendricks, I think is a virtue.  There's 1,500 folks that I haven't spoken and I intend to speak to as many people that are around that at least want to have the Court dockets translated to them informally.

But as far as the 49 that you see before you, that's it.  That's my number.  The fact that I've spoken to many people does not translate into a contract, Mr. Hendricks.  Next question.

Q    And these 49 motions that you helped these people get filed, were they all filed in person in the clerk's office or were some of them done by mail or electronically?

A    I believe they were done in person.

Q    All 49 of them in person?

F. Aguirre - Cross/Lawrence                    38

A    I believe so.

Q    And who was the person who did that?

A    Ms. Beltran, who is in the hospital right now.

Q    And she -- is she located in Dallas?

A    She's not located in Dallas.

Q    But she's the one who physically filed them with the clerk's office here in Dallas?

A    You asked that already and I answered.

Q    Well, did she come to Dallas for that purpose then?  Is that a fair assumption?

A    She did come to Dallas, and she went to Dallas for the purpose of filing those motions, those petitions.  That's what I explained to the Court at my introduction.

Q    And you said you had an administrative fee of $1,500 plus there was some kind of a fee based on the outcome, as I recall your testimony.  Is that correct?

A    That is correct, which quite frankly, I would never expect based on your attitude, Mr. Hendricks.  You're defending the crooks of Tricolor that I would never get anything at all.

Q    What is your arrangement if the people you're trying to help get their loans reduced, how much do you receive?

A    If they are able, if these folks are ever able to get any type of balance reduced, Mr. Hendricks, I would charge a ten percent fee on the amount that is reduced.

        MR. HENDRICKS:  I think that's all I have for now,

F. Aguirre - Cross/Lawrence                39

Your Honor.  Thank you.

THE COURT:  Thank you, Mr. Hendricks.

Mr. Lawrence, any questions of the witness?

MR. LAWRENCE:  Just a few, Your Honor.

THE COURT:  Okay, thank you.

CROSS-EXAMINATION

BY MR. LAWRENCE:

Q    Mr. Aguirre, my name is Scott Lawrence and I'm an attorney for Vervent.  I am curious if any of the people that you've helped have raised their concerns with Vervent through their customer -- through Vervent's customer support personnel.  Do you know if any of the people you've helped have raised concerns with Vervent?

A    Mr. Lawrence, Scott Lawrence, correct?

Q    Yes, Sir.

A    Finally, I appreciate the opportunity to speak with you because there are concerns, Mr. Lawrence.  While the system in place by Vervent right now may look good on paper, if you will, it's not translating well in practice, Mr. Lawrence.

It is not.  In fact, it is what has led to the frustration of these folks.  First, you may recall, Mr. Lawrence, Vervent was calling --

MR. LAWRENCE:  Your Honor, I apologize.  I'm going to object as non-responsive and ask that the witness answer the questions I've asked.  I believe you may give him an

F. Aguirre - Cross/Lawrence                       40

opportunity to make a closing statement, so if that's helpful but I can repeat the question if you --

A    I am answering your question --

THE COURT:  I think the Court --

A    I am answering your question, Mr. Lawrence, in the way that you will understand and the folks around here would understand as well.

The way that Vervent was identifying themselves, and this will answer your question, was as Vervent, these folks have no clue who Vervent is.  And then, after something occurred, whatever event, maybe the Sixth Amendment that was filed by Vervent, then they're identifying themselves, hey, we are Tricolor under new administration.

Literally, word for word, we are Tricolor under new administration.  That's how they are identifying themselves. And the --

THE COURT:  So, is the answer to his question, yes, that they tried to contact the customer service number or not?

THE WITNESS:  For the Court to understand, and I beg the Court's indulgence, for the Court to understand what that contact is, is haphazardous at best, because they have -- they're calling these folks on a recorded line.

THE COURT:  Okay.  Let's start with did they call -- let's start with did they call the customer service number and then, you can describe what happened on it.

F. Aguirre - Cross/Kippes                     41

THE WITNESS:  Yes, Your Honor.  Yes, I apologize.
Yes.  Yes.  They called --

THE COURT:  So, they did?

THE WITNESS:  Yes, they called on that recorded line, but that is so frustrating for them, because there is a recorded line and I've heard it myself.  It's a recorded line that cuts off at the end, and it doesn't give the victims the opportunity to say anything to that recorded line.

When finally there is a live individual that reaches them, Your Honor, then it's an entirely different story because that person, and I have them on record, I have it recorded, where they're telling the victims, hey, I am Tricolor, we're under new administration, everything is okay, we do exist under, not under Vervent, but under the name of Tricolor.

Now, I believe, again, I don't know whether that's appropriate or not, but that is just leading to the confusion of how the collection procedure is being handled, Your Honor, and that's --

THE COURT:  All right.

Mr. Lawrence, your next question.

MR. LAWRENCE:  Your Honor, I'm going to pass the witness.

THE COURT:  All right, thank you very much.

Ms. Kippes, do you have any questions of the witness?

MS. KIPPES:  Yes, Your Honor.

F. Aguirre - Cross/Kippes                    42

CROSS-EXAMINATION

BY MS. KIPPES:

Q    Good afternoon, Mr. Aguirre.  Again, my name is Meredith Kippes.  I have a few additional questions.  You testified earlier in response to Mr. Hendricks' questions that Ms. Beltran doesn't live in Dallas.  Where does she live?

A    I live in Arizona, Scottsdale, Arizona.

Q    Okay.  And how does she get to Dallas?  How does she get to Dallas?

A    She flew.

Q    Okay.  And there's several different filing dates for these various pleadings.  So, she flew into Dallas for every filing?

A    You would have to ask her.

Q    You testified earlier that she files them in person?

A    That's correct.

Q    Okay.  So, the inference is that she flies here every time new pleadings are filed.  Is that a fair --

A    That is correct.

Q    Okay.

A    That's a fair, that's a fair assessment.

Q    Okay.  Does the cost of airfare come out of that $1,500 administrative fee?

A    I'm not sure.  I'm not sure how that accounting is being broken down.  But I can tell you that is a better accounting

F. Aguirre - Cross/Kippes                    43

that the folks at Vervent have for the victims.

Q    Okay.

        MS. KIPPES:  Your Honor, I move to strike the editorial comment at the end.

        THE COURT:  It'll be stricken.

        MS. KIPPES:  Thank you, Your Honor.

Q    Does she have relatives in Dallas?

A    I don't know.

        THE COURT:  Did you say you do not know?

        THE WITNESS:  I do not know, Your Honor.

        THE COURT:  Okay.  Thank you, Mr. Aguirre.

Q    Does Ms. Beltran hold any kind of legal certification, including a paralegal certification?

A    I believe she does, Ms. -- and forgive me, your first name is Meredith.  I didn't catch your last name.

Q    Kippes, K-I-P-P-E-S.  It's German.  Do you think she is certified as a paralegal in the State of Arizona?

A    I believe she is.  She might, she might not be.  I'm not sure.

Q    Okay.  Do you have any kind of professional certifications?

A    I have a master's degree in administration and I do have a paralegal certification.

Q    Is that from the State of Arizona?

A    No, that is not from the State of Arizona.

F. Aguirre - Cross/Kippes                    44

Q    Okay.  And what State?  California?

A    My master's is from, yes, from California.

Q    Okay.  And the paralegal licensure, that's from California?

A    No, it's from Pennsylvania.

Q    Okay.  And is it still current?

A    I beg your pardon?

Q    Is your paralegal licensure still current?

A    Yes.  Yeah.

Q    Okay.  The Court asked you earlier about who wrote the forms, the form pleadings that were filed with the Bankruptcy Court.  Do you recall those questions?

A    Yes.

Q    Okay.  And you said that you didn't know.  That's correct?

A    That's correct.

Q    Okay.  Did -- where did you get the forms from?

A    I cannot answer that.  I don't know.

Q    Were they on Ms. Beltran's system, the Beyond Attorney system?

A    I don't know.  I can't answer that.  I don't know.

Q    I mean, you had to get them from somewhere.  So, were they already loaded on your document, on your computer?

A    Ms. Kippes, I've answered your question.

Q    With all due respect, Sir, you have not, because they just didn't appear whole, but either they were --

F. Aguirre - Cross/Kippes                    45

A     Ms. Kippes --

Q     -- on your system -- I'm not --

A     Ms. Kippes, I don't know, and I've answered the question. Ms. Kippes, you said something quite interesting when you were doing your presentation, that you should find a mechanism to handle the concerns of the victims.  I think that your focus should be there.  Find a mechanism to address the concerns of the victims.

        MS. KIPPES:  Your Honor, move to strike?

A     Find a mechanism to address the concerns of the victims. Your resources --

        THE COURT:  Motion to strike, granted.

        MS. KIPPES:  Thank you, Your Honor.

A     Go ahead.

Q     Mr. Aguirre, I did say those things, but it is not your turn to argue and certainly it's not your turn to argue with me.  We're all trying to come up to an answer here and right now the question is where did the form motion that you acknowledge you used came -- come from?

A     You asked and I answered.

Q     Okay, no.  Now, I'm going to ask you some specific questions.  Did you already have it on your computer?

A     No.

Q     Okay.  Did Ms. Beltran have it on her computer?

A     I don't know.

F. Aguirre - Cross/Kippes                    46

Q    Did you download it from the internet?

A    No, I didn't.

Q    Okay.  Did Ms. Beltran download it from the internet?

A    I don't know.

Q    Okay.  Did you ask Generative AI to draft a pleading such as that?

A    No.

Q    Did Ms. Beltran?

A    I don't know.

Q    Okay.  Did Ms. Beltran email you the form to use?

A    I don't -- I cannot speak for Ms. Beltran.  Certainly, she is not present, so I don't know.

Q    Did you receive an email from her with a form attached to use?

A    I cannot say, no.

Q    Okay.  And you just had the form, you don't know how you got it?

A    I told you I didn't have a form, Ms. Kippes.

Q    Are you telling me that each and every one of these nearly identical documents were drafted separately without using a form?

A    I don't know, Ms. Kippes.

Q    Did you draft them?

A    I did not draft them.  I already answered that question.

Q    Okay.  Who did draft them?

F. Aguirre - Cross/Kippes                 47

A     I'm going to tell you exactly the same answer.

Q     Who drafted them?

A     I don't know, Ms. Kippes, and I've already answered that question.

Q     Who filled -- who filled in the forms with the factual information about the customers' loans?

A     You're asking me if I did, I didn't.

Q     Okay.  Did Ms. Beltran?

A     I don't know.

Q     Did someone within your company?

A     I don't know.

Q     But you acknowledge that you assembled all of this information into this form and you provided it to the customers?

A     I acknowledge the fact that the customers, the victims, as I call them, provided the information that is on each file.

Q     Okay.  Are you suggesting that each one of these individuals drafted each of those pleadings on their own?

A     I'm not suggesting anything.  You're suggesting that.  I'm not suggesting that at all.

Q     Who drafted them?  If you didn't --

A     I don't know.  It was -- we could go around this until 7 o'clock tonight.  I'm telling you exactly what my answer is. I'm giving you my answer.

          MS. KIPPES:  Okay.  Your Honor, no further questions.

F. Aguirre - Examination by the Court          48

THE COURT:  All right.  Thank you very much, Ms. Kippes.

EXAMINATION

BY THE COURT:

Q    Just a few more questions, Mr. Aguirre.

A    Yes, Judge.

Q    How many people work for Beyond Attorneys, LLC, Mr. Aguirre?

A    There's no employees per se.  There's just people like myself who are 1099, so they're subcontractors.

Q    Okay.  So, the business card that Ms. Beltran provided to the Clerk of Court says that you were the Founder and CEO; is that correct?

A    I am no longer the CEO.  I was the Founder.

Q    Okay.  Who is the CEO now?

A    There is no CEO, Your Honor.

Q    Okay. Okay.  Who are the principals of Beyond Attorneys, LLC?

A    I was the principal at one time.  I'm no longer.

Q    Okay.  And so, who is?

A    I don't know who the principal is now, Your Honor.

Q    Did you sell the company?

A    The company has been actually closed down.  Beyond Attorneys itself, it's no longer an ongoing organization.  Ms. Beltran might have given the trustee or the clerk a business

F. Aguirre - Examination by the Court          49

card that is outdated, Your Honor.

Q    Okay.  So, who do you work for now?

A    I work for myself as an individual.

Q    Okay.  So, who gave you the 1099?

A    I work for myself, Your Honor.  So --

Q    You said you were a 1099 independent contractor.  Who do you work for?

A    Yes, I work for several attorneys who seek out my services and they give me 1099.

Q    Did you work for any, with any attorneys on the filings that were made in the Tricolor case?

A    No, Your Honor.

Q    Do you do any other type of services for folks?  Do you do any --

A    No, Your Honor, I'm actually retired.

Q    Okay.

A    I apologize, did not mean to interrupt you.  I'm retired, Your Honor.

Q    Okay.  And so, who were the, you said that earlier that there were contracts with some of the various, excuse me, the various movants before the Court, there were contracts with them.

A    Yes.

Q    Who were the contracts between; the movant and who else?

A    And myself.

F. Aguirre - Examination by the Court      50

Q    So, they contracted with you directly, Mr. Aguirre?

A    Directly, that is correct, Your Honor.

Q    And so, how does Ms. Beltran fit in?

A    She assists with the administrative aspect of gathering the documentation with the intake of each individual.

Q    You described her as the principal of Beyond Attorneys at the beginning of the hearing.  So, does she assist or is she principal?

A    I may have misspoken, Your Honor.  Beyond Attorneys, for all intents and purposes, is no longer an active organization. So, when I said that she is the principal, she at one point worked for Beyond Attorneys, but no longer.  She herself is an independent contractor.  And by that, she works for herself.

Q    Is she an independent contractor or is she self-employed?

A    Forgive the misnomer.  Yeah, self-employed, which is what I meant to say for myself.

Q    Okay.  Do you and Ms. Beltran perform any other kind of services for folks?  Anything else, any accounting, immigration, any other types of services?

A    No, Your Honor.  I will speak for myself.  Like I mentioned, I turned 65 on December the 22nd, I retired.

Q    December 22nd of 2025?

A    25, yes, Your Honor.

        THE COURT:  Okay.  All right.  Thank you for your testimony, Mr. Aguirre.

F. Aguirre - Examination by the Court                51

THE WITNESS:  You're welcome, Your Honor.

THE COURT:  All right.

Is there any one of the movants who would like to address the Court?  The Court has some questions about the relief that's being sought in these motions for relief from stay and the motions to enforce the automatic stay.

Is there anyone who wishes to be heard?

MS. MARTINEZ:  May you repeat that again, Your Honor?

THE COURT:  Yes.  So, I have a number of motions for relief from stay and a number of motions to enforce the automatic stay that have been filed by the movants that I called the beginning of the hearing.

And I'm trying to understand better what the folks are asking for in the motions because I have the distinct feeling that what's being asked in the motion is not exactly the relief that that they want.

And so, I'm just trying to get to someone to just articulate for me in just basic terms what they're asking the Court to do.

MS. MARTINEZ:  Can I speak for myself in my case?

THE COURT:  Yes.  I'm only asking you to speak for yourself.

MS. MARTINEZ:  Okay, okay.

THE COURT:  I appreciate the clarification.

So, you are Ms. Brisa Ibarra, correct, Martinez

Martinez - Examination by the Court                52

Ibarra?

              MS. MARTINEZ:  Yes, I am.

              THE COURT:  Okay.

              MS. MARTINEZ:  Martinez, yes.

              THE COURT:  Okay.  Thank you, Ms. Martinez.  Let me go ahead and swear you in and then I'll go ahead and hear you out, okay?

              MS. MARTINEZ:  Okay.

              B R I S A   M A R T I N E Z, SWORN

                           EXAMINATION

BY THE COURT:

Q    All right.  And so, could you explain to the Court what, and I'll just say for the record because my able staff has pulled it up, you have a motion that was filed at Docket 682 and it's a motion to lift stay.

     And so, tell me what you were trying to accomplish in your motion.

A    What I was trying to accomplish for me, myself, is that I have proof of me paying Tricolor through the app.  I was constantly giving payments but the number of the total amount that I was due was no longer being reduced.

     And when I would try to call them, it was always like a voicemail machine that would counsel me through but never someone to speak with.  So, that was scaring me because I'm working.  I have my car.  I'm paying but nothing is shown that

Martinez - Examination by the Court                53

my debt's going down.

And I looked for resources outside to get more of a clarification of what I could do because it looks like I was never paying my car when I have been paying my car and my debt stayed at around 12,000.  And I only have about a year and some-months left to finish paying off the car.

And that's when I heard on the news that Tricolor was actually in bankrupt.  And I passed by where I bought my car, there was no one inside, no one I can physically speak with at the location that I bought.

I also have on my phone voicemails where Tricolor has left me a voicemail saying they're from Colorado and I, just because my phone number where I bought my car, is a Colorado number.  I never bought a car from Colorado.  I actually bought it in Fort Worth.

So, they don't even have like correct information where they were calling me and when I would speak to them and I told them, hey, can I have -- like, I'm trying to get in contact with them.  I never got a clarification of what with the next step was.

And for Vervent to say that they have reached out, I actually have no missed calls from them but I do have a text message sent yesterday at 2 p.m. saying we are the new providers.

So, this is their first time actually contacting me

Martinez - Examination by the Court                54

personally, Vervent, trying to get information from me.  And I actually have that.  I don't know how I can send it to you guys but I have text messages where it shows Vervent has just barely yesterday at 2 p.m. send me a message.

And I'm sorry if I'm talking too fast.

Q    You're not.

A    I just wanted to be clarified, if I keep continue paying off my car who -- because the loan provider that I got it from, the actual Tricolor, they told me that they had their own bank. Tricolor had their own financial bank that I financed my car with.

So, my car was never financed by a different bank.  It was financed by their own bank.  So, if Tricolor is bankrupt and I was financed by their bank, I want to know which bank now does my loan fall for and can I have information with that bank, so I can now go back and continue making payments because I did.

I'm going to admit I did stop making payments because I no longer felt safe if I gave that money it was not going to be shown that I paid for it.

Q    And when you said that you were paying to a Tricolor bank was that Tricolor Auto Acceptance LLC, do you know?

A    I believe.  I'm not sure.

Q    Okay.

A    Because when I spoke to the dealer that sold me the car, she just told me, oh congratulate -- and I felt like she's --

Martinez - Examination by the Court        55

they viewed my situation.  I can give you just a small background so you can see.

My car had broke down more recently.  I had just moved to Texas.  I had a brand new job, I needed a car.  So, that was the first place I went to, the first place I got it, and they can see the desperation that I had.

So, the first car they said, this is the only car you are accepted for your credit.  This is the only car you can buy.  So, I went with that car, and it is a pretty expensive car for the type of car it is, now that I'm older and actually gone to speak to other places.

I do feel like that I -- it is a very overpriced car for what I paid for, but it is my car now.  This is the only car that I do have to go from work to pick up my kids and back.

This is my only car that I have, but I do have a daughter that is on the spectrum that does take speech therapy and physical therapy that I have to be relying for her.  So, I do need my car, I'm not saying that I'm trying to not pay my car.

I just want to know and get a clarification for my part, if once I'm done paying my car, am I getting the title for my car?  What's going to happen?  What are the next parts of this?

Because I feel like that's the part where I'm at, that I wanted to speak to you guys.  I don't know what's happening.  I just know that Tricolor is no longer here, but yet I do get phone calls saying Tricolor is here, Tricolor is active.

Martinez - Examination by the Court                56

But when I speak to someone, it's not Vervent.  They're saying it's Tricolor to me.  And I have emails where I stopped answering, or when I can't answer them because I'm at work, of them voice recordings.  I have all the voice recordings of them.

And I just don't feel like, for me personally, they are talking to me and clarifying what's my next step and why the amount that I owe, even when I was paying off my car, why it wasn't shown that it's getting paid off.

Q    Okay.  And so, you said that you're being told by folks that are calling you that they're from Tricolor?

A    Yes.

Q    Okay.

A    And I have actual voice recordings where if I don't answer it, my phone saves it and also writes it on, like, through text what they're saying.  So, they're actively telling me they're from Tricolor, not Vervent.

So, and this is actually my second time hearing about Vervent.  So, I personally do not know anything about Vervent at all.  And like I said, I have a text message proving that just yesterday at 2 PM, I got a message saying there are new providers, but that was not until yesterday at 2 PM.

Q    And so, I understand you're saying that the caller ID that was calling you said it was Tricolor?

A    Yes, and then when the voice people that leave the

Martinez - Examination by the Court                     57

voicemail, this is Tricolor asking you to give us a call back.

Q    Okay.  All right.

A    So, that is my confusion is if Tricolor is bankrupt, they're not here and Vervent's taking over, I don't understand why I'm still getting phone calls from Tricolor.

     And when I tried to call Tricolor, they tell me that they don't even have my own personal information, that I have to give them all my personal information for them to give me a slight information.  So, that confuses me because I'm like, well, you guys are calling me.  That means you guys know my information, but you're expecting me to give you all of my information again.

Q    And I do understand, I am very hesitant to give out my own information when folks call me, so I completely understand that.  Looking at your filing, it says -- give me just one second.

A    No, you're fine.

Q    Okay, looking at your filing, it says, I'm looking at like text messages.  And it says, Tricolor Auto, just a friendly reminder, your payment is due tomorrow, and it gives a phone number to call.  These are the messages that you're talking about that where Tricolor is contacting you?

A    That's, yes, that's one part.  And then, they have their phone number that they're constantly, because I stopped, like I said, I'm not lying.  I stopped making payments, so I have

Martinez - Examination by the Court                    58

their phone calls where they're calling me, leaving me voicemails.

But that message is where I would pay my car, and that's the only way I've ever paid the car.  I've never gone to there, I've always paid it online.  And that's when I started realizing, the more payments I was making, nothing was going down how it used to be.

Q    And so, the text message, it says, Tricolor Ganas, you made a payment of 310 on blank-date --

A    Yeah.

Q    -- that these are the types of, and you're saying that you were making these payments, but you didn't show the loan balance going down.

A    Yes, Ma'am.  Yes, Your Honor.

Q    Okay.  Thank you.  All right.

So, I understand everything that you're asking essentially.  Correct me if I'm wrong, you want clarity that you're paying the right company; you want clarity of who you're being contacted by; and that the pay down that you are making are paying down your loan.  Is that correct?

A    Yes.  And I would also like to get clarified because I, I've also known that once a provider gets moved, a new provider happens, sometimes they put on their own fees and lift up whatever the amount is.  They go a little bit higher because now they're new providers or the amount can change.

And I would like to know that whatever my amount was, the loan was for, it's going to stay that, and I'm not going to have to pay extra just because I have a new provider, which I still don't know who are the provider or which bank is my loan for, because my loan was typically for Tricolor's own bank, because they told me, oh, no, we have our own bank, we finance cars, to all people that don't have credit to build their credit up.  So, now, I really don't know if I have a bank or not.

Q    All right.  And looking at your filing, it asks that you would like to pursue State-Court adjudication of fraud, rescission, declaratory relief, lien ownership and recoupment. Do you wish to pursue any of these things?

A    Yes, and one part, because I do feel like that they took vulnerability.  Like I said, at the position that I was in, they only let me have one car.  I didn't have multiple, like they didn't tell me here is a cheaper option for you.

And they just told me, this is a car that you can only, this is the only car that you can afford, which I'm like, and it's a pretty, it's a pretty big car.  It's a car that fits for seven people.

So, it wasn't like they gave me a smaller car.  If they gave me an, kind of, a smaller SUV, it's an Acadia.  So, I feel like for them to get money off of me, they was like, oh, this is the only car you get.  There's nothing cheaper.

Martinez - Examination by the Court                60

And for the, like I said, for the amount of the car, the miles that I had the year of the car, I'm paying way more than if I would have gone to the actual dealership of GMC for a brand new car at that time.

Q    Okay.  Okay.  And so, you do wish to pursue litigation outside of the Bankruptcy Court?

A    Yeah.

Q    Okay.

A    Well, I don't -- how can I explain this?  If there's no clarification and if I can't get nothing to ensure me that I will have my title, they are going to clarify me which bank I am loaned to, then yes, I would like to proceed that because at the end of the day, I know I got a loan.  I know I bought a car and if it has to be where I get all that clarified in detail for me personally, then I can see, okay, this is your loan banker.  This is your, after this, you're going to get your title through this.

Then, I do not mind going back and paying for the car and not asking for them not to, for them to delete whatever the remaining balance is, but if I can't get clarified for that --

UNIDENTIFIED SPEAKER:  Your Honor?

A    -- or if I cannot get any more information, I would like to proceed on that because then I feel, I do feel strongly that Tricolor used their advantage of people like me, that they knew I needed a car right then and there, and they gave me whatever

Martinez - Examination by the Court                    61

they thought they can get more money out of me, not actually, hey, this is a cheaper option for you.

Q   Okay.  Thank you.  And so, with respect to filing the motion, tell me how it is that you came to file the motion. How did you get in contact with Beyond Attorneys LLC, or did you?

A   When all the things was going, a lot of things in social media were going around and I saw someone post a video saying that Beyond Lawyers had helped her.  And that's how I messaged her on the comments, asking her if I can have their phone number, and that's how I reached out to him.

Q   Okay.  And you reached out and you worked with Mr. Aguirre?

A   Yes.

Q   All right.  And did Mr. Aguirre provide you the form of motion to sign?

A   Yes.

Q   Okay.  And you supplied him with the information about the car, the specifics about the car, the GMC, et cetera, the VIN, et cetera?

A   I -- yes.  Yes, I sent him all my information, my ID, the contract.  I showed him what I had signed, the contract that I did, everything I sent, I personally sent everything to him.

Q   Okay.  And he put it together and then, you signed and dated it and sent it back to him?

Martinez - Cross/Hendricks                                   62

A     Yes.

          THE COURT:  Okay.  All right.

          Mr. Hendricks?

                    CROSS-EXAMINATION

BY MR. HENDRICKS:

Q     Ms. Martinez, is that --

A     Yes.

Q     Yes.  I'm Chuck Hendricks, I'm an attorney for the
Bankruptcy Trustee.  You understand that the Bankruptcy Trustee
is not Tricolor, but was appointed by the Court essentially to
try to straighten out as many problems as she can that Tricolor
created.  Do you understand that?

A     Actually, I did not understand that at first, until now
that I'm actually doing more research on everything because
nothing was actually told to any of us other than Tricolor is
bankrupt and all the stores in Texas, everywhere in Tricolor
Ganas, they're completely shut down.

      It's not like we could have gone to the actual place and
talked with someone, someone to -- no.  Not even a letter was
sent out to us.  Nothing was really sent out to the people that
actually bought anything.  We all learned about this through
the news, social media, TikTok, Facebook.

      Everything was pretty much given to me out of everyone
else's words, not really by any of Tricolor.

Q     Thank you.  And a couple of questions.  Did you pay Mr.

Aguirre any money?

A    Yes, I did.

Q    How much did you pay Mr. Aguirre?

A    I did two payments of 700.

Q    So, $1,400 total?

A    Yes.

Q    Did you sign a contract with Mr. Aguirre?

A    Yes.

Q    All right.  And this is all done by mail?

A    Yes.

Q    And you're in Texas, is that correct?

A    Yes, Sir.

Q    Okay.  And you've never met Mr. Aguirre or Ms. Beltran, is that correct?

A    No, just through FaceTime and phone.

Q    Okay.  And, Ms. Martinez, if the Court and the Trustee were to reassure you that Vervent is acting on behalf of the owner of your retail installment contract for the payment of your cars, would that help you be comfortable continuing to make payments?

A    I would like more than just being reassured that it's Vervent taking over.  I actually would like Vervent to at least show me which bank is taking over our loans, what information.

     Like, I would like more detail other -- because, yes, I can take your word for me saying that they're taking over, but

that still doesn't clarify the rest of the questions of what's going to happen after I'm done paying because, yes, you guys are taking over the loan, but what happens to my car after I'm done paying for it?  Who do I go for to pick up my title?  My car broke down twice in a year while being with Tricolor.

I can't go to their dealership to get it fixed.  I had to pay out of my own pocket to get things fixed.  So, that also is, with the dealership, when you're buying a car, as a woman, it's not easy just to go to any dealership to help you, auto shop to help you fix the car because, as a woman, they can take more advantage than you because we don't know.

But when you have a dealership, you have -- they know that they have a loan, so they're going to fix your car properly and not just tell you, it's just this and not fix the other part.

So, I would like to just not know that Vervent is taking over, but what's going to happen with our contract, because technically, I don't have a contract with Vervent.  I had a contract with Tricolor.

Q    Okay.  And is the payment, the method of how you make payments --

A    Was always online.

Q    It's always online.

A    It's always --

Q    Has that changed?  Has that changed?

A    No, because even when I paid for it, the last time that I

Martinez - Cross/Hendricks                                          65

ended up paying for it was always through that.  Since the first day I bought my car from Tricolor, it shows up when you enter the link, it goes Tricolor Ganas.  I put in the that I have to pay, submit it, and that's it.

But it tells you the date that the payments due, but the full amount of like the $12,000 that I owe does not go down.

Q    Okay.

A    It just stays the same.

Q    And does that link still work when you check on your loan status?

A    Yes.  Yes, because when I stop paying for it, Tricolor sends me friendly reminders, your payment is due and it's only with that link.

Q    Okay.

A    So, I have no other way to pay my car other than through the link of Tricolor.

Q    Okay.  And when did you stop making payments then, sometime before Christmas?

A    December.

Q    December, okay.

A    Yeah, in December, yeah.

Q    And what did Mr. Aguirre, what did you understand that Mr. Aguirre was going to provide in exchange for your $1,400?

A    That he will, they were going to help me with all the legal paperwork, help me out to understand what it is and to

help me just talk with you guys; how to say what I want to say for me personally, like this is what I want; pretty much just helping me, guiding me in the way that I should go, if that makes sense.

Q     And is Mr. Aguirre speaking on your behalf?

A     No, I am speaking over my behalf.

Q     Okay.  Did you agree with all the things he said earlier?

A     It is -- it's -- some parts were a little bit shocking, I'm not going to lie.  Some parts I did not quite understand. I also kind of feel bad for all of the other people that are applying right now that do not fully understand English.

     Like me, I understand full English and full Spanish.  So, for the people that did not get a translator, I do feel bad for them because I don't think they actually know what went on during the Court as of right now.

Q     Thank you.

          THE COURT:  All right.  Thank you, Ms. Martinez.

          Mr. Lawrence, do you have any questions for Ms. Martinez?

          MR. LAWRENCE:  Just a couple, Your Honor.

          THE COURT:  Okay.

                    CROSS-EXAMINATION

BY MR. LAWRENCE:

Q     Good afternoon, Martinez.  My name is Scott Lawrence, and I'm an attorney for Vervent.  First, I'd just like to say thank

Martinez - Cross/Lawrence                              67

you for being here today, and I think your testimony has been very productive and helpful.  I actually had some somewhat technical questions for you.

The first one is, I understand that there was an issue on your loan where, I guess, Vervent or Tricolor placed insurance on your vehicle?

A    Yeah.

Q    And then you had to provide proof of insurance, that you had insurance.

A    I still have insurance.

Q    Can you just tell me a little -- right.

A    I still have insurance, yeah.

Q    Right, can you tell me a little bit about what happened with, how did that, what happened on this insurance issue?

A    The insurance issue is that in order for me to take the vehicle out of their lot, I have to have full coverage.  But as, I don't know if you, when you're buying a car, it's a long process of what you're going through, paperwork with them talking.

By the time that they told me that I was approved and I could take it, all the insurance, car insurance places were closed, so I have to buy their car insurance on the same.  And then, I could go behind, and then after that, I could look for my own provider and provide that I have full coverage on the car.

Martinez - Cross/Lawrence                                        68

Q    And you ultimately did that; you went to your own provider and found your own insurance?

A    Yes, for (indiscernible).

Q    All right.  And when did that happen?

A    Literally at -- so, they give you a month because insurance is for a month.  So, when I bought my car in December, before January happened, I had buying a car insurance with Dairyland, full coverage.

      And I had to show them the deductible of $500, that my car was getting a deductible of $500, and I had to show them proof that I had full coverage on the car.

Q    All right.  And what is your understanding of the status of the insurance now that you've done all that?

A    The -- anything that happens to the car, like for example, I don't have GAP, so I know that I don't have GAP.  So, if anything that would happen to the car and the insurance, my car insurance would pretty much be the ones taking over that, if that -- I don't know, that's what I thought.

Q    It wasn't a very good question, Ms. Martinez.  I'm going to try asking it a little bit differently.

A    Okay.

Q    Are you still paying for insurance through Tricolor or Vervent?

A    No, I stopped paying for insurance with them as soon as I took it out, because insurance with Tricolor was going to cost

Martinez - Cross/Lawrence                    69

me more than if I got an outside provider.

Q    Perfect.  Okay.  That was -- I asked the question correctly the second time, so thank you.

A    Oh.

Q    Okay.  And you said, you received a text message yesterday for the first time?

A    At 2 PM, yes.

Q    Can you tell me a little bit more about what that text message said?

A    They send it to me in Spanish.  (Indiscernible).  I don't really know, I guess.  I do know Spanish, but I'm mainly English speaker.  So, let me -- give me one.  Another one to me right now at 3:08 and it says, I'm just going to, I'm translating English, but they send it to me in Spanish says, and it says, Tricolor, this is a possible legible to readjust and assign assessment on your late due payments; please visit our website or call me in response for English.

And then, the one at 2 PM yesterday says, again, Tricolor, your account for 5082 has been transferred to a new provider and service.  You have a payment due; please call us for assistance or visit our website -- and it gives me the website -- or call us in response for English.

Q    Thank you.  The website that you use to make payments, do you know the, do you know that address, that web address?

A    Give me one second.  Let me look for it again.  I'm so

Martinez - Cross/Lawrence                    70

sorry.  This is --

Q    It's okay.

A    -- yeah, I'm so sorry.  It's not showing with me right now.  I didn't save those.  I normally have everything saved right here. Oh.  I'm so sorry.  It's taking me some time.  I'm so sorry.

THE COURT:  You're fine.

MR. AGUIRRE:  I think it's (indiscernible).

A    I have -- since I stopped paying for it, I have to go back in my messages to see exactly. ████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████.  That is the website that I would have to go in every single time to pay my car.

Q    Okay. All right.  Just one more time, Ms. Martinez.  I just want to say thank you very much for being here today, and that's all my questions.

A    Okay.

THE COURT:  Thank you very much, Mr. Lawrence.

Ms. Kippes, do you have any questions for Ms. Martinez?

MS. KIPPES:  No, Your Honor, I do not.

THE COURT:  Okay, thank you very much.

All right.  Ms. Martinez, thank you very much for being here today and being willing to testify.  I think this

Martinez - Cross/Lawrence                    71

was very, very helpful to the Trustee, to the Court, to Vervent, to the United States Trustee's Office.  As we started in the beginning of the hearing, we've received 50 or more of these motions and we know that everybody is facing something a little bit different and we're trying to figure out the best way to tackle this.

As I alluded to, the Court's got some serious concerns with what appears to have been legal advice that was given to you and some of the other movants and the fees that were taken.  But again, with respect to your situation, we certainly are very thankful that you were here today and testified for us.

Is there anyone else who wishes to be heard?

MR. JORGE AGUIRRE:  Yes.

MS. MARTINEZ:  I would just like to say thank you, Your Honor, for just hearing me out in my case.

THE COURT:  You're very welcome, Ms. Martinez.  Thank you.  Thank you very much.

MS. VASQUEZ:  Hi, my name is Maria Vasquez, and I would like to --

MR. JORGE AGUIRRE:  Yes.  (Indiscernible) --

MS. VASQUEZ:  -- (Indiscernible)

THE COURT:  Okay.  Ms. Vasquez?

MS. VASQUEZ:  Yes?

THE COURT:  Yes.  Let me go ahead and swear you in,

Vasquez - Examination by the Court        72

ma'am.

If you could raise your right hand for me.

MS. VASQUEZ:  Okay.

MARIA VASQUEZ, MOVANT, SWORN

THE COURT:  All right.

And just for the record, just before you start --
let's see.  Thank you very much, Ms. Vasquez.

MR. LAWRENCE:  722, I think, Your Honor.

THE COURT:  Okay.  Yeah, I think that that is
correct.

Yes.  So we have you on file as filing a motion to
enforce the automatic stay on February 2nd at Docket 722.

All right.

EXAMINATION

BY THE COURT:

Q    And so, Ms. Vasquez, why don't you describe for the Court
the issues that were concerning you that led to the filing of
the motion.

A    Well, my issue is pretty much like Ms. Martinez.  I'm not
sure who I'm paying because my balance was not going down
either.  Each time I make my payment, my balance was not going
down.  And it's -- when I took out the truck -- the car that I
bought, they took my social.  They took my ID.  They took all
the information.

I looked on my credit score, it doesn't even show on my

Vasquez - Examination by the Court                73

credit at all.  And I was lied to.  They said that it was going to be reported to the Bureau of Credit, which it's not.  And it still, to this date, does not show there.

I was told I was paying Tricolor and I looked up my VIN on my vehicle, and it says it's Ganas.  I didn't even know anything about Ganas.  So that's what concerned me.  I did stop making the payments just because I was scared.  My truck broke down.  I called Tricolor because it was under warranty, and they said they no longer had auto repair, auto parts, or the shop to take care of it, that I needed to do it on my own.

I put so much money onto my car within the three months that I bought it, and I honestly got scared.  I did see all these things put the Tricolor on the news, that bankruptcy and all that.  So I started looking around Google, social media.  I heard -- saw comments about other people, so I texted one of the other people and got Mr. Aguirre's number from them.  And that's when I called him and I wanted to get clarification of where am I paying my payments, am I ever going to get a title for my car if I -- I mean, I'm paying and I'm not even -- it's like, who am I paying, a ghost?

Q    All right.  Thank you.

A    That's definitely my concern.

Q    All right.  Thank you, Ms. Vasquez.

And do you have a contract with Beyond Attorneys, LLC or Mr. Aguirre?

A      Yes.

Q      Okay.  And who is your contract with?

A      My contract?  What do you mean?

Q      Did you sign a contract with Mr. Aguirre or with Beyond Attorneys and pay an upfront fee?

A      Yes.

Q      Okay.  And who's the contract with?

A      I met with Mr. Aguirre.

Q      Okay.  You're in Arizona?

A      Yes.

Q      Okay.  So you met with him, and did you sign a contract?

A      Yes.

Q      Okay.  And do you know if it's with the company or with Mr. Aguirre personally?

A      Honestly, I don't know.  Don't remember, honestly.  To be honest, I don't remember if it was said Mr. Aguirre or Beyond Law.

Q      Okay.

A      Honestly.  Can't remember.

Q      Okay.  And how much did you pay as an upfront fee?

A      1,500.

Q      1,500.  Okay.  All right.

        THE COURT:  Mr. Hendricks, any questions for Ms. Vasquez?

        MR. HENDRICKS:  No questions, Your Honor.  Thank you.

THE COURT:  All right.

Mr. Lawrence, any questions for Ms. Vasquez?

MR. LAWRENCE:  A couple, Your Honor, if I may.

THE COURT:  Of course.

CROSS EXAMINATION

BY MR. LAWRENCE:

Q    Ms. Vasquez, my name is Scott Lawrence.  I'm an attorney for Vervent.  Thank you for being here today and for giving us your testimony.

I have a record from my client, Vervent, that said that you called in to one of our call representatives to report an issue with the vehicle.  Is that the maintenance issue that you were talking about earlier?

A    Yes.  That, I had issues, yes, with the -- yes, with the motor.

Q    And you called Tricolor or Vervent to report that issue to who you pay your loan to?

A    Yes, I did.  When I initially called, when this happened, I didn't know nothing about Vervent.  I didn't even know Vervent existed.  I didn't even know that even they were in bankruptcy.  I didn't even know that.  I found out later, after that, when I was told that.

I drove by the dealership where I bought the -- my truck.  I noticed that there was no signs.  There was nothing.  That's when I got worried and I go, what's going on?  I went to a

Vasquez - Cross/Lawrence                                  76

second dealership that I knew existed for Tricolor, and the same thing -- the same thing, no signs, no nothing.  So that's when I decided to call that 800 number for Tricolor.

I think a Jose answered, and he told me that they no longer existed, that the warranty -- they didn't have no body shop where -- or a mechanic shop where they could recommend me, that I had to deal it -- deal with it myself.

Q    Okay.  Thank you for that information.

Have you received emails about your loan in the past few days?

A    Okay.  Yes.  Yesterday at 12:58, I -- it's in Spanish.  It says, "Are you worried that we might take your car, Maria? Visit paynearme.com or call 888-448-7426."  That's it.

And then I got one today at 1:09, and it says, "Tricolor. Congratulations.  You're eligible to have options to discuss your" -- it's all in Spanish.  I'm trying to do it in English.

Q    Take your time.  Take your time.

A    It says, "Congratulations.  You're eligible to discuss offers and options we might offer you.  Visit paynearme.com or call 888-448-7426."

That's the only thing I got, yesterday and today.

Q    Have you filed any lawsuits against Vervent or Tricolor?

A    Like, directly lawsuits?  No, I don't think so.

Q    And so, I know you filed the document in this bankruptcy case.

Vasquez - Cross/Hendricks                     77

A     That's correct.

Q     But have you made any other legal filings other than that about your loan or with Tricolor?

A     No.  No.

Q     Okay.

A     Not that I know.

Q     Okay.

MR. LAWRENCE:  I have no further questions, Your Honor.

Thank you very much, Ms. Vasquez, for your testimony today.

THE COURT:  Thank you, Mr. Lawrence.

MR. HENDRICKS:  Your Honor, I said no.  I do have one question.

THE COURT:  Okay.  Please, Mr. Hendricks.

CROSS-EXAMINATION

BY MR. HENDRICKS:

Q   Ms. Vasquez, again, I'm representing the bankruptcy Trustee.  My name is Chuck Hendricks.

A     Mm-mm.

Q     And when did you first meet with Mr. Aguirre?

A     Honestly, I don't remember the exact date, but it's been over a month, if I'm not mistaken.

Q     Okay.  Did you discuss with Mr. Aguirre whether or not you should continue to make payments?

Vasquez - Cross/Hendricks                          78

A     No.  No, that was my only choice.  That was my decision of not making the payments.  Just because I did log in into my credit to see if I could find -- I mean, I wanted to see what was on my credit, honestly, because I needed another car.  And that's when I noticed that my truck is not even on my credit, which I thought it was in my credit, honestly.  And --

Q     And you just bought your truck last May, I believe.  Is that correct?

A     Yes, correct.

Q     Okay.

A     That's correct.

Q     Okay.

          MR. HENDRICKS:  Thank you.

          THE COURT:  All right.  Thank you.

          All right.  And Ms. Vasquez, did you receive all of the paperwork from Mr. Aguirre and then sign that, and then it was filed with the Court on your behalf?

          THE WITNESS:  That's correct, yes.

          THE COURT:  Okay.  Thank you.

          All right.  Thank you very much for your testimony, Ms. Vasquez.  Appreciate you being here.

          THE WITNESS:  (Indiscernible)

          MR. JORGE AGUIRRE:  Your Honor, I want to --

          THE WITNESS:  Thank you.

          MR. JORGE AGUIRRE:  -- talk to you.

Jorge Aguirre - Examination by the Court        79

THE COURT:  Is that Mr. Jorge Aguirre speaking?

MR. JORGE AGUIRRE:  Yes.

THE COURT:  Okay.

MR. JORGE AGUIRRE:  Yes.

THE COURT:  Mr. Aguirre, okay.  Let me go ahead and swear you in, sir.

MR. DIAZ:  (Indiscernible)

THE COURT:  Okay.  Mr. Aguirre, can you hear the Court?

MR. JORGE AGUIRRE:  Yes.

THE COURT:  Okay.

MR. JORGE AGUIRRE:  I can hear you.

THE COURT:  I'm going to swear you in, sir.

JORGE ENRIQUE AGUIRRE, MOVANT, SWORN

THE COURT:  All right.  Thank you.

EXAMINATION

BY THE COURT:

Q   All right.  And why don't you explain to the Court the issues that you've had with respect to your vehicle?

MR. HENDRICKS:  Your Honor.

THE WITNESS:  Yes.  First of all --

THE COURT:  Oh, wait.  Mr. Aguirre, that's the --

MR. HENDRICKS:  655 is --

THE COURT:  -- the Court, let me -- you are Mr. Jorge Enrique Aguirre, correct?

Jorge Aguirre - Examination by the Court        80

THE WITNESS:  Yes, that's correct.

THE COURT:  Okay.  I'm sorry to have to ask specifics.  We had a few Aguirres on our list.  Just one second.

Okay.  And so 655 is what you have in your records, Mr. Hendricks.  Is that correct?

MR. HENDRICKS:  That's correct, Your Honor.

THE COURT:  Okay.  So that's what I'm finding as well.  So that was a motion for relief from stay.

BY THE COURT:

Q    All right.  Please proceed, Mr. Aguirre.  You were going to tell me about your issues.

A    First of all, my English is not too good.  I'm trying.  But I have a big concern about this -- about my car.  When I got my car, I didn't have credit.  That's why I went through Tricolor because they offer me facilities to get it.

And I know the interest is really bad, but I say, okay, I will get a car to build my credit.  I have three years making payment on my cars.  I did a stop two months ago because every time when I pay my car, sometimes they request me seven -- $707.  And almost 50 percent of the time I pay $1,000 or $3,000 each month, just to pay fast and, you know, don't have too much interest.

The thing is that I have three years paying -- making payments, and I still owe 24,000.  Supposedly, my car value is

Jorge Aguirre - Examination by the Court       81

30,000 when I got the car.  So on three years, I just reduced 6,000 of my debt.  When their bank -- or when Tricolor -- when that happened, I called to Tricolor to make my payments supposedly, and they told me, okay, Tricolor it doesn't work. We are Vervent, and we will take your payment.

And they told me about, your balance is 6000 and something.  And I say, why?  I mean, I make my payments all the times.  And they say, because you have insurance with us and you never pay your insurance.  So that's why your balance never decrease, because when you make a payment, it's not complete.

So I put a complaint on October with the Vervent, I think so, and I sent all my insurance document and I send all my payment history and they never respond.  They try to collect my payment all month, and I continue payment until three months ago because it's no point.  I make payments and my balance is the same.

So they text me 10 minutes ago, Tricolor, and they say, this is Tricolor.  If you want to avoid to repo your car, please give us a call.

So the thing, I'm not trying to steal a car.  I know I got a contract when I buy my car, but I buy the car through Tricolor.  They don't exist now.  And if you have a record line on my (indiscernible) there, you will see when Vervent told me, supposedly my case is particular because they found a lot of payment in internet, but it's not into my account.

Jorge Aguirre - Cross/Hendricks          82

So I have like a $10,000 of payment not reflected on my account. So if I need continue payment, I can. Okay. But I need to know what's my real balance and what will happen when I finish with my payments.

That's it.

Q    All right. Thank you, Mr. Aguirre.

THE COURT: Mr. Hendricks, any questions for Mr. Aguirre?

CROSS EXAMINATION

BY MR. HENDRICKS:

Q    Mr. Aguirre, are you related to the other Mr. Aguirre that we've been talking to today in the Court?

A    No. No. No.

Q    All right.

And did you pay the other Mr. Aguirre money to help you?

A    Yes, sir.

Q    And how much did you pay?

A    1,500.

Q    And what did you understand that the other Mr. Aguirre was going to do for you for $1,500?

A    He will help me with all -- to be in middle of that, you know. To put a complaint and be in the Court and try to fix my problem because when I -- I mean, you can see my records too. I call a lot. A lot, I call you guys, hey, I want to fix my problem. I don't want to lose my car. I don't want broke my

Jorge Aguirre - Cross/Kippes                    83

credit.  I got this car to build my credit.  I need to figure it out.

So I never have an answer, and they offer me to help me being in the Court and be clear about what's going on or fix everything.

Q    And did you understand that the other Mr. Aguirre was a lawyer or not a lawyer?

A    To be honest, I don't know.

Q    Thank you.

THE COURT:  Thank you, Mr. Aguirre.

Thank you, Mr. Hendricks.

Mr. Lawrence, do you have any questions for Mr. Aguirre?

MR. LAWRENCE:  No, Your Honor.  If I may just note that we do have records of many calls with Mr. Aguirre, and so I'll just note that for the Court that he has been in communication with us evidently about the issues that he's testified about.

THE COURT:  Okay.

Ms. Kippes, anything from Mr. Aguirre?

CROSS EXAMINATION

BY MS. KIPPES:

Q    Good afternoon, Mr. Aguirre.

A    Hello.

Q    Did Mr. Francisco Aguirre provide to you the document that

Jorge Aguirre - Cross/Kippes                    84

was ultimately filed on your behalf in the Bankruptcy Court?

A    Yes.  He sent me a copy about what he present in the Court.

Q    Okay.  And you signed that?

A    Yes.

Q    And returned it to him?

A    I signed in his office.

Q    You signed it in his office.

A    Mm-mm.

Q    And then it was filed by, apparently, Ms. Beltran on your behalf?

A    I don't know.  When I get there, I just talk with him.

Q    Okay.  But he provided you the document and you signed it, and then it eventually got filed with the Bankruptcy Court?

A    Yes.

Q    Okay.  Thank you.

         THE COURT:  All right.  Thank you, Ms. Kippes.

         Mr. Diaz, did I understand that you wanted to testify, sir?

              (No audible response)

         THE COURT:  Mr. Yosvanys Diaz, did you wish to testify, sir?

              (No audible response)

         THE COURT:  If so, you're on mute, sir.

         THE CLERK:  He's on mute, Your Honor.

(No audible response)

THE COURT:  If you can unmute your line and then you'll say testing, testing, you'll appear on the screen. Right now, you're still on mute.

(No audible response)

THE COURT:  All right.  He might be having a little bit of trouble with his connection.

Is there anyone else who wishes to be heard today?

(No audible response)

THE COURT:  All right.  Mr. Diaz, I see that your line has been unmuted.  I'll go ahead and swear you in, sir, if you wish to testify.

If you could raise your right hand for me.

YOSVANYS DIAZ, MOVANT, SWORN

THE COURT:  Okay.

Why don't you do this, Mr. Diaz?  Why don't you turn your video off, which I'm hoping might improve your audio?

THE WITNESS:  (Indiscernible)

THE COURT:  Okay.  And I believe that you filed a lift stay motion at Docket 676 for the record.

EXAMINATION

BY THE COURT:

Q    And so why don't you state your name for the record and then tell me what you want to let me know about your car?

A    (Indiscernible)

Y. Diaz - Examination by the Court          86

Q     Do you have earbuds on, Mr. Diaz?

A     (Indiscernible) speakers (indiscernible).

Q     Yeah, why don't you try to just to speak into the phone without the earbuds?  We're only hearing like every other word.  I'm sorry, sir.

A     (Indiscernible)

      Hello.

Q     Okay.  Why don't we try now, and let's see if it got any better.

A     Can you hear me now?

Q     I can.  That is better.  Thank you.

A     Oh.

Q     And so, did you have a loan with Tricolor?

A     Yeah, I'm going to have to go to get some wire so I can be able to talk to the Judge.

Q     Okay.

A     Yeah.  Can you pass (indiscernible).  I'll get the next one so I can go get some wire.  Because I'm at work right now, and I don't got service over here.

Q     Oh, no, I can hear you.  I can hear you now if you're available.

A     Yeah, okay.

Q     Yes.  I can hear you.

A     Yeah, I just bought that car like three years ago.  And then that time, the car broke down, so I took it down there.

Y. Diaz - Examination by the Court          87

They charged me for (indiscernible).

Q    I'm sorry, Mr. Diaz.  We lost the good connection that we had.

Are you walking right now?

A    No.  I'm inside the office, trying to get a WiFi so I can be able to talk, but -- let me --

Q    Okay.  Right now, it's okay.  If you can stay right there, maybe we'll keep a good connection.

A    Oh, yeah, I'm sorry.  Can you hear me now, here?

Q    I can.

A    Okay.  Yeah, so right after the bankruptcy with Tricolor, and I called right away to the dealership that I bought the car because my transmission was breaking down and I was under warranty for the car.  And then Johan, the guy who sold me -- who sold me the car, he told me that the company was already in bankruptcy for fraud and nobody was going to be able to help me out.

So I'll be ending.  I spent like $3,000 to fix my transmission and I still was making payment on the car.  And I quit making payment for two payments, skipped two payments, until I figured out what was going to happen with Tricolor.

And after I tried make the payment because I hear on the news that everything was going to be fine, so I make a payment, and they charge me like $800.  That was the payment that I make, but I never noticed that $800 that I paid it went

Y. Diaz - Examination by the Court          88

straight to my account because my principal balance, it was always going up.

Like, I call the Tricolor number a few times to figure out what was going to happen, or why is my account always going up every day, $9 and something cents.  And they tell me that was interest, but I explained to them that before I never had that problem with my balance.  Every time I was making the payment, my payment was taking my principal amount, it was going down.  Now, it's going up.

So right after that, somebody tell me from Tricolor or whoever it was in that call, that they was going to have somebody who got more knowledge about what was going on with my loan to contact me and let me know what was going on.  I never received any call.  And I tried to make a few payments and was rejected on the app.

And right after that, I call them a few more times, and the amount was keep going up.  So that's when I stopped.  I stopped making payments and I seeking for some help, somebody who can help me out to figure out how can like -- if you guys like understand my situation.  Because, I mean, that's the only car I have to come to work.

And not only that, right after that I tried to file some paperwork to the Court, I do some more research to my car, and I find out that my car has like a couple accidents reported. And they sell me that car for like almost $70,000.  I already

Y. Diaz - Examination by the Court                    89

pay like $30,000 for that loan, so I almost half, halfway -- but the calculation I'm taking right now for my car is that, like, I'm supposed to be done with my loan on 2029.

And by the money they taking right now and the interest they putting on my loan, I never going to be able to finish that payment by the time that I was signed on the paper. And then I tell that to Tricolor, and they said that they don't know what type of contract copy I have, but whatever they have, that's what I have. They say I probably have the, what's it called, the first contract.

That means there's like another contract that I don't even know. And so, that's my point why I'm trying to, like, figure out who is the real owner of my car and who I owe the money because before it was showing up that I owe like $50,000 on my Credit Karma. I went to TransUnion, Equifax, everything was fine. It was showing like I was kind of building credit, but I start looking at it, there was no more payments reported to my credit.

And after, like, a few months ago I got a notification that my credit -- my account was removed from my file, so it's not appear anymore on my credit report. So I'm kind of scared to make payments because, I mean, I already got like $30,000 investment on my truck and I'm willing to pay, but I, like, I'm not going to like wasting money paying to somebody that is not warranty give me for -- to get the property of that vehicle --

Y. Diaz - Examination by the Court                    90

Q     All right.

A     -- and which I'm paying still like repairs, service, over and over because the car has problem, like I said.  The car was in a wreck, right on March 2021.  I bought a 2021 F-150.  Like right after a couple of months, whoever purchased the car the first time, they got into a wreck, and they sell me that car as a brand new car, and the car has been reported, like an accident report.

Like I went to insurance company to give me insurance on that car because the records they have.  And I do some research and I put the same miles I bought the car, when I bought the car from Tricolor and it was only worth -- I went to CarMax and CarFax.  They only worth like $20,000, so they ripped me off of like -- about like $30,000 on the car that is not even worth it that much.

But I'm trying to protect my credit and -- because I'm looking to buy a house, but I, like, you know, that's the only reason what I'm trying, like, with this debt.  Like, I don't want to (indiscernible) or not be responsible for what I signed, but they have to be accountable for whatever we met that day on that contract that we signed because we both have to respect the contract we signed.  And what I'm looking right now over here, nobody's respecting anything.

Vervent is not respecting anything because they charge me fee for something that is -- it was not in my contract, and

Y. Diaz - Examination by the Court                    91

everybody wants their money.  Supposedly because we owe money to some bank.  But who is the bank that we owe the money?  Like, we don't even know.  They say we have to pay obligation that we owe because Tricolor give us a car that we owe that money to a bank.  But which bank?

Because the thing is, I take my loan to Chase Bank because I'm banking with Chase and I tell them, hey, look, Tricolor is going in bankruptcy and I don't want to be dealing with all this.  I don't want to lose my car.  I want to refinance.  They tell me I cannot refinance because whatever's going on with Tricolor right now.  So I'm on a limbo right now, and I don't even know what's going to happen with my car.

That's one of the main reasons why I just want to administrate help to file all the paperwork to the Court properly.

Q   All right.  Thank you, Mr. Diaz.

And did you pay a fee to Mr. Aguirre or Beyond Attorneys for the documents that you filed?

A   Yeah.  I pay in two payments, 750 for all the process and whatever it's going to cost for them to go to the Court and all the paperwork they have to do on my behalf.  I mean, yeah.

Q   Okay.  You paid two payments of 750?

A   Two payments of 750, yes, ma'am.

Q   All right.

A   Yes, Your Honor.

Y. Diaz - Cross/Hendricks                    92

Q    Okay.

And how did you find Beyond Attorneys, LLC?

A    I find it because a friend of mine talked to me about -- I have a couple friends, they know kind of about the law and they were discussing -- we were discussing about a bunch of like ways how to figure out how to deal with my loan because I've been having a few trouble back in the past with, not with loan, but like with other legal stuff, legal matters.  And I find someone who knows Aguirre, and I call Aguirre, and he tell me he can help me out to do the legal process.

But he always tell me that he was not a lawyer, so he tell me that he can help me out or guide me to get through all the paperwork and have the way how I can represent myself in Court, but he can help me out to do the paperwork the right way so it doesn't look bad in Court.

Q    Okay.  Thank you, Mr. Diaz.

THE COURT:  All right.

Mr. Hendricks, any questions for Mr. Diaz?

CROSS-EXAMINATION

BY MR. HENDRICKS:

Q    Mr. Diaz, my name is Chuck Hendricks.  I represent the bankruptcy Trustee.  Can you hear me okay?

A    Yes, sir.

Q    I'm looking at some notes that Vervent provided, and they say you called on January 9, 2026, to request a copy of the

Y. Diaz - Cross/Hendricks                                    93

title, payment history, and payoff.

Do you recall doing that?

A    Yeah, I called.  And I called and I requested all the history of my payments and I request a copy of my contract.  But they never send me my copy of contract.

Q    Okay.

A    But they tell me it was -- it was paid off -- a paid-off note, which I take it to Chase Bank.  They deny me.  And I wasn't trying to get too many hard inquiry on my credit because in the past I have another car with Tricolor before in the past, and it was involved in a car accident.  And they didn't give me coverage, which I was paying the insurance from Tricolor.  They repossess my car, and then, like, three months later, the insurer didn't paid the car.  So I lost the car.  I lost the money and they damaged my credit.  So that was the reason why I didn't want to get in no more, like, dispute or --

Q    Okay.

A    -- none of that stuff on my credit.  Yeah.

And the thing is, like, the only thing that I thought that I saw in the paperwork that Vervent sent me is that when I purchased the car, it was in Texas.  And when the Tricolor filed to DMV the paperwork for my tags and my title and my registration, it was saying that I purchased the car and I only owed $47,000.

But I moved to Texas and I request a new plate -- I mean,

Y. Diaz - Cross/Hendricks                    94

a new -- I moved from Texas to New Mexico, and I request another plate because I'm on a different state. And on that paper, I saw that Tricolor reported to the DMV that I got the car, or I got it lien, worth then with $57,000. So they added $10,000 on it, so --

Q    Okay. But --

A    And right after that, and, yeah, my account right now is, like, going high, like, over $50,000.

Q    Okay. I understand --

A    Yeah.

Q    -- that, Mr. Diaz.

    My next question is, the note says that you called them on January 9th. And they say on January 12th they sent you by email a payment history along with a payoff.

    Did you recall receiving that?

A    Yeah, I received that payment history --

Q    Okay.

A    -- and everything, yeah.

Q    Okay. Thank you.

        THE COURT: All right. Mr. Lawrence, any questions for Mr. Diaz?

        MR. LAWRENCE: No questions, Your Honor.

        THE COURT: Thank you.

        Ms. Kippes, any questions for Mr. Diaz?

        MS. KIPPES: No, Your Honor.

THE COURT: Okay.

Thank you very much for your testimony, Mr. Diaz.

THE WITNESS: Yes. Yes, Your Honor.

THE COURT: I appreciate you --

THE WITNESS: I'm sorry about the internet. Like I'm really in the middle of nowhere. I work in the oilfield, and I'm trying, like, hey, get this internet over here.

THE COURT: Oh, no, we understand. When you get this many people on the line, you're to expect a few glitches here and there. I thank you for working with it, or working with us on that.

All right.

THE WITNESS: Okay.

THE COURT: What's become obvious to the Court is a lot of folks, they're going to have varying issues. Some are going to have mechanical issues with their vehicles. Some are going to be insurance, potential for force-placed insurance from what I'm hearing. But then, obviously a lot of folks are expressing issues relative to understanding what their loan balance is and making sure that if they continue to make payments, they are going to -- that they want to obviously see their loan balance going down.

But I would imagine with the number of customers that are affected, the issues could be very complex and disparate, to say the least, that everyone is going to be facing different

types of issues.  So I guess the question before the Court is, where do we go from here?

Obviously, the Court having to deal with this in 50 to 70 different motions is not efficient for the folks that are affected.  It is not efficient for the Trustee or for Vervent or the United States Trustee's Office.  So the Court still certainly has the same concerns that I started with, but I guess I need to think about how we're going to address this logistically.

Just for sake of those on the phone, what has been filed with the Court are 50 to 70 separate motions, and each of those motions requires $199 fee.  Each of those motions requests relief from the automatic stay.  And they request a freezing of payments and a variety of things.  Just suffice to say I don't think the form of the motion addresses what you guys are really after.

Likewise, dealing with this 50 to 70 times is inefficient for you.  It's very inefficient for the Court and for the Chapter 7 Trustee.  So what I'll do is I'll hear from the Trustee and I'll hear from Vervent whether you have any thoughts on how we can proceed going forward and what makes the most sense to bring some efficiency to the process.  And recognizing that maybe you don't have all the answers right now but I am open to suggestions at this point.

Mr. Hendricks.

MR. HENDRICKS:  Your Honor, thank you.  Chuck Hendricks again for the Trustee.

There really are two different --

THE COURT:  Yes.

MR. HENDRICKS:  -- things going on here.

THE COURT:  Yes.

MR. HENDRICKS:  The Trustee, to address the one that I think is rather obvious, really is concerned that these consumers are getting taken advantage of again during the chaos.  And Vervent has been hired and has the people to address the problems.  I totally understand the confusion.  Between stolen identity, robocalls, all of the things that we have going on now, how the consumers would be confused as to people calling with a different name, using the same name, saying, pay me, pay me.  I do think the one thing that hasn't changed is how they pay, and that's kind of interesting.

The pay-near-me is still the system that collects their payments, and that really hasn't changed.  And I think Vervent can confirm that.  The Trustee's suggestion is, I think, let's put all these -- and I know the Court's leaving, but maybe two weeks and give Vervent a chance to address each one of these and see if they can resolve their concerns.

Vervent has told us that they're responding and we got one of them to say, yeah, I asked for a payoff and they sent it to me.  And see if we can't --

THE COURT:  But we don't know if it's correct.

MR. HENDRICKS:  We don't know if it's correct. That's correct.  But there was communication -- two-way communication.  And let Vervent address these.  We do have 49 of them filed.

I hope there's not another slew of them on the way. But if there are, I think we need to address that somehow.  The Court can address that.  But I think the ones that have been filed, let's reset them all, maybe for a couple of weeks, and let Vervent address each one.  They've got plenty of people to do it and see if we can get at least a process or a confidence that we can get the consumers what they need.

And the Court can address the Beyond Attorneys issue separately.  But I am concerned that people are paying money needlessly.  That is a problem, so.

THE COURT:  All right.  Thank you, Mr. Hendricks.

Mr. Lawrence, thoughts, ideas, solutions?

MR. LAWRENCE:  Your Honor, I'm just a lawyer.  I have been looking at what the websites and there's a claims agent in this case.  There's a information on the top of that page that directs people to an email address and a phone number.

The website to make payments on your Tricolor loan, as Mr. Hendrix said, deliberately has not changed.  I completely understand that there is some confusion or certainly suspicion from --

99

THE COURT: Sure.

MR. LAWRENCE: -- consumers about, well, I saw that Tricolor went bankrupt, so why is Tricolor still, collecting? Well, what it is is that Vervent is collecting on the loans that Tricolor originated and that we now service.

And so the process from that perspective seems to be working to me. I hear that folks are having trouble communicating with Tricolor asking questions, excuse me, with Vervent --

THE COURT: Correct.

MR. LAWRENCE: Asking questions that Vervent doesn't always answer the way that they think -- that they have disputes with Vervent about that. And I like the suggestion, first of all, that Mr. Hendricks made that, we have the benefit today of some testimony from some of these people. We have more information that I can pass along to the Vervent operational folks who can reach out to these folks, to the movants today.

One of the things that I suspect is happening is potentially we had older contact information. So because all of the movants gave us updated contact information on these documents, it sounds to me like some of these people are now receiving communications from us that they weren't previously. And I don't know exactly what the mechanism was of that, but I'm glad to hear it, right. Because one of the things we have

100

to do to do our jobs correctly is to have good contact information for people.

It sounds to me like when people are reaching out to Vervent using the contact methods and modes that exist, they are generally reaching representatives.  I think you heard from several today who asked specific questions from Vervent, maybe tried to remove their force-placed insurance, et cetera, and that generally, it's not perfect.  And this was a messy situation, as the Court and everyone here is aware.  But it does appear that things are working.

So I certainly take Mr. Hendricks' invitation to try to reach out to the folks who are the movants here today and to resolve what issues of theirs that we can.  It appears to me that if we get a clearly articulated request for a payment history and a balance that we're able to provide that for people, and that sometimes our records aren't good enough to respond to some of the requests we're getting.  But it does appear that we're trying.

Now, then, once we get past that -- none of that answers the Court's original question, which is, what do we do with folks that have disputes that Vervent's good but they're not going to resolve every single one of these issues?  I think that procedures or mechanisms in place would be helpful.  I know that Vervent is monitoring this hearing and we'll be ordering a transcript of this hearing and we will be using the

information that each of these movants have given us about our procedures to try to enhance and improve them because, ultimately, our goal is to collect on these loans.

THE COURT: Sure.

MR. LAWRENCE: You can hear from some of these folks that when we start missing payments, we start talking to them about, are you worried that your car is going to get repossessed? Can we talk about it? Right. So we want to keep doing that. It sounds like things are going successfully and we're eager to improve those processes.

As far as dispute resolution mechanisms, Your Honor, I would still like to think about that some more. I heard Ms. Kippes and I think she may have some additional ideas about creating a form on the Verita website, or potentially other ways to add additional communication channels here which would be helpful in my opinion for people that do want to reach out, that do want to talk to us, that do want to ask questions and find out, more. I'd like for them to be as successful as possible with that.

And then, I just have to think about some more -- what makes sense under the circumstances for dispute resolutions. It also sounds like, for the most part what I heard today is people said, I just don't know who I'm who owns my loan and who --

THE COURT: They want assurance.

102

MR. LAWRENCE: -- I'm supposed to pay to. And so that doesn't sound to me like something you need a hearing for. It sounds like something that exists in the orders that are already on the docket in this case that says the Bankruptcy Court is going to figure that out, and it will.

But in the meantime, people have to pay the loans that they took out to buy their cars. And the servicer has to comply with reasonable requests in that process as well.

So, we'll keep doing that. We'll try to get better at what we can from the information we've learned today. And I'll certainly keep working with Ms. Kippes, Mr. Hendricks, Ms. Burns, Mr. Gibbs, everyone else in this case to maybe propose procedures or other mechanisms that we can use to be efficient with the Court time and only bring disputes to the Court that really require the Court's attention.

THE COURT: All right. Thank you, Mr. Lawrence.

Ms. Kippes?

MS. KIPPES: Thank you, Your Honor, Meredyth Kippes on behalf of the United States Trustee. I agree with Mr. Lawrence that I think that a lot of the issues that have come before the Court today are probably already addressed in the court orders and this is mainly a communication problem. And so I did whisper in his ear right before he stood up, wondering whether we could use the Veritas website to improve communication, maybe have an online form where people can fill

it out.  If their main concerns are who owns my loan and how am I going to get my title, that seems like something that -- I mean, I'm spit-balling, Your Honor --

THE COURT:  Sure.

MS. KIPPES:  -- but it seems like there may be a simpler way beyond a thousand lift-stay motions at 199 a pop and probably hours of court time to address those sorts of simple issues.

So, I think that something can be worked out.  I think that these smart people here behind me can come up with a solution that makes things simpler and, like I said, communicates in plain and simple language to people what it is that the Court has ordered, because we lawyers sometimes talk in our own language, and it may be helpful, as I said before, to figure out a way to utilize the Veritas website to do that.

THE COURT:  All right.

MS. KIPPES:  Thank you.

THE COURT:  Thank you very much, Ms. Kippes.

All right.  So, before the Court gives her comments, Mr. Francisco Aguirre, do you wish to be heard any further, sir?

MR. AGUIRRE:  Thank you, Your Honor.  Just it occurs to me that we wouldn't be having this hearing unless there was a little tree shaking, if you will, and that the victims are at least finally being heard.  And I am going to agree with just

104

one thing that Mr. Hendricks said that, yeah, there has to be a way to resolve this issue, it needs a couple of weeks with Vervent to resolve this issue.  It is partly a communication problem, but it is also a problem that is being felt by this community, particularly when it comes to repossessions, Your Honor, and unfortunately there was no witness to talk about the impact of the repossessions.  When the cars are being lifted by the repossession companies, the repo companies are demanding an exorbitant amount of cash -- cash only, cash only -- amount to retrieve the victims' vehicles, but they were also demanding, Your Honor, a valid U.S.-issued ID, which, as we mentioned, most of these folks do not have.  That is the real-life consequence.

Your Honor, I'm merely trying to provide some input, if Ms. Kippes, Mr. Lawrence, Your Honor, Mr. Hendricks, if I could be a source of communication and information for you folks to make the system work, to make the system improved, that is my intention, Your Honor.  My intention is (indiscernible) is clear.  Like I said, the stories that I've heard from these folks have been, some of them, echoed in the court, and I appreciate Ms. Kippes, Mr. Lawrence, and Mr. Hendricks, and of course Your Honor for the time that you've dispensed to these folks and to myself today.

THE COURT:  Thank you, Mr. Aguirre.

Mr. Hendricks, Mr. Lawrence, if either of you know

105

the answer to this question because it was -- it's actually part of the Court's concern, are there active repossessions that are going on right now?

MR. HENDRICKS:  I think that's a question for Vervent --

THE COURT:  Okay.

MR. HENDRICKS:  -- I don't know the answer.

THE COURT:  Mr. Lawrence?

MR. LAWRENCE:  Your Honor, I do believe Vervent as the servicer -- how about I don't run my mouth on that?

(Laughter)

THE COURT:  Okay.

MR. LAWRENCE:  I don't know the answer to the question --

THE COURT:  Okay.

MR. LAWRENCE:  -- I'll just say that.

THE COURT:  All right.  Thank you.

So, the Court -- obviously, the Court has a variety of concerns, I've said them now repeatedly, one is the sanctity, transparency, and efficiency of the court process. This is an incredibly complicated case that, as I've said many times, fell into the Trustee's lap in what can only be described as trying to catch a flaming ball of fire.  So I understand in part how we could have this breakdown in communication and this breakdown in processes, and I think that

that's one of the things that we need more than anything now. I think it's now apparent to Vervent -- we only heard maybe a handful of folks testify, but it does look like Vervent is certainly trying to reach out to them, but in some cases obviously reaching out a couple hours ago is not going to help, and I recognize that people are trying.

What I'm going to ask the Trustee and Vervent to do, and recognizing that Vervent is going to have to speak with those banks and trusts and securitization parties that it works for as well, is to come up with some sort of process, some sort of communication process that will allow Vervent as the servicer that has been appointed for each of the underlying banks, as the servicer that has been appointed for the Trustee for any estate-owned vehicles, which would be the Tricolor-owned vehicles, to establish communication processes to, number one, work with all of the different folks that have filed these pleadings.  Okay?

Thankfully, from an informational standpoint, you might have more information about these folks than you have with respect to some accounts because all of these people have put their vehicles and VINs and dealer locations and things of that nature into the motion.  So, you've got a head start, so to speak, with respect to them.

And then what I'd like you to do is, let's put the process out by notice.  And, again, the Court is recognizing

that this is going to take a little bit of time.  And then that's the initial way we are going to address these motions.

Mr. Aguirre, I'm very concerned, sir -- I don't disagree with you, sir, that if it weren't for your involvement maybe this stuff doesn't get to the Court, the problem is court processes are run two different ways: *pro se* by individuals, which means they draft and file their own pleading, or by attorneys, and you, sir, are neither -- and Ms. Beltran is neither of those and, at a minimum, you've got your toe on the line of the unauthorized practice of law.  And I don't want to go too far, this is not necessarily an evidentiary hearing, no matter what it might look like.  It's a status conference.

So, the Court is concerned.  And the Court is concerned about, frankly, what we've got is 70 or so virtually identical pleadings, and I don't know that any of them were going to get us to where we needed to go.  Okay?  I think we need a process and I think that that much is clear.

So, I'm not going to address any further today whether or not you or Ms. Beltran or Beyond Attorneys LLC has committed the unauthorized practice of law, I'm not going to do that today.  I am going to state that any pleading for which a fee has not been filed is going to be denied within seven days if no fee is paid.  Now, I'm going to say that because what you have filed in my court are motions to lift stay and motions to

108

enforce the stay, all which require a $199 fee.  With the sole exception of I think something that Ms. Martinez might have said, I don't think anyone really seeks to lift the automatic stay.  If you intend to bring a lawsuit, then, yes, you may need to lift the automatic stay, but if you want to proceed under the motions as filed, I would number one strongly recommend that every single one of the folks who filed them consult an attorney, an actual attorney.  Okay?  But I don't think that they do see a lift of stay.

So, if you want to proceed under that motion, then you have to pay the fee, and otherwise the motion is going to be denied within seven days.

What I'll also say is, for all of the motions that call themselves no-fee motions, the Court is going to be clear there is no such thing as a no-fee lift-stay motion.  There is a fee, it's $199.

The next thing that I will address is all of the original motions, the original lift-stay motions said that they're going to be set and heard without a hearing.  No, they're not.  Objections have been filed and they will all be subject to notice and a hearing.  I can tell you right now, final hearings on lift-stay motions are typically evidentiary hearings and they're in person.  I don't intend to change how hearings are taking place just because folks are trying to do this without attorneys.

There are a lot of what the Court will just generally refer to as either misstatements or misconceptions about the automatic stay and things like that in the motions.  If folks intend to proceed on them, we're going to have evidentiary hearings, but, again, I don't think that's what everyone wants. And I recognize that I've got some non-English speakers, I recognize that folks are just trying to address problems they have and their idea was let's get it into court.  And maybe to that extent you've at least gotten people to hear you; the Trustee hears you, Vervent hears you, the Court hears you, the United States Trustee's Office hears you.

So, from a docket perspective, if you haven't paid the fee, the motion is going to be denied in seven days.  If you want to keep your motion that a fee has already been paid for, we're going to set that for a final evidentiary hearing and I'm going to give you a date in a little while of when we're going to set that.  But before that date occurs the Court is going to have a hearing on a process that is going to allow each of these consumers to address with Vervent and/or the Trustee, in the first instance because, again, a lift-stay is a very specific type of motion and I think that the wrong kind of motion has been filed.

The last thing that I'm going to do is I am going to put a freeze on repossessions for a month.  I don't do that lightly.  I've got 50 or so motions before me and I've got a

110

handful of folks that just testified today that they're having considerable trouble with their loan balances.  I'll be honest, we tried to access some of the websites while we were in the hearing today.  It's confusing, okay, and it's confusing with folks with seven years of college degrees.

And so I don't do that lightly because I recognize the time and the pressure that Vervent is under, the time and the pressure that the Trustee is under, but I think that 30 days of a freeze of repossessions will allow the parties to come to the Court with a process and a framework for resolution.  And I'm not saying that the Court has to be necessarily in charge of that process or involved in that process.  To the extent that it gets out there and you put it on the Veritas website and things start improving, that's fine. This is definitely an out-of-court issue, but given that I have all of these pleadings filed in front of me, I'm trying to make sure that whatever process gets put out there is a process that is going to address all of the folks that have filed these motions.

So, with all of that said, let me look at the calendar.

(Pause)

THE COURT:  Mr. Lawrence?

MR. LAWRENCE:  I don't want to interrupt, but I now have some things that I need to say and --

111

THE COURT:  All right.

MR. LAWRENCE:  -- a conversation to have with you.

THE COURT:  Sure.

MR. LAWRENCE:  But --

THE COURT:  No, I was just going to find a time for a future hearing.

MR. LAWRENCE:  Okay.  Repossessions are happening right now.

THE COURT:  Okay.

MR. LAWRENCE:  So, I'm sorry I didn't know that before.

THE COURT:  No, I had a feeling they were based on prior motions, but please proceed.

MR. LAWRENCE:  And so, as a result of that, if -- you know, if somebody today, based on the criteria in the servicing agreements and to how -- and Vervent's policies and procedures based on days, delinquent days or days since last payment, there may be right now, as we standing here in court --

THE COURT:  I have no doubt.

MR. LAWRENCE:  -- orders going out to repossess vehicles.  Additionally, there may be repossessions that occurred and the tow truck driver is driving the vehicle to an auction house.  There may be repossessions that have been completed and dropped off at an auction house, and those vehicles may be in an intake process where they're being

112

inspected and -- Your Honor went through a lot of this on the sale process --

THE COURT:  Yes.

MR. LAWRENCE:  -- about how those vehicles are appraised and so forth.

So, I don't have all of the answers about this, but I think one thing that might make sense under the circumstances is to set that repossession freeze out some amount of time for us to attempt to, you know, pause the processes that are actively in place, and then also to try to negotiate or address what's going to happen with -- for example, if the Court wants us not to complete repossessions that are currently in process and the vehicles are at auction houses, then -- and say for a 30-day pause, then there will be 30 additional days of storage costs at those auction houses while the vehicles sit.  And other kinds of logistical issues like that that I'm trying to anticipate on the fly, Your Honor --

THE COURT:  No, I recognize it's a mess, if you have another suggestion, Mr. Lawrence, because here's the problem that the Court has, okay?  If I take a situation in which someone stopped paying because they stopped seeing their balance recognize payments, okay, I'll be honest, that's not the most illogical response to there is no system showing me that my payments are going somewhere.  Okay?  So, I stopped paying.  Well, the stop paying got people's attention, but if

113

they stop paying for two months and now their vehicle is subject to repossession, but we've got people that say, look, I'm willing to pay, I just want to make sure I'm paying the right entity.

So, again, as I sit here right now, I don't know how in terms of communication, in terms of contact.  I know Vervent is drinking from the fire hose, I get that.  I have no doubt, but I guess my question is, how do I meet my resolution with the problem that is obviously happening?

MR. LAWRENCE:  Well, one thing I heard today, Your Honor, that I believe is happening for some of these people is that there are charges that are accruing on these accounts --

THE COURT:  That I understand, yes.  The issues with insurance and it's not going down --

MR. LAWRENCE:  That sort of thing.

THE COURT:  -- because of forced-place insurance --

MR. LAWRENCE:  Right.

THE COURT:  -- that's going to be the situation.

MR. LAWRENCE:  That could explain why the balance is going up --

THE COURT:  Yeah --

MR. LAWRENCE:  -- instead of down.

THE COURT:  -- that can be the situation for certain individuals, I don't doubt that at all.

MR. LAWRENCE:  And to your point, Your Honor, we

114

don't know, right?

THE COURT:  We don't.

MR. LAWRENCE:  Because some of these people came and made these allegations today and --

THE COURT:  Agreed.

MR. LAWRENCE:  -- and the information that we provided you doesn't answer all of those questions either.  So, I understand that.

THE COURT:  And so I guess my question is -- and, look, I'm not trying -- those in which the repossession is already underway, I don't think I can stop that without making the estate bear more expense, which is not my intent.

MR. HENDRICKS:  Just no more pickups for 30 days.

MR. LAWRENCE:  I do think --

THE COURT:  Yeah, and that's --

MR. LAWRENCE:  -- that is --

THE COURT:  -- and that is what the Court intended in terms of freezing repossessions is no new repossessions going forward.

MR. LAWRENCE:  And just, Your Honor, I know that the Court is sensitive to this, but I would expect that that will result -- it may be acceptable from the Court's perspective, but I just want to say that may result in decreases in the value of these assets, right?  As it becomes clear that there aren't going to be any repossessions, I think that collections

are probably going to be materially impacted.

THE COURT: Oh, no, no, the freeze on repossessions would only be to bridge us to the next hearing. Again, my hope is to establish a communication process, a dispute-resolution process, and a process that at least -- I'm not going to say it's broken, but I'm going to say there's kinks in it. And, frankly, perhaps we have a slew of people out there who are willing to make these payments if they have assurance that at the end of the making of the payments they get title to their vehicles and, if I have 50 filings, I know that there are probably at least 45 different scenarios, right?

MR. LAWRENCE: And, Your Honor, I hear some action, activity behind me. I think it would be appropriate, at least to my view, if I could confer with Mr. Hendricks and Ms. Burns about that.

THE COURT: Why don't we do that. It's 5:11 now, why don't I take a recess until about 5:30, give you guys time to at least think about it. I'm sure that there are other folks on the line who may want to -- your clients that might want to give you some feedback. If you need a little bit more time, I'm here.

It's like I said, I didn't intend to rule from the bench today. I'm trying to serve a few masters; I'm trying to figure out what's the best process going forward, I'm trying to make sure that folks like we heard from today, some of which

just want to make sure that they're making the payments in the right spots and that they're getting credit for those payments, and folks that have vehicles that have nothing on their credit, that some of these issues can be addressed and when and how. It's the 17th now and thinking about when we could establish --

(Crosstalk on Zoom)

MR. HENDRICKS:  Your Honor?

THE COURT:  Mr. Hendricks.  We're going to mute that. Thank you.

MR. HENDRICKS:  Before we break, I think it would be helpful to get that the Court has in mind for setting --

THE COURT:  Okay --

MR. HENDRICKS:  -- so we know a time frame --

THE COURT:  -- for setting --

MR. HENDRICKS:  -- at least to discuss.

THE COURT:  -- I am thinking -- Ms. Harden and she'll have to give me the final word, I'm thinking that we would probably have this on the 26th or the 27th of March.  Okay?

MR. HENDRICKS:  Okay.

THE COURT:  Because other than that, I'm going to have to ask for another court to hear it.  Okay?  And this seems like a lot to ask of another judge.

I may have time the morning of March 23rd, but again, I'm trying to bridge us to a process.  So that's not anything that I have in stone, but I'll hear people out.

117

Mr. Hendricks.

MR. HENDRICKS:  The Trustee is speaking at the Fifth Circuit Bar on the 26th and 27th.

THE COURT:  Right, right, that's true.  I forgot about that.  I could not go because I was out of town before that.

MR. HENDRICKS:  I'm actually out of the country on another matter the week of the 23rd.

THE COURT:  Okay.  All right.  Well, let's -- they're starting -- I'll have time the following week.

So, let's take a break.  You guys talk about what you would propose.  I have to take a half a day on the 31st, I've got some time on April Fool's Day, of all days --

(Laughter)

THE COURT:  -- and some other days.  So, I've got time in the next week as well.  So, let's just talk it out, but I'll give you guys time to talk with your clients and some of the other interested parties.

MR. LAWRENCE:  Thank you, Your Honor.

(Recess at 5:15 p.m./Reconvened at 5:40 p.m.)

THE COURT:  Please be seated.  We're going to go back on the record in Case Number 25-33487.

All right, Mr. Lawrence.

MR. LAWRENCE:  Your Honor, thank you for the moment to discuss.

118

THE COURT:  Of course.

MR. LAWRENCE:  I essentially would report to you that the parties who are here who had a chance to speak during the break, the clients that were consulted, all pretty much agree that more communications, more outreach, more information is already being provided and can be enhanced, right?  And so more of that will be done.  My client tells me that there's already been outreach to Univision, who called for like an interview, and so there was some, you know, information that we got to distribute through that channel.  The lawyers out in the hallway talked about that it may be more effective to work through Facebook or -- that's for people who are closer to my age, I guess, or older -- but maybe TikTok or whatever else it is that has the best chance of success at reaching people --

THE COURT:  Which platform did Mr. Hendricks recommend?

MR. HENDRICKS:  Channel 33 --

(Laughter)

THE COURT:  I'm kidding, I'm kidding.

MR. LAWRENCE:  I am embarrassed to admit that my suggestion was maybe we just do a big bailout.  And everybody in the hallway said, you know, maybe not, Mr. Lawrence.

So, you know, we also talked about that there are -- it's possible that we may seek approval from the Court for a specific message that attempts in the best, simplest language

119

possible to convey the key components of the continuing stipulations about Vervent's servicing role, so that when we distribute that we can say this has been approved by the United States Bankruptcy Court and that Vervent is really servicing these loans and for real, when you make your payment, they are collecting it, counting it, and crediting it to you.

So those are some of the ideas that we talked about. And then lastly, Your Honor, with respect to the repo --

THE COURT:  Yes.

MR. LAWRENCE:  -- pause or moratorium --

THE COURT:  Yes.

MR. LAWRENCE:  -- Your Honor, we are capable of implementing whatever the order is that you would enter.  We would suggest that the moratorium take effect at some point, maybe a specific time in the future.  And people who are smarter than me pointed out that a lot of repossessions occur at night, so maybe that time should be maybe, you know, midday or something like that to make it easiest to implement.

And lastly, Your Honor, I think we had started down this road before we took the break, but that that would be -- it would be best if that was prospect, so that we could continue and conclude and complete repossessions that are already in effect.

Your Honor, I don't have this as testimony and you've already told me that it's not an evidentiary hearing today, but

120

the information I'm receiving from the clients, from Vervent, is that we have completed fewer than 1300 repossessions since we've been the servicer on these loans, and that our portfolio is somewhere in the neighborhood of 60,000 vehicles, which means that repossessions amount to a little bit less than -- a little bit more than two percent of the loan portfolio, for whatever it is that the Court's information may help guide your decision.

We are incentivized and we would like to incentivize the borrowers to pay their payments or to enter into a loan modification program so that they can make their payments because we, Vervent, and the various parties who assert interests in these loans make more money when borrowers make payments. And, yes, we make the most money when people pay the contractual rate and the amounts that are specified in there, but Vervent is already rolling out implementing loan modification programs, I think you heard testimony from some of these parties today that they're receiving those communications, and Vervent is interested in increasing the scope and scale of those loan modification programs.

I don't have specifics for you about exactly what those programs would look like. I can tell you that Vervent has already commenced outreach to the servicing counterparties, to the servicing agreement counterparties, you know, the Chases and the Wilmington and so forth, to message to them that the

121

best way to -- to say what I just said, the best way to make money off this portfolio is to bring people current, to bring people performing to make these loans manageable for the borrowers.  We are not looking to repossess vehicles and because that's not the best outcome for us here and it's not the best outcome for the estate.

So, if the Court wants to implement the repossession freeze, those are some comments.  We would like to use any such time to maybe make a broader push on communication and potential loan modification options that would assist borrowers and we're going to be doing that anyway.

THE COURT:  All right.  Thank you, Mr. Lawrence.

Mr. Hendricks, anything further on behalf of the Trustee?

MR. HENDRICKS:  I don't -- I think Mr. Lawrence covered what we need to hear.

THE COURT:  Okay, excellent.

Anything, Ms. Kippes?

MS. KIPPES:  Thank you, Your Honor.  No, there's no answer right now, but I do think the conversations in the hallway were productive and I look forward to seeing it better fleshed out.  So, we'll see what we get.

THE COURT:  Okay.  Thank you.

I do agree, Mr. Lawrence, that some sort of Court-approved statement or FAQ sheet might be helpful here that

122

might be able to tell people, if it could be circulated to the right folks, that pay-near-me is still the right avenue for payment, if you have questions, call X.

And, I think it's been made plain that there are communication busts and it can be improved, but I don't necessarily believe that it's indicative of a broken process. I think that at least we've heard inklings of people are unsure of the process and I think that perhaps rightly so in a lot of circumstances that they don't have the transparency. And to be honest, it's something that Vervent has been trying to work through to get all the records from Tricolor and kind of keep going as the back-up servicer. So, again, the glitches in the process are not necessarily surprising to the Court.

So, in terms of getting some sort of Court-approved statement out, the Court is not opposed to that. If you want it out before the 27th, I'm not sure that this is something that requires -- and let me explain -- I'll be out of town the 2nd through the 20th --

MR. HENDRICKS:  Of March, Your Honor?

THE COURT:  -- of March, yes.  So, I think that this is probably something that the Court could act on quickly, if it could be filed and sent to the Court's attention before that time.  I recognize that there's --

MR. HENDRICKS:  That doesn't strike me as being particularly controversial, I think it's just a clarification.

123

THE COURT: Right, and I don't think there's anything in the rules that would require anything like a 14 or a 21-days notice. So, I think that I could certainly give you guys the imprimatur of the Court's approval on that to get it out quickly.

If the parties believe that any sort of processes need to be changed or need some Court approval of a process, I suggest you get those on file such that we could hear them at the end of March, early April, if you need new processes.

I'm going to push the motions to lift stay for which the fee has been paid, I'm going to push those to end of March, early April, because that will give us time to get the notice out, that will give us time to see if these are otherwise resolved, or if we have to develop any new processes we could do it in the time before these have to be heard. As I said before, for all of the motions that are filed for which there was no fee paid, they were filed with a change of title that said we're not asking for relief for stay, but when you read the inside of the motion they request relief from stay, those motions still require a fee. So, if they're going to remain on the docket, they're going to be denied if no fee is paid.

Now, again, I can't say this enough times, I don't think based on the limited folks that I was able to hear from, the movants today, that most of these people want a lift of stay; they want clarity, they want to know what's happening

124

with their loan.  I'm not sure that they needed court processes to do that, but I don't think that this hearing, this status conference, should I say, has been an all together unproductive process.

So, all of those motions for which a fee has been paid, I'm going to carry those to -- let's see -- is anyone have -- that April 1st doesn't work for?  I've got morning or an afternoon setting.

(Pause)

MR. HENDRICKS:  That works around the Trustee's 341 schedules.

THE COURT:  It does?

MR. HENDRICKS:  Yes.

THE COURT:  Okay.

MR. LAWRENCE:  And, Your Honor, you're asking about April 1st, correct?

THE COURT:  Yes, sir.

MR. LAWRENCE:  I see no reason that wouldn't work for us.

THE COURT:  Okay.  So, again, I'm going to -- that's going to be where I push these motions to lift stay to.  Now, I'm pushing them a little further out, again, to give us time to be able to address everything with the hope that at the end of the day these hearings don't have to be had or that we can winnow these down to the last few folks and they can tell me

what they want a lift-stay to do.  So, I'm going to carry the ones that have fees paid to them to April 1st at 9:30 a.m.

So, Mr. Hendricks.

MR. HENDRICKS:  Your Honor, is there a way to address the 29 -- 27 more --

THE COURT:  No, what's going to --

MR. HENDRICKS:  -- that have been filed since then --

THE COURT:  -- yeah, what's going to happen --

MR. HENDRICKS:  Okay.

THE COURT:  -- is anything that has not been paid for, they're going to get a note on the docket that says this is a lift-stay motion, there's a $199 fee and, if the fee is not paid, it will be denied within seven days.  That's what the Court's minute entry is going to say.

Now, what I do hope is that everything that you're getting Vervent and the Trustee from these motions in terms of information that you're able to use that to make sure that you know these are some customers that have questions.

MR. HENDRICKS:  Yeah, my question was maybe a little bit different.

THE COURT:  Oh, I'm sorry.

MR. HENDRICKS:  After this batch that the Court noticed for show cause today --

THE COURT:  Yes.

MR. HENDRICKS:  -- there have been 27 more filed that

126

were actually filed last week.

THE COURT:  I know.

MR. HENDRICKS:  I don't know how many of them have fees paid or not, but are we going to include all those for --

THE COURT:  Yes, any --

MR. HENDRICKS:  -- the April 1st --

THE COURT:  -- motion that has a request for relief from the automatic stay in it going forward in this case is going to be assessed the $199 fee.  And so what's going to happen is all of those -- trust me, the Clerk's Office is not super happy with me right now, I am *persona non grata* in terms of the Clerk's Office, but I'm going to have them reopen all those entries, they're going to assess the fee and, when the fee is not paid in seven days from whenever it was filed, they're going to be denied.

And, again, that's just a recognition that, number one, the Court doesn't substantively believe that most of these people want relief from stay.  I believe that these were filed by non-attorneys that didn't know what a motion for relief from stay was.

Number two, this is a recognition that if somebody really does want it, they'll pay it, and they'll get their hearing at some point.  The fee could probably also be set for April 1st at this juncture.

And then, lastly, it's just a way to perhaps reduce

127

the cost on the estate to respond to these motions, even collectively, and the cost to Vervent to do so when, again, I think that these were just ill-thought-out processes for these problems.

I'm going to direct that Beyond Attorneys, LLC, Mr. Aguirre and Ms. Beltran, not to file any further -- going from today on, if they're filed without a fee, they're just going to be dismissed. The motions will be denied. I've told you as plain as I can. Another thing is, Mr. Aguirre, these are being filed repeatedly with personally identifiable information in it. They were being filed early on with people's identification, with their international identification in them and that's coming to the Court. And we're redacting it when we see it, but you need to understand, I have thousands of cases, sir, thousands. So, if you think I'm seeing everything that's being filed, no, but when I see it, I can restrict it, but it's not my obligation to be doing this. And this is just one more reason why attorneys should be filing things. Because they will know to not include personally identifiable information.

Another thing is, in some of these text messages -- well, I don't want to -- to be honest, I don't want to say too much because we're on too broad of a line, but just suffice it to say, please do not file things with personally identifiable information in it. You are not doing your colleagues any good there.

128

My rulings today are going to be without prejudice to a further hearing with respect to Beyond Attorneys, LLC.  As I've said before, I am very concerned.  Although I think that the Court can state that the status conference today is probably going to lead to more clarity and transparency for consumers that held loans with Tricolor, I can't ignore the way that this came to the Court, I can't ignore what's going on on the Court's docket, and I can't ignore that folks were paying for what, subject to another hearing, seems to be legal advice that was provided by non-lawyers.  So that will be without prejudice to look further into that.

So that leaves the Court with what to do with respect to repossessions.  Let me look at the dates.

(Pause)

THE COURT:  The Court will readily recognize that there is no good answer here.

Well, with respect to repossessions, number one, to the extent that a car is turned over voluntarily, the Court will not prohibit anything of that nature.

MR. LAWRENCE:  I was just going to say, I had a couple more comments, and the number one on there was can we keep doing voluntary repossessions.

THE COURT:  Yes, voluntary repossessions --

MR. LAWRENCE:  Right.

THE COURT:  -- the Court isn't stopping that at all.

129

There's a hundred reasons why somebody might want to voluntarily turn over their vehicle and nothing is to stand in the way of that. Likewise, the Court's procedures are not going to apply to cars that have already been repossessed, cars that are sitting that have been repossessed recently and are sitting at auction houses, and things of that nature.

I think that what the Court will do is to say that there will be a moratorium on repossession other than on a voluntary basis that will go into effect on February 20th at noon Central time. And, again, it's not going to affect voluntary repossessions, it's not going to affect anything that's already -- vehicles that have already been repossessed and vehicles that are already at auction houses or in transit to auction houses, those can go forward.

(Pause)

THE COURT: Actually -- oh, Mr. Lawrence, please.

MR. LAWRENCE: Okay. I'm happy for you to go first too, Your Honor.

THE COURT: No, go ahead.

MR. LAWRENCE: So, I actually got to participate in a legal proceeding in Guadalupe County earlier this week or last week maybe, I guess it was last week, where an individual sold a car that had been subject to a Tricolor lien to another person, but didn't tell them that there was a Tricolor lien on it, took the cash and disappeared. And so that person came to

the police station and reported this fraudulent sale when they went after -- I'm sorry, they went to the DMV to put the title in their name, and that's when they found out that they had been defrauded. We were called by a JP Judge who was conducting a hearing and said his office and court were filled with police officers and wondered if the -- you know, if we wanted to come by and pick up our vehicle.

So that was a perhaps unnecessary digression to say we'd also like to be able to keep picking up impounds where the vehicle has been impounded by law enforcement or if -- I guess that probably also includes like a -- not a repossession because of default under the loan, but because the vehicle was just left somewhere and it was impounded --

THE COURT: Yes.

MR. LAWRENCE: -- or something like that. And then additionally we would ask to be able to keep sending a notice of intent to sell on vehicles that have previously been repossessed. I think that's pretty much the intent, the spirit of your explanation of the order on repossessions, but that is -- so that when we have a vehicle in our possession already, we just want to make sure that your order doesn't prevent us from taking, you know, the following steps, the notice of intent to sell, and then transport the existing repossessions to auction after that notice of intent expires.

Again, just kind of fleshing out what we mean when we

131

say we won't do new repossessions, but those are just some of the things that follow on from existing repossessions that we want to make sure are okay --

THE COURT:  Fair enough.

MR. LAWRENCE:  -- to the Court's order.

THE COURT:  Yes, and those would be allowed.  You can post the notices, you can pick up anything that's been impounded or otherwise turned over in that way, and you can continue voluntary repossessions.

MR. LAWRENCE:  Thank you, Your Honor.

THE COURT:  You're welcome.

I think that what I'll do is I will put the moratorium in effect from February 20th at noon Central time to March 23rd at noon Central time.

If there are any motions that are filed -- I think Tricolor has a big sale hearing that afternoon --

MR. HENDRICKS:  The 23rd?

THE COURT:  Yes.  If motions are filed during the month of March, reach out to settings, and that may be a day that we can either have further status on this one on the 23rd because the moratorium will be lifting.  Again, you'll have to go through Ms. Harden, but we can probably get it set if we need to that morning.  Because I understand the afternoon will be fully taken up with the sale hearing, and I think there's a motion to compel that day as well.

132

Again, I don't issue this moratorium lightly.  I did not want to do this.  I don't like to do anything that could have a detrimental effect on collection of assets for the estate.

And for all of those folks that are on the line, I think you've now heard that Vervent is the servicer that is collecting for Tricolor.  It sounds like in a lot of instances, at least probably today, if not prior to today, you've received something from Vervent that says that they're trying to reach out to you.  If you've got questions with respect to your loan, if you've got questions with respect to insurance and any forced-place insurance and things of that nature, reach out to them.  It's best to address your loan payments with them and your loan balances with them sooner rather than later.

Like I said, there will be the moratorium in place from February 20th at noon to March 23rd at noon.  That is by no means a statement by the Court that these loans shouldn't be being paid or that these loans shouldn't be being collected by Vervent, they should.  I am just recognizing that there has been some communication issues, which the Court doesn't find that are probably that uncommon in a case like this where a company with this active of a loan portfolio on cars filed bankruptcy and you had to get a third party servicer to come in and keep things active of this measure.

So, what I'm hearing from at least some of the

parties that I've heard from today, the intent is to try to keep the car, the intent is to try to maintain your credit, the intent was to try to make the loan payments, but you needed the assurance. And so there are already court orders in place where Vervent is the servicer on these loans. I am not stopping the payments on the loans, you can keep making your payments through the same processes to Vervent. I am going to stop any repossessions primarily because folks wanted clarity on their loan balances.

And folks that have stopped making payments because they were unsure who to pay and they were unsure who Vervent was, I hope that this has been a helpful process for you. Obviously, the Trustee and Vervent and others are going to try to make the lines of communication even more fulsome so that you have more information, but please don't hear me to say that the moratorium on repossession is going to be in place forever because it will open back up. This is primarily a product of the Court's schedule and that I want to give time for people to get the information out there because I recognize that the common mode of communication, whether that be physical addresses -- snail mail or anything else doesn't always fit the problem here because so many people were operating solely online. I heard today repeatedly, how did you come across this? Social media.

So, I want to give folks an opportunity to kind of

134

think out loud with each other of the best way to tackle these problems, but I want you guys to hear me loud and clear, the moratorium on repossession is temporary and will lift.  And so this is your opportunity to make your payments, get them caught up, and get the best information that you can from Vervent in the meantime.  And if anybody has a question about their motion and the setting, ask me now and I'll answer your question, again, about the filing because I'm not imposing a fee on these motions to try to get everyone to pay 200 or more dollars to the Court, that's not what I'm trying to do.  I don't think you need these motions, but as is my duty, I'm going to hear every motion that is properly before the Court.

So, does anybody have any questions about the Court's rulings?

(No audible response)

THE COURT:  All right.  Well, thank you all for being here, everyone who testified, thank you very much.  And the Court will stand in recess and this status conference will be continued until March 23rd.

MR. HENDRICKS:  Do we need to try to craft an order?

THE COURT:  We do need to craft an order and I would be most thankful to you guys for doing it, especially because I know that Mr. Lawrence is going to go back to his office and Vervent is going to say but what about, and what about and what about, and at that point I can -- I'm happy to answer those

135

when the order comes to me.  And if you'd send it to me in Word, thank you very much, and if you'd send it -- if you send it to Ms. Harden and let her know that it's there, then I'm happy to look at it and just address any kind of issues that might have come up after the hearing.

Does it make sense to continue this status conference to 9:30 on Monday the 23rd, the first thing I get to do, or do you want to -- I don't want to cut into your sale hearing. I've been told that you guys are going to use up every minute of that afternoon, but we could do that, I could put it to 1:30.

MR. HENDRICKS:  I'll be out of town personally, but --

THE COURT:  Okay, that's true.

MR. HENDRICKS:  -- yeah.  If we just have all this to the 1st --

THE COURT:  Oh, I could put it to the 1st.

MR. LAWRENCE:  Your Honor, I don't have any problem with the setting, this is the status conference on the --

THE COURT:  On the motions --

MR. LAWRENCE:  -- show-cause --

THE COURT:  -- and the motions are being set for the 1st, you're correct, I probably don't need to reset it.

MR. LAWRENCE:  So, if there's going to be a setting on the show-cause hearing, that's not what you're asking

136

either.  So, this is the status conference.  I think, if that's what we're resetting, that makes more sense to go to the 1st, right?

THE COURT:  Yeah, I think you're right.  I think that we will have a further status conference on the 1st that we've already set for 9:30, I believe.

And, as I said, if anything of an urgent nature comes up and motions be filed, we can either set those on the 1st or we can set those the morning of the 23rd, like I said, if they're urgent and they go to the relief in the moratorium. Okay?  I'm sure that's clear as mud.

(Laughter)

THE COURT:  All right.  Thank you all.

MR. HENDRICKS:  Thank you, Your Honor.

MR. LAWRENCE:  Thank you, Your Honor.

* * * * *

137

# C E R T I F I C A T I O N

We, DIPTI PATE, TRACY VERGOLLO, KAREN WATSON and TRACEY WILLIAMS, court approved transcribers, certify that the foregoing is a correct transcript from the official digital audio recording of the proceedings in the above-entitled matter.

/s/ Dipti Patel

DIPTI PATEL

/s/ Tracy Vergollo

TRACY VERGOLLO

/s/ Karen Watson

KAREN WATSON

/s/ Tracey Williams

TRACEY WILLIAMS

J&J COURT TRANSCRIBERS, INC.        Date:  February 19, 2026