

**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

_____
**United States Bankruptcy Judge**

**Signed June 10, 2026**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Chapter 7** |
| | § | |
| **Tricolor Holdings, LLC et al.,** | § | **Case No. 25-33487-mvl7** |
| | § | |
| **Debtors.** | § | |
| | § | |
| | § | |
| | § | |

### MEMORANDUM OPINION AND ORDER FINDING BEYOND ATTORNEYS, LLC AND FRANCISCO X. AGUIRRE IN CONTEMPT OF COURT AND THAT EACH SHOULD BE SANCTIONED FOR THE UNAUTHORIZED PRACTICE OF LAW

Before the Court is a matter in connection with the *Order for Beyond Attorneys, LLC, Francisco Aguirre, and Lluvia Medina Beltran to Appear Before the Court on April 1, 2026, at 9:30 a.m. and Show Cause Why They Should Not Be Sanctioned for the Unauthorized Practice of Law* (the "**Show Cause Order**") entered by the Court on February 23, 2026 [ECF No. 902]. The Show Cause Order was entered following a hearing on February 17, 2026, related to an *Order for Beyond Attorneys, LLC, Francisco Aguirre, Lluvia Medina Beltran, and the Consumer Creditors*

1

*Listed Herein to Appear Before the Court on February 17, 2026, at 2:00 P.M. for Status Conference* (the "**Order to Appear**") entered by the Court on February 6, 2026 [ECF No. 754].[1]

The purpose behind both the Show Cause Order and the Order to Appear was to address numerous motions filed in the above-referenced Chapter 7 bankruptcy case related to Tricolor Holdings, LLC and its related entities (the "**Debtors**" or "**Tricolor**"), jointly administered under Case No. 25-33487. More specifically, the Court was made aware of multiple *Motions for (1) Relief from the Automatic Stay Under 11 U.S.C. § 362(d)(1); (2) § 105(a) Status-Quo Freeze; (3) Interim Relief Under Rule 4001(a)(2); (4) Determination on the Papers with Waiver of Appearance* (the "**Lift Stay Motions**") filed, *pro se*, by various Consumer Creditors (the "**Consumer Creditors**")[2] on January 13, 2026, and January 21, 2026, respectively [ECF Nos. 655, 676–90]. Additionally, on February 2, 2026, and February 11, 2026, respectively, *Motions to Enforce the Automatic Stay, Clarify the Scope of Servicing Authority, and Preserve Status Quo Pending Determination of Lien Ownership* were filed (the "**Motions to Clarify**" and, together with the Lift Stay Motions, the "**Consumer Creditor Motions**"), *pro se*, by several more Consumer Creditors [ECF Nos. 718–723, 779–806].[3]

The concern the Court had with Consumer Creditor Motions is that, despite the Motions stating that they had been filed *pro se*, each of the Motions was virtually identical in terms of format, and that they had been prepared and filed on behalf of the Consumer Creditors by Beyond Attorneys, LLC ("**Beyond Attorneys**"), Mr. Franciso X. Aguirre ("**Mr. Aguirre**"), or Ms. Lluvia

---

[1] For clarity, the Order to Appear at ECF No. 754 was an amended version of the original Order entered at ECF No. 746, which was amended solely to add an additional party to the mailing list of parties served with the Order.

[2] The Order to Appear contains a complete and exhaustive list of the Consumer Creditors.

[3] The Court notes that the Motions filed at ECF Nos. 718–723 and 779–806 have since been corrected on the docket and relabeled as Lift Stay Motions, given the relief requested therein.

Medina Beltran ("**Ms. Medina**")[4] in various capacities. To gain a better understanding of the context and purpose behind the filings, the Court entered the Order to Appear and scheduled a hearing related to same for February 17, 2026 (the "**Order to Appear Hearing**"). At the Order to Appear Hearing, counsel for Anne Burns—the duly appointed Chapter 7 Trustee (the "**Trustee**")—appeared, as did the counsel for Vervent, Inc. ("**Vervent**"), and the United States Trustee (the "**UST**"). Mr. Aguirre appeared *pro se*. Ms. Medina did not appear due to a recent hospitalization according to testimony provided by Mr. Aguirre. Finally, the following Consumer Creditors appeared *pro se*: Jorge Enrique Aguirre, Yosvanys Garcia Diaz, Richard Gildardo Armenta, Salomon Vaquera Oviedo, Mayra Alejandra Robledo Moreno, Angel Celiseo Ceronio, Johanna Ruby Vasquez Zermeno, Brisa Viridiana Martinez Ibarra, Jose Alberto Ferrer Suarez, Jose Eduardo Alas Linares, Jeronimo Gonzalez Isidro, Erminio Melchor Morales, Evaristo Valle Mendoza, Juan Pablo Frigoli Campos, German Augusto Hoyos Baquero, Maria Alejandra Otega, Juan Calafell Martinez, Maria Isabel Vasquez and Karla Celina De Santiago Chavez.

At the Order to Appear hearing, the Court heard testimony from Mr. Aguirre, as well as several of the Consumer Creditors: namely, Brisa Viridiana Martinez Ibarra ("**Ms. Martinez**"), Maria Vasquez ("**Ms. Vasquez**"), Jorge Enrique Aguirre ("**Mr. Jorge Aguirre**"), and Yosyvanys Garcia Diaz ("**Mr. Diaz**").

Following that hearing, the Court entered the Show Cause Order—ordering Beyond Attorneys, Mr. Aguirre, and Ms. Medina to appear before the Court and show cause why the Court should not impose sanctions for the unauthorized practice of law—and set a hearing date for same for April 1, 2026 (the "**Show Cause Hearing**"). At the Show Cause Hearing, counsel for the

---

[4] While the Court initially referred to Ms. Medina as Ms. Medina Beltran in previous Orders, Ms. Medina clarified for the Court her preferred last name.

Trustee, Vervent, and the UST once again appeared. Counsel for TBK Bank, SSB ("**TBK**") also appeared. Ms. Medina appeared *pro se*. Mr. Aguirre failed to appear due to recent reincarceration. No representative of Beyond Attorneys appeared. Finally, Mr. Diaz and a relative of another Consumer Creditor—Luis Lopez ("**Mr. Lopez**")—also appeared *pro se*. At the Show Cause Hearing, the Court heard testimony from Ms. Medina, Mr. Diaz, Mr. Lopez, and a representative from Vervent—Anthony Sperelakis ("**Mr. Sperelakis**").[5]

Upon conclusion of the Show Cause Hearing, the Court took the matter under advisement with the intention of ruling on whether to hold Beyond Attorneys, Mr. Aguirre, and/or Ms. Medina in contempt of court and impose sanctions for the unauthorized practice of law pursuant to, *inter alia*, § 81.101 of the Texas Government Code as well as Rule 9011 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"). Moreover, the Court held that, upon entry of a ruling with respect to the Show Cause Order, a separate hearing would be set with respect to damages in connection with any imposed sanctions.[6]

After consideration of the evidence and the testimony provided, the Court hereby make several findings.[7] First, the Court finds that Ms. Lluvia Medina Beltran did not violate § 81.101 of the Texas Government Code for the unauthorized practice of law, nor did she violate Bankruptcy Rule 9011. Second, the Court finds that, to the extent applicable, Beyond Attorneys, LLC is in contempt of court and violated § 81.101, and damages in connection with its unauthorized practice

---

[5] The Court notes that the testimony provided by Mr. Sperelakis was primarily in relation to the Lift Stay Motion filed by Mr. Diaz and is not deemed pertinent with respect to the outcome of the Court's ruling herein. Therefore, the substance of the testimony provided by Mr. Sperelakis will not be discussed as part of this Order.

[6] Additionally, at the Show Cause Hearing, the UST represented that UST's Exhibits T and U were not available as of the date of the hearing. Accordingly, the Court held that it would accept and consider UST's Exhibits T and U, post-hearing. The exhibits were filed on April 9, 2026. *See* ECF No. 1040.

[7] The Court places great emphasis on the manner with which it considered the evidence presented, especially with respect to the prior acts and/or convictions of Mr. Aguirre. Accordingly, as provided throughout this Order, the Court's inclusion of this evidence remains in strict accordance with the Federal Rules of Evidence (the "**Evidentiary Rules**").

of law shall be determined at a later date. Finally, the Court finds that Mr. Francisco X. Aguirre is in contempt of court for violations of both § 81.101 for the unauthorized practice of law, as well as Bankruptcy Rule 9011(b), and damages in connection with same shall be determined at a later date pursuant to § 105(a) of the Bankruptcy Code and Bankruptcy Rule 9011(c). The following constitutes the analysis underlying the Court's ruling:

## I. FACTUAL HISTORY

Ironically, the name "Beyond Attorneys" is quite apt in this matter, because the facts underlying this matter are utterly unrecognizable with the practice of law. However, to fully understand the gravity of the situation before the Court, it is essential to provide a comprehensive overview of the conduct that preceded this opinion, especially with respect to Mr. Aguirre.[8]

### A. "We're Certainly Not Attorneys"

The title above is a direct quote from the testimony provided by Mr. Aguirre at the Order to Appear Hearing, in which he stated under oath that neither he nor Ms. Medina were licensed attorneys and did not provide any legal advice. *See* ECF No. 863 at 10:24–11:1 ("The role of Beyond Attorneys, my role personally as well as Ms. [Medina's], we're certainly not attorneys.

---

[8] As a threshold matter, Mr. Aguirre did not appear at the Show Cause Hearing due to reincarceration, and thus any objections to the admission of evidence pertaining to his prior acts were waived or forfeited under Evidentiary Rule 103. *See Tucker v. SAS Inst., Inc.*, 462 F. Supp.2d 715, 722 (N.D. Tex. 2006) (holding that Evidentiary Rule 103(a)(1) "requires an objecting party to make specific objections detailing the specific evidence the party wishes to have stricken and stating the specific grounds upon which each piece of evidence should be stricken); *see also In re Stamat*, 395 B.R. 59, 78 (Bankr. N.D. Ill. 2008) (holding not only that Evidentiary Rule 103(a) requires that evidentiary objections be made contemporaneously with presentation of evidence, but also that a party's failure to timely and properly object to the admission of evidence constitutes a waiver on that issue).

We do not provide any legal advice."). This particular proclamation is an all-too-familiar one for Mr. Aguirre, and one that, while legally true, is directly contradicted by his past course of conduct.[9]

While not his first encounter with the legal system, the first point in time that is of moment to the Court is February 22, 2017, when Mr. Aguirre was indicted by the State of Arizona with 19 counts relating to theft, forgery, and mortgage fraud (among other counts), and in which the State alleged that Mr. Aguirre, on or around 2013–2015, "made false or fraudulent pretenses, promises, or material omissions to individuals who thought they were purchasing homes." UST's Ex. O at 2. [10]  Specifically, the alleged offenses involved Mr. Aguirre "providing false information and documentation to obtain mortgages for victims, then taking their down payments and mortgage payments, which resulted in a loss of over 1.7 million dollars across 55 victims." UST's Ex. U at 7.[11]

However, 2018 remained a busy year for Mr. Aguirre, and on June 6, 2018, a *Judgment of Default and Cease and Desist Order* was entered by the Superior Court of the State of Arizona in Maricopa County for the unauthorized practice of law in violation of ethics rules issued by the Supreme Court of Arizona. UST's Ex. I at 1–5. More specifically, the court ordered that Mr. Aguirre pay restitution in the amount of $13,031.83 to Jesus and Dinorah Rodriguez, finding that

---

[9] The Court re-emphasizes that the evidence presented with respect to Mr. Aguirre's past is not being considered to prove that Mr. Aguirre possessed a propensity to commit the unauthorized practice of law, which would contravene Evidentiary Rule 404(a). *See* Fed. R. Evid. 404(a) ("Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait."). Rather, such evidence was admitted in accordance with Evidentiary Rule 404(b) for several other, permitted, purposes, such as: (1) demonstrating that Mr. Aguirre had prior knowledge as to the illegal nature of his actions; (2) highlighting the complete absence of mistake in committing the unauthorized practice of law; and (3) providing a comprehensive accounting of the financial harm Mr. Aguirre's past actions have caused others in similar circumstances to the Consumer Creditors. *See* Fed. R. Evid. 404(b)(2) (establishing that evidence of other crimes, wrongs, or acts may be admissible for other purposes, such as proving "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident").

[10] The exhibits admitted by the UST can be found at ECF Nos. 981 and 1040, respectively.

[11] Setting aside the fact that evidence of Mr. Aguirre's indictment was not objected to, the Court once again clarifies that its consideration of this evidence is solely to note Mr. Aguirre's knowledge of the illegality of drafting legal documentation and collecting fees for same, as well as the severity of the alleged damages suffered by his victims.

Mr. Aguirre was not only inappropriately retained as the plaintiffs' counsel, but charged and/or collected money from the plaintiffs in exchange for "providing advice or services constituting the unauthorized practice of law." *Id.* at 4.

On or around May 21, 2023, Mr. Aguirre was released from the Arizona Department of Corrections, but remained on probation in connection with the above-referenced criminal indictment from June 2023 through October 2025. UST's Ex. U. Likewise, Mr. Aguirre remained subject to a *Criminal Restitution Order* entered by the Superior Court of Arizona in Maricopa County on November 6, 2023, in which he was ordered, pursuant to A.R.S. § 13-805, to pay approximately $1,765,906.40 to the victims of the above-referenced crimes. UST's Ex. R at 1–4.

Despite the conditional nature of his probation, according to the Probation Violation Report issued by the Adult Probation Department for the Superior Court of Arizona in Maricopa County (the "**Probation Report**"), Mr. Aguirre reported to a probation officer soon after his release that he was employed by Gaxiola & Litwak Law Group, to which he was then directed by the officer to refrain from working with "any vulnerable population or mortgages" while holding this position. UST's Ex. U at 3. On June 14, 2023, shortly after the first probation meeting, Mr. Aguirre reported to another officer that he worked as a "legal consultant for the same law firm, was the Executive Director of La Casita de me Angel Foundation (a non-profit) and was trying to **start his own legal consulting service called BeyondLaw Office**." *Id.* at 3 (emphasis added).

After being transferred to a different division of the Adult Probation Department in late 2023, Mr. Aguirre once again met with a probation officer on January 9, 2024, in which he detailed the type of work he performed as a "Legal Consultant" and reassured the supervising officer that he "doesn't file any Court paperwork and that he works under other attorneys." *Id.* at 4. However, Mr. Aguirre notably reported that he completed this work under two LLCs that he had registered

7

in Arizona—Beyond Attorneys, LLC and BeyondLaw Office LLC. *Id.*; *see also* UST's Ex. J (entity search for Beyond Attorneys, LLC on the Arizona Secretary of State website, showing a registration date of December 27, 2023).

During another meeting on July 16, 2024, after being cautioned once again about the limitations of his work, Mr. Aguirre represented to his supervising officer that he "was not doing anything an attorney should do" and was "simply assisting individuals and their families with information through the process, but wasn't representing them in Court." UST's Ex. U at 4. Interestingly, the Probation Violation Report states that, despite Mr. Aguirre's assurances at the July 2024 probation meeting, the supervising officer noted frequent charges related to various clerks of court offices dating back as far as February 2024. *Id.* When questioned about these payments at a September 17, 2024, meeting, Mr. Aguirre represented to the officer that he was simply "paying for filing [a] client's paperwork or their summons, but that he wasn't filing or preparing it himself." *Id.* Regardless, the officer "was still under the impression that Mr. Aguirre was working through a law office primarily." *Id.* As detailed in the report, in order to ensure for more transparency regarding his business practices, Mr. Aguirre agreed to a Behavior Agreement on November 5, 2024, which required him to obtain permission before opening any other LLC in his name and before opening any business-related bank accounts. *Id.*

Unbeknownst to the probation officer, transparency was seemingly not as high of a priority for Mr. Aguirre as it likely should have been, and on March 10, 2025, a Complaint was filed against Mr. Aguirre and Beyond Attorneys in Arizona state court, alleging violations of Rule 75–80 of the Supreme Court of Arizona for the unauthorized practice of law. UST's Ex. A at 1–17. Pursuant to the *Judgment and Order* entered by the court on December 16, 2025, Mr. Aguirre and Beyond Attorneys were ordered to: (1) pay the plaintiffs restitution in the amount of $1,500 within 30 days

of entry of the court's order; (2) permanently refrain from engaging in activity that amounts to the unauthorized practice of law under Arizona law; (3) immediately notify current customers for whom either Mr. Aguirre or Beyond Attorneys had agreed to prepare legal documents for, give legal advice to, negotiate, or otherwise perform legal services on behalf of; (4) return all documents and other property to current customers; and (5) immediately cease using any language that would be reasonably likely to induce others to believe that either Mr. Aguirre or Beyond Attorneys was authorized to provide legal services of any kind in Arizona. UST's Ex. H. at 1–5.

After the above-mentioned case had commenced, and as detailed in the Probation Violation Report, Mr. Aguirre's supervising officer continued to have concerns throughout 2025 that Mr. Aguirre was not being forthright with the nature of his business activities. These concerns included: (1) a July 15, 2025, meeting in which Mr. Aguirre mentioned that he had been interviewed by CNN as an "expert in matters regarding undocumented individuals"; (2) an August 24, 2025, occurrence when the officer received a link to a social media account where Mr. Aguirre was being interviewed and outlining his various services to undocumented individuals, including, specifically, "the ability to protect these individuals' assets, property, [and] bank accounts" in the form of either a property trust or power of attorney under Mr. Aguirre's name; and (3) a September 3, 2025, investigation of Mr. Aguirre's online presence and businesses, which revealed multiple liens filed by Mr. Aguirre against properties, where Mr. Aguirre claimed to be owed money for services totaling approximately $139,000 against purported clients. UST's Ex. U at 4.

Moreover, the supervising officer's September 2025 investigation further revealed that Mr. Aguirre had: (1) formed two new LLCs in February and March 2025; (2) created and named himself the statutory agent of a non-profit entity in March 2025; (3) reported on the paperwork for the non-profit that he never been found guilty of a financial offense, such as fraud; (4) claimed to

be operating an office in Los Angeles, California; (4) expressly provided for on his business websites that he could assist with "Any motion filed. Any county. Any Court in Arizona or in the USA"; and (5) offered services related to divorce proceedings in Arizona, as well as the above-mentioned asset protection services to undocumented individuals. *Id.* at 4–5. Upon being confronted by his probation officer on September 3, 2025, Mr. Aguirre, while admitting to opening two new LLCs without permission to do so, stated that any business-related bank accounts in his name—especially with respect to an entity titled "Benevest LLC"—were inactive. *Id.* at 5.

The investigation conducted by the Adult Probation Department also revealed that, beyond the contradictory information concerning Mr. Aguirre's representations and his continued online presence, Mr. Aguirre's bank accounts and contractual records were even more misaligned. As for his contractual records, according to the Probation Report, on November 14, 2023, Mr. Aguirre was directed to submit all client invoicing to allow his supervising officers to "pair up" his invoices with the numerous cash or check deposits into his bank accounts. *Id.* Not only did Mr. Aguirre fail to supply that documentation, but the contracts that he did supply were largely incomplete or unsigned. *Id.* at 5–6. Moreover, of the completed contracts that Mr. Aguirre supplied, his supervising officer observed that the contracts contained payment structures similar to an attorney's—such as a contingency fee for any settled civil matters—as well as a provision stating that Mr. Aguirre would submit a lien on a client's property or wage garnishment, including a monthly interest rate, if fees went unpaid. *Id.* at 6.

As for his bank records, according to a Supplemental Report completed by the Adult Probation Department, Mr. Aguirre's 2024 tax returns contained substantial discrepancies in terms of Mr. Aguirre's reported income in comparison to the transactions flowing in and out of Mr. Aguirre's purported inactive accounts. *Id.* at 11. More specifically, the supervising officer noted

10

that while Mr. Aguirre had reported self-employment income of $43,580 on his 2024 tax returns under his various business entities, a review of the businesses' bank accounts revealed that Mr. Aguirre had received approximately $143,000 in direct client payments via platforms such as Zelle or Square, approximately $98,000 in check deposits, and approximately $66,000 in cash deposits, totaling approximately $308,000 in potentially unreported or underreported income for 2024. *Id.* Notably, the supervising officer observed that Mr. Aguirre had continued to receive a substantial level of income in 2025, accruing approximately $42,000 in October 2025 alone. *Id.* Enter the *Tricolor* bankruptcy case.

### B.  The Consumer Creditors' Dilemma

As noted above, the Debtors filed the underlying Chapter 7 bankruptcy case on September 10, 2025. ECF No. 1. A cursory glance at the Court's docket and the dozens of filings in the early days of this case reveals the complex, yet fast-moving nature of the proceedings. In short, the Debtors were a Texas-based auto dealer and subprime auto lender with approximately 60 retail locations largely located in the U.S. Southwest. *See, e.g.*, ECF No. 107 at 3 (the Trustee's *Emergency Motion for Limited Authorization to Operate Pursuant to 11 U.S.C. § 721*, briefly summarizing the Debtors' operations). Not only did the Debtors sell vehicles to their customer base, but also provided financing and auto repairs, among other related services. *Id.* Accordingly, complex matters have continued to arise in this case, primarily revolving around the tens of thousands of vehicles with outstanding loans to Tricolor customers, and how best to construct the appropriate procedures to continue servicing the underlying loans, allowing Tricolor's customers to keep their vehicles.

Prior to the Debtors' petition date, Vervent served as the backup loan servicer to the primary loan servicer, Tricolor Auto Acceptance, LLC ("**TAA**"), which was terminated as the

primary servicer due to certain prepetition defaults. *See* ECF No. 53 at 2–4 (the Trustee's *Emergency Motion for Entry of Order Approving Stipulation Between Chapter 7 Trustee and Vervent, Inc.*, briefly summarizing Vervent's role and operations as an auto loan servicer). Pursuant to the *Order Granting Chapter 7 Trustee's Motion for Entry of Order Approving Stipulation Between Trustee and Vervent, Inc.* (the "**Vervent Order**") entered by the Court on September 19, 2025 [ECF No. 79], Vervent became the primary loan servicer with respect to the thousands of outstanding car loans with former Tricolor customers. As part of its assumed role, Vervent would provide numerous services to the former customers, including: (1) managing, servicing, administering and making collections on loan receivables; (2) collecting, transporting, disposing, and/or repurposing the vehicles related to the loan receivables; (3) investigating delinquencies in connection with unpaid loan receivables; and (4) importantly, communicating and contracting with various third parties and creditors of the Debtors. ECF No. 79-1.

Despite the seemingly comprehensive plan implemented by the Trustee and Vervent, significant concerns began to emerge with respect to Vervent's communications with Tricolor's former customers. According to testimony from several of the Consumer Creditors, many customers, despite having continued to make payments on their respective loans, noticed that their underlying balances did not reflect any payments made. According to Ms. Martinez at the Order to Appear Hearing, she continued to make payments but the loan balance was not going down. ECF No. 863 at 52:19–52:21. Ms. Martinez further testified that she continually looked for outside resources to get clarification on the status of her loan, given that TAA was no longer her primary loan servicer, and that she was not notified by Vervent that it was now the primary servicer on her loan until the day before the Order to Appear Hearing. *See id.* at 53:2–54:4. According to Ms. Martinez, the lack of clarification regarding the status of her loan, as well as repeated post-petition

phone calls from a number claiming to belong to Tricolor, forced her to temporarily stop making payments on her loan because she "no longer felt safe" that any payments were actually reducing the underlying balance. *Id.* at 54:17–55:25.

The circumstances and concerns surrounding Ms. Martinez's individual loan echoed the testimony of several other Consumer Creditors. According to Ms. Vasquez, despite having made significant payments on her loan for three months, her balance had also not been reduced. *Id.* at 72:16–73:20. Ms. Vasquez testified that not only was she unable to get in contact with anyone at Tricolor, given that its operations had permanently ceased, but she "didn't even know Vervent existed" for a significant period of time following Tricolor's bankruptcy filing. *Id.* at 75:10–76:7. Likewise, Mr. Jorge Aguirre (no relation to Mr. Francisco Aguirre) provided that, despite being contacted by Vervent regarding continuance of his loan payments, he noticed a discrepancy of approximately $10,000 in terms of loan payments not reflected on his overall balance. *See id.* at 81:6–82:4. Finally, Mr. Diaz testified that, after numerous attempts to contact representatives at Tricolor, he temporarily ceased making payments not only out of concern that the principal balance on his loan looked to be increasing regardless of the payments he was making, but due to the lack of clarity he was receiving from Vervent with respect to additional fees on his original loan agreement that were purportedly implemented by Vervent. *Id.* at 87:13–91:15.

As reflected in the testimony provided by the Consumer Creditors, the fallout of the Tricolor bankruptcy filing was fraught with confusion as to the loan servicing process and apprehension with regard to making future payments without clear guidance and communication from Vervent. As a natural response to the turmoil, the Consumer Creditors sought out guidance from wherever they could find it. Unfortunately, this unknowingly placed the Consumer Creditors, among many others, in Mr. Aguirre's sights.

## C. El Jefe Legal

While the exact circumstances that led to Mr. Aguirre's sudden, specter-like appearance in the *Tricolor* bankruptcy case are not entirely clear, the testimony provided by Mr. Aguirre, Ms. Medina, and the Consumer Creditors, provides a workable backdrop as to how the Consumer Creditor Motions came to be filed in this Court. When questioned by the Trustee as to how he became involved in this case, Mr. Aguirre testified that an unidentified friend of his called him several months prior to the Order to Appear Hearing and had mentioned that, despite having purchased a vehicle through Tricolor, the friend had not received any registration or license plates. ECF No. 863 at 31:7–31:15. Upon receiving this phone call from his friend—whom he curiously could not recall the name of—Mr. Aguirre agreed to investigate the matter himself. *Id.* at 31:16–32:18.

Mr. Aguirre further testified that he had been contacted by approximately 1,500 former Tricolor customers who had purportedly found him through word of mouth. *Id.* at 33:6–33:13. Mr. Aguirre's testimony on this point was not altogether untrue. Ms. Martinez testified that she had contacted Beyond Attorneys after seeing a video post on social media from someone else stating that Beyond Attorneys had helped her, to which Ms. Martinez messaged that person for Mr. Aguirre's contact information. *Id.* at 61:5–61:11. Ms. Vasquez shared a similar story, in that once she became concerned about the status of her auto loan, she began searching Google and social media for information regarding the *Tricolor* bankruptcy case and eventually stumbled upon comments on social media from others who had been supposedly helped by Mr. Aguirre. *Id.* at 73:11–73:16.

However, Mr. Aguirre further testified that neither he nor Beyond Attorneys advertised with respect to the services being offered. *Id.* at 33:14–33:15. The evidence presented and

14

testimony from several witnesses shows that this statement was remarkably untruthful. First, as noted in the Probation Violation Report, the Adult Probation Department uncovered that Mr. Aguirre had quite the online presence using the persona "El Jefe Legal," which, translated to English, means "The Legal Boss." UST's Ex. U at 4. According to Ms. Medina, it was under the El Jefe Legal pseudonym that Mr. Aguirre advertised to Tricolor customers, primarily through video posts on TikTok. ECF No. 1021 at 45:25–46:16. Likewise, Ms. Medina testified that Mr. Aguirre would prepare the El Jefe Legal TikTok videos by himself in his office, offering to help those with Tricolor loans. *Id.* at 46:5–46:25. Ms. Medina further testified that the El Jefe Legal videos were not strictly contained to Mr. Aguirre's office, and that he would travel to various lots previously owned or operated by Tricolor and film TikTok videos there as well. *Id.* at 66:5–66:8.

Several of the Consumer Creditors corroborated Ms. Medina's testimony regarding the El Jefe Legal videos. Mr. Lopez, the son of one of the Consumer Creditors, Jose Alberto Alvaraz Aguirre, testified that, other than speaking with Mr. Aguirre on the phone, the only way Mr. Lopez and his father were even aware of Beyond Attorneys was through Mr. Aguirre's TikTok videos. *Id.* at 98:5–98:8. Ms. Martinez and Mr. Diaz also testified that, while they were encouraged to reach out to Mr. Aguirre and Beyond Attorneys after speaking with friends, they both had seen the El Jefe Legal TikTok posts from Mr. Aguirre. *See* ECF No. 863 at 62:18–62:22; ECF No. 1021 at 117:1–117:4.

Stemming from the purported buzz that he was receiving on social media, Mr. Aguirre began the process of turning his prospective clients into actual ones. The first stage of that process involved signing a contract with either Mr. Aguirre or Beyond Attorneys (the "**Services**

**Agreements**").[12] While Consumer Creditors like Ms. Vasquez were not necessarily aware of who the Services Agreements were with, in terms of either Mr. Aguirre or Beyond Attorneys, many of the contracts signed by the Consumer Creditors were signed either in person—as in Ms. Vasquez's case—or after having the contract mailed to them in another state—as in Ms. Martinez's case. *See* ECF No. 863 at 63:7–63:12, 74:2–74:12 (Ms. Martinez and Ms. Vasquez's respective testimonies as to the contract signing process). Others, such as Mr. Lopez and his father, testified that they signed the Services Agreements with Mr. Aguirre and/or Beyond Attorneys over email via DocuSign. ECF No. 1021 at 101:21–102:11.

The terms of the respective Services Agreements are even more notable.[13] First, although Mr. Aguirre testified that the role of Beyond Attorneys was merely to function as an administrative coordinator, handling "intake document organizing, filing logistics, and . . . translation coordination," the Services Agreements contradict that testimony. ECF No. 863 at 10:24–11:5. Rather, the "Scope of Services" provision contained therein states that Beyond Attorneys provides such services as: (1) assisting the client in "completing and submitting all necessary forms and applications" related to a "civil matter"; (2) communicating with the "other parties in the Case on behalf of Client"; and (3) negotiating a settlement or resolution of the case at hand with the other

---

[12] The Court notes that the circumstances surrounding the contract signing process with either Mr. Aguirre or Beyond Attorneys are a bit of a black box, in large part due to Mr. Aguirre's contradictory, equivocal, and evasive testimony. According to Mr. Aguirre, the Consumer Creditors signed contracts with him directly. ECF No. 863 at 49:19–50:2. However, Mr. Aguirre became combative and largely non-responsive with respect to questions asked by counsel for the Trustee and the UST in connection with how many clients Mr. Aguirre had contracted with and how much these clients were paying Mr. Aguirre for his services. *Id.* at 35:6–36:19. Only after being instructed by the Court did Mr. Aguirre answer the Trustee's questions.

[13] Although no parties were able to produce a version of the Services Agreements signed by the Consumer Creditors, specifically, several witnesses testified that the Consulting Services Agreement produced by the UST as Exhibit C contained extremely similar, if not identical, terms and provisions to the ones signed by the Consumer Creditors. *See* ECF No. 1021 at 88:2–89:2 (testimony from Ms. Medina confirming that the Consulting Services Agreement produced under UST's Exhibit C was similar to the Services Agreements that clients signed in relation to the Tricolor case).

16

parties involved. UST's Ex. C at 1.[14] However, under the "Representations and Warranties" provision, the Agreements also include language that neither Beyond Attorneys nor any of its employees are licensed attorneys and would not provide legal advice or representation to any clients in matters such as "negotiating legal rights or responsibilities" or "preparing documents to affect or secure legal rights." *Id.* at 11–12. The contradictory nature of these provisions did not go unnoticed in previous cases, as the State Bar of Arizona noted in a letter mailed to Mr. Aguirre on January 8, 2025, that the language in the Services Agreements is "likely confusing to your customers and could result in an allegation that you offer to engage in the practice of law by negotiating on their behalf." *Id.* at 16–17.

Second, the "Fees" provision contained in the Services Agreements stated that Beyond Attorneys would charge a "consulting fee," alongside any additional expenses incurred in connection with the case at hand, including "filing, court costs, service fees, [and] administrative fees associated with this case." *Id.* at 10. In the context of the *Tricolor* case, specifically, most, if not all, of the Consumer Creditors who testified said that, pursuant to their respective contracts with Beyond Attorneys and/or Mr. Aguirre, they paid Mr. Aguirre approximately $1,500 upfront in exchange for his "consulting services." *See* ECF No. 863 at 17:6–17:14 (testimony from Mr. Aguirre stating that Beyond Attorneys charges an "administrative fee" upfront of $1,500); *see also* ECF No. 1021 at 94:22–95:5 (testimony from Mr. Lopez stating that he and his father had been charged a total of $1,625 across two installments pursuant to their respective Services

---

[14] The Court notes that its ability to examine a prior version of the Services Agreements is in large part due to an exhibit attached in the *Verified Answer of Francisco X. Aguirre and Cross-Complaint* filed by Mr. Aguirre on July 2, 2025, as part of the state court litigation in Maricopa County, Arizona. UST's Ex. C at 10. Ironically, it seems as though Mr. Aguirre attached this copy of the Services Agreement as evidence that he had **not** engaged in the unauthorized practice of law in Arizona.

Agreement).[15] Mr. Aguirre further testified that, with respect to the Consumer Creditors, not only had each of them signed a Services Agreement, but at least forty-nine (49) former Tricolor Customers (and most likely all of the Consumer Creditors) had paid Mr. Aguirre $1,500 each. ECF No. 863 at 37:2–37:20. Moreover, despite first testifying that Beyond Attorneys did not collect any fee that is "directly generated to us based on an outcome," Mr. Aguirre subsequently admitted that a 10% contingency fee was charged to the Consumer Creditors if Mr. Aguirre and/or Beyond Attorneys were able to reduce the underlying balance of their respective loans. *Id.* at 38:14–38:24.

In sum, and based upon rough estimations of the total number of Services Agreements that Mr. Aguirre testified he had finalized with Consumer Creditors, Mr. Aguirre and/or Beyond Attorneys were paid approximately $73,500 pursuant to these Agreements.[16]

### D.  The Consumer Creditor Motions

Having converted prospects into actual clientele, Mr. Aguirre and Beyond Attorneys began the process of performing their various "services" on behalf of, at the very least, the Consumer Creditors in this case. Much like the majority of Mr. Aguirre's testimony in this matter, the exact scope of services performed, however, involves material conflict between Mr. Aguirre's testimony and the other witnesses. According to Mr. Aguirre, Beyond Attorneys' role in the process began primarily with gathering each Consumer Creditor's documentation—namely, their respective loan agreements and financial documentation with Tricolor and/or Vervent—and "preparing" further documentation based on what was provided. *Id.* at 12:12–12:18. If that description seems pointedly

---

[15] It should also be noted that, upon questioning from the Court with respect to whether Beyond Attorneys charged a fee for its work, Mr. Aguirre originally testified that it did not charge a fee "per se." ECF No. 863 at 15:16–15:20. After the Court sought further clarification on this point, Mr. Aguirre subsequently testified that that the Consumer Creditors were charged a fee in the form of a "cost" that prospective customers are "assessed" and then ultimately charged upfront. *Id.* at 17:8–17:14.

[16] The Court's calculation is limited in scope, primarily by the fact that a proper accounting of the total number of clients that Mr. Aguirre and/or Beyond Attorneys received money has not been completed to date. The above-referenced estimate is based solely on approximately forty-nine (49) Consumer Creditor Motions at $1,500 per motion.

vague, that is because, at least based on Mr. Aguirre's testimony, it appears to be purposely so. Although Mr. Aguirre informed the Court that he did not want to "get in the weeds" with respect to what his and Beyond Attorneys' roles were in compiling the documentation given to them by the Consumer Creditors, Mr. Aguirre testified that, "We prepare the documents. We do not create the documents per se." *Id.* When asked by the Court whether that involved using artificial intelligence (AI) platforms to help assemble or "prepare" same, Mr. Aguirre testified, equivocally, that:

> The way we gather the documentation is by taking the information that is sent to us, either via email or by text message. And we assemble it based on a format that is being used to prepare the documentation. Whether artificial intelligence is used in assisting the gathering of the information, I believe there may be. I don't know to what extent it is being used, though.

*Id.* at 12:25–13:6.

Building upon that non-answer, Mr. Aguirre was provided an example of one of the Consumer Creditor Motions, to which he testified that the language in the motion might have come from his office, but that he "certainly did not prepare that." *Id.* at 13:25–14:4. Rather, the Consumer Creditors "are preparing these documents in a *pro se* capacity. We merely try to coordinate the filings for them." *Id.* at 11:18–11:24. To the contrary, Ms. Medina testified that Mr. Aguirre was in fact the person drafting and preparing the Consumer Creditor Motions filed in this Court. ECF No. 1021 at 68:25–69:4. Likewise, Mr. Diaz testified that Mr. Aguirre had sent him "four or five different motions" over the course of their contractual relationship. *Id.* at 116:4–116:12. More specifically, Mr. Diaz testified that, upon hiring Mr. Aguirre and Beyond Attorneys in or around October 2025, Mr. Aguirre told him that, upon payment, Mr. Aguirre would begin filing paperwork within fourteen (14) days of Mr. Diaz signing the contract. As Mr. Diaz articulated, "[Mr. Aguirre] told me, in 14 days, he was going to have the paperwork ready to file to the Court, and that's when

he needs the rest of the money." *Id.* at 109:21–109:23; *see also* ECF No. 863 at 61:18–62:1 (testimony from Ms. Martinez in which she stated that she provided Mr. Aguirre all of her financial and vehicle documentation with respect to her loan, which he then compiled into her particular motion).

The substance of the Consumer Creditor Motions Mr. Aguirre and/or Beyond Attorneys drafted is equally important to evaluate. Taking the Motion purportedly filed by Mr. Diaz as an example, the Motion requests, among other things, relief from the automatic stay pursuant to § 362 of the Bankruptcy Code, a "status-quo freeze" of loan payments pursuant to § 105(a) of the Bankruptcy Code, and "interim relief" pursuant to Bankruptcy Rule 4001(a)(2) in order to prevent immediate repossession and/or collection activity with respect to Mr. Diaz's vehicle. *See, e.g.*, ECF No. 676.[17] Each of the dozens of Consumer Creditor Motions follow similar patterns, citing to provisions of the Bankruptcy Code and the Bankruptcy Rules, as well as requesting similar forms of relief. [18]

The drafting of the Motions was not the only service Mr. Aguirre provided the Consumer Creditors either. Mr. Aguirre informed those like Mr. Diaz that, upon finalizing his Services Agreement, if the Consumer Creditors eventually needed an attorney that they need not worry

---

[17] The Court notes that a series of Demand Letters were also mailed to the Trustee and Vervent (the "**Demand Letters**") with DocuSign signatures from many of the Consumer Creditors. *See* Tr.'s Exs. 1–5. While it remains unclear from the record who mailed the Demand Letters, the substance in the letters is substantially similar to the Consumer Creditor Motions from a substantive perspective. Likewise, the Court notes that many, if not all, of the Demand Letters were mailed to the Trustee and Vervent after the Order to Appear Hearing.

[18] Despite being labeled as if the motions requested different relief, the Court notes that the Motions to Clarify not only substantively request many of the same forms of relief in the Lift Stay Motions, but expressly go out of their way to state that they are not in fact Lift Stay Motions. The Motions to Clarify, however, contain declarations from the Consumer Creditors, which specifically include requests for relief from the stay pursuant to § 362(d)(1) of the Bankruptcy Code. *See, e.g.*, ECF No. 805 at 12. Pursuant to the Show Cause Order, the Court ordered that the Motions to Clarify be re-docketed as Lift Stay Motions and that the required $199 filing fee for each Motion be paid within seven (7) days of entry of the Order. *See* ECF No. 902. The filing fees with respect to the Motions to Clarify were never paid, and on March 3, 2026, an *Order Denying Consumer Creditor Stay Motions for Non-Payment of Filing Fee* (the "**Filing Fee Order**") was entered by the Court [ECF No. 919], denying the Motions for failure to pay same.

about it and that Beyond Attorneys would provide one. ECF No. 1021 at 109:13–110:5. However, Ms. Martinez testified that Mr. Aguirre informed her that part of the Services Agreement entailed Beyond Attorneys helping with all of her legal paperwork and helping her "talk with you guys"—presumably the Court, the Trustee, and Vervent. ECF No. 863 at 65:22–66:4. As Ms. Martinez articulated, Mr. Aguirre and Beyond Attorneys helped guide her "in the way that [she] should go" with respect to her auto loan. *Id.*

This particular guidance, at least in Mr. Diaz's case, came in the form of Mr. Aguirre advising Mr. Diaz to quit making payments on his loan. More specifically and as previously mentioned, Mr. Diaz had become increasingly concerned that his loan payments were not accurately processing and that his auto loan balance had not reduced according to his payments. After hiring Mr. Aguirre, Mr. Diaz was told by Mr. Aguirre that, once his Consumer Creditor Motion was file, he could stop making payments on the loan "until we figure out what was [the Court's] decision [with respect to the status of the loan]." ECF No. 1021 at 110:17–111:10. According to Mr. Diaz, he stopped making his payments on November 11, 2025, in reliance on Mr. Aguirre's representations. *Id.* at 111:6–112:7. Mr. Lopez provided similar testimony, stating that ceasing payments on his father's loan was "one of the things that was stressed . . . as legal things were continuing."[19]

Beyond the Motions themselves, Mr. Lopez testified that Mr. Aguirre went so far as to provide him with pre-written statements to respond to any further calls from Vervent or Tricolor. Mr. Lopez testified that he also "received a statement that [he] should read upon receiving calls from Vervent or Tricolor that [he] was taking legal matters on the case and that [he] was not

---

[19] The Court will note for the record that Ms. Martinez testified that she did not receive any advice from Mr. Aguirre as to whether she should cease or continue making payments on her loan.

authorizing any repossessions or charges for the vehicle and that all type of communication should not happen other than in court." *Id.* at 102:15–102:23.

### E. The Filing Process

The last remaining step of the process with respect to the Consumer Creditor Motions was the actual filing of the Motions with the Court. In order to assist in that process, Mr. Aguirre sought help from Ms. Medina. According to Ms. Medina's testimony, she began working for Beyond Attorneys on or around November 2024 and stopped working for same on or around March 19, 2026. *Id.* at 24:7–24:13; 30:5–30:10. Prior to working for Beyond Attorneys, Ms. Medina further testified that she had previously worked for a law-related business in Arizona for a Licensed Document Preparer ("**LDP**"). *Id.* at 30:5–30:18. Her title at Beyond Attorneys was that of administrative assistant, and her primary responsibilities were to "put together the motion and file it." *Id.* at 15:22–15:24. To be certain, Ms. Medina testified that she was not personally involved in the drafting of the Consumer Creditor Motions, and that her job at Beyond Attorneys was solely to print the Motions out and file them with the Court at Mr. Aguirre's direction. *Id.* at 26:1–26:20. When specifically asked whether she had ever filled out forms for any person that were "legal in nature," Ms. Medina testified that she had never done so either before or during her time with Beyond Attorneys. *Id.* at 30:21–31:2.[20]

As for the filings, Ms. Medina testified that she would fly from Arizona to Texas to file the Motions in-person, in which her airfare was paid for by Mr. Aguirre. *Id.* at 20:20–21:1. The filings by Ms. Medina primarily took place on three separate occasions: (1) January 13, 2026; (2)

---

[20] It should be further noted that Ms. Medina testified that she did not collect money from any of the Consumer Creditors or other prospective clients of Beyond Attorneys and/or Mr. Aguirre, she did not have access to the original signed copies of the Services Agreements with respect to any Tricolor clients, and did not interact with any prospective Tricolor clients beyond occasionally greeting them on the phone or in person before they were to meet with Mr. Aguirre. *See generally* ECF No. 1021. Her testimony in this regard was not materially disputed.

February 11, 2026; and (3) February 25, 2026. *See id*. at 38:13–42:17 (testimony from Ms. Medina explaining the logistics of her trips to Dallas, Texas to file the Consumer Creditor Motions).[21] According to Ms. Medina, she would fly to Texas to file the Motions in-person, and was then directed by Mr. Aguirre to scan the Motions and send them to Vervent afterwards. *Id.* at 39:7–39:17.

Additionally, Ms. Medina testified that, during her first trip on January 13th, she filed the Lift Stay Motions and paid for same using cashier's checks provided to her by Mr. Aguirre. *Id.* at 44:17–45:5. However, prior to her February 11th trip, Ms. Medina was told by Mr. Aguirre that money orders and/or cashier's checks were no longer necessary and that filing fees were no longer required. *Id.* at 45:6–45:16. Moreover, Ms. Medina testified that she was directed by Mr. Aguirre to fly out once again on February 25th, despite the fact that the Order to Appear Hearing had been held on February 17, 2026, and the Show Cause Order was entered by the Court on February 23, 2026. *Id.* at 43:8–44:4.[22]

For her efforts in filing the Motions (along with other administrative work she completed for Beyond Attorneys on other cases), Ms. Medina testified that Mr. Aguirre paid her $850 per week via Zelle. *Id.* at 28:8–28:12. Ms. Medina received these payments from both Mr. Aguirre and Beyond Attorneys to varying degrees. *Id.* at 23:16–23:20.[23]

Finally, with respect to her knowledge of Mr. Aguirre's checkered history with the law, Ms. Medina testified that, despite having known Mr. Aguirre for approximately three years, she

---

[21] The Court notes that Ms. Medina could not recall the date of her February 11th trip, specifically, despite testifying that she did in fact travel to file the Consumer Creditor Motions on three separate occasions. The Court's docket reflects that the Motions to Clarify were filed on February 11, 2025. *See* ECF Nos. 779–806.

[22] Ms. Medina testified that she was not made aware of the Show Cause Order until she returned from vacation on March 19th.

[23] Although Ms. Medina testified as to having a record of her Zelle payments, no evidence was presented with respect to how much Ms. Medina was paid by Mr. Aguirre or Beyond Attorneys in connection with her work for Beyond Attorneys.

was only generally familiar with his criminal background and run-ins with the State Bar of Arizona. *Id.* at 31:3–32:5. More specifically, Ms. Medina had knowledge that Mr. Aguirre was on probation for certain real estate-related charges, and that "he did have some complaints in the state bar," but that she did not know he had allegedly engaged in the unauthorized practice of law in Arizona. *Id.* She also testified that she had no knowledge of Beyond Attorneys other than it being the registered entity Mr. Aguirre frequently used to conduct business. *Id.* at 32:6–32:11.

Despite her relatively extensive involvement with Mr. Aguirre and Beyond Attorneys in connection with the physical filing of the Consumer Creditor Motions, Ms. Medina testified credibly that she followed Mr. Aguirre's directions under the premise that he was attempting to help Tricolor's former customer base. In fact, when asked what her understanding of the purpose behind Mr. Aguirre's and Beyond Attorneys' work was, Ms. Medina testified that Mr. Aguirre was:

> [H]elping these clients . . . he would say that nobody was helping them, so he wanted to help them to at least have them not pay like the full loan . . . because you know how they had various loans. So he was helping them out to not pay all of this money back.

*Id.* at 33:18–33:22.

## II. APPLICABLE LAW

### A. Section 81.101

The unauthorized practice of law by a non-licensed person is an affront to a high court's power to define and regulate the practice of law. Violative conduct has the potential to undermine the public's confidence in the integrity of the judiciary. "Bankruptcy Courts look to state law to determine what acts constitute the unauthorized practice of law." *In re Martin*, Case No. 19-31260, 2025 WL 2486401, at *44 (Bankr. W.D. La. Aug. 28, 2025); *see also In re Zuniga*, 332 B.R. 760, 772 (Bankr. S.D. Tex. 2005) ("Attorneys who practice before a bankruptcy court must not only

24

concern themselves with the obligations set forth in the Bankruptcy Code and the Federal Rules

of Bankruptcy Procedure . . . but also with the application of state ethical rules.") (citation omitted)

(internal quotations omitted). Moreover, bankruptcy courts in Texas have utilized Texas state law

to determine whether a party committed the unauthorized practice of law. *See In re Torres*, Case

No. 14-50122, 2015 WL 458057, at *15 (Bankr. S.D. Tex. Jan. 23, 2015) ("The Court has the duty

and the inherent power to determine in each case what constitutes the practice of law, and to inhibit

persons from engaging in the practice of law without having obtained a license to do so.") (citing

*Unauthorized Prac. of L. Comm. v. Cortez*, 692 S.W.2d 47, 51 (Tex. 1985)). Section 81.101 of the

Texas Government Code states that the "practice of law" means:

> [T]he **preparation of a pleading or other document** incident to an action or special proceeding or the management of the action or proceeding on behalf of a client before a judge in court as well as a service rendered out of court, including the giving of advice or the rendering of any service **requiring the use of legal skill or knowledge, such as preparing a will, contract, or other instrument, the legal effect of which under the facts and conclusions involved must be carefully determined**.

Tex. Gov't Code § 81.101(a) (emphasis added).

What does or does not constitute the practice of law under § 81.101 is non-exclusive, and

the statute expressly provides courts with the power and authority to "determine whether other

services and acts not enumerated may constitute the practice of law." *Id*. at § 81.101(b). In other

words, the practice of law "embraces all advice to clients and all action taken for them in matters

connected with the law." *In re Gutierrez*, 248 B.R. 287, 295 (Bankr. W.D. Tex. 2000).

Section 81.101 articulates what does **not** constitute the "practice of law" as well, under

certain conditions. Under § 81.101(c), the practice of law does not include:

> [T]he design, creation, publication, distribution, display, or sale, including publication, distribution, display, or sale by means of an Internet web site, of written materials, books, forms, computer software, or similar products **if the products clearly and conspicuously state that the products are not a substitute for the advice of an attorney.**

Tex. Gov't Code § 81.101(c) (emphasis added).

Courts applying Texas law have outlined several additional principles with respect to the unauthorized practice of law. First, the definition of the practice of law implicitly "requires the rendering of legal services for *someone else*." *Unauthorized Prac. of L. Comm. v. Am. Home Assur. Co., Inc.*, 261 S.W.3d 24, 36 (Tex. 2008) (emphasis in original). Second, drafting a document that "secures legal rights" and "involves the giving of advice requiring the use of legal skill or knowledge" constitutes the practice of law. *Fadia v. Unauthorized Prac. of L. Comm.*, 830 S.W.2d 162, 164 (Tex. App.—Dallas 1992, writ denied). Third, although Rule 503(a)(3) of the Texas Rules of Evidence provides for a separate definition of "lawyer" that includes a person whom the client reasonably believes is authorized to practice law, the Supreme Court of Texas has established that reasonable belief "plays no part" in determining whether a person is a lawyer pursuant to § 81.101. *See In re Silver*, 540 S.W.3d 530, 535 (Tex. 2018) (distinguishing a "lawyer" under the Texas Rules of Evidence versus what constitutes a "lawyer" under the State Bar Act); *see also* Tex. R. Evid. 503(a)(3) ("A 'lawyer' is a person authorized, or who the client reasonably believes is authorized, to practice law in any state or nation.").

## B. Bankruptcy Rule 9011

Bankruptcy Rule 9011(b) states, in pertinent part:

By presenting to the court a petition, pleading, written motion, or other document—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that, to the best of the person's knowledge, information, and belief formed after an inquiry reasonable under the circumstances: (1) it is not presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase litigation costs; (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument to extend, modify, or reverse existing law, or to establish new law; (3) the allegations and factual contentions have evidentiary support—or if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the denials of factual contentions are warranted on the evidence—or if specifically so identified, are reasonably based on a lack of information or belief.

26

Fed. R. Bankr. P. 9011(b)(1)–(4). Bankruptcy courts have consistently held that Bankruptcy Rule

9011 is "essentially identical" to Rule 11 of the Federal Rules of Civil Procedure (the "**Rules**").

*See In re Raymond Prof. Grp., Inc.*, 420 B.R. 448, 459 (Bankr. N.D. Ill. 2009). Accordingly, much

like Rule 11, the central goal of Bankruptcy Rule 9011 is to "deter abusive litigation practices. *Id.*

at 460 (citation omitted) (internal quotations omitted). More specifically, the focus is on the

"conduct of the parties and not the results of the litigation." *Id.*

However, courts have also cautioned that sanctions under Bankruptcy Rule 9011, much

like Rule 11, should be "granted sparingly, and should not be imposed lightly." *Id.* (citation

omitted) (internal quotations omitted). Therefore, a sanction imposed for violation of Bankruptcy

Rule 9011(b) "shall be limited to what is sufficient to deter repetition of such conduct or

comparable conduct by others similarly situated." *In re Lawrence*, 494 B.R. 525, 531 (Bankr. E.D.

Ca. 2013). Moreover, a court may impose a sanction for violation of any of the four subsections

of Bankruptcy Rule 9011(b), which fall into two general categories—frivolous representations to

the court and those made with an improper purpose. *In re Dernick*, Case No. 18-32417, 2020 WL

2617037, at *6 (Bankr. S.D. Tex. May 22, 2020).

A party that violates Bankruptcy Rule 9011(b) may then be sanctioned under Bankruptcy

Rule 9011(c), which provides that, "if after notice and a reasonable opportunity to respond, the

court determines that (b) has been violated, the court may . . . impose an appropriate sanction upon

. . . parties that committed the violation or are responsible for it." Fed. R. Bankr. P. 9011(c)(1).

Sanctions under this provision may be entered by the bankruptcy court *sua sponte* so long as any

sanctions imposed are preceded by an order that describes the specific conduct in violation of

subsection (b) and directs the party to show cause why subsection (b) was not violated. *Id.* at (c)(3).

### C.  11 U.S.C. § 105(a)

27

A bankruptcy court "has inherent power to sanction a party appearing before him or her." *In re Zuniga*, 332 B.R. 760, 788 (Bankr. S.D. Tex. 2005). Moreover, "[b]ankruptcy courts have broad leeway in forming an appropriate sanction for unethical behavior." *Id.* However, when a party's conduct is not effectively sanctionable pursuant to an existing rule or statute, the court may nevertheless utilize its inherent powers to impose sanctions pursuant to § 105(a) of the Bankruptcy Code. *See In re Saldana*, 531 B.R. 141, 166 (Bankr. N.D. Tex. 2015) (Jernigan, J.); *see also* 11 U.S.C. § 105(a) ("The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.").

Accordingly, in the context of the unauthorized practice of law in the bankruptcy context, bankruptcy courts have the power to not only enjoin a party's actions insofar as they constitute the unauthorized practice of law, but can further impose monetary sanctions, including restitution or payment of reasonable and necessary attorney's fees. *See O'Connell v. David*, 35 B.R. 141, 145 (Bankr. E.D. Penn. 1983) (holding that, under § 105(a), the court had the power to order a refund of all monies paid to the defendants by the debtors in the case); *see also In re Moody*, 105. B.R. 368, 375 (S.D. Tex. 1989) (permanently enjoining a party from filing further papers on behalf of a *pro se* debtor, and further requiring the party to pay $15,000 to the trustee for legal fees and expenses reasonably incurred in responding to the party's unauthorized filings). Likewise, § 105(a) authorizes bankruptcy courts to impose civil contempt sanctions. *Matter of Carroll*, 850 F.3d 811, 815 (5th Cir. 2017) (quoting *Placid Refin. Co. v. Terrebonne Fuel & Lube, Inc.* (*In re Terrebonne Fuel & Lube, Inc.*), 108 F.3d 609, 613 (5th Cir. 1997)).

## III.   DISCUSSION

As the facts above illustrate, the actions taken by Mr. Aguirre and Beyond Attorneys, as well as their overall involvement in the *Tricolor* case, are vastly different than Ms. Medina's

28

conduct in this case. Therefore, the Court will address Ms. Medina's actions separately from the former two parties.

### A.  Ms. Medina

Under the lens of § 81.101, the Court does not find that Ms. Medina's actions in this case constitute the unauthorized practice of law. Accordingly, the Court will not find Ms. Medina in contempt or order any further sanctions to be imposed upon her in connection with the *Tricolor* case or the Consumer Creditor Motions.

As the evidence reflects, Ms. Medina's involvement was primarily administrative, and the Court found that Ms. Medina credibly testified that her actions with respect to the Consumer Creditor Motions were strictly limited to printing out the pre-drafted Motions upon arriving in Texas and filing same at Mr. Aguirre's direction and on behalf of Beyond Attorneys.[24] Although testimony reflects that Ms. Medina may have had occasional contact with the Consumer Creditors or other prospective clients of Mr. Aguirre's, either in-person or via answering phone calls on Mr. Aguirre's behalf, the evidence further reflects that such contact was minimal and lacking in connection to any discernible act that might constitute the unauthorized practice of law.

Rather, Ms. Medina credibly testified that she did not: (1) draft either the Services Agreements or the Consumer Creditor Motions; (2) maintain complete or consistent access to Mr. Aguirre's files containing client information; (3) participate in any communications and/or

---

[24] The Court makes this finding notwithstanding Mr. Aguirre's attempt to fashion Ms. Medina as the principal of Beyond Attorneys initially until retracting that position after further questioning by the Court. *See* ECF No. 863 at 5:10–5:14 (testimony by Mr. Aguirre in which he stated, upon being asked by the Court who the principal of Beyond Attorneys was, that Ms. Medina was the principal); *see also* ECF No. 863 at 50:3–50:13 (testimony by Mr. Aguirre in which he retracted his earlier statement regarding Ms. Medina's role as the principal of Beyond Attorneys). Indeed, Ms. Medina credibly testified that Mr. Aguirre was the only person to ever act as the principal or officer of Beyond Attorneys, and, despite his claims to have retired on or around December 2025, he was working on behalf of Beyond Attorneys up to the filing of the Consumer Creditor Motions. *See* ECF No. 1021 at 63:15–63:21 (testimony by Ms. Medina stating that Mr. Aguirre had not retired and that no one else had ever acted as a principal or officer of Beyond Attorneys other than Mr. Aguirre).

meetings that Mr. Aguirre had with the Consumer Creditors; or (4) have knowledge as to whether her weekly income and/or airfare, paid by Mr. Aguirre, was funded by the fees paid by the Consumer Creditors to Mr. Aguirre and Beyond Attorneys. Furthermore, no contrary evidence was introduced to show that Ms. Medina's connection to Beyond Attorneys and Mr. Aguirre was anything more than the person designated to file documents at Mr. Aguirre's direction. Although the Court undoubtedly has the discretion to define what constitutes the unauthorized practice of law, Ms. Medina's actions in this matter, without more, do not constitute a violation of § 81.101 of the Texas Government Code.

However, the Court places great emphasis on the fact that, while Ms. Medina will not be sanctioned in connection with this matter, this Order should serve as a clear and definitive warning to her regarding the unauthorized actions of non-attorneys in legal proceedings. Although merely filing legal documents on behalf of Mr. Aguirre does not constitute violative behavior under these circumstances, the Court emphasizes that Ms. Medina is standing on the thinnest of ice from a sanctions perspective. Ms. Medina testified that she was aware of Mr. Aguirre's criminal history, and at least had a general idea that he had been contacted by the State Bar of Arizona at some point in time. Given not only the volume with which Mr. Aguirre was purportedly signing up clients, collecting fees, and drafting the Consumer Creditor Motions, but also the fact that the Motions involved complex legal matters, it behooved Ms. Medina to take a moment and reflect on whether anything revolving around Mr. Aguirre's or Beyond Attorneys' business was authorized, legitimate, or, frankly, legal. Rather than ask questions, Ms. Medina simply followed directions.

Despite Ms. Medina's involvement with the filing of the Consumer Creditor Motions, the Court is not inclined to deem her involvement as the unauthorized practice of law for simply doing what Mr. Aguirre hired her to do. Rather, it is Ms. Medina's credible and transparent testimony

30

regarding her involvement in this case, as well as her ability to sufficiently explain her limited role with respect to the Consumer Creditor Motions to the Court's satisfaction, that allows the Court to hold comfortably that she did not violate § 81.101.

Likewise, the Court does not find that Ms. Medina's actions rise to the level of sanctionable conduct under Bankruptcy Rule 9011. To be certain, in filing the Consumer Creditor Motions, Ms. Medina comes dangerously close to falling within the bounds of Bankruptcy Rule 9011(b) by having presented the Motions to the Clerk of Court. *See* Fed. R. Bankr. P. 9011(b) (establishing that the filing of a written motion constitutes a party's presentation of that document to the court, thus imposing certain certification requirements upon the presenter as to the contents of the document being filed). However, the Court does not believe the mere filing of a motion at the direction of another, without any prior knowledge as to the substance of the motion or the representations therein, is in league with the type of conduct Bankruptcy Rule 9011 seeks to deter.

The Court urges Ms. Medina to take heed of its ruling in this matter, and to fully process the gravity of this situation. While her actions to date do not rise to the level of the unauthorized practice of law, this Court will not tolerate any further actions or conduct in this case from non-attorneys, such as Ms. Medina, that violates § 81.101 or the Bankruptcy Rules. Therefore, the Court finds that Ms. Medina's actions in this case do not constitute the unauthorized practice of law in violation of § 81.101, nor do they constitute a violation of Bankruptcy Rule 9011.

### B. Mr. Aguirre and Beyond Attorneys

If there were ever a textbook written on the ins and outs of the unauthorized practice of law, the cover of that textbook could include a picture of Beyond Attorneys and its contents could simply be a chapter-by-chapter breakdown of the actions taken by Mr. Aguirre in this case. Notwithstanding the fact that Mr. Aguirre had ample knowledge as to the wrongfulness of his

31

actions in prior legal proceedings, his conduct in this case alone, on behalf of Beyond Attorneys, is sufficient to find violations of § 81.101 and Bankruptcy Rule 9011 several times over.

*1. The Services Agreements Are Akin to Legal Retention Agreements*

First, the drafting and consummation of the Services Agreements constitute the unauthorized practice of law. Notwithstanding clever attempts to disguise the nature of the services offered, the contracts drafted by Mr. Aguirre underscore that, on behalf of clients like the Consumer Creditors, Beyond Attorneys and Mr. Aguirre endeavored to assist in completing and submitting documents in connection with civil matters, communicating with parties on behalf of clients in relation to same, and even go so far as to negotiate settlements on clients' behalf. The contracts expressly state that Beyond Attorneys will provide "guidance throughout the course of the Case" along with "**legal support services**." UST's Ex. C at 10–1 (emphasis added). Despite the existence of these documents (which only came into evidence at the Show Cause Hearing), Mr. Aguirre testified numerous times that neither he nor Beyond Attorneys provided any type of legal advice or services in connection with the Consumer Creditor Motions, and engaged in nothing more than "administrative coordination." ECF No. 863 at 12:4–12:6.

The Court recognizes that the Services Agreements contain numerous disclaimers and provisions that purport to limit the types of services Beyond Attorneys would be providing. For example, in the Representations and Warranties section, the Agreements state that "Beyond Attorneys is not a law firm and does not engage in the practice of law . . . We do not provide legal services or advice to individuals or entities." UST's Ex. C at 11–12. Likewise, the Agreements warrant that, "Our representatives and employees are not authorized to offer legal advice or engage in activities that would constitute the practice of law, including negotiating legal rights or . . . preparing document to affect or secure legal rights." *Id.* at 12. However, much like Mr. Aguirre's

testimony, these representations and warranties are internally inconsistent. As referenced above, the Scope of Services provision in the Agreements include these exact services as actions Mr. Aguirre and Beyond Attorneys **could** take on behalf of clients. Likewise, the Representations and Warranties provision contradicts itself within the exact same paragraph, warranting that Beyond Attorneys shall provide "legal support services," only to warrant two sentences later that it does not provide "legal services." *Id.* at 11–12. Splitting hairs between legal support services and legal services under these circumstances is a meaningless exercise.

The fee provisions of the Services Agreements, as well as Mr. Aguirre's testimony related to same, are equally problematic. The Agreements provide for a strikingly similar fee structure to that of an attorney-client based relationship, including a "consulting fee" of approximately $1,500 (a retainer of sorts for Beyond Attorneys' services), additional "costs incurred" that are to be "tracked as the case progresses" (resembling attorney's fees and expenses), and, as Mr. Aguirre testified to, a compensation structure "based on a future outcome" in the *Tricolor* case (i.e. a contingency fee). *Id.* at 10; *see also* ECF No. 863 at 15:18–15:20. Notwithstanding Mr. Aguirre's plainly contradictory testimony in the span of mere minutes—in which he first stated that Beyond Attorneys received outcome-based compensation, only to then take the exact opposite stance that Beyond Attorneys did not receive compensation based on particular outcomes—the Services Agreements include, in bold, all caps typeface, the option to mark the Agreements as contingency fee agreements. *See* UST's Ex. C at 13 ("**THIS IS_ THIS IS NOT_ A CONTINGENCY FEE AGREEMENT**") (emphasis in original).

At bottom, the Services Agreements are littered with language that encapsulates an attorney-client relationship, a troubling aspect of the contracts that the State Bar of Arizona explicitly warned Mr. Aguirre about. Numerous provisions illustrate a level of involvement in civil

matters akin to a licensed attorney, and despite Mr. Aguirre's efforts to cloak his and Beyond Attorneys' unauthorized practice of law behind representations that they are no more than consultants and/or administrative coordinators, the Agreements speak for themselves.

2. *The Drafting and Preparation of the Consumer Creditor Motions Constitute the Unauthorized Practice of Law*

Next, the drafting and preparation of the Consumer Creditor Motions by Mr. Aguirre and Beyond Attorneys undoubtedly constitutes the unauthorized practice of law. A mere cursory glance at the Consumer Creditor Motions uncovers numerous references to provisions of the Bankruptcy Code and the Bankruptcy Rules, as well as requests for relief with respect to the underlying loans being serviced by Vervent. The Court notes that Mr. Aguirre deftly attempted to pivot during his testimony regarding his involvement in the drafting of the Motions. Mr. Aguirre's testimony included an ever-changing depiction of his involvement with the Consumer Creditor Motions, stating, at different points in time, that: (1) he and Beyond Attorneys only "prepared" the Motions; (2) he merely assembled the Motions "based on a format that is being used to prepare the documentation"; (3) Beyond Attorneys "certainly" did not prepare the Motions; and, finally, (4) he claimed to have no knowledge as to how the Motions were prepared or who drafted them at all. *See* ECF No. 863 at 12:7–45:8 (Mr. Aguirre's testimony regarding the drafting and filing process with respect to the Consumer Creditor Motions). To say his testimony lacked credibility is an understatement of monumental proportions.

However, the evasiveness and unreliability in Mr. Aguirre's testimony are laid bare by testimony from several of the Consumer Creditors, who explained that Mr. Aguirre would take the information related to their respective vehicles and loans, prepare the Motions, and then provide them with drafts to sign. Even if Mr. Aguirre's testimony was not the oasis of unreliability that the

Court finds it to be, the evidence shows overwhelmingly that he drafted and prepared legal pleadings for the Consumer Creditors.

Moreover, there is no question that the Consumer Creditor Motions required the use of legal skills or knowledge, as the substance contained therein implicates significant portions of bankruptcy law and would have a direct effect on the Consumer Creditors' legal rights with respect to their loans. To be certain, the Lift Stay Motions: (1) address § 362(d) of the Bankruptcy Code and a lifting of the automatic stay; (2) cite to jurisdictional provisions of both the Bankruptcy Code and Title 28; (3) proclaim that the Court may make a determination with respect to the Motions without a hearing pursuant to Bankruptcy Rule 4001(a)(2); and (4) request a temporary injunction pursuant to the Court's powers under § 105(a) of the Bankruptcy Code. *See, e.g.*, ECF No. 681. In sum, Mr. Aguirre's process in preparing the Consumer Creditor Motions, as well as the substantive arguments he provided in the Motions on behalf of the Consumer Creditors, are direct violations of § 81.101.

The Consumer Creditor Motions also contain representations to the Court that are undoubtedly violative of Bankruptcy Rule 9011(b).[25] While the Court recognizes both the underlying concerns that the Consumer Creditors credibly testified to as well as their good faith intent in seeking clarity from the Trustee and Vervent as to the status of their respective loans, it nevertheless finds that the manner with which Mr. Aguirre and Beyond Attorneys chose to pursue such relief on behalf of the Consumer Creditors was both frivolous and pursued for an improper purpose. Mr. Aguirre's strategy with respect to the Motions not only created unnecessary complication in terms of muddying the waters of communication between Vervent and the

---

[25] The Court notes that, as required under Bankruptcy Rule 9011(c)(1)(B), the Show Cause Order described the specific conduct committed by Mr. Aguirre and Beyond Attorneys that appeared to violate subsection (b). *See* ECF No. 902 at 2–5.

35

Consumer Creditors, but has since required two separate hearings, hours of witness testimony, and numerous pleadings filed by the Trustee, UST, and Vervent just to unpack the mess that Mr. Aguirre created. In short, Mr. Aguirre's conduct in the drafting and filing of the Motions is definitionally frivolous, and he has harmed the parties in this case, as well as the bankruptcy estate, substantially in the process.

### 3. *Recommendations with Respect to Loan Activity Constituted Legal Advice*

Further, the Court finds that Mr. Aguirre's recommendation to Consumer Creditors like Mr. Diaz, that they cease making payments on their loans, constitutes legal advice, and therefore is yet another instance of the unauthorized practice of law. Mr. Diaz credibly testified that Mr. Aguirre told him that once Beyond Attorneys filed his motion in this Court, Mr. Diaz could stop making payments until the Court reached a decision with respect to the motion. This action is undoubtedly the giving of legal advice on a client's behalf in connection with a legal proceeding, with adverse implications to the Consumer Creditors.

### 4. *Mr. Aguirre's "El Jefe Legal" TikTok Videos Constitute the Unauthorized Practice of Law*

Finally, the Court finds that, despite the conditional nature and limited scope of § 81.101(c), the extensive advertisement and distribution of Mr. Aguirre's services via TikTok did not "clearly and conspicuously" state that the products and services offered by Mr. Aguirre—working under the pseudonym El Jefe Legal—were not a substitute for legal advice by a licensed attorney. The evidence reflects that Mr. Aguirre garnered a large portion, if not all, of his clientele from posting videos on TikTok and offering his services to help those with Tricolor auto loans. While the phrase "clearly and conspicuously" is not defined under § 81.101, the Court is highly doubtful that a person without any legal credentials, offering services with respect to loan

agreements, and proclaiming himself to be, quite literally, "**The Legal Boss**," is clearly and conspicuously distinguishing his services from those of a licensed attorney.[26]

### 5. *Mr. Aguirre Knew That His Actions Constituted the Unauthorized Practice of Law*

The extent of the Court's analysis and its inclusion of Mr. Aguirre's troubling history with the legal system are not superfluous to its underlying ruling. To be certain, the Court's ruling is based solely on Mr. Aguirre's actions in this case. However, the Court believes that comprehensively unpacking Mr. Aguirre's historical conduct reveals both the intentional nature of his actions and the substantial detriment he has singlehandedly caused in this case.

First, Mr. Aguirre's actions in connection with the Consumer Creditor Motions are only the latest instance in a long and unbroken pattern of willful deceit and exploitive behavior, the unlawfulness of which Mr. Aguirre had ample knowledge of. As the evidence reflects, Mr. Aguirre has, time and again, injected himself into various legal proceedings under dubious and self-serving premises, to say the least. When individuals have needed assistance in legal affairs,[27] Mr. Aguirre continuously maneuvers his way into various representative roles in those individuals' proceedings, proclaiming to be nothing more than a "consultant," "administrator," or "coordinator" in some capacity. Yet, when legal documents need drafting and filing—from demand letters to substantive motions—Mr. Aguirre conveniently replaces his administrator/consultant hat with that of a pseudo-attorney, provides services under the umbrella of various law-adjacent entities he has registered, compiles information on behalf of his clients,

---

[26] To be clear, the Court refrains from venturing too far into how Mr. Aguirre's advertising harmonizes with the limitations provided for in § 81.101(c). However, § 81.101(b) provides the Court the authority to determine what acts might otherwise constitute the unauthorized practice of law. The Court finds that garnering clients through social media by titling yourself as "El Jefe Legal," which ultimately leads to signing those clients to contracts mimicking legal engagement letters that include legal services and compensation structures, and then preparing legal documents on their behalf, can easily be considered the unauthorized practice of law under § 81.101.

[27] In fact, Ms. Medina testified that Mr. Aguirre had been involved in numerous other "cases," including assisting clients with wills, trusts, powers of attorney, and the like. *See* ECF No. 1021 at 61:18–62:4.

and then drafts their filings for them (or seemingly uses artificial intelligence to do so). Then, when convenient, despite his overt actions to the contrary, Mr. Aguirre proclaims that he is not an attorney in any capacity.

Based upon the rampant ambiguities and inconsistencies in his testimony with respect to his role in the *Tricolor* case and the Consumer Creditor Motions, the Court cannot find that this ambiguity is anything but intentional on Mr. Aguirre's part. By operating as a consultant or administrator in name only, yet conducting himself as an attorney, Mr. Aguirre is able to play either character whenever necessary. When it comes to generating business, drafting motions, and instructing the Consumer Creditors on what to do with their loans, Mr. Aguirre is El Jefe Legal, a social media personality promising legal victories. Conversely, when ordered to appear before the Court, he is suddenly a shrinking violet who minimizes his role in the proceedings by testifying that he is only "secondary, tertiary, probably not important in this process." ECF No. 863 at 34:7– 34:8.

The Court, however, wholeheartedly disagrees with his characterization. In a matter of months, Mr. Aguirre, through Beyond Attorneys, compiled and drafted approximately forty-nine (49) Consumer Creditor Motions, each of which requested extraordinary relief in connection with the underlying vehicle loans and with dubious legal support. There is nothing tertiary or unimportant in causing such a volume of pleadings to be filed in a Chapter 7 case during a critical juncture and when the Trustee and Vervent were in the early stages of developing a loan review and reconciliation process.

It is also impossible to regard Mr. Aguirre's role in this matter as "unimportant," given the exorbitant fees he charged the Consumer Creditors in exchange for Beyond Attorneys' services. At approximately $1,500 in fees to each Consumer Creditor per motion filed (which, to be certain,

require only a $199 filing fee each), Mr. Aguirre and Beyond Attorneys have been paid approximately $73,500 in connection with motions that neither they nor the Consumer Creditors were in any position to litigate at the time of filing, and were effectively doomed to fail from the beginning. Moreover, the Motions to Clarify were purposely filed under the dubious premise that they did not require filing fees, only for the Court to determine that the Motions were in fact Lift Stay Motions in substance. To add insult to injury, despite having taken the same fees in connection with filing the Motions to Clarify, Mr. Aguirre and Beyond Attorneys walked away from the Motions to Clarify when the required filing fees for the converted Consumer Creditor Motions came due.[28]

In light of these facts, the Court and the Consumer Creditors are left with only more questions. If the purpose of the Consumer Creditor Motions was purportedly to help the Consumer Creditors receive clarity on their loans from either Vervent or the Trustee, then how was that goal achieved by drafting and filing the Motions to Clarify and ultimately letting the Motions be dismissed for failure to pay the filing fees? If the intention was to receive clarity on the loans and/or draw attention to an alleged lack of communication with Vervent with respect to loan balances, what exactly did the requests for a lift of the automatic stay have to do with that relief?

The Court recognizes that Mr. Aguirre never had a chance to testify at the Show Cause Hearing because he was reincarcerated prior to the Show Cause Hearing for violating his probation through continual non-compliance and rampant misrepresentations regarding both his finances and businesses. Nevertheless, Mr. Aguirre testified for nearly three (3) hours at the Order to Appear Hearing, and it is unquestionable that Mr. Aguirre fails to possesses even a sliver of credibility.

---

[28] The Court further notes that none of the Lift Stay Motions were ever prosecuted other than the Lift Stay Motion filed by Mr. Diaz at ECF No. 676, which was ultimately amicably resolved outside of court by Mr. Diaz and Vervent.

When asked at the Order to Appear Hearing whether he drafted and/or prepared the Consumer Creditor Motions, Mr. Aguirre was evasive, internally inconsistent within his own testimony, or directly and materially contradicted by other witnesses. When asked about the fees charged to the Consumer Creditors, Mr. Aguirre resorted to equivocations and word salads in place of straightforward answers. When asked about his and Ms. Medina's respective roles with Beyond Attorneys, Mr. Aguirre provided inconsistent testimony, stating that: (1) Ms. Medina was the only principal of Beyond Attorneys, despite the Clerk of Court being presented with a business card that showed Mr. Aguirre to be the Founder and CEO; (2) there was no longer any CEO of Beyond Attorneys and that he did not know who the principal of Beyond Attorneys was; (3) he was a 1099 independent contractor; and (4) he was actually retired and that Beyond Attorneys was no longer in business.[29] In fact, Mr. Aguirre was so incapable of providing credible information that, when asked how he became aware of the *Tricolor* bankruptcy case to begin with, he resorted to what can best be described as a comically ludicrous response by stating that he gained knowledge of the bankruptcy filing through an unidentified friend of his whom he could (seemingly) no longer recall. Yet, despite the audacity of his misstatements, Mr. Aguirre layered his testimony with the veneer of faux earnestness and selective memory.

Although Mr. Aguirre's prior actions illuminate both the familiar contrivance to his schemes and his well-established knowledge as to its unlawfulness, it is his actions in this case that cement how damaging of a presence he can be. On the surface, he protests to being a benign good Samaritan, offering a helping hand to those in need who are in the midst of a tenuous legal

---

[29] The evidence reflects that Mr. Aguirre signed and filed Articles of Termination for Beyond Attorneys on January 5, 2026, which, as the UST noted at the Show Cause Hearing, preceded the filing of the first batch of the Consumer Creditor Motions by only a few weeks. *See* UST's Ex. L; *see also* ECF No. 1021 at 81:18–81:22. Nevertheless, he continued to utilize the Beyond Attorneys branding and continued to solicit his services under the business's name well after that date. In fact, it was Mr. Aguirre's Beyond Attorneys business card that was presented to the Clerk of Court by Ms. Medina upon the filing of the Consumer Creditor Motions.

proceeding. However, this self-generated perception is nothing more than a façade built on a foundation of empty promises, the business ethics of Saul Goodman,[30] and an aversion to the truth akin to the likes of George Costanza.[31]

Recognizing that Mr. Aguirre was not available to testify at the Show Cause Hearing due to incarceration, any attempt to rationalize what has occurred would be futile, given that his conduct at issue (even as described at the Order to Appear Hearing) is inherently unjustifiable. Mr. Aguirre's relationship to this case is plainly parasitic; the verve with which he carries himself as an "advocate" of others only lasts long enough for him to be paid for services he has no legal authority or ability to provide. Although he has attempted to position himself as a good faith actor in comparison to parties like Vervent, cosplaying as the Robin Hood of *Tricolor* does not make you in fact Robin Hood, especially when your goal is to effectively take from those in need and give to yourself.

The Court does not draw such comparisons flippantly or in jest. Rather, it does so to underscore the more notable issue in this matter—the significant damage Mr. Aguirre has caused the Consumer Creditors in this case. From the date of filing, the *Tricolor* case has been mired in uncertainty and complexity as the Trustee, the UST, and the various parties in interest to the case attempt to sort out the underlying loan agreements and ownership of tens of thousands of vehicles. Moreover, the reasons behind Tricolor's bankruptcy filing remain the subject of extensive civil

---

[30] On the AMC hit television show, *Better Call Saul*, the show's titular character—Saul Goodman—is a formerly incarcerated conman who, after becoming a licensed attorney, gradually begins carrying out increasingly unethical and illegal actions at the expense of his clients and the legal system. *Better Call Saul* (Sony Pictures Television Studios television broadcast, aired Feb. 18, 2015–Aug. 15, 2022). The Court finds the entirety of Mr. Aguirre's behavior to be eerily similar to the show's fictional conman with one notable discrepancy—Saul Goodman was, at the very least, authorized to practice law.

[31] In the NBC hit television show, *Seinfeld*, George Costanza proclaimed that, "It's not a lie if you believe it." *Seinfeld: The Beard* (NBC Television Broadcast, aired Feb. 9, 1995). Given the prolific slipperiness of his testimony at the Order to Appear Hearing, it appears Mr. Aguirre has adopted this absurd rationale as a way of life.

and criminal proceedings involving allegations of fraud and conspiracy, among many other causes of action and/or charges. *See* Case No. 25-3126.

At the heart of this case are the consumers themselves, who have had their lives turned upside down. As the testimony reflects, most of these Consumer Creditors are simply seeking guidance as to the status of their loans amidst all of the procedural turmoil. They maintained understandable uncertainty about who was entitled to be paid on their loans and whether their accounts were accurate. The Consumer Creditors sought Mr. Aguirre and Beyond Attorneys' help in good faith, actively participated in the court proceedings to stay apprised of further developments, and have sacrificed considerable time and expenses attempting to retain their vehicles.

Despite their good faith and due diligence, the Consumer Creditors were taken advantage of by Mr. Aguirre and provided little in the way of clarity. Moreover, they were left in the unwinnable position of trying to navigate an intimidating legal system, and one that is especially difficult to navigate for those Consumer Creditors who were non-English speakers. Mr. Aguirre chose to capitalize on their dire circumstances and extract money from the most vulnerable parties in this case. Despite the delicate financial situations that several of the Consumer Creditors testified to, Mr. Aguirre charged these individuals thousands in fees in exchange for services he knowingly could not provide. Likewise, when those like Mr. Diaz reached a point of desperation with respect to their loans and the lack of communication regarding same, Mr. Aguirre advised them to stop making payments altogether, thus placing such individuals at a significant risk of repossession.

Mr. Aguirre's unauthorized practice of law has cost dozens of individuals who were operating in good faith tens of thousands of dollars, created countless expenses for the Debtors' estate, and poisoned the well of communications between individual creditors, the Trustee, and

Vervent by spreading misinformation and filing knowingly frivolous motions. If there is even a morsel of truth in anything that Mr. Aguirre testified to, it is in his sentiment that the Consumer Creditors were "victims" and simply wanted their motions to be filed for the Court to hear their stories. *See* ECF No. 863 at 20:7–20:12; 103:22–104:13. In listening to the Consumer Creditors at the Order to Appear Hearing and the Show Cause Hearing, the Court, the Trustee, the UST, and Vervent, were able to implement better loan processing procedures and instill better communications between the parties. That accomplishment, however, is due solely to the good faith efforts and credible testimony provided by the Consumer Creditors, not Mr. Aguirre.[32]

Therefore, the Court finds Francisco Aguirre in contempt of court. He has committed the unauthorized practice of law and thus violated § 81.101 of the Texas Government Code. Moreover, the Court finds that Mr. Aguirre violated Bankruptcy Rule 9011(b), and shall be subject to further sanctions pursuant to Bankruptcy Rule 9011(c) and § 105(a) of the Bankruptcy Code. Additionally, the Court finds Beyond Attorneys, LLC in contempt of court. It has also committed the unauthorized practice of law in violation of § 81.101. A further hearing will be scheduled with respect to the amount and/or extent of sanctions that will be imposed upon Mr. Aguirre and Beyond Attorneys. At such hearing, the Court will endeavor to ascertain a comprehensive accounting of the fees and expenses incurred by the estate, the Consumer Creditors, and Vervent in this matter, relative to Mr. Aguirre's and Beyond Attorneys' violations. Parties shall provide that accounting to the Court in connection with a further hearing on sanctions.

---

[32] Ironically, in listening to hours of stories from the Consumer Creditors, the Court was more readily able to ascertain the extent of Mr. Aguirre's conduct in this matter. Accordingly, in response to the means with which Mr. Aguirre sought to grab the Court's attention and disrupt this bankruptcy case, the Court is guided by two variations of the same sentiment. The more classic adage might be that one should be careful what they wish for, lest it come true. Alternatively, the Court places equal weight in a more contemporary iteration of that same phrase—fool around and find out.

IV.    CONCLUSION

For the reasons set forth above, it is hereby

**ORDERED** that Francisco X. Aguirre is in contempt of court and subject to further sanctions pursuant to § 105(a) of the Bankruptcy Code and Rule 9011(c) of the Federal Rules of Bankruptcy Procedure for: (1) the unauthorized practice of law pursuant to § 81.101 of the Texas Government Code; and (2) violations of Rule 9011(b) of the Federal Rules of Bankruptcy Procedure; it is further

**ORDERED** that Beyond Attorneys, LLC is in contempt of court and subject to further sanctions pursuant to § 105(a) of the Bankruptcy Code for the unauthorized practice of law pursuant to § 81.101 of the Texas Government Code; it is further

**ORDERED** that Lluvia Medina Beltran shall not be held in contempt of court or subject to further sanctions in connection with the filing of the Consumer Creditor Motions; and it is further

**ORDERED** that a hearing with respect to the extent of the sanctions imposed against Mr. Aguirre and Beyond Attorneys, as well as a comprehensive accounting of the fees and expenses incurred relative to Mr. Aguirre's and Beyond Attorneys' violations, shall be held at a future date.

**###END OF ORDER###**